Carol A Sobel SBN 84483
Weston Rowland SBN  327599
Law Office of Carol A. Sobel
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403
t. (310) 393-3055
e. carolsobellaw@gmail.com
e. rowland.weston@gmail.com

David Loy SBN 229235
Aaron R. Field SBN 310648
First Amendment Coalition
534 4th St., Suite B
San Rafael, CA 94901
t.(415) 460-5060
e. dloy@firstamendmentcoalition.org
e. afield@firstamendmentcoalition.org

Peter Bibring SBN 223981
Law Office of Peter Bibring
2140 W Sunset Blvd # 203,
Los Angeles, CA 90026
t. (213) 471-2022
e. peter@bibringlaw.com

Paul Hoffman, SBN 71244
Michael Seplow, SBN 150183
John Washington, SBN 315991
Schonbrun, Seplow, Harris, Hoffman
& Zeldes LLP
9415 Culver Blvd, #115
Culver City, California 90230
t.(310) 396-0731
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. jwashington@sshhlaw.com

Susan E Seager SBN 204824
Law Office of Susan Seager
128 N. Fair Oaks Avenue
Pasadena, CA 91103
t. (310) 890-8991
e. susanseager1999@gmail.com

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| LOS ANGELES PRESS CLUB, STATUS COUP,<br><br>PLAINTIFFS,<br><br>v.<br><br>CITY OF LOS ANGELES, a municipal entity,  JIM MCDONNELL, LAPD CHIEF, sued in his official capacity;<br><br>DEFENDANTS. | CASE NO.:<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>42 U.S.C. § 1983: U.S. CONSTITUTION: FIRST, FOURTH, AND FOURTEENTH AMENDMENTS CALIFORNIA CONSTITUTION, ARTICLES 1, §§ 2, 3, 7, 13 CALIFORNIA CIVIL CODE § 52.1; CALIFORNIA PENAL CODE §409.7 CALIFORNIA PENAL CODE §13652 |

## I.    INTRODUCTION

1.    Being a journalist in Los Angeles is now a dangerous profession.  This case responds to the continuing abuse, including the use of excessive force, by Los Angeles Police Department ("LAPD") officers during recent protests in downtown Los Angeles against federal immigration policies.  Dozens of journalists from around the world were present during these protests to record and report on the events as they unfolded.  These journalists were not engaged in protest or unlawful activity and were exercising their First Amendment rights and safeguarding the First Amendment rights of all members of the community. They were fulfilling an important function in a democracy as set out in the First Amendment.

2.    The LAPD has a long history, as set forth below, of using excessive force against journalists at protests.  In 2021, in response to the 2020 protests following the death of George Floyd in Minneapolis and given the history of the LAPD and other law enforcement organizations around the state assaulting press and precluding access for them on the streets, the California Legislature acted to protect journalists covering protests by codifying guarantees for the press, as discussed below.

3.    LAPD actions during the June 2025 protests in downtown Los Angeles reveal a brazen refusal to abide by the Constitution and state law and repeats the same conduct by the Defendant City repeatedly held to be unconstitutional by the federal courts for the past 25 years.  This action seeks judicial assistance once again to force the LAPD to respect the constitutional and statutory rights of journalists engaged in reporting on these protests and inevitable protests to come.

## II.    JURISDICTION AND VENUE

4.    This is an action for injunctive relief for violations of Plaintiffs' federal and state constitutional and statutory rights and those of their members. Jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1343 as Plaintiffs assert a

claim under 42 U.S.C. § 1983.  Jurisdiction also exists pursuant to 28 U.S.C. §§ 2201(a) and 2202, the Declaratory Judgment Act. The Court has supplemental jurisdiction to consider Plaintiffs' state law claims under 28 U.S.C. § 1367 as these state law claims arise from the same common nucleus of operative facts as Plaintiffs' federal claims.

5.    Venue is proper in the Western Division of the Central District of California pursuant to 28 U.S.C. § 1391(b) because the events and conduct giving rise to Plaintiffs' claims all occurred in the City of Los Angeles.

