Carol A Sobel SBN 84483
Weston Rowland SBN 327599
Law Office of Carol A. Sobel
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403
t. (310) 393-3055
e. carolsobellaw@gmail.com
e. rowland.weston@gmail.com

David Loy SBN 229235
Aaron R. Field SBN 310648
First Amendment Coalition
534 4th St., Suite B
San Rafael, CA 94901
t. (415) 460-5060
e. dloy@firstamendmentcoalition.org
e. afield@firstamendmentcoalition.org

Peter Bibring, SBN 223981
Law Office of Peter Bibring
2140 W. Sunset Blvd. #203
Los Angeles, CA 90026
t. (213) 471-2022
e. peter@bibringlaw.com

Paul Hoffman, SBN 71244
Michael Seplow, SBN 150183
John Washington, SBN 315991
Schonbrun, Seplow, Harris, Hoffman
& Zeldes LLP
200 Pier Avenue #226
Hermosa Beach, California 90254
t.(310) 396-0731
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. jwashington@sshhlaw.com

Susan E Seager SBN 204824
Law Office of Susan Seager
128 N. Fair Oaks Avenue
Pasadena, CA 91103
t. (310) 890-8991
e. susanseager1999@gmail.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES PRESS CLUB, STATUS COUP, <br><br>        Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES, a municipal entity, JIM McDONNELL, LAPD CHIEF, sued in his official capacity; <br><br>        Defendants. | Case No. 25-cv-05423 HDV-E <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** <br><br> Date: N/A <br> Time: N/A <br> Ctrm 5B Hon. Hernan D. Vera |

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ...................................................................................... 3

    A.   Evidence Shows LAPD Deliberately Targets Journalists for Force. ........... 3

    B.   Evidence Shows LAPD Subjected Journalists to Unlawful and Reckless Use of LLMs Fired Indiscriminately on Crowds ......................... 6

    C.   Evidence Shows LAPD Ordering Journalists to Leave Public Areas ......... 8

    D.   LAPD's History of Targeting Press ......................................................... 10

LEGAL STANDARD ............................................................................................... 11

ARGUMENT ........................................................................................................... 12

I.    Plaintiffs are Likely To Succeed on the Merits. ............................................ 12

    A.   Constitutional Claims ............................................................................. 12

        1.   Interference with Right to Record and Cover Protests ..................... 12

        2.   Retaliation ...................................................................................... 14

    B.   California Claims .................................................................................... 15

        1.   Protections for Journalists in Protests under SB 98 ........................ 16

        2.   Protections Against Less-Lethal Munitions under AB 48 ................ 17

        3.   LAPD's Targeting of Journalists Violates the California Constitution. ................................................................ 19

        4.   The Court Can Enjoin Violations of California Law under the Bane Act. ....................................................................... 19

        5.   This Court Can Enjoin Violations of California Law under the Fourteenth Amendment. .................................................. 20

II.    Plaintiffs Will Suffer Irreparable Harm Without the Court's Intervention. .... 21

III.   The Public's Interest and Balance of Equities Weigh Strongly in Favor of Plaintiffs ................................................... 22

CONCLUSION ........................................................................................................ 25

*i*

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Al Otro Lado v. Exec. Off. for Immigr. Rev.*
  138 F.4th 1102 (9th Cir. 2025) ...................................................................15

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*,
  916 F.3d 749 (9th Cir. 2019) .....................................................................22

*Arizona Students' Ass'n v. Arizona Bd. of Regents*,
  824 F.3d 858 (9th Cir. 2016) .....................................................................15

*Askins v. U.S. Dep't of Homeland Sec.*,
  899 F.3d 1035 (9th Cir. 2018) ...................................................................13

*Baird v. Bonta*,
  81 F.4th 1036 (9th Cir. 2023) ....................................................................12

*Best Friends Animal Soc'y v. Macerich Westside Pavilion Prop. LLC*,
  193 Cal. App. 4th 168 (2011) .....................................................................21

*Black Lives Matter Los Angeles v. City of Los Angeles*,
  No. CV 20-5027 CBM (ASX), 2021 WL 3162706 (C.D. Cal. Apr. 19, 2021) .....10, 24

*Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*,
  466 F. Supp. 3d 1206 (W.D. Wash. 2020) ................................................22

*Branzburg v. Hayes*,
  408 U.S. 665 (1972)....................................................................................13

*Browning v. Vernon*,
  44 F.3d 818 (9th Cir. 1995) .......................................................................21

*California Assn. of Psychology Providers v. Rank*,
  51 Cal. 3d 1 (1990) ....................................................................................16

*Cmty. House, Inc. v. City of Boise*,
  490 F.3d 1041 (9th Cir. 2007) ...................................................................22

*Cornell v. City & Cnty. of San Francisco*,
  17 Cal. App. 5th 766 (2017) ......................................................................20

*Cox Broad. Corp. v. Cohn*,

ii

420 U.S. 469 (1975)....................................................................................................23

*Cuviello v. City of Vallejo,*
944 F.3d 816 (9th Cir. 2019) .............................................................................19, 22

*Drakes Bay Oyster Co. v. Jewell,*
747 F.3d 1073 (9th Cir. 2014) ...................................................................................22

*Easyriders Freedom F.I.G.H.T. v. Hannigan,*
92 F.3d 1486 (9th Cir. 1996) .....................................................................................24

*Elrod v. Burns,*
427 U.S. 347 (1976)....................................................................................................21

*Ennis v. City of Daly City,*
756 F. Supp. 2d 1170 (N.D. Cal. 2010)......................................................................20

*Fordyce v. City of Seattle,*
55 F.3d 436 (9th Cir. 1995) .......................................................................................13

*Hallstrom v. City of Garden City,*
991 F.2d 1473 (9th Cir. 1993) ...........................................................................20, 21

*Hartman v. Moore,*
547 U.S. 250 (2006)....................................................................................................14

*Index Newspapers LLC v. City of Portland,*
480 F. Supp. 3d 1120 (D. Or. 2020) ..........................................................................24

*Index Newspapers LLC v. United States Marshals Serv.,*
977 F.3d 817 (9th Cir. 2020) ...................................................................13, 14, 15

*Leigh v. Salazar,*
677 F.3d 892 (9th Cir. 2012) .............................................................................13, 23

*Leiserson v. City of San Diego,*
184 Cal. App. 3d 41 (Cal. Ct. App. 1986) .................................................................17

*Matsumoto v. Labrador,*
122 F.4th 787 (9th Cir. 2024) ...................................................................................12

*Meinecke v. City of Seattle,*
99 F.4th 514 (9th Cir. 2024) ......................................................................................12

*iii*

MEMORANDUM IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ..................................................................22

*Mendocino Env't Ctr. v. Mendocino Cnty.*,
192 F.3d 1283 (9th Cir. 1999) ................................................................15

*Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*,
246 F.R.D. 621 (C.D. Cal. 2007) ............................................................11

*Murchison v. Cnty. of Tehama*,
69 Cal. App. 5th 867 (2021) ...................................................................19

*Olim v. Wakinekona*,
461 U.S. 238 (1983) ................................................................................20

*Peltz v. City of Los Angeles*, No. 2:22-CV-03106-HDV(AGRX),
2025 WL 1412479 (C.D. Cal. Feb. 20, 2025) ....................................10, 11

*People for the Ethical Treatment of Animals, Inc. v.*
*N. Carolina Farm Bureau Fed'n, Inc.*, 60 F.4th 815 (4th Cir. 2023) ...........23

Porter v. Warner Holding Co.,
328 U.S. 395 (1946) ................................................................................21

*Snyder v. Phelps*,
562 U.S. 443 (2011) ................................................................................12

*Ulrich v. City & Cnty. of San Francisco*,
308 F.3d 968 (9th Cir. 2002) ..................................................................15

*Warner Holding Co.*,
328 U.S. 395 (1946) ................................................................................21

*Warsoldier v. Woodford*,
418 F.3d 989 (9th Cir. 2005) ..................................................................21

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..............................................................................12, 22

**Statutes**

Cal. Const. art. I, § 2 ........................................................................2, 19, 20

Cal. Civ. Code § 52.1(a),(b) ...................................................................19

*iv*

Cal. Penal Code § 409.5 ........................................................................14, 16, 17

Cal. Penal Code § 409.6 ........................................................................14, 16, 17

Cal. Penal Code § 409.7 ................................................................................ Passim

Cal. Penal Code § 409.7(a) ............................................................................17

Cal. Penal Code § 13652 ........................................................................11, 18, 24

**Other Authorities**

Sen. Pub. Safety Comm. Analysis, S.B. 98, 2021-2022 Reg. Sess. ................................17

67 Ops. Cal. Atty. Gen. 535 (1984) ..............................................................16

2021 California Assembly Bill No. 48, California 2021-2022 Regular Session .....1, 2, 17

2021 California Senate Bill No. 98 California 2021-2022 Regular Session......1, 2, 16, 17

MEMORANDUM IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

# INTRODUCTION

On June 6, 2025, in response to a series of aggressive raids by federal immigration authorities, Los Angeles residents took to the public streets and sidewalks to make their voices heard. People gathered to protest the ongoing raids and the immigration policies of the new federal administration, both in smaller demonstrations that popped up spontaneously at the site of immigration raids and in massive demonstrations downtown over a period of more than a week leading up to, and including, a previously planned "No Kings" protest on June 14. Journalists flocked to cover the demonstrations, first as a reflection of the enormous popular opposition to the federal administration's immigration policies and then increasingly to cover aggressive policing of the protests by police. And the Los Angeles Police Department (the "LAPD" or the "Department") deployed to police protests downtown.

LAPD has a decades-long history of violating the rights of members of the press and public at demonstrations, including at protests in 2020, 2021 and 2022. The Department had recently issued department-wide notice to officers on changes to state law — SB 98, a 2021 measure that added protections for journalists against arrest and use of force at protests, as well as AB 48, a bill from the same year that placed restraints on crowd control weapons, including chemical irritants and kinetic impact projectiles.

But if the June protests provided a test of LAPD's recent efforts to bring its policing of protests into compliance with the requirements of California law and the Constitution, the Department failed — utterly, completely and abjectly. LAPD responded with demonstrations with extraordinary force and a total disregard for the rights of the press. Over and over, day after day, LAPD officers shot journalists clearly identified as press at close range with so-called "less-lethal munitions" ("LLMs"). LAPD officers rammed journalists wearing cameras and press identification with horses. They fired LLMs indiscriminately into crowds containing journalists, without provocation, and with no apparent effort to avoid hitting journalists. They used LLMs in ways prohibited by state law and their own policies, shooting people in the head and

1

upper body, both prohibited targets because of the potential to cause serious injury to critical organs and even death And they repeatedly detained journalists, kettled them with protestors, ordered them to move out of public places where they posed no threat and were not interfering with police, and told press they would be arrested if they remained in the area in blatant violation of California law.

Plaintiffs have compiled more than thirty-five instances in which LAPD violated the rights of journalists, including a dozen separate occasions in which LAPD appeared to deliberately target people obviously identifiable as journalists for use of force without provocation; another dozen incidents in which LAPD hit journalists with tear gas or projectiles colloquially referred to as "rubber bullets" after using force indiscriminately against a crowd, and more than a dozen times that LAPD officers ordered journalists away from public places where they were gathering material to report on the protests, in blatant violation of California law. These violations are described in detail in the accompanying declaration of Adam Rose ("Rose Dec.") and other members of the press, which include video documenting LAPD's conduct, both linked in the declarations and concurrently lodged with the Court.

Based on this formidable evidence, Plaintiffs have shown they are likely to prevail on the merits of their claims that LAPD violated the rights of journalists granted by California statute under SB 98 and AB 48, codified in Penal Code sections 409.7 and 13652, as well as infringed on their rights of the press guaranteed the California Constitution, Art. I, sec. 2, and the First Amendment. The loss of these constitutional rights and enabling statutory rights, even for short periods of time, constitutes irreparable harm. And because the relief Plaintiffs seek asks little more of LAPD than to require that they follow the law, the balance of hardships tips sharply in favor of issuing the temporary restraining order and ordering LAPD to show cause why a preliminary injunction should not issue.

MEMORANDUM IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

# FACTUAL BACKGROUND

## A.    Evidence Shows LAPD Deliberately Targets Journalists for Force.

In just the first week of protests, Plaintiffs' evidence documents fourteen instances in which LAPD officers shot reporters with rubber bullets, charged them with horses, and shoved them in situations where the journalists were away from protesters, apart from any evident threat, and plainly identifiable as journalists. LAPD targeted them nonetheless, suggesting they used force against them *because* they were journalists, or at best in reckless disregard of their constitutional and statutory rights to gather news free from assault by police. The record provides ample evidence that LAPD officers are intentionally targeting journalists:

On June 8, an LAPD officer brazenly shot television reporter Lauren Tomasi of 9News Australia from behind while she was on air, speaking to her camera. The footage shows a line of officers behind Tomasi while she stands near other journalists and people filming and talks to the camera. One of the officers turns towards Tomasi, deliberately raises his less-lethal rifle, and fires at her without any apparent justification. The incident drew international attention. The Australian Prime Minister called the shooting "horrific" and said he had raised concerns with the U.S. government. Rose Dec ¶ 26.

On June 8, Journalist Sean Beckner-Carmitchel videorecorded LAPD officers repeatedly shoving a photographer who has two professional-looking cameras with large zoom lenses and holding up what appeared to be identification on a lanyard, before a mounted LAPD officer rams the photographer with a horse. Beckner-Carmitchel Dec. ¶ 6 & Exh B. There were few people nearby, no obvious threat, and the photographer appeared to be already moving in the direction LAPD officers had indicated before they shoved them. *Id.*; Rose Dec ¶ 30. In the same incident, another LAPD officer appeared to take potshots at a photographer in a yellow helmet holding a professional camera and identification on a lanyard. Beckner-Carmitchel Dec. ¶ 7 & Exh. C.

On June 9, an LAPD officer shot Capital & Main reporter Jeremy Lindenfeld with a 40mm foam baton round from about 25 feet away. Lindenfeld was obviously press,

3

wearing a helmet with "PRESS" written in large letters across the front and a press ID with the word "PRESS" in large letters on a lanyard around his neck. Rose Dec. ¶ 36.

On June 9, CNN Anchor Erin Burnett was reporting from protests and was shoved by an advancing line of LAPD officers while filming in front of the camera on live television. As she noted in the broadcast, "They knew we're media. They're just as happy to push me as to push anybody else." Rose Dec. ¶ 38.

On June 9, officers shot LLMs at award-winning freelance photojournalist Michael Nigro while he stood practically alone on a pedestrian overpass elevated above the protests/, Initially, the LLM struck a pole near his head. Nigro Dec. ¶¶ 5–9. At the time, Nigro carried two large DSLR cameras and wore: (1) a helmet with "PRESS" written in large white capital letters against a black background on both the left and right sides of his head, (2) a vest with "PRESS" in large white capital letters against a black background both on his chest and back, and (3) a press ID with the word "PRESS" in large letters on a lanyard around his neck. Id. ¶¶ 14–16. Two hours later, Nigro was documenting the protests at street level when a line of LAPD officers suddenly and without warning or any apparent justification yelled "move" and began shoving and shooting LLMs indiscriminately at the crowd. Nigro Dec. ¶¶ 10–12, 19. Nigro still wore his helmet, vest, and press ID that all read "PRESS" in large letters on visible from a distance on all sides. Id. ¶ 16. Nonetheless, an LAPD officer shot and struck Nigro in the head with an LLM, leaving a white mark from its impact visible on his helmet at his temple. Id. ¶¶ 10, 14–15; Rose Dec. ¶ 37.

On June 11, freelance photographer Montez Harris was documenting protests at Grand Park downtown, carrying two large, professional cameras and a press ID that was visible for most of the day. Harris Dec ¶ 5. When a dispersal order issued, he turned to leave. A mounted officer (whom Harris believes he had just told he was a journalist) tried to grab him, and another mounted officer rode up and pinned him between the horses. The officer threatened to hit Harris with batons, told him he wasn't leaving fast enough, hit him with horses, and shot him in the back of his leg with an LLM. Id. ¶¶ 5-7.

MEMORANDUM IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

Video of the incident shows that Mr. Harris was complying with the dispersal order, walking away from the officers, and certainly posed no threat. *Id.*; Rose Dec ¶ 45.

On June 14, ABC's chief national correspondent, Matt Gutman, was filming live for ABC news when an LAPD officer came behind him, grabbed him, and shoved him. Another officer then came up to Gutman and screamed at him that he had touched an officer. Gutman calmly said he had not, that they were on TV and that the video would show what happened. Rose Dec ¶ 51.

On July 14, photojournalist Héctor Adolfo Quintanar Perez was covering the protests in downtown Los Angeles on assignment from Zuma Press, an independent press agency. He carried two professional cameras, a large camera bag, and a large press badge issued by Zuma on a worn visibly on a lanyard around his neck. Perez Dec. ¶ 2. At about 5 p.m., when he was close to 300 Los Angeles Street, without any apparent provocation, LAPD officers began using force on protestors and firing LLMs. *Id.* ¶¶ 4-6. Perez was taking pictures when he saw an officer aiming an LLM in his direction from "very close," so that the officer must have known he was press given his press pass and cameras. The officer fired an LLM that hit both his knees, opening a wound in his left knee that left Perez walking with a cane and possibly in need of surgery. *Id.* ¶ 7-8, 11; Rose Dec. ¶ 54 & n. 35.

On June 14, an LAPD mounted officer charged 82-year-old photographer David Healy with his horse, knocking Healy to the ground and breaking one of his ribs. Healy carried a large professional Canon camera with large lens, was shooting on film, and had business cards with him identifying himself as a photographer. Rose Dec. ¶ 55.

On June 14, LAPD officers shot an Agence France-Presse photographer in the face and leg. The photographer told France24, "I was covering the protest … 90 feet away from the police when I received the impact of a rubber bullet in my face and another one in my right arm… I was working with two cameras, a helmet with AFP stickers on it and also, I had a big patch on my chest that said 'Press.'" Rose Dec. ¶ 56.

Several other incidents provide evidence of the LAPD intentionally targeting

5

journalists. Kayjel J. Mairena, a student journalist with the Santa Monica College Corsair, was tear gassed twice in downtown Los Angeles on June 14 while standing with other press off to the side. Rose Dec. ¶ 58. An AP video livestream shows an LAPD officer apparently aim and fire without any evident justification at the unnamed videographer, who ducks behind an obstacle at the last minute as a foam baton round lands near him. Rose Dec. ¶ 35.

### B. Evidence Shows LAPD Subjected Journalists to Unlawful and Reckless Use of LLMs Fired Indiscriminately on Crowds

In addition to evidence of LAPD deliberately targeting journalists, there are many more incidents where LAPD hit journalists after firing LLMs indiscriminately into crowds that provided no imminent threat of harm to the officers or anyone else and where journalists (plainly marked as such) were present. This evidence shows at best a reckless disregard of the risks of hitting journalists or bystanders, and likely is further evidence of intentional targeting of journalists.

While journalist Jeremy Cuenca was on assignment for the Collegian, the student newspaper for Los Angeles Community College, on June 8, LAPD shot him twice with rubber bullets, one of which hit his hand, nearly severing his finger (which took hours of surgery to reattach) and destroying his camera. Rose Dec ¶ 27.

On June 14, photographer Marshal Woodruff was documenting protests near City Hall, when an LAPD officer began firing LLMs. One of LAPD's rubber bullets hit Woodruff in the face, fracturing his cheek and slicing open his right eye, requiring five hours of surgery and leaving doctors uncertain how much vision he will regain. Woodruff told local news, "They came in with horses and people almost got trampled. They were firing like 40 bullets in the span of like five seconds. … [I]t sounded more like fireworks being rapidly shot off." Rose Dec. ¶ 53. On June 14, photographer Tod Seelie was shoved by LAPD, shot in the leg with a "less lethal" munition, and tear gassed multiple times. He was wearing a helmet with a press badge and also had a media credential. Rose Dec. ¶ 57.

MEMORANDUM IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

On June 14, LAPD released tear gas and LLMs on a crowd that included Constanza Eliana Chinea, a California Local News Fellow and founder of the independent media platform Malcriá Media, without issuing any announcement or dispersal order and without the crowd engaging in any violent or destructive acts. Chinea Dec. ¶¶ 25–28. Chinea wore a press-identification badge and carried a professional camera and microphone. *Id.* ¶ 24. Because LAPD did not allow time or space to disperse, Chinea suffered burning and discomfort in her sinuses and eyes. *Id.* ¶ 27.

During the first weekend of the protests, LAPD shot Gabriel Ovalle of Channel 5 (an online service unrelated to local television station KTLA) with a "less lethal" munition while he was filming protestors carrying a banner through the street. Rose Dec. ¶ 59.

On June 11, LAPD shot Sangjin Kim, a staff photographer for Korea Daily, in the back with an LLM resulting in a bloody welt. Kim carried professional camera equipment and wore a visible press ID. Rose Dec. ¶ 46.

Also on June 11, Univision's national correspondent Romi De Frias was reporting on the protest with a camera rolling when an LAPD mounted officer shoved her with a horse. Rose Dec. ¶ 50. LAPD mounted officers were shoving people, including De Frias and other obvious members of the press carrying large cameras. *Id.* although the crowd was moving in the direction indicated by LAPD. One mounted officer repeatedly hit a protestor next to De Frias with a baton. *Id.*

LAPD shot journalists numerous times with LLMs after firing into crowds of protesters who did not appear to be engaged in unlawful activity, hitting journalists due to the lack of any apparent attempt to target specific individuals who posed a threat or to minimize the impact on press or other bystanders. Rose Dec. ¶ 32 (CalMatters journalist Sergio Olmos hit with foam round in chest while filming police and protestors); ¶ 28 (New York Times reporter shot in ribs with foam baton); ¶ 44 (Lauren Day of ABC News camera operator tear-gassed and her camera operate shot in the chest with a "less lethal" round on June 10); ¶ 49 (photojournalist Ted Soqui shot in his back with LLMs

7

three times by LAPD on June 11); ¶ 52 (LAPD shot acclaimed war photographer Ron Haviv in the arm with an LLM on June 14).

### C.    Evidence Shows LAPD Ordering Journalists to Leave Public Areas

LAPD has repeatedly and deliberately ordered journalists to move from closed areas, in violation of California Penal Code § 409.7.

On June 8, journalist Sean Beckner-Carmitchel was huddling with other journalists, all carrying large cameras and professional equipment, in an entrance to a closed underground parking garage at the Clara Shortridge Foltz courthouse, to stay out of the way of LAPD and report about the protest and LAPD actions. Beckner-Carmitchel Dec. ¶ 5. LAPD fired tear gas directly across from them and entered the parking garage ramp and ordered the journalists to leave. *Id.*

On June 9, the LAPD detained CNN reporter Jason Caroll and his crew while Caroll was reporting live on air. In violation of California Penal Code Sec. 409.7, the CNN crew were forced to get behind yellow police caution tape the police had set up. As is seen and heard on the video, LAPD officers told Carroll he had to leave the area and would be arrested if he came back, ordered him to place his hands behind his back, and escorted him out of the protest area. When he asked if he was being arrested said, "we're letting you go, but you can't come back." Rose Dec. ¶ 39.

On June 10, journalist Tina-Desiree Berg was reporting on assignment for Plaintiff Status Coup News on the protests, wearing her press pass and accompanied by a photojournalist. She was positioned on the pedestrian plaza over Los Angeles street with a direct line of sight to the protestors and LAPD, with the protesters about 100 feet away. LAPD had members of the press held in a kettle, and an LAPD officer accosted Berg and repeatedly ordered her to leave, saying, "I gave you a direct order to leave," despite Berg asking why she had to move. Berg repeated that she was a journalist, citing to Penal Code § 409.7, and stating that the LAPD officer was breaking the law by ordering her to move. Berg Dec. ¶¶ 2-4.

On June 8, LAPD officers ordered a group of approximately 20 to 30 journalists

8

away from protesters and a police line and held them in a "press area" about 150 feet away from protestors under threat of arrest, making reporting on the line impossible. Chinea Dec. ¶ 13; Rose Dec. ¶ 34.

On June 8, journalist Beckner-Carmitchel videorecorded an LAPD officer clearing the area near Alameda and Aliso and specifically order press to disperse as well, shouting "Media, go!" Beckner-Carmitchel Dec. ¶ 8; Rose Dec ¶ 33.

Also on June 8, photojournalist Montez Harris was kettled with a group of protesters. He carried two large professional cameras, a press pass, and business cards identifying him as press. Harris Dec ¶¶ 4, 8. LAPD officers would not allow Harris to leave even though he repeatedly informed them he was a member of the press. *Id.* ¶ 8. Harris eventually scaled a small wall, despite an officer threatening to shoot him. *Id.*

On June 10, LAPD officers at the corner of 4th and Olive chased and shoved multiple people wearing helmets plainly marked with "PRESS," with IDs on lanyards, and carrying large cameras. The officers shout, "Leave the area!" repeatedly, although video shows no protesters in the immediate area, and the only people being shoved by LAPD officers all appear to be journalists. Rose Dec. ¶ 44.

On June 11, LAPD officers kettled a group of journalists in front of City Hall. The journalists repeatedly pointed out that the group contained credentialed media and asked if they were allowed to leave and were told, "no." Rose Dec. ¶ 48.

On July 19, independent journalist Anthony Orendorff was at the Plaza Pacoima shopping complex when an ICE raid happened there. Orendorff Dec. ¶¶ 2, 3. He was documenting the operation when he was seized by LAPD. Despite public outcry and appeals to the Mayor and Chief of Police, he was held in jail from Thursday until Monday, when he was released without charges. *Id.* ¶¶ 4-6.

In numerous other instances, LAPD officers ordered the press to move or physically shoved them without regard to their right to remain in order to report. *See* Rose Dec. ¶ 38 (LAPD officers shoved CNN anchor Erin Burnett while she talked to the camera on live TV); ¶ 41 (an LAPD officer told Los Angeles Times reporter James

Queally to move, then when Queally reminded the officer he had a legal right to be there the officer shoved him); ¶ 42 (on June 10, an LAPD officer at a police line tells CNN crew live on air that some members could pass while others in the same crew could not).

### D. LAPD's History of Targeting Press.

For decades, LAPD's policing of protests has been marked by widespread constitutional violations, including a pattern of "restricting or retaliating against the press for attempting to gather news on police activity, [and] detaining members of the press without probable cause" — a description this Court recently recognized was "not mere hyperbole." *Peltz v. City of Los Angeles*, No. 2:22-CV-03106-HDV(AGRX), 2025 WL 1412479, at *10 (C.D. Cal. Feb. 20, 2025). Indeed, LAPD's violations in response to protests over the killing of George Floyd in 2020 helped spark state legislation to address "the blatant disregard for the safety of journalists engaged in constitutionally protected activities by law enforcement during protest activities" and to place limitations on the use of crowd control weapons, codified at Penal Code §§ 409.7 and 13652, respectively.[1]

LAPD's constitutional violations in its use of less-lethal munitions in 2020 also led a federal court to impose specific requirements regulating their use. *See Black Lives Matter Los Angeles v. City of Los Angeles*, No. CV 20-5027 CBM (ASX), 2021 WL 3162706, at *4 (C.D. Cal. Apr. 19, 2021) (granting preliminary injunction setting forth limits on LAPD's use of 40mm and 37mm launchers). Based on evidence of injuries submitted in that case, the *Black Lives Matter* Injunction restricted use of several kinetic impact projectiles as direct impact weapons targeted at the head and torso even before the Legislature's passage of similar force restrictions in Penal Code § 13652.

LAPD's policing of protests has resulted in widespread violations of the rights of the press and the public including at protests in response to the overturning of *Roe v.*

---

[1] *See* Sen. Pub. Safety Comm. Analysis, Sen. Bill 98, 2021-2022 Reg. Sess. (noting that bill came "in response to the use of force against journalists covering protests" and citing "one protest in Los Angeles where police allegedly used force against at least four journalists in separate instances").

MEMORANDUM IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

*Wade* in 2022, protests at the City's decision to clear a homeless encampment at Echo
Park lake in 2021, protests in 2020 over policing in the wake of the killing of George
Floyd, protests in 2020 over the Trump campaign, protests in 2015 over the election of
Donald Trump, protests in 2014 over the police killing of Michael Brown in Ferguson;
LAPD's clearing of MacArthur Park at May Day protests in 2007, protests over the
imminent invasion of Iraq in 2003 and protests at the Democratic National Convention
in 2000, among others, sparking lawsuits, settlements, and after-action reports. *See
generally* Sobel Dec. ¶¶ 3-28 (listing incidents, lawsuits and after-action reports); *Peltz*,
2025 WL 1412479, at *10 (concluding that assertion that "genuine issues of material
fact exist as to whether LAPD's alleged practice of arresting journalists was so persistent
and widespread that it amounted to deliberate indifference"); *Multi-Ethnic Immigrant
Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621, 627 (C.D. Cal. 2007)
(recounting LAPD's history of "unlawful dispersal orders and displayed excessive force
orders against demonstrators" going back to 1991 and the Gulf war). The immigration
raids that sparked the protest have continued, and further protests are reportedly planned
for Independence Day and later in July.[2]

What is certain from this history is that, as sure as the sun rises in the East every
morning, spontaneous protests will occur and recur in Los Angeles in response to
unanticipated societal "sparks" and LAPD will respond. The need for the Court to cabin
the unrestrained force repeatedly shown by LAPD is clear and immediate.

## **LEGAL STANDARD**

To obtain a temporary restraining order or a preliminary injunction, a plaintiff
must show "(1) he is likely to succeed on the merits of his claim, (2) he is likely to suffer

---

[2] *See* Karen Garcia, *Fear of immigration raids forces cancellation of several July
festivities in Los Angeles*, Los Angeles Times (June 30, 2025),
https://www.latimes.com/california/story/2025-06-27/fear-of-immigration-raids-force-
the-cancellation-of-several-july-festivities-in-los-angeles; Callum Sutherland, *'Free
America': Anti-Trump Administration Protests Planned Across U.S. on July 4*, Time
(July 1, 2025), https://time.com/7299015/.

MEMORANDUM IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

irreparable harm absent the preliminary injunction, (3) the balance of equities tips in his favor, and (4) a preliminary injunction is in the public interest." *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024) (quoting *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). When the government opposes an injunction, the third and fourth factors merge. *Meinecke*, 99 F.4th at 521.

The Court must follow "a unique likelihood-of-success standard in First Amendment cases," under which "the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech." *Meinecke*, 99 F.4th 514

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

LAPD recently and repeatedly violated the rights of the press to cover protests in a public forum. Protests are likely to recur, whether further protests on federal immigration enforcement or on other issues. Consistent with its decades-long history of trampling on the rights of the press, LAPD continues to attack and unlawfully interfere with reporters, and it is likely to continue doing so. Therefore, Plaintiffs are likely to prevail on the merits, which is "the most important factor" in deciding whether to grant a preliminary injunction," and "even more so when a constitutional injury is alleged." *Matsumoto v. Labrador*, 122 F.4th 787, 804 (9th Cir. 2024).

### A.    Constitutional Claims

#### 1.    *Interference with Right to Record and Cover Protests*

The protests and press coverage at issue in this case took place on the City's public streets and sidewalks, which are "the archetype of a traditional public forum" and hold a "special position in terms of First Amendment protection." *Snyder v. Phelps*, 562 U.S. 443, 456 (2011). As the Ninth Circuit has held, "[t]he First Amendment protects the right to photograph and record matters of public interest" in a public forum, including

but not limited to "the right to record law enforcement officers engaged in the exercise of their official duties in public places." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018); *see also Fordyce v. City of Seattle*, 55 F.3d 436, 438–39 (9th Cir. 1995) (recognizing "First Amendment right to film matters of public interest" such as "public protest march").

Newsgathering by other means must also "qualify for First Amendment protection," because "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). Therefore, "newsgathering is an activity protected by the First Amendment," especially since a "free press is the guardian of the public interest." *Leigh v. Salazar*, 677 F.3d 892, 897, 900 (9th Cir. 2012). "Just as streets and sidewalks historically have been recognized as being open to the public, the press has long been understood to play a vitally important role in holding the government accountable." *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 831 (9th Cir. 2020).

In light of "our deeply entrenched recognition of the public's right to access city streets and sidewalks, circuit precedent establishing the right to film public police activity, and the broadly accepted principle that the public's interest is served by the role the press plays," the Ninth Circuit upheld an injunction which provided that "journalists and legal observers" covering ongoing protests "shall not be subject to arrest for not dispersing following the issuance of an order to disperse," provided they do "not impede, block, or otherwise physically interfere with the lawful activities" of law enforcement officers. *Id.* at 823, 831. The injunction listed indicia to help identify journalists and legal observers, "such as press passes, people standing off to the side of protests not engaging in protest activities, people not intermixed with protest activities, and people carrying professional-grade photographic equipment." *Id.*

As the Ninth Circuit acknowledged, dispersing the press is not "essential or narrowly tailored to serve the government's interests," where "trained and experienced law enforcement personnel are able to protect public safety without dispersing

MEMORANDUM IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

journalists and legal observers and can differentiate press from protesters, even in the heat of crowd control."[3] *Id.* at 832–33. Therefore, "journalists" and "members of the public" who are merely observing or reporting on a protest "cannot be punished for the violent acts of others," and the "proper response to potential and actual violence is for the government to ensure an adequate police presence, . . . and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." *Id.* at 834 (cleaned up).

Here as in *Index Newspapers*, there is a "mountain of evidence" that LAPD violated these settled principles of First Amendment law by repeatedly attacking or targeting journalists who were easily identifiable as such according to well-recognized indicia. *Id.* at 831. Like the reporters in *Index Newspapers*, the journalists harmed or detained by LAPD were simply covering the news and doing nothing that remotely justified shooting them with LLM's, shoving them, forcing them to move, or detaining them. If other individuals committed unlawful acts, perhaps those individuals were subject to appropriate use of force, detention, or arrest. But the First Amendment prohibits LAPD from abusing the rights of journalists to cover events of public concern in a public forum.

### 2. *Retaliation*

The First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To state a First Amendment retaliation claim, a plaintiff must allege (1) he or she was engaged in a constitutionally protected activity; (2) the officers' actions would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the protected activity was a substantial or motivating factor in the officers' conduct.

---

[3] California law has long provided statutory protection for members of the press covering natural disasters, avalanches, and protests. Cal. Penal Code §§ 409.5, 409.6, 409.7. Although First Amendment rights do not derive from statute, the fact that California law enforcement agencies are subject to pre-existing obligations to identify journalists further shows they are capable of doing so.

14

*Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300–01 (9th Cir. 1999).

The first two elements are easily met. As explained above, reporters covering the protests at issue are engaged in speech protected by the First Amendment. It cannot be contested that actions such as "being shot with less-lethal munitions like pepper balls, tear gas, and paint-marking munitions, being pepper sprayed at close range, or being shoved by a law enforcement officer would chill a person of ordinary firmness from continuing to exercise their First Amendment rights." *Index Newspapers*, 977 F.3d at 827 n.4. As set for the in great detail in the declaration of Dr. Rohini Haar, although called "less lethal," the impact weapons LAPD uses can cause serious injury, disability, and death. Haar Dec. ¶¶ 17-21; *see also generally* Rose Dec.; Chariton Dec.¶

The third element is met as well. A plaintiff's speech is "a substantial motivating factor" in an officer's conduct when there is some "nexus between the defendant's actions and an intent to chill speech." *Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). "As with proof of motive in other contexts, this element of a First Amendment retaliation suit may be met with either direct or circumstantial evidence." *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002).

*Index Newspapers LLC*, 977 F.3d at 827, the Court found the numerous instances of unnecessary attacks on reporters or others gave rise to a strong intterference of retaliation by the government. The facts here show the same. LAPD committed numerous, repeated, and unprovoked attacks on journalists. This evidence establishes that Plaintiffs are likely to prevail on their claim that LAPD retaliated against them.

**B.    California Claims**

LAPD's actions also violate both the California constitution and protections for journalists and the public at protests enacted by the California Legislature.[4]

---

[4] Because courts should avoid reaching constitutional questions unnecessarily, the Court should grant Plaintiff's motion based on the state law claims, which provide total relief. *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1123 (9th Cir. 2025).

15

### 1.    *Protections for Journalists in Protests under SB 98*

In 2021, California Governor Newsom signed into law Senate Bill 98 ("SB 98"), ensuring protections for the press to observe and record law enforcement activities at public protests. The Legislature recognized that, "[w]hile [existing] California law protects members of the press from being stopped when entering closed areas during emergencies and natural disasters to gather information, these protections don't extend to protest events such as demonstrations, marches, protests, or rallies where individuals largely engage their First Amendment right to speech."[5]

SB 98, codified at Penal Code section 409.7, extends three key protections to members of the press when peace officers "establish a police line, or rolling closure at a demonstration, march, protest, or rally where individuals are engaged in activity that is protected pursuant to the First Amendment":

(1) A duly authorized representative[6] of any news service, online news service, newspaper, or radio or television station or network may enter the closed areas …

(2) A peace officer or other law enforcement officer shall not intentionally assault, interfere with, or obstruct the duly authorized representative of any news service, online news service, newspaper, or radio or television station or network who is gathering, receiving, or processing information for communication to the public.

(3) A duly authorized representative of any news service, online news service,

---

[5] *See* Sen. Floor Analysis, S.B. 98 (2021-2022 reg. sess.), as amended Sept. 3, 2021, at *https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220SB98*
[6] According to the California Attorney General, the term "'duly authorized' refers to the news station, newspaper, or radio or television station or network having 'duly authorized' the individual to be its representative," and it does not refer to "someone authorized to be in the area by the law enforcement officer." 67 Cal. Op. Att'y Gen. 535, 539 (1984) (discussing similar language in Cal. Penal Code § 409.5). Whatever the outer limits of a "duly authorized" journalist in the digital age, LAPD's actions unquestionably impacted reporters who fit within the Attorney General's definition, which carries great weight, especially since the Legislature was presumably aware of it in enacting Penal Code section 409.7. *California Assn. of Psychology Providers v. Rank*, 51 Cal. 3d 1, 17 (1990).

MEMORANDUM IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

newspaper, or radio or television station or network that is in a closed area
described in this section shall not be cited for the failure to disperse, a violation
of a curfew, or a violation of [Penal Code § 148(a)(1)] for gathering, receiving,
or processing information. …

Penal Code § 409.7(a).

The bill's author stated that law was enacted following widespread assaults and arrests of reporters covering the protests in response to the killing of George Floyd in 2020. "In California and across the country police have arrested, detained, and have physically assaulted journalists with rubber bullets, pepper spray, tear gas, batons, and fists. In many cases there are strong indications that the officers injuring journalists knew their targets were members of the press. Members of the press risk their personal safety and wellbeing each time they attend protest events to get the public the information they need, but rubber bullets, teargas, and even arrest cannot be the norm for an essential pillar of our democracy." Sen. Pub. Safety Comm. Analysis, S.B. 98, 2021-2022 Reg. Sess., at 3-4.

The author's statement was unfortunately prescient. As it has consistently done for decades, LAPD did exactly what SB 98's author condemned by committing numerous unprovoked attacks on journalists and improperly excluding them from areas in which they had the right to be present to cover ongoing protests. Any attempts to confine reporters to a "designated press area" does not comply "with a statute which specifically authorizes representatives of the press to enter closed areas." *Leiserson v. City of San Diego*, 184 Cal. App. 3d 41, 50 (Cal. Ct. App. 1986) (interpreting similar provisions of Cal. Penal Code § 409.5).

## 2. *Protections Against Less-Lethal Munitions under AB 48*

The same year it adopted SB 98, the Legislature also established limitations on law enforcement's use of kinetic energy projectiles and chemical agents at protests by passing Assembly Bill 48 ("AB 48"). Among other provisions, AB 48 added section 13652 to the Penal Code, which provides that "kinetic energy projectiles and chemical agents shall not be used by any law enforcement agency to disperse any assembly,

17

protest, or demonstration"[7] except when "the use is objectively reasonable to defend against a threat to life or serious bodily injury to any individual, including any peace officer, or to bring an objectively dangerous and unlawful situation safely and effectively under control," and when certain requirements have been met that protect both journalists and members of the public:

(1) Deescalation techniques or other alternatives to force have been attempted, when objectively reasonable, and have failed.

(2) Repeated, audible announcements are made announcing the intent to use kinetic energy projectiles and chemical agents and the type to be used, when objectively reasonable to do so. The announcements shall be made from various locations, if necessary, and delivered in multiple languages, if appropriate.

(3) Persons are given an objectively reasonable opportunity to disperse and leave the scene.

(4) An objectively reasonable effort has been made to identify persons engaged in violent acts and those who are not, and kinetic energy projectiles or chemical agents are targeted toward those individuals engaged in violent acts. Projectiles shall not be aimed indiscriminately into a crowd or group of persons.

(5) Kinetic energy projectiles and chemical agents are used only with the frequency, intensity, and in a manner that is proportional to the threat and objectively reasonable.

(6) Officers shall minimize the possible incidental impact of their use of kinetic energy projectiles and chemical agents on bystanders, medical personnel, journalists, or other unintended targets.

…

(9) Kinetic energy projectiles shall not be aimed at the head, neck, or any other

---

[7] Section 12652 defines "kinetic energy projectiles" to mean "any type of device designed as less lethal, to be launched from any device as a projectile that may cause bodily injury through the transfer of kinetic energy and blunt force trauma" including "rubber bullets, plastic bullets, beanbag rounds, and foam tipped plastic rounds." Penal Code § 13652(d)(1). It defines "chemical agents" to mean "any chemical that can rapidly produce sensory irritation or disabling physical effects in humans, which disappear within a short time following termination of exposure" including tear gas, "pepper balls, pepper spray, or oleoresin capsicum." *Id*. § 13652(d)(2).

MEMORANDUM IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

vital organs.

(10) Kinetic energy projectiles or chemical agents shall not be used by any law enforcement agency solely due … (A) A violation of an imposed curfew. (B) A verbal threat. (C) Noncompliance with a law enforcement directive.

The evidence shows that LAPD violated this statute by gratuitously shooting clearly identifiable reporters with kinetic energy projectiles, shooting them in the head or face, and indiscriminately firing into crowds. The evidence also shows indiscriminate use of tear gas in violation of the statute.

### 3. *LAPD's Targeting of Journalists Violates the California Constitution.*

The California Constitution's protections for freedom of speech in a public forum, as set out in Article I, section 2, are at least as extensive as those of the First Amendment to the United States Constitution. *Cuviello v. City of Vallejo*, 944 F.3d 816, 827 (9th Cir. 2019). For the same reasons that LAPD's conduct violates the First Amendment, it violates Art. I, § 2 of the California Constitution.

### 4. *The Court Can Enjoin Violations of California Law under the Bane Act.*

The Bane Act, Civil Code § 52.1, provides a private right of action for injunctive relief and other "appropriate equitable relief" against any person or entity that "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured" by federal or state law and the United States or California constitutions. Cal. Civ. Code § 52.1(a), (b). "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Murchison v. Cnty. of Tehama*, 69 Cal. App. 5th 867, 896 (2021) (quotation omitted).

Here, LAPD's intentional use of LLMs, horses, other physical force and threat of arrest against journalists who were obviously engaged in reporting constitutes interference with journalists' right to be in public places and gather news free from

assault by kinetic energy projectiles or otherwise—as protected under the First Amendment, Cal. Const. art. I, § 2, and Penal Code §§ 409.7, 13652— through "threats, intimidation or coercion." *Ennis v. City of Daly City*, 756 F. Supp. 2d 1170, 1177 (N.D. Cal. 2010) (showing that defendants targeted a plaintiff engaged in protected speech activities for "harassment and physical attack" by calling police on them, chasing and assaulting them satisfies the "threats, intimidation or coercion" requirement of the Bane Act). Police need not target protesters specifically because of their protected rights. Reckless disregard of the "right at issue" is all that is necessary. *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 804 (2017), *as modified* (Nov. 17, 2017).

Here, the evidence abundantly shows that LAPD repeatedly attacked and harassed journalists, violating their constitutional and statutory rights by threats, intimidation, or coercion. Plaintiffs are therefore likely to prevail on their Bane Act claim for injunctive relief. This Court has supplemental jurisdiction to enjoin Defendants' conduct as violations of Penal Code §§ 409.7 and 13652, and Cal. Const. art. I, § 2, under the Bane Act or directly under the state Constitution.

**5.** ***This Court Can Enjoin Violations of California Law under the Fourteenth Amendment.***

Plaintiffs have a protected liberty interest under the Fourteenth Amendment in the rights against police abuse of journalists provided by Penal Code §§ 409.7 and 13625, and this Court can enjoin LAPD's violation of those rights under the Fourteenth Amendment as well.

A violation of state law may be actionable as a Section 1983 claim based on a liberty interest**.** *Hallstrom v. City of Garden City*, 991 F.2d 1473, 1482 n.21 (9th Cir. 1993). "[A] State creates a protected liberty interest by placing substantive limitations on official discretion through state law or regulation," *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983), or by "(1) establishing 'substantive predicates' to govern official decision making, and (2) using 'explicitly mandatory language,' i.e. specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow."

20

MEMORANDUM IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

*Browning v. Vernon*, 44 F.3d 818, 821 (9th Cir. 1995) (holding state statute creating process for local courts to divert convicted defendants to probation created liberty interest in a fair and accurate rehabilitation evaluation and report required by that program); *Hallstrom*, 991 F.2d at 1482 (state statute guaranteeing timely presentation to a magistrate creates a liberty interest protected liberty interest actionable under § 1983).

Both § 409.7 and § 13652 create rights in which Plaintiffs have a protected liberty interest. Both statutes provide that when there are 'substantive predicates' — the existence of a public demonstration — certain specific mandates to police apply: law enforcement may not detain, arrest, or remove the press; and may not intentionally assault them; and may not indiscriminately fire less lethal weapons at the press when there is no reason to believe that this protected group presents an imminent threat of serious harm to law enforcement or others. LAPD's violation of these rights is therefore actionable under § 1983, and this Court has inherent equitable power to issue injunctive relief. *Porter v. Warner Holding Co.*, 328 U.S. 395, 397–98 (1946) (where plaintiff seeks to enjoin a defendant's illegal acts and practices, court's jurisdiction is equitable and "all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction," which are "even broader and more flexible" when the public interest is involved).

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT THE COURT'S INTERVENTION.

The Ninth Circuit has held that "a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005); *id.* 1002 ("'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury' for purposes of the issuance of a preliminary injunction." (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *accord Best Friends Animal Soc'y v. Macerich Westside Pavilion Prop. LLC*, 193 Cal. App. 4th 168, 185 (2011) (applying *Elrod* standard to state speech claim). More generally, because constitutional violations

21

can often not be adequately remedied through damages, the Ninth Circuit does "not require a strong showing of irreparable harm for constitutional injuries." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). Similarly, the guarantees of press access protected by § 409.7, which support constitutional guarantees of press access, cannot be adequately remedied by damages.

Because Plaintiffs have, at minimum, raised a colorable claim that the exercise of their constitutional and statutory rights to gather news and report on government activity in public, without fear or excessive force, have been infringed, they have satisfied the irreparable-injury requirement. *See id.* Members of the press are being shot by LAPD and are suffering serious injury as a consequence. As long as the Government is free to use less lethal munitions against nonviolent journalists, Plaintiffs' exercise of their First Amendment rights will "surely [be] chilled." *Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*, 466 F. Supp. 3d 1206 (W.D. Wash. 2020). And because Penal Code § 409.7 & § 13652 protect and enable Plaintiffs' constitutional rights to be present at protests and to gather news and report on them, LAPD's abridgment of those rights by using force against journalists and preventing them from reporting also constitutes irreparable harm.

## III.    THE PUBLIC'S INTEREST AND BALANCE OF EQUITIES WEIGH STRONGLY IN FAVOR OF PLAINTIFFS.

The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Since this case involves government actors, the balance of equities factor merges with the fourth factor, public interest. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

This balance tilts sharply in Plaintiffs' favor. First, the balance of equities and public interest always favor "prevent[ing] the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted); accord, *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th

22

MEMORANDUM IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1  Cir. 2007). *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758
2  (9th Cir. 2019).

3  The public interest also strongly favors protecting the rights of journalists
4  covering public protests. "[I]n a society in which each individual has but limited time
5  and resources with which to observe at first hand the operations of his government, he
6  relies necessarily upon the press to bring to him in convenient form the facts of those
7  operations." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491 (1975). The public depends
8  on journalists for "[f]irsthand accounts, buttressed by video evidence," which "enhance
9  accuracy and credibility in reporting and increase transparency and reader trust." *People*
10 *for the Ethical Treatment of Animals, Inc. v. N. Carolina Farm Bureau Fed'n, Inc.*, 60
11 F.4th 815, 829 (4th Cir. 2023). "When wrongdoing is underway, officials have great
12 incentive to blindfold the watchful eyes of the Fourth Estate," and the public interest
13 demands protecting the media's role as "surrogates for the public" to report on
14 controversial events. *Leigh*, 677 F.3d at 900.

15 Finally, but importantly, Plaintiffs' proposed relief would not impose hardship on
16 Defendants because the relief largely tracks existing substantive requirements. Penal
17 Code § 409.7 already limits Defendants' use of force against journalists and prohibits
18 them from excluding journalists from closures at protests or arresting them for failure to
19 disperse. Clark Decl. ¶ 13. Penal Code § 13652 already imposes limitations on
20 Defendants' use of LLMs at protests generally, including against journalists. Defendants
21 are additionally already subject to an injunction regulating their use of certain LLMs
22 through the *Black Lives Matter* Injunction. *See Black Lives Matter Los Angeles*, 2021
23 WL 3162706, at *4; Sobel Dec ¶ 18. LAPD is amply capable, if it chose to do so, of
24 avoiding deliberately or indiscriminately using force against journalists, of
25 distinguishing journalists from protestors, and of providing journalists the access and
26 treatment that LAPD is statutorily required to provide. Clark Decl. ¶¶ 10-13. Further
27 proof that the order is not an unreasonable hardship is that LAPD's written policies and
28 directives largely require the same things that the requested injunction would do. Clark

23

Decl. ¶¶ 14-31.

Plaintiffs propose a TRO and preliminary injunction that would require LAPD to follow the mandates of Penal Code §§ 409.7 and 13652 and the BLM injunction (specifically as to journalists), with certain actionable requirements to help ensure implementation and guard against further abuse, including:

- Confirming the definition of a journalist subject to these protections, based on California law, and providing indicia for identifying journalists, based largely on the criteria established in *Index Newspapers LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1156 (D. Or. 2020), and upheld by the Ninth Circuit, as well as LAPD's own stated policy that it "WILL recognize individuals who self-identify as media representatives and will NOT require specific media credentials," *see* Sobel Dec., Exh. 79 (Departmentwide memo from Deputy Chief & Chief of Staff Dominic Choi dated Oct. 30, 2020).[8]

- Ensuring that the Department provides the Preliminary Injunction to all officers and re-issues its policy on protests within 10 days, and does not deploy officers to protests that have not acknowledged receipt and review.

The Preliminary Injunction proposed by Plaintiffs would provide minimally burdensome additional procedures to ensure compliance with the law:

- Ensuring that the Department re-issues its policy on policing protests (including policies on LLMs) along with copies of the Preliminary Injunction to officers every six months, and does not deploy officers to protests that have not acknowledged they received and reviewed the materials.

- Designating a Journalists' Compliance Liaison for the Department at the rank of captain or above charged with ensuring compliance with the Preliminary Injunction, as well as receiving and tracking complaints of violations.

---

[8] This injunction protects all journalists covering the protests at issue because such breadth is necessary to give Plaintiffs the complete relief to which they are entitled. *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996).

24

- Designating an Acting Journalists Compliance Liaison at the rank of lieutenant or above for every protest to which LAPD deploys officers, and providing Plaintiffs with the contact information to allow prompt reporting and resolution of any alleged violations of the Injunction.

Any hardship on Defendants in complying with these minimal provisions, which act only to ensure they follow existing legal obligations, is vastly outweighed by the hardship on Plaintiffs from enduring unlawful use of force or restriction of access when exercising statutorily and constitutionally protected right to report on protests.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their ex parte application for a temporary restraining order and issue an order to show cause why a preliminary injunction should not issue.

Dated:    July 3, 2025          Respectfully submitted,

LAW OFFICE OF CAROL A. SOBEL
FIRST AMENDMENT COALITION
LAW OFFICE OF PETER BIBRING
SCHONBRUN, SEPLOW, HARRIS,
 HOFFMAN & ZELDES
LAW OFFICE OF SUSAN SEAGER


By:    */s/ Peter Bibring*
            Peter Bibring

*Attorneys for Plaintiffs*

MEMORANDUM IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION