# Declaration of Adam Rose

I, Adam Rose, hereby declare:

1.      I am the secretary and press rights chair of the Los Angeles Press Club, which is a plaintiff in the above-captioned action. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

**Background on the Los Angeles Press Club**

2.      Los Angeles Press Club is a 501(c)(3) nonprofit organization with no parent corporation and no stock, registered in the State of California. The organization has about 1,000 member journalists in Southern California and has operated since 1913 to support, promote and defend quality journalism.

3.      I am an individual dues-paying member of the Los Angeles Press Club in good standing and have been for well over a decade. I have spent about 20 years as a journalist and editor for various media organizations, including LAist, Los Angeles Times, HuffPost, and CBS/Paramount. I have worked in the field and in senior editorial roles. My current job is running an applied research lab that authenticates and preserves digital evidence. In that position, I have collaborated on investigations with outlets like Reuters, Associated Press, and Rolling Stone. One of those stories was a war crimes investigation that led prosecutors to re-open a 30-year-old cold case. In 2023 I shared in a National Magazine Award and several National Press Photographer Association Awards, and earned a nomination for a national News Emmy. In 2024 I was given the Si Se Puede Award by the National Association of Hispanic Journalists.

4.      For the Los Angeles Press Club, I serve both on the board of directors and as secretary (an officer of the board). I am also the organization's press rights chair and volunteer for these roles, for which I receive no compensation.

5.      Los Angeles Press Club organizes a variety of programming to benefit members and non-members alike. We offer a *Foot In The Door Fellowship*

1

program to help early-career journalists learn about the profession and find work opportunities, especially if they come from communities historically underrepresented in the media. We provide scholarships to students, emergency grants to journalists in need (ex: losses due to recent wildfires), and grants to support investigative journalism that might otherwise go unreported. We also host a variety of educational and professional networking events. We are known for two annual and long-running awards programs which recognize notable pieces of journalism: the *Southern California Journalism Awards* and the *National Arts & Entertainment Journalism Awards*. Judging takes significant resources. We have reciprocal agreements with other press clubs around the country, who serve as neutral judges in our contest while our volunteers and staff serve as neutral judges in theirs.

6.      The role of press rights chair was established following a series of incidents in 2020 when journalists in our region were injured, detained, and/or arrested by law enforcement officials. I was elected to the role at that time and have served in it since.

7.      As press rights chair, I track and document incidents of press rights abuses throughout California, especially since 2020. I have also done historical research dating back to at least 2000. This is effectively a press function, as I report incidents through a publicly shared tracking spreadsheet and on social media. Many LAPC members and staff contribute to this work.

8.      As press rights chair, I have lobbied for press protections in state law. I worked with a coalition of press advocacy groups to support California Senate Bill 98 in 2021, worked with legislative staff to negotiate the language of that law, and was one of two witnesses the bill's author called to testify about it in the California Assembly Public Safety Committee. Now codified as California Penal Code § 409.7, the law exempts duly authorized members of the press from dispersal orders and from arrest when doing their job at an unlawful assembly. It

also affirms that police may not interfere with press at such incidents. I also lobbied for Assembly Bill 48 the same year, which, among other protections, established Penal Code § 13652(b)(6) to require that police officers "minimize possible incidental impact" of what are commonly referred to as "less lethal" munitions (or "LLMs") on journalists.

9.    Over the past several years, as press rights chair for the Los Angeles Press Club, I have met with command staff and press liaisons for major law enforcement agencies in our region, including the Los Angeles Police Department, as well as civilian personnel such as inspector generals, communications directors (or equivalent), attorneys who represent the Departments, and elected officials and/or commissioners who have some degree of oversight. The purpose of these engagements has been to inform law enforcement leadership of their department's responsibilities to respect press rights and access, and to get their personnel to observe these protections. Other Los Angeles Press Club volunteers and staff have also participated in these activities.

10.    Los Angeles Press Club has issued numerous public letters to local department leadership, and combined with my own correspondence has established years of public records demonstrating that LAPD departmental leadership should have been fully aware of their obligations to protect press rights.

11.    Press rights violations by law enforcement are often concentrated in easily recognizable periods or "flashpoints." Of particular note in Los Angeles: 2000 Democratic National Convention protests; 2007 MacArthur Park "May Day Melee" labor rights protests; 2011 Occupy protests; 2020 Black Lives Matter protests; 2021 Echo Park homeless rights protests; and 2022 abortion rights protests. All six of these prior flashpoints have led to lawsuits (sometimes multiple) by individual journalists against the City of Los Angeles over LAPD misconduct toward press, including judgments and settlements adding up to millions of dollars. These include journalists suffering career-ending injuries at the

hands of LAPD, and multiple instances where LAPD attempted to blame the victim until video evidence surfaced showing that LAPD officers were clearly in the wrong and even fabricating claims meant to discredit press (e.g., leading to a settlement with Calvin Milam of City News Service in 2011).[1] Several lawsuits from 2020, 2021, and 2022 are still unresolved, and significantly more are anticipated due to events in June 2025.

12.    Of particular note among past lawsuits is the widely-known *Crespo* settlement (*Al Crespo et al. v City of Los Angeles*) coming out of the 2000 DNC, where LAPD agreed to a number of requirements to facilitate sight and sound access for press, such as providing news media with observation areas commonly called "Crespo areas." This settlement, binding on LAPD but not on journalists, included Crespo areas to help give journalists a relatively safe place to be at unlawful assemblies but in no way limited press access. Sadly, through public records requests, I obtained internal emails from LAPD's public information office (PIO) where personnel in 2020 seemed to have fundamentally misunderstood the settlement and perversely contorted the meaning to use Crespo areas like a cage to constrain media away from sight and sound access of events.

13.    Following the 2007 May Day Melee, then-Chief William Bratton made a public comment that "officers go out of control faster than any human being in the world." Responding to union pressure he later walked back that comment in a video LAPD released online, noting still that "One of the things I know about cops is you have to control them.[2]

---

[1] Dennis Romero, *Occupy LA: LAPD Investigates Caught-on-Video Arrest of Journalist Calvin Milam*, L.A. Weekly (Dec. 12, 2011), *https://www.laweekly.com/occupy-la-lapd-investigates-caught-on-video-arrest-of-journalist-calvin-milam/*, a true and correct copy of which is lodged as Exhibit 27.

[2] Los Angeles Police Department, *LAPD - Chiefs Message - The May 1st Macarthur Park Incident* (May 17, 2011), https://www.youtube.com/watch?v=ssFrukJET38, a true and correct copy of which is lodged as Exhibit 28 to my declaration.

14.     In 2017, then-First Assistant Chief Michel Moore spoke candidly on an official LAPD podcast where the host said he "bleeds LAPD blue." Discussing the 2007 May Day Melee at the 10:34 mark, Moore said, "It's not to say that everything that occurred there, every act, was wrong. But what happens with the rights acts is that it gets overwhelmed by the instances in which that we were not right, and we were actually operating out of a point of anger or apparently being punitive, and being excessive." A few months after the interview, Moore became Chief of LAPD.[3]

15.     I have raised alarm with law enforcement leadership about the actions of their personnel in the flashpoints in 2020, 2021, 2022, and a handful of smaller but no less important incidents.

16.     During a 12-month period (May 2020 to April 2021) in California, I identified more than 50 incidents of apparent law enforcement misconduct toward people who should have been recognized as journalists. Twenty-six of these incidents involved LAPD, and an additional six may have involved LAPD but it was impossible to tell who fired LLMs due mutual aid situations where LAPD lined up with another law enforcement agency. The victims were just doing their job when they had their constitutional rights chilled. I provided photo and video evidence of these incidents to legislators to demonstrate the need for Senate Bill 98 and Assembly Bill 48, which the California Legislature passed overwhelmingly and the Governor signed into law.

17.     The Los Angeles Press Club conducts advocacy on press rights, and created the press rights chair position I hold, because its members have routinely covered protests and other incidents in which police have subjected them to excessive force and restriction of their right to access protests, and because our

---

[3] *https://archive.org/details/our-lapd-story-official-lapd-podcast/2017_10_29_our_lapd_story_podcast_crowd-control.mp3*, a true and correct copy of which is lodged as Exhibit 29.

members, as journalists, will unquestionably cover protests in in Los Angeles and elsewhere in the future and so face harm at the hands of LAPD and other agencies.

**Los Angeles Press Club Response to June 2025 Protests**

18.    During just the first few days of June 2025 at protests in Los Angeles (notably "Anti-ICE" and "No Kings"), I identified more than 75 incidents of apparent law enforcement misconduct toward people who should have been recognized as journalists. Based on my personal knowledge of Senate Bill 98 and Assembly Bill 48, I believe law enforcement officers in these incidents have been violating both the letter and legislative intent of the law.

19.    The brief period from June 6, 2025 to today has seen an overwhelmingly greater number of incidents of law enforcement assaults on press, and violations of press rights than during any other period of protest, to my knowledge and experience as press rights chair. I know from speaking to members and reviewing photos and video, that since June 6 at least seven members of my organization have been subject to use of force or suffered a serious press rights violation by federal officers (two of them repeatedly), six by LAPD, and five by LASD. This doesn't include potentially dozens of incidents with minor amounts of tear gas or similar chemical agents.

20.    Since June 6, 2025, I have had to divert significant time and resources from other Club activities in order to address press rights violations by law enforcement personnel. In the first seven days of these incidents, I estimate that I spent at least 100 hours personally responding to these incidents and calls from members of the press, a significant portion of which involved LAPD agents. Other volunteers and staff from our organization have also supported these efforts. Both volunteer and staff time continues to be diverted from our other activities during what happens to be the busiest period of the year for our staff in annual fundraising and awards programs. Our annual Southern California Journalism Awards event, our biggest function and fundraising event, was scheduled for June 22, 2025. The

resources our staff has spent on responding to incidents of assaults on press by
LAPD officers has come out of resources we planned to spend, and needed to
spend, working on the details, logistics, and fundraising for the event to ensure its
success.

21.    Our response efforts include but are not limited to checking on the
wellbeing of journalists brutalized by police, ensuring they have access to
emergency grants or mental health services, providing information on available
legal support hotlines, and tips on safety and access on protests. I have made an
effort to contact most if not all of the journalists named in this declaration, plus
dozens of others. Many journalists victimized by police force are ones I have
known personally over the years due to my work with the Los Angeles Press Club,
and many are our members.

22.    Over the past five years, I have repeatedly contacted and sometimes
had lengthy meetings with the highest ranks of LAPD management, LAPD PIO,
president and staff of the Los Angeles Police Commission, and other civic leaders
(including conversations with deputies and emails directly to Mayor Karen Bass,
City Attorney Hydee Feldstein-Soto, and members of City Council). I have been
joined in many of these efforts by representatives from other journalist trade
associations and labor unions, including but not limited to the national or local
chapter leadership from the Society of Professional Journalists, Media Guild of the
West (the union of the Los Angeles Times and Los Angeles Daily News), Asian
American Journalists Association, National Association of Black Journalists,
National Association of Hispanic Journalists, IWW Freelance Journalists Union,
and National Press Photographers Association. We have been careful to ensure a
diverse cross-section of the press was both heard from and could demonstrate we
shared the same consistent concerns about LAPD misconduct toward press. In
advance of many of these meetings, roughly two dozen such trade associations and
labor unions have participated and contributed feedback on how to convey

journalists' concerns to LAPD. The resulting communications and meetings have
addressed LAPD policy and culture (including apparent shortcomings in training
and discipline) related to press treatment, as well as implementation of the laws
that we helped to pass.

23.    I have frequently notified LAPD leadership, LAPD PIO, and civic
leaders about press rights violations as they happen in real time, occasionally even
at odd hours of the night to ask assistance getting the release of journalists
unlawfully detained or arrested. I have also initiated a number of departmental
complaints seeking investigations and discipline for officer misconduct, although
in years of filing such complaints I am unaware of any discipline meted out.

**Documenting LAPD Violations in June 2025 Protests**

24.    One of my most intensive response efforts has been collecting
evidence of these incidents. To collect and document these incidents, I review
social media, send emails out to press club members, and ask journalists and
members to report incidents to me. I also try to confirm incidents by obtaining
photographic or video evidence, confirmation through other reporting sources, and
often by contacting the reporter who experienced the violation. In other words, I
approach the task of documenting violations as I approach reporting, with the need
to confirm the accuracy of reports and fact-check sources. Approaching this as
reporting has allowed me to compile a tracking spreadsheet that now includes more
than 70 potential examples of law enforcement misconduct across multiple
agencies, including LAPD, since June 6. 2025. I have also put together a slideshow
of photo and video evidence. Both have been shared with law enforcement and
civic leaders in hopes of convincing them to police their own officers. To date, the
official response has been muted. These documents have also been shared with
other media members to help them report on these incidents, and I have spent
significant hours fielding media inquiries.

25.    After more than 20 years in media, I have learned that most journalists

have been taught that they should not "be part of the story" and avoid reporting on

or publicizing their own personal experiences while on the job. Further, I have

witnessed a pattern from communications with general counsels and PR

representatives for large newsrooms that many corporate outlets are reluctant to

share details about their employees whose rights have been impacted in the field.

As a result, I am confident that my reporting is a significant undercount of the

incidents. Unless otherwise noted, the incidents set forth below all involve LAPD

officers in the area of downtown Los Angeles since June 7, 2025.

26.    On June 8, 2025, an LAPD officer appeared to aim his weapon and

intentionally shoot Lauren Tomasi of 9News Australia in the leg.[4] The video of the

incident showed that she was an appropriate distance from LAPD, holding a

clearly visible mic flag, and talking into a professional TV camera on a public

street. The incident has been widely condemned, even by Australian Prime

Minister Albanese during remarks he gave shortly after at the National Press Club

of Australia, calling the incident "horrific."[5] 9News Australia is a newsroom

member of the Los Angeles Press Club.

27.    On June 8, LAPD shot student journalist Jeremy Cuenca twice with

LLMs without prior warning, nearly severing the tip of his finger and requiring

hours of surgery to reattach it. The LLMs also caused significant bruising on his

leg and destroyed his camera. Cuenca was on assignment for the Collegian, the

student paper of Los Angeles Community College, which reported on the incident.[6]

---

[4] *Reporter shot with rubber bullet in LA: The FULL story | Lauren Tomasi
interview | Today's Take*, 9News Australia (June 12, 2025), at
https://www.youtube.com/watch?v=FOoeZFR9DY4, a true and correct copy of
which is lodged as Exhibit 30.
[5] https://www.youtube.com/watch?v=-FCmHPAQ-DU, a true and correct copy of
which is lodged as Exhibit 31.
[6] *Without Warning: LAPD Opens Fire on Student Journalist, Downtown L.A.
Crowd*, Collegian Wired (June 14, 2025),
https://www.youtube.com/watch?v=UhBRU5KVPMQ&, a true and correct copy

(cont'd)

9

LACC has a long-running close relationship with the Los Angeles Press Club and their students participate in many of our events. Cuenca himself volunteered at our most recent fundraiser. When Penal Code § 409.7 was established, it was a frequent point of discussion with legislators that students would have the same rights as any other journalist. Since his injury, I have spent time helping Cuenca find assistance on multiple fronts.

28.    On June 8, New York Times reporter Livia Albeck-Ripka was shot by LAPD with a "less lethal" munition and injured just below her rib cage. She was treated at a hospital.[7]

29.    On June 8, freelance journalist Sean Beckner-Carmitchel and several other journalists were filming a protest on Spring Street between Los Angeles City Hall and the Clara Shortridge Foltz criminal courthouse. The journalists were carrying large cameras and similar professional equipment and huddled in an entrance to a closed underground parking garage at the Clara Shortridge Foltz courthouse to stay out of the way of LAPD. The journalists were forced to leave the parking garage entrance when LAPD fired tear gas directly in front of their location and physically entered the parking garage ramp and ordered journalists to leave. Beckner-Carmitchel is a member of the Los Angeles Press Club. I have known Beckner-Carmitchel for several years, in particular following his coverage of protests as a freelancer for a number of news outlets. His work has been published in The New York Times, CNN, CalMatters, among other outlets. He has been reporting for LA Public Press during these June incidents. Beckner-

of which is lodged as Exhibit 32.  True and correct copies of photos Jeremy provided me of his injury and damage to his camera caused by the LLM are lodged as Exhibits 33 and 34.

[7] Livia Albeck-Ripka, Gabriel Blanco, Christina Shaman and Nikolay Nikolov, *A Look at the Crackdown On the L.A. Protests*, N.Y. Times (June 10, 2025), at *https://www.nytimes.com/video/us/politics/100000010217680/a-look-at-the-crackdown-on-the-la-protests.html*, a true and correct copy of which is lodged as Exhibit 35.

Carmitchel filmed the incident at the garage entrance.[8]

30.     During this same incident on Spring Street on June 8, Beckner-Carmitchel and other journalists attempted to flee LAPD by walking onto Spring Street and Grand Park. In video he captured, Beckner-Carmitchel can clearly be heard telling officers that he was going where they want him to go. LAPD officers chased an unidentified woman photographer with multiple professional cameras and large lenses as well as press identification on a lanyard around her neck even though she was walking away from officers and holding her arms in the air. One LAPD officer shoved the photographer as she was walking away and then another officer on horseback ran his horse into her from behind as she continued to walk away. Beckner-Carmitchel filmed this incident.[9]

31.     During this same incident on Spring Street on June 8, when Beckner-Carmitchel and other reporters attempted to flee LAPD into Grand Park, LAPD officers appeared to take pot shots with an LLM at an unidentified photographer with a yellow helmet. The photographer was holding up a professional camera to film the officers, had other photography gear strapped to him, and appeared to have some sort of identification on a lanyard which he was also holding in the air. The LLM landed in the bed of yellow flowers in front of him. Video of the incident was filmed by Beckner-Carmitchel.[10]

32.     On June 8, CalMatters reporter Sergio Olmos was hit in the chest with an LLM. Video I watched appeared to show LAPD discharging skip-fire rounds

---

[8] See the video attached as Exhibit A to the Declaration of Sean Beckner-Carmitchel, lodged as Exhibit 36 and posted at https://bsky.app/profile/acatwithnews.bsky.social/post/3lr5dzsokwc2i

[9] See the video attached as Exhibit B to the Declaration of Sean Beckner-Carmitchel, lodged as Exhibit 38 and posted at https://bsky.app/profile/acatwithnews.bsky.social/post/3lr5esplzsc2b

[10] https://drive.google.com/file/d/1A5m2UNhs7PfcSbfWsikLYypvnxnMobO5/view?usp=drive_link

1   into a crowd of protestors and journalists.[11] There was no apparent effort to

2   minimize possible incidental impact of the munition on journalists.[12] CalMatters is

3   a leading online source of civic news about California. Olmos has reported in

4   Ukraine on the war and been published in several top national outlets.

5       33.    On June 8, photojournalist Sean Beckner-Carmitchel was among a

6   group of journalists carrying large cameras, tripods, headphones, and similar

7   professional equipment and were filming and reporting about protesters walking in

8   the intersection of Alameda and East Aliso streets in downtown Los Angeles. The

9   LAPD ordered the press to leave the protest area. At least twice and as depicted in

10  Beckner-Carmitchel's video, the LAPD screamed at the journalists, "Media, go!" [13]

11  This appears to be a blatant violation of Penal Code § 409.7 as I understand the

12  intent of the law.

13      34.    Similarly, on June 8 on Temple and Alameda streets in downtown Los

14  Angeles, a group of about 12 journalists were ordered by LAPD to move away

15  from protests and were held in a "press area" about 150 feet away from protesters

16  and the police line. Many of these journalists were wearing large "press" labels on

17  their clothing and with press identification on lanyards, along with large

18  professional camera equipment. Journalists complained of being held too far a

19  distance to observe police actions, and also of being threatened with arrest if they

20  did not stay behind the police line, in back of the officers and away from

21  protesters. This incident was documented in multiple videos posted by independent

22

23  [11] "Skip-firing" is when police aim at LLM rounds at the ground in front of
    protestors so that they bounce toward people rather than hitting them directly.
24  [12] Lodged as Exhibit 40:
25  https://x.com/mrolmos/status/1931881207073264118?s=46, Lodged as Exhibit 41:
    https://www.washingtonpost.com/style/media/2025/06/09/journalists-injured-la-
26  protests/
27  [13] See the video attached as Exhibit E to the Declaration of Sean Beckner-
    Carmitchel, lodged as Exhibit 42 and posted at
28  https://bsky.app/profile/acatwithnews.bsky.social/post/3lr4ubmg2nc22

journalist Constanza Eliana Chinea, who identified journalists from CNN and the

Associated Press in the group.[14]

35.    On June 8, an unidentified videographer for the Associated Press was

filming their livestream. Seen from the videographer's own camera starting at the

1:31:17 mark of their live stream posted online (and running for about one

minute)[15], an LAPD officer lines up a shot at the videographer (surrounded by

other press), who ducks behind something just before an LLM round lands next to

them. There is no evident threat or justification for the officer to fire. The video

records nearby journalists or protesters saying of the officers with LLMs that

"they're supposed to shoot them at the ground" but were firing "at their face" and

"he's firing right at us."

36.    On June 9, Capital & Main reporter Jeremy Lindenfeld was shot by

LAPD in the abdomen with foam baton or similar round from approximately 25

feet away. Along with video, he posted a photo of himself demonstrating how he

was wearing a helmet with "PRESS" written across it in large letters and

displaying a press ID issued from the National Press Photographers Association on

a lanyard.[16] Lindenfeld is a member of the Los Angeles Press Club and has won

several awards in our annual journalism contests, and I have followed his reporting

and photojournalism for many years.

37.    On June 9, photojournalist Michael Nigro was shot in the head by

LAPD with a "less lethal" munition. He was clearly wearing "press" labels and

holding two large cameras. He was saved from serious injury only because he wore

---

[14] Lodged as Exhibit 43: https://www.instagram.com/p/DKp_9HZBtUp/
Lodged as Exhibit 44: https://www.instagram.com/reel/DKsywBRyr2u/
[15] Lodged as Exhibit 45:
https://www.youtube.com/watch?v=YF5yTOWzdB4&t=5477s
[16] Lodged as Exhibit 46:
https://bsky.app/profile/jeremotographs.bsky.social/post/3lr7uewktsk2x
Lodged as Exhibit 47:
https://bsky.app/profile/jeremotographs.bsky.social/post/3lr7wtm7h6s2x

a large helmet, which was damaged in the shooting. He provided me with photos of the damage as well as video he was taking during the incident (it occurs where he turns slightly at the 2:52 mark).[17] Nigro is a freelance photojournalist who was working for Sipa Photo Agency and Getty on that day.

38.    On June 9, nationally recognizable CNN anchor Erin Burnett was shoved by an advancing line of LAPD officers. While being shoved on live television, recordings show her saying, "They knew we're media. They were just as happy to push me as to push anybody else."[18]

39.    On June 9, while reporting live from a public street, CNN reporter Jason Carroll was told he was being "detained" by the LAPD, ordered to put his hands behind his back, and escorted away from the police line. An LAPD officer told Carroll, "Don't come back or you will be arrested." I made repeated calls to LAPD's Public Information Office and was in contact with CNN personnel. My understanding is that while Carroll and a photographer were released, two of CNN's security guards were arrested and cited even though they were duly authorized by CNN to remain as part of their crew. Videos of Carroll during the incident and reporting on it after were circulated widely online.[19]

40.    On June 10, Status Coup reporter Tina-Desiree Berg was livestreaming in a place that appeared safe and to offer an appropriate vantage point while being out of the way of LAPD. She was wearing press ID on a lanyard. However, an officer ordered her to leave the area. Berg repeatedly asserted her right under Penal Code § 409.7 but the officer refused to comply with the law and escorted her out. The incident begins at the 1:56:25 mark of her livestream and

---

[17] Lodged as Exhibit 48: https://drive.google.com/drive/u/0/folders/1K_15-GYcAQf-KK9iCBy1vmgcM1t7vTib
[18] Lodged as Exhibit 49:https://x.com/OutFrontCNN/status/1932277470075486409
[19] Lodged as Exhibit 50:https://x.com/acyn/status/1932290084164051406?s=46
Lodged as Exhibit 51: https://x.com/acyn/status/1932292641418527217 ; Lodged as Exhibit 52: https://www.youtube.com/watch?v=BFxwYnj52q0

runs about two minutes.[20] Berg is a member of the Los Angeles Press Club who has covered dozens of protests. Status Coup is a co-plaintiff.

41.    On June 10, Los Angeles Times reporter James Queally was told to leave an area by LAPD. When Queally reminded the officer that he had a legal right to be there, the officer shoved Queally.[21] I have known Queally for about five years and followed his reporting for at least twice as long. He covers crime and policing, has extensive experience covering protests, and was part of Pulitzer Prize winning coverage at the Times.

42.    On June 10, another CNN crew was split up as LAPD officers detained their security. LAPD officers were caught on camera saying that some of the CNN crew could pass while others could not, even though other CNN crew were speaking up to make it clear they were all duly authorized to be part of the news coverage team.[22]

43.    On June 10, LAPD at the corner of 4th and Olive chased and shoved multiple people in "press" helmets and gave unlawful orders to "leave the area," violating PC 409.7. Video shows no protesters in the immediate area, and the only people being shoved by LAPD officers all appear to be press due to their helmets, IDs on lanyards, and large cameras.[23]

44.    On June 10, Lauren Day of ABC News (Australia) was hit by chemical munitions, saying on air, "You can see why they call it tear gas: it really

---

[20] Lodged as Exhibit 53:
https://www.youtube.com/live/NPG9zIxMUKc?si=_JTYvoF1-3m4WBnH&t=6985
[21] Lodged as Exhibit 54:
https://bsky.app/profile/jqwritesstuff.bsky.social/post/3lrcjfamzdk2l
[22] Lodged as Exhibit 55:
https://bsky.app/profile/acyn.bsky.social/post/3lrbu7nu36u2w
[23] Lodged as Exhibit 56:
https://drive.google.com/file/d/1gdrY3LP2QVDlB3eAitvrrLwGJ-yn2xwY/view?usp=sharing

burns your eyes, it burns your throat." [24] Her camera operator was shot in the chest with a "less lethal" round. Despite wearing Kevlar, the camera operator described the pain in a news report as "being punched in the chest."[25] Both incidents occurred in Downtown's Little Tokyo where LAPD was deployed and clearing protesters, but the ABC News crew did not positively ID who fired the munitions.

45.    On June 11, two mounted LAPD officers pinned photographer Montez Harris between their horses. Later, LAPD used a horse to repeatedly charge into Harris, while other officers pointed weapons directly at Harris (rather than pointing to fire the weapons at the ground in front of him). Harris was later shot with a "less lethal" munition. Harris is a freelance photographer who was carrying an unmistakable professional camera with a large lens.[26]

46.    On June 11, Korea Daily staff photographer Sangjin Kim was shot in the back by LAPD with a "less lethal" munition, resulting in a significant bloody welt.[27] Kim was carrying professional camera equipment and wearing visible press ID. Kim was shot in Koreatown.

47.    "Kettling" is a tactic employed by police in protests in which they use one or more police lines to surround an assembly so that participants are not free to leave. Police often use kettling as a way to confine a group of protestors they intend to arrest, so they can arrest them one at a time. Kettling is a familiar tactic to many journalists who have covered protests. During the passage of Senate Bill 98, both the legislature and governor expressed concern that they did not want the bill to include language that would imply press are allowed into a command post, but

---

[24] Lodged as Exhibit 57: https://www.youtube.com/watch?v=P_gkltz67VA
[25] Lodhed as Exhibit 58: https://www.smh.com.au/world/north-america/fourth-australian-media-worker-struck-in-la-riots-press-groups-say-journalists-targeted-20250611-p5m6iq.html#selection-4419.0-4423.117
[26] Lodged as Exhibit 59: https://www.instagram.com/reel/DKyS2XzRXSo/
[27] Lodged as Exhibit 60 https://drive.google.com/drive/folders/1bGm47NgKH7IPQpZAf2RlCbOOCoG7czEv?usp=drive_link

otherwise wanted to ensure press access to areas closed by police to the general public. Their legislative staff specifically reviewed examples I provided to them where LAPD had kettled press in 2020 and 2021 in such a manner that the press could not observe the police activities. The resulting bill sought to prevent that in the future by including the requirement in Penal Code section 409.7 that if police "establish a police line, or rolling closure at a demonstration, march, protest, or rally" that any "duly authorized representative of any news service, online news service, newspaper, or radio or television station or network may enter the closed areas."

48.    On June 11, a group of press was kettled by LAPD officers in front of City Hall. Press repeatedly pointed out they were media and asked if they were allowed to leave. Officers said "no." The group of perhaps 10 press included freelancers and someone with Fox News, among other unidentified newsrooms.[28]

49.    On June 11, photojournalist Ted Soqui was shot with "less lethal" munitions by LAPD three times in his back[29]. Soqui has worked as photojournalist in Los Angeles for the past 40 years and works for Sipa Photo Agency. He is a former staff photographer for the LA Weekly and his work has been published in the New York Times, Time, Newsweek, among other publications.

50.    On June 11, Univision national correspondent Romi De Frias was run into by an LAPD officer on a horse while she was complying and walking away.

---

[28] Lodged as Exhibit 61: https://drive.google.com/file/d/1o2NOWzbFi7MhA-RMmRBCWtwoF1P_e0pk/view?usp=sharing
Lodged as Exhibit 62: https://drive.google.com/file/d/1gFHrtMP-K9-dpVVwkDs-dYKSti_xqX-d/view?usp=sharing
Lodged as Exhibit 63:
https://drive.google.com/file/d/1xNAbSnn8ueBhaBzeBL6AtcWTGAt6fj1B/view?usp=sharing
Lodged as Exhibit 64: https://drive.google.com/file/d/1n-omAHflaD8teqPf9xXRjslGdnwnZ0dy/view?usp=sharing
[29] Lodged as Exhibit 65: https://www.instagram.com/p/DKyY5iPO2AP/?hl=en

1  Officers in the area had acknowledged that media was present. She provided me

2  with video of the incident, which begins at the 8:00 mark and runs for about a

3  minute.[30] An officer on horseback is seen swinging a large stick at a protester.

4  Video from another angle posted online shows that the protester is holding what

5  appears to be a traffic cone, but the physical attack by the officer seems

6  unprovoked and calls into question their entire use of force in that moment where

7  De Frias was run into.[31]

8      51.    On June 14, ABC News chief national correspondent Matt Gutman

9  was reporting live when an officer assaulted him from behind by grabbing him and

10  shoving him. Gutman was trapped next to the hood of a car and put up his arm

11  slightly as a natural reflex to being assaulted and to apparently losing his balance.

12  Gutman exclaimed confusion about where he should go. He did not make any

13  significant contact with the officer.[32] Subsequently, an officer came up to Gutman

14  and screamed at him in a way that was utterly out of proportion to anything

15  happening and I can only describe as unhinged. He also shoved Gutman. This

16  officer claimed that Gutman touched an officer. Gutman never lost his cool, calmly

17  reminding the officer that they were on TV and that the video would prove what

18  happened.[33]

19      52.    On June 14, photojournalist Ron Haviv was shot in the arm by LAPD

20  with a "less lethal" munition. Haviv is an acclaimed war photographer who has

21  covered dozens of conflicts and worked in over 100 countries, including some of

22

23  [30] Lodged as Exhibit 66:

24  https://drive.google.com/file/d/1HXhHrTG2fLvNqTAdtdlESFrotFZjAsC1/view?usp=sharing&t=475

25  [31] Lodged as Exhibit 67
https://www.instagram.com/reel/DKyYcgyAmrb/?igsh=NTc4MTIwNjQ2YQ==

26  [32] Lodged as Exhibit 68
https://www.tiktok.com/@tastydan/video/7515974644034211118

27

28  [33] Lodged as Exhibit 69
https://bsky.app/profile/cwebbonline.com/post/3lrndlulp522g

the most dangerous conditions in the world (ex: Afghanistan War, Bosnian War, Mexican Drug War, Haiti Earthquake). He is widely considered one of the leading photojournalists of his generation. He co-founded the VII Agency. I previously collaborated with Haviv on an award-winning project published by Rolling Stone.

53.    On June 14, Marshall Woodruff was shot in the face by LAPD and required five hours of eye surgery. Doctors do not know if he will regain his vision. Due to the severity of the incident I am still trying to learn details, but understand from reporting by KNBC that Woodruff was there as "a photographer who was documenting the 'No Kings' protest."[34]

54.    On June 14, an LAPD officer in downtown Los Angeles shot photojournalist Hector Adolfo Quintanar Perez in the knee, ripping open his jeans and causing bleeding. He is a photojournalist who was on assignment for Zuma Press, and wearing company ID on a lanyard around his neck. I received an image of his injury from a witness in which you can see his large camera hung around his neck and his press pass displayed, and his agency provided me with a photo from just before the incident of the LAPD officer who shot him.[35]

55.    On June 14, 82-year-old photographer David Healy was charged by an LAPD officer on horse, knocking him to the ground. Healy broke his rib due the horse charge. Healy was caring a large professional Canon camera with large lens and shooting on film.[36] A longtime photographer, he was also carrying business cards to further identify himself but was never given that opportunity.

---

[34] Lodged as Exhibit 70 https://www.nbclosangeles.com/news/local/photographer-struck-in-the-eye-by-lapds-rubber-bullet-during-la-protest/3725912/

[35] These images are lodged as Exhibit 10, https://drive.google.com/file/d/1NgqZLEN5RJN1gpl4eq2uiuAbsuv6KKjX/view?usp=drive_link and Exhibit 13, https://drive.google.com/file/d/1nUZxVw6q_h6jVB0gf4tYECu3qmmoR2qi/view?usp=drive_link

[36] Lodged as Exhibit 72 https://www.instagram.com/p/DK8rnWFuA8V/?img_index=1

19

56.     On June 14, an unidentified photographer for AFP was shot in the face and leg. They were an estimated 90 feet from police, carrying two cameras, a helmet with AFP stickers, and a "press" patch across their chest.[37]

57.     On June 14, Tod Seelie was shoved by LAPD, shot in the leg with a "less lethal" munition, and tear gassed multiple times. He was wearing a helmet with a press badge and also had a media credential.[38]

58.     On June 14, student journalist Kayjel J Mairena was tear gassed twice in downtown Los Angeles while standing with other press off to the side. Mairena is with the Santa Monica College Corsair.

59.     On a date still being confirmed in the first two to three days of the June 2025 protests, Gabriel Ovalle of Channel 5 (an online streamer not to be confused with local television station KTLA) was shot with a "less lethal" munition while filming.[39]

60.     On June 9, a staff photographer for a large national photo agency was shot by a mixed line of law enforcement that included both LAPD and LASD. She was keeping well to the side of the action. After officers shot at a protester, there was about a 10 second pause before one of them shot the photojournalist with a "less lethal" munition. She was wearing large "press" labels as well as a lanyard with press identification.

**Importance of Reporting on June 2025 Protests**

61.     The June 2025 protests are extraordinarily important to the public and therefore important for the press to cover. The protests respond to a dramatic

---

[37] Lodged as Exhibit 73 https://petapixel.com/2025/06/17/afp-photographer-shot-twice-by-rubber-bullets-during-la-protests/, Lodged as Exhibit 74: https://www.france24.com/en/live-news/20250617-afp-photographer-shot-in-face-with-rubber-bullet-at-la-protest
[38] https://flaminghydra.com/issue-344/
[39] Lodged as Exhibit 76: https://x.com/Channel5iveNews/status/1932497835288560088

1   escalation of immigration enforcement activities in Los Angeles, a city with large

2   and diverse immigrant communities that local governments have taken steps to

3   defend that some think go too far and some not far enough, reflecting the deeply

4   divided views on immigration policy and an unprecedentedly aggressive approach

5   by the current administration to immigration enforcement. After the initial protests

6   were met with violence, President Trump deployed the National Guard and

7   Marines into Los Angeles, apparently to perform traditionally civilian law

8   enforcement functions, causing the California's governor to file suit to contest the

9   authority for that deployment. In addition, the protests themselves — and the

10  response of law enforcement and LAPD in particular — have become a major

11  national and international news story, as protesters are met with greater force than

12  any protests in recent memory, at least since 2020. Whatever one's position on

13  these policy matters, they are newsworthy. Los Angeles encompasses a large

14  geographic area, with a City of 469 square miles and a County of over 4,000

15  square miles. The County population is larger than 40 states. Despite a potential

16  Constitutional crisis in our own streets, the vast majority of people in the Los

17  Angeles region would have had no idea about these events if not for the press

18  reporting on them. The press is the public's surrogate to document what's

19  happening, and is vital to the public, to policymakers and event to courts who must

20  evaluate those constitutional questions. There could not be a more important story

21  to guarantee access to the press.

22

23

24      I declare under penalty of perjury of the laws of the State of California and

25  the United States that the foregoing is true and correct. Executed this 2nd day of

26  July, 2025, in Los Angeles, California.

27  _____

28      Adam Rose

21