Carol A Sobel SBN 84483
Weston Rowland SBN  327599
Law Office of Carol A. Sobel
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403
t. (310) 393-3055
e. carolsobellaw@gmail.com
e. rowland.weston@gmail.com

David Loy SBN 229235
Aaron R. Field SBN 310648
First Amendment Coalition
534 4th St., Suite B
San Rafael, CA 94901
t.(415) 460-5060
e. dloy@firstamendmentcoalition.org
e. afield@firstamendmentcoalition.org

Peter Bibring SBN 223981
Law Office of Peter Bibring
2140 W Sunset Blvd # 203,
Los Angeles, CA 90026
t.(213) 471-2022
e. peter@bibringlaw.com

Paul Hoffman, SBN 71244
Michael Seplow, SBN 150183
John Washington, SBN 315991
Schonbrun, Seplow, Harris, Hoffman
& Zeldes LLP
200 Pier Avenue #226
Hermosa Beach, California 90254
t.(310) 396-0731
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. jwashington@sshhlaw.com

Susan E Seager SBN 204824
Law Office of Susan Seager
128 N. Fair Oaks Avenue
Pasadena, CA 91103
t. (310) 890-8991
e. susanseager1999@gmail.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

LOS ANGELES PRESS CLUB,
STATUS COUP,

    PLAINTIFFS,

    v.

CITY OF LOS ANGELES, a municipal
entity,  JIM MCDONNELL, LAPD
CHIEF, sued in his official capacity;

    DEFENDANTS.

Case No. 2:25-CV-05423-HDV-E

HON. HERNÁN D. VERA

**VOLUME ONE** OF PLAINTIFFS'
EXHIBITS TO' EX PARTE
APPLICATION FOR A TEMPORARY
RESTRAINING ORDER AND ORDER
TO SHOW CAUSE RE
PRELIMINARY INJUNCTION

1

# Exhibit 1



LOS ANGELES POLICE DEPARTMENT

# USE OF FORCE-TACTICS DIRECTIVE

| Directive No. 11.2 | April 2021 |
|---|---|

## CROWD MANAGEMENT, INTERVENTION, AND CONTROL

### PURPOSE

"Respect for People" and "Service to our Communities" are fundamental core values of the Los Angeles Police Department. In a society where free speech and assembly is guaranteed by the Federal and State Constitutions, it is the mission of police officers to protect the constitutional rights of all members of the public. These constitutional rights apply to individuals participating in lawful activities such as public speeches, marches, demonstrations, picketing, rallies and celebratory events.

This Directive was developed to provide guidelines to assist officers and supervisors in identifying lawful versus unlawful assemblies. Additionally, it will provide insight into how the response and actions of law enforcement may affect the demeanor and response of a crowd. The thoughtful application of crowd management and intervention strategies will generally assist in efforts to facilitate legal First Amendment activity with reverence for life, fairness, respect and dignity for every individual, while at the same time removing those individuals whose illegal behavior jeopardize the purpose and safety of protected activity. Additionally, the Department's Use of Force Policy relating to crowd control techniques is reviewed in this Directive.

### PROTOCOL

In determining whether First Amendment activities are lawful, police officers must not consider their personal views of either the political affiliation or the message of those persons exercising their right to assemble and engage in expressive activities. The responsibility of police officers is to objectively determine at what juncture a demonstration or assembly leaves the realm of legal protest.

It is important for supervisors and officers to understand the definition of an unlawful assembly to determine the appropriate police response. Penal Code Section 407 defines an unlawful assembly as: "Whenever two or more persons assemble together to do an unlawful act, or to do a lawful act in a violent, boisterous or tumultuous manner, such assembly is an unlawful assembly." *"Boisterous or tumultuous manner"* has been interpreted by the courts to mean conduct which *poses a clear and present danger of imminent violence.*

PTE 05/06/21

2

Use of Force - Tactics Directive No. 11.2
Crowd Management, Intervention, and Control
Page 2

Penal Code Section 407 identifies two different circumstances when an assembly may be declared unlawful:

The first circumstance is when people assemble to participate in an unlawful act. The unlawful act must be an act made criminal by law, or by the commission of an overt act that leads to a violation of the law. In the absence of any unlawful conduct, an assembly may be declared unlawful only if there is reasonable cause to believe, based on articulable facts, that the assembly's purpose is unlawful. If people are assembled to commit an unlawful act, then they are an unlawful assembly (e.g. unlawfully blocking entrances to public buildings, highways, sidewalks or schools, or engaging in other unlawful or riotous activity).

The second circumstance is when people assemble to do a lawful act in a "violent, boisterous or tumultuous manner." In order to be considered violent, boisterous or tumultuous, the manner in which the people are acting must be violent, or pose a clear and present danger of imminent violence. For example, a demonstration that disturbs the peaceful enjoyment of property through noisy singing and chanting is not an unlawful assembly unless it also poses a clear and present danger of imminent violence. It is important to note that one must differentiate between First Amendment activity and other activity. A loud party at a private residence would not have to be violent, boisterous or tumultuous to be considered unlawful.


**PROCEDURES**

Any public assembly of individuals or groups, lawful or unlawful, may require support and/or intervention by law enforcement. Depending upon the situation, the response of law enforcement can range from observation and crowd management strategies, to crowd intervention and control strategies. The police response to each assembly or protest is different and will require law enforcement's flexibility, creativity, discipline and patience.

**Crowd Management**

First Amendment activity such as a march, demonstration, protest, rally or celebratory event is most often successfully facilitated by initially using the least amount of visible law enforcement presence necessary. An ongoing assessment of crowd behavior is critical in order for supervisors and officers to

Crowd Management Primary Objectives

- Establish contact with crowd
- Obtain voluntary compliance
- Minimize enforcement action

appropriately respond to the actions of a crowd or protest group. Experience has shown that the appearance of an organized, disciplined contingent of police officers will often cause a disorderly group to abandon their disruptive activities. However, if used inappropriately, the mere presence of officers and/or horses in protective gear may be perceived as aggressive and is sufficient to change the behavior of the crowd.

Use of Force - Tactics Directive No. 11.2
Crowd Management, Intervention, and Control
Page 3

This can cause the focus of the protest to shift from the group's original cause to the presence and actions of officers. Therefore, supervisors should consider this potential impact on crowd behavior and be thoughtful about the strategic deployment of police officers and horses in protective gear.

Instead of thinking about the best form of police action to control the crowd, it is important for supervisors to focus on how to act in order to encourage the crowd to manage itself. One way of achieving this is to place a major emphasis on urging crowd members to express their views in a lawful manner, even under conditions where one is aware of the presence of small isolated groups with illegal goals and even at points where these small isolated groups start to act in illegal and violent ways.

**Intervention**

Police officers and supervisors must understand the importance of differentiating between violent members of the crowd and peaceful protestors. When possible, officers should interact with crowd members in an effort to communicate law enforcement support of lawful First Amendment activity and rights of free speech and expression.

Crowd Intervention Primary Objectives

- Isolate unlawful behavior
- Arrest law violators
- Protect First Amendment activity
- Facilitate lawful protests

Unlawful behavior by individuals, or unlawful conduct observed in an isolated incident, should not automatically form the basis for declaring an otherwise lawful assembly to be unlawful. When it appears practical, officers should attempt to give warning to the leaders or spokesperson of the activity, the other participants, and/or the individuals about any observed unlawful or potentially unlawful conduct. When appropriate, officers should instruct them on what they must do to comply with the laws, so as to allow an opportunity to correct the conduct in question. Every effort should be made to protect and facilitate the actions of lawful demonstrators while using intervention strategies to stop illegal activity and remove law violators. However, when group behavior appears to be unlawful, aggressive, or otherwise uncontrollable, it is reasonable for the assembly to be declared unlawful.

**Crowd Control and Dispersal**

In the event a group or portion of a group becomes involved in violent or riotous behavior, the mission of the Department is to protect lives and property, and restore conditions to normal as rapidly and efficiently as possible. The rapid deployment of forces to contain and arrest those responsible for violent, riotous, or unlawful behavior and the dispersal of unlawful groups will help accomplish the Department's crowd control primary objectives.

Crowd Control Primary Objectives

- Protect life
- Restore and maintain order
- Arrest violators
- Protect vital facilities
- Protect property

Use of Force - Tactics Directive No. 11.2
Crowd Management, Intervention, and Control
Page 4

When circumstances require crowd dispersal, the dispersal should generally not occur until control forces are in place to assist in managing the dispersed crowd, as unlawful conduct is extremely dynamic and mobile. Crowd dispersal strategies should only be used when immediate action is necessary to stop violence and/or property damage and/or sufficient resources are not present to ensure public safety.

**Dispersal Orders**

Methods to Deliver and Document
Dispersal Orders

- Amplified sound
- Multiple languages when appropriate
- Confirm audibility from various locations
- Display signage indicating unlawful assembly and dispersal when possible
- Document with video/audio recording

The intent of a dispersal order is to permanently disperse a crowd, not to merely relocate the problem to another location. Supervisors should make a reasonable assessment to determine if the members of a crowd are attempting to comply with the dispersal order or relocate the unlawful behavior. It should be made clear that the crowd is expected to immediately leave the area and include a warning that force may be used which could result in serious injury. The dispersal order must be given in a manner reasonably believed to be heard and understood by the intended audience. Based upon the circumstances, multiple announcements from various locations may be required. Dispersal orders should be delivered in English and in other languages that are appropriate for the audience. Regardless of the delivery method, the name of the individual giving the dispersal order and the date and time each order was given should be documented. Dispersal orders should not be given until control forces are in position to support crowd movement.

**THE MEDIA**

It is the Department's goal to provide the media as much access as legitimately possible to assist them in their duties. However, when an event is declared unlawful, all persons present, including members of the media, may be ordered to disperse. With the exception of spontaneously occurring events, whenever the Department develops an Incident Action Plan for an event that involves a public assembly, the Department will, when practicable, designate an area outside of the anticipated impacted area, but within viewing distance and audible range of the event, for members of the media to assemble.

**USE OF FORCE**

There are no exceptions to the Department's Use of Force Policy for crowd control situations. Officers may use only that force which is objectively reasonable. Verbalization should be used throughout the operation in an attempt to gain compliance. In determining the appropriate amount of force, officers shall evaluate each situation in light of the facts and circumstances of each particular case, including, but not limited to the seriousness

Use of Force - Tactics Directive No. 11.2
Crowd Management, Intervention, and Control
Page 5

of the crime(s), the level of threat or resistance presented by the individual(s) and the danger to the community.

During crowd control situations, police officers may be required to physically engage individuals who exhibit conduct ranging from uncooperative to violent behavior.  In these situations, officers may have to utilize force to move crowd members who do not respond to verbal directions, control violent individuals, or to effect an arrest.  When the use of force is appropriate in a crowd control situation, only that force reasonable to make an arrest or disperse a crowd should be used.

**Baton**

The baton may be used to push individuals who do not respond to verbal commands and encroach upon officers on a skirmish line or, after a lawful dispersal order has been issued, on individuals who intentionally delay departure while officers attempt to disperse the crowd.  The push technique utilizes the baton as an extension of your hand on passive/ aggressive demonstrators failing to comply with officer's orders.  During this technique the tip of the baton is placed on the center of the chest, officers then push the demonstrator.  The push technique is not a strike and is not a reportable Use of Force while utilized in a crowd control situation.

> **Note:**  The use of a baton as an impact device against an individual must be in response to the threatening or violent behavior of that individual and in a crowd control situation must be reported to a supervisor and appropriately documented.

**Chemical Agents**

The use of any Department approved chemical agent during a crowd control incident requires the approval of a commander or above.  Chemical agents include CS gas, CN gas, OC, and all tear gas canisters.  Before using any chemical agent, tactical consideration should be given to wind direction, safety equipment for officers, and the potential non-effectiveness of the chemical agent.

**Less-Lethal Munitions**

Less-lethal munitions are either **target specific** or **non-target specific**.  Target specific munitions may be used on a hostile individual which may or may not be in a crowd that poses an immediate threat of violence or physical harm, (e.g., throwing projectiles).  Beanbag shotgun Super-Sock rounds and 40mm sponge rounds are target specific munitions.  Less-lethal munitions can be deployed by trained personnel.

The 37mm foam rubber baton round is a non-target specific round used for crowd control.  With the approval of the Incident Commander, the 37mm foam rubber baton may be used as a crowd control tool when a dispersal order has been issued and/or **immediate** action is necessary, to stop violence, to ensure public safety, and restore order.  Its use should be constantly assessed as to its effectiveness and its effect on the crowd.

Use of Force - Tactics Directive No. 11.2
Crowd Management, Intervention, and Control
Page 6

The 37mm minimum recommended range is 5 – 10 feet in front of the crowd (skip fired) with a maximum effective range of 50 feet.

The use of less-lethal munitions, the circumstances, and the number of rounds expended should be documented on Incident Command System (ICS) Form 214.

**Reporting a Non-Categorical Use of Force in Crowd Control Situations**

In a crowd control situation, a Use of Force Report is not required when officer(s) become involved in an incident where force is used to push or move individuals who exhibit unlawful or hostile behavior and who do not respond to verbal directions by the police. This applies only to officers working in organized squad and platoon sized units directly involved in a crowd control mission. Additionally, should force be utilized under these circumstances, officers shall notify their immediate supervisor of the use of force once the tactical situation has been resolved. The supervisor shall report the actions on ICS Form 214, or as directed by the incident commander.

A Use of Force Report is required when an officer(s) becomes involved in an isolated incident with an individual during a crowd control situation, which goes beyond the mission of the skirmish line.

> **Note:** When a suspect has been taken into custody, the booking number or DR number of the related report shall be cross-referenced on ICS Form 214.

**Medical Treatment**

Any suspect taken into custody that has been injured or complains of injury shall receive medical treatment in accordance with established procedures.

**CONCLUSION**

The police response to each assembly or protest is different and will require flexibility, creativity, discipline, and patience. A non-violent, "sit-down" demonstration requires a much different police response than a violent group who has become destructive. The tactics used to manage or control a crowd should make every attempt to facilitate and protect First Amendment activity while isolating and arresting those engaged in unlawful behavior.

Points to Remember

- First Amendment Rights vs. unlawful behavior
- Keep the peace
- Protect property and vital facilities
- Maintain situational awareness
- Economy of force
- Stop unlawful behavior
- Obtain voluntary compliance
- Remain flexible

Use of Force - Tactics Directive No. 11.2
Crowd Management, Intervention, and Control
Page 7


**AMENDMENTS**

This version replaces Use of Force-Tactics Directive No. 11, Crowd Management, Intervention, and Control, October 2020

MICHEL R. MOORE
Chief of Police

DISTRIBUTION "A"

Attachments: Dispersal Order, Concepts and Strategies, Terms and Definitions

**Crowd Management, Intervention, and Control
Example Dispersal Orders**

## DISPERSAL ORDER

"I am (rank and officer's name), a police officer for the City of Los Angeles. I hereby declare this to be an unlawful assembly and, in the name of the people of the State of California, command all those assembled at (give specific location for example, the area bounded by Main Street on the east, Spring Street on the west, City Hall steps on the north, and the south sidewalk of 1st Street on the south) to immediately disperse, which means to break up this assembly. If you do not do so, you may be arrested or subject to other police action. Other police action may include the use of less lethal munitions, which could cause significant risk of serious injury to those who remain. Section 409 of the Penal Code prohibits remaining present at an unlawful assembly. If you remain in the area which was just described, regardless of your purpose in remaining, you will be in violation of Section 409. The following routes of dispersal are available (give the most convenient route(s) of dispersal). You have _____ minutes (give a reasonable amount of time—take into consideration the number of participants, location of the event, and number of exit routes) to disperse."

## DISPERSAL ORDER
### (Spanish)

"Soy (officer's name and rank) oficial de policía de la Ciudad de Los Ángeles. Por la presente declaro que esta reunión es ilegal y en nombre del pueblo del Estado de California ordeno que todas las personas reunidas en (give specific location, for example, the area bounded by Main Street on the east, Spring Street on the west, City Hall steps on the north, and the south sidewalk of 1st Street on the south) se dispersen inmediatamente. De lo contrario serán arrestadas o estarán sujetos a otras acciones policíacas. Otras acciones policíacas pueden incluir el uso de minciones de menos lethal, el cual puede causar riesgo significación de heridas serias a los que permanecen. La Sección 409 del Código Penal prohíbe permanecer en una reunión ilegal. Si usted/ustedes permanecen en las áreas mencionadas, sin importar el propósito de su permanencia, usted/ustedes estarán violando la sección 409 del Código Penal de California. Las rutas que se pueden usar para dispersarse son las siguientes: (give the most convenient route(s) of dispersal). Uds tienen _____ minutos (give a reasonable amount of time—take into consideration the number or participants, location of the event and number of exit routes) para dispersarsse."

## Crowd Management, Intervention, and Control Concepts and Strategies

| Lawful Assembly | Isolated Unlawful Behavior | Unlawful Assembly | Riot |
|---|---|---|---|
| *Free Speech and assembly are protected First Amendment activity. The following are examples:* | *Isolated unlawful activity by individuals or small groups within a crowd should not automatically form the basis for declaring an assembly unlawful.* | **407 PC** Two or more persons assemble<br>• To do an unlawful act or<br>• To do a lawful act in a boisterous or tumultuous manner | **404 PC Riot, (a)** Any use of force or violence, disturbing the public peace, or any threat to use force or violence, if accompanied by immediate power of execution, by two or more persons acting together, and without authority of law, is a riot. |
| • **Speeches**<br>• **Marches**<br>• **Demonstrations**<br>• **Rallies**<br>• **Picketing**<br>• **Public assemblies**<br>• **Protests**<br>• **Celebratory events** | • Isolated destruction of property<br>• Isolated acts of violence<br>• Isolated rock or bottle throwers<br>• Individual sit down demonstrators | *Assemblies may be dispersed when they are: Violent, or pose a clear and present danger of violence, or the group is breaking some other law in the process. If a crime is occurring action may be taken to stop it prior to a Dispersal Order being given.*<br><br>• **Civil Disobedience**<br>• **Sit down demonstration** | • **Group violent behavior**<br>• **Group acts of property damage** |

### Police Action

| | | | |
|---|---|---|---|
| **Use Crowd Management strategies:** | **Use Crowd Intervention strategies:** | **Use Crowd Control strategies:** | **Use Crowd Control strategies:** |
| • Meet with event organizers and stakeholders<br>• Determine the history and risk of the group<br>• Create a planning team<br>• Check permit limitations<br>• Develop Incident Action Plan and objectives<br>• Identify and assign resources: Video unit, fixed posts, MFF, Bicycle Units, Air Support, TSE, Shadow Teams, Mounted Unit<br>• Monitor and assess crowd behavior<br>• Separate opposing factions<br>• Maintain video log<br>• Provide direction and expectations at roll call<br>• Engender facilitation not confrontation<br>• Ensure the appropriate uniform for the event<br>• Interact with organizers and gain cooperation | • Use organizers and monitors to gain voluntary compliance<br>• Isolate, arrest and remove law violators as quickly as possible<br>• Video action of officers and law violators<br>• Use amplified sound (sound trucks or CIUVs) to communicate intent or to gain compliance<br>• Use low profile tactics when possible. Don't become the focus of the demonstration.<br>• Use Passive Arrest Teams, Tangle Teams, Shadow Teams, Cross Bows, Arrest Circles<br>• When it is not possible to make an immediate arrest, identify and track suspects using cameras, observation posts, an air unit or shadow teams<br>• Continue to assess; escalate and de-escalate as behavior changes<br>• Don't increase crowd tension or change crowd focus to law enforcement by unnecessary aggressive appearance or behavior | • Obtain voluntary compliance<br>• Video action of officers and law violators<br>• Act quickly<br>• Request resources (MFF)<br>• Put control forces in place<br>• Identify dispersal routes<br>• Put a traffic plan in place<br>• Move media to protected area. Use amplified sound (sound trucks or CIUVs) to communicate intent to declare an unlawful assembly<br>• Disperse unlawful crowd<br>• Track and contain groups involved in illegal behavior using cameras, observation posts, Shadow Teams or Air Unit<br>• Arrest individuals who fail to disperse or who are involved in illegal activity<br>• Use Arrest Links to move arrestees<br>• With appropriate approval, deploy the appropriate less lethal munitions on a crowd that poses an immediate threat of violence or physical harm<br>• Ensure only reasonable force<br>• Report use of force and expended munitions<br>• Restore traffic flow | • Video action of officers and law violators<br>• Immediately stop the behavior<br>• Request resources (MFF)<br>• Put control forces in place<br>• Stop the illegal activity<br>• Put a traffic plan in place<br>• Track and contain groups involved in illegal behavior using cameras, observation posts, Shadow Teams or Air Unit.<br>• Arrest law violators<br>• Use Arrest Links to move arrestees<br>• With appropriate approval, deploy the appropriate less-lethal munitions to defend officers or to stop violent behavior<br>• Ensure only reasonable force<br>• Report use of force and expended munitions<br>• Restore and maintain order<br>• Restore traffic flow<br>• Discourage groups from forming<br>• Protect lives, property, and vital facilities<br>• Establish and patrol divisions<br>• Remain present<br>• Reassess the situation<br>• Return to normalcy<br>• Act quickly |

## Crowd Management, Intervention, and Control
## Terms and Definitions

**Active Resistance:**  To intentionally and unlawfully oppose the lawful order of a peace officer in a physical manner.

**Arrest Links:**  A method of linking multiple arrestees together for control purposes.

**Arrest Protocol:**  The formal process of placing subjects under arrest, taking into custody, and associating the arresting peace officer(s) with the specific individual arrested.

**Arrest Teams:**  Personnel assigned to arrest duties during civil disobedience/civil disorder operations.

**Booking Teams:**  Personnel assigned to custodial and processing duties during civil disobedience/civil disorder operations.

**Civil Disobedience:**  An unlawful event involving a planned or spontaneous demonstration by a group of people.

**Civil Disorder:**  An unlawful event involving significant disruption of the public order.

**Collective Behavior:**  The unlawful behavior of a group of persons involved in situations where normal cultural structure and controls are not observed, such as unruly crowds, civil disobedience, and riots.

**Command:**  The authority a person lawfully exercises over subordinates by virtue of his/her rank and assignment or position.

**Compliance Techniques:**  Reasonable, lawful use of force methods intended to encourage suspect cooperation.

**Control Devices:**  Devices intended to assist peace officers in gaining control of subjects who refuse to submit to lawful authority (e.g., batons, TASER, restraints, chemical agents, etc.).

**Cordoning:**  Surrounding or enclosing a particular problem area; also referred to as perimeter control.

**Critical Facilities:**  Any location essential to the well-being and safety of the community requiring law enforcement protection during a critical incident.

**Crowd:**  A number of persons collected into a close body.

**Crowd Control:**  Law enforcement response to a pre-planned or spontaneous event, activity or occurrence where there is a potential for unlawful activity or the threat of violence.

**Crowd Dynamics:**  Factors which influence crowd behavior.

**Crowd Intervention:**  Strategies and tactics employed by law enforcement during lawful assemblies to address unlawful activity, civil disorder, and to arrest violators.

**Crowd Management:**  Strategies and tactics employed by law enforcement to manage lawful assemblies in an effort to prevent the escalation of events into an unlawful assembly or riot.

**Decontamination:**  Procedures taken to reduce the effects of any non-lethal chemical agent.

**Discipline:**  Pattern of behavior consistent with demonstrating self-control, teamwork, moderation, and restraint.

**Dispersal Order:**  Lawful orders communicated by law enforcement personnel commanding individuals assembled unlawfully to disperse.

**Flashpoint:**  Specific location(s) which can be anticipated to attract criminal elements and become the origin or focal point of civil disorder.

**Force Options:**  Reasonable force applications utilized by law enforcement to effect arrest, overcome resistance, and prevent escape.

**Crowd Management, Intervention, and Control**
**Terms and Definitions**

**Formations:** Coordinated unit tactics utilized by law enforcement to control crowds, stop unlawful activity, and disperse and/or arrest violators.

**Incident Command System (ICS):** The statewide model for field level management of emergencies mandated by the Standardized Emergency Management System (SEMS). ICS is specifically designed to allow its users to adopt an integrated organizational structure equal to the complexity of demands of single and multiple incidents without being hindered by jurisdictional boundaries.

**Less-Lethal Impact Munitions:** Projectiles launched or otherwise deployed for purposes of overcoming resistance, preventing escape, effecting arrest, reducing serious injury and are without significant likelihood of causing death.

**Management:** The process of planning, organizing, coordinating, directing, budgeting, and controlling resources.

**Mobile Arrest and Booking Teams:** Mobile teams designated to assist field personnel with mass arrest and booking.

**Mobile Field Force:** An organized, mobile law enforcement tactical force equipped and trained to respond to unusual occurrences. The Mobile Field Force configuration is currently the statewide standard known as "Mutual Aid Response Mobile Field Force."

**Mobile Tactics:** specialized techniques that give Mobile Field Force (MFF) personnel the ability to respond rapidly and complete high-risk missions beyond the capabilities of other personnel. The vehicles may also be utilized for crowd control and containment.

**Mob:** A disorderly group of people engaged in unlawful activity.

**Mounted Tactics:** Tactics while mounted on horses.

**Non-Compliant Behavior:** Behavior which does not yield to a lawful order.

**Non-Lethal Chemical Agents:** Devices utilized by law enforcement agencies which may include CS, CN or OC.

**Non-Target Specific Less-Lethal Impact Munitions:** Less-lethal munitions fired at a crowd for the purpose of crowd control (37mm, 20F Multiple Foam Rubber Projectiles).

**Pain Compliance:** The stimulation of nerves or the manipulation of joints to elicit a sense of unease or distress in a subject, causing that subject to comply. Examples include control holds, impact weapons, non-lethal chemical agents, TASER, etc.

**Passive Arrest Teams (PAT):** Organized teams of peace officers assigned to take "passive arrestees" into custody.

**Passive Resistance:** A commonly used term referring to non-violent opposition to the lawful directions of law enforcement during arrest situations.

**Photographic Teams:** Law enforcement photographers assigned to document designated activity involving civil disobedience.

**Platoon:** A tactical component consisting of two or more supervised squads.

**Policy:** Statements of principles and values which guide the performance of a specific Department activity. Policy establishes limits of action and reflects a statement of guiding principles that should be followed in order to achieve an agency's objective.

**Procedure:** A method of performing an operation, or a manner of proceeding on a course of action, within limits of policy.

**Public Disruption:** The interruption or disturbance of public order.

**Crowd Management, Intervention, and Control**
**Terms and Definitions**

**Shadow Team:**  A squad sized plain clothes unit made up of two, five-officer elements, each having a supervisor that is responsible for working within crowds to identify individuals involved in illegal behavior, and when possible monitor their behavior, and/or arrest and remove them from the crowd as quietly as possible.

**Uniformed Shadow Support Team:**  A squad of 10 uniformed officers and two supervisors that are responsible for coordinating with, and supporting, Shadow Teams.

**Stakeholder:**  Entities having a legal, professional, economic or community interest/responsibility in the event.

**Standardized Emergency Management System (SEMS):**  A system required by the California Government Code for managing response to multi-agency and multi-jurisdictional emergencies in California.  SEMS consists of five organizational levels that are activated as necessary: Field Response, Local Government, Operational Area, Region and State.

**Target Specific Less-Lethal Impact Munitions:**  Less-lethal munitions fired at a specific/identifiable target for purpose of selectively and temporarily incapacitating an individual or to cause the individual(s) to stop their actions: 12 gauge Super-Sock Projectiles; and 40mm Exact Impact Sponge Munitions
- The suspect or subject is violently resisting arrest or poses an immediate threat of violence or physical harm
- Unlawful behavior must include violent actions/movements

**Unlawful Assembly:**  Penal Code Section 407 defines an "unlawful assembly" as: "Whenever two or more persons assemble together to do an unlawful act, or to do a lawful act in a violent, boisterous or tumultuous manner, such assembly is an unlawful assembly."  "Boisterous or tumultuous manner" has been interpreted by the courts to mean conduct which poses a clear and present danger of imminent violence.

**Violent, Boisterous or Tumultuous manner:**  A manner in which the people are acting must be violent or pose a clear and present danger of imminent violence.

# Exhibit 2

response, but should reduce their speed and, if reasonable, maintain a position out of the line-of-sight of the suspect's vehicle to maximize public safety. The Department shall make every effort to provide immediate supervisory oversight at the beginning of the pursuit and through its termination.

**Factors In Initiating a Pursuit.** Officers must also weigh the seriousness of the offense against the potential dangers to themselves or members of the community and should consider the following factors when assessing whether to initiate a pursuit:

- Whether there is an unreasonable risk to the public's safety, to the pursuing officers' safety or the safety of the occupant(s) in the fleeing vehicle;
- The speed of the fleeing vehicle, relative to other roadway conditions and factors;
- Whether vehicular and/or pedestrian traffic safety is unreasonably compromised;
- The traffic conditions: volume of vehicular traffic, volume of pedestrian traffic, and road conditions;
- Nature of the area of the pursuit: residential, commercial, or rural;
- Whether the suspect can be apprehended at a later time;
- If weather conditions such as rain, fog, snow, etc., create an unreasonable risk of injury to the public or the pursuing officers;
- The seriousness of the crime and its relationship to community safety;
- Whether the lack or quality of communication between the primary unit and Communications Division or the primary unit and a supervisor causes an unreasonable risk to the public; and,
- The familiarity of the primary pursuing unit with the area of the pursuit.

The same liability and potential danger inherent in a vehicle pursuit is also present when following a vehicle. Officers shall not violate the rules of the road, e.g., Division 11 of the California Vehicle Code, when following a vehicle. Exemption from provisions of the Vehicle Code (Division 11) is granted only when officers sound a siren as may be reasonably necessary and the officer's vehicle displays a lighted red lamp visible from the front. The decision whether or not to initiate a pursuit should be made as soon as it is clearly evident that the law violator is intending to flee. Officers shall not use "following" as a substitute for initiating a pursuit.

**556. USE OF FORCE.**

**556.10 POLICY ON THE USE OF FORCE.**

**PREAMBLE TO USE OF FORCE.**  The use of force by members of law enforcement is a matter of critical concern both to the public and the law enforcement community.  It is recognized that some individuals will not comply with the law or submit to control unless compelled to do so by the use of force; therefore, law enforcement officers are sometimes called upon to use force in the performance of their duties.  The Los Angeles Police Department also recognizes that members of law enforcement derive their authority from the public and therefore must be ever mindful that they are not only the guardians, but also the servants of the public.

The Department's guiding principle when using force shall be reverence for human life. Officers shall attempt to control an incident by using time, distance, communications, and available resources in an effort to de-escalate the situation, whenever it is safe, feasible, and reasonable to do so.  As stated below, when warranted, Department personnel may use objectively reasonable force to carry out their duties.  Officers may use deadly force only when they reasonably believe, based on the totality of circumstances, that such force is necessary in defense of human life.  Officers who use unreasonable force degrade the confidence of the community we serve, expose fellow officers to physical hazards, violate the law and rights of individuals upon whom unreasonable force or unnecessary deadly force is used, and subject the Department and themselves to potential civil and criminal liability.  Conversely, officers who fail to use force when warranted may endanger themselves, the community and fellow officers.

**POLICY.**

**Use of De-Escalation Techniques.**  It is the policy of this Department that, whenever feasible, officers shall use techniques and tools consistent with department de-escalation training to reduce the intensity of any encounter with a suspect and enable an officer to have additional options to mitigate the need to use a higher level of force while maintaining control of the situation.

**Verbal Warnings.**  Where feasible, a peace officer shall, prior to the use of any force, make reasonable efforts to identify themselves as a peace officer and to warn that force may be used, unless the officer has objectively reasonable grounds to believe that the person is aware of those facts.

**Proportionality.**  Officers may only use a level of force that they reasonably believe is proportional to the seriousness of the suspected offense or the reasonably perceived level of actual or threatened resistance.

**Fair and Unbiased Policing.**  Officers shall carry out their duties, including use of force, in a manner that is fair and unbiased.  Discriminatory conduct on the basis of race, religion, color, ethnicity, national origin, age, gender, gender identity, gender expression, sexual orientation, housing status, or disability while performing any law enforcement activity is prohibited.

**Use of Force − Non-Deadly.**  It is the policy of this Department that personnel may use only that force which is "objectively reasonable" to:

- Defend themselves;
- Defend others;
- Effect an arrest or detention;
- Prevent escape; or,
- Overcome resistance.

**Factors Used to Determine Objective Reasonableness.**  Pursuant to the opinion issued by the United States Supreme Court in *Graham v. Connor*, the Department examines the reasonableness of any particular force used: a) from the perspective of a reasonable Los

16

Angeles Police Officer with similar training and experience, in the same situation; and b) based on the facts and circumstances of each particular case. Those factors may include, but are not limited to:

- The feasibility of using de-escalation tactics, crisis intervention or other alternatives to force;
- The seriousness of the crime or suspected offense;
- The level of threat or resistance presented by the subject;
- Whether the subject was posing an immediate threat to officers or a danger to the community;
- The potential for injury to citizens, officers or subjects;
- The risk or apparent attempt by the subject to escape;
- The conduct of the subject being confronted (as reasonably perceived by the officer at the time);
- The amount of time and any changing circumstances during which the officer had to determine the type and amount of force that appeared to be reasonable;
- The availability of other resources;
- The training and experience of the officer;
- The proximity or access of weapons to the subject;
- Officer versus subject factors such as age, size, relative strength, skill level, injury/exhaustion and number officers versus subjects;
- The environmental factors and/or other exigent circumstances; and,
- Whether a person is a member of a vulnerable population.

**Drawing or Exhibiting Firearms.**  Unnecessarily or prematurely drawing or exhibiting a firearm limits an officer's alternatives in controlling a situation, creates unnecessary anxiety on the part of citizens, and may result in an unwarranted or accidental discharge of the firearm.  Officers shall not draw or exhibit a firearm unless the circumstances surrounding the incident create a reasonable belief that it may be necessary to use the firearm.  When an officer has determined that the use of deadly force is not necessary, the officer shall, as soon as practicable, secure or holster the firearm.  Any drawing and exhibiting of a firearm shall conform with this policy on the use of firearms.  Moreover, any intentional pointing of a firearm at a person by an officer shall be reported.  Such reporting will be published in the Department's year-end use of force report.

**Use of Force - Deadly.**  It is the policy of this Department that officers shall use deadly force upon another person only when the officer reasonably believes, based on the totality of circumstances, that such force is necessary for either of the following reasons:

- To defend against an imminent threat of death or serious bodily injury to the officer or to another person; or,
- To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended.

In determining whether deadly force is necessary, officers shall evaluate each situation in light of the particular circumstances of each case and shall use other available resources and techniques if reasonably safe and feasible.  Before discharging a firearm, officers

shall consider their surroundings and potential risks to bystanders to the extent reasonable under the circumstances.

> **Note:**  Because the application of deadly force is limited to the above scenarios, an officer shall not use deadly force against a person based on the danger that person poses to themselves, if an objectively reasonable officer would believe the person does not pose an imminent threat of death or serious bodily injury to the officer or another person.

**Department's Evaluation of Deadly Force.**  The Department will analyze an officer's use of deadly force by evaluating the totality of the circumstances of each case consistent with California Penal Code Section 835(a), as well as the factors articulated in Graham v. Connor.

**Rendering Aid.**  After any use of force, officers shall immediately request a rescue ambulance for any person injured.  In addition, officers shall promptly provide basic and emergency medical assistance to all members of the community, including victims, witnesses, subjects, suspects, persons in custody, subjects of a use of force and fellow officers:

- To the extent of the officer's training and experience in first aid/CPR/AED; and,
- To the level of equipment available to an officer at the time assistance is needed.

**Warning Shots.**  It is the policy of this Department that warning shots shall only be used in exceptional circumstances where it might reasonably be expected to avoid the need to use deadly force.  Generally, warning shots shall be directed in a manner that minimizes the risk of injury to innocent persons, ricochet dangers and property damage.

**Shooting at or From Moving Vehicles.**  It is the policy of this Department that firearms shall not be discharged at a moving vehicle unless a person in the vehicle is immediately threatening the officer or another person with deadly force by means other than the vehicle.  The moving vehicle itself shall not presumptively constitute a threat that justifies an officer's use of deadly force.  An officer threatened by an oncoming vehicle shall move out of its path instead of discharging a firearm at it or any of its occupants. Firearms shall not be discharged from a moving vehicle, except in exigent circumstances and consistent with this policy in regard to the use of Deadly Force.

**Note:**  It is understood that the policy regarding discharging a firearm at or from a moving vehicle may not cover every situation that may arise.  In all situations, officers are expected to act with intelligence and exercise sound judgment, attending to the spirit of this policy.  Any deviations from the provisions of this policy shall be examined rigorously on a case by case basis.  The involved officer must be able to clearly articulate the reasons for the use of deadly force.  Factors that may be considered include whether the officer's life or the lives of others were in immediate peril and there was no reasonable or apparent means of escape.

**Requirement to Report Potential Excessive Force.**  An officer who is present and observes another officer using force that the present and observing officer believes to be

18

beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances based upon the totality of information actually known to the officer [as delineated in California Penal Code Section 835(a)], shall immediately report such force to a superior officer.

An officer who has a sustained excessive force complaint shall be prohibited from training other officers for a period of at least three years from the date that the complaint was sustained.

**Retaliation for Reporting Potential Excessive Force or Violation of Any Law or Regulation**. Retaliation for reporting potential excessive force or violation of any law or regulation by any employee of this Department is strictly prohibited, shall be reported immediately, and is considered to be serious misconduct

**Requirement to Intercede When Excessive Force is Observed.**  An officer shall intercede when present and observing another officer using force that is clearly beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances, taking into account the possibility that other officers may have additional information regarding the threat posed by a subject.

**Note:**  For purposes of this section, "intercede" includes, but is not limited to, physically stopping the excessive force (when safe and reasonable to do so) and recording the excessive force, if equipped with a body worn video (BWV) camera.  Officers shall attempt to document on BWV the efforts to intervene, efforts to de-escalate the excessive use of force, and confronting the offending officer about the excessive force during the use of force. If the offending officer continues to use excessive force, the witnessing officer shall immediately report the excessive force to a superior officer.

Any officer who has received all required training on the requirement to intercede and fails to do so when excessive force is observed as described above shall be subject to discipline up to and including in the same manner as the officer who committed the excessive force.

**DEFINITIONS.**

**Deadly Force.**  Deadly Force is defined as any use of force that creates a substantial risk of causing death or serious bodily injury, including but not limited to, the discharge of a firearm.

**Excessive Force.**  Excessive Force means a level of force that is found to have violated Section 835(a) of the California Penal Code (PC) or the requirements of any other law or statute.

**Feasible.**  Feasible means reasonably capable of being done or carried out under the circumstances to successfully achieve the arrest or lawful objective without increasing risk to the officer or another person.

**Imminent.** Pursuant to California Penal Code Section 835a(e)(2), "[A] threat of death or serious bodily injury is "imminent" when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed."

**Intercede.** Intercede includes, but is not limited to, physically stopping the excessive force (when safe and reasonable to do so) and recording the excessive force, if equipped with a body worn video (BWV) camera.

**Necessary.** In addition to California Penal Code 835(a), the Department shall evaluate whether deadly force was necessary by looking at : a) the totality of the circumstances from the perspective of a reasonable Los Angeles Police Officer with similar training and experience; b) the factors used to evaluate whether force is objectively reasonable; c) an evaluation of whether the officer exhausted the available and feasible alternatives to deadly force; and d) whether a warning was feasible and/or given.

**Objectively Reasonable.** The legal standard used to determine the lawfulness of a use of force is based on the Fourth Amendment to the United States Constitution. See *Graham v. Connor, 490 U.S. 386 (1989). Graham* states in part, *"*The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation. The test of reasonableness is not capable of precise definition or mechanical application."

The force must be reasonable under the circumstances known to or reasonably believed by the officer at the time the force was used. Therefore, the Department examines all uses of force from an objective standard rather than a subjective standard.

**Retaliation.** Retaliation means demotion, failure to promote to a higher position when warranted by merit, denial of access to training and professional development opportunities, denial of access to resources necessary for an officer to properly perform their duties, or intimidation, harassment, or threat of injury while on or off-duty.

**Serious Bodily Injury.** Pursuant to California Penal Code Section 243(f)(4), Serious Bodily Injury includes but is not limited to:

- Loss of consciousness;
- Concussion;
- Bone fracture;
- Protracted loss or impairment of function of any bodily member or organ;
- A wound requiring extensive suturing; and,
- Serious disfigurement.

**Totality of the Circumstances.**  All facts known to or reasonably perceived by the officer at the time, including the conduct of the officer and the subject leading up to the use of force.

**Vulnerable Population.**  Vulnerable populations include, but are not limited to, children, elderly persons, people who are pregnant, and people with physical, mental, and developmental disabilities.

**Warning Shots.**  The intentional discharge of a firearm off target not intended to hit a person, to warn others that deadly force is imminent.

**556.80 DRAWING OR EXHIBITING FIREARMS.**  Unnecessarily or prematurely drawing or exhibiting a firearm limits an officer's alternatives in controlling a situation, creates unnecessary anxiety on the part of citizens, and may result in an unwarranted or accidental discharge of the firearm. Officers shall not draw or exhibit a firearm unless the circumstances surrounding the incident create a reasonable belief that it may be necessary to use the firearm in conformance with this policy on the use of firearms.

**Note:** During a special meeting on September 29, 1977, the Board of Police Commissioners adopted the following as a valid interpretation of this Section:

**"Unnecessarily or prematurely drawing or exhibiting a firearm limits an officer's alternatives in controlling a situation, creates unnecessary anxiety on the part of citizens, and may result in an unwarranted or accidental discharge of the firearm. An officer's decision to draw or exhibit a firearm should be based on the tactical situation and the officer's reasonable belief there is a substantial risk that the situation may escalate to the point where deadly force may be justified. When an officer has determined that the use of deadly force is not necessary, the officer shall, as soon as practicable, secure or holster the firearm."**

**560. HOSTAGES.**  Criminals who use hostages to effect their escape are desperate individuals who, if allowed to escape, will pose a continuing threat to their hostage and to the public at large. Assurance that a hostage will be released unharmed is a meaningless promise. The Department does not have the ability to protect the safety of a hostage who is allowed to be removed from the presence of officers. The safety of hostages can be best assured by keeping them in the presence of officers and by preventing their removal by the suspect. Officers should use every verbal and tactical tool at their disposal to secure the arrest of the suspect without harming the hostage. However, officers should realize that exceptional situations could arise where considered judgment might dictate allowing removal of a hostage, such as where there is imminent and probable danger to a large group of persons.

**564. OFFICERS SURRENDERING WEAPON.**  An officer or their partner may be at the mercy of an armed suspect who has the advantage, but experience has shown that the danger to officers is not reduced by them giving up their weapon upon demand. Surrendering their weapon might mean giving away their only chance for survival;

# Exhibit 3

L O S   A N G E L E S   P O L I C E   D E P A R T M E N T

# USE OF FORCE DIRECTIVE

UOF Directive No. 3                                                      September 2023

---

### 40mm LESS-LETHAL LAUNCHER

**PURPOSE**

The purpose of this Directive is to familiarize officers with the use, nomenclature, and operational procedures of the 40mm Less-Lethal Launcher (40mm LLL).  The **40mm LLL** is a tactical single-shot launcher configured with a green stock, pistol grip, a rifled barrel, picatinny rail mounting system, and Department- approved optics.  The color green is used to signify that the 40mm LLL is to be used only with Department-specified less-lethal munitions.  The only current Department-approved munition is the 40mm eXact iMpact round.



**PROTOCOL**

The Department's guiding principle when using force shall be reverence for human life.  Officers shall attempt to control an incident by using time, distance and cover, communication, and available resources in an effort to de-escalate the situation whenever it is safe, feasible, and reasonable to do so.  When warranted, Department personnel may use objectively reasonable force to carry out their duties.  Officers may only use a level of force that they reasonably believe is proportional to the seriousness of the suspected offense or the reasonably perceived level of actual or threatened resistance.

Use of an intermediate force option, including the 40mm LLL, is an appropriate force option when an officer reasonably believes either of the following:

- There is an immediate threat to the safety of the officers or others; or,
- If the threat is not immediately addressed, there is an articulable risk the incident could escalate to the use of deadly force.

Intermediate force options should not be used on a suspect or subject who is believed to be unarmed, and, is passively resisting or merely failing to comply with commands.  Verbal threats of violence alone do not justify the use of an intermediate force option.

Use of Force Directive No. 3
40mm Less-Lethal Launcher
Page 2


The Department uses the objectively reasonable standard and the totality of the circumstances when evaluating the reasonableness of the force used, which includes the number of times a particular force option was utilized.  If the force option being utilized appears to be ineffective, Department personnel should consider transitioning to another, potentially more effective force option or tactic.

Officers who encounter an armed self-mutilating or suicidal individual shall not use a 40mm LLL against that person, unless the officer reasonably believes either there is an immediate threat to the safety of the officers or others; or, if the threat is not immediately addressed, there is an articulable risk the incident could escalate to the use of deadly force.  If officers choose to use a 40mm in these situations, they should utilize distance and cover, when feasible, to avoid placing themselves in a vulnerable position.  Officers are reminded that it is not a criminal act to express suicidal ideations or commit/attempt to commit suicide or self-mutilation in the State of California.

The 40mm LLL shall not be used to target the head (e.g., face/eyes), neck, groin, spine, or kidneys unless lethal force is authorized.  The 40mm LLL may be used in crowd control situations against a single suspect or subject as a target-specific intermediate force option.

Prior to deployment, officers shall inspect the ammunition and the holder to ensure only 40mm eXact iMpact ammunition is utilized.  The **40mm eXact iMpact round** is a point-of-aim, point-of-impact, direct fire round consisting of a plastic body and a sponge nose that is spin stabilized via the incorporated rifling collar and the 40mm launcher's rifled barrel.  It can be identified by its silver metal case and blue sponge nose.  These rounds are designed to be non-penetrating, and upon striking  a target, distribute energy over a broad surface area.  The sponge round utilizes smokeless powder as the propellant and has velocities that are extremely consistent.


**PROCEDURES**

The approved deployment range for the 40mm LLL is five (5) to 75 feet.  Officers should always consider weapon retention principles when deploying the 40mm LLL to prevent a suspect or subject from gaining control of the launcher.  When officers identify the need for a 40mm LLL, they should broadcast, "Code Sam-40."  **Code Sam-40** is the radio code used to broadcast a request for a 40mm LLL.

If tactically and environmentally feasible, the designated 40mm LLL officer should deploy the launcher from a position of cover with a designated cover officer.  The 40mm LLL officer alerts other officers when the designated officer is ready to fire by shouting or broadcasting, "40, 40!"  This alerts the officers at the scene that the firing of the 40mm LLL is about to occur.

24

Use of Force Directive No. 3
40mm Less-Lethal Launcher
Page 3

When firing the 40mm LLL, officers should assess the effectiveness of each round fired. The effectiveness of the 40mm eXact iMpact round is based on the energy at impact. Therefore, the round may have little or no effect on a suspect or subject who:

- Has a large body mass;
- Is wearing heavy clothing/body armor;
- Is under the influence of drugs; or,
- Is in an altered state and cannot feel the impact of the sponge round.

If shots to the navel area or beltline do not appear to be effective, then a leg, arm, or hand may be a viable alternative target.  The primary **target area** is the navel area or beltline, but officers may target the suspect's arms, hands, or legs when practicable.  If the hand is the selected target, consider its location and what it is holding.  Officers shall not target the head, neck, spine, groin, or kidneys — unless lethal force is authorized.

**If control is not achieved and/or it appears that the 40mm eXact iMpact round is not effective, even after changing target areas, the officers must assess the viability of an alternate force option.**  Additionally, officers should continue to assess the suspect's actions and the effectiveness of each force option used.

Generally, officers should not deploy the 40mm LLL at a fleeing suspect.  Officers should pursue and attempt to contain the suspect, while continually assessing the situation and considering the most appropriate tactical plan.  Additionally, officers should avoid deploying the 40mm LLL on individuals who:

> **Tactical Considerations**
>
> - Size of suspect versus size of officer
> - Clothing
> - Altered mental state (may not be effective)
> - Any known history of mental illness
> - Age and/or physical condition of the suspect
> - Suspect's access to weapons
> - Suspect's ability to retreat or escape
> - Bystander involvement
> - Availability of back-up officers (Can suspect be distracted until other units arrive?)
> - Background/Foreground (What is behind/in front of the suspect?)
> - Officers should maintain distance from the suspect

- Are on an elevated or unstable surface which could cause a fall that could result in a significant impact injury;
- Are operating or riding any mode of transportation where the risk of injury would be substantially increased by use of the 40mm; or,
- Are known to be pregnant, under 12 years of age, elderly, or visibly frail.

The 40mm LLL is not a substitute for deadly force.  When conducting a building search for a suspect who may be armed, standard firearms must be deployed.  Having a 40mm LLL along with other force options during the search will provide officers with different options should the situation change.

Use of Force Directive No. 3
40mm Less-Lethal Launcher
Page 4

**Face Shield Considerations**

It is recommended that operators are aware of their stock position prior to any deployment or crowd control operation and familiarize themselves with operating the launcher system while using a face shield. The face shield should not be in the down position when the launcher stock is in the completely collapsed or mid-length position. The shield in the down position could affect proper manipulation or sight alignment and cause the system to move off target and ultimately compromise the operator's accuracy.

**Use of Force Warning**

An officer shall, when feasible, give a verbal warning prior to using the 40mm LLL to control an individual. A warning is not required when an officer is attacked and must respond to the suspect's actions. Additionally, if a tactical plan requires the element of surprise to stabilize the situation, a warning is not required. An example would be a hostage situation. However, officers are reminded that the surprise/tactical element must still be necessary at the actual time the 40mm LLL is fired.

The verbal warning should include a command and a warning of the potential consequences of the use of force. The command should be similar to "drop the weapon" or "stop what you are doing" followed by a warning similar to "or we may use the 40mm, and that may cause you injury."

The use or non-use of the warning shall be documented. The Non-Categorical Use of Force Report, Form 01.67.05, Use of Force Summary heading shall include:

- The name of the officer giving the warning; and,
- An explanation and appropriate justification for not using the warning.

Statements that the "element of surprise was needed" or "for officer safety reasons" will not justify non-use of the warning. The explanation for non-use must:

- Clearly articulate why the element of surprise was needed;
- Explain in detail any officer safety considerations; and,
- List all pertinent reasons that justify why the warning was not provided.

The use of the warning, or the reasons for non-use, will be factors considered in the determination whether the use of force was objectively reasonable.

Use of Force Directive No. 3
40mm Less-Lethal Launcher
Page 5

**Tactical Discharges**

A tactical discharge is defined as any projectile from a less-lethal control device launched with the intent to gain a tactical advantage by creating a distraction, removing obstacles, or altering the environment, and not directed at an individual (e.g., use of a baton or beanbag shotgun to break a window, or deployment of a chemical agent during a barricaded suspect incident).

Tactical discharges are allowed, but are not recommended, as they may cause secondary, unintended impacts. Before a tactical discharge is used to break a window, officers should consider that another officer or individual may be behind the window and subject to impact by the 40mm round. In the event the 40mm LLL is used for a tactical discharge, it should be communicated to all officers at scene prior to its use, for their situational awareness.

Tactical discharges **may** be an effective option in **limited** circumstances. Officers must assess the situation after each tactical discharge, and if the launcher is not producing the desired effect, discontinue its use. Officers must be prepared to give the rationale behind their decision to fire the 40mm LLL as a tactical discharge. Tactical discharges shall be reported on an Employee's Report, Form 15.07.00, and submitted to the employee's commanding officer for review and appropriate action.

**Requirement to Intercede When Excessive Force is Observed**

An officer shall intercede when present and observing another officer using force that is clearly beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances, taking into account the possibility that other officers may have additional information regarding the threat posed by a subject.

> **Note**: For the purposes of this section, "intercede" includes, but is not limited to, physically stopping the excessive force (when safe and reasonable to do so) and recording the excessive force, if equipped with a body worn video (BWV) camera. Officers shall attempt to document on BWV the efforts to intervene, efforts to de-escalate the excessive use of force, and confronting the offending officer about the excessive force during the use of force. If the offending officer continues to use excessive force, the witnessing officer shall immediately report the excessive force to a superior officer.

**Requirement to Report Potential Excessive Force**

An officer who is present and observes another officer using force that the present and observing officer believes to be beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances based upon the totality of information actually known to the officer, shall immediately report such force to a superior officer.

Use of Force Directive No. 3
40mm Less-Lethal Launcher
Page 6

**Medical Treatment**

Any person struck with a 40mm eXact iMpact round shall be transported to a Department-approved facility for medical treatment prior to booking.  The person should be carefully monitored for signs of distress.  If a medical emergency situation exists, officers shall render medical aid as required and request a rescue ambulance to respond to their location.

**Reporting**

All discharges of a projectile weapon (e.g., 40mm LLL), excluding tactical discharges, are reportable uses of force and shall be reported in accordance with Department policy whether or not the projectiles/munitions or device make contact with the suspect or subject, including their clothing.

<u>**Points to Remember**</u>

- 5 feet is the minimum deployment range
- Deployment range is from 5 to 75 feet
- Assessment between rounds is critical
- **Do not target the head, neck, spine, groin, or kidneys, unless lethal force is authorized**
- Have a backup plan in the event the 40mm round is ineffective
- 40mm LLL should not be deployed unless lethal force is available for cover
- All discharges of the 40mm LLL, excluding tactical discharges, are a reportable UOF

Use of Force Directive No. 3
40mm Less-Lethal Launcher
Page 7

---

**Important Reminder**

Deviation from these basic concepts sometimes occurs due to the fluid and rapidly evolving nature of law enforcement encounters and the environment in which they occur.  Deviations may range from minor, typically procedural or technical, to substantial deviations from Department tactical training.  Any deviations are to be explained by the involved officer(s), and justification for substantial deviation from Department tactical training shall be articulated and must meet the objectively reasonable standard of the Department's Use of Force Policy.

---

**AMENDMENTS**

This Use of Force Directive cancels and supersedes Use of Force-Tactics Directive No. 17.1, 40mm Less-Lethal Launcher, October 2021.


MICHEL R. MOORE
Chief of Police

DISTRIBUTION "A"

Attachment

## HANDLING AND STORAGE OF THE 40mm LESS-LETHAL LAUNCHER

All Department personnel are reminded of the proper care, handling, and storage of the 40mm Less-Lethal Launcher.  In order to maintain the 40mm Less-Lethal Launcher's proper function and accuracy, officers shall treat the equipment with care and refrain from dropping the 40mm Less-Lethal Launcher on the ground.

**Pre-Inspection**

As part of officers' start of watch inspection and prior to going into the field, officers shall ensure that the following 40mm Less-Lethal Launcher procedures are conducted:

- Physically inspect all components of the 40mm Less-Lethal Launcher to ensure they are in good working order;
- Ensure the sight optic is functional and secured to the launcher;
- Ensure the elevation and windage adjustments of the sight optic are aligned with the markings and have not been manipulated or moved; and,
- Ensure the sling is attached securely.

**Securing During Transportation**

Department personnel shall secure the unloaded 40mm Less-Lethal Launcher in their vehicle's 40mm Less-Lethal Launcher mount.  If the Department vehicle is not equipped with a 40mm Less-Lethal Launcher mount, Department personnel shall keep the 40mm Less-Lethal Launcher in the Department-issued case and place it in a secured position inside the trunk of the vehicle.  Care should be taken to ensure the weapon system does not shift during transportation.

**Damage**

Any movement or damage to the sight optic may cause it to no longer be zeroed.  If movement or damage to the sight optic does occur or any components of the 40mm Less-Lethal Launcher malfunction, officers shall immediately return it to their Area/division kit room and notify the Area/division Training Coordinator of the damage.  The damaged 40mm Less-Lethal Launcher shall be removed from the inventory immediately and deemed non-operable and non-deployable.  The concerned Area/division Training Coordinator shall, without delay, notify the Department Armorer of the damage.  The Area/division shall also be responsible for transporting the damaged 40mm Less-Lethal Launcher to the Department Armorer for immediate repair.

Lastly, if the 40mm Less-Lethal Launcher is **deployed and fired,** the concerned Area/division Training Coordinator shall, as soon as possible, cause it to be transported to the Department Armorer where it shall be cleaned and inspected prior to redeployment.

Should you have any questions, please contact Firearms Training Section, Training Division, at (818) 832-3740 or (323) 612-4404.

# Exhibit 4

L O S   A N G E L E S   P O L I C E   D E P A R T M E N T
# USE OF FORCE-TACTICS DIRECTIVE

| Directive No. 17.1 | October 2021 |
|---|---|

## 40mm LESS-LETHAL LAUNCHER

### PURPOSE

The purpose of this Directive is to familiarize officers with the use, nomenclature, and operational procedures of the 40mm Less-Lethal Launcher (40mm LLL).



### PROTOCOL

The Department's guiding principle when using force shall be reverence for human life. Officers shall attempt to control an incident by using time, distance, communication, and available resources in an effort to de-escalate the situation, whenever it is safe, feasible and reasonable to do so.  When warranted, Department personnel may use objectively reasonable force to carry out their duties.

Officers who use unreasonable force degrade the confidence of the community we serve, expose the Department and fellow officers to physical hazards, violate the law and rights of individuals upon whom unreasonable force or unnecessary deadly force is used, and subject the Department and themselves to potential civil and criminal liability.  Conversely, officers who fail to use force when warranted may endanger themselves, the community, and fellow officers.

Officers may only use a level of force that they reasonably believe is proportional to the seriousness of the suspected offense or the reasonably perceived level of actual or threatened resistance.

An officer may use the 40mm LLL as a reasonable force option to control a suspect **when the suspect poses an immediate threat to the safety of the officer or others.**

Less-Lethal force options shall not be used on a suspect or subject who is passively resisting or **merely failing to comply** with commands.  Verbal threats of violence **or mere non-compliance** do not alone justify the use of less-lethal force.  An officer's decision to draw, exhibit, or use the 40mm LLL should be based on the tactical situation and/or the suspect's actions.  In addition, generally, an officer shall give a verbal warning prior to using such force when feasible.

The 40mm LLL shall not be used to target the head, neck, face, eyes, or spine unless lethal force is authorized.

PTE 10/07/21

Use of Force - Tactics Directive No. 17.1
40mm Less-Lethal Launcher
Page 2

The 40mm Less-Lethal Launcher may be used in crowd control situations against a single subject/suspect as a target-specific less-lethal option.

Officers shall inspect the ammunition and the holder to ensure only 40mm eXact iMpact ammunition is utilized.



## PROCEDURES

The minimum recommended deployment range for the 40mm LLL is five feet, while the effective deployment range is up to 110 feet.  Officers should always consider weapon retention principles when deploying the 40mm LLL to prevent a subject/suspect from gaining control of the launcher.  When officers realize the need for a 40mm LLL, they should broadcast, "Code Sam-40."

If tactically and environmentally feasible, the 40mm LLL officer should deploy the launcher from a position of cover with a designated cover officer.  The 40mm LLL officer alerts other officers when he/she is ready to fire by shouting or broadcasting, "40mm Ready!"  The primary officer gives the clear to fire signal by shouting or broadcasting, "40mm, Standby!"  This alerts the officers at the scene that the firing of the 40mm LLL is about to occur.

When firing the 40mm LLL, officers should assess the effectiveness of each round fired.  The effectiveness of the 40mm eXact iMpact round is based on the energy at impact. Therefore, the round may have little or no effect on a subject/suspect who:

- Has a large body mass;
- Is wearing heavy clothing/body armor;
- Is under the influence of drugs; or,
- Is in an altered state and cannot feel the impact of the sponge round.

If shots to the navel area or beltline do not appear to be effective, then a leg, arm, or hand may be a viable alternative target.

### Tactical Considerations

- Size of suspect versus size of officer
- Clothing
- Altered mental state (may not be effective)
- Any known history of mental illness
- Age and/or physical condition of the suspect
- Suspect's access to weapons
- Suspect's ability to retreat or escape
- Bystanders' involvement
- Availability of back-up officers (Can suspect be distracted until other units arrive?)
- Background/Foreground (What is behind/in front of the suspect?)
- Officers should maintain distance from the suspect

33

Use of Force - Tactics Directive No. 17.1
40mm Less-Lethal Launcher
Page 3

**If control is not achieved and/or it appears that the 40mm eXact iMpact round is not effective, even after changing target areas, the officers must assess the viability of an alternate force option.** Additionally, officers should continue to assess the suspect's actions and the effectiveness of each force option used.

Officers who encounter an armed self-mutilating or suicidal individual shall not use a 40mm LLL against that person, unless the officers reasonably believe the use of the 40mm LLL would not place the officers in a position which could escalate the situation to the use of lethal force. If officers choose to use a 40mm LLL in these situations, they should utilize distance and cover to avoid placing themselves in a vulnerable position.

Generally, officers should not deploy the 40mm LLL at a fleeing suspect. Officers should pursue and attempt to contain the suspect, while continually assessing the situation and considering the most appropriate tactical plan. Additionally, officers should avoid deploying the 40mm LLL on individuals who:

- Are on an elevated or unstable surface which could cause a fall that could result in a significant impact injury;
- Are operating or riding any mode of transportation; or,
- Are known to be pregnant, under 12 years of age, elderly, or visibly frail.

The 40mm LLL is not a substitute for deadly force. When conducting a building search for a suspect who may be armed, standard firearms must be deployed. Having a 40mm LLL along with other force options during the search will provide officers with different options should the situation change.

**Requirement to Intercede When Excessive Force is Observed**

An officer shall intercede when present and observing another officer using force that is clearly beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances, taking into account the possibility that other officers may have additional information regarding the threat posed by a subject.

**Use of Force Warning**

An officer shall, when feasible, give a verbal warning prior to using the 40mm LLL to control an individual. The warning is not required when an officer is attacked and must respond to the suspect's actions. Additionally, if a tactical plan requires the element of surprise to stabilize the situation, a warning is not required. Examples of this would be a hostage situation or a subject threatening suicide. However, officers are reminded that the surprise/tactical element must still be needed at the actual time the 40mm LLL is fired.

The verbal warning should include a command and a warning of potential consequences of the use of force. The command should be similar to "drop the weapon" or "stop what you are doing" followed by a warning similar to "or we may use the 40mm, and that may cause you injury."

34

Use of Force - Tactics Directive No. 17.1
40mm Less-Lethal Launcher
Page 4


The use or non-use of the warning shall be documented. The Non-Categorical Use of Force Report, Form 01.67.05, Use of Force Summary heading shall include:

- The name of the officer giving the warning; and,
- An explanation and appropriate justification for not using the warning.

Statements that the "element of surprise was needed" or "for officer safety reasons" will not justify non-use of the warning. The explanation for non-use must:

- Clearly articulate why the element of surprise was needed;
- Explain in detail any officer safety considerations; and,
- List all pertinent reasons that justify why the warning was not provided.

The use of the warning, or the reasons for non-use, will be factors considered in the determination whether the use of force was objectively reasonable.

**Tactical Discharges**

Tactical discharges (disabling lights, breaking out windows, etc.) are allowed, but are not recommended, as they may cause secondary, unintended impacts. Before a tactical discharge is used to break a window, officers should consider that an individual may be behind the window and subject to impact by the 40mm round.

Tactical discharges **may** be an effective option in **limited** circumstances. Officers must assess the situation after each tactical discharge, and if the launcher is not producing the desired effect, discontinue its use. Officers must be prepared to give the rationale behind their decision to fire the 40mm LLL as a tactical discharge. The reporting procedure for a tactical discharge is the same as a discharge that does not strike a person (Employee's Report, Form 15.07.00).

In the event the 40mm LLL is used for a tactical discharge, it should be communicated to all officers at scene prior to its use, for their situational awareness.

**Reporting**

The use of a 40mm LLL for any reason other than an approved training exercise shall be documented according to established Department procedures on the Non-Categorical Use of Force Report; however, when a 40mm LLL is fired and the round does not strike a person, a use of force report is not necessary and an Employee's Report, Form 15.07.00, should be completed to document the incident. Supervisors shall obtain photographs of all visible and complained of injuries, even when evidence of injury is not present.

Use of Force - Tactics Directive No. 17.1
40mm Less-Lethal Launcher
Page 5

**Requirement to Report Potential Excessive Force**

An officer who is present and observes another officer using force that the present and observing officer believes to be beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances based upon the totality of information actually known to the officer, shall report such force to a superior officer.

**Medical Treatment**

Any person struck with a 40mm eXact iMpact round shall be transported to a Department-approved facility for medical treatment prior to booking.  The person should be carefully monitored for signs of distress.  If a medical emergency exists, officers shall request a rescue ambulance to respond to their location.

**DEFINITIONS**

**40mm Less-Lethal Launcher:**  A tactical single-shot launcher configured with a green stock and pistol grip, a rifled barrel, picatinny rail mounting system and Department-approved optics.  The color green is used to signify that the 40mm launcher is for the 40mm eXact iMpact round only.

**Code Sam-40:**  The radio code used to broadcast a request for a 40mm LLL.

**40mm eXact iMpact Round:**  The 40mm round is a point-of-aim, point-of-impact, direct fire round consisting of a plastic body and a sponge nose that is spin stabilized via the incorporated rifling collar and the 40mm launcher's rifled barrel.  It can be identified by its silver metal case and blue plastic nose.  These sponge rounds are designed to be non-penetrating, and upon striking a target, distribute energy over a broad surface area.  The sponge round utilizes smokeless powder as the propellant and has velocities that are extremely consistent.

**Tactical Discharge:**  The purposeful discharge at an object to assist officers in a tactical situation, such as to disable lighting or break windows.

**Target Areas:**  The primary target area is the navel area or beltline, but officers may target the suspect's arms, hands or legs when practicable.  If the hand is the selected target, consider its location and what it is holding.  Officers shall not target the head, neck, spine, chest, groin, or kidneys.

Use of Force - Tactics Directive No. 17.1
40mm Less-Lethal Launcher
Page 6

---

### Points to Remember

- 5 feet is the minimum deployment range
- Deployment range is from 5 to 110 feet
- Assessment between rounds is critical
- **Do not target the head, neck, spine, chest, groin, or kidneys**
- Reportable use of force if a round strikes a person
- Have a backup plan in the event the 40mm round is ineffective
- 40mm LLL should not be deployed unless lethal force is available for cover
- Form 15.07.00 required when the Launcher is fired and the round does not strike a person, and for tactical discharge

---

### Important Reminder

**Deviation from these basic concepts sometimes occurs due to the fluid and rapidly evolving nature of law enforcement encounters and the environment in which they occur. Deviations may range from minor, typically procedural or technical, to substantial deviations from Department tactical training. Any deviations are to be explained by the involved officer(s), and justification for substantial deviation from Department tactical training shall be articulated and must meet the objectively reasonable standard of the Department's Use of Force Policy.**

---

## AMENDMENTS

This version replaces Use of Force-Tactics Directive No. 17, 40mm Less-Lethal Launcher, July 2018.

MICHEL R. MOORE
Chief of Police

DISTRIBUTION "A"

37

# Exhibit 5

L O S   A N G E L E S   P O L I C E   D E P A R T M E N T

# USE OF FORCE
# DIRECTIVE

| UOF Directive No. 1 | September 2023 |
|---|---|

## USE OF FORCE

### PURPOSE

The purpose of this Directive is to provide Department personnel with a Use of Force policy that is concise, easily understood, and consistent with prevailing legislation and law enforcement best practices.

### PREAMBLE

The use of force by members of law enforcement is a matter of critical concern both to the public and the law enforcement community.  It is recognized that some individuals will not comply with the law or submit to control unless compelled to do so by the use of force; therefore, law enforcement officers are sometimes called upon to use force in the performance of their duties.  It is also recognized that members of law enforcement derive their authority from the public and therefore must be ever mindful that they are not only the guardians, but also the servants of the public.

The Department's guiding principle when using force shall be reverence for human life. Officers shall attempt to control an incident by using time, distance, communication, and available resources in an effort to de-escalate the situation, whenever it is safe, feasible and reasonable to do so.  When warranted, Department personnel may use objectively reasonable force to carry out their duties.  Officers may use deadly force only when they reasonably believe, based on the totality of circumstances, that such force is necessary in defense of human life.  Officers who use unreasonable force degrade the confidence of the community we serve, expose the Department and fellow officers to physical hazards, violate the law and rights of individuals upon whom unreasonable force or unnecessary deadly force is used, and subject the Department and themselves to potential civil and criminal liability.  Conversely, officers who fail to use force when warranted may endanger themselves, the community, and fellow officers.

### POLICY

### Use of De-Escalation Techniques

It is the policy of this Department that, whenever feasible, officers shall use techniques and tools consistent with Department de-escalation training to reduce the intensity of any

39

Use of Force Directive No. 1
Use of Force
Page 2

encounter with a suspect and enable an officer to have additional options to mitigate the
need to use a higher level of force while maintaining control of the situation.

**Verbal Warnings**

Where feasible, a peace officer shall, prior to the use of *any* force, make reasonable
efforts to identify themselves as a peace officer and to warn that force may be used,
unless the officer has objectively reasonable grounds to believe that the person is aware
of those facts.

**Proportionality**

Officers may only use a level of force that they reasonably believe is proportional to the
seriousness of the suspected offense or the reasonably perceived level of actual or
threatened resistance.

**Fair and Unbiased Policing**

Officers shall carry out their duties, including use of force, in a manner that is fair and
unbiased.  Discriminatory conduct on the basis of race, religion, color, ethnicity, national
origin, age, gender, gender identity, gender expression, sexual orientation, housing
status, or disability while performing any law enforcement activity is prohibited.

**Use of Force – Non-Deadly**

It is the policy of this Department that personnel may use only that force which is
"objectively reasonable" to:

- Defend themselves;
- Defend others;
- Effect an arrest or detention;
- Prevent escape; or,
- Overcome resistance.

**Factors Used to Determine Reasonableness**

Pursuant to the opinion issued by the United States Supreme Court in *Graham v. Connor*,
the Department examines the reasonableness of any particular force used:

1) From the perspective of a reasonable Los Angeles Police Officer with similar training
   and experience, in the same situation; and,
2) Based on the facts and circumstances of each particular case.  Those factors may
   include, but are not limited to:

   - The feasibility of using de-escalation tactics, crisis intervention, or other
     alternatives to force;

40

Use of Force Directive No. 1
Use of Force
Page 3

- The seriousness of the crime or suspected offense;
- The level of threat or resistance presented by the subject;
- Whether the subject was posing an immediate threat to officers or a danger to the community;
- The potential for injury to citizens, officers, or subjects;
- The risk or apparent attempt by the subject to escape;
- The conduct of the subject being confronted (as reasonably perceived by the officer at the time);
- The amount of time and any changing circumstances during which the officer had to determine the type and amount of force that appeared to be reasonable;
- The availability of other resources;
- The training and experience of the officer;
- The proximity or access of weapons to the subject;
- Officer versus subject factors such as age, size, relative strength, skill level, injury/exhaustion, and number of officers versus subjects;
- The environmental factors and/or other exigent circumstances; and,
- Whether a person is a member of a vulnerable population.

**Intermediate Force Options**

Use of an Electronic Control Device (e.g., TASER), Impact Device (e.g., Baton), Kinetic Energy Projectile (e.g., Beanbag Shotgun, 40mm Less-Lethal Launcher, FN 303 Less-Lethal Launcher), or certain Chemical Agents (e.g., Oleoresin Capsicum) is an appropriate force option when an officer reasonably believes either of the following:

- There is an immediate threat to the safety of the officers or others; or,
- If the threat is not immediately addressed, there is an articulable risk the incident could escalate to the use of deadly force.

Intermediate force options should not be used on a suspect or subject who is believed to be unarmed, and, is passively resisting or merely failing to comply with commands. Verbal threats of violence alone do not justify the use of an intermediate force option.

The Department uses the objectively reasonable standard and the totality of the circumstances when evaluating the reasonableness of the force used, which includes the number of times a particular force option was utilized. If the force option being utilized appears to be ineffective, Department personnel should consider transitioning to another, potentially more effective force option or tactic.

**Drawing or Exhibiting Firearms**

Unnecessarily or prematurely drawing or exhibiting a firearm limits an officer's alternatives in controlling a situation, creates unnecessary anxiety on the part of citizens, and may result in an unwarranted or accidental discharge of the firearm. Officers shall not draw or exhibit a firearm unless the circumstances surrounding the incident create a reasonable belief that it may be necessary to use the firearm. Moreover, any intentional pointing of

41

Use of Force Directive No. 1
Use of Force
Page 4

a firearm at a person by an officer shall be reported. Such reporting will be published in the Department's year-end use of force report.

When an officer has determined that the use of deadly force is not necessary, the officer shall, as soon as practicable, secure or holster the firearm. Any drawing and exhibiting of a firearm shall conform with this policy on the use of firearms.

## Use of Force – Deadly

It is the policy of this Department that officers shall use deadly force upon another person only when the officer reasonably believes, based on the totality of circumstances, that such force is necessary for either of the following reasons:

- To defend against an imminent threat of death or serious bodily injury to the officer or to another person; or,
- To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended.

In determining whether deadly force is necessary, officers shall evaluate each situation in light of the particular circumstances of each case and shall use other available resources and techniques if reasonably safe and feasible. Before discharging a firearm, officers shall consider their surroundings, background, and potential risk to bystanders to the extent reasonable under the circumstances.

> **Note:** Because the application of deadly force is limited to the above scenarios, an officer shall not use deadly force against a person based on the danger that person poses to themselves, if an objectively reasonable officer would believe the person does not pose an imminent threat of death or serious bodily injury to the officer or another person.

## Department's Evaluation of Deadly Force

The Department will analyze an officer's use of deadly force by evaluating the totality of the circumstances of each case consistent with California Penal Code Section 835a as well as the factors articulated in Graham v. Connor.

## Rendering Aid

After any use of force, officers shall immediately request a rescue ambulance for any person injured. In addition, officers shall promptly provide basic and emergency medical assistance to all members of the community, including victims, witnesses, subjects, suspects, persons in custody, subjects of a use of force, and fellow officers:

- To the extent of the officer's training and experience in first aid, cardiopulmonary resuscitation, and automated external defibrillator; and,
- To the level of equipment available to an officer at the time assistance is needed.

Use of Force Directive No. 1
Use of Force
Page 5


**Warning Shots**

Warning shots shall only be used in exceptional circumstances where it might reasonably be expected to avoid the need to use deadly force. Generally, warning shots shall be directed in a manner that minimizes the risk of injury to innocent persons, ricochet dangers, and property damage.

**Shooting at or From Moving Vehicles**

Firearms shall not be discharged at a moving vehicle unless a person in the vehicle is immediately threatening the officer or another person with deadly force by means other than the vehicle. The moving vehicle itself shall not presumptively constitute a threat that justifies an officer's use of deadly force.

An officer threatened by an oncoming vehicle shall move out of its path instead of discharging a firearm at it or any of its occupants. Firearms shall not be discharged from a moving vehicle, except in exigent circumstances and consistent with the policy regarding the use of deadly force. The driver of a vehicle should not draw their weapon while operating a moving vehicle; the drawing of a weapon while operating a moving vehicle is unsafe for both officers and the community. If an officer determines that it is necessary to draw their firearm while operating a vehicle, it should be to address an imminent threat and conform to the Department's policy on drawing and exhibiting firearms.

> **Note:** It is understood that the policy in regard to discharging a firearm at or from a moving vehicle may not cover every situation that may arise. In all situations, Department members are expected to act with intelligence and exercise sound judgment, attending to the spirit of this policy. Any deviations from the provisions of this policy shall be examined rigorously on a case by case basis. The involved officer must be able to clearly articulate the reasons for the use of deadly force. Factors that may be considered include whether the officer's life or the lives of others were in immediate peril and there was no reasonable or apparent means of escape.

**Requirement to Intercede When Excessive Force is Observed**

An officer shall intercede when present and observing another officer using force that is clearly beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances, taking into account the possibility that other officers may have additional information regarding the threat posed by a subject.

> **Note**: For the purposes of this section, "intercede" includes, but is not limited to, physically stopping the excessive force (when safe and reasonable to do so) and recording the excessive force, if equipped with a body worn video (BWV) camera. Officers shall attempt to document on BWV the efforts to intervene, efforts to de-escalate the excessive use of force, and confronting the offending officer about the excessive force during the use of force. If the offending officer continues to use

43

Use of Force Directive No. 1
Use of Force
Page 6

excessive force, the witnessing officer shall immediately report the excessive force to a superior officer.

Any officer who has received all required training on the requirement to intercede and fails to do so when excessive force is observed as described above shall be subject to discipline up to and including in the same manner as the officer who committed the excessive force.

## Requirement to Report Potential Excessive Force

An officer who is present and observes another officer using force that the present and observing officer believes to be beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances based upon the totality of information actually known to the officer [as delineated in California Penal Code Section 835a], shall immediately report such force to a superior officer.

An officer who has a sustained excessive force complaint shall be prohibited from training other officers for a period of at least three years from the date that the complaint was sustained.

## Retaliation for Reporting Potential Excessive Force or Violation of Any Law or Regulation

Retaliation for reporting potential excessive force or violation of any law or regulation by any employee of this Department is strictly prohibited, shall be reported immediately, and is considered to be serious misconduct.


## DEFINITIONS

**Deadly Force.** Deadly Force is defined as that force which creates a substantial risk of causing death or serious bodily injury, including but not limited to, the discharge of a firearm.

**Excessive Force.** Excessive Force means a level of force that is found to have violated Section 835a of the California Penal Code or the requirements of any other law or statute.

**Feasible.** Feasible means reasonably capable of being done or carried out under the circumstances to successfully achieve the arrest or lawful objective without increasing risk to the officer or another person.

**Imminent.** Pursuant to California Penal Code Section 835a(e)(2), "[A] threat of death or serious bodily injury is "imminent" when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great to likelihood of the

Use of Force Directive No. 1
Use of Force
Page 7

harm, but is one that, from appearances, must be instantly confronted and addressed."

**Intercede.**  Intercede includes, but is not limited to, physically stopping the excessive force (when safe and reasonable to do so) and recording the excessive force, if equipped with a BWV camera.

**Necessary.**  In addition to California Penal Code 835a, the Department shall evaluate whether deadly force was necessary by looking at: a) the totality of the circumstances from the perspective of a reasonable Los Angeles Police Officer with similar training and experience; b) the factors used to evaluate whether force is objectively reasonable; c) an evaluation of whether the officer exhausted the available and feasible alternative to deadly force; and, d) whether a warning was feasible and/or given.

**Objectively Reasonable.**  The legal standard used to determine the lawfulness of a use of force is the Fourth Amendment to the United States Constitution.  See *Graham v. Connor*, 490 U.S. 386 (1989).  Graham states in part, "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation.  The test of reasonableness is not capable of precise definition or mechanical application."  The force must be reasonable under the circumstances known to or reasonably believed by the officer at the time the force was used.  Therefore, the Department examines all uses of force from an objective standard, rather than a subjective standard.

**Retaliation.**  Retaliation means demotion, failure to promote to a higher position when warranted by merit, denial of access to training and professional development opportunities, denial of access to resources necessary for an officer to properly perform their duties, or intimidation, harassment, or threat of injury while on or off-duty.

**Serious Bodily Injury.**  Pursuant to California Penal Code Section 243(f)(4) defines Serious Bodily Injury as including, but not limited to:

- Loss of consciousness;
- Concussion;
- Bone fracture;
- Protracted loss or impairment of function of any bodily member or organ;
- A wound requiring extensive suturing; and,
- Serious disfigurement.

**Totality of the Circumstances.**  All facts known to or reasonably perceived by the officer at the time, including the conduct of the officer and the subject leading up to the use of force.

Use of Force Directive No. 1
Use of Force
Page 8

**Vulnerable Populations.**  Vulnerable populations include, but are not limited to, persons who are known to be: under 12 years of age, elderly, pregnant, visibly frail, or people with physical, mental, or developmental disabilities.

**Warning Shots.**  The intentional discharge of a firearm off target, not intended to hit a person, to warn others that deadly force is imminent.

---

**Important Reminder**

Deviation from these basic concepts sometimes occurs due to the fluid and rapidly evolving nature of law enforcement encounters and the environment in which they occur.  Deviations may range from minor, typically procedural or technical, to substantial deviations from Department tactical training.  Any deviations are to be explained by the involved officer(s), and justification for substantial deviation from Department tactical training shall be articulated and must meet the objectively reasonable standard of the Department's Use of Force Policy.

---

**AMENDMENTS**

This Directive cancels and supersedes Use of Force-Tactics Directive No. 1.3, Use of Force Policy - Revised, August 2022.

MICHEL R. MOORE
Chief of Police

DISTRIBUTION "A"

# Exhibit 6

LOS ANGELES POLICE DEPARTMENT

# USE OF FORCE DIRECTIVE

UOF Directive No. 12                                      November 2024

### 37MM LESS-LETHAL LAUNCHER

**PURPOSE**

The purpose of this Directive is to familiarize officers with the use, nomenclature, and operational procedures for the 37mm Less-Lethal Launcher (37mm LLL) crowd control device. **The 37mm LLL utilizes target-specific non-direct impact munitions and may only be used during crowd control situations**.



**PROTOCOL**

The usage protocols for the 37mm LLL during crowd control situations are different than that of normal Department intermediate force options. The specific protocols for deployment of the 37mm LLL are guided by the California Penal Code.

The 37mm launchers are classified by the State of California as kinetic energy projectiles (KEPs). Kinetic energy projectiles and chemical agents shall only be deployed during crowd control situations by a peace officer that has received training in their proper use as designated by the California Commission on Peace Officer Standards and Training. Additionally, they shall not be used solely to due to an imposed curfew, verbal threat, or non-compliance with a Department directive. Only Department-certified officers may deploy a 37mm Launcher.

**The 37mm LLL may only be deployed during crowd control situations, with the incident commander's approval, under the following circumstances**:

- To defend against a reasonably perceived threat to life or serious bodily injury to any individual, including a peace officer; or,
- To bring a reasonably perceived dangerous and unlawful situation safely and effectively under control; and, only in accordance with the following requirements:

  1) De-escalation techniques or other alternatives to force have been attempted when objectively reasonable, and have failed;

Use of Force Directive No. 12
37mm Less-Lethal Launcher
Page 2

2) Repeated audible announcements have been made stating the intent to use kinetic energy projectiles, when objectively reasonable to do so (in multiple languages and from various locations, if appropriate);

3) Persons have been given an objectively reasonable opportunity to disperse and leave the scene;

4) An objectively reasonable effort has been made to identify persons engaged in violent acts as opposed to those who are not. Kinetic energy projectiles and chemical agents shall not be used indiscriminately on a crowd or group of persons, and shall instead be targeted toward those individuals reasonably believed to have engaged in violent acts;

5) Kinetic energy projectiles and chemical agents shall only be used when objectively reasonable, and only with the frequency, intensity and in a manner that is proportional to the threat;

6) Officers shall attempt to minimize the possible incidental use of kinetic energy projectiles and chemical agents on bystanders, medical personnel, journalists, or other unintended targets;

7) An objectively reasonable effort has been made to extract individuals in distress;

8) Medical assistance is promptly requested and, if properly trained personnel are present, to provide such assistance to injured persons, when it is reasonable and safe to do so; and,

9) Kinetic energy projectiles shall not be aimed at the head, neck, or other vital organs.

## PROCEDURES

The 37mm target-specific non-direct impact munitions are utilized by designated **less-lethal operators** using Department crowd control tactics.

The non-direct impact multi-foam baton rounds are skip fired. For tactical and weapon retention purposes, the approved deployment range for the 37mm launchers is 10 to 50 feet from the front of the targeted individual(s). The point of aim is five (5) to 10 feet on the ground in front of the targeted individual(s).

Ideally, when deployed in front of the skirmish line, 37mm launchers should be positioned on the left and right sides of the skirmish line. While splitting areas of responsibility (center-left, center-right), operators should be supported by a target-specific direct-impact KEP operator (e.g., 40mm Less-Lethal Launcher, FN303) to provide protection for the 37mm operator(s).

**Tactical Considerations**

- Optimally two (2) 37mm LLL per skirmish line
- Optimally two (2) target-specific launchers adjacent to each 37mm LLL
- Assess effectiveness between every round fired (can be done during reload)
- 10-50 feet recommended deployment range
- Skip-fired 5-10 feet on the ground in front of the targeted individuals
- Officers should maintain distance from the crowd (at least 10 feet) to allow for proper dispersal of rounds

Use of Force Directive No. 12
37mm Less-Lethal Launcher
Page 3

**Reporting**

All discharges of a projectile weapon are reportable uses of force and shall be reported in accordance with Department policy whether or not the projectiles/munitions or device make contact with the suspect or subject, including their clothing.

**Medical Aid**

Any person known to have been struck by a non-direct impact munition shall be transported to a Department-approved facility for medical treatment prior to booking, unless the person who was struck is not taken into custody, or refuses medical treatment. The person should be carefully monitored for signs of distress. If a medical emergency exists, officers shall render medical aid as required and request a rescue ambulance to respond to their location.

**Deployment**

The command to deploy the 37mm launchers is "**Less lethal up**," at which time ALL less lethal operators will move in front of the skirmish line. No secondary command to fire is given.



Following the command to deploy ("Less lethal up"), each 37mm launcher operator is responsible for determining whether deployment is consistent with the guidelines set forth in this Directive. If the officer does not deploy the launcher, the officer should remain in front of the skirmish line at the low ready conducting an ongoing assessment of the crowd.

All operators will continue assessing the crowd, whether the operators are on the move or static. Upon assessment of the crowd, a supervisor may deem it prudent to halt the deployment of the 37mm LLL. The supervisor will give the command of, "**Less lethal recover**." Upon this command, less-lethal operators will stop and assess from a standing position and await the movement of the skirmish line to envelope them. If deployed from a static skirmish line, on the command of, "**Less lethal recover**," the less-lethal operator will immediately recover on their own behind the skirmish line. Once behind the skirmish line, launchers should be carried at the indoor low-ready position to prevent pointing them at skirmish line personnel.

Use of Force Directive No. 12
37mm Less-Lethal Launcher
Page 4

## Equipment

All officers deployed to crowd control incidents are expected to wear their Department-issued helmet with face shield.  Less-lethal operators shall deploy with face shields in the up position and are recommended to utilize secondary eye protection (clear glasses are preferred).  **Firing the 37mm launcher with the face shield down may result in an improper sight picture.**



Officers are responsible to account for every round they are issued (fired, dropped, etc.) with a pre- and post-deployment munition count.   The 37mm launcher must be equipped with the Department-issued sling.

## Definitions

**37mm LLL:** The 37mm LLL is made by Defense Technology (DEF-TEC).  It has a 14-inch barrel capable of dispensing single-shot cartridges containing baton rounds, stinger balls, gas, smoke, etc., single shot, breach loaded with fixed front and rear sights.  Only the multi-foam baton munitions are approved for patrol personnel.

**37mm LLL Munitions:** The 37mm LLL Multi-Foam Baton incorporates an 8.0-inch aluminum cartridge that contains (5) foam projectiles, which utilize black powder as a propellant.  Only approved 37mm LLL munitions are to be used in the 37mm LLL.  Officers shall inspect the munition and the holder to ensure that the approved desired munition is selected.  Only the multi-foam baton munitions are approved for use by the Department.

**Target Areas:** The target area is five (5) feet to 10 feet, skip-fired, in front of the targeted individual(s).

## Nomenclature:



Use of Force Directive No. 12
37mm Less-Lethal Launcher
Page 5

## Loading/Unloading

Prior to loading or unloading, the launcher should be tucked high underneath the armpit of the primary arm. This allows the officer controlled access to the barrel while keeping focus downrange to assess the crowd and terrain.

When deployed in front of a skirmish line, all manipulations should be conducted with the officer's support

**Points to Remember**

- Requires incident commander approval.
- Sighted, shoulder fired weapon system
- **Ten feet** minimum deployment range, to allow dispersal of projectiles
- **Skip-fired** five feet to ten feet in front of the targeted individuals
- Fired in double action only
- Minimum of (2) per skirmish line
- **Should wear eye protection, with face-shield in the up position**

hand. Open the barrel by lifting the breach latch, ensuring the barrel opens completely to a 90-degree angle. Place a new cartridge into the barrel. Close the barrel by gripping the foregrip with support hand and pushing the barrel upwards, ensuring the breach latch locks back into place.

## Care and Cleaning

It is extremely important to clean and oil the 37mm Launcher after every deployment event. The black powder propellant can cause issues with the firing pin and barrel if allowed to accumulate and clog the areas. As soon as possible after use:

- Clean barrel with hot soapy water, brush and rag,
- Wipe dry and lightly oil, and,
- Apply a few drops of oil to the action.

## Troubleshooting

In the event a munition fails to fire after the trigger is pressed, officers should press the trigger again and attempt to fire one more time. If the round fails to fire after the second attempt, unload the cartridge and insert a new one.

**Important Reminder**

**Deviation from these basic concepts sometimes occurs due to the fluid and rapidly evolving nature of law enforcement encounters and the environment in which they occur. Deviations may range from minor, typically procedural or technical, to substantial deviations from Department tactical training. Any deviations are to be explained by the involved officer(s), and justification for substantial deviation from Department tactical training shall be articulated and must meet the objectively reasonable standard of the Department's Use of Force Policy.**

DOMINIC H. CHOI
Chief of Police

DISTRIBUTION "A"