Carol A Sobel SBN 84483
Weston Rowland SBN 327599
Law Office of Carol A. Sobel
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403
t. (310) 393-3055
e. carolsobellaw@gmail.com
e. rowland.weston@gmail.com

David Loy SBN 229235
Aaron R. Field SBN 310648
First Amendment Coalition
534 4th St., Suite B
San Rafael, CA 94901
t.(415) 460-5060
e. dloy@firstamendmentcoalition.org
e. afield@firstamendmentcoalition.org

Peter Bibring SBN 223981
Law Office of Peter Bibring
2140 W Sunset Blvd # 203,
Los Angeles, CA 90026
t.(213) 471-2022
e. peter@bibringlaw.com

Paul Hoffman, SBN 71244
Michael Seplow, SBN 150183
John Washington, SBN 315991
Schonbrun, Seplow, Harris, Hoffman
& Zeldes LLP
200 Pier Avenue #226
Hermosa Beach, California 90254
t.(310) 396-0731
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. jwashington@sshhlaw.com

Susan E Seager SBN 204824
Law Office of Susan Seager
128 N. Fair Oaks Avenue
Pasadena, CA 91103
t. (310) 890-8991
e. susanseager1999@gmail.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

LOS ANGELES PRESS CLUB,
STATUS COUP,

    PLAINTIFFS,

    v.

CITY OF LOS ANGELES, a municipal entity,  JIM MCDONNELL, LAPD CHIEF, sued in his official capacity;

    DEFENDANTS.

Case No. 2:25-CV-05423-HDV-E

HON. HERNÁN D. VERA

**VOLUME THREE** OF PLAINTIFFS' EXHIBITS TO' EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1

# Exhibit 8



**2022**

# POST Guidelines
# Crowd Management, Intervention and Control

**CALIFORNIA COMMISSION ON PEACE OFFICER STANDARDS AND TRAINING**

200

POST Guidelines — Crowd Management, Intervention and Control

© 2021 by California Commission on Peace Officer Standards and Training

Published April 2021
Revised February 2022

All rights reserved. This publication may not be reproduced, in whole or in part, in any form or by any means electronic or mechanical or by any information and retrieval system now known or hereafter invented, without prior written permission of the California Commission on Peace Officer Standards and Training, with the following exception:

California law enforcement agencies in the POST peace officer program and POST-certified training presenters are hereby given permission by POST to reproduce any or all of the contents of this manual for their internal use within their agency or presentation location.

All other individuals, private businesses and corporations, public and private agencies and colleges, professional associations and non-POST law enforcement agencies in state or out-of-state may print or download this publication for non-commercial use.

Infringement of the copyright protection law and the provisions expressed here and on the POST website under *Copyright/Trademark Protection* will be pursued in a court of law. Questions about copyright protection of this publication and exceptions may be directed to the *Publications Manager*.

# POST Mission Statement

The mission of the California Commission

on Peace Officer Standards and Training

is to continually enhance the professionalism

of California law enforcement in serving

its communities.

Intentionally blank

# POST Commissioners

**Chair**

**Joyce Dudley**
District Attorney, Santa Barbara County

**Alan Barcelona**
Special Agent, Department of Justice

**Ingrid Braun**
Sheriff, Mono County

**Lai Lai Bui**
Sergeant, Sacramento Police Department

**Barry Donelan**
Sergeant, Oakland Police Department

**Robert T. Doyle**
Sheriff, Marin County

**P. Lamont Ewell**
Public Member

**Ex-Officio**
**Rob Bonta**
Attorney General, Department of Justice

**Vice Chair**

**Rick Braziel**
Educator, Humboldt State University

**Kelly Gordon**
Chief, Monterey Park Police Department

**Geoff Long**
Public Member

**Tina Nieto**
Chief, Marina Police Department

**James O'Rourke**
Sergeant, California Highway Patrol

**Batine Ramirez**
Sergeant, Placer County Sheriff's Department

Intentionally blank

# Acknowledgment

This document represents the collective effort of individuals from several organizations, agencies and communities. The content contained herein does not necessarily represent the viewpoint or position of every advisor or author. However, it does represent the diverse perspectives and meaningful dialogue that is necessary to come together in a collaborative and respectful process.

## Project Advisors*

**Darren Allison**, Assistant Chief, Oakland Police Department

**Ezery Beauchamp**, Chief, California Highway Patrol

**Lai Lai Bui**, Sergeant, Sacramento Police Department, Commissioner, California Commission on Peace Officer Standards and Training

**Art Chute**, Commander, Pasadena Police Department

**Joel Cook**, Assistant Chief (Ret), Santa Monica Police Department

**Ron Davis**, Chief of Police (Ret), East Palo Alto Police Department, Policing Advisor to California Governor Gavin Newsom, Served as Head of the U.S. DOJ Office of Community Oriented Policing Services

**Jack Ewell**, Chief, Special Operations, Los Angeles County Sheriff's Department

**Bob Green**, Deputy Chief (Ret), Los Angeles Police Department

**Matt Gutman**, Chief National Correspondent, ABC News

**Mike Hillmann**, Deputy Chief (Ret), Los Angeles Police Department

**Amber Lashbrook**, Police Support Services Manager, National City Police Department

**Robert Lewis**, Commander, Special Operations, Los Angeles County Sheriff's Department

**Jim McDonnell**, Sheriff (Ret), Los Angeles County Sheriff's Department, Former POST Commissioner

**Pastor Jethroe Moore II**, President, San Jose/Silicon Valley National Association for the Advancement of Colored People, Commissioner, Public Member, California Commission on Peace Officer Standards and Training

**Brian Muller**, Sergeant (Ret), Sheriff's Response Teams, Los Angeles County Sheriff's Department

**Steve Nottingham**, Lieutenant (Ret), Long Beach Police Department, Public Safety Consultant

Commission on Peace Officer Standards and Training



# Acknowledgment
*(continued)*

**Mildred K. O'Linn**, Partner, Governmental Entity Defense Co-Team Leader, Manning & Kass, Ellrod Ramirez, Trester LLP

**Nader Oweis**, Chief of Police, Sonoma State University

**John Perez**, Chief of Police, Pasadena Police Department

**Cynthia Renaud**, Chief of Police (Ret), President, International Association of Chiefs of Police

**Brandon Rodgers**, Sergeant, Academy Tactical Training Program, California Highway Patrol

**Carol Ann Rohr**, Deputy City Attorney (Ret), City of Santa Monica

**Ryan Stonebraker**, Chief, California Highway Patrol

**Paul E. Walters**, Law Enforcement Coordinator, Region I, California Governor's Office of Emergency Services-Law Enforcement Branch

**Marlon Williams**, Sergeant, Los Angeles County Sheriff's Department

**Wayne Windman**, Lieutenant, Redondo Beach Police Department

**George Zagurski**, Lieutenant (Ret), Sheriff's Response Teams, Los Angeles County Sheriff's Department

## Project Staff*

**Kris Allshouse**, Executive Director, Los Angeles County Regional Training Center – Lead Project Facilitator/Lead Writer

**Larry Ellsworth**, POST Law Enforcement Consultant II, Project Lead/Writer

**Tara Russell**, Captain, Alameda County Sheriff's Office, Facilitator, Los Angeles County Regional Training Center, Project Facilitator

**Virginia Tomek**, Police Communications Supervisor (Ret), Oakland Police Department, POST Special Consultant

*\* This document may require future update and revision to reflect changing statutes, case law and/or best practices. The above represents those individuals who collaborated with advice and support for the completion of this document in April of 2021.*

# Foreword

*Penal Code §13514.5* requires the Commission on Peace Officer Standards and Training to establish guidelines and training for law enforcement's response to crowd management. It specifies that "the guidelines to be developed by the commission should take into consideration the roles and responsibilities of all law enforcement officers responding to acts of civil disobedience."

These guidelines provide information for law enforcement agencies to consider when addressing the complexities and broad range of issues related to crowd management. For the purposes of these guidelines, the general term "crowd management" encompasses the management, intervention and control strategies for a law enforcement response to public assemblies and gatherings that can range from peaceful/non-violent to unlawful and riotous.

These guidelines should help law enforcement to identify, monitor and strategically detain individuals suspected of violence and/or destruction of property during protests and demonstrations. The guidelines are not meant to constitute policy, nor are they intended to establish a statewide standard. They are solely a resource for law enforcement leaders to provide foundational guidance for the facilitation of First Amendment rights while allowing discretion and flexibility in the development of individual agency policies.

The information contained in this publication represents the best thinking of contemporary law enforcement leadership. POST is grateful for the assistance of the project advisors who generously gave of their time and expertise.

**Manuel Alvarez Jr.**
*Executive Director*
Commission on Peace Officer
Standards and Training

Intentionally blank

# Table of Contents

**PART 1 Law Enforcement Objectives** ...................................................................1

   1.1  Public Safety Objectives in the 21st Century ........................................ 1

   1.2  Principles of Crowd Management ........................................................ 2

   1.3  Community Stakeholders .................................................................... 4

**PART 2 Planning and Preparation** ......................................................................5

   2.1  Standardized Emergency Management System  (SEMS) and Incident Command System (ICS)............................................................ 5

   2.2  Incident/Event Planning..................................................................... 8

   2.3  Crowd Behavior ..............................................................................13

   2.4  Mutual Aid & Multi-Agency Coordination .........................................16

   2.5  Public Agency and Community-Based Resources ...............................18

   2.6  Training for Managing Crowds ..........................................................19

**PART 3 Information Management**......................................................................**21**

   3.1  Information Gathering and Assessment .............................................21

   3.2  Incident Documentation ..................................................................22

**PART 4 Roles and Responsibilities** ...................................................................**25**

   4.1  Command and Control ....................................................................25

   4.2  Leadership Responsibilities ..............................................................26

   4.3  Criminal Investigations ...................................................................27

   4.4  Health and Wellness........................................................................29

**PART 5 Crowd Management, Intervention and Control Strategies** .....................**31**

   5.1  Crowd Management, Intervention and Control  Strategies ...................31

   5.2  Dispersal Orders .............................................................................36

   5.3  Mass Arrests and Bookings ..............................................................39

   5.4  Use of Force Options.......................................................................42

   5.5  Use of Kinetic Energy Projectiles and Chemical Agents .....................46

**PART 6 Media** ................................................................................................**53**

   6.1  Media Strategies.............................................................................53

   6.2  Electronic Communications and Social Media....................................55

**APPENDICES**.................................................................................................**57**

   ***APPENDIX A***  Terms and Definitions .................................................57

   ***APPENDIX B***  Crowd Management, Intervention and Control Strategies ........62

   ***APPENDIX C***  Applicable Statutes .....................................................64

   ***APPENDIX D***  Applicable Case Law....................................................70

Intentionally blank

*PART 1*

# Law Enforcement Objectives

## Guideline

### 1.1

*Establish policies and procedures that recognize and address law enforcement objectives and provide for the legal protection of the Constitutional rights of all persons.*

## Public Safety Objectives in the 21st Century

**Discussion:**  Peace officers must carefully balance the First Amendment rights and other civil liberties of individuals with the interventions required to protect public safety and property. When establishing policies and procedures, every agency should consider that all persons have the right to peaceably assemble, demonstrate, protest, rally or perform other activities protected by the First Amendment of the United States Constitution. Peace officers have the responsibility to protect the lives, property and First Amendment rights of all people. Peace officers must not be affected by the content of the opinions being expressed nor by the race, color, ethnicity, national origin, age, religion, gender identity or expression, sexual orientation, mental or physical disability or political affiliation of anyone exercising their lawful First Amendment rights. They must have the integrity to not allow personal, political or religious views affect how they perform their duties. Peace officers must continuously evaluate the need to take enforcement action, balancing the benefit, risk and consequences of those actions or inactions.

Law enforcement planners should be proactive in consulting with and advising their jurisdiction's elected and administrative leaders and advisors of the identified strategies and plans for specific events. Such interactions will help establish responsibility and accountability at all levels.

**Issues to consider (not in priority order):**

- Facilitation of First Amendment activities during public demonstrations
- Protection of Constitutional rights
- Fair and impartial enforcement of laws
- Protection of life and property
- Protection of vital facilities and critical infrastructure
- Arrest and evidence collection protocols
- Public and peace officer safety
- Protecting transportation, commerce and community affairs
- Unlawful assembly elements
- Awareness and impact of national or regional incidents on local communities
- Proper collection, verification and dissemination of information
- Situational awareness led planning
- Collaborative planning with involved agencies and community stakeholders
- Community relations and alerts
- Continuity of public safety operations, government and community

Commission on Peace Officer Standards and Training

**Guideline**

## *1.2*   *Principles of Crowd Management*

*Establish policies and procedures designed for effective response by law enforcement to crowd management events.*

**Discussion:** Any public assembly or gathering, whether lawful or unlawful, may require the response of peace officers. The response can range from communication and monitoring to engaging in various crowd management strategies.

Not all crowd situations involve unlawful activity. A peace officer's responsibility is to objectively discern at what juncture a demonstration leaves the realm of legal protest and becomes an abridgement of the rights of others. Public safety agencies should seek to facilitate lawful expression by groups who are present even when unlawful activity occurs. The goal should be to protect lawful activity while identifying and addressing unlawful behavior.

**Effective response to crowd management events necessitates adherence to certain foundational principles (not in priority order):**

- Leadership
- Knowledge of Constitutional law
- Knowledge of the law, local ordinance and agency policies
- Detailed planning to include a willingness to collaborate with allied agencies, protest organizers/groups and stakeholders
- Intelligence gathering, risk assessment, resource evaluation and acquisition
- Using time, patience, flexibility and communication to facilitate protest activities and obtain voluntary compliance when feasible
- Use of the *Standardized Emergency Management System* (SEMS) and *Incident Command System* (ICS) to maximize proper command and control
- Appropriate use of the mutual aid system (see *Guideline 2.4*)
- Seeking support of community and public agency resources
- Continual and/or pre-event training
- Conducting thorough briefings with all levels that address the situation, mission, execution, objectively reasonable force, administration and command and control
- Gaining and maintaining situational awareness
- Proper incident documentation
- Thorough and complete criminal investigations
- Effective strategies and tactics
- Objectively reasonable use of force



**Guideline**

## 1.2

*Establish policies and procedures designed for effective response by law enforcement to crowd management events.*

## Principles of Crowd Management
### *(continued)*

**Effective response to crowd management events necessitates adherence to certain foundational principles (not in priority order)** *(continued)***:**

- Proportional and reasonable response while maintaining operational readiness
- Liaison with the media
- Understanding and effective use of social media platforms and electronic communication
- Assessing and when feasible, leveraging de-escalation opportunities
- Officer wellness
- Risk management
- Planning for multi-issue groups (including counter-protests and criminal acts)
- Maintaining equipment inventory and ensuring proper training and readiness
- Establishing communication plan with internal and external stakeholders

Commission on Peace Officer Standards and Training

**Guideline**

*1.3*

*Establish procedures to identify and liaise with community stakeholders for the purpose of developing relationships, receiving input and engaging in collaborative discussion.*

## Community Stakeholders

**Discussion:** Stakeholder communication, education and involvement may benefit law enforcement response to crowd management events. Law enforcement should collaborate with community stakeholders when planning for and responding to public assemblies and gatherings when feasible. The timely and thoughtful use of social media platforms to disseminate accurate and helpful information between all stakeholders should be considered to reduce confusion and misunderstanding.

**Community stakeholders may include (not in priority order):**

- Advocacy groups
- Business associations
- Civil rights organizations
- Elected officials
- Labor organizations
- Leaders of local/state government
- Neighborhood associations
- Religious groups/clergy
- Schools/colleges/universities
- Special interest groups
- Media
- Event organizers and liaisons

*POST Guidelines — Crowd Management, Intervention and Control*

# Planning and Preparation

### Guideline
### 2.1

## Standardized Emergency Management System (SEMS) and Incident Command System (ICS)

*Use the Incident Command System, an element of the Standardized Emergency Management System, when managing crowds.*

**Discussion:** SEMS, established by *Government Code §8607(a)*, incorporates ICS and must be utilized by law enforcement agencies to apply for potential reimbursement from the State of California. Law enforcement's use of ICS is outlined in the *Law Enforcement Guide for Emergency Operations*.

**SEMS consists of the following five organizational levels that are activated as necessary:**

- Field response
- Local government
- Operational area
- Region
- State

**Discussion:** The purpose of ICS is to bring about a positive and efficient resolution.  The ICS provides a command structure for coordination, information flow, analysis, decision-making, communications and implementation in an authoritative and standardized manner.

**The ICS consists of five scalable elements:**

- Command
- Operations
- Planning/intelligence
- Logistics
- Finance/administration

Successful incident management requires continuous situational awareness and leadership that is active, strategic, decisive and mission focused. Because crowd management can be extremely dynamic, the incident management team should have a "hands-on approach" to facilitate and/or control the situation. The incident management team should ensure that subordinate staff fully understand the commander's intent and expectations, particularly regarding use of force and arrest protocols.

**Considerations for ICS in crowd management (not in priority order):**

- The ICS should be completely mission-centered overall and in each tactical element
- Maintaining objective focused decision-making and avoiding over-tasking of resources



Commission on Peace Officer Standards and Training

**Guideline**

## 2.1

### *Standardized Emergency Management System (SEMS) and Incident Command System (ICS)* *(continued)*

*Use the Incident Command System, an element of the Standardized Emergency Management System, when managing crowds.*

**Considerations for ICS in crowd management (not in priority order)** *(continued):*

- Incident commanders must quickly identify, prioritize and execute tactical missions
- Developing an incident command structure that identifies the command functions (e.g., liaison, information and safety personnel, general staff positions of operations, logistics, planning and finance sections)
- In some incidents the general staff may also include the intelligence and investigations functions, operating under a staff section or as a stand-alone section
- Preparing for events should include an Incident Action Plan (IAP) based on the SEMS and ICS format
- Ensuring the IAP addresses incident objectives, response, mitigation and arrest strategies
- Preparation must include clear and concise use of force expectations for field personnel
- Consistently solicit real-time information from field personnel to inform decision making and resource allocation
- Remaining flexible to address unplanned or unanticipated developments
- The Incident management team, including the incident commander, should be selected from qualified and experienced leaders
- Knowing when to increase and/or decrease peace officer presence is key to achieving success
- Utilizing real-time informational sources such as live media coverage, open-source media including social media platforms, unmanned aircraft systems and other aircraft
- Resources must be nimble for deployment to problematic areas with the ability to quickly readjust to escalating criminal activity
- Consider using small unit tactics that are agile and highly mobile
- Incident command must embrace the facilitation of lawful activity, protecting life and property, keeping the peace and enforcing the law fairly and impartially
- Under unified command, agency employees are still under the control of their individual agency leadership policy and reporting requirements

**Guideline**

## 2.1

*Use the Incident Command System, an element of the Standardized Emergency Management System, when managing crowds.*

## Standardized Emergency Management System (SEMS) and Incident Command System (ICS) (continued)

The Law Enforcement Guide for Emergency Operations can be found on the California Governor's Office of Emergency Services (CalOES) website at *www.caloes.ca.gov*.



**Guideline**

## 2.2

*Initiate incident/event planning consistent with the Incident Command System (ICS).*

# *Incident/Event Planning*

**Discussion:** Planning and preparation are essential elements of effective crowd management. The planning process establishes a foundation for informed decision-making and accountability. For pre-noticed events, agencies should take advantage of the time available to develop operational plans. Prior planning experiences and after-action reports can provide a basic level of guidance and operational consistency when planning for pre-noticed events and responding to spontaneous incidents.

Law enforcement leaders are encouraged to apply the principles of ICS when developing operational plans, to include the use of ICS forms.

**Incident/event planning considerations should include (not in priority order):**

- Determining command and control
  - Identifying incident, operations and tactical commanders
  - Identifying staffing requirements for department operations center and/or emergency operations center
- Identifying and establishing incident objectives
- Developing a flexible operations plan
- Based on known information and participants, developing an overall staffing plan to include event and continuity of public safety operations
- Identifying partner law enforcement agencies (local, state and federal as applicable)
- Cross-jurisdictional issues
- Contacting police agencies that have prior experience with similar events or groups
- Identifying and conferring with other city/county/state agencies that can contribute logistical support (see *Guideline 2.5*)
- Determining operational security needs
  - Counter-surveillance activities
  - Counter-intelligence activities
- Developing protocols for event information gathering and disseminating
- Communicating with event organizers and potential attending groups (other than organizers) and offer to meet with them
- Meeting with community stakeholders
- Any restrictions placed on the event must be content neutral and reasonable; based on time, place, manner and duration

*POST Guidelines — Crowd Management, Intervention and Control*

**Guideline**

## 2.2

*Initiate incident/event planning consistent with the Incident Command System.*

## *Incident/Event Planning*
### *(continued)*

**Incident/event planning considerations should include (not in priority order)** *(continued)*:

- Reviewing parameters and methods for declaring an unlawful assembly
- Planning for media contact
  - ➤ Establishing procedures for information dissemination
  - ➤ Identifying public information officer(s)
  - ➤ Establishing procedures for media access
  - ➤ Establishing staging area(s)
- Outlining criminal investigation/arrest protocols (multi-agency/jurisdictional events)
- Identifying and arranging for specialized support units (e.g., mounted, bicycles, other special vehicles, air support, marine support, mobile field force, hazmat)
- Using plain clothes personnel to enhance the public safety when appropriate
- Arranging for adequate administrative/support personnel (e.g., communications, transportation, booking, records, detention, medical)
- Identifying emergency medical services staging area(s) and coordination with local emergency treatment facilities
- Coordinating internally and externally with other governmental departments/agencies (e.g., fire, public works, information technology, purchasing, private entities)
- Interoperability issues (e.g., individual communications-radios, cell phones)
- Developing a communications plan (e.g., plain speak, primary channels, radios for others assisting/mutual aid agencies, etc.)
- Identifying available translators when needed
- Arranging for other equipment (e.g., barriers, fencing, field force extrication equipment, containment alternatives)
- Arranging for vehicle removal/towing capability
- Checking the integrity of barriers to ensure they have not been compromised prior to the event (e.g., water drained, fence pre-cut, etc.)
- Clearing the event area of pre-staged weapons and other unlawful instrumentalities of criminal behavior
- Developing predetermined responses/options and arrest thresholds for specific criminal activity during the event
  - ➤ Throwing objects and substances
  - ➤ Arson and fireworks

Commission on Peace Officer Standards and Training

**Guideline**

## 2.2

*Initiate incident/event planning consistent with the Incident Command System.*

## *Incident/Event Planning*
*(continued)*

**Incident/event planning considerations should include (not in priority order)** *(continued)*:

- Reviewing parameters and methods for declaring an unlawful assembly
- Planning for media contact
  - ➤ Establishing procedures for information dissemination
  - ➤ Identifying public information officer(s)
  - ➤ Establishing procedures for media access
  - ➤ Establishing staging area(s)
- Outlining criminal investigation/arrest protocols (multi-agency/jurisdictional events)
- Identifying and arranging for specialized support units (e.g., mounted, bicycles, other special vehicles, air support, marine support, mobile field force, hazmat)
- Using plain clothes personnel to enhance the public safety when appropriate
- Arranging for adequate administrative/support personnel (e.g., communications, transportation, booking, records, detention, medical)
- Identifying emergency medical services staging area(s) and coordination with local emergency treatment facilities
- Coordinating internally and externally with other governmental departments/agencies (e.g., fire, public works, information technology, purchasing, private entities)
- Interoperability issues (e.g., individual communications-radios, cell phones)
- Developing a communications plan (e.g., plain speak, primary channels, radios for others assisting/mutual aid agencies, etc.)
- Identifying available translators when needed
- Arranging for other equipment (e.g., barriers, fencing, field force extrication equipment, containment alternatives)
- Arranging for vehicle removal/towing capability
- Checking the integrity of barriers to ensure they have not been compromised prior to the event (e.g., water drained, fence pre-cut, etc.)
- Clearing the event area of pre-staged weapons and other unlawful instrumentalities of criminal behavior
- Developing predetermined responses/options and arrest thresholds for specific criminal activity during the event
  - ➤ Throwing objects and substances
  - ➤ Arson and fireworks

*POST Guidelines — Crowd Management, Intervention and Control*

**Guideline**

## 2.2

*Initiate incident/event planning consistent with the Incident Command System.*

## *Incident/Event Planning*
*(continued)*

**Incident/event planning considerations should include (not in priority order) *(continued)*:**

- ➢ Vehicle assaults
- ➢ Looting
- ➢ Vandalism
- ➢ Physical assaults
- ➢ Use of lasers as retinal weapons on officers
- ➢ Emergent issues where an officer or community member rescue is required
- Anticipating, determining and communicating arrest posture
- Ensuring local ordinances are communicated to personnel (e.g., that prohibit carrying or possessing specified items while attending or participating in any demonstration, rally, picket line or public assembly)
- Publishing local ordinances via social media platforms
- Setting up logistical support for officers
  - ➢ Food and water
  - ➢ Rest intervals
  - ➢ Access to restrooms
  - ➢ Specialized equipment
    - ○ Unmanned aircraft (e.g., speakers, lights, etc.)
    - ○ Pole cameras or other video system integration
    - ○ Body-worn or helmet cameras
    - ○ Personal protective equipment
    - ○ Riot shields
    - ○ Outer impact gear
    - ○ Fire suppression equipment
    - ○ Anti-laser protection for personnel
    - ○ Glasses/goggles
    - ○ Over-mask protection
    - ○ Applied films on face shield
    - ○ Mass-arrest supplies
    - ○ Carrying equipment (e.g., Sked)
  - ➢ Spare vehicles and fuel
  - ➢ Property and evidence control
    - ○ Storage
    - ○ Biohazards
  - ➢ Decontamination

Commission on Peace Officer Standards and Training

**Guideline**

## 2.2

*Initiate incident/event planning consistent with the Incident Command System.*

## *Incident/Event Planning*
*(continued)*

**Incident/event planning considerations should include (not in priority order)** *(continued)***:**

- Sustainability for protracted events
- Developing a demobilization plan
- Scene stabilization to prevent recurrence of unlawful activity
  - ➤ Methods and resources
  - ➤ Short-term requirements
  - ➤ Long-term requirements
- Ensuring timely post-event debriefing at the command and squad level (inclusion of community stakeholders when appropriate)
- Soliciting input from event organizers
- Producing a written after-action report outlining lessons learned, recommendations and training opportunities
  - ➤ Establishing a retention plan for operational plans and after-action reports
- Reviewing standing plans for effectiveness
- Implementation of recommendations following after-action reporting

**Guideline**

## 2.3

*Recognize patterns of behavior and be prepared to respond appropriately to various types of crowds.*

# Crowd Behavior

**Discussion:** Be aware of the various types of behaviors associated with crowds that may result in a public safety response. Crowds at times can be a blend of both lawful and unlawful conduct. Conduct can be lawful, individual and or group criminal acts, civil disobedience and rioting. During some events, individuals or groups may exploit a lawful assembly to help conceal or otherwise facilitate criminal acts. If feasible, law enforcement should identify, isolate and attempt to surgically remove unlawful behavior in an effort to protect lawful assemblies.

**The following are examples of crowds and crowd behaviors (not in priority order):**

- Lawful conduct of First Amendment rights
- Community celebrations
- Direct action occupations
- Crime scenes
- Anarchists or criminal agitators
- Entertainment events
- Sporting events
- Labor disputes
- Media events
- Mobile crowds
- Pedestrians blocking roadways and/or sidewalks
- Flash mobs
- Parades
- Parties/social gatherings
- Political events
- Product release/commercial activity
- Unlawful vehicle exhibition
- Vehicle caravans
- Social agenda driven events (e.g., abortion, animal rights, jury decisions, environmental issues, etc.)
- Protests on private property, targeting individuals
- Isolated unlawful
- Unlawful
- Riotous
- Deliberate criminal activity unrelated to lawful protest



Commission on Peace Officer Standards and Training

**Guideline**

**2.3**

*Crowd Behavior*
*(continued)*

*Recognize patterns of behavior and be prepared to respond appropriately to various types of crowds.*

**Unlawful elements of otherwise peaceful protests are rapidly evolving and use tactics that may include (not in priority order):**

- Use of complex coordinated protests/marches and vehicle caravans that rapidly move across multiple jurisdictions, intentionally fragmenting command and control and overwhelming allied agencies' resources
- Use of lasers as retinal weapons on officers and to direct other participants
- Use of unmanned aircraft systems
- Commercial fireworks as weapons
- Umbrellas as shields and to provide concealment
- Traffic cones and pylons to "chimney" riot control agents
- Use of liquid nitrogen to freeze riot control agent grenades
- Leaf blowers to divert chemical agents
- Protester arm locking devices (e.g., Sleeping Dragons)
- Spiked weapons (e.g., Caltrops)
- Tools to compromise fencing
- Use of amplified speaker systems to disrupt/override delivery of public safety commands and sonically assault officers (e.g., bullhorns)
- Balloons and light bulbs filled with paint or other caustic substances
- Super soakers with caustic chemicals or biohazards (e.g., feces/urine)
- Throwing of missiles (e.g., bricks, rocks, bottles or objects containing frozen liquid)
- Skateboards as shields or used as impact/striking weapons
- Use of materials constituting shields, at times camouflaged and with sharpened edges
- Highly mobile protesters engaged in reconnaissance (e.g., scooters, motorcycles, bicycles)
- Vehicles used to force entry into structures
- Protesting on private property targeting individuals
- Targeting high-end businesses outside the original area of conflagration
- Direct action occupations
- Firebombs (e.g., Molotov cocktails)
- Arson
- Use of spears
- Use of flamethrower
- Body armor




**Guideline**

## 2.3

*Recognize patterns of behavior and be prepared to respond appropriately to various types of crowds.*

## *Crowd Behavior*
*(continued)*

**Unlawful elements of otherwise peaceful protests are rapidly evolving and use tactics that may include (not in priority order)** *(continued)***:**

- Strobing flashlights
- Use of improvised explosive devices
- Fortified vehicles
- Firearms
- Providing logistical support to lawful protesters and unlawful operatives (e.g., food, water and weapon distribution)
- Intentionally targeting small or multiple cities to overwhelm resources
- Use of diversionary tactics
- Unlawful returning of law enforcement chemical agent munitions into control forces
- Pre-event training
- Pre-event reconnaissance and planning

**Guideline**

## 2.4 *Mutual Aid & Multi-Agency Coordination*

*Be familiar with the California Law Enforcement Mutual Aid System and plan.*

**Discussion:** Agencies should be familiar with the process and responsibilities of requesting and receiving law enforcement mutual aid. Large demonstrations and mass gatherings have the potential to tax the resources of any law enforcement agency. Agencies should be familiar with the California Governor's Office of Emergency Services, Law Enforcement Branch, Law Enforcement Mutual Aid Plan and its companion document, Law Enforcement Guide for Emergency Operations. Both publications are available on the California Office of Emergency Services (CalOES) website at *www. CalOES.ca.gov*.

The size and magnitude of an event/incident requiring law enforcement response will dictate the need for multi-agency coordination and cooperation to efficiently provide adequate mutual aid resources. Critical elements of applying mutual aid to an event should include pre-event planning (if possible), well-defined missions and objectives, specific uniform and equipment requirements, identified staging areas and incident facilities, adequate briefings, an incident action plan, use of force considerations, communication plan, arrest protocols and logistical support (e.g., food, lodging, rest intervals, etc.).  Memorandums of understanding and contracts are not to be considered as mutual aid.

### *Requesting Mutual Aid*



*POST Guidelines — Crowd Management, Intervention and Control*

**Guideline**

## 2.4

*Be familiar with the California Law Enforcement Mutual Aid System and plan.*

## Mutual Aid & Multi-Agency Coordination
### (continued)

| Region | Counties |
|--------|----------|
| I | Los Angeles, Orange |
| IA | San Luis Obispo, Santa Barbara, Ventura |
| II | Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, San Francisco, San Mateo, Santa Clara, Santa Cruz, Solano, Sonoma |
| III | Butte, Colusa, Glenn, Lassen, Modoc, Plumas, Shasta, Sierra, Siskiyou, Sutter, Tehama, Trinity, Yuba |
| IV | Alpine, Amador, Calaveras, El Dorado, Nevada, Placer, Sacramento, San Joaquin, Stanislaus, Tuolumne, Yolo |
| V | Fresno, Kern, Kings, Madera, Mariposa, Merced, Tulare |
| VI | Imperial, Inyo, Mono, Riverside, San Bernardino, San Diego |



*Law Enforcement Mutual Aid Regions*

Commission on Peace Officer Standards and Training

**Guideline**

**2.5**

*Establish procedures to identify, develop and utilize public agency and community-based resources.*

# *Public Agency and Community-Based Resources*

**Discussion:** Collaborating with other public agencies and community-based resources is recommended for effective law enforcement response to crowd management events. Law enforcement should use available public agency and community-based resources when planning for and responding to crowds.

**Public agency and community-based resources may include (not in priority order):**

- Adjacent law enforcement agencies (e.g., mutual aid)
- Animal control
- California Governor's Office of Emergency Services (*www.CalOES.ca.gov*.)
- City manager/county administrator
- City/county/state departments of transportation
- Correctional facilities
- District attorney/city attorney/agency counsel
- EMS providers/ambulance services
- Fire services
- Hospitals
- Judiciary
- National Guard
- Parks and recreation
- Parole and probation
- Public health services
- Public transportation
- Public works
- Red Cross/Salvation Army or other similar service providers
- Refuse/waste removal services
- Schools/colleges/universities
- Social services
- Utility companies



## Guideline

### 2.6

*Training for Managing Crowds*

**Establish procedures to provide training for law enforcement command and operational staff in managing crowds.**

### Command Personnel

**Discussion:** It is important to prepare for incidents through recurring training and simulation exercises. Command personnel should have experience in managing complex, rapidly evolving and multi-dimensional events. Because experiences vary, there is a need for reality-based scenario training that mimics, as much as possible, the "fog" encountered during critical event management. Training should include the actual stress of incident management to ensure that critical thinking can be applied during real events. Command personnel must be trained to clearly see and explain what they are specifically trying to accomplish while managing crowds. They should anticipate and identify tactical objectives, understand resources, operational strategies, capabilities, department policies and the law. Command personnel should also understand limitations of field forces.

**Training for command personnel should include (not in priority order):**

- Advanced critical incident management
- Command decision-making during chaotic events
- Critical incident management
- Delegation strategies
- Critical thinking and use of innovative strategies
- Crowd intervention strategies
- Media relations
- SEMS/ICS to include an understanding of event planning and unified command
- Crowd dynamics
- Tactical decision-making
- Crowd management related policies, procedures and laws

Commission on Peace Officer Standards and Training

**Guideline**

## 2.6

*Establish procedures to provide training for law enforcement command and operational staff in managing crowds.*

# *Training for Managing Crowds*
## *(continued)*

### *Field Personnel*

**Discussion:** Field personnel need to understand the law, policy, tactics and mission objectives. Officer discipline, situational awareness and thoughtful restraint are essential components necessary for successfully managing crowds. Discipline is achieved through regular training in the areas of tactical fundamentals and First Amendment rights. Training should be relevant, realistic and ongoing.

**Training for field personnel should include but is not limited to (not in priority order):**

- Crowd management related policies, procedures and laws
- Arrest and control techniques
- Baton/impact weapon techniques
- Crowd management law
- Crowd dynamics
- Incident command using reality-based training and exercises
- SEMS/ICS
- Kinetic energy projectiles
- Mass-arrest
- Media relations
- Mobile field force
- Field force extrication training
- Mutual aid
- Chemical agents
- Supervisory leadership
- Tactical decision-making
- Team arrest techniques
- Multi-agency reality-based training

# Information Management

**Guideline**

## 3.1   *Information Gathering and Assessment*

*Establish policies and procedures to address the collection of information prior to and after crowd management incidents/events.*

**Discussion:** Gathering and analyzing information about an event can dramatically increase the effectiveness of an agency's planning and response to incidents/events involving crowd management. When collecting information, the process must be lawful, within policy and considerate of the constitutional rights of all persons.  Protection of the First Amendment rights of persons to peaceably assemble and participate in free speech activities should be paramount in the collection of information.

**When gathering and assessing information, law enforcement should consider, but not be limited to, the following (not in priority order):**

- Determining information available including projected crowd size, nature of event, times of assembly, duration of event, location and anticipated activities
- Gathering real-time information from various sources including the Internet
- Determining methods to communicate with the community at large
- Determining methods to communicate information with mutual aid resources
- Determining methods to communicate with identified spokespersons within the groups
- Opportunities to identify lines of communication with the crowd/group spokespersons
- Assessing the validity of information
- Adapting to changing information
- Assessing any previous incidents or events involving the same or similar groups, tactics, techniques or procedures
- Pre-event protective sweeps of anticipated areas for potential hazards or weapons (e.g., rocks, bricks, pre-staged projectiles, etc.)
- Analyzing expected times of arrival and departure along with the means and routes of travel for participants
- Public safety staging, access routes and transportation
- Assessing the impact on public transportation, freeways and roadways
- Assessing the impact on business districts, commerce and public accessibility
- Assessing and considering options to mitigate potential disruptive activities and hazards
- Analyzing the potential for opposing/counter groups
- Designation of public safety liaison(s) to media including social media



Commission on Peace Officer Standards and Training

**Guideline**

### 3.2

*Establish protocols for documenting crowd management activities.*

# *Incident Documentation*

**Discussion:** Thorough documentation is a key element which supports not only criminal investigation and prosecution, but also gives an account of public safety's response to an event. Accurate, transparent and complete documentation is imperative for public safety credibility and objective review. Documentation should begin during planning and continue throughout the process. Proper documentation can aid in addressing after-action concerns such as complaints, civil litigation, training considerations and requirements for potential reimbursement. Agencies should ensure record retention protocols are followed.

Each peace officer is responsible and required to report their individual use of force in accordance with department policy and the law. Furthermore, officers are required to intercede, immediately report and document excessive force they observe.

Agencies should anticipate that all documentation, including electronic communications, may be subject to subpoena and the Public Records Act, *Government Code §6250–6270* requests.

**Methods of documentation may include (not in priority order):**

- Still photography
- Audio recording
- All available video recordings
- Body-worn videos
- Three-dimensional (3D) mapping (before and after)
- Live stream capture
- Communication, dispatch recordings and printouts
- Civilian hand-held radio frequency audio capture
- Written log/journal
- Crime reports, after-action reports and any appropriate ICS forms
- Media reports/open-source footage
- Social media sources

**Subjects to be documented may include (not in priority order):**

- Incident/event action plan
- Records of law enforcement decisions and information
- Records of law enforcement actions in response to the event
- Property damage
- Injuries and claims of injuries

*POST Guidelines — Crowd Management, Intervention and Control*

**Guideline**

## 3.2

*Establish protocols for documenting crowd management activities.*

## Incident Documentation
*(continued)*

**Subjects to be documented may include (not in priority order)** *(continued)***:**

- Collective and individual behavior of participants
- Individual arrests
- Individual officers' actions
- Use of force
- Evidence/property collected
- After-action report

Intentionally blank

# Roles and Responsibilities



## 4.1

**Establish policies and procedures to achieve effective command and control during crowd management events.**

## Command and Control

**Discussion:** Agencies should use the Incident Command System (ICS) as a basis to structure a law enforcement response to crowd management events. The incident commander is in command of the event. The success of any critical incident depends on the incident commander exercising active leadership, strategic thinking and decisive decision-making. The incident commander establishes the objectives of the incident action plan, considers new information, continually re-evaluates the situation, assesses available resources and balances competing demands to best achieve incident objectives.

Establishing a clear command structure during an incident is essential. Unity of command is the concept that each officer is assigned to only one supervisor. It clearly identifies the individual in charge of any specific group of officers, function or assignment. Unity of command provides for effective management of all events.

When responding to an incident, individuals of any rank may serve as incident commander until relieved by a ranking officer. All personnel should be trained in the Standardized Emergency Management System (SEMS) and specifically, the ICS.

**Peace officers should be aware of the following (not in priority order):**

- Their role, responsibilities and objectives
- To whom they report
- What resources are allocated and available
- Their geographical or functional area of operation

**The transfer of command should include, but is not limited to (not in priority order):**

- Receive a situational report from the current incident commander or representative
- Determine an appropriate time for the transfer of command
- Document the transfer of command
- Do not interrupt real-time operations
- Announce the new incident commander to all involved personnel

***Note:*** Effective incident commanders continually assess the situation, determine a course of action and make mid-course adjustments to achieve tasks and mission objectives.



**Guideline**

## 4.2

*Recognize the essential role of leadership during crowd management incidents and events.*

## *Leadership Responsibilities*

**Discussion:** A key component to the success of any crowd management incident/event is that all personnel demonstrate competent leadership, regardless of rank.

**Effective event leaders have the following characteristics (not in priority order):**

- Accountable
- Competent
- Innovative
- Organized
- Decisive
- Delegate appropriately
- Provide clear direction
- Identify and disseminate operational goals and objectives

**Leadership responsibilities may include (not in priority order):**

- Knowledge of the laws, agency policies and procedures
- Recognizing and addressing public safety and personnel concerns
- Understanding of community expectations and concerns
- Inspiring confidence, calm and professionalism in the face of unfolding events
- Understanding and maintaining focus on the goals and objectives
- Adaptable and flexible to changing situations or circumstances
- Available for decision-making and receptive to personnel input
- Communicating throughout the chain of command as required
- Emphasizing teamwork and avoiding individual action



*POST Guidelines — Crowd Management, Intervention and Control*

**Guideline**
**4.3**

*Establish procedures to investigate and prosecute criminal activity.*

## Criminal Investigations

*Discussion:* Crowd behaviors that result in criminal activity should be investigated and documented. Statutory offenses may include but are not limited to arson, looting, trespass, unlawful assembly, failure to disperse, assaults, rioting, vandalism and conspiracy.

Arrests should be made based upon applicable laws. Law enforcement may use discretion when considering appropriate enforcement action based on the totality of the circumstances.

**Investigative considerations may include but are not limited to (not in priority order):**

- Identifying crimes
- Consulting with city/district attorney prior to and after the event
- Identifying a master report writer/case agent
- Private person's arrests when appropriate
- Identifying an evidence coordinator
- Gathering documents that may aid in an investigation (e.g., press releases, internet material, signs, banners, etc.)
- Collecting body-worn camera and unmanned aircraft systems video
- Obtaining video evidence from all sources (e.g., business security cameras, social media sources, etc.)
- Obtaining audio evidence from all sources
- The necessity for reviewing each arrest
- Recording specific chants with nexus to unlawful activity and, when possible, identifying who is leading them
- Photographing/video recording the event
- Maintaining evidence beyond criminal prosecution pending civil litigation
- Photographing the overall area and collecting samples of weapons (e.g., rocks, bottles, etc.) utilized in the commission of a crime
- Photographing the crime scene, overall scene and collection and/or documentation of expended less-lethal law enforcement ordinance

**Conspiracy charges may be considered. Evidence considerations for conspiracy investigations may include (not in priority order):**

- Clothing and items showing affiliation with similar groups
- Computers and storage devices
- Documents (e.g., correspondence, address books, journals, etc.)
- E-mail or digital communication

Commission on Peace Officer Standards and Training

**Guideline**

**4.3**

*Establish procedures to investigate and prosecute criminal activity.*

## Criminal Investigations
*(continued)*

**Conspiracy charges may be considered.  Evidence considerations for conspiracy investigations may include (not in priority order)** *(continued)***:**

- Manifestos
- Photographs (including criminal activity and assembly site before and after)
- Posts on social media and Internet sites, including live feeds
- Telephone records
- Video recordings

*Note:* Seizures of some of these items may require a search warrant.

*POST Guidelines — Crowd Management, Intervention and Control*

**Guideline**

**4.4**

*Establish systemic procedures to ensure personnel health and wellness during crowd management events.*

# Health and Wellness

**Discussion:** The roles of public safety personnel during a crowd management event can range from a pleasant, even warm, dialog exchange with crowd members, to violent and potentially life-threatening encounters. Over the course of such events peace officers may experience mental, emotional and physical consequences that must be recognized and managed by the individual and by the agency.

Officer wellness is a fully integrated state of physical, mental and emotional well-being and may be achieved by employing proactive strategies that are dynamic, holistic and goal oriented. Officer wellness includes being self-aware and making good decisions and balanced choices to lead a healthy, fulfilled, personal and professional life.

Agencies should consider creating a culture within their organization that promotes the training and practice of officer wellness and emotional intelligence.  These skills may provide officers with the ability to better regulate their own emotions and to better assess and thus influence the emotional state of others (subjects, victims and coworkers).

**Systemic personnel wellness considerations may include (not in priority order):**

- Training and practice of a culture within your organization that promotes officer wellness
- Training for crowd management supervisory personnel, in officer wellness and emotional intelligence
- When possible and feasible, providing staffing for an event that allows for personnel rest periods
- When possible and feasible, long-term logistical support to minimize fatigue and exhaustion
- Promotion of a culture where officers come forward to report fatigue and exhaustion in themselves or other agency personnel
- Consideration of personal needs (e.g., food, water, rest area, restroom facility, electrical outlets to charge personal communications devices, etc.)

240

Intentionally blank

**PART 5**

# Crowd Management, Intervention and Control Strategies

### Guideline
## 5.1

*Develop crowd management, intervention and control strategies to address crowd behavior, lawful or unlawful, that may impact public safety.*

## Crowd Management, Intervention and Control Strategies

**Discussion:** Public gatherings may conclude without any need for law enforcement intervention. Crowd events generally fall into three potential phases or categories, management, intervention and control. Crowd management is the preparation and response to all forms of public gatherings. This includes planning, facilitation of First Amendment activities, protecting life and property and the prevention of violence. If members of a crowd become unlawful, "crowd intervention" may be necessary.

Crowd intervention is the implementation of strategies and tactics to mitigate and remove unlawful behavior during public gatherings so as not to disrupt an otherwise lawful assembly. Intervention strategies and tactics include communications with all crowd factions as well as the utilization of resources to identify, prevent, locate and remove unlawful behavior. If the general assembly becomes unlawful, "crowd control" may be needed.

Crowd control is the law enforcement response to a protest or gathering that may involve objectively dangerous or unlawful situations. Circumstances may warrant law enforcement actions such as arrests, deployment of personnel and use of force options including kinetic energy projectiles, chemical agents or dispersal tactics.

Every incident/event should be independently assessed to determine the strategies and tactics that will effectively support and facilitate First Amendment activity and provide for public safety. The strategies and tactics that agencies utilize must begin by first identifying the objectives to be accomplished and then the best means by which those objectives can be achieved. Tactics used may evoke a positive or negative response (e.g., a strong show of force may calm and disperse a crowd or incite them). Careful consideration should be given to arrest thresholds/postures and surreptitious or passive influences on crowd movement to maintain a lawful assembly. Incident leadership should constantly evaluate potential crowd behavioral progressions and contingencies.

Law enforcement leaders should utilize escalation and de-escalation techniques through active communications with crowd factions to encourage, maintain and facilitate lawful First Amendment activity before having to declare an unlawful assembly.

Significantly, command and supervisory personnel and any personnel deploying kinetic energy projectiles or chemical agents must be familiar with



Commission on Peace Officer Standards and Training

**Guideline**

**5.1**

*Develop crowd management, intervention and control strategies to address crowd behavior, lawful or unlawful, that may impact public safety.*

## Crowd Management, Intervention and Control Strategies *(continued)*

the statutory requirements.

Crowd management, intervention and control strategies and tactical considerations may include (not in priority order):

**General strategies/tactics:**

- Supporting and facilitating First Amendment activities

**General strategies/tactics *(continued)*:**

- Establishing and maintaining communications with the crowd and all stakeholders
- For spontaneous assemblies, attempting to contact organizers/leaders and documenting all attempts and responses
- Deploying identified public information officers to assist with media movement and positioning of equipment
- Readily available amplified sound devices (e.g., PA systems) to make announcements to the crowd and police resources (including speaker equipped unmanned aircraft systems)
- Readily available mobile signboards
- Conducting a post-incident debrief with event organizers/leaders to exchange feedback, develop/improve relationships, solicit compliance for future events, learn pitfalls and foster goodwill
- Providing handouts prepared in advanced to facilitate and guide protester conduct
- Placing uniformed personnel out of view, avoiding unnecessary confrontation but still able to respond quickly if needed
  - ➤ Will allow the reduction or elimination of visible police equipment such as:
    - ○ Armored vehicles
    - ○ Helmets, riot batons, shields, etc.
    - ○ Uniform apparel not in compliance with PC 13655
- Situational awareness
  - ➤ Deployment of observation teams in elevated positions (less visible)
  - ➤ Deployment of unmanned aircraft systems teams
    - ○ Unmanned aircraft system operators covert if possible (to avoid distraction and harassment)
    - ○ Streaming video to command post
    - ○ Well-equipped (e.g., lights, speaker, thermal imaging, zoomable camera, infrared camera, mapping software, etc.)



*POST Guidelines — Crowd Management, Intervention and Control*

**Guideline**

## 5.1

*Develop crowd management, intervention and control strategies to address crowd behavior, lawful or unlawful, that may impact public safety.*

## Crowd Management, Intervention and Control Strategies *(continued)*

- ○ Appropriate waivers/certificates of authorization
- ➤ Pole cameras
- ➤ Public or private sector camera systems
- ➤ Monitoring the internet with teams prior to and during an event
- ➤ Reporting of real-time actionable information to the incident commander is critical
- ➤ Media coverage
- ➤ Ensuring officers monitor critical infrastructures

**General strategies/tactics *(continued)*:**

- Using protocols that allow for nimble deployments
  - ➤ Ability to reposition those mobile field force resources quickly to meet changing dynamics of crowds and locations
- Developing a traffic management and/or control plan
  - ➤ Establishing public safety corridors to assist with separation of crowds while allowing movement of emergency equipment and personnel
  - ➤ Deploying barriers to separate conflicting groups that demonstrate potential violence
  - ➤ Positioning personnel to assist with vehicle and pedestrian movement as necessary
  - ➤ Announcing road closures and discontinuance of public transportation as required
  - ➤ Preparing vehicle barriers to protect the crowd and public safety
- Providing a high-visibility or low-visibility law enforcement presence
- Positioning officers to minimize contact with the assembled crowd
- Assisting organizers in advance with any/all permit requirements Deployment of uniformed "liaison officers" to help facilitate organizers/ leaders
- Communicating with groups during planning as much as possible to help facilitate a successful event
- Responding to special needs individuals' participation in First Amendment activities

**Crowd management strategies/tactics:**

- Preparation of a "protester guide" outlining planning and participating in a First Amendment assembly and publishing it on the agency website
- Through advance communication with organizers and leaders of all

Commission on Peace Officer Standards and Training

### Guideline

## 5.1

## Crowd Management, Intervention and Control Strategies *(continued)*

*Develop crowd management, intervention and control strategies to address crowd behavior that includes, lawful and/or unlawful activities.*

factions, encourage lawful facilitation of First Amendment rights with the encouragement of lawful behavior

- Through advance communication with organizers and leaders, offer an understanding that unlawful conduct of a few could lead to a declaration of an unlawful assembly and the dispersal of the crowd
- Using uniformed "public safety greeters" to welcome groups, monitor items being carried by protesters and to establish law enforcement spatial ownership

**Crowd management strategies/tactics *(continued)*:**

- Requesting event organizers provide safety marshals to assist with protester control ("if you police yourself, we don't have to")
- Deployment of uniformed "liaison officers" to help facilitate organizers' coordination of a lawful protest and to build trust with the police
- Conducting daily situational reports with mutual aid agencies to reinforce policies, priorities and command structure
- Assess the impact of the presence and/or participation in the protest of elected officials, sports figures and/or entertainment figures
- Monitoring crowd to protect participants, bystanders and property from criminal activity

**Crowd intervention strategies/tactics:**

- Deployment of uniformed "liaison officers" to help facilitate organizers/ leaders
- Communications directly with the crowd encouraging lawful behavior and discouraging unlawful conduct
- Communications with the crowd describing the unlawful behavior within the crowd and why a dispersal order may be imminent if it does not cease
- Deployment of teams of police community relations officers to calm and mitigate crowd confrontations when appropriate
- Attempt de-escalation techniques or other alternatives when objectively reasonable
- If audible announcements appear to be ineffective, you should have sufficient control forces in place and prepared for deployment
- Deploying plain clothes personnel (Behavior Detection Officers) to enhance the public safety when appropriate
- Contingencies for when law enforcement intervention tactics may lag behind fast moving protester tactics

*POST Guidelines — Crowd Management, Intervention and Control*

## Guideline
## 5.1

*Develop crowd management, intervention and control strategies to address crowd behavior that includes, lawful and/or unlawful activities.*

# Crowd Management, Intervention and Control Strategies (continued)

- Monitoring civilian hand-held radio channels (walkie-talkie) for criminal elements exploiting protest
- Integrating surgical intervention of unlawful conduct based on observations as soon as reasonable and practical (arrest teams)
- Identifying and making objectively reasonable efforts to extract individuals in distress
- Deploying small agile response teams to targeted areas of violence/property damage or other unlawful activity
- Protecting critical facilities

**Crowd control strategies:**

- Conducting daily situational reports with mutual aid agencies to reinforce policies, priorities and command structure
- Selecting appropriate equipment
- Deploying plain clothes personnel to enhance the public safety when appropriate
- Protecting critical facilities
- Protecting responding law enforcement assets and their ability to deploy
- When communications and de-escalation techniques do not bring an objectively dangerous and unlawful situation safely and effectively under control, a declaration of an unlawful assembly may be appropriate
- Making arrests as warranted
- Facilitating traffic flow
- Assessing visibility vs. non-visibility  of control forces
- Continuing communications and de-escalation efforts with protest groups to help reduce confrontations
- Defining dispersal routes in advance

*Note:* For a more comprehensive list of considerations, see Appendix B.

**Guideline**
### 5.2

*Establish procedures for declaring unlawful assemblies and issuing dispersal orders.*



## *Dispersal Orders*

**Discussion:** Law enforcement agencies should understand the law as it pertains to an unlawful assembly. The decision to declare a crowd unlawful must be based upon reasonable and articulable facts. California Penal Code section 407 states, "Whenever two or more persons assemble together to do an unlawful act or do a lawful act in a violent, boisterous or tumultuous manner, such assembly is an unlawful assembly." The terms "boisterous" and "tumultuous" have been interpreted as conduct that poses a clear and present danger of imminent violence *[In re Brown (1973) 9 Cal. 3d 612, 623.]*.

Dispersal orders for the purpose of ordering people to leave an area, must satisfy the legal requirements and convey the importance of compliance. Elements of an effective dispersal order include audible announcements setting forth the pending consequences of continued unlawful behavior, such as remaining at the location will subject individuals to arrest. Law enforcement should provide sufficient time to disperse after the order with clear directions and visible and ample means of egress.

With regard to dispersal orders **pertaining to objectively dangerous and unlawful situations where the use of kinetic energy projectiles and chemical agents are warranted,** it is required that repeated audible announcements are made announcing the intent to use kinetic energy projectiles and chemical agents. The announcements must include the type of kinetic energy projectiles and/or chemical agents to be used **when objectively reasonable to do so**. The announcements shall be made from various locations, if necessary and delivered in multiple languages, if appropriate.

**Dispersal order considerations (not in priority order):**

- Purpose and anticipated action necessitating the dispersal order
- Should be delivered thoughtfully, deliberately and strategically
- Need for repeated announcements, from various locations and potential multiple language concerns
- Must be communicated in a manner reasonably believed to be heard and understood by the intended audience
- Voice inflection and tone of voice should be considered in an attempt to portray calm and to encourage an orderly dispersal
- Provide sufficient time to disperse after the order
- Communicate clear, visible and ample means of egress
- Law enforcement should record the name of the individuals making the announcements and the date and time each order was administered

**Guideline**

## 5.2

*Establish procedures for declaring unlawful assemblies and issuing dispersal orders.*

## Dispersal Orders
*(continued)*

- Use of amplified sound may elevate the formality of the announcements
- May have an unintended escalation affect
- Intent to permanently disperse a crowd where unlawful activity is occurring, not to merely relocate the problem
- Should be used when communications have failed and restoration of order does not appear possible, absent enforcement action

**Methods of delivering and documenting dispersal orders and alternatives (not in priority order):**

- Loud audible speech
- Amplified sound
- Ensuring that the order is heard in remote areas
- Confirming and documenting that the orders are transmitted sufficiently to be received by those intended
- Using unmanned aircraft equipped with amplified sound flown to inaccessible areas
- Pre-recorded unlawful assembly messages in multiple languages as appropriate
- Display of signage, including electronic signage and billboards, indicating unlawful assembly, dispersal and clearly identified routes of egress
- Gaining the attention of the crowd and documenting affirmative responses of crowd members prior to the declaration of unlawful assembly
- Position law enforcement personnel to confirm and document the receipt of the transmission of the dispersal order to those intended
- Consider multiple-language capability
- Community alert systems
- Provide clear directions with regard to crowd dispersal
- Using video/audio recording equipment for documentation of the dispersal order, the crowd response and their ability to hear
- Use of social media platforms to send out alerts to specific areas

**Methods that may be used to deliver and document dispersal orders include (not in priority order)** *(continued)***:**

- Positioning law enforcement personnel to the rear of a crowd to confirm and document hearing the transmission of the dispersal order
- Acquiring multiple-language capability
- Community alert system(s)

Commission on Peace Officer Standards and Training

**Guideline**

**5.2**

*Establish procedures for declaring unlawful assemblies and issuing dispersal orders.*

## Dispersal Orders
### (continued)

- Provide easy to understand directions that help the crowd disperse so that they clearly understand the desired response
- Using video/audio recording equipment for documentation of the dispersal order, the crowd response and their ability to hear
- Use of social media platforms to send out alerts to specific areas

**UNLAWFUL ASSEMBLY DISPERSAL ORDER**

**Dispersal Order Example:** *"I am (peace officer's name and rank), a peace officer for the (name of jurisdiction). I hereby declare this to be an unlawful assembly and in the name of the People of the State of California, order all those assembled at (specific location) to immediately disperse, which means to break up this assembly. If you do not do so, you may be arrested.*

**INSERT REQUIRED WHEN KINETIC ENERGY PROJECTILES/CHEMICAL AGENTS TO BE DEPLOYED (FOR OBJECTIVELY DANGEROUS AND UNLAWFUL SITUATIONS)**

*You may also be subject to other police action including the use of kinetic energy projectiles and chemical agents, which include: _____*

**(Insert here type to be used e.g., rubber bullets, plastic bullets, beanbag rounds, foam tipped plastic rounds, tear gas, CN, CS, pepper balls, pepper spray or OC).  Use of these devices could result in serious injury.**

*Penal Code section 409 prohibits remaining present at an unlawful assembly, which means that you must leave the area I just described. If you remain in the area just described, you will be in violation of Penal Code section 409. The following routes of dispersal are available (routes). "You have (state the current time and the reasonable amount of time to disperse, e.g., it is now 9:30 pm and you have 15 minutes to leave the area) to disperse."*

**Guideline**

## 5.3 *Mass Arrests and Bookings*

*Develop procedures for conducting and managing mass arrests and bookings.*

**Discussion:** The most successful law enforcement strategy for dealing with mass arrests and bookings is proper planning, training and comprehensive briefing of involved peace officers prior to the event. Mass arrests are dynamic situations that are resource intensive. Any process must be flexible enough to handle challenges that may confront the field force.

Be prepared to utilize various arrest tactics to address unlawful behavior, including passive/non-compliant resistance, active resistance and assaultive and life-threatening confrontation. It is imperative to maintain accountability of arrestees from the arrest site (crime scene) through the booking process. Many cases are lost due to the inability to link the arresting peace officer to the arrestee. The arrest report should articulate each arrestee's specific criminal act(s) and the witnessing officer(s). This process will aid in criminal prosecution and the reduction of civil liability.

A coordinated effort by all involved criminal justice entities is essential to ensure proper arrest, booking and prosecution of violators. It is imperative to keep accountability of evidence. Consideration should be given to maintaining evidence beyond criminal prosecution, pending potential civil litigation.

**Mass arrest and booking considerations may include (not in priority order):**

*Arrest teams:*

- Predesignated
- Designated
- Personal protective equipment
- Sufficient handcuffs/restraint equipment

*Booking/processing area:*

- On-site, off-site or temporary holding facilities
- Multiple language translation capabilities
- Emergency medical services (EMS)
- Decontamination
- Security (protest groups often target booking facilities)
- Weather issues
- Media issues
- Handcuff/flex-cuff release device
- Computer access for records checks, etc.
- Telephone access (per *CA Penal Code section 851.5* and *Welfare & Institutions Code section 627)*



Commission on Peace Officer Standards and Training

**Guideline**

**5.3**

*Develop procedures for conducting and managing mass arrest and bookings.*

## Mass Arrests and Bookings
*(continued)*

***Booking/processing area (continued):***

- Designated booking teams
- Sufficient forms/paperwork
  - Booking forms
  - Field release from custody
  - Field interview cards
  - Evidence collection/storage of materials
- Personal needs issues
  - Restrooms
  - Water
  - Food
  - Medications
- Segregation issues
  - Gender
  - Gangs
  - Juveniles
  - Vulnerable individuals, including the disabled
  - Opposing factions
  - Environmental issues (contagious diseases, chemical exposures, etc.)
- Documentation (photo/video/audio/written) of arrests
  - Linking arrestee with arresting officer
  - Date
  - Time
  - Location
  - Offense(s)
  - Arrestee's property
  - Arresting peace officer(s)
  - Identification of arrestees
  - Disposition

***Prisoner transportation***

- Security issues during transportation, to include conflicts between groups
- Special needs (e.g., wheelchairs, face masks, etc.)
- Secure, away from involved area
- Use transport vehicles to economize police personnel
- Be prepared with alternatives for transportation if normal assets are eliminated or refused

*POST Guidelines — Crowd Management, Intervention and Control*

**Guideline**

**5.3**

*Develop procedures for conducting and managing mass arrest and bookings.*

## Mass Arrests and Bookings
*(continued)*

***Coordination:***

- Medical/EMS
- Jail
- Court
- District/city attorney
- Probation/parole
- Public defender's office
- Private attorneys
- Child Protective Services
- Master report writer/case agent
- Public affairs/media relations representative
  - ➤ Public service announcements



**Guideline**

## *5.4*    *Use of Force Options*

*Develop use of force policies, procedures and training for controlling crowds engaged in unlawful activity.*

**Discussion:** The law enforcement response to unlawful behavior should be consistent with the agency's use of force policy and the law. In *Graham v. Connor, 490 U.S. 386 (1989)*, the Supreme Court held that an excessive force claim is properly analyzed under the Fourth Amendment's 'objective reasonableness' standard.  The Graham court discusses a non-exhaustive list of factors to be considered in evaluating whether the force used to effect a particular seizure is reasonable:

- Whether the suspect poses an immediate threat to the safety of the officers or others
- Whether the suspect actively resists
- The time available for officers to make decisions (e.g., split-second decision-making)
- The severity of the crime(s) at issue
- Whether the individual is attempting to escape or evade

The test of reasonableness in this context is an objective one, viewed from the vantage of a reasonable officer on the scene.  The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation.  In all situations, the force used must be objectively reasonable under the totality of the circumstances.

The reasonableness of force used to effect a seizure is determined by balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the governmental interests at stake. In essence, the consideration is what force option was used and what was the foreseeable risk of injury under the totality of the circumstances.  The courts have emphasized that the most important factor is whether the individual posed an immediate threat to the officer or to the safety of the public *[Young v. County of Los Angeles, 655 F.3d 1156, 1162 (9th Cir. 2011)]*.

In instances wherein, a suspect is non-violent and poses no threat to the safety of the officers or others, the force options used should be non-deadly force with a minimal risk of injury.  Intermediate force options are objectively reasonable when under the totality of the circumstances, the



## 5.4

## *Use of Force Options*
### (continued)

*Develop use of force policies, procedures and training for controlling crowds engaged in unlawful activity.*

individual is actively resisting and poses a threat.  Intermediate force includes force options that pose a significant risk of injury under the totality of the circumstances and include typically: the use of chemical agents and pepper spray; the use of impact weapons; conducted energy weapons in probe mode; and the use of law enforcement canines. Deadly force is defined as force with a substantial risk of causing serious bodily injury or death and includes the use of firearms, as well as other force that poses such substantial risks.

Significantly, peace officers need not use the least intrusive force option available, but only that force that is objectively reasonable under the totality of the circumstances.  Prior to the use of a particular force option, officers should consider the availability of resources and tactics that are reasonably safe and feasible to an objectively reasonable officer.  Warnings should be given, if feasible, when force is used that may inflict significant pain or result in serious bodily injury or death.

Law enforcement personnel should utilize and document de-escalation strategies individually and operationally to reduce force applications when feasible. As discussed in part 5.5, kinetic energy projectiles and chemical agents should only be used to defend against a threat to life or serious bodily injury to peace officers or others or to bring an objectively dangerous and unlawful situation safely and effectively under control.

An objectively dangerous and unlawful situation is one where, absent intervention, there is an imminent threat under the totality of the circumstances to overtake and/or exceed law enforcement capabilities and on-scene resources.

In such a situation, law enforcement may use kinetic energy projectiles and chemical agents to safely and effectively bring a situation under control in accordance with specific requirements.  Those requirements are set forth in Penal Code section 13652 (b) (1-11) and summarized below.

**Examples of objectively dangerous and unlawful situations may include, but are not limited to:**

- Act of felony vandalism that will likely lead to further felonious acts
- Looting
- Blocking roadways with active vehicular traffic endangering life
- Arson

Commission on Peace Officer Standards and Training

**Guideline**

## 5.4

*Develop use of force policies, procedures and training for controlling crowds engaged in unlawful activity.*

# *Use of Force Options*
### *(continued)*

- Rioting
- Illegally taking or attempting to take a prisoner from a peace officer
- Individuals in distress, injured, trapped or encircled in a crowd
- Carjacking of motorists during civil disorder
- Individuals engaged in violent acts
- Use of biological, chemical agents, substances or explosives that could inflict serious bodily injury to a peace officer or citizen
- Potential immediate takeover by an unlawful crowd of critical facilities that may overwhelm existing resources or impact public safety

**Use of force considerations particular to crowd management may include (not in priority order):**

- Continually assess the makeup and behavior of the crowd
- Identify potential disruptive elements or factions within the crowd
- Prepare and preposition personnel in anticipation of the need to give warnings or orders
- Public safety ramifications of unlawful behavior
- Evaluate the seriousness of the unlawful conduct and the threat posed
- Ensure that the appropriate personnel are on scene for approval of force options
- Need to maintain public safety access (e.g., ingress/egress for emergency vehicles)
- Evaluate compliance or non-compliance of individuals
- Ensure prompt medical assistance is provided for injured persons when it is reasonable and safe to do so
- Identifying criminal violations
- Implementing arrest protocols for various types of offenders
- Removal and processing of nonviolent, non-compliant offenders
- Addressing the use of various force options
- Accommodations for physically challenged, elderly and child demonstrators
- Considering the resources available based on the situation
- Evaluating the availability of other public safety resources
- Using personal protective equipment
- Planning for the safety of bystanders and the media
- Evaluating the mobility of suspects/protesters

## Guideline

### 5.4

*Develop use of force policies, procedures and training for controlling crowds engaged in unlawful activity.*

## Use of Force Options
*(continued)*

**Use of force considerations particular to crowd management may include (not in priority order)** *(continued)***:**

- Determining avenues of controlled departure
- Anticipating the potential need for medical resources
- Addressing the use of kinetic energy projectiles and chemical agents (see section 5.5)

Commission on Peace Officer Standards and Training



**Guideline**

### 5.5

*Develop policies and procedures regarding deployment of chemical agents during incidents of civil disobedience.*

## Use of Kinetic Energy Projectiles and Chemical Agents

***Discussion:*** With regard to the use of kinetic energy projectiles and chemical agents, California Penal Code section 13652 provides specific guidelines for the use of such force options. Penal Code section 13652 provides that kinetic energy projectiles and chemical agents shall:

- Not be used by any law enforcement agency to disperse any assembly, protest or demonstration except under specific circumstances
- Only be deployed by a peace officer that has received training on their proper use by the Commission on Peace Officer Standards and Training for crowd control
- Deployed ONLY if the use is objectively reasonable to defend against a threat to life or serious bodily injury to any individual, including any peace officer OR to bring an objectively dangerous and unlawful situation safely and effectively under control; AND
- ONLY in accordance with ALL of the following requirements:
  - ➢ De-escalation techniques or other alternatives to force have been attempted, when objectively reasonable and have failed
  - ➢ Repeated, audible announcements are made announcing the intent to use kinetic energy projectiles and chemical agents and the type to be used, when objectively reasonable to do so. The announcements shall be made from various locations, if necessary and delivered in multiple languages, if appropriate
  - ➢ Persons are given an objectively reasonable opportunity to disperse and leave the scene
  - ➢ An objectively reasonable effort has been made to identify persons engaged in violent acts and those who are not and kinetic energy projectiles or chemical agents are targeted toward those individuals engaged in violent acts. Projectiles shall not be aimed indiscriminately into a crowd or group of persons
  - ➢ Kinetic energy projectiles and chemical agents are used only with the frequency, intensity and in a manner that is proportional to the threat and objectively reasonable
  - ➢ Officers shall minimize the possible incidental impact of their use of kinetic energy projectiles and chemical agents on bystanders, medical personnel, journalists or other unintended targets
  - ➢ An objectively reasonable effort has been made to extract individuals in distress
  - ➢ Medical assistance is promptly provided, if properly trained personnel are present or procured, for injured persons, when it is reasonable and safe to do so



**Guideline**

## 5.5

### Use of Kinetic Energy Projectiles and Chemical Agents *(continued)*

*Develop policies and procedures regarding deployment of chemical agents during incidents of civil disobedience.*

➤ Kinetic energy projectiles shall not be aimed at the head, neck or any other vital organs

➤ Kinetic energy projectiles or chemical agents shall not be used by any law enforcement agency solely due to any of the following:

    ○ A violation of an imposed curfew
    ○ A verbal threat
    ○ Noncompliance with a law enforcement directive

➤ If the chemical agent to be deployed is tear gas, only a commanding officer at the scene of the assembly, protest or demonstration may authorize the use of tear gas

    ○ For the purposes of this section, the following terms have the following meanings:

➤ "Kinetic energy projectiles" means any type of device designed as less lethal, to be launched from any device as a projectile that may cause bodily injury through the transfer of kinetic energy and blunt force trauma. For purposes of this section, the term includes, but is not limited to, items commonly referred to as rubber bullets, plastic bullets, beanbag rounds and foam tipped plastic rounds

➤ "Chemical agents" means any chemical that can rapidly produce sensory irritation or disabling physical effects in humans, which disappear within a short time following termination of exposure. For purposes of this section, the term includes, but is not limited to, chloroacetophenone tear gas, commonly known as CN tear gas; 2-chlorobenzalmalononitrile gas, commonly known as CS gas; and items commonly referred to as pepper balls, pepper spray or oleoresin capsicum

***Note:*** Penal Code § 13652 does not apply within any county detention facility or any correctional facility of the Department of Corrections and Rehabilitation. See Appendix C, Applicable Statutes, Penal Code section 13562(b), (2), (5), (6), (11) and (d)(2): Section 3, Section 13652.1a(b), (1), (2), (3), (4) and (5)

**Additional Considerations for Deployment of Kinetic Energy Projectiles and Chemical Agents:**

• Totality of the circumstances
• Field personnel requests for authorization to deploy

**Guideline**

## 5.5

### Use of Kinetic Energy Projectiles and Chemical Agents (continued)

*Develop policies and procedures regarding deployment of chemical agents during incidents of civil disobedience.*

- Crowd composition (e.g., children, elderly and persons with disabilities)
- Protection of bystanders and property
- Overall effect on area from contamination
- Overall safety of public safety personnel involved
- Effect on public safety personnel, mounted units and K-9s
- Type and amount of kinetic energy projectiles and chemical agents available
- Storage, replacement and inventory accountability
- Field issuance, deployment and accountability for recovery
- Appropriate methods of deployment to be used
- Weather conditions and wind direction
- Physical location and terrain considerations
- Protective mask fit testing
- Protective devices for public safety personnel in place prior to deployment
- Identify personnel with authority to authorize the use of kinetic energy projectiles and chemical agents
- Identify availability of sufficient number of personnel trained to deploy kinetic energy projectiles and chemical agents
- Notification of all public agency personnel of intent to deploy kinetic energy projectiles and chemical agents
- Decontamination issues
- Multi-agency event dynamics

**Kinetic energy projectiles and chemical agent deployment considerations may include (not in priority order):**

- Kinetic energy projectiles and chemical agents use must be consistent with an objectively dangerous and unlawful situation
- Tear gas use must be authorized by an on-scene commanding officer
- Field personnel request for authorization to deploy
- Defend against a threat to life or serious bodily injury to any individual, including any peace officer, when objectively reasonable
- An imminent threat under the totality of the circumstances constituting objectively dangerous and unlawful situations
- Prior to repeated dispersal orders, personnel notifications of the intent to deploy kinetic energy projectiles and chemical agents
- Intentions to deploy chemical agents should be included in the unlawful assembly dispersal order, along with dispersal routes
- De-escalation techniques or other alternatives to force have been attempted when objectively reasonable and have failed

**Guideline**

## 5.5

*Develop policies and procedures regarding deployment of chemical agents during incidents of civil disobedience.*

## Use of Kinetic Energy Projectiles and Chemical Agents *(continued)*

- Promptly provide medical assistance if properly trained personnel are present or procured for injured person(s) when it is reasonably safe to do so
- Kinetic energy projectiles or chemical agents shall not be used for a violation of an imposed curfew, a verbal threat or the non-compliance with a law enforcement directive
- Kinetic energy projectiles shall not be aimed at the head, neck or any other vital organs
- Minimize possible incidental impact of kinetic energy projectiles and chemical agents on bystanders
- Make an objectively reasonable effort to extract individuals in distress
- Kinetic energy projectiles and chemical agents used only with the frequency, intensity and manner proportional to the threat and objectively reasonable
- Repeated audible announcements are made of the intent to use kinetic energy projectiles and chemical agents, including the type to be used, when objectively reasonable to do so made from various locations, if necessary, made in multiple languages when appropriate
- Kinetic energy projectiles and chemical agents are targeted toward those individuals s engaged in violent acts and not aimed indiscriminately into a crowd or group of persons
- Objectively reasonable effort made to identify persons engaged in violent acts vs. those who are not
- Individuals are given an objectively reasonable opportunity to disperse and leave the scene
- Safety of personnel involved
- Trained personnel available
- Methods of delivery
- Weather conditions
- Wind direction
- Physical location/terrain considerations
- Effect on law enforcement horses
- Overall effect on area from contamination
- Types of agents available
- Protective devices for personnel in place prior to deployment
- Crowd composition (e.g., potential exposure to children, elderly and persons with disabilities)
- Protection of bystanders, officers and property
- Decontamination



Commission on Peace Officer Standards and Training

**Guideline**

**5.5**

*Develop policies and procedures regarding deployment of chemical agents during incidents of civil disobedience.*

## Use of Kinetic Energy Projectiles and Chemical Agents *(continued)*

**Chemical agent deployment considerations may include (not in priority order)** *(continued)*:

- Totality of circumstances
- Training
- Reporting
- Types of agents
- Appropriate methods of deployment
- Identity of person(s) who can authorize the use of chemical agents
- Identity of person(s) trained to deploy chemical agents
- Decontamination/observation
- Medical attention
- Storage, replacement and inventory accountability
- Field issuance, deployment and accountability for recovery
- Protective mask fit testing
- Multi-agency events

**Guideline**
## 5.6

*Develop policies and procedures related to the reporting requirements arising out of crowd management.*

## Agency Use of Force Reporting Requirements: Kinetic Energy Projectiles and Chemical Agents

**Discussion:** Law enforcement agencies are required to comply with specific reporting requirements for all uses of force that occur involving law enforcement personnel that result in serious bodily injury or death. Additionally, any deployment of force involving the use of kinetic energy projectiles or chemical agents during any assembly, protest or demonstration must also be reported according to specific statutory requirements.

**Law Enforcement Agency Reporting Requirements for Use of Force Resulting in Serious Bodily Injury or Death:**

Law enforcement agencies are required, pursuant to GC 12525.2, to furnish monthly to the Department of Justice a report of all instances when a peace officer employed by that agency is involved in any of the following:

- An incident involving the shooting of a civilian by a peace officer
- An incident involving the shooting of a peace officer by a civilian
- An incident in which the use of force by a peace officer against a civilian results in serious bodily injury or death or
- An incident in which use of force by a civilian against a peace officer results in serious bodily injury or death

The information reported to the California Department of Justice shall include, but not be limited to, all of the following:

- The gender, race and age of each individual who was shot, injured or killed
- The date, time and location of the incident
- Whether the civilian was armed and if so, the type of weapon
- The type of force used against the officer, the civilian or both, including the types of weapons used
- The number of officers involved in the incident
- The number of civilians involved in the incident
- A brief description regarding the circumstances surrounding the incident, which may include the nature of injuries to officers and civilians and perceptions on behavior or mental disorders

Each year, the California Department of Justice shall include a summary of information contained in the reports received through the Open Justice Web portal.  This information shall be classified according to the reporting law enforcement jurisdiction. In cases involving a peace officer who is injured or killed, the report shall list the officer's employing jurisdiction and the



Commission on Peace Officer Standards and Training

**Guideline**

**5.6**

## Agency Use of Force Reporting Requirements: Kinetic Energy Projectiles and Chemical Agents

(continued)

*Develop policies and procedures related to the reporting requirements arising out of crowd management.*

jurisdiction where the injury or death occurred, if they are not the same. This subdivision does not authorize the release to the public of the badge number or other unique identifying information of the peace officer involved.

For purposes of this section, "serious bodily injury" means a bodily injury that involves a substantial risk of death, unconsciousness, protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member or organ.

In the event that kinetic energy projectiles or chemical agents are deployed for crowd control under the provisions of Penal Code 13652, the law enforcement agency is required, pursuant to PC section 13652.1, to publish a summary of such use on the agency internet website within 60 days of each incident. That period of time may be extended for an additional 30 days (total not to exceed 90 days) if good cause for the extension is demonstrated. **Further, PC 13652 does not apply within any county detention facility or any correctional facility of the Department of Corrections and Rehabilitation.**

The summary of the use of kinetic energy projectiles and chemical agents shall include only the information known at the time of the report and include only the following:

- A description of the assembly, protest, demonstration or incident, including the approximate crowd size and the number of officers involved
- The type of kinetic energy projectile or chemical agent deployed
- The number of rounds or quantity of chemical agent dispersed, as applicable
- The number of documented injuries as a result of the kinetic energy projectile or chemical agent deployment
- The justification for using the kinetic energy projectile or chemical agent, including any de-escalation tactics or protocols and other measures that were taken at the time of the event to de-escalate tensions and avoid the necessity of using the kinetic energy projectile or chemical agent

***Note:*** The statute requires the California Department of Justice to post on its internet website a compiled list linking each law enforcement agency's reports posted pursuant to the statute.

*POST Guidelines — Crowd Management, Intervention and Control*

# Media



## Guideline
### 6.1

## *Media Strategies*

*Develop policies and procedures for facilitating the role of the media during incidents that require a law enforcement response to crowd management events.*

***Discussion:*** Having an effective media relationship is important to law enforcement when addressing crowd management incidents. The more that law enforcement interacts with the media in a spirit of cooperation and transparency, the more accurate the reporting. In most instances involving crowd management events, it is beneficial for an agency to routinely provide timely information rather than simply respond to inquiries.

Pursuant to Penal Code section 409.7, peace officers shall not deny access to a duly authorized representative of any news service, online news service, newspaper, radio, television station or network to a closed area immediately surrounding any emergency field command post or any other command post. If peace officers establish a police line or rolling closure at a demonstration, march, protest or rally where individuals are engaged in activity that is protected pursuant to the First Amendment to the United States Constitution or Article I of the California Constitution, certain requirements shall apply.

Nor shall a peace officer intentionally assault, interfere with or obstruct a duly authorized media representative who is gathering, receiving or processing information for communication to the public. Such individuals should not be cited for failure to disperse, for violation of curfew or a violation of PC 148(a)(1). If the media representative is detained by a peace officer, that representative shall be permitted to contact a supervisory officer immediately for the purpose of challenging the detention, unless circumstances make it impossible to do so.

Penal Code section 409.7 does not prevent a peace officer from enforcing other applicable laws if the media representative is engaged in activity that is unlawful. Furthermore, Penal code section 409.7 shall not be used as a basis for criminal liability.

**Media strategy considerations may include (not in priority order):**

- Anticipating that the entire event is being livestreamed
- Establishing a media center and/or points of contact that the media can call/access to receive timely updates to combat the increase of misinformation, particularly on social media
- Utilizing social media to disseminate accurate and important information proactively, including livestreaming or similar medium (e.g., releasing related video)
- Consider dissemination of information to the media that may include:
  - ➤ The what, where and when of anticipated activities

Commission on Peace Officer Standards and Training

### Guideline
### *6.1*

*Develop policies and procedures for facilitating the role of the media during incidents that require a law enforcement response to crowd management events.*

## *Media Strategies*
### *(continued)*

➢ Specific parade or protest routes
➢ Locations subject to disruption of normal business or traffic
➢ The extent of disruption expected when possible
➢ Alternative routes and/or mass transit alternatives
- Informing the media of law enforcement expectations during a dispersal order(s)
- Use of a media pool (e.g., camera, radio, print, streamers, etc.)
- Embedding media with law enforcement when appropriate
- Establishing a joint information center
- A coordinated public information strategy
- Assigning public information officers to manage platform(s)
- Complying with *Penal Code § 409.5 and § 409.7*



*POST Guidelines — Crowd Management, Intervention and Control*

**Guideline**

## 6.2

*Develop policies and procedures for the use of electronic communication and social media for community outreach and as an investigative tool.*

# Electronic Communications and Social Media

**Discussion:** The use of electronic communication and social media has grown exponentially and can have specific application to law enforcement's response to incidents of crowd management. The effective use of electronic communication and social media can enhance law enforcement efforts related to community outreach, investigations and in other strategic initiatives.

**Some tactics seen in organized protests that may affect law enforcement responses (not in priority order):**

- Doxing law enforcement personnel and/or public figures
- Use of encrypted apps to communicate (to move where police personnel are understaffed or not present)
- Livestreaming events to gain support
- Use of hand-held two-way hobby radios
- Viral disinformation and/or intentional misreporting

**Considerations for law enforcement regarding utilization of electronic communication and social media may include (not in priority order):**

- Quickly informing the public and media about events, developments, police activities or other announcements in real time
- Building relationships with the public, special interest groups and protesters
- Providing ways for the public to communicate with law enforcement, such as reporting suspicious activity
- Informing crowds by posting or handing out instructions to attendees
- Communicating with citizens about crime information, road closures, etc.
- Providing relevant information, prior to and during an event
- Providing timely warnings, emergency notifications and/or advisories to mass recipients (e.g., reverse 9-1-1, texting, etc.)
- Establishing operational security and identifying legal implications in the official use of electronic communication and social media platforms
- To follow, engage or track a group, there should be an operational necessity to carefully ensure the protection of civil liberties
- Developing agency-specific policies and procedures regarding the personal use of electronic communication and social media, which includes measures to ensure operational security

Commission on Peace Officer Standards and Training



**Guideline**

**6.2**

*Develop policies and procedures for the use of electronic communication and social media for community outreach and as an investigative tool.*

## Electronic Communications and Social Media *(continued)*

**Considerations for law enforcement regarding utilization of electronic communication and social media may include (not in priority order) *(continued)*:**

- Use of anti-doxing platforms
- Being aware of agency social media policy and the use of personal recording devices



# Terms and Definitions

**Active Resistance**

To intentionally and unlawfully oppose the lawful order of a peace officer in a physical manner (e.g., bracing, tensed muscles, interlock arms/legs, pushing, kicking, etc.).

**After-Action Report**

A report covering response actions, application of ICS, modifications to plans and procedures, training needs and recovery activities.

**Anarchist**

A person who uses unlawful, violent means to cause disorder or upheaval.

**Arrest Protocol**

The formal process of placing subjects under arrest, taking into custody and associating the arresting peace officer(s) with the specific individual arrested.

**Arrest Teams**

Personnel assigned to arrest duties during civil disobedience/civil disorder incidents.

**Assaultive Resistance**

Aggressive or combative behavior which attempts or threatens to assault an officer.

**Behavior detection officers**

(BDOs) Plain clothes personnel within a crowd to identify problematic individuals based on reasonable suspicion.

**Booking Teams**

Personnel assigned to custodial processing duties during incidents of civil disobedience/civil disorder.

**Chemical Agents**

Any chemical that can rapidly produce sensory irritation or disabling physical effects in humans, which disappear within a short time following termination of exposure. For purposes of this section, the term includes, but is not limited to, chloroacetophenone tear gas, commonly known

as CN tear gas; 2-chlorobenzalmalononitrile gas, commonly known as CS gas; and items commonly referred to as pepper balls; pepper spray or oleoresin capsicum. *(See Appendix C, Applicable Statues, Penal Code § 13562 (11d, 2).*

**Civil Disobedience**

An unlawful event involving a planned or spontaneous demonstration by a group of people.

**Civil Disorder**

Any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual. *(18 USC, Ch. 12, Civil Disorder, Section 232 Definitions).*

**Command**

The authority a peace officer lawfully exercises over subordinates by virtue of his/her rank and assignment or position.

**Commanding officer**

The National Incident Management System (NIMS) defines an **incident commander** as an individual having the authority to establish objectives, make assignments and order resources. The incident commander should have the training, experience and expertise to serve in this capacity. Additionally, **per NIMS, qualifications to serve as an incident commander should not be based solely on rank, grade or technical knowledge.** *https://training.fema.gov/programs/emischool/el361toolkit/glossary.htm*

**Compliance Techniques**

Reasonable, lawful use-of-force methods intended to encourage suspect cooperation.

**Compliant Behavior**

Behavior consistent with submitting to lawful orders of a peace officer without resistance.

Commission on Peace Officer Standards and Training

**Control Devices**
Devices intended to assist peace officers in gaining control of subjects who refuse to submit to lawful authority (e.g., batons, electronic control devices, restraints, chemical agents, etc.).

**Cordoning**
Surrounding or enclosing a particular problem area; also referred to as perimeter control.

**Critical Facilities**
Any location essential to the well-being and safety of the community requiring law enforcement protection during a critical incident.

**Crowd**
A number of persons gathered together.

**Crowd Control**
Law enforcement response to a protest or gathering that has become unlawful and/or violent.  It may require arrest and/or deployment of dispersal tactics or even use of force.

**Crowd Dynamics**
Factors which influence crowd behavior.

**Crowd Intervention**
The implementation of strategies and tactics to mitigate and remove unlawful behavior during public gatherings so as not to disrupt an otherwise lawful assembly.  Intervention strategies and tactics include communications with all crowd factions as well as the utilization of resources to identify, prevent, locate and remove unlawful behavior.

**Crowd Management**
The preparation and response to all forms of public gatherings. This includes planning, facilitation of First Amendment activities, protecting life and property and the prevention of violence.

**Decontamination**
Procedures taken to reduce the effects of any less-lethal chemical agent or bio-hazard exposure.

**De-escalation**
The process of using strategies and techniques intended to decrease the intensity of the situation. (POST (2021), *De-escalation Strategies & Techniques*

*for California Law Enforcement*, cover page, http:POST.ca.gov).

**Direct Action**
Direct action can include nonviolent and violent activities which target persons, groups or property. Nonviolent direct action may include sit-ins, strikes etc. Violent direct action may include, assault, arson, street blockades and property destruction.

**Discipline**
Peace officer behavior that is consistent with demonstrating self-control, teamwork, moderation and restraint.

**Dispersal Order**
Lawful order communicated by law enforcement personnel commanding individuals unlawfully assembled to disperse.

**Dismounted Tactics**
Non-mobile tactical formations generally involving team, squad and platoon-sized units.

**Doxing**
A term referring to the act of revealing identifying information about someone (e.g., home address, real name, financial information, etc.).

**Emergency Operations Center (EOC)**
A location from which centralized emergency management is performed. EOC facilities are established by an agency or jurisdiction to coordinate the overall agency or jurisdictional response and support to an emergency.

**Essential Elements of Information**
Critical tactical information, obtained from any source, received prior to and/or during an event which is considered so essential that without it, meaningful planning cannot proceed.

**Flash Mob**
A group of people organized using social media or other means, to coordinate meeting at a specific location at a specific time for entertainment, satire or in some cases, criminal activity.

**Flashpoint**
Specific location(s) which become the initial source

of unlawful activity and/or the origin or focal point of civil disorder.

### Force Options
Reasonable force alternatives that may be utilized by law enforcement to effect arrest, overcome resistance and prevent escape.

### Formations
Coordinated unit tactics utilized by law enforcement to control crowds, stop unlawful activity, disperse and/or arrest violators.

### Incident Action Plan (IAP)
A written document containing general management objectives that reflect the overall incident strategy and specific plans using personnel and resources. Incident action plans will vary in content and form depending upon the kind and size of an incident.

### Incident Command System (ICS)
The statewide model for field-level management of emergencies is mandated by the Standardized Emergency Management System (SEMS).  ICS is specifically designed to allow its user(s) to adopt an integrated organizational structure equal to the complexity and demands of single and multiple incidents without being hindered by jurisdictional boundaries.

### Incident Objectives
Statements of guidance and direction are necessary for the selection of an appropriate strategy and the tactical use of resources. Incident objectives are based on realistic expectations of what can be accomplished when allocated resources have been effectively deployed. Incident objectives must be achievable and measurable, yet flexible enough to adjust to strategic and tactical alternatives.

### Journalist
A duly authorized representative of any news service, online news service, newspaper or radio or television station or network. *CA Penal Code section 409.7.*

### Kinetic Energy Projectile
Any type of device designed as less lethal, to be launched from any device as a projectile that may cause bodily injury through the transfer of kinetic energy and blunt force trauma. For purposes of this section, the term includes, but is not limited to, items commonly referred to as rubber bullets, plastic bullets, beanbag rounds and foam tipped plastic rounds. *(Penal Code Section 13562 (11d)(1)).*

### Leadership
The art and exercise of influence to obtain willing compliance, confidence, respect and loyal cooperation of personnel.

### Less-Lethal Chemical Agents
Chemical gents utilized by law enforcement agencies which may include CS, CN, OC and HC (smoke).

### Less-Lethal Impact Munitions
Projectiles launched or otherwise deployed for purposes of overcoming resistance, preventing escape, effecting arrest, reducing serious injury and may be applied without a significant likelihood of causing death.

### Life-Threatening
Any action likely to result in serious injury or death of an officer or another person.

### Mobile Arrest and Booking Teams
Mobile teams designated to assist field personnel with mass arrests and processing.

### Mobile Field Force
An organized, mobile law enforcement tactical force equipped and trained to respond to unusual occurrences. The mobile field force is currently the statewide standard configuration known as "Mutual Aid Response Mobile Field Force."

### Mobile Tactics
The ability to rapidly deploy law enforcement personnel using vehicles. The vehicles may also be used for crowd control and containment.

### Mob
A disorderly group of people engaged in unlawful activity.

### Mounted Tactics
Crowd control while mounted on horses.

Commission on Peace Officer Standards and Training

**Non-Compliant Behavior**
Behavior which does not yield to the lawful order of a peace officer but offers no physical resistance (sometimes referred to as "passive resistance").

**Noticed Events**
Public assemblies, demonstrations or crowd events, which are planned for in advance and allow for prior notice, whether direct or indirect, to law enforcement.

**Operations Plan**
A plan describing the tactical deployment of resources at an incident or event to meet the objectives of the incident action plan.

**Operations Security (OPSEC)**
Methods used to prevent sensitive information, which may compromise the integrity and safety of a law enforcement operation, from being improperly disseminated.

**Pain Compliance**
Stimulation of nerves or the manipulation of joints to elicit a sense of unease or distress in a subject, causing that subject to comply with lawful directives.

**Passive Resistance**
Refers to intentional and unlawful opposition of a lawful order of a peace officer during arrest situations but involves no physical resistance. (*See Active Resistance*).

**Perimeter Control**
See *Cordoning*.

**Photographic Teams**
Law enforcement photographers assigned to memorialize designated activity involving civil disobedience.

**Policy**
Statements of principles and values which guide the performance of a specific agency activity. Policy establishes limits of action and reflects a statement of guiding principles that should be followed to achieve an agency's objective.

**Procedure**

A method of performing an operation or a manner of proceeding on a course of action within the limits of policy.

**Public Disruption**
The interruption or disturbance of public order.

**Sectoring**
An overall area of operation and dividing it into sub-sections based upon geographical and/or defined boundaries.

**Serious Bodily Injury**
With regard to officer use of force, serious bodily injury is defined as a bodily injury that involves a substantial risk of death, unconsciousness, protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member or organ. *(California Government Code section 12525.2 (d))*.

**Social Media**
Communications of social interaction, using highly accessible and scalable devices, including web-based and mobile technologies used to promote interactive dialogue.

**Spontaneous Events**
Public assemblies, demonstrations or crowd events, which occur without prior planning and/or without prior notice to law enforcement.

**Stakeholder**
Entities having a legal, professional, economic or community interest/responsibility in a public assembly or gathering.

**Standardized Emergency Management System (SEMS)**
A system required by California Government Code for managing response to multi-agency and multijurisdictional emergencies in California. SEMS consists of five organizational levels that are activated as necessary: Field response, Local government, Operational area, Region and State.

**Tear Gas**
The term used in the California Penal Code for what law enforcement more accurately refers to as "*less-lethal chemical agents*."

### Unified Command

In ICS, it is described as a unified team effort, which allows all agencies with responsibility for the incident, either geographical or functional, to manage an incident by establishing a common set of incident objectives and strategies. It maintains agency authority, responsibility and accountability. In most instances unified command will require co-locating allied agencies.

### Unity of Command

The concept that each officer is assigned to only one supervisor. It clearly identifies the individual in charge of any specific group of officers, function or assignment.

### Unlawful Assembly

*Penal Code §407* defines an unlawful assembly as: "Whenever two or more persons assemble together to do an unlawful act, or to do a lawful act in a violent, boisterous or tumultuous manner, such assembly is an unlawful assembly." "Boisterous or tumultuous manner" has been interpreted by the courts to mean conduct which poses a clear and present danger of imminent violence.

Commission on Peace Officer Standards and Training

# Crowd Management, Intervention and Control Strategies

| Situation | Law Enforcement Response | |
|---|---|---|
| **Lawful Assembly**<br><br>Free Speech and assembly are protected First Amendment activities:<br><br>↪ Speeches  ↪ Picketing<br>↪ Marches  ↪ Public<br>↪ Demonstrations  assemblies<br>↪ Rallies  ↪ Protests<br>  ↪ Celebratory events | **Use Crowd Management Strategies/Tactics**<br><br>↪ Meet with event organizers and stakeholders<br>↪ Assess the history and risk of the group<br>↪ Create a planning team<br>↪ Assist with permit preparation<br>↪ Develop Incident Action Plan and objectives<br>↪ Identify and assign resources (ICS)<br>↪ Monitor and assess crowd behavior | ↪ Separate opposing factions<br>↪ Maintain video log<br>↪ Provide direction and expectations at roll call/ briefing<br>↪ Engender facilitation, not confrontation<br>↪ Interact with organizers and gain |
| **Isolated Unlawful Behavior**<br><br>Isolated unlawful activity within a crowd should not always require declaration of an unlawful assembly.<br><br>↪ Isolated destruction of property<br>↪ Isolated acts of violence<br>↪ Isolated rock or bottle throwers<br>↪ Individual sit-down demonstrators | **Use Crowd Intervention Strategies/Tactics**<br><br>↪ Use organizers and monitors to gain voluntary compliance<br>↪ Isolate, arrest and remove law violators as quickly as possible (BDO Teams)<br>↪ Video action of officers and law violators<br>↪ Use amplified sound to communicate intent or to gain compliance<br>↪ Use low profile tactics when possible. Don't become the focus of the demonstration | ↪ When it is not possible to make an immediate arrest, identify and track suspects using cameras, observation posts aviation/behavior detection teams (BDOs)<br>↪ Continue to assess; escalate and de-escalate as behavior changes<br>↪ Don't increase crowd tension or change crowd focus to law enforcement by unnecessary aggressive appearance  or behavior |

*Situation Severity*

*Note:  This table is neither all-inclusive nor limiting.*

**APPENDIX B**

# Crowd Management, Intervention and Control Strategies

| Situation | Law Enforcement Response |
|---|---|
| **Unlawful Assembly**<br><br>Assemblies may be dispersed when they are violent, or pose a clear and present danger of violence, or the group is breaking some other law in the process. If a crime is occurring, action may be taken to stop it prior to a Dispersal Order being given. Per Penal Code §407, two or more persons assemble to:<br><br>⮑ Commit an unlawful act or<br>⮑ Commit a lawful act in a boisterous or tumultuous manner | **Use Crowd Control Strategies/Tactics**<br><br>⮑ Seek voluntary compliance<br>⮑ Video action of officers and law violators<br>⮑ Act quickly<br>⮑ Request needed resources<br>⮑ Put control forces in place<br>⮑ Identify dispersal routes<br>⮑ Consider a traffic plan<br>⮑ Move media to protected area<br>⮑ Use amplified sound – declaration of force an unlawful assembly<br>⮑ Disperse and/or arrest unlawful activity<br>⮑ With incident commander approval, deploy kinetic energy projectiles if objectively reasonable to defend against threat to life, serious bodily injury<br><br>or to bring an objectively dangerous and unlawful situation safely and effectively under control<br>⮑ Track and contain groups involved in unlawful activity using cameras, observation posts, BDOs and/or aviation<br>⮑ Arrest individuals who fail to disperse or involved in illegal activity<br>⮑ With incident commander approval, deploy chemical agents to defend officers or to disperse the crowd<br>⮑ Attempt de-escalation and apply reasonable force<br>⮑ Report use of force<br>⮑ Restore order |
| **Riot**<br><br>Penal Code §404: (a) Any use of force or violence, disturbing the public peace or any threat to use force or violence, if accompanied by immediate power of execution, by two or more persons acting together and without authority of law, is a riot.<br><br>⮑ Group violent behavior<br>⮑ Group acts of property damage<br>⮑ Apply de-escalation techniques | **Use Crowd Control Strategies/Tactics**<br><br>⮑ Video action of officers and law violators<br>⮑ Request needed resources<br>⮑ Have control forces in place<br>⮑ Stop the illegal activity<br>⮑ Put a traffic plan in place<br>⮑ Track and contain groups involved in illegal behavior using cameras, observation posts, shadow teams or air unit<br>⮑ Arrest law violators<br>⮑ With incident commander approval, deploy kinetic energy projectiles if objectively reasonable to defend against threat to life, serious bodily injury<br><br>or to bring an objectively dangerous and unlawful situation safely and effectively under control<br>⮑ Ensure only reasonable force<br>⮑ Report use of force<br>⮑ Restore and maintain order<br>⮑ Restore traffic flow<br>⮑ Discourage groups from forming<br>⮑ Protect lives, property and vital facilities<br>⮑ Remain present<br>⮑ Reassess the situation<br>⮑ Return to normalcy<br>⮑ Act quickly<br>⮑ Attempt de-escalation and apply reasonable force |

*Situation Severity*

*Note: This table is neither all-inclusive nor limiting.*

Commission on Peace Officer Standards and Training

# Applicable Statutes

| CODE | STATUTE | CATEGORY | SUBJECT |
|------|---------|----------|---------|
| Penal Code | 69 | Crimes against the executive power of the state | Resisting or deterring officer. |
| Penal Code | 71 | Crimes against the executive power of the state | Threat of injury made to peace officer in performance of his duties. |
| Penal Code | 102 | Crimes against public justice | Retaking property from officer. |
| Penal Code | 148 | Crimes against public justice | Resisting or obstructing public officer. |
| Penal Code | 148.1 | Crimes against public justice | False reporting planting of bomb. |
| Penal Code | 148.2 | Crimes against public justice | Interfering with fireman or EMT. |
| Penal Code | 148.9 | Crimes against public justice | Giving false identification. |
| Penal Code | 151 | Crimes against public justice | Advocating injury or death of peace officer. |
| Penal Code | 169 | Crimes against public justice | Picketing in or near courthouse with intent to interfere or obstruct administration of justice or influence judge, juror, witness or officer of the court. |
| Penal Code | 171f | Crimes against public justice | Entering state capitol without authorization- disorderly conduct. |
| Penal Code | 182 | Crimes against public justice | Conspiracy. |
| Penal Code | 185 | Crimes against public justice | Wearing masks or personal disguises in the commission of any public offense. |
| Penal Code | 197 | Crimes against the person | Killing in defense of self or property and arresting fugitives or quelling riot. |
| Penal Code | 218 | Crimes against the person | Derailing or wrecking train. |
| Penal Code | 219 | Crimes against the person | Wrecking train or firing bridge. |
| Penal Code | 219.1 | Crimes against the person | Throwing missile at vehicle of common carrier. |
| Penal Code | 219.2 | Crimes against the person | Throwing a missile or shooting at trains, street cars or vessels. |
| Penal Code | 240 | Crimes against the person | Assault-defined. |

*POST Guidelines — Crowd Management, Intervention and Control*

| CODE | STATUTE | CATEGORY | SUBJECT |
|---|---|---|---|
| Penal Code | 241 | Crimes against the person | Assault against peace officer, or other specified persons engaged in performance of duties (note: see PC 241 subsections). |
| Penal Code | 242 | Crimes against the person | Battery-defined. |
| Penal Code | 243 | Crimes against the person | Punishment for battery generally, against specified officers and others. |
| Penal Code | 247 | Crimes against the person | Discharge firearm at unoccupied aircraft or motor vehicle or uninhabited building or dwelling house. |
| Penal Code | 247.5 | Crimes against the person | Discharging laser at aircraft. |
| Penal Code | 248 | Crimes against the person | Interfere with helicopter operation- light or bright device. |
| Penal Code | 302 | Crimes against the person | Disorderly conduct at church service. |
| Penal Code | 372 | Crimes against public health and safety | Maintaining public nuisance. |
| Penal Code | 374 | Crimes against public health and safety | Littering and waste matter defined (note: see PC 374 subsections). |
| Penal Code | 375 | Crimes against public health and safety | Use of offensive substances in place of public assembly; manufacture of offensive subject. |
| Penal Code | 396 | Crimes against public health and safety | Price gouging during state of emergency. |
| Penal Code | 403 | Crimes against public health and safety | Disturbing an assembly. |
| Penal Code | 404 | Crimes against public health and safety | Riot-defined. |
| Penal Code | 404.6 | Crimes against public health and safety | Incitement to riot. |
| Penal Code | 405 | Crimes against public health and safety | Punishment of participants in riot. |
| Penal Code | 405a | Crimes against public health and safety | Taking person from lawful custody. |

Commission on Peace Officer Standards and Training

| CODE | STATUTE | CATEGORY | SUBJECT |
|---|---|---|---|
| Penal Code | 406 | Crimes against public health and safety | Rout-defined. |
| Penal Code | 407 | Crimes against public health and safety | Unlawful assembly. |
| Penal Code | 408 | Crimes against public health and safety | Participating in a riot or unlawful assembly. |
| Penal Code | 409 | Crimes against public health and safety | Refusal to disperse when ordered. |
| Penal Code | 409.5 | Crimes against public health and safety | Closing areas in emergency. |
| Penal Code | 409.7 | Crimes against public health and safety | Duly authorized media representatives may enter areas closed by police. |
| Penal Code | 410 | Crimes against public health and safety | Duty to suppress riot or rout. |
| Penal Code | 415 | Crimes against public health and safety | Fighting, causing loud noise or using offensive words in public place. |
| Penal Code | 415.5 | Crimes against public health and safety | Unlawful acts committed in buildings or grounds of colleges or university. |
| Penal Code | 416 | Crimes against public health and safety | Duty of crowd to disperse when ordered; Restitution for property damage. |
| Penal Code | 420 | Crimes against public health and safety | Obstructing entry on government land. |
| Penal Code | 422 | Criminal threats | Threats to commit crime resulting in death or great bodily injury. |
| Penal Code | 422.6 | Civil Rights | Civil rights; Interfere with property damage or speech. |
| Penal Code | 451 | Crimes against property | Arson. |
| Penal Code | 452 | Crimes against property | Unlawfully causing a fire. |
| Penal Code | 453 | Crimes against property | Possession or manufacture of combustible or explosive material or firebomb. |

*APPENIDX C*    **Applicable Statutes**

*POST Guidelines — Crowd Management, Intervention and Control*

| CODE | STATUTE | CATEGORY | SUBJECT |
|---|---|---|---|
| Penal Code | 455 | Crimes against property | Attempts to burn. |
| Penal Code | 463 | Crimes against property | Burglary during state of emergency. |
| Penal Code | 555 | Crimes against property | Entry without permission (note: see 555 PC subdivisions). |
| Penal Code | 587 | Crimes against property | Injuring or obstructing railroad tracks, rights-of-way or structures. |
| Penal Code | 588 | Crimes against property | Injuring public road or bridge (note: see PC 588 subsections). |
| Penal Code | 591 | Crimes against property | Injuring or tapping telegraph, telephone or cable telephone line. |
| Penal Code | 594 | Malicious mischief | Vandalism. |
| Penal Code | 602 | Malicious mischief | Trespassing. |
| Penal Code | 602.5 | Malicious mischief | Unauthorized entry of dwelling. |
| Penal Code | 602.8 | Malicious mischief | Trespass- Entering cultivated, fenced or posted land. |
| Penal Code | 602. 10 | Malicious mischief | Physical obstruction of student or teacher from attending or instructing at a university of California, California state university or community college. |
| Penal Code | 602.11 | Malicious mischief | Obstruct entry/exit of health care facility, place of worship or school. |
| Penal Code | 616 | Malicious mischief | Tampering with posted legal notice. |
| Penal Code | 626 | Miscellaneous crimes | Definitions- miscellaneous crimes- schools (note: See PC 626 subsections). |
| Penal Code | 640 | Miscellaneous crimes | Infractions committed on or in facilities or vehicles of a public transit system (note: see PC 640 subsections). |
| Penal Code | 647 | Miscellaneous crimes | Disorderly conduct defined. |
| Penal Code | 647c | Miscellaneous crimes | Accosting person in public place, disorderly conduct, impose or begging. |
| Penal Code | 647e | Miscellaneous crimes | Alcoholic beverages; possession of opened containers on posted premises; regulation by local ordinance. |
| Penal Code | 659 | General provisions | Counseling or aiding another in the commission of a misdemeanor. |
| Penal Code | 667.5 | General provisions | Enhancement of prison terms for new offenses. |
| Penal Code | 667.61 | General provisions | Specified sex offenses subject to punishment by incarceration for life. |
| Penal Code | 726 | Of the prevention of public offenses | Unlawful assembly- officer's duty to disperse. |
| Penal Code | 727 | Of the prevention of public offenses | Arrest for refusal to disperse. |

Commission on Peace Officer Standards and Training

| CODE | STATUTE | CATEGORY | SUBJECT |
|------|---------|----------|---------|
| Penal Code | 832.7 | Peace officers | Confidentiality of peace officer records; exceptions. |
| Penal Code | 835a | Peace officers | Use of reasonable force to effect arrest. |
| Penal Code | 836 | Peace officers | Arrest by peace officer. |
| Penal Code | 1192.7 | Of judgment and execution | Limitation of plea bargaining. |
| Penal Code | 4600 | Offenses relating to prisons and prisoners | Destroying or injuring prison or jail (including jail property). |
| Penal Code | 12022.7 | Sentence enhancements | Bodily harm inflicted during commission of felony not having bodily harm as an element. |
| Penal Code | 12022.8 | Sentence enhancements | Enhancement where person suffers great bodily harm, or sodomy or oral copulation by certain means. |
| Penal Code | 13519. 10 | Field services and standards for recruitment and training | Training of law enforcement officers in the use of force; guidelines. |
| Penal Code | 16770 | Weapons Law | Less-lethal ammunition. |
| Penal Code | 16780 | Weapons Law | Less-lethal weapons. |
| Penal Code | 19400 | Weapons Law | Peace officer may purchase, possess or transport less-lethal weapons. |
| Penal Code | 171b | Weapons Law | Bringing firearms into state office, State Capitol grounds or public school grounds. |
| Penal Code | 171c | Weapons Law | Bringing loaded firearm into state office, State Capitol Grounds or public school grounds. |
| Penal Code | 171d | Weapons Law | Bringing loaded firearm into residence of Governor or other constitutional officer. |
| Penal Code | 171f | Weapons Law | Entering State Capitol without authorization-disorderly conduct within. |
| Penal Code | 374c | Weapons Law | Discharging firearms on a public highway. |
| Penal Code | 417 | Weapons Law | Drawing or exhibiting weapon in a rude or threatening manner (note: see PC 417 subsections). |
| Penal Code | 626.9 | Weapons Law | Bringing or possessing firearm on grounds of public school, college or university. |
| Penal Code | 626. 10 | Weapons Law | Knives, razors, Tasers, stun guns, etc., on school grounds, exceptions. |
| Penal Code | 13652 | Weapons Law | Restricts use of and identifies requirements for use of kinetic energy projectiles and chemical agents. |
| Penal Code | 13652.1 | Weapons Law | Website publishing requirements for agency's use of kinetic energy projectiles or chemical agents. |
| Penal Code | 13655 | Law Enforcement | Restricts and prohibits some uses of law enforcement uniforms similar to military uniforms. |

*POST Guidelines — Crowd Management, Intervention and Control*

| CODE | STATUTE | CATEGORY | SUBJECT |
|---|---|---|---|
| Penal Code | 16590 | Weapons Law | Manufacture importation, sale or possession of disguised firearms or other deadly weapons prohibited; carrying concealed weapons prohibited; exceptions. |
| Penal Code | 17500 | Weapons Law | Possession of deadly weapon with intent to commit assault. |
| Penal Code | 18710 | Weapons Law | Possession of destructive device prohibited. |
| Penal Code | 22610 | Weapons Law | Purchase, possession or use of stun gun. |
| Penal Code | 25400 | Weapons Law | Unlawful to carry concealed firearms without license. |
| Penal Code | 25850 | Weapons Law | Loaded firearm; carrying in public place or in vehicle. |
| Vehicle Code | 21456 | Offenses | Unauthorized traffic devices and unofficial signs. |
| Vehicle Code | 21467 | Offenses | Prohibited sign or device as public nuisance. |
| Vehicle Code | 21954 | Offenses | Pedestrians outside crosswalks. |
| Vehicle Code | 21956 | Offenses | Pedestrian walking on roadway. |
| Vehicle Code | 21960 | Offenses | Restrictions on use of freeways. |
| Vehicle Code | 21962 | Offenses | Throwing substances at vehicles from bridge or overpass. |
| Vehicle Code | 23110 | Offenses | Throwing substance at vehicle. |
| Vehicle Code | 23112 | Offenses | Throwing, depositing or dumping matter on highway. |
| Elections Code | 18340 | Campaigns | Prevention of electors from assembly; misdemeanor. |
| Elections Code | 18380 | Campaigns | Vandalism at polling places, violations; misdemeanor. |
| Elections Code | 18502 | Voting Process | Interference with officers or voters; imprisonment. |
| Elections Code | 18540 | Voting Process | Use of force, violence, tactic or coercion or intimidation; penalties. |
| Gov't Code | 6250-6270 | Public Records | Requirements, definitions and exemptions for public record requests. |
| Gov't Code | 7070-7075 | Law Enforce-ment | Funding, acquisition and use of military equipment. |
| Gov't Code | 7286 | Law Enforcement | Definitions; Policy on the use of force; public access. |
| Gov't Code | 7286.5 | Law Enforcement | Prohibits law enforcement's use of carotid restraint, choke hold and any restraint which may create positional asphyxia. |
| Gov't Code | 12525.2 | Attorney General | Annual report of specified incidents involving peace officer; information required; inclusion of summary in annual report. |

Commission on Peace Officer Standards and Training

# Applicable Case Law

| CASE | CITATION | YEAR | COURT | CATEGORY | FACTS AND HOLDING |
|---|---|---|---|---|---|
| Cohen v. California | 403 U.S. 15 | 1971 | U.S. | First Amendment | An undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. |
| Houston v. Hill | 482 US 451 | 1987 | U.S. | First Amendment | Hill verbally tried to distract officer during arrest of another man. Municipal ordinance made it unlawful to interrupt a police officer in the performance of their duties. Unconstitutionally overbroad under the First Amendment. The First Amendment protects a significant amount of verbal criticism and challenge directed to police officers. |
| NAACP v. Claiborne Hardware Co. | 458 U.S. 886 | 1982 | U.S. | First Amendment | Violence has no sanctuary in the First Amendment. The use of weapons, gunpowder and gasoline may not constitutionally masquerade under the guise of "advocacy." |
| Nieves v. Bartlett | 139 S. Ct. 1715 | 2019 | U.S. | First Amendment | The First Amendment prohibits officers from subjecting an individual to retaliatory arrest for engaging in protected speech. |
| Felarca v. Birgeneau | 891 F.3d 809 | 2018 | 9th Cir. | First Amendment | Where protesters substantially outnumbered officers, refused to obey the officers' commands to disburse, shouted at the officers and engaged the officers in verbal and physical alterations, the university was not required to permit organized lawlessness. Under these circumstances, the government had a legitimate interest in applying minimal force to maintain order and enforce university policy. While baton blows are a type of force capable of causing serious injury, jabs with a baton are less intrusive than overhand strikes. District court ordered to enter summary judgment for the officers. |
| CPR for Skid Row v. City of Los Angeles | 779 F.3d 1098 | 2015 | 9th Cir. | First Amendment | Penal Code § 403 does not cover political meeting. Elections Code § 18340 makes it a misdemeanor to disrupt political meetings and only if the disruption consists of threats, intimidations or unlawful violence. |

*POST Guidelines — Crowd Management, Intervention and Control*

| CASE | CITATION | YEAR | COURT | CATEGORY | FACTS AND HOLDING |
|---|---|---|---|---|---|
| Jefferson v. Superior Court | 215 Cal. App.4th 758 | 2017 | Cal.App. | First Amendment | Words may be restricted under the First Amendment where they are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.  There is a fundamental difference between loud communications, or the use of loud shouting, uttered not to inform or persuade, but to disrupt lawful endeavors. Loud shouting designed to disrupt rather than communicate may be prohibited generally. |
| McMahon v. Albany U.S.D. | 51 Cal. App.3d 721 | 1975 | Cal.App. | First Amendment | The mere use of a vulgar, profane, indecorous, scurrilous, opprobrious epithet cannot alone be grounds for prosecution.  The context in which the words are used must be considered and there must be a showing that the words were uttered in a provocative manner, so that there was a clear and present danger violence would erupt. |
| Curiello v. City & County of San Francisco | 104 Cal. App.4th 1275 | 2002 | Cal.App. | First Amendment | To effectuate Penal Code § 403 within constitutional limits of the First Amendment, the defendant must have  substantially impaired the conduct of the meeting by intentionally committing acts in violation of implicit customs or usages or of explicit rules for governance of the meeting, of which he knew, or as a reasonable man should have known. |
| Hampsmire v. City of Santa Cruz | 940 F.Supp.2d 1071 | 2013 | Dist.Cal. | First Amendment | Viewpoint discrimination by the government contravenes the First Amendment. Viewpoint discrimination occurs when the government prohibits speech by particular speakers, thereby suppressing a particular view about a subject. |
| Hightower v. City & County of San Francisco | 899 F.Supp.2d 922 | 2012 | Dist.Cal. | First Amendment | While government has a significant interest in protecting its citizens from unwelcome noise, the "narrowly tailored" standard does not tolerate a time, place, or manner regulation that burdens substantially more speech than necessary to achieve its goal. |
| In Re J.C. | 77 F. Supp.3d 867 | 2014 | Dist.Cal. | First Amendment | The First Amendment protects "symbolic speech" if the conduct demonstrates an intent to convey a particularized message and there is a great likelihood that the message would be understood by those who view the conduct. |
| In re Curtis S. | 324 F.Supp.3d 1121 | 2018 | Dist.Cal. | First Amendment | City's prohibition on circulating initiative or referendum petitions, or advertising brochures, at a farmers' market held on the parking lot of a public park, was a content-based restriction on speech  not narrowly tailored to achieving a compelling state interest and was facially invalid under the First Amendment. |

Commission on Peace Officer Standards and Training

| CASE | CITATION | YEAR | COURT | CATEGORY | FACTS AND HOLDING |
|------|----------|------|-------|----------|-------------------|
| Mahgerefteh v. City of Torrance | 228 Cal. App.4th 1394 | 2014 | Cal.App. | First Amendment | Government has a compelling interest in maintaining discipline at public schools, as it does in maintaining the orderly operation of public college and university campuses. Education Code § 32210, which makes it a misdemeanor to act violently or in a manner that incites violence at a public school or public school meeting, does not impinge on any conduct protected by the First Amendment. |
| Park Mgmt. Corp. v. In Defense of Animals | 36 Cal. App.5th 649 | 2019 | Cal.App. | First Amendment | Under Article 1, Section 2 of the California Constitution- the "liberty of speech" clause - private property constitutes a public forum if the property is open to the public in the same manner as public streets or parks. |
| Prigmore v. City of Redding | 211 Cal. App.4th 1322 | 2012 | Cal.App. | First Amendment | In analyzing speech restrictions under the California Constitution, California courts employ the same time, place and manner test as the federal courts in analyzing speech restrictions under the First Amendment. |
| Collins v. Jordan | 110 F.3d 1363 | 1996 | 9th Cir. | Unlawful Assembly | Enjoining or preventing First Amendment activities before demonstrators have acted illegally or before the demonstration poses a clear and present danger is presumptively a First Amendment violation.  Courts have held that the proper response to potential and actual violence is for the government to ensure an adequate police presence and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure. |
| Galvin v. Hey | 374 F.3d 739 | 2004 | 9th Cir. | Unlawful Assembly | Conditioning a march permit on a promise to refrain from illegal activity is an unconstitutional restriction on freedom of speech. |
| Menotti v. City of Seattle | 409 F.3d 1113 | 2005 | 9th Cir. | Unlawful Assembly | After days of violent protests, the City issued a ban on access to parts of the city. Several protesters were arrested for violating the ban. The Court held that the order was a constitutional time, place and manner restriction because it was content- neutral, narrowly tailored to achieve a significant government interest and left open other means of communication.  Even if the violent protesters were less than one percent of the total protesters, this is not a small amount of violence given the activities in which those protesters engaged. |

| 283  *APPENDIX D*    **Applicable Case Law**

*POST Guidelines* — *Crowd Management, Intervention and Control*

| CASE | CITATION | YEAR | COURT | CATEGORY | FACTS AND HOLDING |
|---|---|---|---|---|---|
| In Re Brown | 9 Cal.3d 612 | 1973 | Cal. | Unlawful Assembly | Protesters at a student strike were arrested for unlawful assembly and convicted.  The court overturned the convictions, holding that the proscriptions in Penal Code § 407 and 408 on assemblies must be limited to assemblies which are violent, or which pose a clear and present danger of imminent violence. |
| In Re Kay | 1 Cal.3d 930 | 1970 | Cal. | Unlawful Assembly | In light of First Amendment interests, participants at a meeting may express disagreement. Penal Code § 403 authorizes the imposition of criminal sanctions only when the defendant substantially impaired the conduct of the meeting by intentionally committing acts in violation of implicit customs or usages or of explicit rules for governance of the meeting, of which he knew, or as a reasonable man should have known. |
| In Re Bacon | 240 Cal. App.2d 34 | 1966 | Cal.App. | Unlawful Assembly | Protesters assembled together in a "sit-in" at Sproul Hall after the building was closed and after they were ordered to leave.   The protesters' rights to free speech, assembly and petition for redress of grievances did not abrogate their duty to not violate laws which reasonably provide for the protection of the public and of public property and which were not arbitrarily applied by the authorities. |
| Chambers v. Municipal Court | 65 Cal. App.3d 904 | 1997 | Cal.App. | Unlawful Assembly | Proof of intention to commit overt acts that are themselves violent or that tend to incite others to violence is requisite to criminal liability under Penal Code § 416. |
| In Re Wagner | 119 Cal. App.3d 90 | 1981 | Cal.App. | Unlawful Assembly | Demonstrators who failed to disperse were arrested for unlawful assembly.  Not every member of the assembly must individually commit unlawful acts to render the assembly unlawful; if a person is a participant in a lawful assembly which becomes unlawful, he has an immediate duty upon learning of the unlawful conduct to disassociate himself from the group. |
| People v. Davis | 68 Cal.2d 481 | 1968 | Cal. | Riots | Riotous conduct in any form or demonstrations which conflict with properly drawn statutes designed to promote law and order, protect the community against disorder, regulate traffic, safeguard legitimate interests in private and public property or protect essential governmental functions will not be sanctioned. When clear and present danger of riot, disorder or other immediate threat to public safety, peace or order, appears, the power of the State to prevent or punish is obvious. |

Commission on Peace Officer Standards and Training

| CASE | CITATION | YEAR | COURT | CATEGORY | FACTS AND HOLDING |
|------|----------|------|-------|----------|-------------------|
| People v. Bundte | 87 Cal. App.2d 735 | 1948 | Cal.App. | Riots | Court held that strikers who initially met lawfully for the purpose of "peaceable picketing," later cooperated and acted together for the unlawful purpose of using force and violence to disturb the public peace, they would nevertheless be guilty of a riot under Penal Code § 404. |
| People v. Cipriani | 18 Cal. App.3d 299 | 1991 | Cal.App. | Riots | It is the concurrence of unlawful action by individuals in the use, or threat to unlawfully use force or violence that constitutes the offense of riot. All persons who encourage, incite, promote, give support to or countenance a riot are principals in a riot. |
| People v. Jones | 19 Cal. App.3d 437 | 1971 | Cal.App. | Lynching | The taking by means of a riot of any person from the lawful custody of any peace officer is a lynching. |
| People v. Patino | 95 Cal. App.3d 11 | 1979 | Cal.App. | Lynching | The misdemeanor offenses of rout, unlawful assembly and remaining present at a place of riot or rout or unlawful assembly, are lesser and necessarily included offenses within the offense of lynching. |
| People v. Richards | 18 Cal. App.5th 549 | 2017 | Cal.App. | Lynching | Protester attempted to prevent officers from arresting a suspect involved in an earlier altercation at a restaurant. All that is necessary to prove an attempted violation of Penal Code § 405a is an intent to participate in taking a person from the police by means of a riot. |
| Cox v. New Hampshire | 312 U.S. 569 | 1941 | U.S. | Right of Access | Regulation of the use of streets for parades and processions is a traditional exercise of control by local government; that control must not be exerted so as to deny or unwarrantedly abridge the right of assembly. |
| Seattle Affiliate etc. v. City of Seattle | 550 F.3d 788 | 2008 | 9th Cir. | Right of Access | City ordinance which gave police chief, when issuing a parade permit, the unbridled discretion to require marchers to use the sidewalks instead of the city streets, violated the First Amendment. |
| Mardi Gras of S.L.O. v. City of S.L.O. | 189 F.Supp.2d 1018 | 2002 | Dist.Cal. | Right of Access | City ordinance an impermissible prior restraint on speech and other expressive activities because it (1) required a permit to engage in expressive activities on public streets and sidewalks and (2) imposed a lengthy pre-filing requirement before a permit may be granted. |
| L.A. Free Press v. City of L.A. | 9 Cal. App.3d 448 | 1970 | Cal.App. | Right of Access | The First Amendment does not give the publisher of a weekly paper a right of access to the scenes of crimes and disasters superior to that of the general public. |
| Zemil v. Rusk | 381 U.S. 1 | 1965 | U.S. | Media Access | First Amendment rights do not include an unrestricted right to gather information. |

*POST Guidelines — Crowd Management, Intervention and Control*

| CASE | CITATION | YEAR | COURT | CATEGORY | FACTS AND HOLDING |
|------|----------|------|-------|----------|-------------------|
| Branzburg v. Hayes | 408 U.S. 665 | 1972 | U.S. | Media Access | First Amendment does not guarantee the press a right of special access to information not available to the public generally. |
| Houchins v. KQED | 438 U.S. 1 | 1978 | U.S. | Media Access | First Amendment does not mandate a right of access to government information or sources of information within the government's control. |
| Coates v. City of Cincinnati | 402 U.S. 611 | 1971 | U.S. | Public Place Obstruction | City ordinance provided that if three or more people met together on a sidewalk or street corner, they must conduct themselves so as not to annoy any police officer or other person who should happen to pass by. The ordinance violated the constitutional rights of free assembly and association. Mere public intolerance or animosity cannot be the basis for abridgment of these constitutional freedoms. |
| In Re Cox | 3 Cal.3d 205 | 1970 | Cal.Sup. | Public Place Obstruction | The First Amendment nullifies an ordinance so loosely drawn that a police officer can construe it to mean that he can expel from public places persons whom he finds objectionable. |
| People v. Man | 39 Cal. App.3d. Supp. 1 | 1980 | App.Div. LASC | Public Place Obstruction | Protesters on a public street placed themselves in front of trees to prevent their removal. Before doing so, the protesters were advised by a deputy sheriff that it was illegal; and after doing so, the protesters did not comply with the sheriff to remove themselves and were then arrested. The "symbolic conduct" involved here is not free speech whose exercise was unconstitutionally impeded by the statute. |
| In Re M.L.B. | 110 Cal. App.3d 501 | 1980 | Cal.App. | Obstructing Police Officer | Penal Code § 69 proscribes interference with a police officer's performance of his duties by threat or by violence; and can be violated by a threat without violence. |
| People v. Whitney | 76 Cal. App.3d 863 | 1987 | Cal.App. | Throwing Substances | Vehicle Code § 23110 (b), making it a felony for a person to throw a substance at a vehicle with intent to do great bodily harm, does not require that the vehicle at which the substance is thrown be in motion. |
| Graham v. Connor | 490 U.S. 386 | 1989 | U.S. | Use of Force | Police officers violate the Fourth Amendment when they use force that is not objectively reasonable under the circumstances. Determining reasonableness requires careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. |

*APPENDIX D*  **Applicable Case Law**    |

Commission on Peace Officer Standards and Training

| CASE | CITATION | YEAR | COURT | CATEGORY | FACTS AND HOLDING |
|------|----------|------|-------|----------|-------------------|
| Boyd v. Benton Cty | 374 F.3d 773 | 2004 | 9th Cir. | Use of Force | Though there are likely circumstances in which a risk to officers' safety would make the use of a flash-bang device appropriate, it was an unreasonable use of force to throw it "blind" into a room occupied by innocent bystanders absent a strong governmental interest, careful consideration of alternatives and appropriate measures to reduce the risk of injury. |
| Bryan v. McPherson | 630F.3d 809 | 2011 | 9th Cir. | Use of Force | Whether officer gave a warning before deploying a TASER and considered less intrusive means in effecting an arrest, is part of the Graham analysis. |
| Chew v. Gates | 27 F.3d 1432 | 1994 | 9th Cir. | Use of Force | The Fourth Amendment permits use of deadly force to apprehend a fleeing felon where there is probable cause to believe the suspect poses a threat of serious physical harm; but does not permit use of deadly force to apprehend suspect who poses no immediate threat to the officer and no threat to others. |
| Deorle v. Rutherford | 272 F.3d 1272 | 2001 | 9th Cir. | Use of Force | Deployment of beanbag round into suspect's face while he was alone on his own property, had not attacked anyone and was generally following instructions.  Summary judgment improper on excessive force claim where suspect may have complied had officer issued warning before shooting beanbag round.  The desire to quickly resolve a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury. Specifically, the court stated that warnings should be given, when feasible, if the use of force may result in serious injury and that the giving of a warning or the failure to do so is a factor to be considered in applying the Graham balancing test. |
| Eberle v. City of Anaheim | 901 F.2d 814 | 1990 | 9th Cir. | Use of Force | Officers did not violate spectator's civil rights by arresting him during a football game after the suspect became abusive and belligerent; the officers diffused a volatile situation that easily could have erupted into a perilous melee. |

*POST Guidelines — Crowd Management, Intervention and Control*

| CASE | CITATION | YEAR | COURT | CATEGORY | FACTS AND HOLDING |
|------|----------|------|-------|----------|-------------------|
| Forrester v. City of San Diego | 25 F.3d 804 | 1994 | 9th Cir. | Use of Force | Officers did not use excessive force by applying pain compliance techniques to arrest demonstrators. Officers warned the demonstrators that they would be subject to pain compliance measures if they did not move, that such measures would hurt and that they could reduce the pain by standing up, eliminating the tension on their wrists and arms. Plaintiffs argued that the officers should have lifted and carried them as they had done on previous occasions. However, the Court explained the officers had a legitimate interest in quickly dispersing and removing the demonstrators with the least risk of injury to police and others. |
| Glenn v. Washington Cty. | 673 F.3d 864 | 2011 | 9th Cir. | Use of Force | The use of a beanbag shotgun, though less than deadly force, is permissible only when a strong governmental interest compels the employment of such force. Summary judgment for officers reversed where beanbag shotgun was used on a mentally ill individual who was not a threat to anyone. |
| Hayes v.County of San Diego | 736 F.3d 1223 | 2013 | 9th Cir. | Use of Force | The duty of reasonable care extends to conduct before the shooting. |
| Hayes v.County of San Diego | 57 Cal.4th 622 | 2013 | Cal. | Use of Force | Graham standard applies to California. Law enforcement tactical conduct and decisions preceding the use of deadly force are relevant considerations under California law in determining whether the use of deadly force gives rise to negligence liability. Such liability can arise, for example, if the tactical conduct and decisions show, as part of the totality of circumstances, that the use of deadly force was unreasonable. |
| Headwaters v. County of Humboldt (I) | 240 F.3d 1185 | 2000 | 9th Cir. | Use of Force | To evaluate the reasonableness of an officer's use of force, courts evaluate the type and amount of force used. Although officers repeatedly warned the protesters that pepper spray would be used, the use of pepper spray on the eyes of protesters who were sitting peacefully, were easily moved by the police and did not threaten or harm the officers, was excessive. Officers were required to consider what other tactics if any were available to effect the arrest of the protesters. |

Commission on Peace Officer Standards and Training

| CASE | CITATION | YEAR | COURT | CATEGORY | FACTS AND HOLDING |
|------|----------|------|-------|----------|-------------------|
| Mattos v. Agarano | 661 F.3d 433 | 2011 | 9th Cir. | Use of Force | Use of a Taser in dart-mode constitutes an intermediate level of force. Whether tasing a woman who was seven months pregnant three times in less than one minute, whose offenses were minor, who did not pose an immediate threat to the safety of the officers or others, who actively resisted arrest by refusing to get out of her car when instructed to do so and who stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from her car, was excessive and was for the jury to determine. |
| Nelson v. City of Davis | 685 F.3d 867 | 2012 | 9th Cir. | Use of Force | A pepper ball projectile, which combines both the physical blow from the force of the projectile and the chemical effects of pepper spray, was an unreasonable use of force on a partygoer who had committed no crime, was not a threat to anyone, and who was not resisting. |
| Scott v. Henrich | 39 F.3d 912 | 1994 | 9th Cir. | Use of Force | It was not unreasonable for officers to take arms, knock on the door of an apartment and identify themselves as police when an armed man who, they were told, had recently fired shots and was acting "crazy" lurked inside. Officers need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of reasonable conduct. |
| Young v. County of L.A. | 655 F.3d 1156 | 2011 | 9th Cir. | Use of Force | Of the three factors the court traditionally examines in determining the governmental interest, the most important is whether the individual posed an immediate threat to officer or public safety. Additionally, the Court held: Pepper spray is an intermediate use of force. Chemical agents and projectiles are intermediate uses of force that present significant intrusions upon a person's liberty interests and can be justified only by a strong governmental interest. When a suspect's disobedience of a police officer takes the form of passive noncompliance that creates a minimal disturbance and indicates no threat, immediate or otherwise, to the officer or others, it will not, without more, give rise to a governmental interest in the use of significant force "A police officer's use of baton blows, too, presents a significant use of force that is capable of causing pain and bodily injury and therefore, baton blows, like pepper spray, are considered a form of intermediate force." |

| CASE | CITATION | YEAR | COURT | CATEGORY | FACTS AND HOLDING |
|------|----------|------|-------|----------|-------------------|
| Zion v. Cty. of Orange | 874 F.3d 1072 | 2017 | 9th Cir. | Use of Force | The use of deadly force against a non-threatening suspect is unreasonable. If a suspect is on the ground and appears wounded, he may no longer pose a threat.  A reasonable officer would reassess the situation rather than continue shooting. |



CALIFORNIA COMMISSION ON PEACE OFFICER STANDARDS AND TRAINING

# Exhibit 9



# LOS ANGELES
## POLICE DEPARTMENT
# MEDIA RELATIONS GUIDE

293



"Our unwavering commitment to supporting the media in their First Amendment Right to free press, is one way the Los Angeles Police Department is transparent and accountable to the public. Providing the various types of media with access to significant events has never been more critical given the multitude of platforms broadcasting newsworthy events. Media and public communication is central to 21st Century Policing." – Chief Choi

DOMINIC H. CHOI

CHIEF OF POLICE

294

# Contents

Introduction..................................................................................................................................1

**Chapter 1    Media Relations Division**.........................................................................**2**

                    About Media Relations Division

                    Public Information Officer Deployment

                    **Media Team Deployment**………………………………………………**3**

                    **Crime and Arrest Reports**………………………………………....…..**5**

                    Releasable Information: Arrest(s)/Booking

**Chapter 2    Media Access at Incidents**.......................................................................**8**

                    Crime Scene Guidelines

                    Media Access at Incidents or Crime Scenes

                    Media Access at Disaster Scenes

                    Media Access at Public Assemblies

**Chapter 3    Media Credentials**....................................................................................**11**

                    News Media Identification Cards (Press/Media Passes)

**Chapter 4    Ride Along Guidelines**.............................................................................**13**

**Chapter 5    Digital Media**...........................................................................................**15**

                    LAPD Online

                    Social Media

                    LAPD Trademark and Licensing

**Appendix    Los Angeles Police Department**………………………………………**17**

                    Preamble, Vision, Mission & Core Values

**Applicable LAPD Manual Sections**…………………………………..………………..19

**Legal Considerations**……………………………………………………………………20

       Al Crespo v City of Los Angeles, Federal Case No. CV 00-08869

       California Public Records Act Requests

**Applicable Los Angeles Municipal Codes**…………………………………………...22

**Applicable Senate and Assembly Bills**………………………………...………………22

**Commonly Used Media Terms**…………………………………………………………27

**Statement Template**………...………….………………………………………………29

# INTRODUCTION

When it comes to issues of public safety and concern, the Los Angeles Police Department (LAPD or Department) is committed to transparency with the media and the public. The media is a medium through which to communicate with and inform the public. It is also the responsibility of the LAPD to uphold the United States Constitution's First Amendment which establishes the foundation for a free press. We must provide the media with reasonable access and information to uphold such lawful mandates.

This Media Relations Guide (Guide) is intended to provide Department personnel and members of the media with relevant policies and procedures, best practices, and applicable laws related to duties and responsibilities when interacting with the media. This is only a reference guide, and it is not intended to cover every possible situation pertaining to the LAPD's policy on the release of information, or Department personnel's interactions with the media.

Media Relations Division (MRD) is committed to supporting the Department by responding to scenes when appropriate and communicating with members of the media on incidents that generate interest. It is the goal of MRD to allow the Commanding Officer (CO) and Investigating Officer (IO) to focus on the incident, and not be diverted by media needs.

In this Guide, you will learn about MRD capabilities to include telephonic advice, formatting a news release, and responding to an incident to speak with members of the media, as well as other services.

For information about LAPD news releases, its policies, procedures, history, statistical data, area of jurisdiction, news conference information, press/media credentials, entertainment and trademark coordination, or anything else related to media, contact Media Relations Division at (213) 486–5910, or visit the LAPD website at www.lapdonline.org, or off–hours through the Department Operations Center.

297

# Chapter 1

## Media Relations Division

### ABOUT MEDIA RELATIONS DIVISION

The Media Relations Division is located at the Los Angeles Police Department's Headquarters
Facility (PHF) on the 2nd Floor, Suite 257B. Below are the sections that make up MRD and some
of their duties.

- Media Relations Section (MRS)
  - News Releases/News Advisories;
  - Coordinate press conferences and interviews for the Chief of Police;
  - Respond to media inquiries, telephonically, and via electronic mail;
  - Social media (LAPD HQ and LAPD PIO platforms);
  - Responds to incidents to provide public statements; and,
  - Issue press/media passes.
- Online Unit
  - Post Critical Incident Videos;
  - Post news releases;
  - Post updated crime data;
  - Post information on homicide victims; and,
  - Post Board of Police Commissioners' agenda.
- Video Unit
  - Critical Incident Videos;
  - Chief of Police Messages;
  - Other internal messaging; and,
  - Social Media Videos.
- Trademark and Location Permits

### PUBLIC INFORMATION OFFICER DEPLOYMENT

A supervisor assigned to MRD will respond to every Officer-Involved Shooting (OIS), excluding
Animal Shootings, or to any incident where the Chief of Police or the Commanding Officer of
MRD deems a Public Information Officer (PIO) is necessary. This may include, but is not
limited to, homicides, fatal traffic collisions, or other significant events.

When an event grows large in scale, the PIO will ensure messaging is coordinated through a
Joint Information Center (JIC) in collaboration with Department and City leaders, as well as
other impacted departments or agencies. This will ensure coordinated and consistent messaging
to the public.

During events expecting a large presence of media and potential civil unrest, an Incident
Commander (IC) or the Planning Section Chief should include a PIO in the Event Action Plan.
Ideally, the PIO will be present at the Command Post, along with at least one media team
consisting of two PIOs who are available to respond to the field to fulfill the IC's needs related to

the media. Additionally, PIOs should post factual, timely information on social media platforms and ensure that such posts are not buried by more recent posts.

## MEDIA TEAM DEPLOYMENT

Senate Bill 98 and Penal Code Section 409.7

**Purpose:** The below deployment recommendations are intended to guide Los Angeles Police Department (LAPD) personnel responsible for creating an Event Action Plan (EAP), when responding to a spontaneous large–scale event, or who are assigned to a Media Team during such an event.

**Background:** On January 1, 2022, Senate Bill 98 (SB) became effective. The bill amended California Penal Code (PC) Section 409.7. Penal Code Section 409.7 allows "a duly authorized representative of the media" to enter or remain in an area closed by police at a protest, demonstration, rally, or where people are gathered primarily to engage in an activity protected by the First Amendment. The LAPD's policy regarding 409.7 PC can be found in the Office of the Chief of Police (OCOP) Notice, *Senate Bill 98 – Media Access to Closed Areas – Assemblies, Protests and Demonstrations,* dated December 14, 2021.

To aid in implementing this change to media access, the LAPD staff shall utilize Media Teams for such events when operationally feasible, as outlined below.

**Media Team Deployment:** If an assembly, protest, or demonstration is known to the Department and the pre–planning allows for personnel to be requested in advance, the Incident Commander (IC) should ensure Media Relations Division (MRD) personnel are requested to staff a Media Team. When a spontaneous event takes place, MRD personnel may be limited or delayed.

**Note: It is the responsibility of the IC to ensure compliance with Penal Code Section 409.7 with the resources available at the time.**

When operationally feasible, MRD will staff one Media Team that includes: one MRD supervisor, one MRD officer, and one MRD social media officer. The social media officer should remain at the command post, while the supervisor and the officer should remain with the IC.

**Note:** A large–scale event may require 2–4 additional personnel to assist MRD. Personnel responsible for creating an EAP shall consult with MRD before the event, when possible, to identify the necessary additional personnel. If the spontaneous nature of an event does not allow time to assign personnel to assist MRD, assistance to identify the additional personnel shall be coordinated through the DOC.

3

This configuration allows for the needs of the media to be facilitated and ensure officer safety when the addressing the media at a skirmish line and behind police lines.

- **Supervisor** – The duties of the supervisor on the Media Team include interacting with media members requesting access into a closed area or behind a police line. Those media members will be allowed access behind the line and directed to the area designated for media, when such an area has been established, under the following circumstances:

    o An LAPD News Media Identification Card is not required to be considered a member of the media. If the individual is acting in a manner consistent with gathering, receiving, or processing information for communication to the public, they should be considered media.

    o If the individual's behavior consists of engaging in criminal behavior or behavior that jeopardizes the safety of officers or the public (including, but not limited to, verbally threatening officers, inciting violence, or criminal conduct), when possible, the behavior should be recorded on video and the individual will not be allowed access reserved for media at the event. In such instances, the Media Team supervisor shall advise the individual why they are being denied access.

    o When the media is allowed behind the police line, the Media Team supervisor, in consultation with the IC, should determine the best point of access along the police line as well as a safe location to where media shall be directed. Although each situation will be assessed by the IC and the supervisor, a preliminary consideration should be to allow media through at one end of the police line. Once the access point is determined, the linebackers should be made aware of the location and share the location with the personnel on the police line, so they can direct any media that approaches them to the selected location to meet with the Media Team.

- **Media Team Members** – The duties of the officers assigned to the Media Team include ensuring that media allowed behind the police line do not interfere with police operations. As stated in the OCOP Notice regarding SB 98, access to a command post may still be restricted. The personnel and vehicles behind a police line are considered part of the command post. Members of the media should be directed to an area behind the LAPD personnel and vehicles. The Media Team officers will ensure the media is aware of where they have access and that members of the media do not encroach upon the command post.

    o A member of the media who attempts to enter the command post can be excluded from being behind the police line for violating 409.7 PC & 409.5(d) PC – Crimes Against the Public Peace, and/or 148 PC – Offenses Against Public Justice. Any advisements given to members of the media that could lead to their exclusion from the designated media area should be given by the Media Team supervisor or

300

another available supervisor. The advisement should be recorded on video and the video should include the image of to whom the advisement was given.

As delineated in the OCOP Notice regarding SB 98, *"Nothing precludes officers from enforcing other applicable laws if the member of the media is engaged in activity that is otherwise unlawful or is interfering with official law enforcement duties including, but not limited to, collecting evidence, and making arrests."*

- **Dispersal Order:**

  o In the event a dispersal order is issued, 409.7 PC exempts members of the media from the order. Media Team officers should identify media members and designate a media staging area for them which does not interfere with police operations but allows them to view police activity while in the closed area. The Media Team should work with the IC to include announcements for the media to identify themselves and meet with the Media Team at a location designated by the Media Team and the IC. However, the media are not required to utilize the designated media staging area.

  o If a member of the media is detained during a large-scale incident, a supervisor shall be notified and meet with the detained individual.

- **Criminal Activity:**

  o If a person who identifies themselves as a member of the media is engaged in criminal activity (*i.e.,* Vandalism, theft, battery, etc.), they <u>are not</u> exempt from arrest for the appropriate criminal section. In this instance, a supervisor shall respond and be made aware of the circumstances surrounding the detention and arrest.

  **Note:** If a person alleging to be media is arrested and an MRD supervisor is not present, MRD shall be notified as soon as possible.

## CRIME AND ARREST REPORTS

Victims of a crime may obtain a copy of the report prepared for their incident by calling Records and Identification Division at (213) 486–8130.

### Releasable Information: Arrest(s)/Booking

In addition to responding to incidents in the field, MRD is also tasked with providing certain crime and arrest information as appropriate via a news release.

The identity of a suspect(s) will not be released prior to booking.

5

301

**Note:** Booking is defined as having been processed with a booking number generated. Department Manual Section 0/030 defines "Booking," as the process of registering in the Department records the custody of persons or property.

The MRD will not provide the following information of an arrestee:

- Prior criminal record, reputation, or character of suspect;
- Confession or existence of a confession;
- Any photograph or booking photograph unless:
    - The release will aid in arrest;
    - The release will aid in investigation; and/or,
    - The release will warn the public of danger.
- Identity or any personal information regarding a juvenile arrestee or suspect without permission from a Juvenile Court;
- The identity, credibility, or testimony of prospective witnesses/including:
    - Any opinion as to the suspect's guilt, innocence, or merits of the case;
    - Any information known to be inadmissible in court; or,
    - Results of investigative procedures (e.g., fingerprints, polygraph tests, or ballistic tests).

**Note:** Pursuant to 5328 Welfare and Institutions Code (WIC), information regarding any 5150 WIC action when a person is taken into custody for a 72–hour hold shall not be disclosed to the public and/or members of the media.

- Results of investigation prior to arrest, unless the release of the information will:
    - Aid in the investigation;
    - Assist in the apprehension of the suspect(s); or,
    - Warn the public of danger.
- The following employee and personnel matters are prohibited for release under Penal Code Section 832.5:
    - Confidential personnel matters;
    - Personnel records;
    - Information relating to pending litigation; and,
    - Any medical files that would constitute an unwanted invasion of privacy.

6

302

The following California PC sections state the name of a victim **may be withheld at the victim's request** or at the request of the victim's parent or guardian if the victim is a minor:

- 220 PC – Assault with Intent to Commit a Felony;
- 261 PC – Rape;
- 262 PC – Spousal/Marital Rape;
- 264.1 PC – Gang Rape (In Concert);
- 273(a) PC – Child Endangerment;
- 273(d) PC – Child Abuse;
- 273.5 PC – Corporal Injury to Spouse/Cohabitant;
- 286 PC – Sodomy;
- 288 PC – Lewd Acts with a Minor Child Under 14;
- 287 PC – Oral Copulation with a Minor;
- 289 PC – Forcible Sexual Penetration with a Foreign Object;
- 422.6 PC – Committing a Hate Crime;
- 422.75 PC – Hate Crime Enhancement; and,
- 646.9 PC – Stalking Laws of the Non–Releasable Information.

303

## Chapter 2

## Media Access to Incidents

### CRIME SCENE GUIDELINES

The following are guidelines the IC, officers and supervisors on scene should take into consideration:

1. Do not establish artificial barriers. If the public has access, so does the media;
2. Do not isolate the media outside of the crime or incident scene unless the area has been secured to preserve evidence; or,
3. Do not prevent the taking of pictures or interviews of person(s) in public places. News reporters may photograph or report anything or interview anyone they observe when legally present at an emergency scene.

### MEDIA ACCESS AT INCIDENTS OR CRIME SCENES

> **Note: *Incident/Crime Scenes and Command Posts may be closed to the media.***

Under most circumstances, the incident or crime scene and accompanying command post will be closed to the media. The purpose of such constraints is to protect the integrity of the investigation and to ensure a safe, coordinated, and unrestricted response by law enforcement and other emergency personnel.

Limitations to media access to incident or crime scenes are subject to review by the responsible Incident Commander (IC) and/or the appropriate Department command staff personnel. Those limitations should be lifted as soon as the situation allows.

Whenever the media is denied access to an incident or crime scene, Department personnel shall:

- Establish a "Media Staging Location," where the most reasonable access is given under the circumstances determined by the IC; and,
- Assign a police supervisor at scene or a PIO, to provide timely and updated information to members of the media present, and via social media.

Consider "Pool" access (one TV camera, one TV reporter, one print reporter, one still photographer, and one radio reporter) at the incident. Pool reporters and photographers will share information with other media personnel at the scene.

8

304

## MEDIA ACCESS AT DISASTER SCENES

The LAPD may close disaster scenes to the public, but authorized media representatives shall not
be prevented from entering the area at their own risk. As stated in the manual, the LAPD may
close an area under authority of 409.5(a) PC when "... a menace to the public health or safety is
created by a calamity such as a flood, storm, fire, earthquake, explosion, accident, or other
disaster ..." However, as stated in 409.5(d) PC, "... Nothing in this section shall prevent a duly
authorized representative of any news service from entering the area closed ..."

> **Note:** Pursuant to 409.5(d)(2) PC (as amended by Assembly Bill 750) an authorized media
> representative cannot facilitate the entry of a person into or facilitate the transport of a person
> within an area closed due to a menace to the public safety or health, if that person is not also
> an authorized media representative, unless it is done for the safety of the person.

## MEDIA ACCESS AT PUBLIC ASSEMBLIES

As per **California Senate Bill 98**, if officers close the immediate area surrounding any
emergency field command post or other area, police line, skirmish line, or other rolling closure at
any demonstration, march, protest, rally, or where individuals are primarily engaged in any
activity that is protected by the First Amendment to the United States Constitution or Article I of
the California Constitution, the following requirements shall apply:

- A duly authorized representative of the media shall include any member of a news
  service, online news service, newspaper, radio, television station or network, and those
  persons may enter the closed area;
- Officers shall not intentionally assault, interfere with, or obstruct the duly authorized
  representative of the media who is gathering, receiving, or processing information for
  communication to the public;

> **Note:** The Department may restrict access to a command post (i.e., the area where
> incident-specific information is being shared by public safety personnel, strategic
> decisions are being made, or deliberations are ongoing), or crime scenes for the purpose
> of the preservation of evidence, but MAY NOT restrict access to the area surrounding the
> command post. Members of the media have access to areas the public has access to.

- A duly authorized representative of the media who is in a closed area described above
  shall not be cited for failure to disperse, a violation of curfew, or other violation of
  paragraph (1) of subdivision (a) of California Penal Code Section 148, for gathering,
  receiving, or processing information; and,
- If a duly authorized representative of the media is detained, that member of the media
  shall be permitted to contact a Department supervisor immediately to challenge the
  detention, unless circumstances make it impossible to do so.

9

305

**Note:** Nothing precludes officers from enforcing other applicable laws if a member of the media is engaged in activity that is otherwise unlawful or is interfering with official law enforcement duties including, but not limited to, collecting evidence, and making arrests.

Consistent with Department Manual Section 3/579.15, Objectives of Body Worn Video, and Section 3/579.13, Digital In–Car Video System (DICVS) Use and Deployment, interactions with members of the media shall be captured on Body Worn Video and, if applicable, Digital In–Car Video.

306

## Chapter 3

## Media Credentials

### NEWS MEDIA IDENTIFICATION CARDS (PRESS/MEDIA PASSES)

The Los Angeles Municipal Code authorizes the Board of Police Commissioners (BOPC) to issue news media identification cards, commonly referred to as "press/media passes." That authority has been delegated by the BOPC to the Chief of Police. News media identification cards are valid for up to a one–year period.

Pursuant to Los Angeles Municipal Code Section 52.16, the exclusive purpose of a news media identification card shall be to enable the bearer "to pass through established police and fire lines in order to cover news events occurring behind such lines." This does not apply to crime scenes.

To review the full text for the Los Angeles Municipal Code Sections 52.16(A) and (C), visit https://codelibrary.amlegal.com/codes/los_angeles/latest/lamc/0-0-0-135802.

News media identification cards are simply a tool to easily recognize members of the media. The Department currently issues news media identification cards to assist with identification of duly authorized members of the media. The Department will honor media identification cards issued by another law enforcement agency. Freelance and independent media representatives without a news media identification card may lawfully cover an event that is open to the public.

If confronted with a situation where a person within the crowd identifies as a member of the media, officers should request a supervisor if they are unable to immediately identify the individual as an actual media representative. Department personnel should make every effort to determine whether the person has any evidence that they are gathering information for news, such as possessing a media station identification or business card. If a determination cannot be made, a PIO should be requested to assist.

> **Note:** If a PIO is not assigned to an incident, PIOs are available off–hours and can be contacted via the Department Operations Center.

If an individual at a protest self–identifies as a member of the media but has been engaged in unlawful activity such as inciting violence or participating in the destruction of property, they can be detained or arrested for criminal behavior with or without a news media identification card.

If, during a large–scale detention or mass arrest event, an officer, supervisor, or PIO determines that an individual detained is a duly authorized member of the media that was not engaged in unlawful activity, other than failing to disperse after a dispersal order has been given, the individual should be immediately released and directed to a media staging location designated by the IC.

307

**Note:** If an IC or supervisor determines that an individual who identifies as a member of the media was engaged in unlawful activity, other than failing to disperse, the IC must ensure the arresting officers clearly articulate the individual's unlawful actions in the arrest report (e.g., how that individual was inciting violence or destroying property).

**Access to Secure Police Facilities and Government Buildings**

The Department may allow members of the media who possess valid government-issued press/media credentials access to secure government buildings for the purpose of attending Department media events. Examples of government–issued media credentials include an LAPD, FBI, or LA County Sheriff's Department issued press/media pass. Other government issued press/media credentials will also be reviewed and honored upon verification. Any other form of identification, such as a media station identification or business card that identifies the bearer as an employee of a media outlet may be an acceptable alternative.

308

## Chapter 4

## Ride-Along Guidelines

It is common for members of the media to go to a law enforcement agency directly and ask for a ride-along. Consistent with Department Manual Section 4/280, Private Persons in Police Vehicles, *all requests to ride in police vehicles for the purposes of gathering information for use in feature articles* shall be referred to MRD. Members of the media and/or camera crews participating in a ride-along, must abide by the following list of guidelines:

1. All media and/or camera crews attending a ride-along shall have prior approval from the Commanding Officer of MRD. Each member of the media requesting to ride in a police vehicle shall sign a waiver releasing the City of Los Angeles and the LAPD from any liability during that ride–along. The MRD has waivers specifically for members of the media.

2. Members of the media and/or camera crews who are accompanying Department personnel are prohibited from accompanying officers into areas that are not accessible to the public. This includes areas where officers gain access due to their authority as peace officers, including, but not limited to, homes, backyards, ambulances, or any area where a reasonable expectation of privacy exists. Under no circumstances shall any member of the LAPD invite any member of the media onto the private property of another person for the purpose of filming activity taking place. Members of the media shall not accompany a member of the Department during the search of private property, with or without a search warrant.

   **Note:** The Department does not allow members of the media and/or camera crews in any areas that are not accessible to the public without prior consent from the person whose reasonable expectation of privacy exists. There is no exception to this rule.

3. Any authorization from a private person who agrees to be taped or who grants access to a non–public area, is an agreement solely between said person and the member of the media and/or a camera crew. Department personnel shall not be involved in obtaining or upholding any such form of consent.

   **Note:** Members of the media may follow officers onto private property when the officers have a legal right to be there, if members of the media have consent from the person(s) in lawful control of the private property, and their presence does not inhibit the officers' ability to affect their duties. Additionally, members of the media may observe officers' activities from an area where they have a legal right to be.

309

4.  Authorized Department personnel shall conduct only tasks directly related to their normal law enforcement duties and shall not grant members of the media and/or camera crews any special treatment or access that exceeds what any other person is entitled to during a ride–along.

5.  Authorized Department personnel shall not allow members of the media and/or camera crews to disrupt the normal course of their law enforcement duties and shall terminate the ride-along immediately upon any such disruption.

6.  All persons approved for a ride–along shall ride in a police vehicle with a supervisor. Under no circumstances shall persons engaged in ride-along activities be permitted to follow in a "convoy" style in a private vehicle.

7.  Under no circumstances shall any member of the LAPD assist any member of the media in obtaining waivers from persons being filmed; nor shall Department personnel mediate or otherwise act as an intermediary in obtaining such a waiver.

8.  To ensure compliance with the provisions of the Lanterman–Petris–Short Act and Section 5328 of the Welfare and Institutions Code (WIC), Department personnel shall take all reasonable steps to protect the privacy of any person who they encounter that appears to have a mental disorder. This includes the evaluation, transportation, or detention of any person pursuant to the provisions of Section 5150 of the WIC.

310

## Chapter 5

## Digital Media

### LAPD ONLINE

As part of the Department's commitment to public access of information, the Online Unit of the MRD is responsible for the maintenance of the LAPD Online website.

The website serves as a tool for the public to acquire information related to the Department's history, division codes, policies, sections, crime mapping and resources for crime prevention, job opportunities, as well as news media information.

The website, which receives an average of 20,000 views per day, also contains two avenues for communication between the Department and the public: the LAPD online e–mail account and E–Policing. E–Policing is a tool which facilitates direct communication between Senior Lead Officers (SLO) of various divisions and community members.

Community members who sign up for E–Policing receive crime information and safety tip e–mail updates from their Area SLO.

Police reports may also be filed online via the LAPD's Community Online Reporting Service (CORS) for various crimes including lost property, vandalism, harassing phone calls, theft–personal, theft from a vehicle, hit and run, illegal dumping, and hate crime/incidents. All CORS reports may be filed in English or Spanish. The CORS system is compliant with the Americans with Disability Act and follows the U.S. Federal standards as set forth in the Electronic and Information Technology Accessibility Standards (Section 508 of the Rehabilitation Act of 1973).

### SOCIAL MEDIA

The Department provides the public with information through a large number of social media channels. The LAPD Headquarters, LAPD PIO, Join LAPD, the Chief of Police, each of the 21 Community Police Stations, the four Traffic Divisions, and several specialized divisions operate their own Facebook, X (formerly known as Twitter), and/or Instagram accounts.

The purpose of these social media channels is to provide the public with real–time information on matters of public safety and community interest. Each division posts their own content related to crime information, traffic alerts, community events, and other information that is relevant to the public in their area. The public and the media are encouraged to follow these accounts to stay informed on the latest from the LAPD.

You can access the various social media links and the Department's social media policy on the LAPD website at http://lapdonline.org/social_media. The Department can provide social media best practices for groups or individuals when requested. Department employees who have questions and/or suggestions related to social media can contact Media Relations Division at (213) 486-5910.

## LAPD TRADEMARK AND LICENSING

The LAPD badge, uniform, motto ("to protect and to serve"), acronym (LAPD) and any other mark–design–motto–insignia that is readily identifiable and/or associated with the LAPD are trademarks of the City of Los Angeles. As a high–profile law enforcement agency, these marks are often portrayed in film, merchandise, and other entertainment media.

In 2006, the Department established the Entertainment and Trademark Unit (ETU). Per the Mayor's directive to enhance filming in Los Angeles, ETU is the Department's liaison with the entertainment industry. The ETU is responsible for coordinating with the Intellectual Property Law Unit within the City Attorney's Office in order to facilitate the proper use of the LAPD trademark as well as filming access and location agreements.

The ETU is responsible for coordinating the Department's participation in entertainment-based projects such as documentaries, filming on LAPD property, and research requests.

There is a monetary cost to licensing the trademark and securing film locations at Department sites. Information on applying for a trademark license or access agreement can be found on the website at http://lapdonline.org.

16

312

## **APPENDIX**

## **LOS ANGELES POLICE DEPARTMENT**

### **PREAMBLE:**

The Los Angeles Police Department is committed to serving the community while protecting the rights of all persons. Consistent with this commitment, the Department's Vision, Mission, and Core Values, in concert with the Law Enforcement Code of Ethics and the Department's Management Principles, reflect the guiding philosophy of the Los Angeles Police Department.

### **VISION:**

It is the vision of the Los Angeles Police Department to, as closely as possible, achieve a City free from crime and public disorder.

### **MISSION:**

It is the mission of the Los Angeles Police Department to safeguard the lives and property of the people we serve, to reduce the incidence and fear of crime, and to enhance public safety while working with the diverse communities to improve their quality of life. Our mandate is to do so with honor and integrity, while at all times conducting ourselves with the highest ethical standards to maintain public confidence.

### **CORE VALUES:**

### **SERVICE TO OUR COMMUNITIES**

We are dedicated to enhancing public safety and reducing the fear and the incidence of crime. People in our communities are our most important customers. Our motto "To Protect and to Serve" is not just a slogan – it is our way of life. We will work in partnership with the people in our communities and do our best, within the law, to solve community problems that affect public safety. We value the great diversity of people in both our residential and business communities and serve all with equal dedication.

### **REVERENCE FOR THE LAW**

We have been given the honor and privilege of enforcing the law. We must always exercise integrity in the use of the power and authority that have been given to us by the people. Our personal and professional behavior should be a model for all to follow. We will obey and support the letter and the spirit of the Law.

17

313

## COMMITMENT TO LEADERSHIP

We believe the Los Angeles Police Department should be a leader in Law Enforcement. We also believe that each individual needs to be a leader in his or her area of responsibility. Making sure that our values become part of our day–to–day work life is our mandate. We must each work to ensure that our co–workers, our professional colleagues and our communities have the highest respect for the Los Angeles Police Department.

## INTEGRITY IN ALL WE SAY AND DO

Integrity is our standard. We are proud of our profession and will conduct ourselves in a manner that merits the respect of all people. We will demonstrate honest, ethical behavior in all our interactions. Our actions will match our words. We must have the courage to stand up for our beliefs and do what is right. Throughout the ranks, the Los Angeles Police Department has a long history of integrity and freedom from corruption. Upholding this proud tradition is a challenge we must all continue to meet.

## RESPECT FOR PEOPLE

Working with the Los Angeles Police Department should be challenging and rewarding. Our people are our most important resource. We can best serve the many and varied needs of our communities by empowering our employees to fulfill their responsibilities with knowledge, authority, and appropriate discretion. We encourage our people to submit ideas, we listen to their suggestions, and we help them develop to their maximum potential. We believe in treating all people with respect and dignity. We show concern and empathy for the victims of crime and treat violators of the law with fairness and dignity. By demonstrating respect for others, we will earn respect for the Los Angeles Police Department.

## QUALITY THROUGH CONTINUOUS IMPROVEMENT

We will strive to achieve the highest level of quality in all aspects of our work. We can never be satisfied with the "status quo." We must aim for continuous improvement in serving the people in our communities. We value innovation and support creativity. We realize that constant change is a way of life in a dynamic city like Los Angeles, and we dedicate ourselves to proactively seeking new and better ways to serve.

314

## APPLICABLE LAPD MANUAL SECTIONS

The following LAPD Manual Sections apply to the police working with members of the media.

### VOLUME 1

- **420.10 ROLE OF THE NEWS MEDIA.**
- **420.20 ROLE OF THE DEPARTMENT.**
- **420.30 DEPARTMENT PUBLIC INFORMATION OFFICER.**
- **420.40 RESPONSIBILITY FOR THE RELEASE OF INFORMATION.**
- **420.50 SCOPE AND CONTENT OF THE RELEASE OF INFORMATION.**
- **420.55 CRITICAL INCIDENT VIDEO RELEASE POLICY.**
- **420.60 NEWS MEDIA IDENTIFICATION CARDS.**
- **420.70 NEWS REPORTERS ENTERING AN AREA CLOSED PURSUANT TO STATUTE.**
- **420.75 ALLOWING NEWS REPORTERS TO ENTER AREA OF A SERIOUS POLICE INCIDENT OR CRIME SCENE.**
- **420.80 WHERE A NEWS REPORTER IS NOT AUTHORIZED.**
- **420.85 NEWS MEDIA NOT EXEMPT FROM LAWS.**
- **420.90 REQUESTING WITHHOLDING OF PUBLICATION.**
- **420.95 SEARCH OF NEWS MEDIA FACILITIES.**
- **440.10 REQUESTS FOR INFORMATION.**
- **440.20 PERMISSION FOR USE OF DEPARTMENT FACILITIES.**
- **440.30 COOPERATION FOR FEATURE ARTICLES OR PROGRAMS.**
- **440.40 RESPONSIBILITY OF OFFICERS TO SUPPLY INFORMATION.**
- **440.50 PUBLIC INFORMATION PROGRAMS AND EDUCATION.**
- **440.60 TOURS OF POLICE FACILITIES.**

**Note:** The LAPD Manual is modified as legislative law changes.

To review the full text for the LAPD Manual Sections please visit:
https://www.lapdonline.org/lapd-manual/.

19

315

## LEGAL CONSIDERATIONS

### AL CRESPO v CITY OF LOS ANGELES, FEDERAL CASE NO. CV 00–08869

These mandates originate from a binding settlement agreement arising out of the 2000 Democratic National Convention, and include the following:

Under the rights guaranteed by the First Amendment to the United States Constitution, it is not uncommon for large numbers of people to assemble for the purpose of demonstrating their opinions. At such demonstrations, it is the Police Department's obligation to protect individuals' First Amendment rights, maintain order, and protect lives and property. Occasionally, demonstrations become unlawful. In such circumstances, pursuant to California Penal Code Sections 407 and 409, an assembly may be declared unlawful, and all persons present, including members of the news media, may be lawfully ordered to disperse.

> **Note:** Effective January 1, 2022, CA Senate Bill 98 added Penal Code 409.7 which amended the law in regard to media access at public assemblies.

The law provides that police officers may use reasonable force to disperse an unlawful assembly and to effect the arrest of violators. The Department's Use of Force Policy applies to such actions. The Department's policies concerning interaction with the news media are described in the relevant provision in Volume One of the Department Manual, the Department's Emergency Operations Guide, and the Department's Media Guide.

1. The Department recognizes that the news media has the right, without interfering with police operations, to cover events that may result in the declaration of an unlawful assembly and order to disperse. To the extent reasonably possible under the circumstances, the LAPD will make efforts to accommodate this reporting obligation. However, such efforts will be made consistent with the LAPD's primary obligation to maintain public safety and order.

2. Except for spontaneously occurring events, whenever the LAPD develops an operations plan for an event the Department is aware will involve a public assembly, the Department will, where practicable, designate an area outside of the anticipated impacted area, but within reasonable viewing distance and audible range of the event, in which members of the media may assemble. To the extent reasonably possible under the circumstances, the Department will try to prevent the media staging location from becoming part of any area impacted by an unlawful assembly declaration and order to disperse. However, the decision to assume the risk of danger involved in covering a public event remains with the individual news reporter making such decision, provided that any such decision does not constitute a waiver by a reporter of any constitutional or other legal rights.

3. The selection of the media staging location will take into consideration public and officer safety, police tactics, input provided by members of the media, if any, and the ability of the LAPD to prevent the location from becoming part of the impacted area. The final selection of the media staging location will be made by the IC in charge of the event.

4.  To the extent reasonably possible without compromising public or officer safety or police tactics, the IC will relocate the media staging location if, due to changing conditions, the initial area no longer affords members of the media a reasonable view of the event.
5.  Pursuant to Volume 2 of the LAPD Emergency Operations Guide, the LAPD IC will designate a PIO or Information Officer as part of the Incident Command System in order to facilitate interaction with members of the media. The PIO or Information Officer will be clearly identified at the scene.

## CALIFORNIA PUBLIC RECORDS ACT REQUESTS

The California Public Records Act (CPRA), Government Code Sections 7920–7931, established the right of the public to access public records. Department records are subject to public disclosure unless a specific legal exemption exists. Members of the media and the public may submit a CPRA request for information by visiting the home page and typing CPRA in the search window (https://www.lapdonline.org/i_want_to_know/content_basic_view/36329).

The 10–day period mentioned in the act is not a legal deadline for producing records. The 10 days allows the agency to review records, if it is not clear that they are public records. As soon as a determination is made, it will be at that time the records shall be released.

The rights under the CPRA provide for the inspection of public records or to obtain copies of identifiable records. It does not compel the agency to create lists or reports in response to the request. Agencies may charge for the "direct costs" for providing copies of an identifiable record.

317

## APPLICABLE LOS ANGELES MUNICIPAL CODES

**Los Angeles Municipal Code Sections 52.16(A) and (C)**

Visit *https://codelibrary.amlegal.com/codes/los_angeles/latest/lamc/0-0-0-135802.*

## APPLICABLE SENATE AND ASSEMBLY BILLS

### SENATE BILL 98

### SB 98 Public Peace: Media Access

Existing law makes every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician, as defined, in the discharge or attempt to discharge any duty of the office or employment, when no other punishment is prescribed, guilty of a misdemeanor. Existing law also authorizes specified peace officers to close an area where a menace to the public health or safety is created by a calamity and to close the immediate area surrounding any emergency field command post or other command post activated for the purpose of abating a calamity, riot, or other civil disturbance, as specified. Existing law makes any unauthorized person who willfully and knowingly enters those areas and who remains in the area after receiving notice to evacuate or leave guilty of a misdemeanor. Existing law exempts a duly authorized representative of any news service, newspaper, or radio or television station or network from the provisions prohibiting entry into the closed areas, as specified.

This bill would, if peace officers close the immediate area surrounding any emergency field command post or any other command post, or establish a police line, or rolling closure at a demonstration, march, protest, or rally where individuals are engaged primarily in constitutionally protected activity, as described, require that a duly authorized representative of any news service, online news service, newspaper, or radio or television station or network, as described, be allowed to enter those closed areas and would prohibit a peace officer or other law enforcement officer from intentionally assaulting, interfering with, or obstructing a duly authorized representative who is gathering, receiving, or processing information for communication to the public. The bill would also prohibit a duly authorized representative who is in a closed area and gathering, receiving, or processing information from being cited for the failure to disperse, a violation of a curfew, or a violation of other, specified law. The bill would require that if a representative is detained by a peace officer or other law enforcement officer, the representative be permitted to contact a supervisory officer immediately for the purpose of challenging the detention. The bill would not impose criminal liability. The bill would state the Legislature's intention to achieve parity in the access and protections in these circumstances as those established pursuant to a specified law.

SECTION 1. It is the intent of the Legislature that this act achieve parity in the access and protections for journalists and news media as those established pursuant to Section 409.5 of the Penal Code.

22

318

SEC. 2. Section 409.7 is added to the Penal Code, to read:

**409.7 (a)** If peace officers, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, close the immediate area surrounding any emergency field command post or any other command post, or establish a police line, or rolling closure at a demonstration, march, protest, or rally where individuals are engaged in activity that is protected pursuant to the First Amendment to the United States Constitution or Article I of the California Constitution, the following requirements shall apply:

(1) A duly authorized representative of any news service, online news service, newspaper, or radio or television station or network may enter the closed areas described in this section.

(2) A peace officer or other law enforcement officer shall not intentionally assault, interfere with, or obstruct the duly authorized representative of any news service, online news service, newspaper, or radio or television station or network who is gathering, receiving, or processing information for communication to the public.

(3) A duly authorized representative of any news service, online news service, newspaper, or radio or television station or network that is in a closed area described in this section shall not be cited for the failure to disperse, a violation of a curfew, or a violation of paragraph (1) of subdivision (a) of Section 148, for gathering, receiving, or processing information. If the duly authorized representative is detained by a peace officer or other law enforcement officer, that representative shall be permitted to contact a supervisory officer immediately for the purpose of challenging the detention, unless circumstances make it impossible to do so.

(b) This section does not prevent a law enforcement officer from enforcing other applicable laws if the person is engaged in activity that is unlawful.

(c) This section does not impose, and shall not be used as the basis for, criminal liability.

## SENATE BILL  978

### SB 978 Law Enforcement Agencies: Public Records.

Existing law establishes within the Department of Justice the Commission on Peace Officer Standards and Training and requires the commission to adopt rules establishing minimum standards regarding the recruitment and training of peace officers.

Existing law, the CPRA, generally requires each state and local agency to make its public records available for inspection by a member of the public, unless the public record is specifically exempted from disclosure.

The act further requires every state and local agency to duplicate disclosable public records, either on paper or in an electronic format, if so requested by a member of the public and he or she has paid certain costs of the duplication.

This bill, commenced January 1, 2020, requires the Commission on Peace Officer Standards and Training and each local law enforcement agency to conspicuously post on their Internet Web

sites all current standards, policies, practices, operating procedures, and education and training materials that would otherwise be available to the public if a request was made pursuant to the California Public Records Act. By imposing this requirement on local law enforcement agencies, the bill would impose a state-mandated local program.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

## SENATE BILL 1421

### SB 1421 Peace Officers: Release of Records.

Effective January 1, 2019, Senate Bill 1421 (SB 1421) amended Penal Code Section 832.7 which generally made all peace officer personnel records and information confidential and exempt from disclosure, except by motion in a criminal, civil, or administrative action. The SB 1421 created exceptions from those general confidentiality requirements for the following categories of peace officer personnel and police investigatory records:

(A) Records relating to the report, investigation, or findings of:

   (i) an incident regarding an officer–involved shooting; or,

   (ii) an incident involving the use of force by an officer resulting in death or great bodily injury.

(B) Records relating to an incident involving a sustained finding of sexual assault by an officer involving a member of the public; and,

(C) Records relating to an incident involving a sustained finding of dishonesty by an officer directly related to the reporting, investigation, or prosecution of a crime or an investigation of misconduct by another officer.

**Pen. Code § 832.7(b)(1)(A)–(C).** These records are now available for public inspection and/or copying pursuant to the California Public Records Act (Cal. Govt. Code section 6250, et seq., or the "CPRA").

The website LAPDonline.org contains documents disclosable under SB 1421 that the Los Angeles Police Department has released through the City of Los Angeles' online public records request portal (Next Request). The Department will continue to upload records disclosed pursuant to the CPRA and SB 1421, along with audio/video redaction cost estimates (if available).

## ASSEMBLY BILL 748

### AB 748 Peace Officers: Video and Audio Recordings: Disclosure.

Existing law, the CPRA, requires that public records, as defined, be available to the public for inspection and made promptly available to any person. Existing law makes records of investigations conducted by any state or local police agency exempt from these requirements.

Existing law requires specified information regarding the investigation of crimes to be disclosed to the public unless disclosure would endanger the safety of a person involved in an investigation or would endanger the successful completion of the investigation.

This bill, notwithstanding the above provisions, commenced July 1, 2019, allows for a video or audio recording that relates to a critical incident, as defined, to be withheld for 45 calendar days if disclosure would substantially interfere with an active investigation, subject to extensions, as specified.

The bill allows the recording to be withheld if the public interest in withholding video or audio recording clearly outweighs the public interest in disclosure because the release of the recording would, based on the facts and circumstances depicted in the recording, violate the reasonable expectation of privacy of a subject depicted in the recording, in which case the bill would allow the recording to be redacted to protect that interest.

If the agency demonstrates the reasonable expectation of privacy of a subject depicted in the recording cannot adequately be protected through redaction, the bill requires that the recording be promptly disclosed to a subject of the recording, his or her parent, guardian, or representative, as applicable, or his or her heir, beneficiary, immediate family member, or authorized legal representative, if deceased.

## ASSEMBLY BILL 750

### AB 750 Menace to Public Health: Closure by Law Enforcement

On June 29, 2023, California Assembly Bill 750 (AB 750), Menace to Public Health: Closure by Law Enforcement, was enacted into law.

AB 750 was introduced in response to reports of media personnel transporting non-authorized persons into closed areas. AB 750 amends Penal Code Section 409.5 to prohibit a duly authorized representative of a news service, newspaper, radio station, television station, or network from facilitating the entry of a non-duly authorized person or transportation of that person within an area closed by law enforcement due to a menace to public safety or health, unless it is done for the safety of such person.

## ASSEMBLY BILL 1475

### AB 1475 Law Enforcement: Social Media

Existing law requires law enforcement agencies, departments, or entities to consider specified best practices regarding the downloading and storage of body–worn camera data, including prohibiting agency personnel from uploading recorded data onto public and social media internet websites, when establishing policies and procedures for the implementation and operation of a body–worn camera system.

This bill would prohibit a police department or sheriff's office from sharing, on social media, booking photos of an individual arrested on suspicion of committing a nonviolent crime, as defined, unless specified circumstances exist.

The bill would require a police department or sheriff's office that shares, on social media, a booking photo of an individual arrested for the suspected commission of a nonviolent crime to remove the information from its social media page, upon request, unless the same specified circumstances exist.

The bill would require a police department or sheriff's office to remove the booking photo of a person who has committed any other crime from social media if the individual's record has been sealed, the individual's conviction has been dismissed, expunged, pardoned, or eradicated pursuant to law, the individual has been issued a certificate of rehabilitation, the individual is found not guilty of committing the crime for which they were arrested, or the individual was ultimately not charged with the crime or the charges were dismissed.

More information on Senate or Assembly bills visit: https://leginfo.legislature.ca.gov.

322

## COMMONLY USED MEDIA TERMS

**Sound Bite / "give sound"**

- An interview which can be on camera or via phone.

**Media Stating Location/Area**

- Predetermined, designated media gathering/viewing area for static demonstrations and/or assemblies. See also: Media Staging location/area.

**B-roll**

- Background video may be used during a voiceover or narration.

**Stringer**

- A news correspondent not on the regular staff of a newspaper or tv station, especially one retained on a part–time basis to report on events in a place.

**Visuals**

- Can describe posters, pictures, evidence.

**Mult-box**

- A microphone plug-in mixer used to combine the main microphone into 1 output location.

**Mic flag**

- Station or news outlet identifier which is wrapped around a reporter's microphone.

**Pool camera**

- A designated camera that will share footage with other news outlets.

**Mug Shot**

- Also known as a booking photo.

**News Advisory**

- Invitation to the media for a news conference or other event (i.e., Open house, toy give–away, DUI checkpoint).

**News Release**

- Information or event summary that is released to the media.

323

**OIS**

- Officer–Involved Shooting.

**Media Availability**

- A less formal media press conference that allows media the opportunity to ask questions of the LAPD participant.

**White Balance**

- Used by photographers and camera persons to focus and color balance their camera's brightness and contrast.

**Sound Check**

- Verification the microphones are operational and audio levels are optimal prior to recording.

**STATEMENT TEMPLATE**

- Begin by introducing yourself. Include your rank, assignment and spell your name.

  "This is an evolving [situation, incident, event], and I have preliminary information to share. As more detail and additional facts become available, I will update you. Right now, what I can tell you is…."

- At approximately [time], a [brief description of what happened].

- The situation is [fluid, active, under] control. We are working with [local, state, federal] partners to [investigate, resolve, determine how this happened].

- We have a [system, plan, procedure, operation] in place. We are being assisted by [local public health officials, emergency response officials] as part of that plan.

- At this point, we do not know [how long the scene will stay active, shelters will stay open, etc.].

- We will continue to gather information and release it to you as soon as possible. I will be back to you within [amount of time in minutes or hours] to give you an update. As soon as we have confirmed releasable information, it will be provided.

- We ask for your patience as we respond to this [situation, incident, event]."

  **Note:** This template is a guide, and it is not all encompassing. Every situation is distinct, and statements made by the Department related to an incident will be based on available information.

For any questions or advice, MRD can be contacted during business hours at (213) 486–5910 and off–hours through the Department Operations Center.

325



This publication was created and approved by Media Relations Division, April 2024
Revised by Lieutenant II Letisia Ruiz 37659

# Exhibit 10



# Exhibit 11

**This exhibit is a video:
[https://www.instagram.com/reel/DKyS2XzRXSo/](https://www.instagram.com/reel/DKyS2XzRXSo/) to be lodged with the court separately**

# Exhibit 11



motherjonesmag • Follow
Original audio

motherjonesmag ● The Marines did not sign up to police LA. Yet they're still there.

Late last week, the Ninth Circuit Court of Appeals decided that Donald Trump's deployment of federal troops to Los Angeles could continue while a challenge by California Gov. Gavin Newsom moved through the courts. But by deploying more than 4,000 National Guard members and at least 700 Marines to the heart of LA, Trump is treading, at best, into a gray area.

"It's a legal authority that is somewhat obscure and murky," says Mark Nevitt, an associate professor of law at Emory University, who previously served twenty years in the Navy as an aviator and lawyer with the Navy Judge Advocate General's Corps. Since 2016, Nevitt has been advocating for reform of the Posse Comitatus Act, the Insurrection Act, and presidential emergency powers.

Read the full Q&A with Mark Nevitt at the link in our bio!

3d

bdohn68
3d  1 like  Reply

usmcgirl3381 ● What exactly do you think we do with "enemy combatants"? We detain them whenever possible...we aren't just out there pew pewing everyone we see. Why do you think so many of us leave the Marine Corps and get hired on at PDs all across the country?? Because we do actually have that experience. Now with that said, we shouldn't be in LA...not because we can't or don't have that experience but because we were always meant to serve in a foreign capacity not a domestic capacity per the constitution and bill of rights. But please don't sit there and act like we don't have that kind of

1,191 likes
3 days ago

Add a comment...

332

# Exhibit 13



# Exhibit 14

police-use-force-protests-continue-1002065804.jpg (JPEG Image, 960 ...https://the-sun.com/wp-content/uploads/sites/6/2025/06/police-use-forc...



336

# Exhibit 15

Fotograf. »Ich habe mit zwei Kameras gearbeitet, hatte einen Helm mit AFP-Aufkleber und einen großen Presse-Aufnäher auf der Brust.«

Unter dem Motto »No Kings« (Keine Könige) hatten in Los Angeles und anderen US-Städten Hunderttausende Menschen gegen Trump demonstriert ▐S▌. Der Vorfall ereignete sich, als Sicherheitskräfte begannen, die Demonstranten auseinanderzutreiben.



Spuren von Gummigeschossen: Ein Demonstrant zeigt seine Verletzungen  Foto: Michael Nigro / Pacific Pre / SIPA / action press

Die Polizei der kalifornischen Stadt bestätigte den Einsatz »nicht tödlicher Munition«, wie Gummigeschosse in den USA genannt werden. Journalisten seien aber nicht ins Visier genommen worden. Ermittler werteten derweil Videoaufnahmen aus. Die Behörden begründen das Vorgehen damit, dass Demonstranten Steine und Flaschen auf die

# Exhibit 16



# Exhibit 17

**This exhibit is a video to be lodged with the court separately**

342