Carol A Sobel SBN 84483
Weston Rowland SBN  327599
Law Office of Carol A. Sobel
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403
t. (310) 393-3055
e. carolsobellaw@gmail.com
e. rowland.weston@gmail.com

David Loy SBN 229235
Aaron R. Field SBN 310648
First Amendment Coalition
534 4th St., Suite B
San Rafael, CA 94901
t.(415) 460-5060
e. dloy@firstamendmentcoalition.org
e. afield@firstamendmentcoalition.org

Peter Bibring SBN 223981
Law Office of Peter Bibring
2140 W Sunset Blvd # 203,
Los Angeles, CA 90026
t.(213) 471-2022
e. peter@bibringlaw.com

Paul Hoffman, SBN 71244
Michael Seplow, SBN 150183
John Washington, SBN 315991
Schonbrun, Seplow, Harris, Hoffman & Zeldes LLP
200 Pier Avenue #226
Hermosa Beach, California 90254
t.(310) 396-0731
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. jwashington@sshhlaw.com

Susan E Seager SBN 204824
Law Office of Susan Seager
128 N. Fair Oaks Avenue
Pasadena, CA 91103
t. (310) 890-8991
e. susanseager1999@gmail.com

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

LOS ANGELES PRESS CLUB, STATUS COUP,

PLAINTIFFS,

v.

CITY OF LOS ANGELES, a municipal entity,  JIM MCDONNELL, LAPD CHIEF, sued in his official capacity;

DEFENDANTS.

Case No. 2:25-CV-05423-HDV-E

HON. HERNÁN D. VERA

**VOLUME FOUR** OF PLAINTIFFS' EXHIBITS TO' EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1

# Exhibit 18

1   BARRETT S. LITT, SBN 45527
    E: blitt@littlaw.com
2   LITT, ESTUAR, HARRISON &
    KITSON, LLP
3   1055 Wilshire Boulevard, Suite 1880
    Los Angeles, California 90017
4   T: (213) 386-3114; F: (213) 380-4585
5
    CAROL A. SOBEL, SBN 84483
6   E: carolsobel@aol.com
    LAW OFFICE OF CAROL A. SOBEL
7   429 Santa Monica Boulevard, Suite 550
    Santa Monica, California 90401
8   T: (310) 393-3055; F: (310) 393-3605
9
10  PAUL L. HOFFMAN, SBN 71244
    BENJAMIN SCHONBRUN, SBN
11  118323
    JAMES DeSIMONE, SBN 119668
12  E: hoffpaul@aol.com
    SCHONBRUN, DE SIMONE, et al.
13  723 Ocean Front Walk
    Venice, California 90291
14  T: (310) 396-0731; F: (310) 399-7040
15
    On Behalf of all MIWON Counsel
16
17  Attorneys for Plaintiffs

18              UNITED STATES DISTRICT COURT

19          FOR THE CENTRAL DISTRICT OF CALIFORNIA

20

| 21 | MULTI-ETHNIC IMMIGRANT WORKERS ORGANIZING NETWORK, et al. | Case No.: CV 07-3072 AHM (FMMx) |
|----|----|----|
| 22 | | [Honorable A. Howard Matz] |
| 23 | Plaintiffs, | STRUCTURAL RELIEF ORDER |
| 24 | vs. | DATE:        June 22, 2009 |
| 25 | CITY OF LOS ANGELES, et al., | TIME:        10:00 A.M. COURTROOM:  14 |
| 26 | | |
| 27 | Defendants. | |
| 28 | | |

1

ClassAction 1500

1      The parties to the above-captioned action have submitted this joint Order for

2  the Court's review and approval, addressing the injunctive relief class certified by

3  the Court in its Order issued on January 8, 2008.  The court has considered the

4  joint submission and now issues the following Order:

5      **1. Basic Principles:**

6      All persons have the right to march, demonstrate, protest, rally or perform

7  other activities protected by the First Amendment of the United States Constitution

8  and the California Constitution.  The government may impose reasonable and

9  narrowly tailored restrictions on the time, place, and manner of conducting these

10 activities.  However, any limitations or restrictions placed on demonstrations or

11 other First Amendment activities must be justified by the requirements of

12 maintaining public safety, public health, or safe access/egress from the area, and

13 should restrict no more speech than necessary to further these substantial

14 government interests.  Officers must not be affected by the content of the opinions

15 being expressed nor by the race, gender, linguistics, national origin, sexual

16 orientation, physical disabilities, appearances, or affiliation of anyone exercising

17 lawful rights.

18     **2. Helicopters:**

19     Los Angeles Police Department (LAPD) helicopters assigned to monitor

20 permitted crowd control incidents shall operate the aircraft at reasonable altitudes

21 so as to avoid disruption of First Amendment protected activities.  The Incident

22 Commander will coordinate with event organizers to help avoid over flights during

23 keynote speaker presentations.  This action is not intended to prevent LAPD

24 helicopters from response to emergency situations requiring immediate police

25 presence during such crowd control events.

26

27

28

                                   2

                                                    ClassAction 1501

345

**3. Marches:**

Demonstrators, while participating in lawful assemblages, shall not be prevented from using public sidewalks to join or exit a lawful march or from using any public sidewalk adjacent to a lawful march route. However, while on the sidewalk, marchers will not be allowed to obstruct or unreasonably interfere with pedestrian movement and/or prevent lawfully open businesses from operating when such conduct violates any applicable law. LAPD will consider the practicality of facilitating demonstrations that may temporarily block traffic and LAPD shall include the subject in its Crowd Management training.

**4. Motorcycles/Bicycles/Motor Vehicles:**

Police motorcycles, bicycles, and motor vehicles may be used for the purpose of observation, visible deterrence, traffic control, transportation and area control during a crowd event. When used at the back of a march, they should maintain a reasonably safe distance behind the marchers. LAPD personnel will not utilize motorcycles, bicycles, or motor vehicles to strike assembled demonstrators/marchers as a method for crowd control or crowd dispersal.

**5. Crowd Management Training - Horses:**

In its crowd management training, the LAPD shall include a subject on the impact of the use of horses on crowd behavior.

**6. Use of Less Lethal Weapons:**

Less-lethal munitions are categorized as projectiles launched or otherwise deployed for the purpose of overcoming resistance, effecting arrest or addressing the threat of serious injury to an officer or suspect with less risk of causing death than the use of a firearm.

    a. Less-lethal munitions may be deployed on aggressive and/or combative suspects in a crowd control situation, on suspects who

3

ClassAction 1502

1    are a potential physical threat to themselves or others, or suspects

2    displaying "aggressive" and/or "combative" actions.

3        b.  For the purpose of deployment of less-lethal munitions,

4            "aggressive" and/or "combative" actions include ongoing

5            destruction of property that presents a threat to the personal safety

6            of officers or others.

7        c.  Less lethal weapons should not be used on a lawfully dispersing

8            crowd or individual.

9        d.  Less lethal weapons should not be used against a person or a crowd

10           that is retreating unless the person or crowd continues to engage in

11           unlawful activity that is aggressive and/or combative.

12       e.  Where feasible, notice should be given to the crowd before less-

13           lethal weapons are deployed in a crowd control or dispersal

14           situation, and where feasible, it should be given in the language(s)

15           spoken by those assembled.

16       f.  If the LAPD resumes the use of stinger rounds, the LAPD will

17           publish a notice that will require that less-lethal stinger weapons

18           can be used only with the approval of a staff officer (i.e.,

19           commander or above) and only in a riotous situation where the use

20           of lethal force would not be reasonable.

21   **7.    Use of Batons:**

22       Batons should not be used against members of the crowd attempting to

23   disperse, persons unable to move because of the press of the crowd, or persons

24   otherwise posing no imminent threat to the officers or other persons.   Batons may

25   be displayed or used in a pushing motion when used as a justified and authorized

26   crowd management technique.   The baton may be used to push individuals who

27   intentionally delay dispersal subsequent to a lawful order to disperse.   When an

28

4

Case 2:07-cv-03072-AHM-FFM    Document 112    Filed 06/24/2009    Page 5 of 7
Case 2:07-cv-03072-AHM-FFM    Document 109    Filed 06/23/2009    Page 5 of 7

1    individual's behavior is threatening or violent in nature, the baton may be used as

2    an impact device in accordance with Department policy.

3        **8.    Public Assemblies:**

4            The Incident Commander and supervisors shall make every effort to ensure

5    that the police mission is accomplished as efficiently as possible, with the highest

6    regard for human dignity and liberty of all persons, with consideration of the

7    cultural and linguistic diversity of the neighborhoods and communities of Los

8    Angeles, and with minimum reliance on the use of physical force.  Incident

9    Commanders, prior to declaring an assembly unlawful, will follow the procedures

10   as directed in the LAPD Guidelines for Crowd Management and Crowd Control,

11   Volume 5 of the LAPD Emergency Operations Guide.  Before any public assembly

12   is declared to be unlawful, the Incident Commander should evaluate the feasibility

13   of isolating and arresting those responsible for the unlawful conduct, and if it is

14   determined to be feasible, shall take such action.

15       **9.    Declaration of Unlawful Assembly:**

16           Crowd dispersal techniques shall not be initiated until after a declaration has

17   been announced as required by California Penal Code Section 409.  LAPD

18   personnel will follow the procedures as directed in the LAPD Guidelines for

19   Crowd Management and Crowd Control, Volume 5 of the LAPD Emergency

20   Operations Guide.  The following factors shall be considered when issuing a

21   dispersal order:

22           **a.** Use of an amplified loudspeaker system to issue the order.

23           **b.** If feasible, send an officer to the far side of the crowd to tape record

24               the order.

25           **c.** If circumstances permit (absence of serious violence), the order

26               shall be made repeatedly over a period of time and, if necessary,

27               from a variety of locations.

28

ClassAction 1504

348

Case 2:25-cv-05423-HDV-E    Document 33    Filed 07/03/25    Page 8 of 173    Page ID
#:567
Case 2:07-cv-03072-AHM-FFM    Document 112    Filed 06/24/2009    Page 6 of 7
Case 2:07-cv-03072-AHM-FFM    Document 109    Filed 06/23/2009    Page 6 of 7

1          **d.** The order must include an objectively reasonable period of time to
2          disperse and a clear and safe route to disperse based on the facts
3          and circumstances known at the time.
4          **e.** An order to disperse shall be given in a manner reasonably
5          calculated to be heard by the entire crowd under the circumstances.
6          When it is known that members of the crowd do not understand
7          English, an effort should be made, when feasible, to give the order
8          to disperse in both English and the other language(s).
9          **f.** The order to disperse shall include a warning that police action may
10         include the use of less lethal munitions, which could cause
11         significant risk of serious injury to those who remain.

12    **10.**    **Crowd Management Training - Shows of Force**

13       In its crowd management training, the LAPD shall include a subject on the

14 impact of shows of force on crowd behavior.

15    **11.**    **LAPD's Policy Regarding Crowd Control:**

16       LAPD's policy regarding crowd control can be found in the Emergency

17 Operations Guide, Volume 5, Chapter 7. All LAPD directives and orders directly

18 related to crowd control and the relevant portions of this agreement shall be

19 included in the Emergency Operations Guide by July 1, 2009. The plaintiffs shall

20 be given an opportunity to provide input and comment on the revisions prior to

21 final approval by the LAPD.

22    **12.**    **Training on Crowd Control Policies:**

23       The LAPD shall require Metropolitan Division to undergo training annually,

24 and every officer at the level of  Sergeant I and above to undergo training at

25 minimum intervals of two years, on the Crowd Control and Use of Force policies

26 to be developed pursuant to Paragraph 11 of this document. The Department's

27 existing training, designed and implemented after May 1, 2007, will be reviewed

28

ClassAction 1505

349

Case 2:25-cv-05423-HDV-E     Document 33     Filed 07/03/25     Page 9 of 173     Page ID
#:568

Case 2:07-cv-03072-AHM-FFM     Document 112     Filed 06/24/2009     Page 7 of 7
Case 2:07-cv-03072-AHM-FFM     Document 109     Filed 06/23/2009     Page 7 of 7

1 and modified, as necessary, to conform to the policies developed as part of this

2 agreement.  The training may be live or by e-module, or both, at the Department's

3 discretion.

4 **13.     Retention of Jurisdiction:**

5 The Court retains jurisdiction to enforce the terms of this judgment and to

6 issue all orders necessary to do so.  The Court's jurisdiction shall continue for a

7 period of four years and may be extended—in whole or in part—for an additional

8 period of two years upon proof by a preponderance of the evidence that the

9 activities complained of are due to the Department's failure to substantially comply

10 with the provisions of this order.

11 Before bringing a motion to enforce this order, plaintiffs shall give

12 defendants notice of an alleged violation and a reasonable opportunity to remedy it.

13 If necessary to permit defendants adequate time to remedy the alleged failure to

14 comply, the parties will submit a joint request to extend the Court's initial period

15 of jurisdiction.

16
17 DATED: _June 24, 2009_     _____

18 UNITED STATES DISTRICT JUDGE

19
20 Submitted by:

21 LITT, ESTUAR, HARRISON & KITSON, LLP
LAW OFFICES OF CAROL SOBEL

22

23

24 By :   _/s/  Barrett S. Litt_____

25 BARRETT S. LITT
Attorneys for Plaintiff Class

26

27

28

7

ClassAction 1506

350

# Exhibit 19

# SETTLEMENT AGREEMENT

## I.  INTRODUCTION

1.      This is a settlement agreement ("Agreement") entered into between each and all of the named plaintiffs ("Plaintiffs") and each and all of the named defendants, including the CITY OF LOS ANGELES, a municipal corporation ("City") and individuals, ("Defendants"), in the litigation entitled " MARILYN VASSOS ET AL. v. CITY OF LOS ANGELES, ET AL.," Superior Court of California, County of Los Angeles, Case No. BC 080155 and Peri Shefik, et al.v. City of Los Angeles, et al. BC 080092.

2.      The purpose of this Agreement is to resolve without further litigation all disputes between each and all of the Plaintiffs and the City and the other Defendants, collectively referred to hereinafter as "the Parties."

3.      The Plaintiffs in this action allege that pursuant to defendants' policies and practices, officers of the Los Angeles Police Department ("LAPD") unlawfully arrested and incarcerated the plaintiffs who had assembled in downtown Los Angeles for the purpose of carrying out a rally on City Hall's south lawn on Saturday morning, May 9, 1992. The plaintiffs allege the LAPD officers declared the assembly unlawful and ordered them arrested for failure to disperse even though  the officers knew that the Mayor's office had given express permission for the rally, which was organized to protest Governor Wilson's proposed budget cuts for human services. Ten (10) of those arrested filed suit against the City of Los Angeles, Police Chief Daryl Gates, and others for damages, declaratory and injunctive relief, and attorney's fees and costs.

4.      Defendants expressly deny the allegations in the complaint.  Defendants enter into this Agreement and Consent Decree solely to avoid the burdens, expense and inconvenience of litigation. This Agreement does not and shall not constitute an admission of liability.

. . . .

1

352

5.      The term "effective date of this Agreement" shall refer to the date on which this document is properly signed.

## II.  STATEMENT OF AGREED POLICY

6.      The City and plaintiffs hereby agree that the statements set forth herein regarding LAPD policy on First Amendment activities are consistent with LAPD polices.  The City further agrees that the statements set forth herein regarding LAPD policy will be placed verbatim in appropriate LAPD publications which record, recite, and clarify LAPD policy.

7.      LAPD has under development a document entitled "Guidelines for Crowd Management and Crowd Control."  The City agrees that document will serve to provide guidance to police officers consistent with the statements set forth herein regarding LAPD policy on First Amendment activities and regarding procedures affected by that policy.

8.      The City further agrees that the statements set forth herein in Paragraphs 9 through 15 regarding LAPD policy on First Amendment activities and regarding procedures affected by that policy will within 120 days after the effective date of this Agreement be communicated to sworn employees of LAPD through LAPD training materials such as special orders, training bulletins and materials prepared for and distributed at in-service training and roll call training.  The City also agrees that instruction on all of these policies and procedures set forth in this Agreement shall be a part of the curriculum given recruits as part of their Police Academy training.

9.      In a society where the right of free speech and assembly is guaranteed by the Federal and State Constitutions, it is the responsibility of police officers to ensure the protection of Constitutional Rights of the members of the public.  In determining whether the speech activity is lawful, police officers may not base their decisions on their subjective, personal views of either the political affiliation or the message of those persons exercising their right to speak.  These constitutional guarantees apply

2

to First Amendment activities, including participation in marches, demonstrations, picketing, protests, rallies, leafleting, signature gathering for petitions, charitable solicitations as well as singing, chanting, pantomime, skits, dance or any other activities that communicate information of ideas. The government may not prohibit or regulate these activities in a way that will prevent meaningful and effective communication. The government may impose reasonable regulations as to the time, place, and manner of any of these expressive activities.

10.    [Any definition of unlawful assembly which is materially different or inconsistent with this definition is not consistent with existing LAPD policy and is hereby superseded.] The definition of an unlawful assembly has been set forth in Penal Code § 407 and in subsequent court decisions. Penal Code § 407 states, "Whenever two or more persons assemble together to do an unlawful act, or to do a lawful act in a violent, boisterous, or tumultuous manner, such assembly is an unlawful assembly." "Boisterous" and "tumultuous" have been strictly limited by the courts to mean conduct which poses a clear and present danger of imminent violence. Penal Code § 407 as so limited identifies two different circumstances when an assembly may be declared unlawful. The first circumstance is when persons assemble to do an unlawful act. The unlawful act must be an act made criminal by law or by the commission of an overt act which leads to a violation of the law. In the absence of any unlawful conduct in an assembly, an assembly may be declared unlawful only if there is reasonable cause based on articulable objective facts to believe that the assembly's purpose is unlawful. If the persons are assembled to do that unlawful act, then they are an unlawful assembly. It does not matter that the persons assembled also intend to do other lawful acts. The second factual setting is when persons assemble to do a lawful act in a "violent, boisterous, or tumultuous manner." However, as previously stated, the courts have added the requirement that the manner in which the assembled persons are acting must itself be violent, or pose a clear and present danger of imminent violence. A demonstration that disturbs the peaceful enjoyment of property through noisy singing and chanting is not an unlawful assembly unless it also poses the threat of clear and present danger of imminent violence.

. . . .

3

11.    The rights guaranteed individuals by the United States and California Constitutions, including the right to assemble and engage in expressive activities, are not annulled by the declaration of a state of emergency. The declaration of a civil emergency and its communication to the public are factors which may be considered by the government in determining whether it is reasonable to impose specific time, place, and manner limitations on the exercise of constitutional rights.

12.    During the course of a march, demonstration, protest, rally, or other First Amendment protected activity, officers may observe behavior by individuals which constitute unlawful conduct. The unlawful behavior of individuals, or unlawful conduct observed in an isolated incident, should not automatically form the basis for declaring an otherwise lawful assembly to be unlawful. To protect the expressive rights of the entire assembly and the safety and rights of the public at large, officers should endeavor where they believe it practical to give warning to the leaders or spokespersons of the activity, the other participants, and/or the individuals who are acting or have acted unlawfully, about any observed unlawful or potentially unlawful conduct. Officers should instruct them clearly on what they must do to comply with the laws, so as to allow an opportunity to correct the conduct in question.

13.    When the Department engages in crowd management it should utilize, among other things, the following general principles:

A.    **Establish Contact with the Crowd.** Experience and studies have shown that crowds are frequently not anonymous gatherings of strangers. They are more likely to consist of groups of known people. As such, formal or informal leaders will exist. Supervisors or senior officers should attempt to make contact with identified formal or informal leaders of a crowd. Interaction with the crowd will allow officers to understand the purpose and motives of the group and allow an opportunity to suggest ways for the group to avoid illegal actions which would necessitate a more aggressive police response. This is referred to as "reading the crowd."

B.    **Control of Personnel.** An otherwise peaceful group can be aroused by inappropriate

4

police conduct, such as individual officers engaging in verbal disputes with individual crowd members or by showing contempt for the crowd or its beliefs. If possible, it is preferable for a crowd to remain focused on the event itself rather than on police tactics used at the event. A show of force may be appropriate as a deterrent to some unruly crowd situations. Careful consideration of the circumstances must be given prior to employing a show of force. Avoid displaying a "challenge" mentality. When possible, keep a disciplined control force out of public sight ready to respond.

C.    **Separate Opposing Factions.** Often a specific issue will polarize groups into hostile opposing factions. When possible, officers should delineate separate areas for each group to exercise their legal rights to picket or demonstrate. Physical barriers or police lines be used to effect this separation. For pre-planned events, specific areas should be identified and physically established for use by groups expected to demonstrate. Physical barriers, natural or strategically placed, can assist control forces in managing opposing groups.

D.    **Gather Intelligence.** Information which has been evaluated and found to be valid is of utmost importance to the management of groups. The most obvious place to obtain information on what is to occur is from the group itself. Establish contact with group members before an event if possible. During the event, attempt to maintain contact with group leaders to stay aware of any changes in their plans or actions. Such information may be incomplete or inaccurate, but experience has shown in the past that it is better to listen to groups than ignore them.

E.    **Knowledge of Previous Events.** Crowd management procedures start not with a specific event but with events in the past and those occurring elsewhere. Supervisors may examine open sources of information and/or after-action reports from prior events or from similar events in order to identify group behavior and successful and unsuccessful tactics and strategies. It is highly recommended that supervisors and commanding officers properly document the results of actions taken at a crowd management or crowd control incident.

5

F.    **Alternate Location for Assembly.** When it is determined that an assembly may become unlawful due to the inappropriate nature of the location (e.g., an otherwise lawful crowd exceeds the size of the location and spills onto and inadvertently blocks the public sidewalk), police may identify an alternative site to leaders or spokespersons where the assembly could relocate to avoid the possibility of the assembly being declared an unlawful assembly.

14.    The dispersal order used by LAPD personnel to announce that an assembly has become unlawful shall be as follows:

"I am _____ (officer's name and rank), a police officer for the City of Los Angeles. I hereby declare this to be an unlawful assembly and, in the name of the People of the State of California, command all those assembled at (give specific location, for example, the area bounded by Main Street on the east, Spring Street on the west, City Hall steps on the north, and the south sidewalk of First Street on the south) to immediately disperse, which means to break up this assembly. If you do not do so, you may be arrested or subject to other police action. Section 409 of the Penal Code prohibits remaining present at an unlawful assembly. If you remain in the area which was just described, regardless of your purpose in remaining, you will be in violation of Section 409.   The following routes of dispersal are available: _____ (give the most convenient route(s) of dispersal.) You have _____ minutes (a reasonable amount of time) to disperse.

Note: A Spanish translation of the dispersal order will be included in LAPD publications.

An order to disperse shall be given in a manner reasonably calculated to be heard by the entire crowd under the circumstances. Where it is known that some members of the crowd do not understand English, an effort should be made to give the order to disperse both in English and the other language(s).

15.    The Department agrees to remind officers that when plastic handcuffs are used, they can

6

cause injury to arrestees if applied too tightly and the one-way locking action in the head of the plastic handcuff prevents it from being loosened once applied. Therefore, care should be taken not to tighten the restraint more than necessary. Field supervisors responding to civil disorders shall insure that cutters are available for removing plastic handcuffs.

16.    The Department will continue its training efforts and review appropriate tactics and strategies to be used to resolve the following scenarios:

(1)    police officer control methods when confronted by crowds who begin pushing from the rear and encroach upon established police control points, yet are not intentionally threatening officers;

(2)    use of force methods utilized by police officers who are presented with passively resisting individuals who refuse to disperse.

All training will include appropriate use of force methods.

17.    The Police Department will integrate training specific to the scenarios in paragraph 16 into use of force, tactics, crowd control, Mobile Field Force, and/or roll call training and into course outlines. training materials, and/or Training Bulletins.  Within 120 days of the signing of this Agreement, the City shall provide counsel for the plaintiffs with a draft of the proposed inclusions. Within 180 days of the signing of this Agreement, the Police Department will implement the training.

18.    This Agreement shall take effect upon execution and is a complete and integrated statement of the parties' intent.  It shall not be modified in any manner except by a writing which expressly states that it is intended to serve as a modification to this Agreement, and which is executed by all the Parties or by attorneys for the Parties on a date after the execution of this Agreement.

19.    Defendants agree to make available to plaintiffs all LAPD policy document or LAPD training material related to the issues encompassed in this Agreement.

20.    The remedy for breach of any or all terms of this Agreement shall be an action to compel specific performance of the terms of this Agreement. In no event shall a breach of this Agreement entitle the Plaintiffs, or any of them, to revive this lawsuit. In the event it is found in a court of competent jurisdiction that this Agreement has been breached, the breaching party shall be liable for the attorneys' fees and costs reasonably incurred by the aggrieved party in order to enforce this Agreement.

## III. MONETARY DAMAGES, COSTS AND ATTORNEYS' FEES

21.    The City hereby agrees that the City Council will appropriate the sum of $200,000.00 and will direct the issuance of a warrant in that amount payable to the ACLU Foundation of Southern California. Said sum is for the Plaintiffs' emotional distress, pain and suffering, other physical and emotional damages, and statutory attorneys' fees and costs under 42 U.S.C. §1988, CCP §1021.5, and CC §§51 et seq.

22.    The defendants will pay within five days of the signing of this agreement the amount set forth in ¶ 21 to the ACLU Foundation of Southern California Client Trust Account.

23.    Once the above funds are deposited in the ACLU Foundation of Southern California Client Trust Account, the defendants shall have no further responsibility for the funds, and plaintiffs' counsel indemnify and hold harmless the defendants from any claims regarding the disbursement of the funds.

## IV. RELEASE

24.    For and in consideration of the sums set forth above, the Plaintiffs hereby agree that upon

8

1 execution of this Agreement and the Release Forms, attached to and hereby made part of this

2 Agreement, Plaintiffs will dismiss with prejudice all claims against the City and against the Named

3 Defendants, and shall thereby waive and release forever their right to make any claim which is based

4 upon the facts which were alleged in the complaint herein, whether known or unknown, suspected or

5 unsuspected, against the City and Named Defendants and against any employee, agent, representative,

6 successor, heir or assign of the City or of the Named Defendants.

7

8      25.      This Agreement is a final and full accord and satisfaction, settlement of and bar to each

9 and every past, present and future right, suit, complaint, compensation, controversy, damage, debt,

10 account, reckoning, liability obligation, cost, expense, lien, action or cause of action, whether known

11 or unknown, fixed or contingent, suspected or unsuspected, foreseen or unforeseen, to the extent that

12 such matter could have been asserted by the plaintiffs in these actions.

13

14      26.      Although the injuries and damages sustained by plaintiffs may be of such a character that

15 the full extent and type of the damages are not presently known, and further damages may be sustained

16 by them, or plaintiffs may hereafter discover facts different from or in addition to those presently known

17 with respect to the subject matter of this lawsuit, any such new, different or additional facts do not

18 constitute a ground to set aside this settlement Order, which fully, finally, absolutely, and forever settles

19 any and all claims, disputes and differences which now exist or have existed in the past between the

20 plaintiffs and defendants to the extent that such matters could have been asserted in this action by the

21 plaintiffs or the defendants.

22

23      27.      It is expressly understood and agreed that the promises and obligations regarding LAPD

24 policies and procedures regarding free speech activities set forth in the Settlement Agreement and the

25 total sum of $200,000 are the sole consideration for Plaintiffs' dismissal of their claims, and that the

26 consideration stated herein is contractual and not a mere recital; that all agreements and understandings

27 between the parties are embodied and expressed herein; that no representations or agreements made to,

28 by, or between the parties hereto, or any of their representatives, prior to or at the time of execution

9

1    hereof, shall be binding upon any party hereto unless the same are printed or written in this Agreement

2    and that neither this Agreement nor any part thereof, shall be construed or used as an admission, or

3    circumstances tending to show an admission, or liability by defendants, and each of them, concerning

4    the fact, nature or extent of the injuries, damages, or losses sustained or alleged to have been sustained.

5

6        28.    It is further expressly understood and agreed that part of the consideration herein is

7    compensation for injuries and damages of which the plaintiffs who execute a release are not aware and

8    that those plaintiffs expressly waive all rights which may exist under Section 1542 of the California

9    Civil Code which reads as follows:

10

11        "A general release does not extend to claims which the creditor does not know or suspect to exist

12        in his favor at the time of executing the release, which if known by him must have materially

13        affected his settlement with the debtor."

14    DATED:              1995                WILLIE L. WILLIAMS
                                              LOS ANGELES POLICE DEPARTMENT
15

16                                            By _____
17                                               RONALD BANKS
                                                 Acting Chief of Police
18

19    DATED:              1995                ACLU FOUNDATION OF SOUTHERN
                                              CALIFORNIA
20

21                                            By _____
22                                               CAROL SOBEL
23                                            Attorneys for Plaintiffs

24    DATED: Dec. 21, 1995                    JAMES K. HAHN, City Attorney
                                              DON W. VINCENT, Assistant City Attorney
25

26                                            By _____
27                                               DON W. VINCENT
                                                 Attorneys for Defendants
28

                                  10

# Exhibit 20

## RELEASE OF ALL CLAIMS AND SETTLEMENT AGREEMENT

This Release of All Claims and Settlement Agreement ("**SETTLEMENT**

**AGREEMENT**"), by and between plaintiffs **National Lawyers Guild Los Angeles Chapter;**

**Los Angeles Chapter of the October 22 Coalition to Stop Police Brutality, Repression and**

**the Criminalization of a Generation; Los Angeles Coalition to Stop the Execution of**

**Mumia Abu-Jamal**; and **D2K Convention Planning Committee**, hereinafter collectively

referred to as "**PLAINTIFFS**," except where indicated otherwise, and defendants **CITY OF**

**LOS ANGELES ("CITY"), GARY BRENNAN, ERIC LILLO, THOMAS LORENZEN,**

**MAURICE R. MOORE, BERNARD PARKS, MARTIN POMEROY, JAMES RUBERT**

**an**d each of the CITY's departments, boards, commissions, bureaus, officials, officers, agents,

employees and all persons that acted on the **CITY**'s behalf in relation to the subject claims of the

civil action by the **PLAINTIFFS**, is being entered into as follows:

1.     **The Action:**   On or about August 13, 2001, **PLAINTIFFS** filed an action in

United States District Court for the Central District of California, captioned CV 01-6877 FMC

(CWx), *National Lawyers Guild, et al. v. City of Los Angeles, et al.*

2.     **The Scope of the Settlement:**  On or about January 26, 2005, the **PLAINTIFFS**

and the **DEFENDANTS** entered into a final and full settlement of all claims raised by the above-

reference action, including all substantive policy and practice issues, as well as the settlement of

all **PLAINTIFFS**' damages, and all fees and costs incurred in the prosecution of such claims

otherwise recoverable by the undersigned in connection with such claims pursuant to 42 U.S.C.

Sec. 1988, Cal.Civil Code Sec. 1021.5, Cal. Civil Code Sec. 51.7, Cal. Civil Code Sec. 52, or

otherwise.

Page 1 of 8

363

3.    **The Release:  PLAINTIFFS** and **DEFENDANTS** desire to fully and finally resolve the controversies, matters, claims and suits of every kind whatsoever, including, but without limitation, any relating to any and all known or unknown personal injuries, property damage, loss, cost or expense of every nature whatsoever resulting from any event, incident, casualty or other contact(s) involving **PLAINTIFFS** and **DEFENDANTS**, including any members of the Los Angeles Police Department occurring on or before the date of this release and arising from events during the 2000 Democratic National Convention, and all subsequent criminal proceeding(s), trial(s) or hearing(s), if any, and all confinement or detention resulting from such event(s), incident(s), or contact(s), if any, which allegedly caused personal injury, loss and/or property damage.  Specifically, **PLAINTIFFS**, and each of them expressly waive all rights under Section 1542 of the Civil Code of California, which reads as follows:

" A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE
CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER
FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF
KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS
OR HER SETTLEMENT WITH THE DEBTOR."

4.    **The Consideration by Defendants:** In consideration of the settlement in this action, **DEFENDANTS** agree to pay **PLAINTIFFS** and their counsel the present value of **SEVEN HUNDRED FIVE THOUSAND DOLLARS** ($705,000.00).  In additional consideration of the settlement in this action, **DEFENDANTS** agree to enact the following changes to the practices, policies and/or customs challenged by **PLAINTIFFS** in this action.

Page 2 of  8

364

a.    **Helicopters:**

Los Angeles Police Department (LAPD) helicopters assigned to monitor permitted crowd control incidents shall operate the aircraft at reasonable altitudes so as to avoid disruption of First Amendment protected activities.  The Incident Commander will coordinate with event organizers to help avoid over flights during keynote speaker presentations.  This action is not intended to prevent LAPD helicopters from response to emergent situations requiring immediate police presence during such crowd control events.

b.    **Marches:**

Demonstrators, while participating in lawful assemblages, shall not be prevented from using public sidewalks to join or exit a lawful march or from using any public sidewalk adjacent to a lawful march route.  However, marchers will not be allowed to disrupt pedestrian movement and/or prevent lawfully open businesses from operating while on the sidewalk when such conduct violates any applicable law.

c.    **Motorcyles/Bicycles:**

LAPD personnel will not utilize motorcycles or bicycles to strike lawfully assemble demonstrators/marchers as a method for crowd control.

d.    **Use of Less Lethal Weapons:**

Less-lethal munitions are categorized as projectiles launched or otherwise deployed for the purpose of overcoming resistance, effecting arrest or addressing the threat of serious injury to an officer or suspect with less risk of causing death than use of a firearm.

Page 3 of  8

365

(1)    Less-lethal munitions may be deployed on aggressive and/or combative suspects in a crowd control situation, on suspects who are a potential physical threat to themselves or others, on suspects armed with weapons other than firearms, or suspects displaying "aggressive and/or combative" actions.

(2)    For the purpose of deployment of less-lethal munitions, aggressive and/or combative actions include ongoing destruction of property that presents a threat to the personal safety of officers or others.

(3)    Less lethal weapons should not be used on a lawfully dispersing crowd or individual.

(4)    Less lethal weapons should not be used against a person or a crowd that is retreating unless the person or crowd continues to engage in unlawful activity that is aggressive and/or combative.

(5)    The department will publish a notice that will require that less-lethal "stinger" weapons can be used only with the approval of a staff officer (i.e., commander or above) and only in a riotous situation where the use of lethal force would not be reasonable.

(e)    **Public Assemblies:**

Incident Commanders, prior to declaring an assembly unlawful, shall refer to LAPD Guidelines for Crowd Management and Crowd Control, Volume 5 of the

366

LAPD Emergency Operatives Guide. In particular, all Incident Commanders shall be trained in the Crowd Management Strategies and Tactics set forth in Chapter 5 of such document.  Before any public assembly is declared to be unlawful, the Incident Commander should evaluate the feasibility of isolating and arresting those responsible for the unlawful conduct, and if it is determined to be feasible, shall take such action.

5.    **The Consideration by Plaintiffs:**    In full consideration of the settlement in this action, **PLAINTIFFS** shall do the following:

a.    **PLAINTIFF** National Lawyers Guild (NLG) shall prepare a Roll Call Training video presentation of 5 to 6 minutes (utilizing NLG resources) describing the NLG's role during public demonstrations. The content of the presentation shall be solely determined by the NLG.

b.    **PLAINTIFFS** shall execute and deliver to **DEFENDANTS** a dismissal with prejudice of this action with the District Court.  Said dismissal may be filed by **DEFENDANTS** only after payment to **PLAINTIFFS'** counsel of the amount described in paragraph 4, hereinabove.  **DEFENDANTS** are not obligated to provide payment to **PLAINTIFFS** unless and until all terms and conditions of this **SETTLEMENT AGREEMENT** have been satisfied, including execution by each **PLAINTIFF** and their counsel of all required written releases and demands.

6.    **Settlement payment:**  Payment shall be made as follows:

a.    Defendant **CITY** will fund a future periodic payment obligation for the benefit of Carol A. Sobel, one of the ocunsel for **PLAINTIFFS**, with a present value of $250,000 through NABCO

367

Assignments Ltd. A separate addendum will be executed by counsel for the parties with respect to the NABCO Assignment and shall be incorporated by reference in this agreement as though fully set forth herein.

b.      Defendant **CITY** will issue a check or warrant for the sum of $455,000 payable to the Law Office of Carol A. Sobel Client Trust Account. By signing this **SETTLEMENT AGREEMENT**, each of the **PLAINTIFFS** hereby agrees that the **DEFENDANTS** may issue a single check payable as described in the foregoing sentence and that **DEFENDANTS** shall have no liability to each or any of them for any damages claimed in this action once the payment is made to the Client Trust Account of **PLAINTIFFS'** counsel.

7.      **Advice of Counsel:** Except as provided herein, the parties acknowledge that each party has received independent legal advice from attorneys of their choice with respect to the advisability of making the settlement and release provided herein, and with respect to the advisability of executing this **SETTLEMENT AGREEMENT**, and prior to the execution of this **SETTLEMENT AGREEMENT**, that party's attorney reviewed this **SETTLEMENT AGREEMENT** at length, made all desired changes, and signed this **SETTLEMENT AGREEMENT** to indicate that the attorney approved this **SETTLEMENT AGREEMENT** as to form and substance. The undersigned understands and represents that reliance is placed wholly upon his own judgment, belief and knowledge as to the nature, extent, and duration of said

368

injuries and damage; that no statement with regard thereto made by or on behalf of any of the releasees has in any way influenced the undersigned in making this settlement

8.    **No Admission of Liability:** The foregoing consideration is received in settlement and compromise of a disputed claim and is not an admission of any liability whatsoever; that this Release contains the **ENTIRE AGREEMENT** between the undersigned and the releasees; and that the terms hereof are contractual and not mere recitals.

9.    **Counterparts:**  This **SETTLEMENT AGREEMENT** may be executed in one or more counterparts, including by facsimile, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

The undersigned **PLAINTIFFS** are the only ones entitled to compensation for any alleged injuries and/or damage herein.

BY SIGNING THIS SETTLEMENT AGREEMENT, THE UNDERSIGNED HEREBY DECLARES THAT THIS RELEASE HAS BEEN CAREFULLY READ AND IS FULLY UNDERSTOOD BY HIM OR HER.

EXECUTED ON:

6/1/05
**DATE**

National Lawyers Guild, Los Angeles Chapter

**DATE**

Los Angeles Coalition to Stop the Execution of
MUMIA ABU-JAMAL

Page 7 of 8

369

3-31-1995 3:15PM          FROM                                                    P. 1

05/31/2005  17:23    13237599909              UNITY                  PAGE  02
  05:51 2005  13:.1    32735c065                GO4

_____5_/_31_/_2005_____          R~~ W D. B~ )
DATE                             Los Angeles Chapter of the October 2~~
                                 Coalition to Stop Police Brutality, Repress...n... a... u
                                 the Criminalization of a Generation

_____          _____
DATE                             D2K Convention Planning Committee

APPROVED AS TO FORM AND CONTENT:

COUNSEL FOR ALL PLAINTIFFS

ACLU FOUNDATION OF SO CALIFORNIA   LAW OFFICE OF CAROL A SOBEL

By:   PETER J. ELIASBERG           By:   CAROL A. SOBEL

NEWMAN AARONSON VANAMAN            SCHONBRUN, DeSIMONE, SEPLOW,
                                   HARRIS & HOFFMAN

By:   ROBERT M. MYERS              By:   MICHAEL MORRISON

LAW OFFICE OF KARL M. MANHEIM

By:   KARL M. MANHEIM

Page 8 of 8

370

DATE _____

Los Angeles Chapter of the October 22nd
Coalition to Stop Police Brutality, Repression and
the Criminalization of a Generation

June 2 2005
DATE

_Don W White_

**D2K Convention Planning Committee**

**APPROVED AS TO FORM AND CONTENT:**

COUNSEL FOR ALL PLAINTIFFS

ACLU FOUNDATION OF SO. CALIFORNIA    LAW OFFICE OF CAROL A. SOBEL.

By:    **PETER J. ELIASBERG** _____

By:    **CAROL A. SOBEL** _____

NEWMAN.AARONSON.VANAMAN

SCHONBRUN, DeSIMONE, SEPLOW,
HARRIS & HOFFMAN

By:    **ROBERT M. MYERS** _____

By:    **MICHAEL MORRISON** _____

LAW OFFICE OF KARL M. MANHEIM

By:    **KARL M. MANHEIM** _____

371

DATE _____

Los Angeles Chapter of the October 22nd
Coalition to Stop Police Brutality, Repression and
the Criminalization of a Generation

DATE _____

D2K Convention Planning Committee

APPROVED AS TO FORM AND CONTENT:

COUNSEL FOR ALL PLAINTIFFS

ACLU FOUNDATION OF SO. CALIFORNIA    LAW OFFICE OF CAROL A. SOBEL

By:    **PETER J. ELIASBERG**

By:    **CAROL A. SOBEL**

NEWMAN.AARONSON.VANAMAN

SCHONBRUN, DeSIMONE, SEPLOW,
HARRIS & HOFFMAN

By:    **ROBERT M. MYERS**

By:    **MICHAEL MORRISON**

LAW OFFICE OF KARL M. MANHEIM

By:    **KARL M. MANHEIM**

372

DATE _____    Los Angeles Chapter of the October 22nd
                                 Coalition to Stop Police Brutality, Repression and
                                 the Criminalization of a Generation


DATE _____    D2K Convention Planning Committee


APPROVED AS TO FORM AND CONTENT:

COUNSEL FOR ALL PLAINTIFFS

ACLU FOUNDATION OF SO. CALIFORNIA    LAW OFFICE OF CAROL A. SOBEL


By:    PETER J. ELIASBERG              By:    CAROL A. SOBEL

NEWMAN.AARONSON.VANAMAN                SCHONBRUN, DeSIMONE, SEPLOW,
                                       HARRIS & HOFFMAN


By:    ROBERT M. MYERS                 By:    MICHAEL MORRISON

LAW OFFICE OF KARL M. MANHEIM


By:    KARL M. MANHEIM


Page 8 of 8

373

_____    _____
DATE                       Los Angeles Chapter of the October 22nd
                           Coalition to Stop Police Brutality, Repression and
                           the Criminalization of a Generation


_____    _____
DATE                       **D2K Convention Planning Committee**


**APPROVED AS TO FORM AND CONTENT:**

COUNSEL FOR ALL PLAINTIFFS

ACLU FOUNDATION OF SO. CALIFORNIA    LAW OFFICE OF CAROL A. SOBEL

_____    _____
By:    PETER J. ELIASBERG        By:    CAROL A. SOBEL

NEWMAN.AARONSON.VANAMAN          SCHONBRUN, DeSIMONE, SEPLOW,
                                HARRIS & HOFFMAN

_____    _____
By:    ROBERT M. MYERS          By:    MICHAEL MORRISON

LAW OFFICE OF KARL M. MANHEIM

_____
By:    KARL M. MANHEIM


Page 8 of 8

374

DATE        **Los Angeles Chapter of the October 22nd Coalition to Stop Police Brutality, Repression and the Criminalization of a Generation**

DATE        **D2K Convention Planning Committee**

**APPROVED AS TO FORM AND CONTENT:**

COUNSEL FOR ALL PLAINTIFFS

ACLU FOUNDATION OF SO. CALIFORNIA    LAW OFFICE OF CAROL A. SOBEL

By:    **PETER J. ELIASBERG**        By:    **CAROL A. SOBEL**

NEWMAN.AARONSON.VANAMAN       SCHONBRUN, DeSIMONE, SEPLOW, HARRIS & HOFFMAN

By:    **ROBERT M. MYERS**        By:    **MICHAEL MORRISON**

LAW OFFICE OF KARL M. MANHEIM

By:    **KARL M. MANHEIM**

**APPROVED BY DEFENDANT:**

CITY OF LOS ANGELES

By: **DON W. VINCENT**, Asst. City Attorney

Page 8 of 8

# Exhibit 21



**ROCKARD J. DELGADILLO**
CITY ATTORNEY

*Office of the City Attorney*
*Los Angeles, California*

January 15, 2002

## FAX TRANSMITTAL SHEET

**To:**      SHARON E. JACKSON, ESQ.
MILBANK, TWEED, HADLEY & McCLOY LLP
FAX NO.: 213 629-5063

**From:**      James Axtell
Deputy City Attorney
Fax Number 213-485-8898

**Re:**      *Settlement Agreement on Crespo v. City*

**Number of Pages:**   _13_  (including this coversheet)

AN EQUAL EMPLOYMENT OPPORTUNITY - AFFIRMATIVE ACTION EMPLOYER
SEVENTEENTH FLOOR CITY HALL EAST·200 N. MAIN STREET·LOS ANGELES CA 90012-4131

# SETTLEMENT AGREEMENT
## (Crespo v. City of Los Angeles CV00-08869)

This Settlement Agreement and Release ("Agreement") is made by and between the following parties: (1) plaintiffs Al Crespo, David Horowitz, Greg Rothschild, Kevin Graf, Jeffrey Kleinman, Rebeka Rodriguez, and Ronald Deveaux, and (2) defendants City of Los Angeles, Chief Bernard C. Parks, Deputy Chief Maurice Moore, Deputy Chief (Ret.) Martin Pomeroy, and Commander Thomas Lorenzen.

## BACKGROUND:

A. On September 7, 2000, plaintiffs filed their first amended complaint in case number CV00-08869 alleging violations of their rights under the First and Fourth Amendments to the United States Constitution and under Article I, sections 2 and 13 of the California Constitution. (An allegation of violation of the Fourteenth Amendment right to due process was voluntarily withdrawn before defendants answered.) Plaintiffs sought damages, declaratory relief, and an injunction directing defendants to develop policies protecting members of the media from interference by the Los Angeles Police Department during major demonstrations.

B. Each plaintiff alleged that he or she was in the vicinity of the Staples Center in Los Angeles during the Democratic National Convention on August 14, 2000 when the Police Department declared an unlawful assembly in the public assembly area immediately adjacent to the Staples Center. As a result of the unlawful assembly, the Department issued a dispersal order that was ultimately followed by a dispersal operation in which police caused persons to leave the demonstration area and to disperse. Plaintiffs alleged that while they were engaged in their business of recording the events, for no apparent cause they were pushed, kicked, knocked down, struck with batons, hit with less lethal munitions, or subjected to some combination of these actions. Plaintiffs further alleged that they suffered personal injury, and in some cases property damage or loss, as a result of the actions of the police.

C. On November 20, 2000, defendants filed their answer denying all of plaintiffs' allegations and setting forth a number of affirmative defenses. Defendants continue to deny all of plaintiffs' allegations and continue to assert that all of the policies of the Los Angeles Police Department are in all respects lawful and consistent with both the United States Constitution and the California Constitution. Nothing in this Agreement constitutes an admission of liability by defendants.

D. Nevertheless, at this time the parties desire to resolve this matter without further litigation and therefore intend with this Settlement Agreement to resolve all issues pertaining to case number CV00-08869, and the allegations contained therein, upon the terms and conditions set forth in this Agreement.

1

**THEREFORE,** in consideration for the recitals, promises, representations, covenants, terms, conditions, and releases contained in this Agreement, the parties agree as follows:

**E. Department Policy.** Defendants agree to amend the policies of the Los Angeles Police Department as follows:

*Preamble*

*Under the rights guaranteed by the First Amendment to the United States Constitution, it is not uncommon for large numbers of people to assemble for the purpose of demonstrating their opinions. At such demonstrations, it is the Police Department's obligation to protect individuals' First Amendment rights, maintain order, and protect lives and property. Occasionally, demonstrations become unlawful. In such circumstances, pursuant to California Penal Code sections 407 and 409, an assembly may be declared unlawful, and all persons present, including members of the news media, may be lawfully ordered to disperse. The law provides that police officers may use reasonable force to disperse an unlawful assembly and to effect the arrest of violators. The Department's Use of Force Policy applies to such actions. The Department's policies concerning interaction with the news media are described in the relevant provisions in Volume 1 of the Department Manual, the Department's Emergency Operations Guide, and the Department's Media Guide.*

1. The Los Angeles Police Department recognizes that the news media has the right, without interfering with police operations, to cover events that may result in the declaration of an unlawful assembly and order to disperse. To the extent reasonably possible under the circumstances, LAPD will make efforts to accommodate this reporting obligation. However, such efforts will be made consistent with LAPD's primary obligation to maintain public safety and order.

2. With the exception of spontaneously occurring events, whenever LAPD develops an operations plan for an event that the Department understands will involve a public assembly, the Department will where practicable designate an area outside of the anticipated impacted area, but within reasonable viewing distance and audible range of the event, in which members of the news media may assemble. To the extent reasonably possible under the circumstances, the Department will try to prevent the news media viewing area from becoming part of any area impacted by an unlawful assembly declaration and order to disperse. However, the decision to assume the risk of danger involved in covering a public event remains with the individual news reporter making such decision, provided that any such decision does not constitute a waiver by a reporter of any constitutional or other legal rights.

3. The selection of the news media viewing area will take into consideration public and officer safety, police tactics, input provided by the news media, if any, and the ability of LAPD to prevent the location from becoming part of the impacted area. The final selection of the viewing area location will be made by the Incident Commander (IC) in charge of the event.

2

4. To the extent reasonably possible without compromising public or officer safety or police tactics, the IC will relocate the news media viewing area if, due to changing conditions, the initial area no longer affords the news media a reasonable view of the event or becomes a tactical concern for the IC.

5. Pursuant to Volume 2 of the LAPD Emergency Operations Guide, the LAPD IC will designate an Information Officer as part of the incident command system in order to facilitate interaction with the news media. The Information Officer will be clearly identified at the scene.

6. Pursuant to Volume 5 of the Emergency Operations Guide, after declaring an unlawful assembly, LAPD will designate a dispersal route for all persons present, including the news media, to use when evacuating the area.

7. LAPD will amend its Emergency Operations Guide to reflect the procedures outlined in paragraphs 1, 2, 3, and 4 above.

8. LAPD Media Relations Section will provide members of the news media with a written pamphlet explaining the procedures outlined in paragraphs 1, 2, 3, and 4 above, as well as the Department's policies concerning interaction with the news media, including at unlawful assemblies, crime scenes, command posts, and disaster scenes, at the time that they apply for a new or renewal LAPD Press Pass.

9. LAPD will issue a Training Bulletin to all Department personnel which explains the procedures outlined in paragraphs 1, 2, 3, and 4 above.

**F. Monetary Payment.** Within 30 days after this Agreement is executed by all parties, defendant City of Los Angeles will pay plaintiffs damages, attorneys fees, and costs in the amount of $60,000. Plaintiffs accept this amount as full payment for any and all monetary amounts owed in connection with case number CV00-08869, and the allegations contained therein, and on behalf of themselves, their agents, and their assigns, hereby release all defendants, as well as all other employees and entities of the City of Los Angeles, from any further obligations to pay any further amounts.

**G. Dismissal of Complaint.** Within 30 days after this Agreement is executed by all parties, plaintiffs will dismiss with prejudice the action titled Al Crespo, et al. v. City of Los Angeles, et al., California Central District Federal Court Case No. CV00-08869.

**H. Mutual Releases.** Except as provided for in this Agreement, plaintiffs, on behalf of themselves and their agents, assigns, successors, heirs, attorneys, and representatives, hereby release defendants and their agents, assigns, successors, heirs, attorneys, and representatives, including any employees and entities of the City of Los Angeles, from any and all claims, liabilities, and obligations of any nature, whether known or unknown and whether suspected or unsuspected, concerning any acts, circumstances, facts, events, or transactions occurring prior to the date on

3

which this Agreement is signed by all parties.

In turn, except as provided for in this Agreement, defendants, on behalf of themselves and their agents, assigns, successors, heirs, attorneys, and representatives, including any employees and entities of the City of Los Angeles, hereby release plaintiffs and their agents, assigns, successors, heirs, attorneys, and representatives, from any and all claims, liabilities, and obligations of any nature, whether known or unknown and whether suspected or unsuspected, concerning any acts, circumstances, facts, events, or transactions occurring prior to the date on which this Agreement is signed by all parties.

I. **Unknown Claims.** It is the intention of the parties that this Agreement constitute a full and final accord and satisfaction and mutual release of all claims, liabilities, and obligations, whether known or unknown and whether suspected or unsuspected, that the parties may have against each other concerning any acts, circumstances, facts, events, or transactions occurring prior to the date on which this Agreement is signed by all parties. The parties acknowledge that they are familiar with and expressly waive the protection of California Civil Code section 1542, which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.**

In connection with such waiver and agreement, each of the parties acknowledges awareness that he, she, they, or their attorneys may at some time in the future discover claims, facts, or legal theories in addition to or different from those which they now know or believe to exist with respect to the subject matter of this Agreement, but it is the parties' intention with this Agreement to fully, finally, and forever settle and release all of the matters known or unknown and suspected or unsuspected which do not now exist, which may exist, or which may have existed previously between the parties concerning any acts, circumstances, facts, events, or transactions occurring prior to the date on which this Agreement is signed by all parties.

J. **Entire Agreement.** This Agreement contains the complete agreement and understanding of the parties with respect to the subject matter described in the Agreement and supersedes all previous discussions, negotiations, commitments, and undertakings concerning such subject matter.

K. **Waiver, Modification, and Amendment.** None of the provisions in this Agreement may be modified, amended, or waived except by written agreement signed by both plaintiffs and defendants. Waiver of any one provision in this Agreement will not be deemed a waiver of any other provision.

4

**L.   Construction and Jurisdiction.**  Interpretation of the provisions of this Agreement will be pursuant to the laws of the State of California.  Jurisdiction over any dispute arising concerning the terms of this Agreement will remain exclusively with the United States District Court for the Central District of California.

**M. Counterparts and Facsimile.**  This Agreement may be executed in counterparts and by facsimile.  Each executed counterpart will be deemed an original, and all executed counterparts, when taken together, shall constitute one and the same document.

**N. Authorization.**  Each undersigned warrants that it has the authority to execute this agreement on behalf of its respective parties and that it has read and understood and agrees to all of the terms and conditions of this Agreement.

**AL CRESPO**

Dated: _11/10_, 2001

By: _____

**DAVID HOROWITZ**

Dated: _____, 2001

By: _____

**GREG ROTHSCHILD**

Dated: _____, 2001

By: _____

**KEVIN GRAF**

Dated: _____, 2001

By: _____

**JEFFREY KLEINMAN**

Dated: _____, 2001

By: _____

5



**L.   Construction and Jurisdiction.**   Interpretation of the provisions of this Agreement will be pursuant to the laws of the State of California. Jurisdiction over any dispute arising concerning the terms of this Agreement will remain exclusively with the United States District Court for the Central District of California.

**M. Counterparts and Facsimile.** This Agreement may be executed in counterparts and by facsimile. Each executed counterpart will be deemed an original, and all executed counterparts, when taken together, shall constitute one and the same document.

**N. Authorization.** Each undersigned warrants that it has the authority to execute this agreement on behalf of its respective parties and that it has read and understood and agrees to all of the terms and conditions of this Agreement.

**AL CRESPO**

Dated: _____, 2001

By: _____

**DAVID HOROWITZ**

Dated: 11/08, 2001

By: _David C. Horowitz_

**GREG ROTHSCHILD**

Dated: _____, 2001

By: _____

**KEVIN GRAF**

Dated: _____, 2001

By: _____

**JEFFREY KLEINMAN**

Dated: _____, 2001

By: _____

5

**L. Construction and Jurisdiction.** Interpretation of the provisions of this Agreement will be pursuant to the laws of the State of California. Jurisdiction over any dispute arising concerning the terms of this Agreement will remain exclusively with the United States District Court for the Central District of California.

**M. Counterparts and Facsimile.** This Agreement may be executed in counterparts and by facsimile. Each executed counterpart will be deemed an original, and all executed counterparts, when taken together, shall constitute one and the same document.

**N. Authorization.** Each undersigned warrants that it has the authority to execute this agreement on behalf of its respective parties and that it has read and understood and agrees to all of the terms and conditions of this Agreement.

**AL CRESPO**

Dated: _____, 2001

By: _____

**DAVID HOROWITZ**

Dated: _____, 2001

By: _____

**GREG ROTHSCHILD**

Dated: 11/8, 2001

By: _GREG ROTHSCHILD_

**KEVIN GRAF**

Dated: _____, 2001

By: _____

**JEFFREY KLEINMAN**

Dated: _____, 2001

By: _____

5

**L.  Construction and Jurisdiction.**  Interpretation of the provisions of this Agreement will be pursuant to the laws of the State of California.  Jurisdiction over any dispute arising concerning the terms of this Agreement will remain exclusively with the United States District Court for the Central District of California.

**M. Counterparts and Facsimile.**  This Agreement may be executed in counterparts and by facsimile.  Each executed counterpart will be deemed an original, and all executed counterparts, when taken together, shall constitute one and the same document.

**N. Authorization.**  Each undersigned warrants that it has the authority to execute this agreement on behalf of its respective parties and that it has read and understood and agrees to all of the terms and conditions of this Agreement.

**AL CRESPO**

Dated: _____, 2001

By: _____

**DAVID HOROWITZ**

Dated: _____, 2001

By: _____

**GREG ROTHSCHILD**

Dated: _____, 2001

By: _____

**KEVIN GRAF**

Dated: 4/9 _____, 2001

By: _Kevin Graf_____

**JEFFREY KLEINMAN**

Dated: _____, 2001

By: _____

5

**L.   Construction and Jurisdiction.**  Interpretation of the provisions of this Agreement will be pursuant to the laws of the State of California.  Jurisdiction over any dispute arising concerning the terms of this Agreement will remain exclusively with the United States District Court for the Central District of California.

**M. Counterparts and Facsimile.** This Agreement may be executed in counterparts and by facsimile.  Each executed counterpart will be deemed an original, and all executed counterparts, when taken together, shall constitute one and the same document.

**N. Authorization.** Each undersigned warrants that it has the authority to execute this agreement on behalf of its respective parties and that it has read and understood and agrees to all of the terms and conditions of this Agreement.

**AL CRESPO**

Dated: _____, 2001

By: _____

**DAVID HOROWITZ**

Dated: _____, 2001

By: _____

**GREG ROTHSCHILD**

Dated: _____, 2001

By: _____

**KEVIN GRAF**

Dated: _____, 2001

By: _____

**JEFFREY KLEINMAN**

Dated: _11_/_13_ ___, 2001

By: _JEFFREY   KLEINMAN_

5

**REBEKA RODRIGUEZ**

Dated: 11/20, 2001

By: _____

**RONALD DEVEAUX**

Dated: _____, 2001

By: _____

**CITY OF LOS ANGELES**
**CHIEF BERNARD C. PARKS**
**DEPUTY CHIEF MAURICE MOORE**
**DEPUTY CHIEF (RET.) MARTIN POMEROY**
**COMMANDER THOMAS LORENZEN**

Dated: _____, 2001

By: _____

148576
October 18, 2001

6

**REBEKA RODRIGUEZ**

Dated: _____, 2001

By: _____

**RONALD DEVEAUX**

Dated: Nov 10 _____, 2001

By: _____

**CITY OF LOS ANGELES**
**CHIEF BERNARD C. PARKS**
**DEPUTY CHIEF MAURICE MOORE**
**DEPUTY CHIEF (RET.) MARTIN POMEROY**
**COMMANDER THOMAS LORENZEN**

Dated: _____, 2001

By: _____

148576
October 18, 2001

6

**REBEKA RODRIGUEZ**

Dated: _____, 2001

By: _____

**RONALD DEVEAUX**

Dated: _____, 2001

By: _____

**CITY OF LOS ANGELES
CHIEF BERNARD C. PARKS
DEPUTY CHIEF MAURICE MOORE
DEPUTY CHIEF (RET.) MARTIN POMEROY
COMMANDER THOMAS LORENZEN**

Dated: 1/8, 2002

By: James Axtell, Deputy City Attorney

148576
October 18, 2001

# Exhibit 22

# LOS ANGELES POLICE DEPARTMENT REPORT TO THE BOARD OF POLICE COMMISSIONERS



**MACARTHUR PARK**

**OCTOBER 9, 2007**

391

## INTRADEPARTMENTAL CORRESPONDENCE

October 5, 2007
1.14

**TO:**　　　　Chief of Police

**FROM:**　　Commanding Officer, Incident Management & Training Bureau
　　　　　　Commanding Officer, Consent Decree Bureau

**SUBJECT:**　LOS ANGELES POLICE DEPARTMENT REPORT TO THE BOARD OF
　　　　　　POLICE COMMISSIONERS "AN EXAMINATION OF MAY DAY 2007"

Immediately following the events that occurred on May 1, 2007 in MacArthur Park, you directed
that a comprehensive examination of the events that occurred in MacArthur Park be presented to
the Board of Police Commissioners. You further instructed that this report serve as a thorough
and transparent critical self-examination, and include recommendations for institutional reform.
This report examines not only the events of May 1, 2007, but also the planning and training
leading up to that day.

We have attempted to examine how the events of May 1, 2007 occurred. Due to restrictions of
state law, however, we could not address the issue of individual discipline that may be imposed
as a result of the actions of individual officers. We have included a detailed list of
recommendations with time lines for implementation and an audit process to insure that the
recommendations are in fact implemented and institutionalized.

This report could not have been accomplished without the assistance of Commander Sandy Jo
MacArthur and Police Administrator Maggie Goodrich, whose efforts were invaluable.

MICHAEL HILLMANN, Deputy Chief　　GERALD L. CHALEFF, Police Administrator
Commanding Officer　　　　　　　　Commanding Officer
Incident Management & Training Bureau　Consent Decree Bureau

Attachment

## TABLE OF CONTENTS

I.  EXECUTIVE SUMMARY .................................................................................. 4

II.  MAY DAY 2007 ............................................................................................... 16

   A.  Planning ........................................................................................................ 16
      1.  Central Bureau's Perception of the Event ............................................ 16
      2.  Drafting of the Rampart Area IAP ....................................................... 17
      3.  Changes in Planning ............................................................................ 18
      4.  The Rampart Incident Action Plan ...................................................... 20
      5.  Distribution of the IAP ........................................................................ 21
      6.  Planning with the Media ...................................................................... 22
      7.  Conclusions Regarding Planning ......................................................... 24
   B.  Central Area March and Rally ...................................................................... 24
   C.  The Afternoon March and Rally in MacArthur Park ................................... 26
      1.  The March from 3rd Street and Vermont to MacArthur Park ............... 27
      2.  The March Arrives at MacArthur Park ................................................ 29
      3.  Strategies to Move the Crowd North Are Devised .............................. 33
      4.  Metropolitan Division Resources Clear the Park ................................ 38

III.  ANALYSIS OF MAY DAY 2007 .................................................................... 43

   A.  Planning ........................................................................................................ 43
   B.  Tactics .......................................................................................................... 45
      1.  Failure to Guide Marchers ................................................................... 45
      2.  Use of Force ........................................................................................ 45
      3.  Treatment of the Media ....................................................................... 48
      4.  Crowd Dispersal Strategies ................................................................. 49
      5.  Arrest Posture ...................................................................................... 52
      6.  Utilization of Available Resources ...................................................... 53
      7.  Use of the Sound Truck ....................................................................... 54
   C.  Command and Control .................................................................................. 55
      1.  Unity of Command .............................................................................. 55
      2.  Radio Silence ...................................................................................... 57
   D.  Situational Awareness .................................................................................. 59
      1.  In the Field .......................................................................................... 59
      2.  The Incident Command Post and the MACC ...................................... 60
   E.  Training ........................................................................................................ 63
      1.  Training Scaled Back / Eliminated ...................................................... 64
      2.  Training without Oversight .................................................................. 65
   F.  Individual Responsibility ............................................................................. 66

IV.  ACTION TAKEN SINCE MAY DAY 2007 ................................................... 68

   A.  Investigations ............................................................................................... 68
   B.  Leadership and Personnel Changes .............................................................. 70
   C.  Training Improvements ................................................................................ 70
      1.  Crowd Control Training ...................................................................... 71

2.    Mobile Field Force Training ................................................................. 73
D.    Institutionalizing Reform .......................................................................... 74
**V.    CROWD MANAGEMENT AFTER MAY DAY 2007 .................................... 77**
A.    The Incident Management Team ................................................................ 77
B.    Implementation of the IMT Following May Day 2007 ........................... 77
**VI.    RECOMMENDATIONS AND CONCLUSION ........................................ 79**
**GLOSSARY OF TERMS .......................................................................... 82**
**APPENDIX 1 .......................................................................................... 84**
**APPENDIX 2 .......................................................................................... 86**
**ADDENDUM A ....................................................................................... 90**
**ADDENDUM B ....................................................................................... 93**
**ADDENDUM C ....................................................................................... 96**
**ADDENDUM D ....................................................................................... 98**
**ADDENDUM E ..................................................................................... 100**

I.    **EXECUTIVE SUMMARY**

On May 1, 2007, what began as a peaceful march, rally and expression of First Amendment rights, ended in confrontation - seemingly the result of a small group of individuals attempting to incite a disturbance, coupled with decisions made by Department personnel. The images of helmeted officers, using batons to push and strike members of the public and the media and firing less-lethal impact munitions at people in the park, were disconcerting. These actions raised questions regarding how this occurred; particularly in light of the extensive efforts on the part of the Department to implement change over the last five years.

The Department has been confronted with large-scale marches, rallies, demonstrations and events over the years, and, with few exceptions, has handled them without disruption to the events and without needing to use force. The events on May 1, 2007 at MacArthur Park stand in stark contrast to the marches and assemblies managed by the Department over the years that occurred without incident. Thus, the events of May 1, 2007 are of great concern.

As a result of what occurred on May 1, 2007, Chief of Police, William J. Bratton took immediate action and ordered a comprehensive examination of not only the events of that day, but also an inquiry into the planning and training leading up to May Day 2007. The Los Angeles Police Department has been the subject of many reports, internal and external. Many may speculate that this report will be put on a shelf with the others that came before it, and that life in the Department will go on unchanged and unaffected, eventually leading to another similar incident. The intention is the opposite. The Department acknowledges that identifying lessons learned is but the first step in bringing about change; what is key, is that the resulting changes be institutionalized.

In preparation for this report, the events of May 1, 2007 were examined from the early planning stages to the eventual dispersal of those in MacArthur Park. Additionally, a thorough review of Department training relating to crowd management and control was conducted, including Department use of force policies, and in particular, the training of those Metropolitan officers who were involved in the events at MacArthur Park.

This report includes a chronology of the day's events and an analysis, which seeks to describe how the actions of the Department and its employees ultimately contributed to the events of the day. This examination encompasses issues relating to planning, tactics, command and control, situational awareness, training and the individual responsibility of officers of the Los Angeles Police Department. This report was approached with the intent to extract specific lessons from the analysis that will lead to meaningful, institutionalized changes that seek to ensure that the events of May 1, 2007 do not happen again. Therefore, this report not only includes recommendations, but also includes deadlines for implementation and audit provisions to ensure that each and every lesson learned is implemented and institutionalized.

This report does not address the issue of discipline to be imposed, if any, on individual officers for any use of force that occurred that day. California law, and a recent court decision interpreting that law, prohibits the dissemination of any personnel information

and/or any disciplinary decisions that may result from these investigations.[1]  Therefore, as personnel investigations are deemed confidential, this report does not include information obtained from any interview of any officer whose use of force is being reviewed or any civilian who may have witnessed the events of May Day 2007.

The investigation of the uses of force in MacArthur Park, and every claim or lawsuit arising from the same, will be thorough and extensive.  When the investigation is complete, the results will be submitted to a panel comprised of Metropolitan Division Captains Kroeber and Greer and Commander Stephen R. Jacobs, who was previously the Commanding Officer of Metropolitan Division.  This panel was appointed by Chief Bratton to specifically review each of the uses of force that occurred in MacArthur Park and make a recommendation to the Chief of Police as to whether misconduct occurred, and if so, the appropriate discipline to be imposed.  The Chief of Police will review the recommendations and make the final determination as to the appropriate disposition, and where applicable, discipline.[2]

This examination of the events of May Day 2007 in MacArthur Park ultimately pointed to six primary factors that influenced the events that day.
> (1) planning;
> (2) tactics, including the uses of force;
> (3) command and control;
> (4) situational awareness;
> (5) training; and
> (6) individual responsibility.

This report examined the events of May Day 2007 with the benefit of hindsight, in an attempt to determine how Department personnel allowed a small group of individuals attempting to disrupt the events of the day, to succeed in that mission.  While this report does not delineate the many examples of professionalism and restraint exhibited by the officers of the Los Angeles Police Department that day, it is important that the actions of these officers are not lost in the critical review presented in this report.

---

[1] California Government Code Section 3304 and Penal Code Section 832, as interpreted by *Copley Press, Inc. v. Superior Court (County of San Diego)*, (2006) 39 Cal.4th 1272, prohibits the release of this type of information.
[2] Pursuant to the Charter of the City of Los Angeles, an officer who has discipline imposed upon him or her by the Chief of Police has the right to a hearing before an administrative board, the Board of Rights.  This board is composed of two officers of the rank of Captain or above and an individual who is not a member of the department (civilian member).  This board holds a hearing and then determines if misconduct has occurred and what the punishment will be.  If the board holds that the officer did not engage in misconduct, the decision is final and no discipline may be imposed.  If the board holds that the officer committed misconduct, the Chief of Police may then leave the discipline imposed as it stands, or reduce it.  He cannot, however, increase the discipline imposed.

398

A.    **The Significance of May Day / May Day 2006**

Historically, the topic of immigration has been of concern to the people of Los Angeles. Moreover, the history of policing in MacArthur Park on May Day is significant, in that for over two decades the park served as a rallying point for many demonstrations and community activities.

During the spring of 2006, immigrants' rights groups across the nation called for protests to take place on May 1, 2006, as a day of action against House Resolution 4437. Individuals were encouraged to strike by refusing to conduct business, go to work or attend school, in an effort to show how a "day without an immigrant" would affect this nation. Thus, recognizing its duty to protect the civil rights of all individuals, while also providing for the safety of those individuals, the Department began planning for May Day 2006.

On May 1, 2006, approximately 500,000 individuals took part in one of the largest single days of protest in the United States. Participants marched and rallied in Central Area during the first half of the day, and then marched into Rampart Area for the final rally at MacArthur Park. The Department successfully managed the event and enabled participants to express their First Amendment rights.

In the late evening of May Day 2006, however, a significant confrontation between police and a small group attempting to incite a disturbance occurred. Individuals in the crowd blocked Alvarado Street and threw rocks, bottles and other debris at police officers and people passing by who were not engaging in unlawful behavior. For nearly an hour the police officers did not take action against the unruly group, and the number of disruptive individuals in the crowd steadily grew to nearly 1,000 as the unlawful behavior continued. Finally, Mobile Field Forces and Metropolitan Division personnel were called to the park to gain control of the situation. An unlawful assembly was called, and in a short period of time, the crowd dispersed. Chief Bratton arrived on scene during the incident and was concerned about the slow response of personnel to manage the situation. The delay caused injury to officers and created an unsafe situation for the majority of law abiding individuals who had come to the park to exercise their First Amendment rights.

Subsequent to May Day 2006, Chief Bratton recognized that many of his command staff had little experience with crowd control situations. Therefore, he directed Special Operations Bureau to conduct a one-day crowd control course for command officers, to expose them to basic crowd control tactics. In September 2006, Special Operations Bureau, in conjunction with other Department experts, provided training for all command and staff officers. The course included a brief overview of basic planning strategies for pre-planned events, Mobile Field Force capabilities and crowd control tactics, which was followed by field demonstrations regarding the capabilities of the following: Bicycle Teams, the Mounted Platoon, non-target and target specific less-lethal impact munitions and Tactical Support Elements. The course included demonstrations but did not adequately allow for practical application exercises. This may be why some of the problems identified in 2006 repeated themselves on May Day 2007.

## B.    May Day 2007

### 1.    Central Area March and Rally

The May 1, 2007 immigration marches and rallies were expected to be similar to those of the prior year; a morning march and rally in Central Area, and a final rally at MacArthur Park. This year, the crowds were expected to be somewhat smaller in number.

The May Day 2007 morning events in Central Area were properly planned for and occurred without incident.  Timely information was channeled through the Central Area Incident Command Post on a regular basis, and, at all times, it was clear that Deputy Chief Carter was the Incident Commander in charge of the event.  The crowd, estimated at between 15,000 and 25,000 people, was peaceful.  While a small group of individuals described by officers as "anarchists" were spotted at the rally and march that morning, they were contacted by officers during the event to ensure they understood the police were aware of their presence, and the May Day events in Central Area occurred without incident.  The well-executed police presence and activity allowed all in attendance the opportunity to express their First Amendment rights and permitted the media to record and report on the events as they occurred.

As the crowd dwindled, Assistant Chief Paysinger, Deputy Chief Roupoli and Deputy Chief Carter, comfortable with the success of the morning events, decided to redeploy three of the four Metropolitan Division Platoons, that had been on stand by for the Central Area event, to perform other duties, just before 3:00 p.m.  Metropolitan Division B-Platoon, comprised of 40 personnel, was deployed to MacArthur Park to be available for the afternoon rally in MacArthur Park and support the 149 Department personnel already on site.

### 2.    Afternoon March and Rally in MacArthur Park

Beginning at approximately 3:30 p.m., a crowd, that included Cardinal Roger Mahoney, marched from 3rd Street and Vermont Avenue to MacArthur Park.  Rampart Area Captain John Egan served as the Incident Commander and took an active role in ensuring the crowd of marchers made their way safely along the designated route.  Notwithstanding one help-call broadcast at 8th Street and Alvarado that resulted in an arrest, the march to MacArthur Park was peaceful and controlled.  Even though this march was not permitted, Captain Egan accommodated the growing crowd, allowing the marchers to spill into the street, while providing for their safety.

By 5:00 p.m., the majority of the demonstrators, estimated at 6,000 to 7,000 individuals, had reached MacArthur Park and were entering the north side of the park.  With no officers or sound truck in place to guide the marchers into the entrance of the park, many individuals marched westbound onto Wilshire Boulevard, rather than entering the park at the corner of Wilshire Boulevard and Alvarado Street.  The crowd that gathered on Wilshire Boulevard soon grew to approximately 200 to 300 people, and officers were faced with an impromptu march, heading westbound toward Park View Street.

400

As a result, several strategies were employed to encourage the crowd to move into the north side of the park.  First, a skirmish line of officers was deployed to stop the crowd from crossing Park View and direct people into a park entrance at Park View and Wilshire.  Then, event organizers were asked to use the Department sound truck to ask the crowd, in Spanish, to move into the park.  Finally, a team of Motorcycle officers drove the crowd eastbound on Wilshire, compressing the crowd.  This, from all accounts, raised the tension of both the crowd and the officers.  In fact, several individuals who were interviewed after May Day 2007 referred to this single instance as the proverbial "tipping point" of the day.

During this move eastbound, a Sergeant with the Motorcycle Team was grabbed by the arms, as three individuals from the crowd attempted to pull the Sergeant from his bike.  The Sergeant was forced to allow his bike to fall to the ground.  In the end, after discussion with Metropolitan Division supervisors, the crowd was permitted to remain on Wilshire, and the suspect, positively identified as the man who pulled the Motorcycle Sergeant from his bike, was not arrested, pursuant to the order of Deputy Chief Carter.

During the events described in the paragraph above, Captain Egan's role as Incident Commander gradually diminished, as Central Bureau Commander Louis Gray and Central Bureau Deputy Chief Lee Carter began to make operational decisions and provide direction to officers in the park.  Soon, the majority of Department employees present that day became confused as to who was in command.

As events unfolded in the park, a group of 20 to 30 individuals, whose intent appeared to be to provoke a confrontation and cause a disturbance, threw objects at police, including wooden sticks, water bottles filled with water, ice and gravel, and pieces of cement.  This group of disruptive individuals appeared to move from Wilshire and Park View to the south side of the park near 7th and Alvarado.

As officers in the vicinity of 7th and Alvarado experienced, and reported via the radio, objects being thrown at them, two distinct groups of supervisors discussed plans to disperse the crowd, independent of each other.  The first discussion took place between Hollywood Lieutenant Guillermo Rosales and officers and supervisors from the Bicycle Unit at 7th and Alvarado.  The second discussion took place between Incident Commander Captain Egan, Commander Gray, Deputy Chief Carter and Metropolitan Division supervisors gathered at the opposite end of the park at Park View and Wilshire.  Neither group had full situational awareness.  While both discussions resulted in a decision to declare an unlawful assembly and disperse the crowd, the plan that was ultimately utilized was formulated by Egan, Gray and Carter and was not communicated to Lieutenant Rosales.  This plan involved the use of Metropolitan Division resources to move the crowd from the south side of the park northbound from 7th and Alvarado toward the north side of the park.

At 6:17 p.m., Metropolitan Division B-Platoon formed a skirmish line on 7th Street, and without a dispersal order being given, moved the crowd northbound, pushing and striking some individuals in the crowd, including some members of the media, and firing less-lethal impact munitions.  As officers continued to report objects being thrown by individuals in the crowd, the skirmish line continued north across Wilshire, driving the small group of

8

disruptive individuals from the south side of the park into the thousands of peaceful demonstrators gathered in the north side of the park for a rally.

The line of B-Platoon resources was eventually joined by Metropolitan Division C and D-Platoons. The line of officers, spanning across the entire north side of the park from Wilshire to 6th Street, proceeded to move the crowd westbound toward Park View, clearing the entire park of participants, whether peaceful or not. During this move westbound, as the line moved past a Spanish-language media tent, some individuals in the crowd, including members of the media, were pushed and struck by officers with batons. Officers also continued to fire less-lethal impact munitions until they reached the sidewalk at Park View at the west end of the park. During this move to clear the park, no complete dispersal order was given in either English or Spanish.

Deputy Chief Carter followed behind the line of Metropolitan Division officers for the entirety of the move westbound through the north side of the park. Captain Egan and Commander Gray remained at Wilshire and Park View for the duration of the move to clear the park, which lasted approximately 24 minutes.

In the end, as seen on video, officers had driven thousands of people from the park, knocked over and struck some individuals - including media and non-media, peaceful or not – and deployed a total of 146 less-lethal impact munitions and over 100 uses of the baton. As a result, 246 individuals claimed injury (from two broken bones to bruises and numerous claims of emotional distress) and 18 officers were treated for various abrasions and contusions by Emergency Medical Technicians at MacArthur Park, or later at hospitals, and released.

### C.    Analysis of May Day 2007

The six primary factors that influenced the events that day included: (1) planning; (2) tactics, including the use of force; (3) command and control; (4) situational awareness; (5) training; and (6) individual responsibility.

#### 1.    Planning

There were several factors that contributed to the inadequate planning for the afternoon march and rally in MacArthur Park. The first was Deputy Chief Carter's underestimation of the size and significance of the afternoon rally at MacArthur Park. Recognizing the historical significance of the May Day rally, the Rampart Area command staff requested additional resources and asked that further attention be paid to planning for the MacArthur Park rally. Deputy Chief Carter, however, believed that the "non-permitted" march in Rampart would be much smaller than the "permitted" march in the morning in Central Area, and, as such, focused the planning efforts on Central Area. In fact, as Rampart Area Captain McDonald pushed for further planning meetings in preparation for the Rampart event, he was verbally reprimanded by Deputy Chief Carter.

The fact that Rampart Command assigned the drafting of the Rampart Incident Action Plan (IAP) – the blue print for the management of the event - to several individuals also

402

contributed to the issues in planning for MacArthur Park. These drafters attempted to plan for an ever-changing event, as Deputy Chief Carter modified the number of external resources to be committed to Rampart and the placement of key personnel during the event, up until the morning of May Day. While, a Rampart IAP was produced and disseminated, it was missing several key details essential to proper event management.

Further, various entities, integral to the management of the crowd on May Day, were absent from the planning process altogether. Entities, such as Air Support Division and Metropolitan Division, were not involved in the planning phase. Ultimately, different versions of the IAP were distributed, some entities did not receive or review the plan, and the final version of the IAP was not communicated to all entities involved. Additionally, a viewing area was not provided for the media - contrary to a settlement agreement entered into by the Department - which resulted in the media unknowingly encircling themselves in and around MacArthur Park, placing members of the media directly in the path of the move to clear the park.

<h3 style="text-align:center">2.    Tactics</h3>

A number of tactical deficiencies arose on May Day, ultimately resulting in the movement of a small group of unruly individuals into a large group of peaceful participants. Tactical issues included:

- The failure to guide marchers into the appropriate area of the park;
- Use of force tactics, including the use of the baton and less-lethal impact munitions;
- The treatment of the media;
- Crowd dispersal strategies;
- The lack of an arrest posture;
- The utilization of available resources; and
- The use of the sound truck.

<u>Failure to Guide Marchers</u>

One of the first tactical deficiencies identified during this review was the failure of the Incident Commander to properly prepare for the arrival of the marchers into MacArthur Park. During past events, officers were pre-deployed to assist with this process. This tactic was not utilized on May Day. This failure caused officers to hastily react to a crowd unexpectedly moving toward them on Park View Street. The decision to deploy a squad of motor officers to push the crowd east on Wilshire resulted in a compression of the crowd, causing tension in the crowd to rise and encouraging others to participate in disruptive behavior.

<u>Use of Force</u>

By the time the events ended in MacArthur Park, more than 100 uses of the baton and 146 less-lethal impact munitions had been deployed. It appeared that some of the officers and supervisors in MacArthur Park believed that, contrary to Department policy, baton strikes could be used to compel a person to disperse, even if they were merely standing in front of the officers, failing to respond to direction. Further, non-target and target specific less-lethal

10

impact munitions, were deployed absent the intent to affect an arrest - in contrast to the law which states that use of force should be deployed as a precursor to an arrest.

Treatment of the Media
The treatment of some members of the media raised questions about the training, discipline and understanding of the role of the media on the part of some of the officers in MacArthur Park that day.  Some officers did not adhere to the guidelines required pursuant to agreements between the Department and the media, including those outlined in the *Crespo v. City of Los Angeles* settlement, arising out of the 2000 Democratic National Convention.  For example, in the move to clear the park, some officers pushed and struck some members of the media to move them from the area, rather than allowing the media to move safely into a designated media viewing area.

Crowd Dispersal Strategies
The declaration of an unlawful assembly should be resorted to only when there are no other reasonable alternatives.  The decision to declare an unlawful assembly and disperse the crowd on May Day 2007 appeared to be made quickly, without consideration of the impact a dispersal order would have on those exercising their First Amendment rights.  As a result, errors were made, including the fact that Captain Egan, Commander Gray, and/or Deputy Chief Carter, apparently did not consider isolating and arresting those engaging in unlawful conduct; a complete dispersal order was not given in either English or Spanish; the dispersal order was not specific to the location of the unlawful conduct; and the tactics employed to move the unlawful individuals were flawed, in that a small group of unlawful individuals were ultimately pushed into a large group of peaceful, law-abiding individuals.

Arrest posture
It appeared that the Department leaders for this event did not consider adopting a posture of isolating and arresting those who were engaging in unlawful activity or disrupting the rally.  Instead, they decided to declare an unlawful assembly and clear the entire area.  While there is no official Department policy on when an arrest shall or shall not be made in a crowd control situation, as each instance is unique, the crowd may have reacted differently if they had seen people committing unlawful acts being isolated from the crowd and arrested.  Moreover, arresting and removing those violating the law may have reduced the need to declare an unlawful assembly, offering a greater level of protection of First Amendment rights.

Utilization of Available Resources
Although, ultimately,  there were nearly 450 officers deployed to the MacArthur Park event who were available to assist Metropolitan Division in crowd movement, Metropolitan Division performed the movement of the crowd almost completely on its own.  Proper coordination with the available resources may have provided the ability for officers to pass people, who were either unable or unwilling to leave, through the skirmish line to awaiting officers who could either redirect or arrest the individuals as appropriate.

404

Use of Sound Truck

The sound truck was used minimally throughout the event to encourage the cooperation of the crowd, provide direction and/or attempt to separate the individuals who were being disruptive. While the sound truck was requested by field supervisors to provide a dispersal order at 7th and Alvarado, the sound truck never appeared.

### 3.    Command and Control

Knowing who is in command during an incident is of utmost importance. There must be one person who understands the objectives of the plans, receives tactical information and makes decisions with a complete understanding of all that is occurring. The Rampart Area IAP identified Captain Egan as the Incident Commander – the person in charge of the events in MacArthur Park. Both Commander Gray and Deputy Chief Carter, however, began to make decisions and give orders very early into the afternoon. Though Commander Gray and Deputy Chief Carter made operational decisions and directed action at various times throughout the afternoon, neither individual exercised the requisite "transfer of command" process.

As a result, subordinate officers witnessed conflicting direction and obvious tension between the three command officers. As subordinates from various positions in the field made numerous requests over the radio that went unacknowledged and unanswered - including requests for the sound truck and repeated requests for action as officers were being struck with objects thrown by people in the crowd - officers began to make independent decisions in efforts to control the crowd. In fact, during critical tactical engagements in and around MacArthur Park, not one order was provided over the radio by Captain Egan, Commander Gray, Deputy Chief Carter, or Captain Tom McDonald, who was in the Rampart Incident Command Post monitoring the radio frequencies. This seemed to result in various forms of miscommunication.

### 4.    Situational Awareness

Deputy Chief Carter, Commander Gray and Captain Egan failed to maintain communication with those in the field in order to obtain a full picture of the unfolding events. As a result, these men were unable to fully understand the situation before them. While many individuals had varying degrees of situational awareness that day, none knew of the scope of the tactical movements and action of officers in MacArthur Park.

The Incident Command Post, had limited situational awareness due to several factors including the lack of an aerial image from the Air Unit and limited resources to monitor the radio. Moreover, Deputy Chief Roupoli, in the Multi-Agency Coordination Center (MACC), which was responsible for oversight of all events in the city on May Day 2007 and the coordination of all resources, received little to no information from the Incident Command Post or the command staff in the park. Consequently, May Day saw an Incident Commander, an Incident Command Post and the MACC all lacking the situational awareness required to manage such an event.

12

### 5.      Training

Research conducted in the preparation of this report revealed that Metropolitan Division received no training in crowd control in the 18 months leading up to May Day 2007, as the Metropolitan Division Basic Course was cut sometime in 2005.  Further, when Metropolitan Division personnel were receiving regular crowd control training, prior to 2005, the content of that training may have been incomplete, or even inaccurate.  These issues were not caught, however, as at that time Training Group was not tasked with providing oversight of the training of specialized units such as Metropolitan Division.

Issues that may have arisen out of inadequate or inconsistent training included the fact that some officers and supervisors in MacArthur Park appeared to believe that baton strikes could be used to compel a person, not engaging in aggressive and/or combative behavior, but merely standing in place, to disperse.  Further, as previously discussed, proper training in regard to the treatment of media was apparently lacking.

### 6.      Individual Responsibility

Every Department employee has an individual duty to act appropriately and every officer is responsible for his or her own actions.  Additionally, every Department employee, whether officer or supervisor, has a duty to stop a fellow officer who is engaging in misconduct.  Therefore, the events of May Day 2007 raised two significant questions: *Why did some officers appear to have performed inappropriately? And, why didn't other officers present make an attempt to intervene?*  In the end, any individual who either engaged in misconduct or witnessed unacceptable behavior, yet did nothing to stop it, must be held accountable.

### D.      Action Taken Since May Day 2007

Immediately upon being notified of the events at MacArthur Park, Chief Bratton responded to the park and met with Deputy Chief Carter and others.  Later that night, he called a meeting with his top executive staff to discuss his concerns.  Soon thereafter, Chief Bratton launched four investigations: a personnel complaint investigation; a use of force investigation; a criminal investigation as to those who threw objects at officers; and an investigation by the Office of Operations, which included orders to produce an internal After Action Report.  Moreover, Chief Bratton ordered the examination of events and this report to the Board of Police Commissioners by Deputy Chief Michael Hillmann and Police Administrator Gerald Chaleff.

Approximately one week after May Day 2007, Chief Bratton made personnel changes to his leadership team to ensure the Department's ability to manage such events in the future would not be compromised.  As such, Deputy Chief Carter was removed from his position of Commanding Officer of Operations-Central Bureau and Commander Louis Gray, Assistant Commanding Officer of Operations-Central Bureau was reassigned to the Office of Operations.  Chief Bratton also made an unprecedented move by relieving Metropolitan Division officers from their field duties until they completed mandatory training.

Chief Bratton subsequently directed Deputy Chief Hillmann, the Commanding Officer of Operations-West Bureau, to prepare training for Metropolitan Division and all command staff within the organization. Chief Hillmann immediately convened a team of Department experts to review and identify points of failure in regard to command and overall operations of the May Day incident.

Additionally, beginning July 2007, Training Group and Metropolitan Division launched the Department-wide training course on Mobile Field Force and crowd control tactics and use of force policy for all personnel assigned to the Office of Operations. As of October 1, 2007, approximately 2,000 field officers and supervisors have been trained and more than 6,500 members of the Department will be trained by March 2008. The Department has also provided training for officers from the Department of General Services Office of Public Safety and the Los Angeles Unified School District Police. Additionally, members of the Los Angeles Human Relations Commission, the media and the ACLU have been provided the opportunity to view the training.

In the weeks after May Day, Chief Bratton held meetings with representatives of the media, the Hispanic community, organizers of May Day, the ACLU and other interested parties. Additionally, at Chief Bratton's direction, in response to a request by the City Council, the Department issued a report to City Council on May 29, 2007.

Chief Bratton further recognized the need to appoint a single entity to be responsible for institutionalizing lessons learned and to help establish policies and procedures for the management of a variety of large-scale incidents (e.g., earthquakes, floods, terrorist activity and demonstrations). He believed having this responsibility divided among several entities in the past may have led to inconsistencies in the planning, operations and after action review of incidents throughout the City. Chief Bratton was also concerned that, as in the past, lessons learned might be lost without a single entity to institutionalize the necessary changes. Thus, on July 1, 2007, the Incident Management and Training Bureau (IMTB) was established.

## E.    Crowd Management After May Day 2007

Following May Day 2007, it was recommended to Chief Bratton that the Department utilize the Incident Management Team (IMT) concept. An IMT is comprised of specialists who are experienced leaders, decision makers and strategic thinkers familiar with all aspects of emergency management, to be responsible for managing large, complex incidents. Recognizing the benefits of this concept, Chief Bratton directed the IMT to be incorporated into the practices and policies of the Incident Management and Training Bureau.

The Department utilized the IMT concept to successfully manage several large-scale events after May Day 2007, including the May 8, 2007 Griffith Park Fire, the May 17, 2007 Procession For Justice March and Rally, the June 15, 2007 Justice for Janitors March and Rally and the June 24, 2007 Full Rights for Immigrants March and Rally. Therefore, the Department has now adopted the IMT concept as its standard.

14

407

**F.    Recommendations and Conclusion**

The recommendations of this report differ from the recommendations of reports and commissions that have preceded it, in that they will be followed by a clear plan for implementation and institutionalization via the Incident Management and Training Bureau. The efforts of the Department, to date, indicate its commitment to ensuring that these recommendations will be ingrained in Department policies and procedures that will remain long after those in command today have moved on.  To this end, it is expected that all of the recommendations will be implemented within one year of the publication of this report.

The recommendations are detailed in the body of this report and are divided into five distinct areas: (1) policy; (2) planning; (3) command; (4) training; and (5) auditing.

15

II.    **MAY DAY 2007**

    A.    **Planning**

As in any large-scale, planned event, a variety of Department entities played key roles in a combined effort to develop a safe and effective response to the events of May Day 2007. In anticipation of the May Day 2007 demonstrations, Department entities prepared four Incident Action Plans (IAPs). An IAP is meant to serve as the blue print for the management of an event, and should contain all information necessary for the execution of an event, including details pertaining to resources, equipment, communications and contingency plans. Thus, a Central Area IAP, Rampart Area IAP, Hollywood Area IAP, and Multi-Agency Coordination Center IAP were developed to safely police the large numbers of marchers that typically participate in May Day events throughout the City.

The Hollywood IAP was drafted in preparation for anticipated school walkouts in the Area based on events in 2006. The Multi-Agency Coordination Center IAP was to be utilized in the Department's efforts to coordinate the responses and resources citywide.

May Day organizers were planning for two marches and two demonstrations, one in the morning in downtown Los Angeles (Central Area) and another in the afternoon to end at MacArthur Park (Rampart Area). The following discussion focuses on the planning within Central Bureau, Central Area and Rampart Area, and their respective IAPs.

    1.    **Central Bureau's Perception of the Event**

While Central Bureau's planning process for the May Day events began sufficiently in advance of the rally - as early as six weeks prior - and involved several Department entities, Central Bureau's primary focus was on facilitation of the first march scheduled to occur in Central Area on the morning of May 1, 2007. In the month prior to the May Day event, the Commanding Officer of Operations-Central Bureau, Deputy Chief Lee Carter, conducted a meeting with event organizers and city entities involved in preparing for May Day. Carter briefed attendees about the morning events in Central Area and the afternoon events in Rampart Area, and told the group that the second march in Rampart Division, as explained later in this report, would be denied a permit. According to several meeting participants, the meeting focused almost solely on the planned (permitted) march and rally in Central Area, sponsored by the March 25 Coalition.

Throughout discussions with event organizers, Rampart Area personnel sought to establish a coordinated response to the planned demonstrations. According to the commanding officers of Rampart Area these efforts, however, were met with resistance from Operations-Central Bureau. When Captain John Egan, the Rampart Area Commanding Officer and Captain Tom McDonald, the Rampart Area Patrol Commanding Officer, discussed the need to solidify Rampart Area's May Day plans with Deputy Chief Carter, Carter - without explanation - advised that the non-permitted march in Rampart Area would be much smaller than the permitted march in the morning in Central Area. In an interview after May Day 2007, Captain Egan recalled that he addressed the historical significance of a rally in MacArthur Park with Carter (citing the problems that occurred in the park at the end of the May Day

16

409

2006 demonstration), however, Carter advised that the group of people attending this march
would not only be smaller than the group last year, but would also have a different mindset
than the groups who caused trouble in years past.

This emphasis on the morning march was further exemplified by the fact that Deputy Chief
Carter made himself the Incident Commander and Commander Gray the Deputy Incident
Commander that morning in Central Area, while Deputy Chief Carter designated Rampart
Area Captain Egan as the Incident Commander in the afternoon.

According to Captain McDonald in an interview held after the events of May 1, when
Rampart personnel attempted to hold additional meetings with various responsible entities to
coordinate a response, including the media and the Los Angeles Fire Department, Deputy
Chief Carter verbally reprimanded Captain McDonald for straying from the focal point - the
downtown event in Central Area.  As a result, these additional meetings never occurred.

During the planning process, Central Bureau denied the following Rampart Area requests:
- 4 radio frequencies (provided one)
- 4 Public Service Representatives dedicated to the Incident Command Post to
  monitor radio transmissions[3] (not provided)
- Additional officer resources (some provided at the last minute)
- 2 sound trucks (provided one)
- Metropolitan Division Mounted Platoon-E (not provided)
- 89 supervisors and 889 officers (provided 450 officers at the last minute)

## 2.    Drafting of the Rampart Area IAP

In the month prior to May Day, Rampart Area staff rewrote the Incident Action Plan (IAP)
more than two dozen times, as dialogue continued between the event coordinators and the
Department.  While many planning documents in the Department are routinely subject to
multiple rounds of edits, the process here was particularly challenging due to the fact that
multiple individuals were called upon interchangeably to draft the IAP.

According to Department time-keeping records, the senior commanding officer of Rampart
Area, Captain Egan, took ten days off prior to the May Day event to attend non-mandated
training.  This left the newly appointed junior commanding officer, Captain McDonald,
responsible for much of the last minute planning for this event.

As early as six weeks prior to May 1, 2007, Sergeant Richard Kanzaki, Special Events
Coordinator for Rampart Area, began preparing the Rampart IAP.  Later, as Captain Tom
McDonald came to believe the public assembly would require a larger response from
Rampart personnel, he directed Lieutenant Jorge Rodriguez to draft the plan, thus
marginalizing Sergeant Kanzaki's responsibility.  Finally, Captain McDonald made the
decision to involve in the writing process those lieutenants who would ultimately be
managing large groups of officers at the event.  According to Rampart lieutenants

---

[3] Public Service Representatives work for Communications Division and are specially trained in monitoring
radio transmissions and help calls.

interviewed after May Day, at different times, McDonald reached out to Lieutenants Wesley Buhrmester, Jorge Rodriguez and Roseira Moreno - all District Policing Lieutenants assigned to Rampart Division - to develop the Rampart IAP. The three lieutenants met and agreed to develop various parts of the reports: Rodriguez would write the tactical portions of the IAP; Buhrmester would wordsmith the document; and Moreno would gather supporting documents related to resources and intelligence.

In considering the tactical needs for the march in Rampart, Lieutenant Rodriguez ensured that all the Senior Lead Officers (SLOs) contacted business owners around MacArthur Park to advise them of the possibility of large numbers of demonstrators in MacArthur Park on May 1st. To prevent property damage, the SLOs recommended that the businesses close if a demonstration ended up in MacArthur Park.[4] Rodriguez also ensured that the Department of Recreation and Parks emptied the trash dumpsters and bins adjacent to the park, knowing that in prior years, individuals retrieved projectiles previously placed in dumpsters and threw them at police officers. Lieutenant Moreno, meanwhile, identified Sergeants Chris Ramirez and Jonathon Pinto as designated Spanish speakers in the event directions in Spanish were necessary. Lieutenant Buhrmester contributed to the drafts as needed and assisted the other lieutenants by taking some of their regular administrative duties.

Despite the efforts of all three lieutenants, the shared authorship process was disjointed, and ultimately led to a lack of accountability for the finished product. Although the lieutenants had clearly delineated roles, Captain McDonald routinely used each of them as primary authors. In interviews held after May Day, each lieutenant would describe that when one lieutenant was on a day off, McDonald would forward a draft of the IAP to one or both of the others and ask for changes. With no system in place to track the changes made by each lieutenant, one would attempt to continue work, not knowing what the others had already completed or where they had left off. This process proved to be ineffective, added confusion to an already complicated task and contributed to errors and omissions in the final product.

Captain McDonald, too, shared the lieutenants' frustration as their work schedules made Rodriguez, Burhmester and Moreno difficult to reach. Therefore, McDonald assigned work to whichever lieutenant was available. Additionally, none of the lieutenants were designated to review the final product. As a result, Sergeant Kanzaki and Lieutenants Buhrmester, Rodriguez and Moreno all became partially responsible for the completion of the Rampart IAP, but none were wholly accountable for its contents. Ultimately, however, Captain McDonald, should have ensured that the final Rampart IAP was complete and accurate.

### 3.    Changes in Planning

Resources committed to Rampart were not solidified by Central Bureau until just hours before the event. By April 18, Rampart personnel had learned that the event organizer intended to hold a rally in MacArthur Park, but the concept of "feeder marches" was not solidified until later. As explained below, the size of the demonstration, the route of the march and the ultimate rallying point were not solidified until April 30, mere hours before

---

[4]  In fact, the majority of businesses on Alvarado Street between 6th Street and 7th Street (the east side of MacArthur Park) did close at 3:00 p.m. on May 1, 2007.

the demonstration.  Finally, Rampart personnel were forced to revise the entire IAP multiple times as Operations-Central Bureau shifted its stance from not granting resources to granting resources from the Central Area event.  These changes to the event location and committed resources led Lieutenant Moreno to describe the event in an interview as "a moving target."

### a.    Event Details

Between March 14 and April 24, 2007, organizers of the Rampart Area event, the Multi-Ethnic Immigrant Worker Organizing Network (MIWON), negotiated the details of the event with the Department in an effort to obtain a permit for a march from the Board of Police Commissioners.

On April 24, 2007, the proposed permit for the MIWON event was heard by the Board of Police Commissioners.  The Department's recommendation, which the Commissioners accepted, was to conditionally approve the permit, provided MIWON alter the location of the proposed event to downtown, to enable the Department to respond and provide resources necessary to ensure the protection and safety of persons and property elsewhere in the City.  MIWON maintained its interest, however, in securing MacArthur Park as a demonstration/rally site.

On April 30, 2007, the Special Event Permit Unit verified MIWON had obtained a Park Use Permit from the Department of Recreation and Parks for a rally to be held in the MacArthur Park soccer field on May 1, 2007 (1500-2100 hours), with participation estimated at 5,000 to 10,000 people.  (See Addendum A.)

A permit for the march to the park, however, was never granted by the Board of Police Commissioners.  This decision reinforced Deputy Chief Carter's perception regarding the lack of significance of the afternoon event in Rampart Area, even though he was aware of the planned rally in MacArthur Park.  Though a march permit was not granted, nothing would prevent the individuals from walking to MacArthur Park on the sidewalks.

### b.    Resource Commitments

As May Day events are part of a long history at MacArthur Park, Rampart Commanding Officers knew to plan for large numbers of demonstrators.  Therefore, in preparation for a large demonstration, Rampart Area requested 89 supervisors and 889 officers through Operations-Central Bureau, including Mobile Field Forces, bicycle officers and motorcycle officers.  Operations-Central Bureau denied this request.  As a result, Captain McDonald advised Lieutenant Rodriguez to prepare three different IAPs: the first was to reflect a plan assuming Operations-Central Bureau granted all of the resources requested; the second was to assume one-half of the requested resources would be granted; the third was to be designed on the premise that Rampart Area would receive no outside resources.

According to interviews of Rampart staff, in the weeks prior to May Day 2007, Deputy Chief Carter moved from a complete denial of additional resources for Rampart Area to a last minute provision of resources.  Initially, Rampart Area was denied additional officers and

19

was told to plan to support the afternoon events with only the support of Rampart Area's 26 supervisors and 153 officers.  Not until Friday, April 27, did Rampart staff learn that in addition to their own officers, they would be loaned South Bureau bicycle and motorcycle officers (an additional 12 supervisors and 102 officers), bringing Rampart Area's total available resources to 38 supervisors and 255 officers – still less than one-third of the total number of resources originally requested.  Then, late into the planning process, Rampart Area was notified that it could utilize officers from the morning Central Area march and rally if necessary.  Due to these last minute decisions, however, no adequate plan was developed to coordinate with Central Area resources.  Though requests were made, Rampart Area personnel received no information in regard to the number of Central Area resources to be provided, and had no idea as to what type of resources to expect until Central Area resources arrived at the Rampart Area Incident Command Post that afternoon.  Thus, May Day began without a clear understanding of the number of outside resources Rampart Area would be provided.

During interviews after May Day 2007, Captain McDonald expressed frustration in regard to this "moving target."  Captains Egan and McDonald planned to capitalize on Captain McDonald's years of expertise in crowd management by teaming him with Captain Egan in the field throughout the May Day events.[5]  According to Egan and McDonald, on Friday, April 27, 2007, they shared this plan with Deputy Chief Carter, who in turn approved the strategy.

On the morning of May 1, 2007, however, a last minute change in plans occurred.  According to Captains Egan and McDonald, Commander Gray directed McDonald to remain in the Incident Command Post as the Executive Officer,[6] and for Egan to remain in the field, because, in Gray's opinion, those were the traditional roles of a Captain III (Egan) and a Captain I (McDonald) during major planned events.[7]  In an interview after May Day 2007, Gray confirmed that this last minute change was made based on a conversation he had with Deputy Chief Carter.

### 4.    The Rampart Incident Action Plan

Crucial to the successful management of any pre-planned large scale event, such as May Day, is the Incident Action Plan (IAP).  An IAP for such a large scale event should be reviewed and approved by Special Operations Bureau and then by the Office of Operations to

---

[5] Captain McDonald previously served as the West Lost Angeles Special Events Coordinator, and was responsible for planning and managing numerous public assemblies, marches and crowd control situations. Captain McDonald also assisted the Salt Lake City Police Department in the development of crowd control training in preparation for the 2002 Winter Olympic Games in Salt Lake City, Utah, and in the management of the events.
[6] The Executive Officer is defined in the LAPD First Responder's Field Operations Guide (FOG) as:  "The person appointed to this position must be completely familiar with the Incident Command System and must have experience in command post operations.  The Executive Officer is responsible for ensuring that a smooth operation of the command post takes place and that ICS is implemented in accordance with Department policy…"
[7] Commander Gray's opinion was inaccurate in that the Department has been staffing Incident Command Posts based on an individual's level of expertise, and not according to rank, on a regular basis since the 2000 Democratic National Convention.

ensure that it is complete and adequately prepares the Department for the event.  As
discussed below, there is no record of that review or approval in this instance.  The Rampart
IAP ultimately failed to address several areas.  Concerns regarding the contents of the IAP
included the following:

- The Organizational Chart was incomplete and inconsistent.
- The number of personnel assigned was unclear.
- No telephone roster was included.
- The use of Observation Posts was unclear.
- No medical treatment plan was included.
- Communications frequencies were listed in several different sections, rather than in one place.
- A media viewing zone was documented only in the version used by the Rampart Command Post.  This section was missing in the version provided to the Multi-Agency Coordination Center.
- A training section was included only in the version used by the Rampart Command Post.  This section was missing in the version provided to the Multi-Agency Coordination Center.
- Resources, blocking forces, sound trucks or greeters, to ensure that the marchers would proceed on a designated path and not disperse were not indicated.
- Strategies to ensure demonstrators remained in the proper area of the park were not included.
- Coordination plan for the use of resources from Central Area was not included.[8]

Of particular significance is the fact that the IAP Organizational Chart was incomplete and
inconsistent.  For example, an Information Officer was not designated; i.e., no one was
assigned to coordinate with the media.  Additionally, Captain McDonald was listed on the
Organizational Chart as the Executive Officer in the Incident Command Post, but listed in the
body of the IAP, as the Assistant/Deputy Incident Commander in the field – obviously these
two positions cannot be staffed by the same person.

Also missing from the Rampart IAP was an arrest protocol.  While discussion at various
Rampart roll calls on the morning of May Day included the fact that criminal activity would
not be tolerated, and the Rampart IAP discussed the potential need for crowd control tactics,
it did not state if or how those who engaged in criminal activity would be separated from the
crowd and arrested.  (The requisite review and approval of IAPs is discussed below.)

### 5.    Distribution of the IAP

Numerous Department and non-Department entities are critical to planning such a large-scale
event.  Here, various entities, integral to the management of the crowd on May Day, were
absent from the Rampart planning process altogether.  In contrast to the Central Area
planning phase, entities, such as Air Support Division and Metropolitan Division, were not

---

[8] This may have been difficult due to the fact that Rampart was not aware of the commitment of Central Area
resources until the last minute.

414

involved in the Rampart Area planning phase. The reason these entities were not involved could not be determined. This is important because, without Air Support personnel involvement, it was not aware of how many helicopters would be necessary or with what capabilities each should be equipped. Further, without Metropolitan Division's involvement, the Commanding Officer of Metropolitan Division was not aware of what its role or mission would be that day in relation to the event and did not inquire.

In addition to not being included in the planning process, some entities were not provided a copy of the Rampart IAP in time to review it, and others were not provided a copy at all. The usual information-sharing stage with involved entities such as Metropolitan Division, The Los Angeles Department of Transportation (LA-DOT) and the Los Angeles Fire Department (LAFD) did not occur in Rampart Area. Moreover, the final version of the Rampart IAP, distributed to entities outside of the Rampart command, omitted significant pieces of information. Furthermore, none of the Mobile Field Force leaders responding in the afternoon from Central Area received an IAP.[9] Finally, Metropolitan Division, which, as events unfolded in the early evening of May 1, 2007, became the principal entity involved in the events in MacArthur Park, operated without ever having received or reviewed the Rampart IAP, even though they knew they might be deployed to the park that day.

Also unclear in regard to the review of the Rampart IAP was Deputy Chief Carter's role in this process. According to an interview with then Central Area Patrol Captain Jodi Wakefield, it was Deputy Chief Carter's practice, as the Commanding Officer of Operations-Central Bureau, to review and scrutinize all Central Bureau IAPs carefully. Captain Wakefield recalled that even though Central Area was proficient in developing IAPs and managing large events, Deputy Chief Carter routinely scrutinized Central Area's plans, including the Central Area IAP for May Day 2007, and often made very detailed modifications before an IAP would be approved. Standard approval of an IAP, prior to May 1, 2007, would have included the review and approval of the Bureau Commanding Officer (Deputy Chief Carter) and the Commanding Officer of the Special Operations Bureau (Deputy Chief Roupoli). It is unclear, however, if Deputy Chief Carter scrutinized the Rampart IAP as he did the Central IAP in preparation for May Day 2007. Deputy Chief Roupoli recalled receiving the Rampart IAP a day or two before the event, but did not recall providing a formal review or approval.

### 6.    Planning with the Media

The Department Training Bulletin, *Police and Media Relations – Part III, Volume XXXIV, Issue 7*, dated August 2000, (see Addendum B) as well as the Department's Media Guide,

---

[9] A MFF is defined as:

- A platoon-sized tactical force (approximately 51 people), rapidly assembled consisting of percentage of all on-duty personnel, specifically capable to respond to events as a unit; and
- Are a stand alone group that is capable of mobility, physical presence, supervision, and command; and
- Are tactically trained and capable of mass arrest; and
- Are utilized during pre-planned and spontaneous events; and
- Are capable of deployment within 45 minutes.

22

address the Department's role and responsibilities pertaining to the creation of a media safe zone. The training bulletin (quoted here from the Media Guide) states:

> The selection of a news media viewing area will take into consideration public and officer safety, police tactics, input provided by the news media, if any, and the ability of the Department to prevent the location from becoming part of the impacted area. The final selection of the viewing area location will be made by the Incident Commander (IC) in charge of the event. Additionally, if due to changing conditions the initial area no longer affords the news media a reasonable view of the event or becomes a tactical concern for the IC, the IC will relocate the news media area. . . . The Department IC will designate an Information Officer as part of the Incident Command System in order to facilitate interaction with the news media. The Information Officer will be clearly identified at the scene.

According to Captain McDonald, when he asked Operations-Central Bureau about setting up a planning meeting that would include representatives from the media in preparation for the May Day Demonstrations, Deputy Chief Carter advised McDonald that the non-permitted event was not going to attract large crowds and that the meeting would not be necessary. Deputy Chief Carter also advised Captain McDonald that, if he were still concerned, McDonald could send a request to have this meeting with the media and others through the Operations-Central Bureau chain of command. However, in interviews held after May 1, McDonald indicated that since Deputy Chief Carter, who was the commanding officer of the Bureau, had already disapproved the meeting, McDonald believed sending a request up the chain of command would be futile. Thus, while Central Area did hold planning meetings with the media, Rampart did not.

There was clearly a failure to plan for the media in the Rampart IAP. It is important to note that one version of Rampart's IAP, prepared on April 30, 2007 at 6:45 p.m. (only hours before the submission of the final version) included a Media section which read:

> The media will be directed to a staging area on Park View Street between 6th and 7th Street. In the event of a need for the media to evacuate their site, they will be directed to the west side of Alvarado Street between 6th and 7th Street.

The IAP distributed to the Multi-Agency Coordination Center and to Media Relations, however, was missing this section. There is no known explanation for the omission of this key section.

The Department Public Information Officer (PIO), Ms. Mary Grady, held meetings with her internal Media Relations Section team to develop a PIO response for the May Day activities, as she typically would in preparing for such an event. Three teams were designated to assist with the flow of information between the Department and the Media. The PIO had requested but not received a Rampart IAP prior to May 1, 2007. When the PIO finally received an IAP

23

from Rampart on the day of the event, there was no information regarding a media viewing area. This is significant, because the PIO typically issues a press release detailing the events of the day, and listing the location of the media viewing area. Thus, the PIO distributed the press release to the media with the Rampart media viewing area listed as, "to be determined." This left the media without guidance as to where to locate their trucks and equipment on MacArthur Park.

Further evidence of the lack of planning for the media is apparent in that the media set up at a location within the park, on their own with no direction, unknown to most officers and supervisors at the park. The area where the media set up tents earlier in the day when the park was peaceful, ended up being in the line of fire of less-lethal impact munitions as seen on several media and Department video tapes.

### 7.    Conclusions Regarding Planning

While the lessons learned from May Day 2006 were available to the Department for its planning for 2007, many of these lessons were not applied. As is evident by the lack of focus and concern on the events planned for the afternoon in Rampart Area, and despite the historical significance of a rally on May Day in MacArthur Park, it appears that Deputy Chief Carter believed that the non-permitted march in Rampart would be much smaller than the permitted march in the morning in Central Area. According to multiple members of Rampart Area staff, Deputy Chief Carter communicated that the march would be smaller and insignificant because it was not permitted, and stated that if people did march in Rampart Area, they would be allowed to walk on the sidewalk only, and would be arrested for any violations of the law.

In hindsight, this was a mistake. A number of non-permitted marches have occurred over the years that have required significant crowd management efforts on the part of the Department. Moreover, the organizers had obtained a Park Use Permit, MacArthur Park had seen a large number of demonstrators in the past, and, no matter the size of the demonstration, participants would have to get from Central Area to MacArthur Park somehow. Further, it was likely that the march to Rampart Area would require resources beyond those Rampart Area would be able to provide on its own, particularly if they were to assume a posture of arresting marchers.

The issues in the planning phase ultimately laid the foundation for what was to occur.

### B.    Central Area March and Rally

The events in Central Area that morning, sponsored by the May 25th Coalition, began with a permitted public assembly at Olympic and Broadway Streets at 8:30 a.m. At approximately 10:00 a.m., the crowd marched to City Hall for a rally. The Central Area event, entitled "The Great American Boycott 2007," ultimately attracted a crowd of approximately 15,000 to 25,000 individuals.

In preparation for the day's events, Central Area Command Officers ensured that the Central Area Incident Command Post was operational early that morning. Scouts and shadow teams,

24

417

including a crime suppression detail and plain clothes vice officers, were deployed to provide information to the Incident Command Post on the composition and general mood of the crowd, and Air Support Division regularly provided crowd estimates. Additionally, a media viewing area was identified, and a Media Relations liaison was present in the Incident Command Post to coordinate communication with the media. A Department videographer also arrived early for a briefing on the events of the day. A sound truck was situated at the Incident Command Post, ready to deploy to the march or rally if needed.

Central Area command also held two briefings that morning: one at the Incident Command Post; and a second briefing with the majority of the officers to be deployed that morning.

The Central Area IAP identified Deputy Chief Carter as the Incident Commander and Commander Gray as the Deputy Incident Commander. For the most part, Deputy Chief Carter walked at the front of the march that day, with the designated Operations Chief for that morning, Central Area Commanding Officer, Captain Andy Smith. Commander Gray indicated that he also participated with Carter and Smith that morning. Central Patrol Commanding Officer, Captain Jodi Wakefield served as the Executive Officer at the Incident Command Post that morning at Central Area.

In an interview after May Day 2007, Captain Wakefield stated that it was common practice, during her tenure at Central Area, to have Captain Smith placed at the front of the march, with Captain Wakefield placed at the back. However, several weeks before the event, Deputy Chief Carter indicated that he wanted a Captain at the Incident Command Post. It was decided that Captain Wakefield would serve in that capacity, as she and Captain Smith wanted a chance to provide other Captains with the opportunity to participate in the field. In the end, Captains Mark Olvera, Ann Young, Eric Davis and Tom Brascia participated in the field that morning; each being assigned a section of the event.

Also present at the Incident Command Post with Captain Wakefield were representatives for logistics, personnel, and the Los Angeles Department of Transportation. Captain Wakefield also had four Public Service Representatives from Communications Division assigned to the Incident Command Post, who monitored each of the four radio frequencies provided to Central Area for the event that morning. The Los Angeles Fire Department Incident Command Post was set up immediately next to the LAPD Incident Command Post to enable a "unified command" city-wide. A "field jail" was staffed by Detectives at the Central Area station who were on stand-by in case the event required mass arrests. Captain Wakefield coordinated with Jail Division for this process. When asked whether a Captain from Metropolitan Division was assigned to the Incident Command Post, Captain Wakefield indicated no, this was not common practice. This was because she, as the Executive Officer of the Incident Command Post, would deploy the Metropolitan Division resources, at the direction of the Incident Commander, if required. Additionally, a Metropolitan Division liaison officer was present in the Incident Command Post.

Assistant Chief Paysinger and Deputy Chief Roupoli remained at the Multi-Agency Coordination Center (MACC), located in the basement of City Hall East, during the morning events as planned. The purpose of the MACC is to ensure that events involving multi-

25

agencies are coordinated properly and resources are tracked and managed through one point. On May 1, the MACC was used as the hub of communications. Assistant Chief Paysinger, Director of the Office of Operations, was the designated Unified Area Commander and Deputy Chief Roupoli was the Deputy Unified Area Commander. (See Addendum C). They were responsible for oversight of all the day's events and communication between the three Incident Command Posts in the field. The MACC would also be available to send resources to any of the three venues (Hollywood, Central or Rampart) if or when the incident commander were to make a request.

Captain Wakefield described the interaction between the Incident Command Post, those in the field and those in the MACC as "very communicative." She communicated from the Command Post with the Captains in the field via radio, with Incident Commander Deputy Chief Carter via cell phone, and with the MACC via telephone. Air Support continuously provided crowd estimates, however, the video downlink from the helicopter was not working. Captain Wakefield also received regular communication from shadow teams that paralleled the Mobile Field Forces in case arrests needed to be made. Captain Wakefield stated that the Central Area arrest posture, which was decided during the planning phase of the event, called for immediate arrests for illegal activity, which was consistent with the protocol for the majority of other crowd management events in Central Area.

Additionally, at noon, all four Metropolitan Division Platoons, which included 25 officers on horseback, arrived at the staging area next to the Central Area Incident Command Post in preparation for the rally at City Hall. While a small group of individuals described by officers as "anarchists" were spotted at the rally and march that morning, the May Day events in Central Area occurred without incident. This small group of potentially troublesome individuals were contacted by officers during the event to ensure they understood the police were aware of their presence. This contact proved to be effective in avoiding problem behavior at the Central event.

Captain Wakefield recalled that during the morning briefing at Central Area, Officer Mary Davis of Metropolitan Division asked if Metropolitan Division resources were able to deploy less-lethal impact munitions. Captain Wakefield responded that while it was wise to have the devices available and ready at a large-scale event, it would ultimately be the Incident Commander who would make that determination, based on the situation at the time Metropolitan Division deemed it necessary. Captain Wakefield believed that such a decision could not be made until there was an actual situation to assess. This belief is consistent with Department protocol on the use of less lethal during crowd control events.

As the event remained peaceful during the first half of the day, Metropolitan Division resources were never deployed in Central Area. Thus, at some time before 2:00 p.m., Metropolitan Division D-Platoon was deployed to MacArthur Park to await the crowd that was expected to arrive later that afternoon.

### C.    The Afternoon March and Rally in MacArthur Park

All times detailed below are approximate, and are based on video or radio timestamps or estimates provided in interviews after May Day 2007. Efforts were made to ensure the

26

419

sequence and approximate timing of events are as accurate as possible. However, it was not always possible to reconstruct events after the fact exactly as they occurred.

Addendum 1 to this report, includes a map of the MacArthur Park area used for reference in reviewing the events of the afternoon of May Day 2007.

### 1.    The March from 3rd Street and Vermont to MacArthur Park

- 2:45 p.m. -    At approximately 2:45 p.m., Chiefs Paysinger, Roupoli and Carter discussed the status of the day's events via conference call. During this call, it was decided that resources would be redeployed, as the immigration march and rally seemed to be peaceful and the majority of participants had dispersed.

- 3:00 p.m. -    Shortly thereafter, Deputy Chief Roupoli spoke with Metropolitan Division Captain Kroeber in regard to redeploying resources. Resources were then redeployed as follows:[10]
- C-Platoon was deployed to Southwest Area to perform crime suppression activities.
- D-Platoon was reassigned from MacArthur Park to the Elysian Park Academy for response to Special Weapons and Tactics (SWAT) related matters.
- B-Platoon was deployed to MacArthur Park.[11]
- E-Platoon (mounted) was ordered to return to the stables.
- Resources from Operations-Central Bureau were ordered to begin migrating toward Rampart Area to support the afternoon rally.

- 3:25 p.m. -    According to the log of the day's events maintained by the MACC, approximately 1,000 participants had gathered in Rampart Area at 3rd Street and Vermont Ave. This intersection served as the primary starting point, from where Cardinal Roger Mahoney led the march to MacArthur Park. Additional starting points were Olympic Boulevard and Vermont Avenue, Washington Boulevard and Vermont Avenue, and Adams Boulevard and Vermont Avenue. These individual "feeder" groups planned to march along Vermont Avenue, merge into one larger group, and then turn eastbound on Olympic Boulevard. The combined groups then planned to march to Alvarado Street and turn northbound, continuing to MacArthur Park, where the permitted rally would be held.

- 3:30 p.m. -    Rampart Area Commanding Officer, Captain John Egan served as the Incident Commander, pursuant to the Rampart IAP, and led the march from 3rd Street and Vermont Ave with Rampart Lieutenant John Romero. Lieutenant Romero recalled

---

[10] Metropolitan Division is divided into platoons. B and C-Platoons are typically assigned to specific geographic areas to perform crime suppression. D-Platoon is the Special Weapons and Tactics (SWAT) unit. E-Platoon is the unit on horseback.
[11] During interviews, several individuals were asked if anyone considered it a problem to send B-Platoon to MacArthur Park, considering it was comprised of officers who had joined Metropolitan Division more recently and were less experienced than others. All individuals indicated that the decision made sense, as B-Platoon is normally assigned to Central Bureau.

420

that Commander Gray was also present at 3rd and Vermont as the march began, and
that Gray was making decisions and providing directions to those present, but did not
take control of the event from Captain Egan.

As the crowd marched toward MacArthur Park, it quickly grew in size, as the
"feeder" groups joined the march along the way.  Captain Egan took an active role in
ensuring the crowd of marchers moved safely along the designated route to
MacArthur Park.  As he walked the route with the crowd, Captain Egan made
numerous broadcasts over the radio, advising, requesting and moving resources.
Captain Egan had at his disposal, approximately 149 officers, most of whom assisted
along the route to MacArthur Park and some of whom awaited the crowd at the park.
Additionally, motorcycle officers and bicycle officers rode along the sides of the
marchers, to ensure they remained on the sidewalks.

- 4:00 p.m. -    By the time the march reached the intersection of Olympic Boulevard and Alvarado
Street, sometime before 4:00 p.m., the crowd had grown so large that it became
impossible for the participants to remain on the sidewalks.  Utilizing his radio
designator, "Commander 2," Egan discussed with officers the necessity to allow the
marchers to take part of the street in order to safely proceed.  Captain Egan also
appropriately adjusted from initial plans in order allow the masses of marchers to
safely cross diagonally across Olympic Boulevard.  Once the crowd became too large
and started to spill into the street, the bicycle and motorcycle officers allowed the
crowd to take over the street and moved into a blocking force to keep the crowd from
spreading out onto other streets not on the march route.

- 4:23 p.m. -    Lieutenant Rodriguez broadcasted, over the radio frequency provided to Rampart that
day, descriptions of a group of 8-10 individuals described as "anarchists."  Lieutenant
Rodriguez also estimated the crowd at 2,000 people.

As Captain Egan and the marchers approached MacArthur Park, he strategized with
Captain McDonald, who was at the Incident Command Post, about the safest way to
direct marchers into the park.  Ultimately, Egan ordered the temporary closure of
Alvarado Street to allow the marchers to move safely into the park.  At that time, the
Department of Transportation was on scene, making rolling street closures, as
requested by Captain Egan.

- 4:25 p.m. -    The front of the march and the organizers reached the intersection at 7th and
Alvarado.

- 4:28p.m. -     A help call was made by an officer for assistance with an arrest at 8th Street and
Alvarado Street.  Upon hearing the help call, Lieutenant Romero left Captain Egan at
7th and Alvarado to continue with the march, and walked to 8th and Alvarado to
provide assistance.  The help call resulted in an arrest for violation of Penal Code
section 148 for "resisting arrest/interfering with a police officer."  Lieutenant Romero
recalled that Deputy Chief Carter also arrived at 8th and Alvarado just as the suspect

was being arrested, and that Carter asked Romero to request an estimate of the crowd size over the radio from the Air Support Unit.

Other than this isolated incident, the march to MacArthur Park was peaceful.

- 4:31 p.m. -   Captain Egan contacted the Incident Command Post and advised them that he needed a unit on Wilshire and Alvarado to hold the eastbound traffic.

- 4:38 p.m. -   Rampart Lieutenant Romero asked the Air Unit for a crowd estimate.  The Air Unit estimates that 3,000 people were in the north part of the park and 2,000-2,5000 people were still on Alvarado.  The Incident Command Post acknowledged receipt of this information.

- 4:54 p.m. -   Twenty-six minutes then elapsed with no reported incidents.  At 4:54 p.m., Deputy Chief Carter requested a crowd estimate at 7th and Alvarado.  Air Support estimated 6,000 to 7,000 people on Alvarado and in the park.

## 2.    The March Arrives at MacArthur Park

- 5:00 p.m. -   By approximately 5:00 p.m., the majority of the demonstrators had moved north of 7th Street and had filtered into the north side of the park.   According to accounts by individuals present, Captain Egan, Rampart Lieutenant Jorge Rodriguez and Operations-Central Bureau Commander Louis Gray were positioned on Park View Street, just north of Wilshire, to monitor the event.

At this time, a large group of people gathered on Wilshire Boulevard.  It appears that some of these people had come from the north side of the park, and some had walked westbound on Wilshire from Alvarado.

In response, Lieutenant Rodriguez, set up a blocking force of uniformed officers to keep people from moving onto Park View Street.[12]  The officers stood on the east side of Park View Street in a line somewhat longer than the width of Wilshire Boulevard.  At this point, their helmets and batons were stowed on their utility belts.  A line of officers was also stretched in a northeasterly direction into the park, in order to encourage the group of people on Wilshire to filter into the soccer field portion of the park through the pedestrian opening at Park View and Wilshire.

In a post-May Day interview, Lieutenant Rodriguez indicated that this blocking force was set up across Wilshire at Park View to prevent this crowd on Wilshire from beginning an impromptu march westbound on Wilshire.  The blocking force was intended to direct the crowd to enter the north side of the park.  While some of the crowd followed this direction, others refused to move from Wilshire.

---

[12] Lieutenant Jorge Rodriguez was responsible for writing much of the Rampart IAP and had briefed all the roll calls on objectives, strategies and tactics.  On the morning of the event, when Captain McDonald was re-assigned to the Command Post, Captain Egan asked Rodriguez to be his assistant in the field.  Rodriguez, in effect, became the Deputy Incident Commander.

422

- 5:02 p.m. -    Lieutenant Rodriguez asked the Incident Command Post to contact event organizer, Victor Narro.  Lieutenant Moreno, at the Command Post, notified Lt. Rodriguez that Victor Narro's voicemail was picking up when she tried to call his cell phone.

- 5:06 p.m. -    Around this time, on Alvarado, officers attempted to clear the remaining marchers so it could be opened to traffic.  A group of individuals, however, refused to clear the street.

- 5:08 p.m. -    The Air Unit "Idaho-70" made an assistance call for a motor officer who appeared to be surrounded by a group of people.  In response, a field lieutenant deployed officers, bike officers and motor officers on both sides of Alvarado just north of 7th to assist in clearing Alvarado of pedestrians.  A group of uniformed officers responded to the location and directed the crowd out of the street and onto the sidewalk.

- 5:10 p.m. -    The Air Unit "Idaho-70" then identified a man in the crowd throwing objects at officers just north of 7th and Alvarado.  For the next several minutes Idaho-70 and ground units maintained a dialogue, pinpointing the suspect's description and his location in the crowd.  The numerous radio transmissions also included unidentified officers making references to forming an arrest team and expressing disagreement as to whether officers should arrest the man, who had moved deep into the crowd.  Ultimately, no arrests were made.

- 5:12 p.m. -    At this time, a crowd was still gathered on Wilshire, between Park View and Alvarado.  A Motorcycle Detail (Motor Team) then moved eastbound on Wilshire from Park View, with their lights and sirens on, in an attempt to move the crowd eastbound on Wilshire toward the larger opening into the park at Wilshire and Alvarado.

In a post-May Day 2007 interview, in describing how this action by the Motor Team occurred, Lieutenant Rodriguez recounted that Commander Gary had asked Rodriguez if the officers on motorcycles, who were present on Park View, could move those refusing to move into the park, eastbound on Wilshire.  Lieutenant Rodriguez was under the impression that Commander Gray was concerned that some individuals in the crowd were trying to "split up" the officers across the park, and thought it would be best to ensure the crowd remained in the north side of the park.  As a result of Gray's stated concern, Lieutenant Rodriguez walked over to the Sergeant Gomez of the Motor team and asked if the move eastbound on Wilshire was possible.  Sergeant Gomez said that it was, and Lieutenant Rodriguez walked back to Commander Gray to let him know.  Commander Gray then directed Rodriguez to tell Sergeant Gomez to proceed with the movement of the crowd eastbound on Wilshire.  Lieutenant Rodriguez did so.

This movement by the Motor Team resulted in the crowd being moved approximately 500 feet eastbound on Wilshire, compressing the westernmost section of the crowd into those standing in the easternmost section.  At that point, the Motor Team

30

423

stopped, and remained in a line across Wilshire, facing east toward the crowd.  As the
Motor Team stopped in front of the crowd on Wilshire, Lieutenant Rodriguez
deployed squads of officers to line the north and south sides of Wilshire for safety
purposes, to prevent marchers from walking behind the Motor Team.  According to
the recollection of individuals present, Captain Egan, Lieutenant Rodriguez and
Operations-Central Bureau Commander Louis Gray remained positioned on Park
View, just north of Wilshire before and during the movement by the Motor team.

Lieutenant Rodriguez indicated that Captain Egan was present when Commander
Gray and Rodriguez had this discussion, but said nothing.  Captain Egan, however,
indicated that he did not hear an order given for the motor officers' move.  Lieutenant
John Romero had joined Egan, Gray and Rodriguez at Wilshire and Park View by
this time.  In an interview after May Day, Lieutenant Romero also recalled that he did
not hear anyone give an order for the movement.  Lieutenant Romero, however,
recalled that when he witnessed the movement, he did not agree with the tactic, as it
seemed to incite the crowd.

- 5:13 p.m. -    During the movement of the Motor Team on Wilshire, three individuals attempted to
pull Sergeant Gomez from his motorcycle.  One individual grabbed Gomez' arms and
a struggle ensued.  Then a second individual also tried to grab Gomez' arm.
Concerned about his safety and the safety of others, Sergeant Gomez let go of his
motorcycle and it fell to the ground.  The individuals then released Gomez.  Gomez
said he then witnessed the individuals running into the crowd.

According to Lieutenant Rodriguez in a post-May Day interview, he witnessed the
motorcycle fall to the ground as he was walking eastbound toward the Motor Team
on Wilshire.  Lieutenant Rodriguez approached Sergeant Gomez.  According to
Rodriguez, Sergeant Gomez gave a description of the men, and then positively
identified the man who had grabbed Gomez' arms standing in the crowd.

Consequently, Lieutenant Rodriguez directed Sergeant Jones, of Rampart Area, to
form an arrest circle around the man and make the arrest.  As this occurred,
Rodriguez indicated that he then saw Deputy Chief Carter in the park for the first
time that day.  Lieutenant Rodriguez indicated that Deputy Chief Carter approached
Rodriguez and adamantly stated that an arrest would not be made; that Chief Carter
had spoken to the Sergeant; that the Sergeant could not identify who pulled him from
his bike; and that the Motor Team needed to move off of Wilshire Boulevard.

Lieutenant Rodriguez indicated that he was confused by this, and walked over to
Gomez again to be sure he had not misunderstood what he believed to be a positive
identification of the suspect.  Lieutenant Rodriguez indicated that Sergeant Gomez
then positively identified the suspect for a second time.

31

In an interview after May Day 2007, Sergeant Gomez stated that he was sure that he could positively identify the suspect, however, he believed that it was Commander Gray, and not Deputy Chief Carter, who ordered that no arrest be made.

Lieutenant Rodriguez walked back to Wilshire and Park View, where Captain Egan and Commander Gray were standing, pulled Captain Egan aside and told him in private about the arrest potential of the suspect and relayed the words and actions of Deputy Chief Carter.  According to Lieutenant Rodriguez, Captain Egan stated something to the effect of, "He's a two-star.  I'm a captain."

Rodriguez then replaced the line of Motor officers on Wilshire with a skirmish line of officers, as the Motor Team returned to Park View north of Wilshire.

In an interview after May Day 2007, Sergeant Gomez stated that while the majority of the crowd was cooperating and moving out of the street, there were eight to fourteen individuals who either had baby carriages with objects to throw or were holding baby dolls to simulate carrying a baby.  He believed that these individuals were attempting to obtain photographs that could be used to depict the officers harming infants.  This description of events was provided by others officers on scene that day as well.

- 5:16 p.m. -    As seen on video, some individuals in the crowd threw objects at the officers at 7th Street and Alvarado.  These objects included wooden sticks and plastic bottles, both empty and filled with water, ice and gravel.

For the next 24 minutes, officers attempted to maintain order at 7th Street and Alvarado, as the some of the crowd threw objects at officers.  At Wilshire and Park View Street, most of the crowd refused to move into the park.  During this time, radio communications were relatively sparse.

At some point before 5:30 p.m., a sound truck was deployed to Wilshire and Park View.

- 5:30 p.m. -    Lieutenant Rodriguez advised the Command Post that he and Captain Egan had located Victor Narro, and that Mr. Narro would have the organizers attempt to move demonstrators back into the park.  The sound truck then moved eastbound on Wilshire and the skirmish line of officers moved westbound and re-formed across Wilshire at Park View.   A Spanish-speaking individual with Mr. Narro then made an announcement from the sound truck.

Lieutenant Rodriguez would later state that he did not know who found Mr. Narro, but that he finally appeared at the sound truck.  In a post-May Day interview, Egan stated that he watched Commander Gray walk into the crowd of people toward the soccer field, escorted by a group of bicycle officers, and return with some event organizers.

425

Metropolitan Division Sergeant Kirk Smith, who was at the Metropolitan Division office, received a call from Metropolitan Division B-Platoon Sergeant Henry Miller, who was at MacArthur Park. Miller indicated that the Incident Commander had called B-Platoon to Wilshire and Park View. Smith then called for C-Platoon to be deployed to the park, and proceeded to the park himself.

In an interview after May Day 2007, Captain Egan recalled that it was Deputy Chief Carter who called for Metropolitan Division resources at Wilshire and Park View.

- 5:45 p.m. -   A group of 20 individuals, described by the Air Unit as "anarchists," were witnessed moving from Alvarado and 7th toward Wilshire and Park View.

### 3.   Strategies to Move the Crowd North Are Devised

- 5:51 p.m. -   Metropolitan Division Lieutenant Roger Murphy and Sergeants Ernie Haleck and Pat Shannon joined Deputy Chief Carter, Commander Gray and Captain Egan near the sound truck on Park View at Wilshire. A discussion about clearing Wilshire took place and the Metropolitan Division supervisors suggested that the officers give the crowd the street, as clearing Wilshire would be very difficult with the limited resources present. Metropolitan Division Sergeant Kirk Smith joined the group at this time and agreed that clearing Wilshire was not a good idea. According to interviews after May Day with the Metropolitan Division supervisors, Deputy Chief Carter and Commander Gray then approved giving the street up to the crowd as a result of this conversation.

At this point, the crowd at Alvarado Street north of 7th Street was relatively calm. The officers along Alvarado withdrew from the center of the street, and bicycle officers were assigned to ride along Alvarado to monitor the crowd.

- 5:55 p.m. -   The Air Unit advised that a group was at Wilshire and Park View running east toward Alvarado Street, attempting to incite those in the crowd, stating over the radio ". . . there's probably 20 of them . . . It's just those anarchist kids that are actually gonna be running eastbound. It looks like they're inciting everybody else . . ." The Air Unit, "Idaho-70," then, over the radio, directed bicycle officers to the "anarchist kids" on Alvarado Street. For the next five minutes, various officers on Alvarado Street, reported "groups of anarchists" throwing "rocks and bottles"[13] at them. As a result, the Air Unit requested a Mobile Field Force to Alvarado, north of 7th Street.

According to a post-May Day interviews with Lieutenant Rodriguez, Commander Gray and Deputy Chief Carter, they heard these various radio transmissions as they stood at Park View and Wilshire.

---

[13] The term "rocks and bottles" is a term of art in the field of law enforcement and is used to describe a variety of projectiles that individuals may throw at the police. Objects may include but are not limited to: rocks, bottles, shoes, trash, trash cans, literally anything that an individual can readily pick up and throw at the officer.

According to Lieutenant Rodriguez, at this point, Captain Egan turned to Deputy
Chief Carter and Commander Gray and inquired as to what he should do in response
to the officers having projectiles thrown at them.  In response, Deputy Chief Carter
indicated that Captain Egan should do whatever he thought should be done.
Lieutenant Rodriguez recalled that, as a result, Captain Egan decided he needed to
deploy Metropolitan Division resources.  Lieutenant Rodriguez indicated that he
disagreed with this decision, because he did not believe sufficient resources were
present, due to the size of the park, to support this move by Metropolitan Division,
and told Captain Egan the same.  In response, according to Rodriguez, Captain Egan
demonstratively stated that his officers were "taking rocks and bottles" and that he
needed to do something.

Metropolitan Division B-Platoon Lieutenant Murphy, Rampart Lieutenant Rodriguez,
Captain Egan, Commander Gray and Deputy Chief Carter were still gathered at Park
View and Wilshire.  Several strategies were discussed among the group in regard to
the appropriate next steps for managing the people who were attempting to incite a
disturbance.  At this time, Rodriguez, Egan, Gray and Carter did not have information
as to the number of people throwing objects or attempting to incite a disturbance.
The only information provided at this time was the description given by Air Support
of 20 "anarchist kids."

Ultimately, it was agreed that Metropolitan Division resources would be used to
move the crowd now in the south part of the park at Alvarado and 7th Street,
northbound to Wilshire Blvd.  According to Lieutenant Rodriguez, he then told
Captain Egan that he was going to 7th and Alvarado to clear the intersection so that
people would not be able to gather behind the Metropolitan Division resources when
they lined up to move north.

In an interview after May Day 2007, Captain Egan stated that he could not recall who
led this discussion in regard to utilizing Metropolitan Division.  He did recall,
however, that the plan was to move the crowd in the south part of the park
northbound to Wilshire, using the lake in the south side of the park as a natural
barrier, and then hold at Wilshire.

Sergeant Smith, in a post May Day interview, recalled that he saw the sound truck,
heard someone speaking Spanish to the crowd from it and, due to the conversation
with Carter, Gray and Egan, assumed that a dispersal order was being given in
Spanish.  Sergeant Smith does not speak Spanish, and therefore, could not understand
what was being said.  Carter, Egan and Gray had been talking about declaring the
incident "an unlawful assembly," due to the individuals throwing objects at police,
and Smith believed that Carter or Gray in fact declared it as such.  However, what
Smith heard was not a dispersal order being given; rather, it was the event organizer
asking people to move into the park.

According to Lieutenant Murphy in a post-May Day interview, he then received
approval from Commander Gray to use less-lethal munitions during the movement of

the crowd. According to Lieutenant Murphy, Deputy Chief Carter nodded his head in the affirmative and Commander Gray gave the approval. Both Murphy and Smith recalled that Gray said less-lethal munitions were in fact authorized. Gray confirmed that he gave approval stating they were authorized to use less-lethal impact munitions if the behavior of the crowd warranted it. Murphy and Smith both recalled that Deputy Chief Carter told Murphy to go to 7th Street and Alvarado, and "clear up to Wilshire."

Lieutenant Murphy indicated that Deputy Chief Carter then instructed Murphy to take the officers he had available and go down to 7th and Alvarado Street and "address the problems." Lieutenant Murphy later stated that he had 35 officers from B-Platoon and hoped to wait for the arrival of C and D-Platoons due to the size of the park, but heeded Carter's direction. Based on their previous conversation, Murphy understood his direction to be to move the crowd, northbound to Wilshire and to stop at Wilshire and assess. The goal was to move the crowd with voluntary compliance if possible, but less-lethal impact munitions were authorized if the crowd became hostile. Lieutenant Murphy believed that Commander Gray would ensure the dispersal order was given.

According to an interview with Metropolitan Division Sergeant Haleck after May Day, Lieutenant Murphy then advised Sergeant Haleck of the decision to move the crowd northbound. Sergeant Haleck indicated that he believed the goal was to move the crowd from 7th and Alavardo, back into the north part of the park. He believed the crowd at 7th and Alvarado was the same crowd that had been in the north side of the park earlier in the day. Sergeant Haleck was not aware that a large, peaceful crowd had remained in the north side of the park, and that this movement by Metropolitan Division would result in moving those attempting to incite a disturbance into that peaceful gathering.

In an interview after May Day 2007, Commander Gray indicated that he did not believe the mission was to move the people in the south side of the park northbound up to Wilshire. He believed that Metropolitan Division was to address the problems at 7th and Alvarado. Gray did not indicate how these problems might be addressed.

- 6:01 p.m. -  Around the same time a plan was being devised by Lieutenant Murphy, Captain Egan, Commander Gray and Deputy Chief Carter, independently, field supervisors on Alvarado Street were requesting four additional squads and discussing the need to declare an "unlawful assembly" due to objects being thrown at police by the same crowd Metropolitan was planning to move north. At this time, as seen on video, several hundred people were gathered in the south side of the park at 7th and Alvarado, a small group of whom were throwing objects at officers.

> *Unknown Officer A:*    Can we get about four more squads up here? We're gonna have to do an unlawful assembly and disperse this crowd in Mac Park.

35

428

*Unknown Officer B:*    There's a lot of things being launched, rocks and that.  We're
gonna probably be close to an unlawful assembly and order it
out.

*Unknown Officer C:*    They've been throwing things at us non-stop for the past few
minutes, so I think that qualifies, let's get the units down here.

Hollywood Lieutenant Rosales, who had arrived with a Mobile Field Force after
assisting with the events in Central Area that morning, had checked in with the
Rampart Command Post.  The Command Post eventually sent Rosales and his Mobile
Field Force to Alvarado between Wilshire Boulevard and 7th without a briefing or
instructions.  Lieutenant Rosales arrived on Alvarado and, unclear as to what his
mission was, began to communicate with various people already in the area.  He
found that a Mobile Field Force lined the west side of Alvarado and a Bicycle detail
lined the east side of Alvarado.  Rosales teamed up with the resources on the west
side of the street to stretch north to prepare to assist in clearing the park.  There is no
indication from radio transmissions that Rosales ever received direction form the
Incident Command Post or any of the command officers on scene.

Various radio transmissions were heard between Lieutenant Rosales, a bicycle officer
("Cycle-26") and other unidentified officers regarding the behavior of the crowd and
their heightened sense of concern that the crowd was getting out of control.
Lieutenant Rosales said he discussed the crowd situation with Sergeant Belthius
(Cycle-20), in person, and then asked the Air Unit to make an "unlawful assembly"
broadcast.  The Air Unit, Idaho-70 advised that it was not equipped to make a
broadcast and requested that a second Air Unit present, Idaho-40, make the
announcement.  An unidentified supervisor then requested a sound truck over the
radio, and Air Unit Idaho-70 indicated that a number of squads would be necessary to
push the group north.  Idaho-70 addressed this broadcast to the Incident Command
Post, likely indicating that it believed the Incident Command Post was listening to
this discussion.

A lieutenant on scene has the authority to declare an unlawful assembly, however,
Lieutenant Rosales made this decision without full situational awareness and should
have made contact with the Incident Commander prior to making this decision (as
discussed in detail later in this report).  In an interview after May Day 2007,
Lieutenant Rosales indicated that he was not familiar with MacArthur Park, and was
unaware of the large crowd gathered in the north part of the park.

While Lieutenant Rosales and the Air Unit discussed declaring an unlawful assembly
over the radio, the individuals discussing the strategy involving Metropolitan
Division at Park View and Wilshire did not seem to hear it.  Thus, two separate plans
were being devised, by two separate groups of supervisors at different ends of the
park, at approximately the same time.

- 6:04 p.m. -  Over the radio, Rampart Lieutenant Rodriguez and an officer from a bicycle unit ("Cycle 26") discussed the plan to move the crowd north from 7th Street to Wilshire. Lieutenant Rodriguez then asked if a dispersal order had been given. The Incident Command Post advised that a sound truck was in route, implying that the order had not yet been given. The sound truck never reached the officers on the skirmish line.

According to Lieutenant Rodriguez in a post-May Day interview, by this time, he had driven to 7th and Alvarado, and informed field supervisors of the plan for Metropolitan Division to move the crowd north toward Wilshire. He also stated that he directed various supervisors to prepare the area. These orders included clearing the sidewalks around the intersection of people and ordering nearby businesses, such as McDonalds, to tell patrons that, for their safety, they either had to leave the area immediately or remain indoors until Metropolitan Division completed the move north.

- 6:08 p.m. -  Hollywood Lieutenant Rosales, then verified with the Air Unit that he did not have enough officers to move the crowd and made a request for an additional Mobile Field Force.

According to video and his own recollection, Deputy Chief Carter arrived at Alvarado and 7th around this time. In a post May Day interview, Carter indicated he witnessed plastic bottles containing frozen water and rocks inside, large rocks, pieces of wood and mortar, and corn cobs being thrown at officers. Carter observed the skirmish lines of officers on Alvarado on the east and west sidewalks.

According to a post-May Day interview with Hollywood Lieutenant Rosales, he saw Deputy Chief Carter walk northbound on Alvarado Street toward him, and, after a brief interchange, Rosales told Deputy Chief Carter that he thought the crowd was out of control and that "we should call this an unlawful assembly." According to Lieutenant Rosales, Deputy Chief Carter placed his hand on Rosales' shoulder and said, "I think you're right." Then Carter and his adjutant continued walking north on Alvarado, and Rosales did not see or hear Carter for the rest of the night. Rosales indicated that he believed Deputy Chief Carter was the Incident Commander.

Lieutenant Rosales did not have access to a sound truck or any other type of Public Address system. Therefore, he made a broadcast over the radio, "6Paul10 to the Air Unit, why don't we go ahead and make that announcement." The Air Unit was not heard making an announcement until 12 minutes later, as the two helicopters had to change positions, as mentioned above.

- 6:09 p.m. -  Units on Alvarado Street where then advised that Metropolitan Division officers were in route to their location.

- 6:11 p.m. -  From the Incident Command Post, Captain McDonald advised Lieutenant Rodriguez that the Incident Command Post had a Valley Bureau Mobile Filed Force and a

37

430

"light" South Bureau Mobile Field Force.  McDonald inquired as to where he should send them and stated, "then we'll get out of your hair."

### 4.    Metropolitan Division Resources Clear the Park

- 6:12 p.m. -    Metropolitan Division Sergeant Ernie Haleck arrived at Alvarado and 7th, exited his police vehicle and witnessed people throwing objects at the officers standing on a loose skirmish line on Alvarado.  Sergeant Haleck, "40B," asked Metropolitan Division Sergeant Kirk Smith "30C" for clarification:

> *40B:*    "Let's find out if there is a crime here as far as rocks and bottles, or are we gonna do a dispersal order here cause this is a whole different crowd here from the first one."

> *30C:*    "30 Charles, my understanding from the Incident Commander is he is making the entire park an unlawful assembly and he wants the entire park dispersed."

- 6:17 p.m. -    Metropolitan Division B-Platoon arrived and lined up along 7th Street at Alvarado, facing north into the southern part of the park.  Metropolitan Division officers were equipped with the 36-inch baton (a baton used solely by Metropolitan Division for the purposes of crowd control) and non-target and target specific less-lethal impact munitions.

B-Platoon then began its push north through the park toward Wilshire Blvd, as previously discussed with Captain Egan, Commander Gray and Deputy Chief Carter.

- 6:19 p.m. -    Less-lethal impact munitions were heard being deployed on a video tape as Metropolitan Division moved slowly north bound.  None of the individuals interviewed during the preparation of this report recalled witnessing what triggered the first round to be fired.

- 6:20 p.m. -    Almost three minutes after the north bound push began, the Air Unit, Idaho-40, was heard on video of the park, broadcasting a partial dispersal order, in English only, as follows: "This is the Los Angeles Police Department.  (Inaudible) . . . This is now an unlawful assembly.  Everybody needs to leave the park immediately."  The Air Unit did not give the entire dispersal order required by Department policy, and did not give even the partial order in Spanish, also required by Department policy.

Twenty seconds later, B-Platoon officers again fired less-lethal impact munitions into the crowd, as the crowd continued to throw objects at the officers.

38

431

Twenty seconds after that, Metropolitan Division supervisors ordered a "cease fire" of the less-lethal impact munitions, as seen on video reviewed after May Day 2007.[14]

Officers continued to periodically fire less-lethal impact munitions. As they pushed through the park, it was difficult to determine, however, via viewing the numerous video accounts of the events, at what time each of the rounds were fired.

Public Information Officer Sergeant Frank Preciado was conducting an interview with Univision Channel 34, at Park View and Wilshire, when less-lethal impact munitions were deployed. He recalled that reporters in the Media Area then turned their focus to the deployment of less-lethal impact munitions, either by turning their cameras in that direction or physically walking toward the south side of the park. Sergeant Preciado called Public Information Director, Ms. Mary Grady, who was in Central Area, and advised her that less-lethal impact munitions were being deployed. As a result, Ms. Grady proceeded to MacArthur Park.

- 6:21 p.m. -    During the push through the southern part of the park, some B-Platoon officers pushed and struck some individuals, who were not moving north as directed, with their 36-inch batons. A review of video showed, among other things, officers strike a young man, who was standing in place, several times; push a woman who was on the ground; and push a woman who appeared to be attempting to help the woman off the ground. Reporter Mark Coogan and his camera operator were also pushed, and the camera operator was knocked to the ground.

As the line of B-Platoon officers approached Wilshire, it was joined by Metropolitan Division C-Platoon.

When the line of officers reached Wilshire, the Air Unit advised that most of the crowd was on the north side of the park. Metropolitan Division advised that some in the crowd were still throwing objects at them.

- 6:22 p.m. -    Lieutenant Murphy, B-Platoon supervisor, then told the Incident Command Post, that they were still "taking rocks and bottles," and that they were going to continue across Wilshire. Once they crossed Wilshire a uniformed Mobile Field Force acted as support and lined up as a blocking force on Wilshire.

- 6:23 p.m. -    B and C-Platoons then crossed Wilshire and lined up in the north side of the park, parallel to Alvarado, facing west into the park. The officers held the line in the park and awaited the arrival of D-Platoon. Deputy Chief Carter continued to stand directly behind the Platoon. Video tapes depict the crowd calm at this time and officers holding their positions, with a gap between the officers and the crowd.

---

[14] A Sergeant may call for a "cease fire" on a skirmish line to assess the situation. However, going forward if aggressive and/or combative behavior again ensues, officers, may deploy the munitions.

432

- 6:24 p.m. -    Radio transmissions continued to report some individuals in the crowd throwing
rocks and bottles.  Projectiles being thrown at officers on the skirmish line were
captured on video tape.

- 6:26 p.m. -    Between six and ten minutes after B-Platoon began its first move through the park,
Deputy Chief Carter's adjutant asked the Incident Command Post to verify that a
dispersal order was given.  In an interview after May Day 2007, Deputy Chief Carter
recalled that he heard the Air Unit giving directions in English multiple times.  He
recalled, that while he believed he was hearing the dispersal order being given, he
really only heard the Air Unit tell the crowd to move.

The Incident Command Post contacted Lieutenant Rodriguez, who was at 7th and
Alvarado, and asked if a dispersal order was given.  According to Rodriguez, he then
asked a supervisor standing near him, and the supervisor confirmed that an order had
been given. The Incident Command Post then advised Deputy Chief Carter that they
were going to verify the time of the dispersal order.  The Incident Command Post
never responded with the time.

- 6:27 p.m. -    As C-Platoon supervisor, Lieutenant Bob Arcos arrived at Park View Street and
Wilshire Blvd., he asked Lieutenant Murphy if the line of officers in the north side of
the park were holding.

Lieutenant Murphy:    "We are holding at…Wilshire and Alvarado…We need
additional resources to continue to push.  We're still taking
rocks and bottles."

Lieutenant Arcos:    "Yeah, roger, the Incident Commander says as long as you're
taking rocks and bottles, continue to push.  If they stop, they
would like you to hold there and re-assess." [15]

Lieutenant Murphy:    "Roger.  As we're holding, we're taking more rocks and
bottles."

Unknown Officer:    "Rocks and bottles are continuing.  We have to push."

As Deputy Chief Carter was with the skirmish line in the north part of the park, it
appeared that Lieutenant Arcos was referring to Captain Egan, or possibly
Commander Gray, (both at Park View and Wilshire) when he referred to the "Incident
Commander."  Later, Lieutenant Arcos recalled that he was unsure if the role of
Incident Commander had changed from Captain Egan to Commander Gray at some
point during the demonstration.  Lieutenant Arcos, in a post May 1 interview, recalled
hearing less-lethal impact munitions being fired at this time and talked to Metropolitan
Division Captain Greer who had just arrived at Park View and Wilshire.
Arcos said once he heard less-lethal munitions being deployed, he began to walk

---

[15] At this point Commander Gray and Captain Egan were located at Park View and Wilshire Boulevard.

433

eastbound on Wilshire Boulevard with another Metropolitan Division sergeant.  As he
approached Wilshire and Alvarado, he observed the Metropolitan movement
and Deputy Chief Carter directly behind the line.  Lieutenant Arcos stated he was
concerned about the tactics of moving the crowd toward the Command Post.

- 6:29 p.m. -   Within 60 seconds of this broadcast by Lieutenant Arcos, Metropolitan Division
officers from B, C and D-Platoons started to move west across the northern side of
MacArthur Park.  (See Addendum D.)

Deputy Chief Carter followed mere feet behind the Metropolitan Division skirmish
line for the length of the move west across the park, behind B and D-Platoons.
Deputy Chief Carter recalled, in an interview after May Day, that the skirmish line
was "taking rocks and bottles" during the entire move westbound.  Carter also stated
that he gave no directions during the movement through the park, but only monitored
Metropolitan Division's activity.

- 6:31 p.m. -   A few minutes later, the skirmish line halted to allow C-Platoon to catch up with the
rest of the skirmish line.  In interviews held after May 1, both Deputy Chief Carter
and Lieutenant Murphy said that Metropolitan Division used the tactic to move
forward toward the crowd, hold ground, reassess, and then move forward again.  This
is consistent with what is depicted on various video tapes of the events.

Carter stated that he recalled the tactic was successful as the crowd would surge
toward the officers initially and then move back.  The video tape of the event does not
support this recollection.  There does not appear to be the "surge forward" as
described by Carter.  Carter also stated in his post May 1 interview that he did not
observe any misconduct by Metropolitan Division during their movement through the
park and was later surprised to see some of the incidents depicted on the various
television broadcasts, as he did not recall seeing indiscriminate use of the baton.

- 6:32 p.m. -   An unidentified officer then broadcasted over the radio, "the problem is we're taking
heavy rocks.  Guys are getting hit and they're getting hurt.  And every time we stop,
we're taking a beating over here.  We need to keep the line moving."  The line of
Metropolitan Division officers then continued its push to the west.

- 6:33 p.m. -   As the line of Metropolitan Division officers approached an area where the media had
set up tents and trucks, various news reporters and camera operators were pushed and
knocked over.[16]  For example, officers pushed reporter Christina Gonzalez and
pushed her camera operator to the ground.  Other examples include: a camera
operator in a kneeling position was pushed on to his back and possibly kneed by an
officer while a different officer throws his camera to the ground; 37mm less-lethal
impact munitions were fired in the general direction of the Spanish language media

---

[16] The section of the line that approached this media area appeared to be where B and D-Platoons came
together.  However, the identities of the officers are being determined as part of Internal Affairs Group
investigation.

41

434

tent, striking an individual; and a live Spanish language media broadcast was disrupted as individuals were pushed into the media tent area.

Deputy Chief Carter later stated that he was walking behind Metropolitan Division officers as they swept by the media tents inside the park and did not recall seeing media personnel being pushed to the ground or a camera being thrown by an officer. Deputy Chief Carter did recall that individuals in the crowd were throwing objects at officers.

- 6:33 p.m. -   The Metropolitan Division skirmish line stopped in the middle of the park to regroup once more and allow officers on the north side of the line to move around a structure in the park, and then continued its move to the west.

Department Public Information Director, Ms. Mary Grady, arrived at Park View between Wilshire and 6th Street, where the media had established a viewing area for themselves. According to Ms. Grady in a post May Day interview, upon her arrival, she spoke with Captain Egan. Captain Egan told her that an incident had occurred earlier in the day that required motor officers to move the crowd on Wilshire. Ms. Grady recalled that Captain Egan was focused on that one event from earlier in the day and did not appear to have much current information pertaining to the events in the park.

Ms. Grady indicated that members of the media came running out of the park toward her, westbound from the north part of the park, yelling that officers were firing at them. As the skirmish line of officers followed behind the members of the media, PIO Sergeant Preciado recalled that Metropolitan Division officers approached the media area and ripped the yellow caution tape that members of the media had used to establish a media viewing area on Park View between Wilshire and 6th. Sergeant Preciado informed Metropolitan Division officers that the reporters had the right to remain in the area and instructed the officers to walk around the media viewing area. Ms. Grady recalled that she then directed her staff to escort some members of the media to their vans parked on Park View, so that they would be protected from the officers clearing the park.

- 6:41 p.m. -   By 6:41 p.m. the skirmish line reached the sidewalk at Park View at the west end of the park. Officers had driven thousands of people from the park, knocked over and struck several individuals - including media and non-media, peaceful or not – and fired a total of 146 less-lethal impact munitions and over 100 uses of the baton. As a result, 246 individuals claimed injury (from two broken bones to bruises and numerous claims of emotional distress) and 18 officers were treated for various abrasions and contusions by Emergency Medical Technicians at MacArthur Park, or later at hospitals, and released.

### III.    ANALYSIS OF MAY DAY 2007

Pursuant to direction from Chief Bratton, a comprehensive examination of the events of May Day, and the details of similar events of the past, was conducted by the Department.  This examination ultimately pointed to the fact that a series of significant errors occurred beginning with the planning for the event and continuing through the execution of the crowd management practices necessary in such an event.  Moreover, important lessons from the past were ignored.  Consequently, six primary factors influenced the events of May Day:

  (1) planning;
  (2) tactics, including the uses of force;
  (3) command and control;
  (4) situational awareness;
  (5) training; and
  (6) individual responsibility.

### A.    Planning

The issues pertaining to the planning phase of the May Day event in MacArthur Park were discussed at length in the "Planning for May Day 2007" section of this report.  They included the following:

- Deputy Chief Carter underestimated the size and significance of the afternoon rally at MacArthur Park;
- Rampart Command assigned the drafting of the Rampart Incident Action Plan to several individuals, without designating one person as ultimately responsible for its review;
- Resource commitments were changed by Deputy Chief Carter up to the day before the event;
- The final Rampart IAP produced was missing several key details;
- The Rampart IAP was not distributed to or reviewed by several key entities within the Department;
- The Department's responsibility to the Media was not properly considered during the planning process;
- Metropolitan Division and Air Support were not included in the planning; and
- The units from the Central Area event who were to assist in MacArthur Park (including Central, Hollywood and Valley Areas) were never briefed on the Rampart Area event.

Many issues arose during the management of the event in MacArthur Park as a result of the issues in planning.

The events previously described, between 2:45 p.m. and 5:00 p.m. as the marchers proceeded from 3rd Street and Vermont Avenue to MacArthur Park, revealed issues primarily pertaining to planning.  The strategies employed by Captain Egan to guide the march to the park were successful, particularly marching with the group and providing the assistance of police on bicycles, and mirrored those strategies also successfully utilized earlier in the day in Central

436

Area.  Several important details that should have been discussed in the planning process, however, were not incorporated.

For example, as the march approached the park, Captain Egan relied solely on event organizers to direct the participants into the entrance of the park at Wilshire and Alvarado.  A line of officers was not set up across Wilshire to welcome the marchers and direct them into the proper entrance, or to keep individuals in the park so they would not spill over onto the street.  The sound truck also could have been used to provide direction to marchers in both English and Spanish.  The sound truck, however, was not positioned to perform this function.  Further, it appears that the officers on motorcycles and bikes who had paralleled the march from 3rd and Vermont and successfully moved the march in an orderly manner, had stopped this effort somewhere near Alvarado and 8th Streets.

Without a defined corridor or direction as to where to enter the park, marchers were left to proceed in any direction they wished.  As a result, a group of individuals marched westbound on Wilshire Blvd toward the Incident Command Post and resource staging area, facing officers with an unexpected march coming toward them at Park View and Wilshire.  According to a post May Day interview with Rampart Lieutenant Rodriguez, he also witnessed individuals, who were in the north side of the park, run southbound and join the crowd on Wilshire.  Lieutenant Rodriguez estimated that the crowd on Wilshire initially consisted of approximately 50 individuals, and quickly grew to more than 200.

Additionally, because a defined media viewing area was not provided to the Department's Public Information Office, when the media arrived, they chose locations to set up on their own.  In the hours leading up to the event of MacArthur Park, media television crews situated their equipment along three of the four streets that surround the park.  Many of the news stations used Park View Avenue to situate their large media trucks, which was actually the site listed in the version of the IAP that was only seen by Rampart staff.  Others, however, used 6th Street.[17]  One major Hispanic news agency erected a platform inside of MacArthur Park, and used this as a base of operation to produce a live remote broadcast.  Effectively, the media had unknowingly encircled themselves in and around MacArthur Park, with little input from the Department.

Another aspect that should have been discussed in the planning phase was which Metropolitan Division resources should have been deployed to MacArthur Park.  However, Metropolitan Division was not involved in the planning.  Assistant Chief Paysinger, Deputy Chiefs Roupoli and Carter, and Captain Kroeber all understood the significance of an event in MacArthur Park on May Day and knew a disturbance had occurred on May Day 2006.  Yet, of the four platoons ordered to stand by at the staging area in Central Area, three were released, and only B-Platoon was ordered to stand by at MacArthur Park that afternoon.  Assistant Chief Paysinger would later recall that this decision was based on the fact that there were a large number of resources, outside of Metropolitan Division, already deployed in the park.  Paysinger, Roupoli, Carter and Kroeber did not appear to discuss the possibility of deploying C-Platoon, which consisted of more senior personnel than B-Platoon, or deploying E-Platoon (the Mounted/Horse Detail) whose primary responsibility is crowd management.

---

[17] This is the same location that was used for the 2006 March.

B.    **Tactics**

Numerous tactical deficiencies arose on May Day, ultimately resulting in the movement of a small group of unruly individuals into a large group of peaceful participants and causing the chaos that occurred.  These tactical issues involved:

- The failure to guide marchers into the appropriate area of the park;
- Use of force tactics, including the use of the baton and less-lethal impact munitions;
- The treatment of the media;
- Crowd dispersal strategies;
- The lack of an arrest posture;
- The utilization of available resources; and
- The use of the sound truck.

1.    **Failure to Guide Marchers**

One of the first tactical deficiencies identified during this review was the failure of the Incident Commander to properly prepare for the arrival of the marchers into MacArthur Park. As discussed above, without personnel to guide (verbally and/or physically) the marchers into the soccer area, the some marchers turned westbound on Wilshire Boulevard causing Rampart Lieutenant Rodriguez to hastily place a line of officers across Wilshire Boulevard at Park View Street to redirect marchers into the park.

As the crowd began moving west on Wilshire Boulevard and had significantly increased in numbers, the Department was faced with a situation for which it had not originally planned. Commander Gray made the decision to deploy a squad of motor officers to push the crowd east towards Alvarado Street in an effort to move the crowd up Wilshire Boulevard toward the larger entrance into the park on the corner of Wilshire Boulevard and Alvarado. However, this action caused the westbound marchers to be confronted by the marchers at the east edge of the park who were now being pushed backward by the motor officers; resulting in a compression of the crowd.  In fact, several individuals who were interviewed after May Day 2007 referred to this single instance as the proverbial "tipping point" of the day, indicating that this movement caused tension in the crowd to rise, encouraged others to participate in the disruptive behavior and that after this point, chance for recovery was diminished.

2.    **Use of Force**

Each application of force exercised in MacArthur Park on May Day 2007 must be reviewed independently to evaluate whether each met the criteria outlined within Federal and State law and Department policy.  By the time the events in MacArthur Park had ended, more than 100 uses of the baton and 146 less-lethal impact munitions had been deployed.  These actions are being reviewed as part of the Internal Affairs Group investigations and the investigations to be submitted to the Chief of Police for a determination of discipline.  Discipline imposed by the Chief of Police will be presented to the Board of Police Commissioners during its regular quarterly review of discipline.

438

a.      The Baton

It is clear from a review of the video tapes and comments of officers involved, made at training sessions after May Day 2007, that some of the officers and supervisors in MacArthur Park believed baton strikes could be used to compel a person to disperse, even if they were merely standing in front of the officers, failing to respond to direction.  Department policy is clear, however, that the use of force policy remains the same in crowd control situations as in any other situation police may encounter, as explained below.

The following excerpt was taken from a Department Training Bulletin entitled, *Use of Force Baton – Crowd management and Control* (October 1996, Volume XXVII, Issue 11).  (*See* Addendum E.)  This Bulletin is still in effect and is the policy of the Los Angeles Police Department.

> … police officers are presented with passively resisting individuals who refuse to disperse.  The appropriate response to these individuals' actions, categorized as NO RESPONSE TO COMMANDS or UNCOOPERATIVE . . . includes the baton as a <u>pushing</u> instrument and Baton Compliance Techniques (non-striking).

That is, a baton may be used to push someone who is passively standing in place, but not strike them.  An officer may use a baton to strike an individual only when the individual is exhibiting aggressive and/or combative behavior.  There is a significant difference between using the baton as a pushing device and using the baton as a striking instrument.

As the Metropolitan Division skirmish line moved north through the park, attempting to deal with the individuals who were throwing objects, officers also came into contact with individuals who were part of the peaceful demonstration.  Officers struck individuals who appeared to be passively standing in place, not engaging in aggressive and/or combative behavior.

Moreover, the pushing and shoving of some members of the media, particularly news reporters and camera operators, who were clearly identifiable, raises concerns about the nature of the response of some of the officers on the skirmish line.  There is no apparent explanation for why individuals clearly holding television cameras and microphones would have been pushed or why their cameras would have been tossed aside by officers.  Where these incidents occurred, the involved officers will be identified via the investigation conducted by Internal Affairs Group, and investigators will attempt to gain such explanations from the identified officers.

Further, basic crowd management strategies, utilized by the Department (and most law enforcement agencies) for decades, include individuals designated as "linebackers," who follow directly behind a skirmish line.  Linebackers are assigned specifically to act in support of the supervisors' direction on scene, to maintain the integrity of the line formation, to assist with arrests and to help temper the response of the officers on the line.  A review of video

46

indicated that this basic crowd management strategy appeared to be utilized effectively in some instances, but lacking in others.

### b.    Less-Lethal Impact Munitions

The applications of force, including non-target and target specific less-lethal impact munitions, were deployed absent the intent to affect an arrest on May Day 2007. This is of import due to the fact that the law allows the use of force to prevent violence or property destruction, which should be a precursor to an arrest. On May Day 2007, Metropolitan Division officers fired a total of 146 rounds of less-lethal impact munitions as they cleared the park. However, no arrests were planned for by command officers or Metropolitan Division, and none occurred as a result of any force used in MacArthur Park.

Super Sock and 40mm Sponge Rounds are target specific tools that are used in crowd control situations to stop an individual's aggressive and/or combative actions from a distance.[18] These rounds are used to stop people in crowds who are throwing objects, lighting fires, destroying property, etc. When deploying these rounds in a crowd control situation, an officer may not fire into the crowd indiscriminately. Rather, an officer must target an individual who is specifically engaging in aggressive and/or combative behavior. Efforts to stop this type of unlawful behavior should then be followed by an attempt to identify and arrest those individuals who were the target of these rounds.

An officer must also be cognizant of the fact that in a crowd control situation, it is possible that a person engaging in peaceful activity, might unknowingly step between the officer and the targeted individual, possibly resulting in that peaceful individual accidentally being struck by a less-lethal round – causing injury to that innocent bystander and diverting the officer's attention from the unlawful behavior.

The 37mm Foam Baton rounds are a dispersal tool to be used from a distance for uncooperative crowds refusing to leave an area. These rounds are to be fired in a downward direction so that the rounds hit the ground, bounce upward, and strike persons in the legs (referred to as "skipping" the rounds) to encourage the crowd to disperse. These rounds should not be used on a retreating crowd or fired directly at persons without skipping them off the ground.

While it is possible that officers in MacArthur Park were justified in using these tools, a close look at these applications of force must be conducted to ensure they were used within the guidelines established by Department policy. From a review of video footage, it appears that non-target and target specific less-lethal impact munitions may have been used interchangeably at times. This determination will be made as part of the Internal Affairs Group investigations.

---

[18]   National Lawyers Guild v. City of Los Angeles (CV 01-6877FMC).

440

3.        **Treatment of the Media**

The treatment of some members of the media also raised serious questions about the training, discipline and understanding of the role of the media on the part of some of the officers in MacArthur Park that day.  Some officers were either unclear as to the requirements of the agreements between the Department and the media, or may have chosen to ignore those requirements.  The mandates involving the media were outlined in the *Crespo v. City of Los Angeles* settlement,[19] arising out of the 2000 Democratic National Convention, and include the following:

- LAPD will recognize that the news media has a right, without interfering with police operations, to cover events that may result in the declaration of an unlawful assembly and order to disperse;
- LAPD will make efforts to accommodate the media reporting obligation, however, such efforts will be made consistent with the LAPD's primary obligation to maintain public safety and order;
- When the LAPD develops an operations plan for an event that involves a public assembly, LAPD, where practicable, will designate an area outside of the anticipated impacted area, but within reasonable viewing distance and audible range of the event in which members of the media may assemble;
- LAPD will take into consideration when selecting the viewing area public and officer safety, police tactics, input provided by the news media and the ability of the LAPD to prevent the location from becoming part of the impacted area;
- To the extent reasonably possible, the LAPD will try to prevent the news media viewing area from becoming part of any area impacted by an unlawful assembly declaration and order to disperse;
- To the extent reasonably possible and without compromising public or officer safety, the LAPD incident commander will relocate the news media viewing area if, due to changing conditions, the initial area no longer affords the media a reasonable view of the event or becomes a tactical concern for the incident commander;
- The incident commander will designate an Information Officer as part of the incident command system in order to facilitate interaction with the media and the Information Officer will be clearly identified at the scene; and
- After declaring an unlawful assembly the LAPD will designate a dispersal route for all persons present, including the media, to use when evacuating the area.

While an area for the media was designated in one version of the Rampart Incident Action Plan, it was not included in the version provided to Media Relations Section or the members of the media.  Additionally, there was never any indication that Deputy Chief Carter, Commander Gray, Captain Egan or Captain McDonald made any effort to contact the media and facilitate moving them from the park before the movement of the crowd began.

---

[19] *Crespo v. City of Los Angeles*, Federal Case No. CV 00-08869.  (See Appendix A.)

48

441

Once the decision was made to clear the park, some officers pushed and struck some members of the media to move them from the area, rather than allowing the media to move safely to the sideline of officers or into a designated media viewing area. The uses of force against some members of the media clearly indicated a failure to ensure that all officers were aware of their responsibilities pertaining to the media. It is incumbent on a law enforcement agency to ensure that, subject to operational or safety concerns, the freedom of the press and its right to report on events as they are occurring is guaranteed.

### 4.    Crowd Dispersal Strategies

On May 1, 2007, a number of significant errors were made in relation to the decision to make, the planning for, and the declaration of the unlawful assembly.[20] These errors included the fact that no discussion, between Captain Egan, Commander Gray, and/or Deputy Chief Carter, took place in regard to isolating and arresting those engaging in unlawful conduct; a complete dispersal order was not given in either English or Spanish; the dispersal order was not specific to the location of the unlawful conduct; and the tactics employed to move the unlawful individuals were flawed, in that a small group of unlawful individuals were pushed into a large group of peaceful, law-abiding individuals.

### a.    The Decision to Declare an Unlawful Assembly

It is imperative that the decision to declare an unlawful assembly be based on a compelling need for the safety of the public and the police, given that it will often result in the curtailing of First Amendment rights. The ". . . Department not only recognizes the right of free speech but will actively protect people in the exercise of this right."[21] Further, the decision to disperse a crowd should be made only after careful consideration of the ability to isolate and arrest those responsible for the unlawful conduct.[22] Therefore, the declaration of an unlawful assembly should be resorted to only when there are no other reasonable alternatives.

The Rampart IAP included a plan to use plain clothes "shadow teams" to be present in the park to report unlawful behavior, and "mirror teams" comprised of Gang Enforcement Detail officers in uniform to locate those unlawful individuals, and where appropriate, extract them from the crowd and arrest them. While this plan resulted in a few arrests that day, it was not coordinated with any attempt to isolate the disruptive individuals. In fact, as supervisors and command staff, standing at Park View and Wilshire, began discussing declaring an unlawful assembly and/or moving the crowd, no discussion regarding isolating the specific individuals engaging in unlawful activity and arresting them occurred. Rather, Deputy Chief Carter, Commander Gray and Captain Egan appeared to have quickly jumped to a decision to move the crowd north from 7th and Alvarado, with no plan to first attempt to make arrests for the unlawful conduct.

---

[20] California Penal Code Section 407 states, "whenever two or more persons assemble together to do an unlawful act, or do a lawful act in a violent, boisterous, or tumultuous manner, such assembly is an unlawful assembly."
[21] *LAPD Emergency Operations Guide, Guidelines for Crowd Management and Crowd Control*, Volume 5.
[22] *National Lawyers Guild v. City of Los Angeles* (CV 01-6877FMC).

442

### b.       The Dispersal Order

Once a decision is made that an assembly is unlawful, law enforcement present at the scene must then announce to the crowd that the crowd must disperse.  According to the LAPD Emergency Operations Guide, Volume 5, "Prior to dispersing an unlawful assembly, officers shall give the following Dispersal Order to those participating in the unlawful assembly.  The Dispersal Order shall be read verbatim:"

> I am (rank and officer's name), a police officer to the City of Los Angeles.  I hereby declare this to be an unlawful assembly and, in the name of the people of the State of California, command all those assembled at (give specific location) to immediately disperse, which means to break up this assembly.  If you do not do so, you may be arrested or subject to other police action.

> Other police action may include the use of less lethal munitions, which could cause significant risk of serious injury to those who remain.  Section 409 of the Penal Code prohibits remaining present at an unlawful assembly.  If you remain in the area which was just described, regardless of your purpose in remaining, you will be in violation of Section 409.   The following routes of dispersal are available: (give the most convenient route(s) of dispersal)   You have ____minutes (give a reasonable amount of time – take into consideration the number of participants, location of the event and number of exit routes) to disperse.

A proper dispersal is necessary to ensure that all present are aware of the fact they are to leave the area; that they know what routes to take.  Without such an order, any arrest for unlawful assembly will be legally insufficient.

On May 1, 2007, a complete dispersal order was never given.  There was an attempt by the Air Unit to make a partial order.  However, no attempt was made to give any order in Spanish.  This failure likely resulted in a number of people who had no idea that they were being ordered to disperse.

### c.       Tactics Employed to Move the Crowd

As indicated in the requisite dispersal order, the announcement must be specific as to the location.  On May Day 2007, some individuals in the crowd were throwing items at the officers and refusing to move towards the soccer field.  It is important to note, however, that the problem was localized within an area that likely could have been isolated from the main rally at the soccer field.  At this point, there was no documented unlawful or "boisterous/tumultuous" activity in the north section of the park at the soccer field.  Therefore, the south side of the park, where individuals were throwing objects at police,

50

could have been declared an unlawful assembly, while those in the north side of the park could have continued with their lawful and peaceful activity.

In fact, at 6:12 p.m., Metropolitan Division Sergeant Ernie Haleck arrived at 7th and Alvarado, witnessed people throwing objects at officers, and asked, ". . . are we gonna do a dispersal order here cause this is a whole different crowd here from the first one."  In an interview after May Day 2007, Sergeant Haleck recalled that he was referring to the fact that the crowd at 7th and Alvarado (at the south side of the park) was much more hostile and violent than the crowd he had witnessed at Wilshire and Park View (near the north side of the park).  Metropolitan Division Sergeant Kirk Smith then replied, ". . . my understanding from the Incident Commander is he is making the entire park an unlawful assembly and he wants the entire park dispersed."  Even though hostile individuals were located in south side of the park at this time, the entire park was declared an unlawful assembly.  As a result, the First Amendment rights of the large group of peaceful individuals were curtailed, as a result of the behavior of a small group of individuals in the opposite side of the park.

Moreover, the crowd must be given sufficient time to disperse.  Anyone failing to leave the area is guilty of a misdemeanor crime and is subject to arrest.[23]  On May 1, 2007, a complete dispersal was not given, and the Metropolitan Division skirmish line appeared to begin its move through the south side of the park before even the partial order to leave the park was provided in English.  Therefore, individuals in the park did not receive sufficient notice of the order to disperse before the line of officers began moving northbound, firing less-lethal impact munitions.

A dispersal order must also include clear instructions on how to disperse from the area.  As Metropolitan Division resources moved through the south side of the park, no direction was provided to those in the park.  If the intent was to disperse individuals engaging in unlawful activity at 7th and Alvarado, those individuals could have been moved southbound toward 7th or westbound toward available public transportation, including the Red Line.  Instead, the crowd was moved northbound, with no direction as to how to exit the park, which resulted in those disruptive individuals being co-mingled with the cooperative participants in the north side of the park.

The strategy of dispersing the crowd by pushing it from the southern part of the park, across Wilshire to the northern part of the park was not tactically sound.  There was a permitted demonstration in the northern part of the park, and this strategy guaranteed disruption of that event.  Additionally, even if the object was to disperse the crowd, it was not sound to push the disruptive few into a large group of peaceful people, as this would seem to only add to those who would resist the movement.  Additionally, it was not logical to push the crowd toward the Incident Command Post and where the media had established a viewing area.

---

[23] California Penal Code Section 409 *Riot, rout, or unlawful assembly; remaining present after warning to disperse* states: "Remaining present at place of riot, etc., after warning to disperse.  Every person remaining present at the place of any riot, rout, or unlawful assembly, after the same has been lawfully warned to disperse, except public officers and persons assisting them in attempting to disperse the same, is guilty of a misdemeanor."

Rampart Area personnel did formulate a plan to disperse an unlawful crowd in the soccer field, should the need arise. The plan was to move the crowd east through the park, sending people toward Alvarado Street, then south on Alvarado. This planned movement would have had several advantages. First, an easterly push would drive people away from the command post, the media viewing area, the officers' staging area, the sound truck, and a residential area that could be significantly damaged if there was ensuing vandalism. Second, a move toward Alvarado Street would give officers the advantage of moving from high ground to low ground, as opposed to working uphill. Third, moving a crowd east would direct it toward mass transit options not available on the west side of the park, including several bus routes and the Metro Orange Line.

The original plan to move the crowd east was not considered by the command officers at Park View and Wilshire when the decision was made to utilize Metropolitan Division resources. In fact, the plan devised to move the crowd north (and then ultimately west) was contrary to this original plan. As Captain Egan had attended at least one of the Rampart roll calls that morning, he should have been aware of the original planned strategy, and as the Incident Commander, at a minimum, should have raised the concerns discussed in the paragraph above.

It appears that the decision to declare an unlawful assembly and to "clear the park" was not well thought out; nor was it tactically sound. The dispersal plan was not coordinated by the Incident Commander and/or other involved entities, and failed to include key requirements that must be followed during the planning for or execution of an unlawful assembly. Further, the movement of a small number of disruptive individuals into an area filled with peaceful demonstrators resulted in a chaotic situation which inhibited the ability of those present to peacefully exercise their First Amendment rights, and the ability of members of the media to report on those activities. Had a higher degree of leadership been exhibited that afternoon, the events of May 1, 2007 may have never occurred.

### 5.    Arrest Posture

Over the past several years, there appears to have been a gradual diminution of an arrest posture during organized crowd control situations. The Department has moved from a posture of isolating and arresting those who are engaging in unlawful activity or disrupting a rally or demonstration, to a posture of declaring an unlawful assembly and clearing the entire area. It is difficult to determine how or why this occurred. However, numerous individuals interviewed after May Day 2007 agreed that arrests are rarely made once an unlawful assembly is declared.

In fact, at one point during May Day 2007, a Sergeant was pulled from his motorcycle, was able to identify the individual responsible, and an arrest team was being formed to apprehend the suspect; yet Deputy Chief Carter ordered that no arrest be made. This action reinforced the belief that the objective was to move the crowd rather than arrest those engaging in criminal activity. This decision was a clear example of an ad hoc policy of dispersal, rather than of isolation and arrest. Allowing a person who physically grabbed an officer by the arms, and pulled him from his motorcycle, to stand by in the crowd, likely emboldened those committing unlawful acts. Perhaps, if an arrest had been made, those attempting to incite a

445

disturbance would have been less likely to continue their unlawful actions, and other officers may have made arrests where appropriate.

During an interview after May Day with Metropolitan Division Sergeant Ernie Haleck, he indicated that it has been common practice over the past several years to disperse a crowd without making arrests.[24]  This is exemplified by the fact that as Metropolitan Division moved through the park, no attempt was made to isolate the individuals who continued to throw objects at police and arrest them. [25]  Further, no attempt was made to arrest individuals who refused to move upon the orders of police.

There is no official Department policy on when an arrest shall or shall not be made in a crowd control situation, as each instance is unique.  There may be sound tactical reasons not to make an arrest (i.e., safety reasons pertaining to officers or the public).  Incident Commanders should have an arrest posture plan, and then determine whether or not it should be used or modified based on the incident at hand.  Here, the crowd may have reacted differently if they had seen people committing unlawful acts being isolated from the crowd and arrested.  Moreover, arresting and removing those violating the law would have reduced the need to declare an unlawful assembly, offering a greater level of protection of First Amendment rights.

### 6.    Utilization of Available Resources

Officers and supervisors alike on Alvarado Street discussed the possibility of declaring an "unlawful assembly" due to the items being thrown at them.  At the same time, discussions about possible tactics were being held at Park View Street by Metropolitan Division supervisors.  Before Metropolitan Division supervisors could finalize a strategy, Deputy Chief Carter directed Metropolitan Division Lieutenant Murphy to take his group to Alvarado Street and "address the problems."  Lieutenant Murphy then requested approval to deploy less-lethal impact munitions, and was granted approval by Commander Gray.

As a result, Metropolitan Division with approximately 35 officers began moving the hostile crowd north towards Wilshire Boulevard; without the use of additional officers in blocking positions.  The size of the park and the amount of space that was to be covered during the movement of the crowd was of concern to Lieutenant Murphy.  However, he did not question the direction given by Deputy Chief Carter.[26]  The independent deployment of Metropolitan Division without the integration of on-scene Mobile Field Force personnel was clearly problematic.  There were nearly 450 additional officers deployed to the MacArthur Park

---

[24] Sergeant Haleck is a subject matter expert in crowd control and less-lethal impact munitions and has been a member of Metropolitan Division for 21 years (13 as an officer, 8 as a supervisor).

[25] Deputy Chief Hillmann, one of the authors of this report, indicated after May Day 2007 that Metropolitan Division was not typically the unit solely responsible for crowd control at an event; rather, it typically served in a support capacity in conjunction with other Area resources.  Thus, the Area resources were typically responsible for making arrests in crowd control events.  On May Day 2007, Area resources were not used in this capacity.

[26] The decision not to question Deputy Chief Carter, due to his rank, was shared by many present in MacArthur park that day, including Captain Egan and several Lieutenants.  This phenomenon is not uncommon in a military or para-military type organization.

event who were available to assist Metropolitan Division in crowd movement.  Yet there was
a failure to include the Mobile Field Force leaders in any meaningful crowd control
discussion.  These officers should have been utilized as arrest teams, blocking forces and
other elements to support the dispersal movement.  This would have provided flexibility for
officers to pass people, who were either unable or unwilling to leave, through the skirmish
line to awaiting officers who could either redirect or arrest the individuals as appropriate.
Instead these officers either walked in a line behind the Metropolitan Division skirmish line,
with no defined function, occasionally acted as blocking forces, or were relegated to the
sidelines to observe and police the outer perimeter of the park.

### 7.    Use of the Sound Truck

Rampart Area had secured a Department sound truck for the event.  However, there was
minimal use of the sound truck throughout the event to encourage cooperation of the crowd,
provide direction and/or attempt to separate the individuals who were being disruptive.  The
first and only use of the sound truck occurred when Commander Gray requested event
organizers to ask participants to move into the park.

The sound truck could have been used to welcome marchers, encourage cooperation and
guide marchers into the park as they initially arrived.  It also could have been used at the
corner of 7th and Alvarado, in an attempt to quiet the crowd and warn the disruptive
individuals that they would be arrested if they did not cease throwing objects at police.  This
mere threat might have helped the situation that day, as such a tactic has proven effective in
the past.

While the sound truck was later requested by field supervisors to provide a dispersal order,
the sound truck never appeared.  The Rampart IAP called for the deployment of a sound
truck and called for a Department-certified Spanish speaker to give the dispersal
announcement should an unlawful assembly have occurred.  On the morning of the event,
Rampart Lieutenant Moreno provided copies of the dispersal announcement to two Spanish-
speaking Rampart Area supervisors designated to give the dispersal order if needed.  At 6:00
p.m., as officers were being struck by projectiles on Alvarado Street, there were two requests
(approximately five minutes apart) for the sound truck to respond and give a dispersal order.
The Incident Command Post first inquired where officers wanted the sound truck to respond,
and at 6:05 p.m., the Incident Command Post advised that they were getting a sound truck.
The sound truck never reached the officers on the skirmish line.  It is not clear why it never
arrived.  Thus, a helicopter was forced to use its sound system to make an announcement to
leave the park; a tactic that has historically proved ineffective.

Interviews of several Rampart Incident Command Post staff indicated a recollection of the
request but uncertainty as to why the sound truck never reached the east side of the park.  As
indicated by a review of sound truck logs, broadcasts on the tactical frequency, and
interviews with Incident Command Post staff, the Incident Command Post was overwhelmed
by numerous requests from personnel at the event.

447

C.    **Command and Control**

1.    **Unity of Command**

Many of the issues that arose during the execution phase of this event pertained to the area of command and an inadequate Incident Command Structure.  Knowing who is in command during an incident is of utmost importance.  Thus, the Department utilizes the concept of "unity of command."  That is, "each individual involved in incident operations is assigned to only one supervisor,"[27] so that the individual in charge is clearly identified at all times.  The use of unity of command by public safety personnel is essential for effective management of any spontaneous or pre-planned event. There must be one person who is the overall commander of the event, who understands the objectives of the plans, receives tactical information and then makes decisions with a complete understanding of all that is occurring.

The individual in charge of an incident is referred to as the Incident Commander.  During the march and rally in Central Area, it was clear to all involved that Deputy Chief Carter was the Incident Commander.  It was also clear, based on interviews and a review of audio and video, that Captain John Egan was the Incident Commander during the march from 3rd Street and Vermont Avenue to MacArthur Park.

The Rampart Area IAP identified Captain Egan as the Incident Commander for the events in MacArthur Park.  Very early into the events in the park, however, both Commander Gray and Deputy Chief Carter began to make decisions and give orders that led to confusion as to who was in command.  As the demonstrators gathered in MacArthur Park, most involved Department personnel became confused as to who was in command.

During a post-May Day interview, Rampart Lieutenant Jorge Rodriguez indicated that as the day began at MacArthur Park, it was very clear to him that Captain Egan was the Incident Commander.  Soon into the afternoon's events, however, Commander Gray ordered the Motor Team to move eastbound on Wilshire; Deputy Chief Carter stopped the arrest of a positively identified suspect; and Captain Egan chose not to intercede.  Consequently, Lieutenant Rodriguez indicated that he became confused as to who the Incident Commander was.  In fact, numerous officers present that day later recalled during interviews that they were confused as to who was acting as the Incident Commander.

Metropolitan Division supervisors who were later interviewed indicated that they perceived Commander Gray to be in charge of operational decisions.  For example, according to Metropolitan Division supervisors, it was Commander Gray who gave the authorization for the deployment of less-lethal impact munitions.

Moreover, Metropolitan Supervisor Lieutenant Arcos statement at 6:27 p.m. that day that if the crowd stopped throwing objects at police, "*they* would like you to hold," suggested that Lieutenant Arcos was referring to more than one person, rather than a single Incident Commander.  Lieutenant Arcos would later recall that when he spoke with Captain Egan and

---

[27] National Incident Management System, March 1, 2004, Command and Management, Chapter II, page 12, Paragraph I., Accountability

55

Commander Gray at Wilshire and Park View, he was unsure if the role of Incident
Commander had changed from Egan to Gray at some point during the demonstration.

Though Commander Gray and Deputy Chief Carter made operational decisions and directed
action at various times throughout the afternoon, neither individual exercised the requisite
"transfer of command" process.  The process of transfer of command is significant, in that
the role of Incident Commander shifts from one person to another.  To complete a transfer of
command, the person assuming command must:

- Assess the situation with the *current* Incident Commander;
- Receive a briefing from the *current* Incident Commander;
- Determine an appropriate time for the transfer of command and document the
  transfer;
- Notify others of the change in incident command; and
- Assign the current Incident Commander to another position within the incident
  organization.

The process of transfer of command must include a radio broadcast made by the person
assuming command to make others aware of the fact that he or she is now on scene and
providing direction.  This is critical because that individual should then serve as the single
point of contact for those in the field to either request resources or suggest strategies to
handle the situation, based on what those in the field are seeing.  This would allow all
information available to be scrutinized so that a tactical plan can be designed to manage the
event as a whole, based on full situational awareness.  The fact that Gray and Carter both
arrived on scene and began to influence operations independent of the Incident Commander,
without making their presence, nor their intentions,  known via radio, created a situation
wherein their orders were made in isolation, resulting in an independent and uncoordinated
response.

In interviews after May Day 2007, Commander Gray and Deputy Chief Carter both denied
ever taking command of the incident at MacArthur Park.  Whether or not either man believed
his actions amounted to an assumption of command, the fact is that tactical operations were
executed by individuals who perceived either Deputy Chief Carter or Commander Gray to be
in charge.  Thus, as superior officers, giving orders and directing the activities of the day, at
different points, each became the "de facto" Incident Commander in the eyes of subordinates.

Further, as Captain Egan was initially identified as the Incident Commander, he had a
responsibility to the officers present to ensure clarity in the incident command structure.
When Captain Egan realized that Commander Gray and/or Deputy Chief Carter were making
decisions and giving orders that afternoon, Captain Egan should have asked each man if he
was assuming command and requested another position within the incident organization.
Instead, Captain Egan said nothing.  In post-May Day interviews, Metropolitan Division
supervisors described Captain Egan's presence as irrelevant.  Lieutenant Rodriguez recalled
that when he informed Captain Egan that Deputy Chief Carter was instructing Lieutenant
Rodriguez not to arrest the man who pulled a motor officer from his bike, Captain Egan said
something to the effect of, "He's a two-star.  I'm a captain."

56

449

The breakdown in command and control at MacArthur Park was apparent when subordinate officers observed three staff officers in the field and one in the Incident Command Post do little in response to the growing concern over the actions of the crowd. As tensions began to build, and decisions needed to be made, not one staff officer affirmatively took command of the entire situation. Subordinates witnessed conflicting direction and obvious tension between the staff officers. Additionally, Captain Egan, the original Incident Commander, frustrated over Commander Gray and Deputy Chief Carter's interventions at various times during the event, virtually gave up his command without notifying the Incident Command Post or any of his subordinate officers.

After numerous requests over the radio for information and resources by subordinates from various positions in the field were left unanswered - worse yet, never acknowledged by the Incident Commander or the Incident Command Post - they felt they had to begin to act as the leadership in place was not. This breakdown in command caused several lieutenants at the scene to formulate plans to try to control the crowd, and, in some cases, prepare to protect the businesses in the surrounding neighborhood. While good intentioned, these various plans lacked coordination and ultimately no one person with total situational awareness was in control.

Further, when direction was given, it was unclear, and supervisors proceeded to interpret the meaning rather than seek clarification. For example, just prior to 6:00 p.m., Deputy Chief Carter directed the B-Platoon Lieutenant Murphy to take the units he had available and go down to 7th and Alvarado Street and "address the problems." This order lacked critical components of a sound incident objective; i.e., clarity and specificity as to what the "problem" was or how to "address" the problem. This statement initiated Metropolitan Division's tactic of "clearing the park" with no real specificity. This was illustrated by the fact that at 6:12 p.m. Metropolitan Division Sergeant Kirk Smith stated over the radio, ". . . my understanding from the Incident Commander is he is making the entire park an unlawful assembly and he wants the entire park dispersed."

## 2.    Radio Silence

As the breakdown in command and control broadened, it discernibly moved from the realm of confusion at the command staff level to frustration in subordinate ranks. A review of the radio transmissions during the rally at MacArthur Park illustrated a building sense of frustration amongst line officers and line supervisors. The frustration was compounded by unanswered requests for the sound truck, the inability of the airship to give a dispersal order, and repeated requests to take action because officers were being struck with objects thrown by people in the crowd.

In terms of command and control, it appeared that just as important as the words of the command staff, was their radio silence from the time officers began reporting being hit by rocks and bottles to the ultimate clearing of MacArthur Park by Metropolitan Division officers. The role of an incident commander is to monitor the event, provide direction regarding tactics and use of resources. In the event that an incident commander is not fulfilling their responsibility, someone of rank on scene must take command. This did not

happen at any time by Deputy Chief Carter, Commander Gray, Captain Egan or Captain
McDonald (who was situated at the Rampart Command Post.)  Additionally, the Incident
Command Post is responsible for monitoring radio broadcasts.  In that capacity the Incident
Command Post should relay information, verify receipt and assist the Incident Commander
with deployment of available resources to the field.

For example, on the Metro frequency at 6:12 p.m. Metro supervisor, Sergeant Ernie Haleck,
arrived at 7th and Alvarado and advised fellow-Metro supervisor, Sergeant Kirk Smith, "Let's
find out if we're still…a crime here as far as rocks and bottles, or are we gonna do a dispersal
order here cause this is a whole different crowd here from the first one."  Smith answered,
"30-Charles, my understanding from the Incident Commander is he is making the entire park
an unlawful assembly and wants the entire park dispersed," as this was his understanding
based on a previous conversation with Commander Gray and Deputy Chief Carter.  Sergeant
Smith would later recall that he believed either Commander Gray or Deputy Chief Carter had
given the order to clear the whole park.  No response was made by Carter, Gray or Egan from
the field, nor McDonald from the Incident Command Post.

Sergeant Smith's broadcast served as a well-documented statement of the Incident
Commander's intent to clear the park.  Had the dispersal of the entire park *not* been the intent
of the Incident Commander, clearly officers hearing this affirmative direction on Metro
frequency would have expected the Incident Commander to come over the air and articulate
differently.  Because the leadership remained silent, the statement made by Smith, based
upon his understanding of the facts, granted Metropolitan Division officers tacit approval for
their move north across the park.

During critical tactical engagements in and around MacArthur Park, not one person higher
than the rank of lieutenant gave an order over the radio.  It does not appear that Captain
Egan, Commander Gray or Deputy Chief Carter monitored the radio frequency utilized by
Metropolitan Division.[28]  Further, Captain McDonald, who was with a Metropolitan Division
liaison, listening to the Metropolitan Division frequency in the Incident Command Post, did
not notify Egan, Carter or Gray of the radio transmissions being made by Metropolitan
Division personnel.

Moreover, the radio discipline necessary in a large, dynamic field incident was absent on
May Day 2007.  A fundamental of radio discipline is positive identification through the use
of call signs as the introduction to a broadcast.  Without knowing the rank or position of the
person behind a radio transmission, the message risks either losing its significance to the
listener, or taking on undue import.

This lack of radio discipline, coupled with the failure on the part of field supervision or
command staff to communicate direction over the tactical frequency, allowed for various
forms of miscommunication: (1) an absence of guidance from the Incident Commander may
have been viewed by some as tacit approval for the actions that officers ultimately took; (2)

---

[28] Metropolitan Division used the radio frequency dedicated to Metropolitan Division communications, so it
would not interfere with broadcasts being made over the frequency dedicated to the Rampart Area personnel.
This is standard Department practice.

anonymous chatter over the radio may have been contagious and caused confusion; and (3) statements left unchallenged by those in command were likely interpreted as truth.

### D.    Situational Awareness

Another contributor to the events of May Day was a lack of complete situational awareness. Without full situational awareness at any incident, individuals with good intentions may take actions independent of others, without understanding how those acts may impact the whole. For example, pushing hostile individuals into a crowd of peaceful demonstrators, rather than segregating and arresting the trouble makers, causes the problem to become more complex and difficult to resolve.

#### 1.    In the Field

Deputy Chief Carter, Commander Gray and Captain Egan failed to maintain communication with those in the field in order to obtain a full picture of the events unfolding. Without proper communication, and because of their positioning in the large park, these men were unable to fully understand the situation before them.

For example, just before 6:00 p.m., Carter, Gray and Egan agreed that Metropolitan Division resources would be used to move the crowd in the south part of the park at Alvarado and 7th Street, northbound to Wilshire Blvd. According to Lieutenant Rodriguez, he then told Captain Egan that he was going to 7th and Alvarado to clear the intersection so that people would not be able to gather behind Metropolitan Division when they lined up to move north. After his arrival at 7th and Alvarado shortly thereafter, however, Lieutenant Rodriguez did not provide Captain Egan with information on the size or demeanor of the crowd or the number of resources available. Nor did it appear that Captain Egan, Commander Gray or Deputy Chief Carter ever requested this information. Thus, a decision to move north through the park was made without any confirmation that the decision still seemed to be appropriate based on situation at hand.

Additionally, Commander Gray, who authorized Metropolitan Division's use of less-lethal impact munitions at MacArthur Park, indicated that he was not aware that less-lethal weapons were discharged on the east side of the park. Captain Egan, from his position on Park View Street, was also uncertain of the tactical events on the east side of the park. In fact, Captain Egan did not have a radio on Metropolitan Division's tactical frequency. Moreover, Deputy Chief Carter's decision to stand so close to the front line afforded him a very small view of the tactical picture. Carter, who followed mere feet behind the Metropolitan Division skirmish line for the length of their push west across the park, would say in interviews that it was not until he saw the televised broadcasts that he saw numerous uses of force.

Diminished situational awareness is a phenomenon that accompanies complex and stressful events and is one of the continued challenges in leading a dynamic tactical event. Captain Egan, Commander Gray and Chief Carter had varying degrees of situational awareness, but none at that time, knew of the scope of the tactical movements and action of officers in MacArthur Park. This issue also affected other decision-makers in the field.

452

Lieutenant Guillermo Rosales, in charge of a Mobile Field Force from Hollywood Area later
expressed a sense of frustration in the lack of information available at MacArthur Park.  In an
interview after May Day 2007, Lieutenant Rosales recounted his experience at 7th and
Alvarado that day.  Unclear if he was to meet anybody at that corner, Lieutenant Rosales
indicated that he observed a crowd of 200 to 300 people.  When nobody approached him to
give him direction, Lieutenant Rosales recalled that he formed his officers into columns just
north of 7th Street, and standing there, he did not know who was in charge, and had no sense
of an objective or mission, because he had not been briefed by anyone.  It is the
responsibility of the Incident Commander and the Incident Command Post to formulate a
mission for the Mobile Field Force, and to communicate this mission to the Mobile Field
Force leader.  If a mission is not provided, it is the responsibility of the Mobile Field Force
leader to request a mission.

Lieutenant Rosales stated that he saw approximately 15 objects thrown at the police officers
by a small group of individuals.  Lieutenant Rosales began his conversation about dispersing
the crowd with only the awareness of what was happening directly in front of him and
without the benefit of any intelligence about what was happening in the north part of the
park.

In the end, after a brief conversation with Deputy Chief Carter at approximately 6:08 p.m.,
during which neither Rosales nor Carter discussed making arrests, Lieutenant Rosales
supported the urging of other officers to declare an unlawful assembly by responding over
the radio, "6Paul10 to the air unit, why don't we go ahead and make that announcement."  In
hindsight, while this decision was made in direct response to the illegal actions of some
people in the crowd, it arose out of a severely limited situational awareness by Rosales.
Lieutenant Rosales had a flawed concept of the size of not only MacArthur Park, but also the
number of people within it.  He had never worked Rampart Area and he had never been in
the park.  Lieutenant Rosales indicated he believed that north of Wilshire, there were
residential neighborhoods or apartments.  When Rosales stood on Alvarado Street and looked
at the crowd in front of him, he believed he could see the entire MacArthur Park
Demonstration.

Lieutenant Rosales had absolutely no concept that the crowd of 300 he saw was merely a
tenth of the number of demonstrators gathered a couple hundred yards northwest of him in
the soccer field just beyond Wilshire Boulevard.  Immediately following the police action,
like other managers, Rosales recalled having no sense that things had gone wrong.  When
Metropolitan Division officers pushed the crowd north, Rosales brought his line of officers
up to Wilshire Boulevard.  When Metropolitan Division moved north beyond Wilshire,
Rosales attended to his skirmish line, re-formed them into a squad, and awaited further
directions from the Incident Command Post.  Those directions never came.

## 2.    The Incident Command Post and the MACC

Deputy Chief Carter, Commander Gray and Captain Egan also failed to communicate with
the Incident Command Post or the Multi-Agency Coordination Center (MACC) to request
additional resources throughout the day.  While staff at the MACC did reach out to the

Rampart Incident Command Post, the Incident Command Post had only limited situational awareness, as it had not only lost the ability to view a live aerial image (as explained below), it also had no Public Service Representatives (PSR) to monitor the radio frequencies (as compared to Central Area, which had four PSRs for the morning event; and to the MACC, which had four PSRs for the day). Staff at the Rampart Incident Command Post resorted to listening to the one dedicated tactical frequency channel they were provided for the day (as compared to the three provided to Central Area that morning).

In a post-May Day interview, Rampart Lieutenant Moreno, who served as the Executive Officer in the Rampart Incident Command Post that day, recalled that the one radio channel was so flooded with calls, that it became almost impossible to monitor or to broadcast over. Lieutenant Moreno also indicated that cell phone calls from plain clothes officers in the crowd, describing individuals in the crowd throwing objects at police, were made to the Incident Command Post with such frequency, that they were difficult to track with the limited resources in the Incident Command Post. Thus, the Incident Command Post became overwhelmed with requests as the day progressed, which hindered the Command Post's ability to respond.

Captain McDonald indicated after May Day 2007, that he had limited experience in command post operations, and as he monitored the radio frequencies, had little sense of the scope of the event.

Additionally, individuals at the Incident Command Post that day, later recalled receiving little communication from Captain McDonald throughout the events of the afternoon, and expressed frustration over having to continually question Captain McDonald for information or direction. Some reflected that Captain McDonald spent some of his time that afternoon expressing his displeasure with the fact that he was in the Incident Command Post, rather than in the field, where he believed he belonged. Moreover, Metropolitan Division Officer Mary Davis, who was at the Incident Command Post listening to the Metropolitan Division radio frequency, made almost no radio broadcasts that afternoon.

As referred to above, the Incident Command Post did not have a live picture of the day's events. A few days before the event, Deputy Chief Carter informed Central and Rampart Area supervisors that the video downlink from the Air Units was inoperable. Therefore, neither Central nor Rampart Incident Command Posts attempted to access the Air Unit's video transmissions. However, according to Air Support personnel in interviews after May Day 2007, the video equipment in the helicopters was functioning properly, and they were not notified that those on the ground were not receiving an aerial image that day. This is a glaring example of how situational awareness was impaired due to inadequate planning.

Without a real-time aerial picture of the march and rally, the Incident Command Post and the MACC had limited awareness of the big picture and were forced to listen to radio calls and place cell phone calls to gain situational awareness. Television news cameras had provided a downlink to the MACC earlier in the day. However, a federally imposed Temporary Flight Restriction (TFR) was imposed at approximately 5:30 p.m., due to a sporting event occurring

454

at Dodger Stadium.  Thus, the MACC lost its live picture just as the events in MacArthur
Park began to unfold.

Moreover, there appeared to be confusion in regard to the role of the MACC that day.  The
MACC, as described in the MACC IAP, was responsible for "the real-time gathering of
information and intelligence, assessing deployment and appropriate response to events and
also successfully responding to any potential incidents."[29]  The MACC IAP listed Assistant
Chief Paysinger as Unified Area Commander and Deputy Chief Roupoli as Deputy Unified
Area Commander over all three events happening in the City that day: one in Central Area;
one in Rampart Area; and another in Hollywood Area that morning.  Deputy Chief Roupoli
would later state, however, that he viewed his role as being responsible for the deployment of
city-wide resources only.  Additionally, with the lack of information coming into the MACC
and the comfort in knowing the events of the first part of the day had been successful,
Assistant Chief Paysinger, unaware of the activity in the field, turned over command to
Deputy Chief Roupoli and returned to his office.

Deputy Chief Roupoli made a phone call to Deputy Chief Carter after witnessing news
coverage of a motor officer being pulled from his bike to inquire as to whether additional
resources were required on Wilshire Boulevard in the park.  According to Deputy Chief
Roupoli, Carter indicated that he did not need additional resources at that time.  Later, upon
hearing that people in MacArthur Park were being moved, Roupoli again called Carter and
asked if a dispersal order had been given.  Roupoli stated that he received confirmation that a
dispersal order had in fact been given, but could not recall if Carter gave the confirmation
during this phone conversation, or if somebody called Roupoli back with the confirmation on
Carter's behalf.

As events unfolded throughout the evening, Deputy Chief Roupoli recalled frustration in not
receiving information from the Incident Command Post or those in the field.  In fact, Deputy
Chief Roupoli expressed his frustration to Assistant Chief Paysinger, who was in his office in
Parker Center.

This total breakdown in communication forced the MACC and the Incident Command Post
into a reactionary role, rather than the proactive role.  The MACC is intended to act as a
coordination center for personnel resources and logistics; e.g., sound trucks, Mobile Field
Forces or Metropolitan Division Platoons, etc.  Yet, the MACC was never contacted, for
example, with a request for the re-deployment of Metropolitan Division resources.  In fact,
Chief Roupoli learned of the re-deployment of C and D-Platoons from Metropolitan Division
Captain Greer, and was surprised that the Incident Command Post had not contacted the
MACC with such a request.  Thus, May Day resulted in an Incident Commander, an Incident
Command Post and the MACC all lacking the situational awareness required to manage such
an event.

Moreover, as the Incident Command Post, the Incident Commander and the MACC
eventually became aware of the events unfolding in MacArthur Park, no attempt was made to
contact either Metropolitan Division Captain.  According to Metropolitan Division Captain

---

[29] *May 1, 2007 Demonstrations Multi-Agency Coordination Center (MACC) Plan*, p. 1.

455

Kroeber, he and Captain Greer were notified of the events via the desk officer in the
Metropolitan Division office who received a request from Metropolitan supervisors in the
field for the return of C and D and E-Platoons.

As a result, Captain Greer immediately proceeded to the park and Captain Kroeber proceeded
to the MACC.  Captain Greer arrived at MacArthur Park as the movement of the crowd
through the north side of the park was occurring.  Upon hearing of the severity of the
situation in MacArthur Park over the radio, however, Captain Kroeber changed his course,
and went to the park instead.  Captain Kroeber arrived after Metropolitan Division had
completed its movement through the park.  Captains Kroeber and Greer were not present in
the park throughout the event due to contemporary command guidance, which places
Metropolitan Division resources under the command of the Incident Commander during
preplanned events instead of under the command of the Metropolitan Division Commanding
Officers.

Additionally, there was a failure to notify chief officers through the proper channels.  In fact,
chief officers learned of the incident from various sources, including the media and the
Mayor's Office.  Chief Bratton himself, who had left the office to attend an event at
Universal Studios with Commissioner Skobin, learned of the problems at MacArthur Park
when the Mayor called him from Central America.  In turn, Chief Bratton called Assistant
Chief Paysinger, who was also unaware of the severity of the events that had occurred in
MacArthur Park, and asked Paysinger to meet him at the park.[30]

E.    Training

Research conducted in the preparation of this report revealed that: (1) Metropolitan Division
received no training in crowd control in the 18 months leading up to May Day 2007; (2) even
when Metropolitan Division personnel were receiving regular crowd control training, the
content of that training may have been incomplete, or even inaccurate.  (*See* Appendix 2.)

For example, it appeared that some officers and supervisors in MacArthur Park believed that
baton strikes could be used to compel a person to disperse, absent aggressive and/or
combative behavior.  Additionally, during training provided after May Day 2007, some
Metropolitan Division personnel raised the fact that individuals who had recently joined
Metropolitan Division had not received training on the 36-inch baton.  However, all officers
have been provided training in the appropriate use of the baton, regardless of size and/or
shape, at some point in their careers and every officer is expected to know Department policy
on the use of force.

Further, the events of May Day made it clear that proper training in regard to the treatment of
media was lacking.  In their effort to clear the park, officers used force against members of
the media as they attempted to cover the event.  Some officers were either unclear as to the
requirements of the agreements between the Department and the media, or simply chose to

---

[30] Chief Bratton was scheduled to fly out to meet the Mayor in Central America that night.  Chief Bratton
scheduled his flight for late into the night of May 1st, so he would remain in the city until the events of May Day
were over.  When Chief Bratton learned of the events in MacArthur Park, he canceled his trip altogether.

456

ignore those requirements.  Updated, accurate training might have prevented these unfortunate circumstances.

The Department will not, however, allow training to be used an excuse for the poor treatment of the media, or any inappropriate use of the baton or less-lethal impact munitions during May Day 2007; as there is clearly a difference between a training issue and a discipline issue. Every officer has a duty to act reasonably and is responsible for his or her own actions (as discussed in detail below).

### 1.    Training Scaled Back / Eliminated

In 2004, with rising concern over crime suppression and field deployment needs, much of the "non-required" training was scaled back at the request of the Director of the Office of Operations, Assistant Chief Gascón.  Chief Bratton supported the reduction of "non-required" training to allow for a strong focus on federal and state mandated training and crime suppression.  Mobile Field Force training for in-service officers was not mandated by the Department or POST; and therefore, was not a priority and was among the many training courses that were scaled back.

In 2005, the Director of the Office of Operations, then Assistant Chief Gascón, scaled back Mobile Field Force and crowd control training for the Department, discontinued the Metropolitan Division Basic Course and cut Metropolitan Division's regular training in half.[31]  The cut back of training allowed for Metropolitan Division officers to be deployed in crime suppression details and assist other commands throughout the city.  Chief Bratton approved Assistant Chief Gascón's recommendation to scale back training with the understanding that the subject would be revisited periodically.

In 2006, as the Department continued to struggle with the problem of employees retiring at a faster rate than recruits were being hired, Assistant Chief Gascón halted Mobile Field Force training altogether (except in recruit basic training).  The Metropolitan Division Basic Course was still not being taught.  In August 2006, Assistant Chief Gascón retired and Deputy Chief Paysinger was promoted to the Director of the Office of Operations.

In February 2007, Captain Scott Kroeber, Commanding Officer Metropolitan Division, raised concerns to Deputy Chief Richard Roupoli, Commanding Officer Special Operations Bureau, that the lack of training over the past three years was negatively impacting Metropolitan Division's readiness.  In particular, he was concerned that any officer, who had joined Metropolitan Division after the Metropolitan Division Basic Course was discontinued in 2005, was lacking necessary skills.  In 2005, B-Platoon had only two tactical training days and C-Platoon had only one for the year.  In 2006, B-Platoon had only one tactical training day and C-Platoon had two. In 2007, prior to May Day, B-Platoon had three tactical training days and C-Platoon had two.

---

[31] The Metropolitan Division Basic Course was a month-long course mandatory for all new officers transferring into Metropolitan Division that covered subjects specific to crowd control, including: Mobile Field Force concepts; use of force policy; the use of less-lethal impact munitions and the proper treatment of the media.

Deputy Chief Roupoli was also concerned and requested that Office of Operations revisit the scaling back of training. As of May Day 2007, the Metropolitan Division Basic Course was still on hold with approximately 30 new officers and supervisors assigned to Metropolitan Division who had not received basic orientation training.[32] In fact, on May Day 2007, 28 percent of the Metropolitan Division officers and supervisors present in the park, had not been provided the Metropolitan Division Basic Course.

Thus, Metropolitan Division resources, organized specifically to handle situations such as May Day, had not trained or discussed proper crowd management strategies in the days, or even months, leading up to May Day 2007.

### 2. Training Without Oversight

Training Group was, and still is, responsible for the coordination, development and delivery of all training for the Department. However, Training Group was not part of the development, planning or delivery of training for Metropolitan Division or any other specialized division or unit. Historically, the Department believed that the training of specialized units such as Metropolitan Division required specialized skills that Training Group did not possess. Thus, these units developed and conducted their training outside of Training Group's oversight. Therefore, no oversight regarding the quality or content of this training was provided by Training Group prior to May 1, 2007.

An absence of oversight of training allowed the quality and content of Metropolitan Division's training to degrade over time. In fact, a review of training lesson plans from the past 15 years revealed that critical crowd management topics (including use of force policy, when use of the baton is warranted and treatment of the media in crowd control situations) were not covered in training at various points in time. Further evidence revealed that some policies were taught incorrectly. For example, during crowd management training provided to Metropolitan Division officers and command staff after May Day 2007, many officers and command staff members expressed a flawed belief that an individual who merely refused to comply with an order to leave the area should be considered aggressive and/or combative. It was very clear that over time Metropolitan Division officers were trained by Metropolitan Division supervisors with this belief in mind. Thus, it appeared that even when Metropolitan Division was conducting regular training, prior to the cut backs beginning in 2004, the content of that training may have been incomplete, or even inaccurate.

After May Day 2007, concerned about the lack of oversight, the commanding officer of Metropolitan Division has removed a supervisor from the field and assigned the position as a fulltime training coordinator. The training coordinator is the liaison to Training Division and will work closely with the Curriculum Design Unit from Police Training and Education, to ensure all training performed by the Metropolitan Division is appropriately researched and documented prior to delivery.[33]

---

[32] When Assistant Chief Paysinger took over as the Director of the Office of Operations, Metropolitan Division had 80 vacant positions. New officers were added to Metropolitan Division in an effort to fill these vacancies.
[33] Training Group is currently working with the Metropolitan Division Training Coordinator to conduct a review of all training delivered by Metropolitan Division to identify and prioritize lesson plan updates.

458

Regardless of how an officer is trained or what an officer truly believes to be true, an officer's use of force is always judged according to Department policy and an objective standard - not a standard that considers only the officer's state of mind.[34]

###### F.    Individual Responsibility

Even if planning was inadequate, tactics were flawed, command had broken down, situational awareness was poor and proper training was lacking, in the end, some behavior by officers on May Day 2007 appeared to be unjustified.  As the investigations into what actually occurred, or did not occur, on May 1st at MacArthur Park come to a close, it is clear that, while several other factors may have contributed to the day's events, ultimately, poor judgment and a lack of common sense also played a significant role.  How much weight is given to the importance of each factor will be a decision that Chief Bratton will make during the adjudication of the Internal Affairs Investigations into individual uses of force by Department personnel, when he reviews the totality of the circumstances.

The video images of May Day 2007 led many to believe that some officers experienced a lapse in judgment by what appeared to be the indiscriminate use of force against some passive individuals and members of the media.  The events of May Day beg two significant questions: *Why did some officers appear to have performed inappropriately? And, why didn't other officers present make an attempt to intervene?*

Every Department employee has an individual duty to act appropriately and every officer is responsible for his or her own actions.  Every officer has a duty to uphold the law, understand policy and fairly apply both.  As stated in Department Manual Section 210.25 ATTENTION TO DUTY:

> As most police work is necessarily performed without close supervision, the responsibility for the proper performance of officer's duty lies primarily with the officers themselves.  Officers carry with them a responsibility for the safety of the community and their fellow officers.  Officers discharge that responsibility by the faithful and diligent performance of their assigned duty. Anything less violates the trust placed in them by the people, and nothing less qualifies as professional conduct.

While policy and procedures are designed to provide officers with rules and guidelines for proper execution of their duties, policy cannot foresee every incident that an officer may encounter.  Therefore, officers must make decisions, such as what tactics to employ and how and when to use force, every day based on the circumstances presented to them in any given moment and be able to articulate their justification for each decision.

---

[34] In *Graham v. Connor*, the United States Supreme Court stated that an individual officer's use of force will be judged by the standard of a reasonable officer in similar circumstances.  *Graham v. Connor,* 490 U.S. 386 (1989).

*Why did some officers appear to have performed inappropriately?*

For some, it is possible that their actions may be deemed justifiable once the totality of the circumstances are reviewed. For others, there may be no justification and those will be held accountable. Officers who may have engaged in misconduct may have done so because they have no regard for Department policy. Others may have acted as they did as a result of the anxiety and tension of the moment. While the Department acknowledges that officers can get caught up in the heat of the moment, that does not excuse behavior that violates Department policy, or the law, nor does it deem it acceptable.

Additionally, every officer has a duty to stop a fellow officer who is engaging in misconduct. Department Manual Section 210.46 EMPLOYEE"S DUTY TO REPORT MISCONDUCT states that, ". . . an employee who observes serious misconduct shall take appropriate action to cause the misconduct to immediately cease. . . . Employees must . . . report all acts of misconduct and to act, if necessary, to prevent the escalation of those acts."

*Why didn't other officers present make an attempt to intervene?*

There are at least two plausible explanations for this question. First, officers on a skirmish line often only focus on what is directly in front of them, particularly in a crowd dispersal situation. The confusion of the situation and the firing of less-lethal weapons make it difficult to truly comprehend the actions of others, when an officer is engaged in the movement of a crowd. Thus, officers may not witness misconduct occurring around them. Again, this is why basic crowd management strategies, require "linebackers" behind a skirmish line to, among other things, help temper the response of the officers on the line. Second, it may be that an officer witnesses an incident, and either agrees with the actions of the officer or believes the officer is engaging in misconduct, but consciously decides not to intervene.

All Department employees, whether peer or supervisor, are expected to stop misconduct when they become aware of it. Supervisors, in particular, are not only responsible for stopping misconduct, but for maintaining the discipline of those they are commanding. Supervisors are expected to set an example for their subordinates. As such, supervisors who witness questionable activity must intervene; as inaction on the part of a supervisor may be perceived as approval of the officer's misconduct.

However, "the fact that a supervisor is present and not taking appropriate action to stop misconduct does not relieve other employees present" from stopping the misconduct.[35] "Experience, rank, or tenure are not factors in knowing the difference between right and wrong, and they do not provide an excuse for failing to take appropriate action."[36] Thus, any individual who witnessed unacceptable behavior, yet did nothing to stop it, will also be held accountable.

---

[35] Department Manual Section 210.46, EMPLOYEE"S DUTY TO REPORT MISCONDUCT.
[36] Department Manual Section 210.46, EMPLOYEE"S DUTY TO REPORT MISCONDUCT.

460

### IV.    ACTION TAKEN SINCE MAY DAY 2007

Upon being notified of the events of May Day 2007, Chief Bratton immediately proceeded to
MacArthur Park.  On his way to the park, Chief Bratton called Deputy Chief Mark Perez,
Commanding Officer of the Professional Standards Bureau, and Inspector General Andre
Birotte, and asked them to meet him at the park.  There, he met with Assistant Chief
Paysinger, Deputy Chief Carter, and others present.

Chief Bratton held a press conference at MacArthur Park that night, expressing his concern
regarding the afternoon's events.  Chief Bratton also directed Public Information Office
Sergeant Preciado to convey in Spanish to the Spanish Media outlets, the Department's
commitment to investigate the entire MacArthur Park incident.

In the late hours of May 1, 2007, Chief Bratton called a meeting with Captain Egan,
Commander Gray, Deputy Chief Carter, Metropolitan Division Captains Kroeber and Greer,
Deputy Chief Perez, Inspector General Birotte, Assistant Chief Paysinger and Mr. Gerald
Chaleff, Commanding Officer of the Consent Decree Bureau, among others, to discuss the
concerns regarding the events at MacArthur Park.  Chief Bratton immediately ordered the
Office of Operations to interview Captain McDonald, Captain Egan, Commander Gray and
Deputy Chief Carter.  Chief Bratton also ordered an Internal Affairs Group investigation and
ensured the Inspector General would have complete access to all information obtained during
all investigations.

It became evident to Chief Bratton that quick action would be necessary to address this
situation.  Chief Bratton's initial response was to quickly fix the short comings he saw in
leadership and begin the task of getting at the root of what happened on May 1, 2007.
Bratton focused on four areas: necessary investigations, leadership, training, crowd
management and how to institutionalize reform.

In the days and weeks after May Day, Chief Bratton held meetings with representatives of
the media, the Hispanic community, organizers of May Day, the ACLU and other interested
parties.  Additionally, at Chief Bratton's direction, in response to a request by the City
Council, the Department issued a report to City Council on May 29, 2007.

#### A.    Investigations

Soon after May Day 2007, Chief Bratton launched four investigations: (1) a personnel
complaint investigation; (2) a use of force investigation; (3) a criminal investigation as to
whether any organized group conspired to cause a disturbance on May Day; and (4) an
investigation by the Office of Operations, which included orders to produce an internal after
action report.  Chief Bratton also ordered that the Department fully cooperate with the FBI,
in its preliminary investigation in regard to the event of MacArthur Park.  Moreover, Chief
Bratton ordered the examination of events and this report to the Board of Police
Commissioners by Police Administrator Gerald Chaleff and Deputy Chief Michael Hillmann.

Soon after the investigations began, Chief Bratton and Deputy Chief Mark Perez decided to
combine the personnel complaint investigation and the use of force investigation into one, so

68

461

that Internal Affairs Group would be responsible for both.  This would ensure that uses of force, alleged to be excessive, would be scrutinized even more so than a typical non-categorical use of force in a crowd control situation (i.e., conducted as a categorical use of force investigation would be).[37]

To date, 246 individuals have reported injuries, ranging from bruises, two broken bones to emotional distress.  These numbers may grow as the litigation arising out of the events of May 1, 2007 progresses.  Additionally, Internal Affairs Group has received complaints from 321 civilians.  Allegations were formed by Internal Affairs Group for each of those complaints received.  Due to some complainants' inability to identify which officers used force and some officers' inability to identify the individuals with whom they came into contact, this investigation has been complex.  Thus, Internal Affairs Group undertook the task of reviewing all video and radio calls from May Day 2007, to identify each officer involved and formulate allegations accordingly.

The Department has conducted an extensive investigation, involving 41 members of the Professional Standards Bureau and resulting in over 4,700 hours of investigation.  This investigation has included the review of hundreds of hours of video and audio tape, interviews of all identified officers involved in a use of force, and interviews of every complainant or witness who could be located and was willing to speak with investigators.  (A number of complainants and witnesses, relying on their attorneys' advice, have refused to be interviewed.)  To date, 26 officers have been identified and may be subject to potential discipline.  The entire investigation is under review by the District Attorney, as is standard practice, to determine if any criminal charges will be filed against any officers involved.

As the individuals who threw objects at police were described as "anarchists," implying that an organized group of individuals may have been involved in the disruptive behavior that day in MacArthur Park, Chief Bratton directed an inquiry by the Counter-Terrorism and Criminal Intelligence Bureau (CTCIB).  CTCIB participated in an overview of all evidence and documentation gathered to determine if in fact "anarchists" or any other organized group were involved in causing the disturbance on May Day.  The investigation found no evidence of any plan formulated prior to May 1, 2007, by an organized group, for a disruption caused by individuals throwing objects at police.

Further, Robbery Homicide Division followed up on the five arrests that were made in relation to the events of May Day.[38]  As a result, two cases were filed for assault with a deadly weapon, a misdemeanor warrant was processed, and two cases are pending.  It should be noted that none of the five individuals were arrested during Metropolitan Division's action to clear the park.

---

[37] Categorical use of force investigations are conducted when there is a injury in which a suspect is hospitalized, shot by an officer, or suspect suffers a head injury.  If one of these events occurs, the Force Investigations Division, Professional Standards Bureau will conduct the investigation.  All other use of force incidents are typically investigated by the Division of occurrence.

[38] Five additional individuals were arrested for drinking alcohol in the park earlier that day, during Rampart Area personnel's efforts to prepare the park for the expected marchers.  These arrests were not included in Robbery Homicide Division's follow up activities.

The After Action Report is a routine internal report used by the Department for years to review the actions of the Department after any large incident, and includes topics such as tactics, training, technology and use of resources.

### B.    Leadership and Personnel Changes

As a result of the tactics and strategies deployed at MacArthur Park and the apparent lack of leadership, Chief Bratton had serious concerns regarding his management team.  In the days immediately following May Day 2007, Chief Bratton exercised his right as manager of the Department and made specific personnel changes to restore confidence in the leadership team and to ensure the Department's ability to manage such events in the future would not be compromised.  Personnel changes immediately following the event included:

- Deputy Chief Carter was removed from his position of Commanding Officer of Operations-Central Bureau and ordered home;
- Commander Louis Gray, Assistant Commanding Officer of Operations-Central Bureau was removed from that assignment and reassigned to the Office of Operations pending the outcome of the personnel complaint investigations;
- Commander Sergio Diaz, Assistant Commanding Officer, Special Operations Bureau was promoted to Deputy Chief and assigned to Operations-Central Bureau;
- Captain Andy Smith, Commanding Officer of Central Area was promoted to Assistant Commanding Officer of Operations-Central Bureau;
- Deputy Chief Hillmann was loaned from Operations West Bureau and assigned to prepare training for Metropolitan Division and all command staff within the organization.

Additional personnel changes occurred over the course of the next two months.  Chief Bratton hand selected those to succeed the outgoing personnel with the intent to build confidence in the leadership of the Department.

Additionally, Chief Bratton made an unprecedented move immediately after May Day 2007, by removing all Metropolitan Division officers from their field duties until they completed mandatory training.  Though such a move had never been made in the history of the Department, Chief Bratton was concerned about the footage of some of the incidents; and expressed concerns that Metropolitan Division officers had not been properly trained; acknowledged that numerous officers on scene were newly appointed to the Division; and that many had voiced confusion regarding the use of force policy as it pertains to crowd management.

### C.    Training Improvements

Training quickly surfaced as one of many concerns relating to May Day 2007.  A critical component of Department preparedness for any event is training.  Immediate areas of concern were:

- No clear unity of command by senior staff;

70

- Mobile Field Force/Crowd Control training had not occurred for over a 18 months;
- The use of force policy was not clear in regard to crowd control situations;
- Tactics and strategy appeared to be flawed;
- The use of force deployed by some Metropolitan Division officers appeared to be problematic; and
- There was a lack of understanding by officers of the media's role at public demonstrations.

As a result of the actions at MacArthur Park, Chief Bratton needed to restore confidence in the Department's ability to handle future events. He immediately directed Deputy Chief Hillmann, Commanding Officer Operations-West Bureau, to review the events of MacArthur Park, prepare training for all Metropolitan Division officers and supervisors, and prepare separate training for all Department command staff.[39]  Deputy Chief Hillmann was provided with the assistance of Special Operations Bureau, Training Group and Use of Force Review Division.

Chief Bratton further directed that all members of Metropolitan Division be re-trained on tactics, policy and crowd control protocols prior to being assigned to any future event. Additionally, Bratton tasked the commanding officers of Training Group and Use of Force Review Division to identify possible conflicts between crowd control tactics and Department use of force policy, resolve them, and incorporate the information into Deputy Chief Hillmann's curriculum.  Additionally, Training Group was directed to conduct a review of all training conducted in preparation of May Day 2007.

## 1. Crowd Control Training

Deputy Chief Hillmann immediately brought together a team of Department experts to review the events of May Day 2007 and identify issues in regard to command, control, use of force and tactics.[40]  Hillmann brought the commanding officer of Training Group onto his team to ensure that the training being designed would be properly documented, legally sound, delivered consistent with adult learning methodology and adhere to Department policy.  Hillmann's training development team used footage from the various media outlets and reviewed the Incident Acton Plans from Central and Rampart Areas to identify immediate training needs.  Training areas identified included: fragmented planning, lack of unity of command, poor operational coordination, ineffective communications, fragmented interpretation of use of force policy in crowd control situations, no arrest posture, poor tactics, lack of understanding of the media's role and the Department's responsibility to the media.

---

[39] Chief Hillmann is currently the Department expert in crowd management.  His tenure with the Department includes a tour of duty at Metropolitan Division as a lieutenant in the 1990's.  He was instrumental in the design and development of the Mobile Field Force concept and training, and is nationally recognized as an expert in this field.

[40] Deputy Chief Roupoli, Commanders Diaz and MacArthur, Captains Webb, Zippermann, Green, Tingiredes, Runyen, and Incontro, and the Director of Public Information were brought together to assess the incident.

464

Deputy Chief Hillmann and Commander Sandy Jo MacArthur, Commanding Officer of
Training Group, assembled the following team to design the curriculum:

- Department experts from both specialized and field assignments on crowd
  management and crowd control tactics;
- Department experts on curriculum design and adult learning theory;
- The Director of Police Training and Education;
- Commanding Officer, Use of Force Review Division;
- Commanding Officer, Public Information Office;
- Representatives from the City Attorney's Office;
- Representatives from the United States Department of Justice, Community
  Relations Section; and
- Representatives from the City of Los Angeles Human Relations Commission.

This was the first time in the development of crowd control curricula that the Department
brought together the Community Relations Section of the U.S. Department of Justice, the
Human Relations Commission and Training Group to assist in the design and delivery of
crowd control training.

Training Group then delivered an eight-hour course on crowd management and crowd
control to all of Metropolitan Division personnel including officers, supervisors and
commanding officers during the week of May 7, 2007.  Two weeks later, Training Group
delivered training to all command staff personnel (captains and above).  This ensured that the
leadership of the Department was provided with consistent information regarding policy (use
of force and media relations), tactics, strategy and law.

This training delivered a clear and concise message including a complete review of: media
relations policy, use of force policy and the Supreme Court case *Graham v. Connor*, which
establishes the legal standard for law enforcement's ability to use force during the course of
their duties, arrest posture and more.  The course included the following:

- History of Mobil Field Force Concept
- Understanding and reading the dynamics of crowds
- Use of force policy and reporting requirements
- Specifically use of force and the baton
- Policies on deployment of less-lethal munitions
- Review of all City of Los Angeles legal settlements as they pertain to crowd
  control, less-lethal munitions and the media
- Unity of command
- Leadership, command and control
- Arrest posture at demonstrations
- Planning and training for demonstrations
- Communications
- Use of sound trucks
- Use of Shadow teams

72

During the delivery of this training, it became evident that there was confusion regarding what "aggressive and/or combative" meant when describing the actions of an unruly crowd. The 1996 Department Training Bulletin became the source document that appeared to create confusion.  According to the Department Training Bulletin on *Use of Force-Baton Part II Crowd Management and Control*, "There are no exceptions to the Department's Use of Force policy."[41]  It further provides for some examples of individuals' actions and then states "these individuals' actions, as described on the Department's Situational Use of Force Options Chart, may be categorized as UNCOOPERATIVE or AGGRESSIVE/COMBATIVE based on an individual officer's subjective viewpoint."  However, nowhere does the bulletin provide a clear definition of aggressive or combative behaviors.

Additionally, a cross section of officers, supervisors and command staff who attended the training voiced frustration that the Department had moved away from taking an arrest posture with those who purposely break the law and prevent others from exercising their First Amendment rights during public demonstrations.  Though the confusion regarding the policy and apparent shift away from an arrest posture was identified, no one of any rank believed excessive force should ever be tolerated.

## 2.    Mobile Field Force Training

Due to the large number of public demonstrations that occur in the City of Los Angeles, Chief Bratton requested that Chief Hillmann and Commander MacArthur develop Department-wide Mobile Field Force and crowd control training and incorporate all of the lessons learned from May Day 2007.  A ten-hour course was designed and Training Group prepared a train-the-trainer course, mandatory for all supervisors and officers selected to train on the new curriculum.  Instructors were hand selected from both Training Division and Metropolitan Division to jointly instruct the Department to ensure that in-service employees and recruit classes would be uniformly trained.  Additionally, all instructors are required to attend a train the trainer course designed and delivered by Training Group prior to teaching any crowd management courses.[42]

The ten-hour course designed as a result of May Day 2007 covers the following topics:
- Tactics
- Arrest posture
- Use of force policy
- Crowd management and crowd control dynamics
- Command and control techniques
- Overview of less-lethal munitions
- Reading a crowd
- Partners from the community
- Multiple practical application exercises

---

[41] 1996 Training Bulletin, *Use of Force-Baton Part II Crowd Management and Control*, p.5.

[42] As of October 1, 2007, 60 trainers have attended the 2007 Crowd Control and Mobile Field Force train the trainer course.  Additionally, Training Division is running several Instructor Development courses specifically for Metropolitan Division instructors to teach them theories of adult learning.

Training Group has established a training schedule that will provide crowd control and Mobile Field Force training every two years and will include all of the above topics with an emphasis on use of force, use of the baton and interactions with the media.

Beginning July 2007, Training Group and Metropolitan Division launched the Department-wide training course for all personnel assigned to the Office of Operations. As of October 1, 2007, approximately 2,000 field officers and supervisors have been trained. The training delivery plan will see that more than 6,500 members of the Department will be trained by March 2008. The Department has also provided training for officers from the Department of General Services Office of Public Safety and the Los Angeles Unified School District Police. Additionally, members of the Los Angeles Human Relations Commission, the media and the ACLU have been provided the opportunity to view the training.

Chief Bratton has further designated Training Group to be responsible for oversight of the training content, documentation of the lesson plans and the delivery of courses provided by all specialized entities within the Department to ensure that the issues in regard to lapses in training do not repeat themselves.

### D.    Institutionalizing Reform

Chief Bratton was concerned that the Department had identified many of these problems in the past and that the lessons learned had been forgotten. Further, concerns over which entity within the Department was responsible for the oversight of managing large scale incidents within the City surfaced, as multiple entities were responsible for setting Department policies and procedures when handling a variety of incidents (including earthquake, floods, terrorist activity, demonstrations, to name a few - referred to as "all hazards/all risks"). This fragmented approach appeared to have caused inconsistencies in the planning, operations and after action review of incidents throughout the City. It also explained why the lessons learned from the past were often forgotten.

In an effort to prevent lessons learned from being lost once again, Chief Bratton made a significant move to institutionalize reform. Much like he did with the creation of the Consent Decree Bureau to institutionalize change as a result of the Federal Consent Decree, Chief Bratton announced the formation of a new Bureau within the Department. On July 1, 2007, Chief Bratton created the Incident Management and Training Bureau (IMTB) and mandated the new bureau report directly to the Chief of Police. Chief Bratton selected Deputy Chief Michael Hillmann to head IMTB. As stated earlier, Hillmann is a nationally recognized expert in the field of crowd control and the management of all hazards/all risk incidents. The creation of IMTB and the appointment of Deputy Chief Hillmann were intended to ensure that reforms put in place today, would be institutionalized rather than lost within the Department going forward.

IMTB was created to be responsible for providing guidance and oversight of the development of policy, procedures and tactics necessary for crowd management events and for liaising with all federal, state and local agencies (e.g., the Federal Bureau of Investigations, the Federal Emergency Management Agency and the Los Angeles County

467

Sheriff's Department, etc.) to develop a coordinated regional response to large-scale incidents affecting the City of Los Angeles. Additionally, IMTB was created to ensure that all Department training would be consistent Department-wide.

Important in the institutionalization of any system is training. For years, training had served merely in a support capacity for the Department. Therefore, when issues arose in regard to things such as field deployment for crime suppression, training was typically one of the first things cut. Further, viewed solely as a support function, training often did not have a voice within the Department. In 2004 and again in 2006, the Commanding Officer of Training Group and the Director of Police Training and Education raised serious concerns over the reduction in training. These concerns were never addressed. Therefore, Chief Bratton moved Training Group under the direct command of IMTB in an effort to move training out of a support function and give training the voice it demands. The Commanding Officer of Training Group and the Director of Police Training and Education report directly to the Commanding Officer of IMTB, who reports directly to the Chief of Police.

IMTB is currently responsible for the following:
- All recruit and in-service training;
- Research, creation and approval of all Department curricula;
- Liaise with all Department subject matter experts who assist in curriculum design;
- Manage compliance with federal and state training and educational mandates;
- Develop best practices for training methodologies;
- Liaise with federal, state and local agencies responsible for resolving all hazards/all risk incidents;
- Develop and coordinate Department incident management strategies, tactics and training consistent with the National Response Plan, standardized Emergency Management Systems, and State mandates;
- Audit Department preparation and response to special events and unusual occurrences;
- Develop, coordinate and maintain Department Mobile Field Force, crowd management strategies, tactics and training;
- Provide subject matter expertise to the Department regarding special events and unusual occurrences management;
- Train incident management staff for selected events in conjunction with Special Operations Bureau (SOB) and Counter-Terrorism and Criminal Intelligence Bureau (CTCIB); and
- Develop, implement and maintain a regional Incident Management Team training program in conjunction with SOB and CTCIB.

The responsibility for each of the tasks listed above had previously been distributed throughout the Department; often with two or more entities tasked with similar duties. Chief Bratton believed that with the inception of IMTB, one entity would be responsible for the development of strategies and tactics based on lessons learned and national best practices that would then be used for training the entire organization. This would allow for consistency in training courses and provide Training Group and Police Training and Education an important

468

voice at the risk management table; as training should be viewed as an investment, not an expense.  This was a departure from the past wherein specialized units had previously developed curriculum and trained with little to no oversight.

469

## V.    CROWD MANAGEMENT AFTER MAY DAY 2007

The events of May Day 2007 clearly identified the need for significantly improving incident management oversight.  Accordingly, the following changes have been made.

### A.    The Incident Management Team

Traditionally, the Department defined Area command responsibilities based on population, calls for service, Area boundaries and reporting districts.  However, unusual occurrences (i.e., earthquakes, fires, public assemblages, criminal/terrorist events etc.), typically do not fall neatly within existing geographic boundaries.  Further, the 21st Century emergency preparedness strategies necessary to handle all-hazards/all-risks, special events and criminal terrorist incidents, must include regional response plans, mutual aid agreements and specialized command expertise.  Today's complex events must be managed by highly trained specialists.

An Incident Management Team (IMT) is a team comprised of specialists who are experienced leaders, decision makers and strategic thinkers familiar with all aspects of emergency management.  An IMT is a cohesive team focused on managing large, complex sensitive incidents.  The IMT concept is industry standard, commensurate with the federally mandated National Incident Management System and has proven successful in the years since the terrorist attack of September 11, 2001.

### B.    Implementation of the IMT Following May Day 2007

Following May Day 2007, it was recommended to Chief Bratton that the Department utilize the Incident Management Team concept going forward.  Recognizing the benefits of this concept, Deputy Chief Hillmann was directed to implement and institutionalize the use of IMTs into the practices and policies of the Incident Management and Training Bureau.

The Department has now utilized the IMT concept to successfully manage several large-scale events since May Day 2007.  The following incidents have clearly demonstrated the effectiveness of the IMT.

**May 8, 2007, The Griffith Park Fire – Hollywood and Central Areas:** On May 8th, at approximately 1:20 p.m., a brush fire broke out near the Roosevelt Golf Course in the Griffith Park area of Los Angeles.  The Los Angeles Fire Department reported a fire covering seven-acres in the hills of the park. The fire moved quickly and threatened over 300 homes in the Los Feliz area of Los Angeles.  In total, over 817 acres of the park were burned.  During this event the Chief of Police directed the Director of Operations to support LAFD with an IMT for evacuation and traffic management.  Although the IMT process in this case was hastily developed it proved successful by selecting experienced personnel to manage the event.

**May 17, 2007, The Procession For Justice March and Rally – Rampart Area, MacArthur Park:**  An IMT was formed to plan for a immigration rights march and rally planned For May 17, 2007.  Personnel were selected, resources were identified and a

470

planning timeline was created.  Meetings were conducted with event coordinators, allied agencies and stakeholders.  A communications plan and contingency measures were created, along with a clearly defined Incident Action Plan (IAP).  The event drew approximately 2,000 attendees who marched from Wilshire and Berendo Streets, eastbound into MacArthur Park.  The IMT established a friendly police presence and facilitated a peaceful First Amendment march and rally.  The event was without incident, no arrests, no use of force and no injuries were reported.  The IMT utilized in this circumstance consisted of experienced crowd management experts from within the Department.  This was the second successful utilizations of the IMT model.

**June 15, 2007, Justice for Janitors March and Rally – Century City:**  The Janitors for Justice organization is known for peaceful marches involving planned civil disobedience.  On June 1, 2007 an IMT was designated and began to plan for the event.  On the day of the event approximately 1,000 individuals attended the march and arrived via buses at Century Park West and Santa Monica Blvd.  The group marched south to Pico Boulevard and Motor Avenue.  Throughout the march the Incident Commander liaised with numerous business owners and event organizers in order to mitigate potential "sit-in" style civil disobedience.  The IMT consisted of selected, experienced crowd management command personnel.  The event concluded without incident.

**June 24, 2007, Full rights for Immigrants March and Rally – Hollywood Area:**  In preparation for this event, the Chief of Police directed an IMT be deployed.  On June 24, 2007, participants gathered at Hollywood and Ivar Streets at 10:00 a.m.  Approximately 5,000 attendees arrived and marched to Hollywood and Highland for a rally pertaining to Immigrant Rights and Anti-War.  The IMT Incident Commander took proactive measures to prevent disruption of the event.  The event concluded without incident.

As a result of the above successes of the IMT concept, Chief Bratton has directed the IMT to be implemented as the standard for the Department.

## VI.    RECOMMENDATIONS AND CONCLUSION

Notwithstanding the problems in planning, tactics, command and control, situational
awareness, training and individual responsibility, the larger issue was the fact that not a
single supervisor or member of the command staff involved attempted to intervene.  There
were a number of instances where the events paused long enough so that what was happening
in the park could have been stopped.  Instead, the failing leadership, breakdown in
supervision, and breakdown in personal discipline, caused those without full situational
awareness to take action without understanding how their decisions might affect the final
outcome.

The recommendations of this report differ from the recommendations of reports and
commissions that have preceded it, in that they will be followed by a clear plan for
implementation and institutionalization via the Incident Management and Training Bureau.
The efforts of the Department, to date, indicate its commitment to ensuring that these
recommendations will be ingrained in Department policies and procedures that will remain
long after those in command today have moved on.  To this end, it is expected that all of the
following recommendations be implemented within one year of the publication of this report.

| POLICY | Implementation |
|---|---|
| 1.  Regularize/Institutionalize Incident Management and Training Bureau (IMTB) and identify existing positions within the Department that currently have responsibilities for incident management and training, and relocate those positions under IMTB. | **June 2008** |
| 2.  IMTB, in conjunction with Special Operations Bureau (SOB), shall annually review policies regarding crowd management and crowd control, including use of force and extended range, less-lethal impact munitions policies, and report recommendations to the Chief of Police. | **June 2008** |
| 3.  The Department shall enhance the ability to identify employees during crowd control situations (i.e., marking of ballistic helmets and tactical vests with rank, serial numbers and/or names). | **June 2008** |
| 4.  The Department shall design a highly mobile sound unit vehicle, utilizing innovative communications and visual technology available. | **January 2008** |
| 5.  The Department shall provide training and develop protocols for Department videographers, to ensure the accurate recording of special events. | **June 2008** |
| 6.  Planning and Research Division shall update the Field Operations Guide to include modifications to the media section, consistent with the settlement agreement arising from *Crespo v. City of Los Angeles*. | **January 2008** |
| 7.  Risk Management Group shall notify Planning and Research Division to draft a special order anytime a settlement agreement affects Department policy. (e.g. *Crespo v. City of Los Angeles*) | **October 2007** |

472

**Implementation**

8. IMTB to develop protocols to be used for planned and unplanned events to **December 2007**
include:

- Incident Commanders, or their designee(s), must make every reasonable effort to coordinate with event organizers prior to and during each event.

- Incident Commanders, command and general staff shall maintain situational awareness throughout any event via all available means.

- Incident Commanders shall reasonably accommodate credentialed members of the media consistent with Department guidelines and policies and Court settlements/agreements.

- Incident Commanders shall ensure coordination amongst all deployed, operational resources (e.g., Metropolitan Division, Air Support Division, Emergency Operations Division, Counter-Terrorism Criminal Investigation Bureau, LA Department of Transportation, General Services Department, LAUSD Police, LAFD, shadow teams, bicycle units, mobile field force units, sound units, video units, community relations and PIO).

- Incident Commanders shall request Air Support Division provide aerial video documentation of specialized events when practical.

- Superior officers who intend to issue orders and/or directions shall assume command and communicate that transfer of command consistent with Department policy and the National Incident Management System (NIMS).

- Incident Commanders shall ensure a clear, concise and well-disciplined communications plan is utilized.

- The Incident Commander shall be responsible for delineating a clear chain of command, consistent with Department policy and the National Incident Management System (NIMS).

- All orders shall be communicated in a manner that clearly states the objectives.

- When Metropolitan Division resources are deployed, the Metropolitan Division Commanding Officer shall be on-scene and assume the role of Critical Assets Branch/Group Leader. The Metropolitan Division Commanding Officer shall report to the Incident Commander.

- Incident Action Plans shall be communicated to and reviewed by all involved entities.

- The Incident Commander shall establish an affirmative arrest posture consistent with the isolation of those committing criminal acts from those persons legally exercising their First Amendment rights.

- The definition of the responsibilities of the Investigative Branch to follow up on criminal cases resulting from arrests.

80

473

| **PLANNING** | **Implementation** |
|---|---|
| 9. Standardize Incident Actions Plans format and criteria consistent with NIMS. | **December 2007** |
| 10. Incident Action Plans for recurring events and all major events shall be approved by Special Operations Bureau. | **September 2007** |

**COMMAND**

| | |
|---|---|
| 11. The Incident Management Team (IMT) model shall be utilized Department-wide as designated by the Chief of Police or his designee. | **May 2007** |
| 12. The Commanding Officer of Metropolitan Division shall be on-scene at the deployment of Metropolitan Division resources involving crowd control, unusual occurrences, preplanned or spontaneous events. | **June 2007** |

**TRAINING**

| | |
|---|---|
| 13. Training Group, under the direction of IMTB shall be responsible for oversight and quality control for all Department training. | **October 2007** |
| 14. The Department shall establish a Mobile Field Force coordinator to ensure regular, periodic training and policy review. | **October 2007** |
| 15. Command and staff officers shall maintain a clear understanding of use of force policies as they pertain to crowd control incidents through periodic training. | **Periodic** |
| 16. IMTB shall incorporate "lessons learned" based on Incident Action Plans, After-Action Reports and audits, into appropriate training curricula. | **Annually** |
| 17. IMTB shall coordinate annual training for Incident Management Teams and command staff regarding incident management. | **Annually** |
| 18. IMTB shall update the 1996 Training Bulletins in regard to crowd control in conjunction with appropriate entities. | **March 2008** |

**AUDITING**

| | |
|---|---|
| 19. IMTB shall standardize the criteria for completion of After-Action Reports and review/update criteria annually. | **November 2007** |
| 20. IMTB shall conduct regular, periodic audits of Incident Action Plans and After-Action Reports. | **Annually** |
| 21. The Department shall develop an automated system for tracking After-Action Reports and audits. | **January 2008** |
| 22. IMTB, in conjunction with SOB, shall evaluated audit results and complete an annual status report to the Chief of Police. | **Annually** |
| 23. All IMTB audit recommendations shall be tracked by IMTB and included in the annual status report to the Chief of Police. | **Annually** |

474

## GLOSSARY OF TERMS

- **Aggressive and/or Combative:** Actions and/or movements by an individual or group of individuals deemed to be objectively confrontational to include, physical attacks on person/public safety; a fighting disposition (e.g., clenched fist, threats of violence coupled with reasonable ability to carry out the threat; destruction of property).
- **Blocking Force:** Personnel deployed in an organized fashion to prevent access of an advancing crowd.
- **Chain of Command:** Clearly defined lines of authority drawn so that a structural relationship exists between each employee and the person in charge.
- **Civil Disobedience:** An unlawful event involving a planned or spontaneous demonstration by a group of people.
- **Crowd Control:** Law enforcement response to a pre-planned or spontaneous event, activity or occurrence where there is a potential for unlawful activity or the threat of violence.
- **Crowd Management:** Strategies and tactics employed by law enforcement agencies to deal with lawful assemblies in an effort to prevent escalation of events into an unlawful assembly or riot.
- **Feeder Marches:** Groups of people gathered at different locations who join into one larger group and march.
- **Incident Action Plan (IAP):** A written plan containing general objectives reflecting the overall strategy for managing an incident. It may include the identification of operational resources and assignments. It may also include attachments that provide direction and important information for management of the incident during one or more operational periods.
- **Incident Command System (ICS):** Is a management system designed to enable effective and efficient domestic incident management by integrating a combination of facilities, equipment, personnel, procedures and communications operating within a common organizational structure.
- **Incident Commander (IC):** The individual responsible for all incident activities, including setting objectives, development of strategies and tactics, and priorities of the incident. The IC is also responsible for the ordering and the release of resources. The IC has overall authority and responsibility for conducting incident operations and is responsible for the management of all incident operations at the incident site.
- **Incident Command Post (ICP):** The field location at which the primary tactical-level, on-scene incident command functions are performed.
- **Incident Management Team (IMT):** The team comprised of the Incident Commander and appropriate Command and General Staff personnel assigned to manage the incident.
- **Less-lethal Impact Munitions:** Projectiles launched or otherwise deployed for purposes of overcoming resistance, preventing escape, effecting arrest, reducing serious injury and are without significant likelihood of causing death.
- **Line Backer:** A term utilized to identify those personnel assigned to a squad, positioned behind the line of officers to assist in maintaining the integrity of an organized squad movement, control of arrestees, control of officers on the skirmish line and communicating with the squad leader's direction.
- **Mobile Field Force (MFF):** A fast and effective method to assemble and deploy a platoon-size, tactical forces from existing on-duty personnel. The MFF is adaptable to both pre-

82

475

planned and spontaneous events, which require the rapid assembly of large numbers of
officers.

- **Multi-Agency Coordination Center (Entity):** A multi-agency coordination entity that
  functions within a broader multi-agency coordination system.  It may establish the priorities
  among incidents and associated resource allocations, do conflict agency policies and provide
  strategic guidance and direction to support incident management
- **Non-Target Specific Less-Lethal Impact Munitions**: Fired at a crowd for the purpose of
  crowd control and/or dispersal.
- **Target Specific Less-Lethal Impact Munitions:** Less-lethal Fired at a specific/identifiable
  target for the purpose of selectively and temporarily incapacitating an individual or to cause
  the individual to stop aggressive/combative actions.
- **Unity of Command:** Every individual within the command structure has a designated
  supervisor to whom they report at the scene of an incident.

476

# APPENDIX 1

477

478

## Settlements Resulting From the 2000 Democratic National Convention In Los Angeles

| CASE NAME | SETTLEMENT OVERVIEW | AREA AFFECTED |
|---|---|---|
| **National Lawyers Guild** v. **City of LA** CV 01-016877FMC | • Helicopters shall operate at reasonable altitudes to avoid disruption of First Amendment protected activities.<br>• The Incident Commander will coordinate with event organizers to help avoid flights during keynote speaker presentations.<br>• Helicopters shall not be prevented from responding to emergency situations requiring immediate police response. | **Helicopters** |
| | • Less-lethal munitions may be deployed in the following situations:<br>  ▪ On aggressive and/or combative suspects in a crowd control situation.<br>  ▪ On suspects who are a potential threat to themselves or others.<br>  ▪ On suspects armed with weapons other than firearms.<br>  ▪ On suspects displaying "aggressive or combative" actions (aggressive/combative actions include ongoing destruction of property that presents a threat to the personal safety of officers).<br>• Less-lethal munitions should not be used on:<br>  ▪ A lawfully dispersing crowd or individual.<br>  ▪ Against a person or crowd that is retreating unless the person or crowd continues to engage in unlawful activity that is aggressive and/or combative.<br>  ▪ Less-lethal "Stinger" weapons can be used only with the approval of a staff officer (Commander and above) only during riotous situations where the use of lethal force would not be reasonable. | **Less-Lethal Munitions** |
| | • Personnel will not utilize motorcycles or bicycles to strike lawfully assembled demonstrators as a method of crowd control. | **Motorcycles and Bicycles** |
| | • Demonstrators participating in lawful assemblies shall not be prevented from using public sidewalks to join or exit a lawful march or from using any public sidewalk. The caveat being marches will not be allowed to disrupt pedestrian movement and/or illegally prevent lawful business from operating. | **Marches** |
| | • The Incident Commander, prior to declaring an unlawful assemble, shall refer to LAPD Guidelines for crowd management and crowd control, Volume V, LAPD Emergency Operations Guide.<br>• Incident Commanders should be trained and follow guidelines in Chapter 5, Crowd management Strategies and Tactics, Volume V, LAPD Emergency Operations Guide.<br>• Before any public assembly is declared unlawful, the Incident Commander should evaluate the feasibility of isolating and arresting those responsible for the unlawful conduct and if feasible, arrest them. | **Public Assemblies** |
| **Crespo** v. **City of LA** | • The Incident Commander will designate a reasonable viewing area for the media to facilitate reporting.<br>• The Incident Commander will designate an information officer clearly identified at the scene of an incident to facilitate interaction with the media.<br>• LAPD will recognize that the news media has a right, without interfering with police operations, to cover events that may result in the declaration of an unlawful assembly and order to disperse.<br>• LAPD will make efforts to accommodate the media reporting obligation, however, such efforts will be made consistent with the LAPD's primary obligation to maintain public safety and order.<br>• LAPD will take into consideration when selecting the viewing area public and officer safety, police tactics, input provided by the media and the ability of the LAPD to prevent the location from becoming part of the impacted area.<br>• To the extent reasonably possible, the LAPD will try to prevent the news media viewing area from becoming part of any area impacted by an unlawful assembly declaration and order to disperse.<br>• To the extent reasonably possible and without compromising public or officer safety, the LAPD incident commander will relocate the news media viewing area if, due to changing conditions, the initial area no longer affords the media a reasonable view of the event or becomes a tactical concern for the incident commander. | **Media** |
| | • After declaring an unlawful assembly the Department will designate a dispersal route for all persons including the media to use when evacuating the area. | **Dispersals** |

**APPENDIX 1**

85

479

480

# APPENDIX 2

481

482

APPENDIX 2

**History of Development and Training**
**Mobile Field Force and Crowd Control/Management**
**Prepared by Training Group July 2007**

| | |
|---|---|
| 1992 | Metropolitan Division developed a 16-hour MFF course and began delivery to LAPD personnel. |
| | Metropolitan Division reached out to the Miami Police Department for lessons learned from their response to riots in Miami Florida in 1980 and 1989. In 1980, 18 people were killed and more than $130 million in property damage occurred after Caucasian Miami police officers were acquitted in the beating death of an African-American and in 1989, Miami police officers shot an African-American motorist resulting in his passenger dying in the ensuing crash. Together with lessons learned from Miami and Los Angeles. |
| | The training consisted of conventional crowd control tactics; counter ambush; lessons learned from April/May 1992; mass arrests procedures; Mobile Field Force concept; personnel and vehicle assignments; use of chemical agents; use of force; and exercises in: arrest and control, chemical Agents, citizen rescue, gang convoy stops, mobile tactics, patrolling hostile areas, and squad formations. |
| 1993 | 6500 Department personnel and 1,000 personnel from outside agencies (California Highway Patrol, Los Angeles County Sheriff's Department to name a few) had completed the course. |
| 1993 | The State of California adopted the MFF concept and codified it into the 1993 California Police Officer's Standards in Training (POST) Crowd Management and Crowd Control Guidelines. |
| 1995 | The Department introduced a new situational use of force continuum to officers that labeled categories of individual behaviors as the following: *cooperative, no response to commands, uncooperative, aggressive / combative and life threatening* and established it as our policy. Various force options available to officers to control a situation were listed and correlate to the behavioral categories At that time the Department published a Use of Force Handbook and trained all sworn employees to the use of force continuum. It was immediately added to the Recruit Basic Course, Supervisor, Watch Commander and Command Development schools. |
| | The subject of use of force was added to roll call training and provided on a regular basis. The policy immediately applied to all use of force incidents including crowd control situations. |
| 1996 | Department issued a Training Bulletin entitled, Use of Force-Baton Part II Crowd Management and Control. This bulletin became the document cited in training to describe the amount of force an officer is able to use during crowd control incidents. |
| 1998 | The MFF and crowd control course was added to the recruit basic academy course. |

87

**History of Development and Training**
**Mobile Field Force and Crowd Control/Management**
**Prepared by Training Group July 2007**

| | |
|---|---|
| **2001** | The in-service MFF lesson plan was updated during a routine review and at that time the use of force section in the MFF lesson plan included a very brief section on use of force that stated that "…there is no exception to the use of force policy during crowd control situations other than the reporting requirements." |
| | There is no further information documented in the lesson plan regarding details of the use of force policy or the appropriate application of baton strokes during crowd control events. There is no ability to now prove if any additional information was provided in the course regarding use of force, except through discussions with various individuals who were students of the course or those who instructed. Additionally, the section of the course that pertained to the use of the baton during crowd control situations focused totally on technical skills. Therefore, from 2001 forward the class discussion surrounding use of force at crowd control situations and the behaviors that allow for the use of the baton during crowd control incidents is sketchy at best. |
| | In 2001, the settlement requirement in the *Crespo v City of Los Angeles* to train officers on issues involving the media were added to the lesson plans. However, the detail in the lesson plans is insufficient to clarify what specifically was taught to the students in these areas. |
| **2003** | Use of force was one of several topics covered in the Continuing Education Delivery program that all in-service sworn employees attended. |
| | Also in 2003 Metropolitan Division updated the Mobile Field Force course, created a four, eight and ten-hour version for delivery on an "as needed" basis. At the request of the Office of Operations, Metropolitan Division modified the Mobile Field Force training into a five-hour course that was combined with a five-hour course on Immediate Action and Rapid Deployment for a ten-hour training day. Combining the two courses was done to help with the growing concern over crime suppression and deployment demands. At this time the focus of the training continued to be technical skill development due to the reduction in time allotted. When the lesson plan was modified to five hours, the use of force section and the media section were removed from the lesson plan. Metropolitan Division instructors voiced concerns about the inadequate time now allotted for the two very different subject matters. However, the training proceeded. It was also incorporated into the Supervisory Development School. |
| | In 2003,during the lesson plan modification and did not cover three critical areas: use of force, when the use of the baton is warranted during crowd control situations, and policy related to the media at crowd management incidents. The lesson plans clearly focus on techniques rather than policy. |
| **2004** | Rising concern over crime suppression and field deployment needs, much of the "non-required" training was scaled back at the request of Office of Operations. |
| | Chief Bratton supported the reduction of "non-required" training to allow for a strong focus on Consent Decree training |

88

**APPENDIX 2**

484

**History of Development and Training**
**Mobile Field Force and Crowd Control/Management**
**Prepared by Training Group July 2007**

|  | |
|---|---|
|  | compliance and crime suppression. Mobile Field Force training for in-service officers was not mandated by the Department or POST and therefore was not a priority and among the many training courses that were scaled back. |
| 2005 | The Director of the Office of Operations, then Assistant Chief Gascón halted the Basic Metro Course and scaled back Metropolitan Division's regularly scheduled monthly training from two days per month to one, due to a growing concern over crime suppression. |
|  | The cut back of training allowed for Metropolitan Division officers to be deployed in crime suppression details and assist other commands throughout the city. Chief Bratton approved Assistant Chief Gascón's recommendation to scale back training with the understanding that the subject should be revisited periodically. |
|  | By 2005, the information regarding the policy with the media was added back into the lesson plan during the annual update. Few officers or supervisors attended training conducted with this lesson plan. |
| 2006 | As the Department continued to struggle with larger numbers of employees retiring than new hires coming into the academy and Mobile Field Force training was sidelined altogether. |
|  | The Metro Basic course remained shut down. |
|  | **Miscellaneous Training Information** |
|  | • To date, every sworn employee in the Department has received training on the use of force policy on more than one occasion, and has been trained on the techniques and the appropriate use of the baton as it pertains to the use of force policy. |
|  | • Traditionally, Metropolitan Division platoons were allowed two training days every four weeks - one firearms and one tactics. Since 2004, Metropolitan Division platoons were generally allowed to conduct one tactics training day and one firearms training day every four weeks January through May, and only one training day June through December. On several occasions the training day(s) was cancelled as a result of special assignments and/or pre-planned events. A review of the tactics training day topics generally focused on dignitary duties and other tactics not related to crowd control events. |

APPENDIX 2

89

# ADDENDUM A

487

488



490

# ADDENDUM B

93



# TRAINING BULLETIN

| Los Angeles Police Department | Martin H. Pomeroy, Chief of Police |
|---|---|

Volume XXXIV, Issue 7                                     August 2002

## POLICE AND MEDIA RELATIONS - PART III

### CROWD CONTROL SITUATIONS

The First Amendment of the United States Constitution provides for the right of the people to assemble peacefully for the purpose of demonstrating their opinions.  During these demonstrations, the Department is obligated to maintain order while also protecting lives, property and First Amendment rights.

In order to protect lives and property, an assembly may be declared unlawful when two or more persons assemble together to do an unlawful act, or do a lawful act in a violent, boisterous, or tumultuous manner (California Penal Code section 407).  When this occurs, all persons present, including members of the media, may be lawfully ordered to disperse (California Penal Code section 409).

The purpose of this Training Bulletin is to inform officers of the media's rights and the Department's role and responsibilities during public assemblies.

## What Are the Media's Rights During Public Assemblies?

The Department recognizes that the news media has the right, without interfering with police operations, to cover events that may result in the declaration of an unlawful assembly and order to disperse.  The Department will make reasonable efforts to accommodate this reporting obligation.  However, such efforts will be made consistent with the Department's primary objective to restore and maintain order.

In order to serve the media's reporting rights during public assemblies, the Department will develop an operations plan, where practicable, that will designate an area outside of the impacted areas for the media to assemble within reasonable viewing distance and audible range of the event.  The Department will also attempt to prevent the news media viewing area from becoming part of any area impacted by an unlawful assembly declaration and order to disperse.  However, the risk of continued coverage by the news media after an event has been declared an unlawful assembly, remains the responsibility of each individual reporter making the decision.

Police and Media Relations - Part III
Crowd Control Situations
Page 2

## Department's Role and Responsibilities

The selection of a news media viewing area will take into consideration public and officer safety, police tactics, input provided by the news media, if any, and the ability of the Department to prevent the location from becoming part of the impacted area. The final selection of the viewing area location will be made by the Incident Commander (IC) in charge of the event.

Additionally, if due to changing conditions the initial area no longer affords the news media a reasonable view of the event or becomes a tactical concern for the IC, the IC will relocate the news media area. This will be done to the extent reasonably possible without compromising police tactics or public safety.

The Department IC will designate an Information Officer as part of the Incident Command System in order to facilitate interaction with the news media. The Information Officer will be clearly identified at the scene. Also, after declaring an unlawful assembly, Department personnel will designate a dispersal route for all persons present, including the news media, to use when evacuating the area.

## CONCLUSION

The Department understands that a well-informed public is essential to the existence of a democratic society. The members of the media provide vital information to the public, and the Department has an obligation, within legal limits, to accommodate the media as they perform this task.

Field Training Services Unit
Continuing Education Division

Distribution "A"

# ADDENDUM C

495



UNIFIED AREA COMMAND
MAC/DOC
ORGANIZATION CHART

UNIFIED AREA COMMANDER
CHIEF PAYSINGER

DEPUTY UAC CHIEF ROUPOLI

INCIDENT NAME MAY 1ST DEMONSTRATIONS
OPERATIONAL PERIOD
DATE 05/01/2007 TIME 0500-1900

MACC DIRECTOR
CAPT. CHOW

HOLLYWOOD ICP
IC
Patrol Watch
Commander

1 Supervisor
3 Units
To Monitor Event

RAMPART ICP
IC
CAPT. EGAN

OPERATIONS
CHIEF
TBD

DIVISION A

DIVISION B

Director
Emergency Operations
DOC
CAPT. McCARTHY

CENTRAL ICP
IC
CHIEF CARTER

OPERATIONS
CHIEF
CAPT. SMITH

DIVISION A
CAPT. DAVIS

DIVISION B
CAPT. OLVERA

DIVISION C
CAPT. BRASCIA

DIVISION D
CAPT. YOUNG

MARCH GOUP
SGT. STABILE

LASD GROUP
SGT. HARGRAVES

CHP GROUP
LT. MOELLER

PAB GROUP
CAPT. ORTEGA

LAPD 14.20.07 (3/2002)

498

# **ADDENDUM D**

499

500



502

# ADDENDUM E

100

503

504



# TRAINING BULLETIN

**LOS ANGELES POLICE DEPARTMENT**    **WILLIE L. WILLIAMS, CHIEF OF POLICE**

Volume XXVIII, Issue 11    October 1996

### USE OF FORCE
### BATON – PART II
### CROWD MANAGEMENT & CONTROL

Any public assembly of individuals, be it for lawful protest or unlawful activities, may require action by law enforcement. Depending upon the situation at hand, the response of law enforcement can range from simple observation and crowd management strategies, to crowd control tactics. This Training Bulletin was developed to provide guidelines to assist officers in determining when an assembly is unlawful and the appropriate responses for crowd control. The Department's Use of Force Policy relating to baton techniques is also reviewed in this bulletin.

In a society where the right of free speech and assembly is guaranteed by the Federal and State Constitutions, it is the responsibility of police officers to ensure the protection of Constitutional Rights of all members of the public. These constitutional guarantees apply to individuals who may be participating in lawful activities such as public speeches, marches, demonstrations, picketing, and rallies.

In determining whether speech activity is lawful, police officers must not base their decisions on their subjective, personal views of either the political affiliation or the message of those persons exercising their right to speak. The responsibility of police officers is to objectively determine at what juncture a demonstration leaves the realm of legal protest and becomes an abridgement of the rights of others.

Penal Code Section 407 provides guidelines for officers by defining an "unlawful assembly":

> "Whenever two or more persons assemble together to do an unlawful act, or to do a lawful act in a violent, boisterous or tumultuous manner, such assembly is an unlawful assembly."

"Boisterous" and "tumultuous" have been interpreted by the courts to mean conduct which poses a clear and present danger of imminent violence.

Penal Code Section 407 is applicable in two different circumstances:

(1) The first circumstance is when people assemble to do an **unlawful act.**  The unlawful act must be an act made criminal by law or by the commission of an overt act which leads to a violation of law.  In the absence of any unlawful conduct in an assembly, an assembly may be declared unlawful **only** if there is reasonable cause to believe, based on articulable facts, that the assembly's purpose is unlawful.  If people are assembled to commit an unlawful act, then they are an unlawful assembly. (For example, unlawfully blocking entrances to public buildings, highways, sidewalks or schools, or engaging in riotous activity).

(2) The second circumstance is when people assembled do a **lawful act** in a "violent, boisterous or tumultuous manner."  The manner in which the people are acting must itself be violent, or pose a clear and present danger of imminent violence.  For example, a demonstration that disturbs the peaceful enjoyment of property through noisy singing and chanting **is not** an unlawful assembly unless it also poses a clear and present danger of imminent violence.

During the course of a march, demonstration, protest or rally, officers may observe behavior by individuals which constitutes unlawful behavior.  Unlawful behavior by individuals, or unlawful conduct observed in an isolated incident, should not generally form the basis for declaring an otherwise lawful assembly to be unlawful.  When it appears practical, officers should attempt to give warning to the leaders or spokesperson of the activity, the other participants, and/or the individuals who are acting or have acted unlawfully, about any observed unlawful or potentially unlawful conduct.  When appropriate, officers should instruct them on what they must do to comply with the laws, so as to allow an opportunity to correct the conduct in question.

This does not imply that where **group** behavior reasonably appears to be unlawful, aggressive, or otherwise uncontrollable, that the assembly should not be declared unlawful.



## CROWD MANAGEMENT

In crowd management, the following general principles should be
utilized:

* **Establish contact with the crowd**

    When appropriate, supervisors or senior officers at the
    scene should attempt to make contact with identified
    formal or informal leaders of a crowd.  Interaction with a
    crowd will allow officers to understand the purpose and
    motives of a group and allow an opportunity to suggest
    ways for the group to avoid illegal actions which would
    necessitate a more aggressive police response.  This is
    referred to as "reading the crowd."

* **Control of personnel**

    An otherwise peaceful group can be aroused by
    inappropriate police conduct, such as individual officers
    engaging in verbal disputes with individual crowd members
    or by displaying contempt for the crowd or its beliefs.
    If possible, it is preferable for a crowd to remain
    focused on the event itself rather than on police tactics
    used at the event.  A show of force may be appropriate as
    a deterrent to some unruly crowd situations.  Careful
    consideration of the circumstances must be given prior to
    employing a show of force.  When possible, keep a
    disciplined control force out of public sight ready to
    respond.

* **Separate opposing factions**

    Often a specific issue will polarize groups into hostile
    opposing factions.  When possible, officers should
    delineate separate areas for each group to exercise their
    legal rights to picket or demonstrate.  Physical barriers
    or police lines can be used to effect this separation.
    For preplanned events, specific areas should be identified
    and physically established for use by groups expected to
    demonstrate.  Physical barriers, natural or strategically
    placed, can assist officers in managing opposing groups.

* **Gather intelligence**

    Information which has been evaluated and believed to be
    valid is of utmost importance to the management of groups.
    The most obvious place to obtain information on what is to
    occur is from the group itself.  Establish contact with
    group members before an event if possible.  During the
    event, attempt to maintain contact with group leaders to
    stay aware of any changes in their plans or actions.  Such
    information may be incomplete or inaccurate, but
    experience has shown that it is better to listen to groups
    than ignore them.

Case 2:25-cv-05423-HDV-E    Document 33    Filed 07/03/25    Page 167 of 173   Page ID #:726

* **Knowledge of previous events**

    Crowd management procedures do not start with a specific
    event, but with events in the past and those occurring
    elsewhere.  Supervisors may examine open sources of
    information and/or after-action reports from prior events
    or from similar events in order to identify group behavior
    and successful and unsuccessful tactics and strategies.
    It is highly recommended that supervisors and commanding
    officers properly document the results of actions at a
    crowd management or crowd control incident.

* **Alternate location for assembly**

    When it is determined that an assembly may become unlawful
    due to the inappropriate nature of the location (e.g., an
    otherwise lawful crowd exceeds the size of a location and
    spills onto, and inadvertently blocks the public
    sidewalks), police may identify an alternate site to
    leaders or spokespersons where the assembly could relocate
    to avoid the possibility of being declared an unlawful
    assembly.

* **Documentation**

    It is highly recommended that events surrounding crowd
    control situations be documented for training, personnel
    accounting, after-action reporting, and litigation.  The
    use of video cameras should be considered at all such
    events.  Utilization of a "videolog" (a videotape record
    of the event), obtaining an overall perspective of the
    event, including selected arrestee behavior and actions of
    personnel, are among the subjects which should be
    documented.  The utilization of a video team is highly
    recommended for future training purposes.



**CROWD CONTROL**

During crowd control situations, police officers may be required to physically engage numerous individuals who exhibit unlawful or hostile behavior. In these situations, it may be necessary for officers to utilize physical force to control or move crowd members who do not respond to verbal directions.

When officers are confronted by this type of behavior, the baton may be used to push individuals who do not respond to verbal commands to disperse. It may also be used as an impact weapon depending upon the degree of active resistance or combative behavior demonstrated by crowd members.

There are no exceptions to the Department's Use of Force Policy. When the use of force is justified during a crowd control situation, only reasonable force shall be employed. Officers must only use reasonable force to overcome resistance and effect control. Verbalization should be used throughout the duration of the operation to gain compliance and reduce the necessity for further physical force.

The Training Bulletin "Use of Force - Side Handle Baton" Volume XVIII, Issue 4, describes the Department approved baton techniques in detail. Officers are strongly encouraged to practice baton techniques since these techniques are based more on technical proficiency than physical strength. Equally important, officers must know Department policy regarding the use of the baton. A review of this policy is described on the following pages.

In a typical crowd control situation, officers are sometimes faced with the following scenarios:

    (1)  Police officers on a skirmish line are confronted by individuals who are being pushed from the rear and encroach upon established police control points, yet are not intentionally threatening officers;

    (2)  Police officers are presented with passively resisting individuals who refuse to disperse.

In the first scenario, for example, police officers on a skirmish line with batons drawn in the "Long Extended Position", are confronted by individuals being pushed from the rear of the crowd into the skirmish line. The crowd is ordered to disperse but refuses to move and continues to push into the officers. These individuals' actions, as described on the Department's Situational Use of Force Options Chart, may be categorized as **UNCOOPERATIVE** or **AGGRESSIVE/COMBATIVE** based on an individual officer's subjective viewpoint.

Volume XXVIII, Issue 11            -6-            October 1996

The baton may be used as a pushing instrument or impact weapon to
gain compliance.  Verbalization should be continued to gain
compliance.  Only reasonable force to gain compliance and to
protect themselves and others may be used by officers.  A
possible solution to such occurrences includes "line-backers" as
part of an arrest team removing the persons pushing from behind
and either arresting them or moving them outside the control
area.

In the second scenario, police officers are presented with
passively resisting individuals who refuse to disperse.  The
appropriate response to these individuals' actions, categorized
as **NO RESPONSE TO COMMANDS** or **UNCOOPERATIVE** on the Use of Force
Options Chart, includes the use of Firm Grip, Compliance
Techniques, Wrist Locks, Twist Locks, Wrist Lock Down/Arm Bar,
the baton as a pushing instrument and Baton Compliance Techniques
(non-striking).  Verbalization should be continued throughout the
situation to gain compliance.  Like the first scenario, only
reasonable force to gain compliance and to protect themselves and
others may be used by officers.  Again, the "line-backers" of an
arrest team can remove those individuals who are pushing, who are
refusing or are unable to disperse from the group behind the
police lines and either arrest them or reposition those
individuals outside the control area.

**REPORTING THE USE OF THE BATON**

The current procedure for reporting the use of the baton as a use
of force incident in other than crowd control situations is not
affected by this Training Bulletin.

> **NOTE:** A Use of Force Report is not required when officer(s)
> become involved in an incident in which the baton is used in
> a crowd control situation to push or move individuals who
> exhibit unlawful or hostile behavior and who do not respond
> to verbal directions by the police.  This procedure will
> apply only to officers working in organized squad and
> platoon-sized units.  Additionally, should the baton be
> utilized under these circumstances, officers shall notify
> their immediate supervisor of the use of force once the
> tactical situation has been resolved.

The supervisor shall prepare the appropriate report documenting
the officer's actions.

> A Use of Force Report is required when officer(s) use the
> baton in a crowd control situation and become involved in an
> **isolated** incident with an individual in the crowd that goes
> beyond the movement of the crowd.

Volume XXVIII, Issue 11             -7-             October 1996

**CONCLUSION**

The police response to a situation where a crowd has gathered requires a careful evaluation by the senior officer-in-charge at the scene.  A non-violent "sit-down" demonstration requires a much different police response than a violent group of people who have become destructive.  The tactics used to manage or control a crowd must be flexible.  During a march, demonstration or similar event, unlawful behavior by an individual, or unlawful conduct observed in an isolated incident, should not generally form the basis for declaring an assembly to be unlawful.

Should force become necessary, the amount of force necessary to overcome a suspect's resistance is dependent on a variety of factors.  When a baton is utilized, even during confrontations with hostile crowds, reasonableness is the key to determining the amount of force and the type of compliance techniques which are most appropriate for the circumstances.  Officers should attempt to de-escalate confrontations by utilizing verbalization techniques prior to, during, and after any use of physical force. Effective crowd management techniques oftentimes precludes the necessity to employ physical force and are a deterrent to unlawful behavior.


This bulletin cancels and supersedes Training Bulletin Volume XXV, Issue 8, "Use of Force-Baton, Part II-Crowd Control" dated December 1993.


**FIELD TRAINING SERVICES UNIT**
**IN-SERVICE TRAINING DIVISION**