## III.    HISTORICAL BACKGROUND

6.    Despite decades of massive protests in the City, and despite express warnings of the failures of law enforcement policies over this same time period, the LAPD was not prepared to respond to these protests.  After protests in response to the killing of George Floyd in May 2020, one internal and two external reports were critical of the LAPD's response to the Floyd protests and all recommended retraining of officers and command staff in the LAPD on crowd control practices.

7.    Significantly, in the range of crowd control issues addressed, LAPD was specifically criticized for its treatment of reporters covering the protests. Repeatedly, police subjected reporters to physical force and arrest and prevented reasonable access to observe police activity in public places.  In response to widespread abuses by law enforcement agencies, legislators amended the California Penal Code to protect press from police assault and interference with news gathering and operations.  However, as proven by recent events, the LAPD did not follow the new law.

8.    The LAPD has a long and entrenched history of using force to obstruct freedom of the press.  In *Crespo v City of Los Angeles*, 2:00-cv-08869 GHK (RC) C.D. Cal. 2000) the Los Angeles Police Department was sued for clubbing reporters and shooting them with less lethal weapons during the 2000 Democratic National Convention. The LAPD entered into a settlement with the ACLU,

3
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

requiring the police recognize the rights of journalists to cover protests even if an unlawful assembly is declared and an order to disperse is given.  As part of the settlement, the City also agreed to assign a liaison to work with members of the press and to designate areas for journalists to observe from.  In a 2001 Los Angeles Times article, retired Asst. Chief Horace Frank, then a lieutenant in the LAPD, asserted that the settlement did not impose any obligation on the LAPD that it was not already doing.  See *Leovy, 7 Reporters Settle Suit Over LAPD*, L.A. Times (Nov. 30, 2001), https://www.latimes.com/archives/la-xpm-2001-nov-30-me-9832-story.html

9.    Although the LAPD claimed two decades ago that it was already doing what the settlement in *Crespo* required, just a few years later the department violated reporters' First Amendment rights to cover public protests in its unprovoked assault on a May Day immigrants' rights rally in MacArthur Park. The LAPD's attack on protestors and press on May 1, 2007 violated settlement agreements reached to redress the police assault on protestors and press at the Democratic National Convention in 2000 at the Staples Center. In a damning report, the LAPD conceded that it had failed to incorporate the lessons learned after the 2000 DNC debacle.[1]

10.    Among the journalists who sued was a camera operator for Fox 11 News who required repeated surgeries for a shoulder injury she suffered when officers knocked her down. *See* Dennis Romero, *Journalist Gets $1.7 Million In Suit Against LAPD Over 'May Day Melee' Response*, LA Weekly (July 9, 2010), https://www.laweekly.com/journalist-gets-1-7-million-in-suit-against-lapd-over-may-day-melee-response/.

---

[1] Dep. Chief Michael Hillman & Gerald Chaleff, *LAPD Report to the Board of Police Commissioners: An Examination of May Day 2007* (Oct. 5, 2007), available at *http://www.lacp.org/2007-Articles-Main/100907-MayFirst-FinalReport.pdf.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

11.    In the 2020 George Floyd protests, the U.S. Press Freedom Tracker identified 23 incidents in the Los Angeles area in which members of the press reported being arrested, subjected to force, and otherwise prevented from exercising their First Amendment rights.[2]

12.    More recently, the LAPD repeated the same unlawful practices during a police action to evict an encampment of unhoused persons at Echo Park Lake in March 2021.[3]  According to the U.S. Press Freedom Tracker, 59 journalists were arrested or detained nationwide in 2021 with more than a quarter of that number involving the LAPD at the Echo Park Lake incident.[4]

13.    Although the LAPD reported that it encourages its personnel not to interfere with the press "whenever possible," it attempted to justify the arrest of press at the Echo Park event as permissible under California Penal Code Sections 407 and 409, as explained in the LAPD's Media Relations Handbook. That erroneous view of the law by the LAPD has now explicitly been rejected by amendments to the Penal Code to ensure that members of the media are exempt from dispersal orders and are not subject to arrest for failure to disperse.

14.    As set forth below, and despite the legislative mandate enforcing press access, the LAPD response during the June 2025 protests continues this long and disgraceful history of unconstitutional actions against journalists.  Defendants have deliberately disregarded court orders placing limitations on "crowd control" policies and explicit statutory protections for members of the press at protests.  The

---

[2] *See* U.S. Freedom Tracker, *Incident Database, https://pressfreedomtracker.us/all-incidents/?search=&date_lower=2020-05-26&date_upper=2020-06-06&city=Los+Angeles&state= 2*

[3] Echo Park Rehabilitation After Action Report

[4] Kristin McCudden, *Another Record Year for Press Freedom Violations in the US*, U.S. Press Freedom Tracker (Jan. 12, 2022) https://pressfreedomtracker.us/blog/another-record-year-for-press-freedom-violations-in-the-us/

press are simply trying to do their job for the community, acting as the eyes and ears of the public.

## IV.    PARTIES

### A. Plaintiffs

15.    Plaintiff **LOS ANGELES PRESS CLUB ("LAPC")** is a 501(c)(3) nonprofit organization with no parent corporation and no stock. The organization has more than 1,000 member journalists and news organizations in Southern California and has operated since 1913 to support, promote and defend quality journalism.   The LAPC has been very active in monitoring and responding to attacks on journalists during the June 2025 protests in downtown Los Angeles and elsewhere in Los Angeles.  To respond to these unlawful attacks, LAPC has been required to divert resources, money and staff time that it would otherwise have been able to devote to its pre-existing mission of improving the quality of journalism.  LAPC members have also suffered excessive force and harassment by LAPD officers in the recent ICE protests and, as these protests continue, to be threatened with such injuries and violations of the law challenged by this action.

15.    Plaintiff **STATUS COUP** is an independent investigative reporting network and media outlet that focuses on in-field and investigative reporting. Status Coup's Los Angeles based reporters are members of the Los Angeles Press Club. Status Coup regularly sends journalists into the field to investigate and report on protests in the City of Los Angeles. Status Coup has journalists on the ground during the June 2025 protests. Status Coup reporters were subjected to force, including being struck by various Kinetic Impact Projectiles ("KIPs") as they attempted to film the LAPD officers' response to the protests.  In addition, Status Coup reporters were barred by the LAPD from areas of the protests where, by law, they should have been permitted access.

**B. Defendants**

16.    Defendant **CITY OF LOS ANGELES** is a municipal corporation duly organized and existing under the Constitution and laws of the State of California. The Los Angeles Police Department is an agency of Defendant City and all actions of the LAPD are the legal responsibility of the City. At all relevant times, Defendant City was responsible for assuring that the actions, omissions, policies, practices, and customs of the LAPD and its employees and agents complied with the laws of the United States and the State of California.

17.    Defendant **JIM McDONNELL** was, at all times relevant to this action, the LAPD police chief and a policymaker for the department. He is sued in his official capacity.  Chief **McDONNELL** directed the actions of the LAPD in responding to the ICE protests.  On information and belief, he ratified the unlawful conduct in public statements he made over the past week at press conferences, in testimony before the Los Angeles City Council, and in communications with the Los Angeles Police Commission.

18.    Plaintiffs are informed, believe, and thereupon allege that **DOES 1 through 10** were agents, servants, or employees of Defendant City and the LAPD. Plaintiffs are ignorant of the true names and capacities sued herein as Does 1 through 10, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs will amend to allege their true names and capacities when ascertained.

19.    Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto **DOES 1 through 10**, in addition to the named Defendants, are responsible in some manner for the execution of the policies, customs and/or practices alleged herein.

20.    Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto, Defendants, and each of them, were the agents, servants, and employees of the other Defendants and were acting at all times within the scope of

their agency and employment and with the knowledge and consent of their principal and employer. At all times, Defendants acted under the color of state law.

21.     Plaintiffs are informed, believe, and thereupon allege that Defendant City's policies and failure of policies, including the repeated failure to train its officers in constitutional responses to the rights of the press at demonstrations, caused the unlawful action taken against Plaintiffs.

## V.     STATEMENT OF FACTS

22.     Starting on or about June 6, 2025, federal agents raided several locations in the Garment District in Downtown Los Angeles ("DTLA").   In response, large scale demonstrations took place in the area, protesting the enforcement of federal immigration policies.   At about the same time, in the nearby city of Paramount when federal ICE agents conducted an operation near local Home Depot, prompting spontaneous protests there.   Demonstrations are a frequent occurrence in Los Angeles.   As is often the case, journalists covered the demonstrations.   Many journalists identify themselves visually and/or verbally as members of the media so that they will not be subjected to excessive force or other constitutional violations.   But such identification did not save them from assaults by law enforcement this past week.

23.     There are many examples of journalists being subjected to excessive force and other constitutional violations during the June 2025 protests. The LAPC has documented dozens of instances of excessive force and other incidents of police misconduct toward journalists during the recent protests in Downtown Los Angeles. Many of these individuals are members of the LAPC or work for media groups that are members of the LAPC.

24.     The following examples of LAPD misconduct exemplify the pattern of unconstitutional conduct challenged in this action.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

25.    **Lauren Tomasi** - Ms. Tomasi is the U.S. correspondent for 9 News Queensland in Australia. On June 9, 2025, as she was completing a live on-air segment while holding a large microphone and working with a camera crew, she was shot in the back of her leg with a less lethal round by a riot-gear-clad LAPD officer. She was standing in a largely empty intersection, not engaged in any unlawful conduct or near anyone who was engaged in such conduct. The video of the shooting shows the LAPD officer looking directly at her and aiming specifically at her without the slightest justification. She held a microphone; she was accompanied by a camera crew. None of that mattered to the LAPD officers. See https://bsky.app/profile/bubbaprog.lol/post/3lr5er5twjs2a. The Australian Prime Minister called the shooting "horrific," indicating that LAPD misconduct also has international ramifications in this context.



COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

26. **Livia Albeck-Ripka** – On June 8, 2025, Ms. Albeck-Ripka was shot in the torso with a KIP by an LAPD officer while reporting for the New York Times. See   https://www.nytimes.com/video/us/politics/100000010217680/a-look-at-the-crackdown-on-the-la-protests.html.



27. **Jeremy Lindenfeld** - On June  9, 2025, Mr. Lindenfeld, , a reporter for *Capital & Main* who was wearing a National Press Photographers Association press pass and a "PRESS" sign on his helmet, was shot in the abdomen by an LAPD office with a less lethal munition. There was no justification for this action.   See https://bsky.app/profile/jeremotographs.bsky.social/post/3lr7uewktsk2x.



28.  **Sergio Olmos** - On June 8, 2025, Sergio Olmos, a journalist with Cal Matters who has covered dozens of protests in his career, was hit in the chest with a less lethal munition by an LAPD officer. He stated that he has never seen law enforcement as trigger happy with protesters as was the case in these protests. See https://www.washingtonpost.com/style/media/2025/06/09/journalists-injured-la-protests.

 

29.  **Ford Fischer** - On June 9, 2025, Ford Fischer, a documentary filmmaker, was struck in the stomach with a less lethal round by an LAPD officer. See https://x.com/FordFischer/status/1932305243657945404.



11
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

30.     **Gabriel Ovalle** - On June 10, 2025, Gabriel Ovalle, a Channel 5 editor and camera operator, was struck in the abdomen with a KIP by an LAPD officer. https://x.com/Channel5iveNews/status/1932497835288560088.

 

31.     **Tina Berg,** a journalist on assignment for **Status Coup** was forcibly removed from multiple locations by LAPD. In one instance, she was arbitrarily removed from filming a protest near the downtown Civic Center. Ms. Berg was told that she was being removed from the area for her safety even though her location was well over 100ft from the officers and the protest. When Ms. Berg told the officer that he was violating 409.7, the officer told her on camera that "he gets that" and continued to escort her out of the Civic Center. https://www.youtube.com/shorts/jTEq8yfFu-4?feature=share



32.    Montez Harris is a freelance photographer. On June 11, 2025 as Mr. Harris was at Grand Park  in front of Los Angeles City Hall filming with a large camera, long lens, and camera bag when an LAPD officer on horseback deliberately charged his horse into Mr. Harris several times screaming at Mr. Harris to "leave the area" as Mr. Harris was leaving. https://www.instagram.com/reel/DKyS2XzRXSo/



33.    On June 9, 2025, CNN reporter Jason Caroll and his crew were detained and ordered to leave the protest area and remain behind the police line on threat of arrest if they returned. Caroll and the CNN crew were led out of the area after being forced to put their hands behind their back and walk backwards. https://www.cnn.com/2025/06/10/us/video/jason-carroll-escorted-la-protest-digvid.

13
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

34.     In each of these cases the journalists in question were simply reporting on the protests as they had a right and duty to do.  None of them were engaged in conduct that would have justified the use of any force against them much less the force that was used.  The widespread use of force against journalists by LAPD officers indicates an intent to prevent public scrutiny of police conduct toward demonstrators, a refusal to abide by constitutional and statutory safeguards for journalists in these circumstances, and an institutional failure by the LAPD.

35.     The facts of the assaults on so many reporters supports the conclusion expressed by the National Press Club that reporters had been singled out by the LAPD and other law enforcement agencies.  "Journalists in Los Angeles were not caught in the crossfire — they were targeted."[5]

## VI.  DEFENDANTS' ACTIONS VIOLATE THE CALIFORNIA PENAL CODE PROVISIONS ENACTED TO PROTECT REPORTERS

32.     Over the last several years, in the wake of the George Floyd protests, the California Legislature has enacted several strict reform measures to limit the use of so-called "less-lethal munitions" as an instrument of crowd control and to protect the rights of all media to document the response of police to protests and other activity in public places. Defendants' actions violate each of these statutes.

### A.    California Penal Code Section 13652

33.     California Penal Code Section 13652 was enacted in 2021 and became effective January 1, 2022.  Penal Code Section 13652 provides in relevant part:

> Except as otherwise provided in subdivision (b), kinetic energy projectiles and chemical agents shall not be used by any law

---

[5] The National Press Club, *National Press Club Condemns Police Targeting of Journalists Covering Los Angeles Protests,* Press Release, June 10, 2025, available at   https://www.press.org/newsroom/national-press-club-condemns-police-targeting-journalists-covering-los-angeles-protests?fbclid=IwY2xjawK8GBlleHRuA2FlbQIxMQBicmlkETFJMktNT2tOdTRVTHI2MlozAR6dIvOPJWdwpQdaezHU5Lvu2hoVWgb5JZbVOB6fn6NtgyZGQuCzqj_uEimNqg_aem_3ErzNfFjD-9g8KOl92hyNg

enforcement agency to disperse any assembly, protest, or demonstration.

(b) Kinetic energy projectiles[6] and chemical agents[7] shall only be deployed by a peace officer that has received training on their proper use by the Commission on Peace Officer Standards and Training for crowd control if the use is objectively reasonable to defend against a threat to life or serious bodily injury to any individual, including any peace officer, or to bring an objectively dangerous and unlawful situation safely and effectively under control, and only in accordance with all of the following requirements:

(1) Deescalation techniques or other alternatives to force have been attempted, when objectively reasonable, and have failed.

(2) Repeated, audible announcements are made announcing the intent to use kinetic energy projectiles and chemical agents and the type to be used, when objectively reasonable to do so. The announcements shall be made from various locations, if necessary, and delivered in multiple languages, if appropriate.

(3) Persons are given an objectively reasonable opportunity to disperse and leave the scene.

(4) An objectively reasonable effort has been made to identify persons engaged in violent acts and those who are not, and kinetic energy projectiles or chemical agents are targeted toward those individuals engaged in violent acts. Projectiles shall not be aimed indiscriminately into a crowd or group of persons.

(5) Kinetic energy projectiles and chemical agents are used only with the frequency, intensity, and in a manner that is proportional to the threat and objectively reasonable.

---

[6] The law defines "Kinetic energy projectiles" as "any type of device designed as less lethal, to be launched from any device as a projectile that may cause bodily injury through the transfer of kinetic energy and blunt force trauma. For purposes of this section, the term includes, but is not limited to, items commonly referred to as rubber bullets, plastic bullets, beanbag rounds, and foam tipped plastic rounds." Cal. Penal Code § 13652(d)(1).

[7] The law defines "Chemical agents" as "any chemical that can rapidly produce sensory irritation or disabling physical effects in humans, which disappear within a short time following termination of exposure. For purposes of this section, the term includes, but is not limited to, chloroacetophenone tear gas, commonly known as CN tear gas; 2-chlorobenzalmalononitrile gas, commonly known as CS gas; and items commonly referred to as pepper balls, pepper spray, or oleoresin capsicum." Cal. Penal Code § 13652(d)(2).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(6)  Officers shall minimize the possible incidental impact of their use of kinetic energy projectiles and chemical agents on bystanders, medical personnel, journalists, or other unintended targets.

(7)  An objectively reasonable effort has been made to extract individuals in distress.

(8)  Medical assistance is promptly provided, if properly trained personnel are present, or procured, for injured persons, when it is reasonable and safe to do so.

(9)  Kinetic energy projectiles shall not be aimed at the head, neck, or any other vital organs.

(    10) Kinetic energy projectiles or chemical agents shall not be used by any law enforcement agency solely due to any of the following:

(A)  A violation of an imposed curfew.

(B)  A verbal threat.

(C)  Noncompliance with a law enforcement directive.

(11)  If the chemical agent to be deployed is tear gas, only a commanding officer at the scene of the assembly, protest, or demonstration may authorize the use of tear gas.

34.    The Preliminary Injunction issued by the federal court in *Black Lives Matter v. City of Los Angeles*, 2:20-cv-05027-CBM-AS (C.D. Cal. 2021 May 5, 2021) [Doc. 102] is consistent with the enactment of California Penal Code Section 13652 regarding the use of KIPs.  In the Floyd protests in 2020, there was very little incidence of chemical irritant projectiles used by the LAPD.  The subsequently enacted state statute provides even greater protections for everyone at a protest.  In this instance, the Plaintiffs did not even receive the threshold protections set by the *Black Lives Matter* injunction.

**B.    Senate Bill 98**

35.    In 2021, California Governor Newsom also signed into law SB 98, ensuring protections for the press to observe and record law enforcement activities at public protests. The Legislature recognized that, "[w]hile [existing] California law protects members of the press from being stopped when entering closed areas during emergencies and natural disasters to gather information, these protections don't extend to protest events such as demonstrations, marches, protests, or rallies where individuals largely engage their First Amendment right to speech."  Assem.

Pub. Safety Committee Analysis, California Senate Bill No. 98, California 2021-2022 Regular Session (July 13, 2021), available at https://trackbill.com/s3/bills/CA/2021/SB/98/analyses/assembly-public-safety.pdf.

36. The bill's author stated that it was enacted following widespread assaults and arrests of reporters covering the protests in response to the killing of George Floyd in 2020. "In California and across the country police have arrested, detained, and have physically assaulted journalists with rubber bullets, pepper spray, tear gas, batons, and fists. In many cases there are strong indications that the officers injuring journalists knew their targets were members of the press. Members of the press risk their personal safety and wellbeing each time they attend protest events to get the public the information they need, but rubber bullets, teargas, and even arrest cannot be the norm for an essential pillar of our democracy." *Id.* The intent of the Legislature in this instance is undebatable.

37. SB 98 added Section 409.7 to the Penal Code, which reads as follows:

409.7. (a) If peace officers … close the immediate area surrounding any emergency field command post or any other command post, or establish a police line, or rolling closure at a demonstration, march, protest, or rally where individuals are engaged in activity that is protected pursuant to the First Amendment to the United States Constitution or Article I of the California Constitution, the following requirements shall apply:

(1) A duly authorized representative of any news service, online news service, newspaper, or radio or television station or network may enter the closed areas described in this section.

(2) A peace officer or other law enforcement officer shall not intentionally assault, interfere with, or obstruct the duly authorized representative of any news service, online news service, newspaper, or radio or television station or network who is gathering, receiving, or processing information for communication to the public.

38. In early December 2021, the Los Angeles Police Commission approved a Notice from Chief Moore to all Los Angeles Police Department personnel concerning the right of members of the press, defined broadly (with or

without official police-issued credentials), to access incident areas, especially at protests, without fear of arrest or assault by the police.   Specifically, the Notice stated that it was issued to implement the legislative mandate of SB 98.  The Notice is attached at Exhibit A and was obtained from Defendant City's website at: http://www.lapdpolicecom.lacity.org/121421/BPC_21-233.pdf

39.    More than a year earlier, on October 30, 2020, after multiple complaints concerning the LAPD treatment of members of the press during the George Floyd protests, the LAPD issued a notice to all department personnel from the Chief's office (DOC Communications Division), affirming the right of the press to access and document police activity at protests.  The Notice provided that, while individuals who identify as press may be asked for their credentials, the lack of press credentials does not bar a person from acting as a member of the media. The October 30, 2020, memorandum also directed that, when an unlawful assembly order is given and a dispersal order made, the Incident Commander and Public Information Officer (PIO) shall establish an area for the media to remain and observe.

40.    Based on what had occurred in response to the George Floyd protests, there can be no doubt that the express intent of the Legislature was to ensure that the media could remain and, in fact, be inside the police line. There is no limiting language in the statute that would justify excluding the press by threat or force.  A copy of the October 30, 2020 document is attached at Exhibit B.  On information and belief, Plaintiff alleges that these provisions were not complied with by the LAPD and its officials and officers. Moreover, merely sending out a notice four years earlier is not adequate training, if the officers even read the Notice when it issued four years ago.

## VI.    MONELL ALLEGATIONS

41.    The Defendant City failed to have adequate policies to inform its officers on the lawful presence of members of the press at protests and, to the extent

it had any such policies, failed to train officers on those policies. As a consequence of the City's and Chief McDonnell's failure, officers assaulted members of the press, including Plaintiffs, with multiple KIPs in violation of the law and causing physical harm and fear to journalists who were just doing their jobs.

42.     Defendants City and McDonnell had either actual or constructive knowledge of the different policies, practices, and customs alleged in the paragraphs above and the foreseeable consequences of the failure to implement and train on these state statutes and constitutional rights afforded to members of the press at protests.

43.     The City was aware of assaults on press rights at the DNC 2000, which led to the *Crespo* settlement, as well as the failure of policy at May Day 2007 and the 2020 George Floyd protests. Chief McDonnell was personally aware of the historic failure of policy by the LAPD on the issue of press access. Chief McDonnell was a member of the Command Staff of the LAPD from the late 1990s and he was the First Asst. Chief of the LAPD under former Chief Bratton. During the time that he was a member of the LAPD Command Staff, the LAPD assaulted press at the DNC 2000 and again at the 2007 May Day protests. Even when his employment with the LAPD was interrupted, Chief McDonnell was the head of two large California law enforcement agencies – the Long Beach Police Department and the Los Angeles County Sheriff – and would have had knowledge of, and been responsible for compliance with, the state statutes ensuring press access and prohibiting the use of force against the press at public protests.

44.     Defendants City and McDonnell also acted or failed to act with deliberate indifference.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (First and Fourteenth Amendments to the U.S. Constitution.
### 42 U.S.C. § 1983; California Constitution Art. I, §2a; California Penal Code §§409.7, 13652)

45.    Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs in this Complaint.

46.    The First Amendment guarantees the right of the press to access areas necessary to engage in coverage of public officials free from interference by tactics such as seizure, arrest, detention, or use of force, especially when they are covering law enforcement conduct in public fora.  In response to the significant and unlawful restrictions against the exercise of this most fundamental right by the Defendants in recent years, the California Legislature passed, and Governor Newsom signed, Senate Bill 98 in 2021. Senate Bill 98 added Section 409.7 to the Penal Code as follows, establishing requirements to permit press access to areas of police actions as described more fully in paragraph 37, hereinabove.

47.    Significantly, this statute expressly prohibits law enforcement from assaulting members of the press to prevent, interfere or obstruct them from "gathering information for communication to the public."  Plaintiff was not engage in any unlawful activity in the course of her press activities at this event.

48.    In doing the acts complained of herein, Defendants violated California Penal Code 409.7, depriving Plaintiffs and their members of their rights under the Constitution and state law.

### SECOND CLAIM FOR RELIEF

### Violation of the Bane Act (Cal. Civil Code § 52.1)

49.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as though fully set forth herein.  The federal and state constitutions, as well as statute, guarantee freedom of the press, as well freedom from unnecessary and excessive force by law enforcement officers. Defendants, by engaging in the

wrongful acts and failures to act alleged above, denied Plaintiffs and their members and other journalists present at the protests of their constitutional and statutory rights by threats, intimidation, or coercion, to deter, prevent and in retaliation for the exercise of their First Amendment and statutory rights, in violation of Cal. Civ. Code § 52.1.

50.    California Civil Code, Section 52.1, known as the Tom Bane Civil Rights Act, provides that : "if a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States or of the rights secured by the Constitution or laws of this state," a person whose such rights have been interfered with or attempted to be interfered with may prosecute an action "for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured, including appropriate equitable and declaratory relief to eliminate a pattern or practice of conduct." Cal. Civ. Code § 52.1. At this time, Plaintiffs seek only injunctive relief in this action.

51.    As alleged herein, LAPD unlawfully used force and the threat of force against Plaintiffs, their members and other journalists to intimidate them and interfere with their constitutional right to document public events as the press, in violation of California Penal Code §§ 409.7 and 13652 to access closed areas and to be free from intentional assault, interference or obstruction by law enforcement while reporting.

52.    In acting as alleged herein, LAPD officers used threats and intimidation to interfere with rights secured under the Constitution of the United States, the Constitution of the State of California, and the statutory laws of the State providing protection to Plaintiffs and other members of the press at protests. The use of any force, let alone unreasonable force, by Defendants was a substantial

factor in causing the violation of rights and attendant harm endured by Plaintiffs and their members and other journalists present at the protests.

53.   As a direct and proximate result of the aforementioned acts or omissions of Defendants, Plaintiffs are entitled to injunctive relief to require Defendants to end its unlawful policies, practices and customs and of Defendants that caused the violation of Plaintiffs' rights of freedom of the press under the federal and state constitutions and statutory law.

## VIII.   REQUEST FOR RELIEF

Wherefore, Plaintiffs seek judgment as follows:

1.   A preliminary and permanent injunction restraining Defendants from engaging in the unlawful and unconstitutional actions detailed above and retaining Court jurisdiction to enforce the terms of the injunction;

2.   A declaratory judgment that Defendants' alleged conduct violated Plaintiff's rights under the federal and state Constitution and statutory laws;

3.   An award of attorneys' fees pursuant to 42 U.S.C. § 1988 and Cal. Civil Code §§ 52(b) & 52.1(h) and Cal. Code of Civ. Proc. § 1021.5;

4.   Costs of suit;

5.   Pre- and post-judgment interest as permitted by law;

6.   Such other and further relief as the Court may deem just and proper.


Dated: June 16, 2025          Law Office of Carol A. Sobel


          /s/   Carol A. Sobel          .
By: CAROL A. SOBEL
Attorneys for Plaintiffs

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF