Carol A Sobel SBN 84483
Weston Rowland SBN  327599
Law Office of Carol A. Sobel
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403
t. (310) 393-3055
e. carolsobellaw@gmail.com
e. rowland.weston@gmail.com

David Loy SBN 229235
Aaron R. Field SBN 310648
First Amendment Coalition
534 4th St., Suite B
San Rafael, CA 94901
t.(415) 460-5060
e. dloy@firstamendmentcoalition.org
e. afield@firstamendmentcoalition.org

Peter Bibring SBN 223981
Law Office of Peter Bibring
2140 W Sunset Blvd # 203,
Los Angeles, CA 90026
t.(213) 471-2022
e. peter@bibringlaw.com

Paul Hoffman, SBN 71244
Michael Seplow, SBN 150183
John Washington, SBN 315991
Schonbrun, Seplow, Harris, Hoffman
& Zeldes LLP
200 Pier Avenue #226
Hermosa Beach, California 90254
t.(310) 396-0731
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. jwashington@sshhlaw.com

Susan E Seager SBN 204824
Law Office of Susan Seager
128 N. Fair Oaks Avenue
Pasadena, CA 91103
t. (310) 890-8991
e. susanseager1999@gmail.com

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

LOS ANGELES PRESS CLUB,
STATUS COUP,

    PLAINTIFFS,

    v.

CITY OF LOS ANGELES, a municipal
entity,  JIM MCDONNELL, LAPD
CHIEF, sued in his official capacity;

    DEFENDANTS.

Case No. 2:25-CV-05423-HDV-E

HON. HERNÁN D. VERA

**VOLUME FIVE** OF PLAINTIFFS' EXHIBITS TO' EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1

# Exhibit 23



# An Independent Examination Of The Los Angeles Police Department 2020 Protest Response

**Report by Independent Counsel, Gerald Chaleff**

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

1

517

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

# Table of Contents

I.    Executive Summary ................................................................................................ 4

II.    Introduction ......................................................................................................... 14

    Section 2.01    Background and Methodology ............................................................ 14

    Section 2.02    Civil Unrest in Los Angeles ................................................................. 15

    Section 2.03    Consent Decree ................................................................................... 16

    Section 2.04    Settlements in Los Angeles ................................................................. 16

    Section 2.05    Department Organization .................................................................... 18

    Section 2.06    Incident Command System Concept ................................................... 19

III.    Timeline Summary of Major Events ..................................................................... 21

IV.    Observations and Findings .................................................................................. 24

    Section 4.01    Planning .............................................................................................. 24

        (a)    Public Information and Messaging ............................................................ 26

    Section 4.02    Command and Control ....................................................................... 26

        (a)    Command and Control ............................................................................. 27

        (b)    Intelligence .............................................................................................. 27

        (c)    Operations Central Bureau Command Post .............................................. 29

        (d)    Operations Central Bureau Staging Area .................................................. 30

        (e)    Operations West Bureau Command Post .................................................. 31

        (f)    Mutual Aid ............................................................................................... 32

    Section 4.03    Public Order Policing ......................................................................... 34

        (a)    Mobile Field Force Configuration ............................................................. 38

        (b)    Shadow Teams ......................................................................................... 40

    Section 4.04    Less Lethal Tools ................................................................................ 41

        (a)    40mm Launcher Deploying the 40 mm eXact iMpact Sponge Round ...................... 41

        (b)    37mm Launcher Deploying the 37 mm Foam Baton Black Powder Round .............. 42

        (c)    Beanbag Shotgun ..................................................................................... 42

        (d)    Hornets Nest Sting Grenade, .60 Caliber Rubber Balls .............................. 43

        (e)    Less Lethal Use ........................................................................................ 43

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

(f)      Handheld Baton ................................................................... 45

Section 4.05   Planning for Mass Arrests and Citations .......................... 46

(a)      Citations Related to Mass Arrests ....................................... 46

(b)      Transportation of Arrestees ............................................... 48

(c)      Field Jails ........................................................................... 49

Section 4.06   Preparedness and Training ............................................ 50

Section 4.07   Wellness ...................................................................... 53

Section 4.08   Community Input ......................................................... 56

V.    Conclusion ................................................................................... 57

VI.   List of Findings ............................................................................ 58

VII.  Recommendations ....................................................................... 65

VIII. Appendix ..................................................................................... 76

Appendix 1:   Review Team Members and Other Contributors ................. 76

Appendix 2:   Methodology and Limitations ......................................... 79

Appendix 3:   1992 After-Action Report Findings .................................. 81

Appendix 4:   2001 Consent Decree Details .......................................... 82

Appendix 5:   2000 DNC National Lawyers Guild Settlement Information ... 83

Appendix 6:   2007 MacArthur Park Settlement ..................................... 84

Appendix 7:   2011 Occupy Los Angeles ............................................... 85

Appendix 8:   2014 Ferguson .............................................................. 86

Appendix 9:   Key Terms .................................................................... 87

Appendix 10: Incident Command System Structures .............................. 91

Appendix 11: LAPD and FEMA National Concepts of Emergency Management ... 93

Appendix 12: LAPD Less Lethal Tools ................................................... 94

Appendix 13: History of Training 1992-2020 ......................................... 96

IX.   Bibliography ................................................................................ 99

3

519

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

## I. Executive Summary

The death of George Floyd sparked protests across the United States. The protests in Los Angeles began on May 27, 2020 and continued for many weeks. In Los Angeles there were many peaceful protests, but some erupted in violence, arson, looting and vandalism. On June 30, the Los Angeles City Council approved a motion that the Los Angeles Police Department (LAPD) prepare an after action report, and that Gerald Chaleff lead the review of the Department's actions during the protests. This report has been prepared pursuant to that motion, although the Department ultimately decided to prepare its own report. Because of that decision, an independent review team was assembled to prepare this report.

In the protests in Los Angeles in May-June 2020, there were small groups that were primarily responsible for the violence and criminal activity, which resulted in the disruption of protestors' ability to exercise their First Amendment rights. Additionally, these disrupters were throwing dangerous objects at the police. The level of violence committed by these small groups had not been seen at demonstrations in years. The lack of adequate planning and preparation caused the Department to be reactive, rather than proactive, and inhibited the Department's ability to have better control over the violence being committed by small groups of individuals whose objectives were to create chaos and confrontation with the police.

Additionally, looting occurred that appeared to be well coordinated with "scouts" and convoys of up to ten cars targeting a given location. It was also believed that some of the organized looting was gang related while other looting seemed to be opportunistic. When the police responded to interdict or make arrests the looters would quickly disperse only to regroup elsewhere to attack another target. The Department initially did not have enough resources or strategies to contain the looting. Eventually using tactics developed by the air unit observers, officers were able to make arrests and reduce the amount of looting that occurred.

The Review Team found deficiencies in the following areas that impacted the Department's actions during the protests: (1) planning, (2) command and control, (3) public order policing, (4) less lethal tools, (5) mass arrests, (6) preparedness and training and (7) wellness.

PLANNING

It appears the Department believed that if protests arising out of George Floyd's death occurred in Los Angeles, they all would be peaceful. In interviews with the Review Team, interviewees said they were surprised at the violence that occurred in the afternoon and evening hours at some protests. They had believed that the good relationships which had been developed with various communities would cause any protests to be peaceful, as they had been in the past.

There had been widely publicized violence in Minneapolis on Tuesday, May 26, and protests were beginning across the country. However, the next day (Wednesday) the Department treated the weekly racial justice protest at the Office of the District Attorney, which had always been peaceful, as if it were business as usual. Even after some protestors left the District Attorney's Office on Wednesday and began to engage in violent or otherwise unlawful activity in downtown Los Angeles, necessitating the

4

declaration of a tactical alert, the Department still did not seem to believe that widespread or violent protests would occur in Los Angeles. For example, the Department did not establish a fully staffed command post until Saturday night, May 30.

On May 27 and 28, the protests in downtown Los Angeles were marred by an escalating level of violence and criminality. Initially, the Department treated these as isolated incidents, rather than as a manifestation of a larger expression of outrage that was spreading across the United States.

When the Department did begin to set up a command post, on Friday, May 29, the assigned personnel did not have the experience or training to execute what needed to be done to successfully run a command post. At that time, the Department designated the Central Bureau command post as the Department area command, giving it the authority to oversee police operations for the entire City. This required those running the Central Bureau command post to manage competing responsibilities, juggling the needs of the Central Bureau divisions (downtown Los Angeles and the surrounding area) with the Department's needs City-wide. If the Department had planned for protests across the City, it would have created an area command structure to oversee the whole City and would not have placed the burden on Central Bureau to manage both.

Another example of lack of planning was creating the staging area downtown, at Dodger Stadium, and requiring all personnel to report there before being assigned to protest locations. This was problematic because officers wasted valuable time driving from their areas of assignment to Dodger Stadium, and then back to their respective areas. This occurred because the Department did not seem to anticipate for protests in parts of Los Angeles other than downtown.

Even as some of the protests began to intensify, the Department failed to properly plan in a number of other areas. For example, the Department did not consult with the City Attorney for advice on the proper charge for arrests. This caused the Department to arrest people for violating Los Angeles Municipal Code (LAMC) Section 80.02 (failure to obey a lawful order of a police officer) which is an infraction. An infraction, pursuant to the California Penal Code (PC), only requires the arrestee to provide proof of identification and sign a promise to appear, in order to be released. It does not authorize the transportation of the person to another site or prolonged detention of the person, both of which occurred during the May-June protests.

The Department also failed to appropriately plan for field jails, in the event the need for mass arrests were to arise. This further impacted operations, because there was not a plan in place for buses to transport those arrested out of the protest areas to be processed. The need for buses for a mass arrest situation is not new for the Department. It has been a problem at large events over the past decade, as evidenced by prior litigation settlements.[1] Preparation and/or planning for large scale protests that

---

[1] The City and the Department settled lawsuits in 2011 involving arrests at the Occupy LA encampment, and in 2014 during protests about the death of Michael Brown in Ferguson, Missouri, where the detention of arrestees for hours while handcuffed, deprived of water and the use of bathroom facilities, were the main issue.

5

521

posed a likelihood of mass arrests was even more important during the time period reviewed because of the existence of a pandemic and the possibility of exposure to the Covid-19 virus.

COMMAND and CONTROL

When confronted by multiple large scale events, it is important that there be a clear chain of command, where everyone knows who is in charge, and those in charge provide clear direction. This did not consistently occur during the protests. There were times when command staff officers arrived on the scene of a protest and issued orders without coordination with the incident commander, who was supposed to be in charge of the entire police response to a protest. This created confusion. Multiple command staff officers gave orders, sometimes conflicting, regarding the same protest.

Members of the LAPD command staff confirmed that they did not always know who was in charge, which led to a chaos of command. In some instances, resources were allocated to a location or tasked by one command staff member, and those decisions were subsequently contradicted by another command staff member, who sent the same resources somewhere else.

For example, on at least two occasions, high-ranking officers self-deployed directly to the field, bypassing the command post, and made tactical decisions. In some instances, the directions given by these high-ranking officers conflicted with directions and actions being undertaken by personnel in the field, who were acting at the direction of the incident commander. As one command officer indicated, he was in the field working on a problem for an extended period when a higher-ranking officer arrived and tried to enact different tactical plans, creating confusion where disorder was already occurring. While it is understood that these situations were highly chaotic and volatile, the duty of high-ranking officers is to think strategically; their limited situational awareness in the field and conflicting tactical directions only exacerbated the confusion.

PUBLIC ORDER POLICING

Public order policing, also known as crowd management/crowd control, is complex in the 21st Century. Skills to manage public order are perishable and diminish over time if they are not maintained. The skills necessary to manage a complex and dynamic situation must be refreshed frequently. In interviews with command officers, many opined that they lacked expertise in public order policing. Many said they were not provided with meaningful or relevant command-level training to be able to effectively manage large scale, complex events that involve violence and criminal activities. The Department did not adequately prepare the Department command staff for events such as those faced in May-June.

Between 2018 and 2020, the Department experienced the departure of a number of high-ranking officers with expertise in public order policing. During that time period, two assistant chiefs, six deputy chiefs, and numerous commanders and captains left the Department, representing an attrition rate of nearly 50%. Some left as their time expired in the irrevocable Deferred Retirement Option Program (DROP); others chose to leave for early retirement; and some left to pursue other career opportunities. This has posed, and continues to pose, a significant leadership challenge.

6

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

Although there are still a few high-level personnel within the LAPD with expertise in public order policing, attempts to ensure that the expertise, lessons learned, and historical knowledge is not lost must be a Department priority. The Department should ensure that, as retirements occur and promotions and assignments are made, the necessary expertise and experience is retained in all areas, not just crowd management.

The expertise, skills, and experience necessary to manage a peaceful protest are different from the skills required to manage a protest that is violent and hostile. The lack of expertise and experience in this area impacted the Department's ability to control the protests and, in particular, to prevent the criminal element from creating the chaos and violence that ultimately occurred.

Actionable intelligence is necessary for the success of public order policing. The Department suffered from a lack of useable intelligence leading up to the protests, which dramatically impacted LAPD's operational effectiveness. There has been a degradation of LAPD's intelligence function because of cutbacks of numerous positions to better support patrol operations. During the period that is the subject of this report, there was a notable lack of specific actionable information available for incident commanders. Accordingly, the LAPD could not reliably plan where or how to dedicate resources to manage the demonstrations.

The Department faced small groups of disrupters within the larger group of protesters at several demonstrations. These groups of disrupters often intermingled throughout the crowd, throwing objects, while those standing in the front were shouting with their hands up in a non-threatening manner. It became exceedingly difficult to isolate and remove the problem individuals from those who were there to exercise their First Amendment rights.

Additionally, the traditional Department strategy used in crowd control incidents utilizes lines of officers (skirmish lines) as a blocking force and/or to move or push crowds and in some instances to protect property. Skirmish lines are often static but will move at a slow pace to direct crowd movement. At the protests in 2020, skirmish lines were effective during the peaceful demonstrations when used to control the direction of the movement of the protestors. When violence erupted at some of the protests, these static or slow-moving skirmish lines were ineffective because they were not able to isolate and arrest those who were committing the criminal acts. Some interviewed for this report stated that the "Napoleonic-style static skirmish line" was useless in controlling the small groups of violent agitators placing protestors and police at risk.

At times, the Department did not, or was not able to, isolate and arrest those criminal elements who were throwing objects, creating violence, or looting due in part to the use of antiquated tactics and lack of training on public order policing. On some occasions, when undercover officers were able to identify criminal activity, they were unable to directly communicate with supervisors on the front line because of their reporting protocols. This did not allow for instantaneous or even quick responses from uniformed personnel. Also, because of the hostility of some of those disrupters in the crowd the safety of undercover officers was threatened and at times officers had to be removed from the violence.

7

523

LESS LETHAL TOOLS

The LAPD used a variety of less lethal munitions and tools during the protests of 2020, including batons, bean bag shotguns, 37mm and 40mm munitions, and, on one occasion, a stinger grenade. Collectively, the LAPD used a significant amount of less lethal munitions during the protests.[2] As stated in the City Council resolution that formed the Review Team, there are reports that people were struck in the face and head, causing significant injuries, some of which required surgery. Not all people struck with less lethal munitions during the protests were engaging in criminal behavior. This appears to be in part due to the complex and rapid movement of the crowds and at times a lack of adequate training on the 40mm system. Multiple lawsuits have been filed regarding the protests in Los Angeles, in which allegations are made that the Department violated detention and arrest procedures; many of the plaintiffs claim to have been injured by police action. The plaintiffs who claim injuries state they were not engaged in the violent or criminal activity.

While this report cannot evaluate each use of force incident or instance of individual injury, it does attempt to examine the overall use of less lethal munitions during the evaluation period and to provide suggestions regarding their use. Whether any of the uses of the less lethal tools were inappropriate, or in violation of policy, is being investigated by the Department, with the Inspector General and the Board of Police Commissioners reviewing the Department's investigations and determinations.

Until 2017, only personnel from Metropolitan Division who were certified and trained frequently to deploy the 40mm less lethal weapon were allowed to do so in crowd control incidents. The use of the 40mm weapon was expanded to routine patrol operations in 2017 for any officer who received training in its use. The training that was provided, however, lasted only two hours and was embedded in a ten-hour integrated communications, de-escalation and crowd control course. The training consisted of learning how to manipulate the weapon and firing the weapon only a few times at a stationary target.

The 40mm training was problematic for several reasons, including that the dynamics dramatically change in a crowd control situation when the person engaging in the criminal behavior is not standing still. There also may be other people in front, behind or to the side of the intended target. In such cases, the officer operating the 40mm weapon must be very precise in its application to minimize the risk to bystanders. The use of the 40mm weapon to fire at individuals who are in a crowd situation requires well-trained, experienced, and highly skilled individuals. Unfortunately, because of dynamic movement of large, unruly crowds, individuals who are not involved in criminal activity can unintentionally be hit and injured, which is alleged to have occurred during these protests. To be precise takes practice. Of further concern is that the policy from 2017 is silent on the use of the 40mm weapon in crowd control situations.

---

[2] It was difficult to determine how many less lethal rounds in totality were fired as the Department did not provide the numbers to the Review Team.

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

Unlike the 40mm munitions, the 37mm foam baton round may be indirectly fired at crowds of people by firing or "skipping" the rounds along the ground in front of the group police intending to disperse. This less lethal tool requires less specialized training and practice to use properly.

The handheld baton is a less lethal tool approved to be used on skirmish lines during crowd control incidents, to push a crowd. The baton is not authorized to be used as an impact device unless the officer or another individual is being physically threatened. In the videos reviewed there is no evidence that the baton use during this evaluation period was inappropriate. However, in lawsuits filed following the events in 2020, plaintiffs have alleged that the baton was inappropriately used as an impact weapon. The Chief of Police reissued a Department directive on baton use in the fall of 2020 to reiterate the policy of baton use in crowd control situations.

One of the recommendations of this report is to analyze the use of the 40mm less lethal weapon in situations with large crowds, or ones where people are standing close together, and whether the use of such a weapon should be limited in such situations to individuals well-trained and experienced, as was the LAPD policy until 2017.

MASS ARRESTS

Thousands of people were arrested throughout the protests without a clearly articulated plan for detentions, transportation and processing. As a result, those arrested were detained at the scene of the arrests for hours, handcuffed on the pavement, detained in buses, and taken to remote locations, without water or the use of bathroom facilities. Additionally, because the protests occurred during the pandemic, officers and those arrested were in close proximity, not socially distancing, many without masks and thus at risk of being exposed to the Covid-19 virus.

These problems have occurred in the past; in 2011 with Occupy LA arrests, and again in 2014 during the arrests in the protests over the death of Michael Brown in Ferguson Missouri. Those earlier protestors were detained for hours in similar conditions as in 2020. Lawsuits were filed in connection with both the 2011 and 2014 mass arrests and were settled by the City for more than $3,000,000. It is unfortunate that the same issues have arisen again and again, with the Department being unable or unwilling to rectify the problem.

The use of LAMC Section 80.02, an infraction, does not allow those cited to be detained for hours and transported to another location for processing[3]. Even when the arrests were made pursuant to LAMC Section 8.78 (curfew violation), a misdemeanor, which does allow for arrest, detention and transportation to another location for processing, the unreasonable delays and failure to provide access to bathroom facilities and water remained a problem.

The failure to obtain buses needed to transport the large number of people arrested was one of the causes of the lengthy detention of those arrested. This failure required those detained to remain

---

[3] Edgerly v City and County of San Francisco, 713F3d976(2013).

9

525

handcuffed sitting on the pavement or standing against walls while buses were obtained to transport them. This failure also required officers to remain with those detained and removed them from being deployed to assist with controlling the protest and help prevent violence from occurring. It also subjected the officers to potential exposure to Covid-19.

The LAPD arrested more than 4,000 people between May 29 and June 2. The Department's failure to establish a field jail early to process the large number of people arrested was problematic.[4] The Department arrested a large number of people on both Saturday and Sunday, yet the first field jail was not set up until Monday, June 1, causing long delays and overwhelming the arrest processing system.

On June 1, a field jail was set up at the University of California, Los Angeles (UCLA), many miles from the location of the arrests. More than 1,000 people were processed there. The lack of experience and trained personnel contributed to the lengthy detention of many of the arrestees, causing them to be released in a location far from their arrest location and in violation of the curfew declaration. However, this field jail was shut down on June 2, when members of the UCLA community complained. That caused further delays in processing arrestees. A second field jail was set up in the parking lot of Grace Community Church in the San Fernando Valley on June 2 to help in the processing. The lack of planning for the field jail created several problems, including:

- An insufficient number of personnel to staff the field jails.
- A lack of properly trained or experienced personnel to adequately handle the large number of arrests; and

Declarations for unlawful assembly were made. However, there were few arrests for failure to disperse; the arrests were generally made for failure to obey a lawful order of a police officer and for curfew violations. The reasons for not arresting people for failure to disperse were not made clear.

PREPAREDNESS AND TRAINING

The Department has a history of legal settlements and agreements that it entered into after lawsuits were filed in connection with police conduct at large events: in 2000 (Democratic National Convention); 2007 (MacArthur Park incident); 2011 (Occupy LA); and 2014 (Ferguson demonstrations). In each settlement, there were mandates that the Department correct policy, procedures, and training regarding various components of the management of protests and demonstrations. The Department did not maintain some of the requirements from these prior settlement agreements, which in turn caused problems for the Department in 2020. Crowd control, mobile field force, mass arrest procedures and less lethal training were all insufficient.

Preparedness demands that an organization plan, organize, train, exercise, and evaluate performance before any event actually occurs. As such, training and exercising that at one time had been implemented should have been sustained within the Department over the years, but were not. If it had

---

[4] Field Jails are temporary facilities set up to process large numbers of arrests that would otherwise overwhelm the available jail facilities and personnel.

been, the LAPD command staff would have been better prepared for the events of May-June 2020 in Los Angeles.

The LAPD's training in public order policing has declined in the past several years and was identified as a problem in 2007 after the MacArthur Park May Day demonstrations. As a result, the LAPD command staff were required to receive annual training on public order policing. This training had not occurred for several years prior to 2020. There had been minimal crowd control and mobile field force training in the past five years and mass arrests procedures were not exercised at all. The lack of training caused problems in 2020. Indeed, command officers interviewed for this report raised the issue of the lack of training to prepare them for public order policing events.

Based on information gleaned during this examination, it is recommended that the LAPD develop a command-level public order policing curriculum and practice these leadership skills frequently. The settlement of the 2007 Macarthur Park lawsuits required every officer above the rank of sergeant to undergo training on crowd control and use of force policies at a minimum of every two years, and command staff to be trained annually. It is recommended that this requirement be followed.

WELLNESS

Many officers worked long hours during the protests without relief and were sleep deprived throughout the protests. It is imperative that when officers are subjected to dangerous conditions and provocations, --such as having objects thrown at them, having lasers pointed at their eyes, and being taunted and screamed at -- they be at their best, with the patience and judgement necessary to perform professionally.

Members of LAPD command staff also were subject to long hours and not afforded the opportunity to get sufficient rest or sleep. The lack of sleep is equally important for command officers, who must make critical decisions as events rapidly unfold. If they are sleep deprived, decision making could be impacted, which then has the potential to affect the success of the police strategy and the safety of the officers they command, as well as the safety of the community.

It is incumbent upon the leadership of the Department to ensure that officers and command staff members can get the necessary down time for rest/sleep. During the protests, there were situations where officers were in staging areas but were never assigned to relieve those working in the field. There were also command staff members who volunteered to work, but were never assigned to the field. The Department must develop schedules that will allow officers to obtain the relief that is necessary.

Almost every day during the protests there were small subgroups of people engaged in criminal activity; they used the protests to attack officers by throwing dangerous objects at them including bricks and concrete blocks, using firecrackers or explosive devices, and pointing lasers at officers' eyes. The Department reported that 106 officers were injured during these protests. The Department must do everything it can to provide for officer safety and at the same time protect the safety of those who are peacefully protesting.

11

527

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

The Department has ordered protective eye gear and shields for the officers to use during future events that might turn violent. The Department should continue to research what additional protective gear is available to ensure that personnel are protected in the future.

Another important aspect of officer wellness is officer morale and trust in Department leadership. The Los Angeles Police Protective League conducted a survey, after the protests, that clearly showed that the officers did not feel supported by their leadership, the Mayor, Board of Police Commissioners, or the City Council. This is a problem that all involved must consider and try to solve.

RECOMMENDATIONS

There are 67 findings included in this report. The Review Team has proposed 22 recommendations for the City, the Board of Police Commissioners, and the Department to consider. These recommendations address the deficiencies noted in planning, command and control, public order policing, use of less lethal tools, mass arrests, preparedness and training, and wellness.

It is recommended that the Department's public order policing strategies be enhanced to meet contemporary operational challenges and anticipate future ones. Crowd psychology is a necessary component of training police to better handle dynamic crowd behavior. The strategies used by some small groups causing violence during the protests in Los Angeles have dramatically changed from past disrupters; disrupters now have become more mobile and better organized likely due to the use of technology, and more violent. This shift has significantly impacted the ability of officers to facilitate peaceful protestors exercising their First Amendment rights. The challenge for police today is how to facilitate the exercising of a crowd's First Amendment rights while at the same time interdicting smaller groups who are attempting to disrupt the lawful demonstrations. A review of the LAPD Emergency Operations Guide, last updated in 2009, reveals that there are no plans/strategies for dealing with the type of highly mobile groups and/or looting convoys that were observed in Los Angeles at some of the May-June demonstrations. When police strategies and tactics are based on inaccurate assumptions about how crowds function, these approaches can stimulate more conflict than they prevent, endangering both crowds and the police.

The Review Team is urging the Department to research and adopt a variety of strategies and tactics that would minimize the extent to which protesters "transfer" their grievances toward the police. [5] The LAPD is in a unique position because it is fortunate enough to have a fulltime, large behavioral sciences section embedded within the Department. Psychologists within this section likely have crowd psychology experience and should be consulted as the Department moves forward. The Department should also contact other agencies, academics, and law enforcement experts to identify best practices and to develop strategies for policing in the 21st Century.

---

[5] Roger Smith, Ian Tomlinson Inquest Proves We Have Moved Forward, L. SOC'Y GAZETTE (May 19, 2011), http://www.lawgazette.co.uk/analysis/ian-tomlinson-inquest-proveswe-have-moved-forwards/60507.

528

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

It is recommended that the LAPD create a high-level executive position (sworn or civilian) with appropriate support staff within the Department to serve as a "Strategic Emergency Manager". That person should have expertise, or be able to develop the expertise, in all-hazards emergency management, public order policing, large scale incident management, intelligence/information gathering and dissemination, use of force, use of less lethal tools, and analysis of current events as they present a challenge to policing operations. That person should be responsible for examining current events and preparing the Department (and City) to manage large-scale emergency events that occur in Los Angeles. Though such events do not happen every day, the costs when the Department is not prepared are too great not to consider such a position. Additionally, the Strategic Emergency Manager would be responsible to the Department to ensure any recommendations adopted from this report, prior court settlement requirements pertaining to public order policing, and other Department policies/directives on the subject, are implemented and sustained.

13

## II.  Introduction

This report examines the LAPD's response to the protests beginning May 27, following the death of George Floyd. The report contains observations, an analysis of the events, 67 findings and 22 recommendations with a focus of the following:

1. Planning
2. Command and Control
3. Public Order Policing
4. Use of Less Lethal Tools
5. Mass Arrests
6. Preparedness and Training
7. Wellness

The report also considers the history of the Department during prior protests and civil unrest to help understand the problems of the past and determine whether the Department learned from its experience in these events or repeated errors in tactics or mistakes of the past.

This report includes 22 recommendations (see Section VI), however, it will be the City's elected and appointed officials and the Department who must determine which, if any, should be adopted. The hope is that this report will provide the Department with findings and recommendations that will assist the leadership in enacting reforms that will improve the Department. Unlike the past, where crises were followed by long periods of time between major events that allowed police leaders to analyze, work with the community and political leadership, and learn from events, police leaders today are facing a precipitous growth in the number of major crises they face, leaving little time between events. This calls for a fundamentally different approach to crisis management that will allow the Department to be more agile, be forward thinking, and be more responsive to communities they serve.

Thus, it is recommended that the LAPD create a high-level executive position (sworn or civilian) within the Department known as a "Strategic Emergency Manager". That person should have expertise in all-hazards emergency management, public order policing, and large-scale incident management. This individual should work closely with the Department executive level officers and the commanding officer of the Risk Management and Legal Affairs Group to focus on the management of natural disasters, acts of terror, other large-scale or catastrophic events in which people and information needs to be managed. This individual should be responsible for examining current events, as well as preparing the Department (and City) for future crises in Los Angeles.

### Section 2.01          Background and Methodology

This report was prepared under the conditions of the Covid-19 stay-at-home orders. Therefore, all interviews were conducted by Zoom video conferencing or by telephone. The Review Team spoke with more than 50 members of the LAPD command staff (captains and above). Over 30 members of both sworn and civilian personnel below the rank of captain or police administrator were also interviewed. All interviews were voluntary. Additionally, the Los Angeles Police Protective League provided access to comments in response to an internal summer 2020 survey conducted by the union that represents all

sworn personnel at the rank of lieutenant and below. The survey discussed officers' perceptions of what occurred during the protests and unrest.

In addition to Department personnel, the Review Team talked to members of the community, representatives from the City Attorney's office, and attorneys representing plaintiffs in litigation arising out of the George Floyd protests. Finally, several individuals with expertise in the field of public order policing, and crisis management were also interviewed. The Review Team conducted an analysis of hundreds of pages of Department documents and conducted in-depth interviews of LAPD command staff resulting in findings throughout this report.

This report does not address the issue of discipline to be imposed, if any, on individual officers related to any use of force or use of less lethal tools or munitions (see Appendix 2 for Methodology and Limitations). The Review Team does not have the authority to conduct internal investigations. The investigations of use of force, use of less lethal munitions, and lawsuit allegations will be investigated by the Department and reviewed or monitored by the Inspector General and the Board of Police Commissioners.

There were thousands of hours of video contained in nearly 141,000 files from body worn video cameras and other sources. Although only a small portion of those were reviewed, this did not affect the understanding of what occurred, as this report is primarily concerned with institutional issues and not individual ones. The use of less lethal tools and the types of munitions used during crowd management and control situations will be addressed later in this report. The appropriateness of the individual uses will be left to the Department to assess.

## Section 2.02    Civil Unrest in Los Angeles

To better understand the dynamics of the issues the LAPD faces today, it is important to understand the history of civil unrest in Los Angeles. Historically, the topics of biased policing and police uses of force have been of concern in the United States and in Los Angeles. For several decades Los Angeles has been a rallying point for many demonstrations, including those specifically concerned with police abuse and the treatment of people of color. The LAPD's history is evidenced in the 1965 Watts Riots and in the civil unrest that erupted on April 29, 1992, in the aftermath of the acquittal of officers involved in the 1991 Rodney King beating.

The 1992 civil unrest lasted approximately seven days and is a stark reminder of how fragile police-community relationships are and how quickly volatile incidents can unfold. The Department was unable to contain and control the events for nearly a week. As sections of the City burned and livelihoods were destroyed, many officers on the front lines watched as the Department was slow, and at times unable to respond. It was noted in the Los Angeles Police Department After-Action Report 1992 April/May Riot that a high-level staff officer conducted a meeting with other Department staff and command personnel a month prior to the release of the jury's decision regarding the officers on trial and requested that plans be developed for the possibility of civil unrest if the officers were acquitted of charges. Commands were advised to train line personnel in civil disorder tactics, revitalize mobilization rosters, update

15

employee "call-up" and notification plans, develop a ratio of officers to available police vehicles for transportation to areas impacted by civil unrest, and develop platoon-size teams to respond to looters. Unfortunately, only a small number of staff officers within the Department believed there was a possibility of violence, and therefore the Department did not prepare. The after action report indicated that the first signs of planning did not begin until 37 days into the officer's trial even though a commander had asked for this to occur.

At that time, the LAPD after action report stated the Department experienced organizational complacency, as few problems with civil unrest had occurred within the City since the 1965 Watts Riots.

The after action report from the 1992 civil unrest contained lessons learned that, like all after action reports, were to be used to improve the Department's future response to such incidents (Appendix 3). Some of the areas include lack of preparation and planning, problems with command and control in the field, lack of discipline at the command post, organizational complacency, lack of intelligence, and lack of training for civil disorder tactics.[6]

### Section 2.03    Consent Decree

In 1999 the Department of Justice informed the City and the Department that it intended to sue the City for a pattern and practice of unconstitutional conduct by the LAPD. The Department of Justice's actions were prompted by complaints about police actions against people of color and a corruption scandal, which became known as the Rampart Scandal.

The result was a settlement agreement, in which the City and the Department consented to monitoring by the Department of Justice, under the jurisdiction of a federal court judge, to enact reforms of the LAPD's policies, procedures, and actions. The agreement, known as the Consent Decree, was enacted in June 2001.[7] It took the Department eight years to be relieved of court jurisdiction for most of the Consent Decree and an additional three years to be relieved of the remainder. Reforms included but were not limited to: investigations of complaints against officers; investigations of officer involved shootings and other uses of force; training; development of an officer early intervention system; control over the use of confidential informants; supervision and management of units responsible for investigating gangs, and the development of a program for responding to persons with mental illness (see Appendix 4 for an overview of the settlement).

### Section 2.04    Settlements in Los Angeles

Los Angeles has a history of lawsuits arising from police actions and responses to demonstrations and protests. The lawsuits have involved the Democratic National Convention (2000), MacArthur Park (2007), Occupy LA (2011) and the Ferguson protests (2014).  Collectively, the settlement agreements involved the use of less lethal munitions, timely processing of arrestees and declaration of unlawful

---

[6] http://documents.latimes,com/los-angeles-police-department-after-action-report-1992-aprilmay-riot/
[7] The Department of Justice Consent Decree, 2001.

assemblies. The settlement costs agreed to by the City (and Department) totaled over $21,000,000. (See Appendix 5, 6, 7, 8 for more information regarding the settlement agreements).

Results of the settlements are as follows:

**Democratic National Convention (2000).** The court ordered that less lethal munitions may only be used to control persons who are aggressive and/or combative or persons armed with weapons other than firearms or who are destroying property. Before declaring an unlawful assembly, the incident commander should consider isolating and arresting those responsible for unlawful conduct if feasible. Settled for over $5,000,000.

**MacArthur Park (2007).** The court ordered that warnings should generally be given prior to the use of less lethal munitions.  Less lethal munitions may only be deployed on aggressive and/or combative subjects in a crowd control situation and to prevent the destruction of property. Less lethal munitions are not to be used on lawfully dispersing crowds. Before declaring an unlawful assembly, the incident commander should consider isolating and arresting those responsible for unlawful conduct if feasible. Crowds shall be given a reasonable amount of time to disperse before being subjected to arrest. Training was mandated for Metropolitan Division personnel every year, patrol officers every two years, and command staff every year. Settled for over $13,000,000.

**Occupy LA (2011).** Plaintiff's alleged that they were arrested without being given the opportunity to leave. Plaintiffs also alleged they were placed on transportation buses with tight handcuffs for an extended period of time and denied access to bathroom facilities or water while held in police custody. Arrestees shall be released on their own recognizance if charged with only a misdemeanor, pursuant to PC Section 853.6. Settled for $2,450,000.

**Ferguson Protests (2014).** Plaintiff's alleged that they were handcuffed using "zip-ties" (plastic handcuffs) for extended periods of time, incarcerated for extended periods of time or denied release on their own recognizance pursuant to PC Section 853.6.  Settled for $750,000.

This evaluation determined that the Department had not corrected its historical problems in the treatment and timely processing of arrestees as agreed to in the Occupy LA and Ferguson Protests agreements. Despite having nearly a decade to revise and exercise custody procedures, the LAPD did not have an adequate arrestee processing procedure in place resulting in arrestees being in handcuffs for extended periods of time and arrestees allegedly not being allowed access to bathroom facilities or water. The lack of an efficient custody process also adversely impacted field operations as noted later in this report.

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

### Section 2.05    Department Organization

The Department is led by a Chief of Police. There are three assistant chiefs or Office Directors who report to the Chief. The Director of Office of Special Operations oversees specialized divisions such as Metropolitan, Emergency Services, Major Crimes and Air Support Divisions along with traffic enforcement and transit services. Another assistant chief, the Director of Office of Support Services, oversees administrative and support entities including Training, Recruitment, Personnel, Fiscal Support, Communications and Custody Services Divisions.

The Director of Office of Operations is responsible for the traditional day-to-day policing that takes place in the City, such as patrol and detective operations. The Office of Operations is divided into four large geographic sectors called bureaus, as depicted in Figure 1, and include: Operations Central Bureau, Operations South Bureau, Operations West Bureau, and Operations Valley Bureau. Each bureau is led by a deputy chief who reports to the Office of Operations assistant chief. The four bureaus are divided further into geographic "areas" also commonly referred to as divisions. Each area is staffed with a senior captain in charge of all Departmental activities for the area and a subordinate captain who oversees patrol functions.



Three Operations Bureaus have Special Events Units where staff are specifically assigned to planning for special events and unusual occurrences. Operations Valley Bureau utilizes their Training Unit personnel to do most event planning. Those persons have expertise in most aspects of event planning and create the majority of incident action plans for preplanned events. Operations Central Bureau command staff indicated that their Special Events Unit alone handles hundreds of special events each year. In nearly all instances, these events are peacefully facilitated by the LAPD.

A list of key terms is found in Appendix 9.

*Figure 1: Los Angeles Police Department Bureaus and Areas Map*

18

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

## Section 2.06    Incident Command System Concept

The incident command system is a standardized hierarchical structure that allows for a cooperative response by multiple entities, both within and outside of government, to organize and coordinate response activities without compromising the decision-making authority of local command (Appendix 10). The incident command system ensures that the most pressing needs are met and that precious resources are used without duplication or waste."[8]

The incident command system was created in the 1970s to allow fire agencies to meld their resources to control wildfires.[9] The system adopted standardized terminologies, position titles, etc. The system soon was adopted by law enforcement and other first responders as an organized structure to establish a command structure over an incident to manage that incident effectively. The incident command system is now the national standard for organizing and handling large-scale events.

Successful deployment of the incident command system requires individuals with expertise to be designated to administer or lead the various sections and subsections within the organizational structure. An incident command system structure is designed to be infinitely adaptable by allowing the incident commander to create an organization that supports the mission. Incident command system protocols advise that the structure should be effective by keeping the span of control from three to seven people with five being the ideal.

The incident command system table of organization that is created for the unique incident designates who is responsible for each function. According to the LAPD's Emergency Operations Guide, some of the essential features of the incident command system are:

- Common Terminology
- Modular Organization
- Management by Objectives
- Incident Action Planning
- Manageable Span of Control
- Incident Location and Facilities
- Comprehensive Resource Management
- Integrated Communications
- Establishment and Transfer of Command
- Chain of Command and Unity of Command
- Unified Command
- Accountability
- Dispatch Deployment
- Information and Intelligence Management[10]

---

[8] Overview: The Incident Command System, accessed December 15, 2020, https://www.nationalservice.gov/sites/default/files/olc/moodle/ds_online_orientation/viewf265.html?id=3139&chapterid=908.

[9] History of ICS, *EMSI* (blog), accessed December 19, 2020, http://www.emsics.com/history-of-ics/.

[10] Emergency Operations Guide (Los Angeles Police Department, 2009), vol. 4, page 5.

19

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**



*Figure 2[11]: A summary of the Incident Command Structure*

The area command is an important component of the incident command system. It is used in instances when there are several incidents occurring simultaneously in the same general area and often similar in nature (e.g., multiple structure fires, multiple wildland fires, collapsed buildings, medical events, civil disturbances, planned everts, earthquake, etc.). Typically, these kinds of incidents compete for the same resources."[12] In these instances, an area command is established. The area command places a hybrid of an incident command system organization over several incident command system organizations handling similar incidents (Appendix 10).



*Figure 3[13]: A summary of the Incident Command Structure*

---

[11]Managing Large Scale Incidents - Area Command, ICS 420-1.3,
January 2020, https://firescope.caloes.ca.gov/ICS%20Documents/ICS%20420-1.3.pdf.
[12] Managing Large Scale Incidents - Area Command, ICS 420-1.3, 1.
[13] Managing Large Scale Incidents - Area Command, ICS 420-1.3, January 2020,
https://firescope.caloes.ca.gov/ICS%20Documents/ICS%20420-1.3.pdf.

20

## III.  Timeline Summary of Major Events

**This timeline was meant to capture the highlights of the events in Los Angeles and does not represent a complete list of all events that occurred during the time in review. It was compiled from documents obtained from the Department and timestamped media footage.**

**On Monday, May 25, 2020,** George Floyd died in Minneapolis, Minnesota, and on May 26 protests began in response to his death throughout the country.

**On Wednesday, May 27,** protests occurred in cities across the country. At approximately 4:00pm, protestors converged on the Hall of Justice in downtown Los Angeles, in front of then District Attorney Jackie Lacey's office. Although protestors were loud, they were peaceful. At approximately 6:00pm the crowd had grown to several hundred and began to march towards Union Station four blocks from the Hall of Justice. The crowd took a turn and entered the Hollywood freeway causing a temporary closure. As protestors began to march off the freeway, some participants turned violent, breaking the windows of two California Highway Patrol (CHP) vehicles before heading towards City Hall and LAPD headquarters. By 6:30pm, groups were observed burning American flags, vandalizing City property and blocking streets in the downtown area. Central Bureau resources were overwhelmed, and the Department called for a City-wide tactical alert, the preliminary stage of the LAPD's mobilization plan for unusual occurrences, holding over on-duty resources. As the crowd became more destructive, the decision was made to declare the event an unlawful assembly. A sergeant delivered a dispersal order using a Department sound truck at the intersection of Temple and Los Angeles Streets. The Department later confirmed to news media that no demonstrators were arrested, despite police headquarters being vandalized with graffiti.

**On Thursday, May 28,** there were multiple peaceful protests during the day. At approximately 5:00pm hundreds of protestors in downtown began to walk towards the 110 freeway, vandalizing CHP vehicles and ultimately shutting down the freeway. An estimated 500 to 1000 people marched from City Hall and blocked multiple intersections in downtown. At 8:00pm a modified tactical alert was declared for Central Bureau. At about 8:30pm there was violence erupting at 7th Street and Grand Avenue, LAPD police vehicles were damaged, and an LAPD officer was dragged into a crowd. Objects were being thrown at the police and an unlawful assembly was declared. The group walked to 3rd Street and Grand Avenue and a second dispersal order was made. Three arrests for failure to disperse and four for burglary were made.

**On Friday, May 29**, multiple peaceful protests continued throughout the City. Simultaneously, a group blocked the 110 freeway, and looting was occurring at multiple businesses in downtown Los Angeles including jewelry stores, food markets, and coffee shops. The crowd pelted police cars, vandalized property, set fires and broke windows. LAPD records indicated that 265 people were arrested, and six police officers were injured. Officers recovered handguns, brass knuckles and bricks during sweeps of downtown. Less lethal munitions were used during the downtown protests.

21

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

**On Saturday, May 30**, multiple peaceful protests took place across the City. A Black Lives Matter demonstration was planned for noon at Pan Pacific Park located at 7600 Beverly, a public green space located just east of The Grove shopping area and adjacent to the historic Farmers Market. Information surfaced that there would also be a demonstration at Mariachi Plaza located at 1st Street and S. Boyle Avenue in the Hollenbeck Area police district and that a plan to take over the Hollenbeck police station might be attempted.

Thousands of people gathered for the peaceful protest at Pan Pacific Park. By early afternoon violence broke out when breakaway groups from the larger protest blocked the intersection of 3rd Street and Fairfax Avenue and surrounded a Department mobile field force which had been sent to the area to rescue a Los Angeles County Metropolitan Transit Authority (MTA) bus with passengers onboard. The bus had been overrun by a group of aggressive agitators. A Department-wide tactical alert was called due to the need for additional personnel demands throughout the City. A large, organized convoy of cars arrived in the area and individuals from those cars began to systematically loot local businesses at The Grove. Looting and vandalism continued there, and groups of criminals set fires, burned a kiosk, and vandalized stores into the evening hours. Several LAPD police cars were damaged, and some were burned.

The Mayor declared a state of emergency and implemented a curfew in Los Angeles effective from 8:00pm to 5:30am. As the curfew went into effect, an LAPD police car was set on fire in downtown. At 11:15pm police arrested dozens of people in vehicles in the vicinity of 8th Street and Broadway. Officers were being pelted with rocks, M-80s, frozen water bottles, bricks, bottle rockets and had lasers directed at their eyes. KNX 1070 news radio reported attacks on police and journalists, looting and vandalism. Weapons found on some individuals included knives, brass knuckles, bottles of urine and a pepper ball gun. The National Guard was requested by the Mayor. A total of 866 people were arrested for looting, curfew violations, failure to disperse, and failure to obey a lawful order of a police officer. Most individuals were processed at the Van Nuys or Wilshire Station. Less lethal munitions were used in both the Pan Pacific Park incident and during downtown protests.

**On Sunday, May 31,** multiple peaceful protests occurred throughout the day in Los Angeles. The National Guard arrived during the early morning hours and was deployed to protect buildings and critical infrastructure. The Mayor lowered the curfew hour to 6:00pm. The LAPD was finding it difficult to obtain buses to transport arrestees. Looting and vandalism occurred in downtown, and less lethal munitions were deployed at various locations. LAPD made 700 arrests for curfew violations and looting. Most arrestees were transported to the Van Nuys jail for processing.

**On Monday, June 1,** multiple peaceful protests occurred during the day. Violence and looting erupted in the late afternoon. A county-wide curfew was issued, beginning at 6:00pm. Looting occurred in Hollywood, Van Nuys and downtown Los Angeles. LAPD deployed less lethal munitions at various incidents to control the crowd. Caravans were seen bringing criminal activity into the City. LAPD arrested 1,242 individuals, most from those three communities for looting, curfew violations and failing to obey a

22

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

police order. The LAPD decided to create a field jail at the Jackie Robinson Stadium at UCLA to which the majority arrested were transported.

**On Tuesday, June 2,** multiple protests continued throughout the City. By 12:30pm violence and looting had erupted in Hollywood. Projectiles were thrown at police and less lethal munitions were used. Looting and vandalism were sporadic in various locations throughout the day and into the night including downtown, the Mayor's Getty House residence approximately five miles west of City Hall, Van Nuys, and Hollywood. Approximately 1,500 persons unexpectedly arrived to demonstrate in and around the Getty House. The demonstrators at Getty House reportedly were loud, but not violent. Olympic Area had one squad (approximately ten officers and one sergeant) at Getty House. Subgroups from the crowds in downtown pelted police cars, vandalized property and set fires. LAPD cited several people for LAMC violations. LAPD records indicate that 956 people were arrested, and six police officers were injured.

**Between the five-day period of Wednesday and Sunday, June 3-7**, a total of 80 arrests were made by the LAPD as peace was restored to the City. On June 4, at 5:21pm, the Mayor rescinded the curfew. On June 6, a peaceful protest occurred at Pan Pacific Park and on June 7, a peaceful protest attended by over 20,000 protesters occurred with no problems. In both cases there were no conflicts between the police and the protesters.

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

## IV. Observations and Findings

There are seven thematic areas identified from the review providing opportunities for improvement: (1) planning, (2) command and control, (3) public order policing, (4) less lethal tools, (5) mass arrests, (6) preparedness and training, and (7) wellness.

The Review Team would like to acknowledge the sworn, including volunteer Reserve Officers, and civilian members of the Department who worked tirelessly under difficult conditions during the protests of 2020 in Los Angeles. It must be noted that although deficiencies have been identified in this examination, most officers involved in the events that are the focus of this report responded to exceedingly difficult circumstances with professionalism and courage.

### Section 4.01    Planning

The potential exists during any large-scale events for events or demonstrations to turn violent. Law enforcement executives should prepare for such instances by developing tactics and strategies to effectively maintain peace and public safety while protecting Constitutional rights and civil liberties.

**Observations**

In the days following May 25, 2020, the death of George Floyd in Minneapolis, a focus on issues of police abuse and discriminatory treatment of people of color fell upon all law enforcement. By the afternoon of May 26, peaceful protests began to develop spontaneously in Minneapolis, as well as in many large cities throughout the nation. As the day progressed in Minneapolis, the tone of the protests began to shift. Subgroups of individuals intent on engaging in criminal behavior started to clash with police. At nightfall acts of violence, vandalism, arson and looting were observed and broadcasted throughout the nation.

On Wednesday, May 27, the LAPD deployed for a protest in opposition to District Attorney Jackie Lacey at the downtown Hall of Justice. This recurring weekly protest had been taking place since late 2017. There is no indication that the LAPD did any additional planning as the result of the death of George Floyd for the May 27 event. Members of the command staff stated that no additional planning had been deemed necessary because there had been no violence at the Wednesday protest in the past and the Department had successfully facilitated hundreds of protests in the City in the last several years with no problems or violence. Additionally, there is no indication that LAPD had received any intelligence or information that the May 27 would become violent.

This protest began at approximately 4:00pm. By 6:00pm, it turned violent when hundreds of demonstrators marched onto the Hollywood freeway, stopped traffic and vandalized two CHP vehicles. By 6:40pm a tactical alert was called holding over all on-duty personnel. An unlawful assembly was declared, and the unlawful assembly order was repeated at 7:34pm at Los Angeles and Temple Streets. The Department had not planned for or deployed for this type of violent protest. The crowd dispersed after a final warning was given at 2nd and Hill Streets.

24

540

It appears limited planning was done for the 5:00pm protest in the downtown area on Thursday, May 28. The protest led to a modified tactical alert being declared for Central Bureau, and a declaration of an unlawful assembly. Police vehicles were damaged, an officer was dragged into the crowd, and there were acts of vandalism.

On May 29, Central Bureau set up a command post to run operations in Central Bureau. Central Bureau became the focal point of where the Department believed unrest would continue. This was largely because initial unrest occurred in downtown Los Angeles, and because of a very consistent historical pattern of demonstrations being limited to downtown municipal facility areas. Because of this focus, Department executives decided the Central Bureau would act as an area command (a command structure that oversees and coordinates City-wide events) and be responsible not just for any incidents in Central Bureau but also be responsible for tracking and allocating resources throughout the City. The command post did not become fully staffed until May 31.

No other geographic bureaus were directed to establish any kind of command structure or prepare for possible protests in communities under their command. However, two bureaus did so without direction. This included one bureau chief directing subordinate commands to contact off duty officers and request they respond voluntarily to provide extra deployment at critical sites within that bureau.

The pattern of past demonstrations being limited to downtown was disrupted when unrest spread to West Bureau (most notably Pan Pacific Park in Wilshire Area) and later into Valley Bureau. In addition to establishing the Central Bureau command post as the area command structure for the City, the Department had also placed many of its operational resources close to downtown causing delays in deployment. While the Central Bureau command post was managing Central Bureau events, executive level leadership should have been planning to set up an area command structure as events began to unfold across the City rather than placing the burden on Central Bureau.

The Department did not provide documentation indicating that any formal or informal high-level meetings or discussions took place within the Department or with City leadership to obtain thoughts or impressions of what the mood of the community was in various parts of the City.

**Findings**

1. The Department did not follow the basic principles of the incident command system and did not set up an appropriate area command post immediately when protests became widespread by designating the Central Bureau as the Department command post overseen by an assistant chief.

2. The Central Bureau command post did not become fully staffed until May 31. Some personnel assigned lacked experience and training in command post operations. (All of the issues with this command post are fully explained in Section 4.02 Command and Control (b) Operations Central Bureau Command post.)

25

3.  There was a lack of firm executive-level direction to the Department command officers to prepare and plan for potential widespread civil unrest and demonstrations which contributed to the problems cited throughout this report. It is unlikely that proper planning would have totally prevented the problems experienced in Los Angeles. However, preplanning and preparation could have mitigated the issues.

### (a)  Public Information and Messaging

In any crisis, best practice is to have a plan for messaging. Messaging must be transparent, allow access for the media, and occur on a consistent basis at set times with updates when necessary. The Department's messaging should be consistent with City leadership so that the City speaks with one voice. It is imperative that the messaging explains what is occurring, why actions are being taken and be accurate.

**Observations**

The Department's Public Information Officer was not given responsibility for messaging and was not asked to contribute to the creation of a Department message. There was no consistent messaging done by the Department during the multi-day events which allowed various factions to use social media and traditional media to fill the information void and drive their own messages. Instead of the public being made aware of the violent nature of some of the protestors, including shots fired at officers and physical attacks on officers, looting, vandalism and arson, social media sources displayed edited videos showing what appeared to be officers attacking peaceful protestors for no reason. In any case there was no response or explanation from the Department or City leaders indicating the full version of the video showed the officers were actually being attacked.

**Findings**

4.  It does not appear that either the Department or City leaders had a plan for messaging to the public, to the media or to Department personnel.

5.  There was a lack of a unified message from City leaders to de-escalate the violence so that peaceful protestors could exercise their First Amendment rights.

Note: The Review Team does not suggest that a slanted or biased version should have been presented by the Department or the City. Rather, messaging by the Department and the City should have been factual, consistent, and thoughtful, which might have helped in discouraging unlawful behavior.

### Section 4.02    Command and Control

It is imperative there be clear lines of command delineated and followed so that there can be unified and coordinated actions. The incident command system provides clear lines of authority and responsibility which are critical to follow in large scale events to ensure there is no confusion in the directions given by the incident commander and the operations chief in their plans to command and control the incident.

26

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

### (a)  Command and Control

**Observations**

In some instances during this review period high-ranking officers, ventured outside their lines of responsibilities causing command and control confusion. On more than one occasion during the multi-day events, command officers appeared at a location and issued orders without coordination with other command officers, the incident commander, or operations chief. Lower ranking personnel complained of operating with unclear missions and conflicting orders and at times minimal direction. In some cases, one commanding officer would intercept resources and redirect them without notifying the original commanding officer or the command post, creating confusion and incongruent direction to personnel regarding enforcement, about when, or if, to make arrests, and enforce curfew laws. This confusion of command inhibited the Department's ability to control what was occurring.

**Findings**

6.  A lack of clear command and control led to diverted resources and at times, an inability to accomplish basic policing tasks given by the incident commander or operations chief.

7.  The lack of a known and clear chain of command resonated in some incidents examined.

### (b)  Intelligence

Accurate and timely intelligence is vital to public order policing. Intelligence is seeking out information (knowledge about a particular fact or circumstance), analyzing it to determine what it means, and then using it in decision making. The more accurate the available intelligence/information to an incident commander, the better the decisions on deployment and tactics will be. There are three components of accurate and timely intelligence/information gathering: (1) intelligence and information must be gathered (2) analyzed; and (3) distributed. During this review period all three factors were problematic.

**Observations**

During the multi-day events, the Department received unanalyzed information from the internet and social media, information shared by the Los Angeles Sheriff's Department (LASD), as well as intelligence/information from the Joint Regional Intelligence Center, the Federal Bureau of Investigation, and the National Operations Center. LAPD geographic bureaus were also attempting to identify relevant information and forward it to appropriate entities within the Department.

The Department established an intelligence control center on Friday, May 29, at the Central Bureau command post. However, it was not until May 31 that the intelligence control center was fully staffed with personnel from the Office of Special Operations and Major Crimes Division. The Department had taken individuals out of specialized units and reassigned them back to patrol operations before the events of May-June 2020 occurred. As a result of this managed attrition, the intelligence function of the Department had been scaled down to a minimal level. One person was assigned to this function at Major Crimes Division, and one was assigned at Robbery Homicide Division. The Robbery Homicide

27

543

Division employee focused on criminal investigations. Department personnel attempted to analyze information during the protests, but the amount of information was too great. The Department currently does not have access to software to assist in gathering and processing information.

Several Department personnel pointed out that there is software available that would assist the Department in gathering open-source information on the internet, analyzing it and making it useful intelligence. Requests to purchase software of this kind have not been approved.

Personnel assigned to the Central Bureau command post, those assigned to field duties, and other staff and command officers gave different statements about how information was received (if at all). This suggests that the distribution method was not consistent, thereby degrading its usefulness.

Some interviewees stated they sent out e-mail blasts to some command staff members, posted information on a white board in the Central Bureau command post and provided information at briefings done at the Central Bureau command post when possible. However, the consensus of those who were in the field in need of the intelligence was that they either did not receive analyzed information or intelligence or that when they did receive analyzed information, it was coming too rapidly to be useful.

**Findings**

8. The lack of a dedicated unit to analyze information, along with the fact that the Department does not have software to assist with the analysis, weakened the process and created a significant disadvantage.

9. Interviews and a lack of any documentation to the contrary support the conclusion that the Department has no specific or consistent direction on how individual commands are supposed to monitor the internet and social media.

10. There is no training within the City or Department to develop employees in the skills necessary to perform the intelligence function.

11. There is no current robust intelligence function to gather information, analyze it and then distribute it effectively and quickly during large, wide-spread events. While current budget deficits could prevent the Department from staffing dedicated intelligence positions, it would be beneficial for the Department to develop a plan on how it would monitor the internet and social media when staffing does become available.

12. Software and technology is available to analyze the flow of information, which would provide meaningful intelligence to those who need it during an event.

13. The Department does not have established protocols on how intelligence/information is going to be distributed during major events so that all personnel know how to obtain the information and that there is consistency throughout the Department.

28

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

### (c)  Operations Central Bureau Command Post

A bureau command post should be responsible for all events within the respective bureau. During instances in which events are occurring simultaneously at various locations throughout the City, the best practice is to set up what is called an area command post to be responsible for tracking and allocating resources throughout the City. Responsibilities for the City-wide command post include: intelligence/information control, logistics, mass arrest response, resource tracking, staging, and working with the National Guard to establish missions.

<u>Observations</u>

On Friday, May 29, the Department established a command post for Central Bureau at the Buddhist Temple on 1st Street near Vignes Street in downtown. The command post was an outdoor, temporary structure located next to the City Emergency Operations Center and the Department Operations Center. A decision was also made that the Central Bureau command post serve as the Department's area command, thus making it responsible not only for all events in Central Bureau but also responsible for tracking and allocating resources throughout the City. Such a structure went against both the basic principles of the incident command system, and against past practices of the Department. The span of control was far too great and placed an undue burden on the Central Bureau incident commander who was dealing with a complex and rapidly changing situation in downtown.

Interviews established that on Saturday, May 30, discussions were held at the executive-level of the Department about transitioning to a true area command. An area command would have required each geographic bureau to establish separate command posts with the responsibility of handling events in their commands while the area command post would have oversight over the four geographic bureaus. The area command post would then be responsible for City-wide tracking and allocation of resources responding to the needs of the four geographic bureaus. The decision was made not to do this as it was believed the Central Bureau command post was already operating effectively, was staffed, and had situational awareness. This was an error in judgement. As of late on May 31, personnel were still being called in to staff positions in the Central Bureau command post. In many cases these personnel did not have training or experience in the positions to which they were assigned.

Further, had the Department had a properly configured area command structure, each of the four geographic bureaus would have had a fully operational command post to support their subordinate commands.

<u>Findings</u>

14. The Department should have set up a separate area command under the direction of an assistant chief using the Department Operations Center. No information was provided to the Review Team that any assistant chief assumed formal operational command of Department operations at any time during the review period. Having Central Bureau act as the area command placed an unnecessary burden on the entire Central Bureau incident command

29

structure. In addition, it exceeded the span of control as recommended by incident management best practices.

Note: Given the extreme anger and violence exhibited by the demonstrators on Saturday, May 30, it is doubtful that establishing a true area command on Friday, May 29, would have prevented the criminal behavior that occurred. But it is legitimate to ask whether, if the appropriate area command structure had been in place and fully staffed with trained personnel, the Department might have been able to act more quickly and possibly have mitigated the criminal behavior. The Department did establish the appropriate area command for the November 2020 presidential election.

### (d)  Operations Central Bureau Staging Area

In the incident command system structure, the logistics chief is responsible for obtaining necessary personnel resources, who are then directed to report to a staging area that is under the direction of the operations chief. The operations chief directs a staging manager to supervise the staging area and the staging manager is responsible for receiving, organizing and tracking personnel resources prior to dispatching them to their respective assignments. It is important for the staging manager to be well trained in and have experience with major events. During such large-scale events dozens, if not hundreds, of personnel are responding and any delays in getting personnel in and out of the staging area can lead to further delays in gaining control of the incident.

**Observations**

Under an area command configuration, each operations bureau would have had its own staging area so as not to concentrate resources in one location. In conjunction with the Central Bureau command post, a Central Bureau staging area was established on Friday, May 29, at Dodger Stadium on the same property that the City of Los Angeles had set up a Covid-19 testing area. Through Sunday, May 31, this was designated as the Department staging area with all personnel resources being directed there for assignments throughout the City.

Several interviewees noted that there was confusion at the staging area with long delays for personnel arriving to their assignments. Several officers commented they spent many hours in staging when they knew they were needed in the field. In some cases, officers reported they were not assigned appropriate radio designations, which caused additional issues. According to a Department executive officer, the problems in the staging area were serious enough at one point that he had to respond to the location to try to fix the problems.

Currently, the Department does not have any technology or software that can be utilized for processing personnel coming into or leaving the staging area.

**Findings**

15.  The initial designation of the Central Bureau staging area as the Department staging area was problematic. Personnel from throughout the City had to respond to this location and in some

30

instances were then sent back to their home bureaus or to locations in the City in other geographic bureaus, outside Central Bureau, causing response delays.

16. Personnel assigned to the staging area in many cases had never received training on how to run a staging area or command post. They had to devise staging procedures on the fly, at the very time that personnel demands were the greatest in the field.

17. Problems with the staging area included the location, long delays in processing personnel, a lack of restrooms and proper lighting and lack of protection from the extreme heat during the day (temperatures over 100 degrees Fahrenheit).

18. Personnel assigned to the staging area were forced to use paper forms and white boards to receive, organize, track, and then dispatch hundreds of officers, causing further delays.

NOTE: Personnel assigned to the Central Bureau staging area appear to have done the best they could under the circumstances. The delays were not because of lack of effort or because they did not try, but instead appeared to be a lack of preparation by the Department in developing personnel with the skill sets necessary and providing the support needed to ensure the deployment of a successful staging area. After several days, the Department moved staging to the four geographic bureaus which is more consistent with an area command.

### (e)  Operations West Bureau Command Post

**<u>Observations</u>**

On Thursday, May 28, the Department received information that there was going to be a Black Lives Matter demonstration at the Pan Pacific Park on Saturday May 30. At that time, West Bureau had not established a fully staffed command post at the bureau level to support major incident management, leaving that task to the individual areas within the bureau.

On Saturday, May 30, the incident commander for the planned Black Lives Matter demonstration in Pan Pacific Park set up a command post at the West Bureau community room at West Bureau Headquarters.

An event action plan was created for the Pan Pacific Park event and while the plan named specific personnel for some positions within the incident command system, it noted "TBD" (to be determined) for many positions. This included the logistics section chief, safety officer, public information officer, resource unit leader, situation unit leader, documentation unit leader and communication unit leader. These are key staffing positions to ensure the incident commander and operations chief have situational awareness and can respond effectively to problems that may occur during the event.

The incident commander responded to the designated staging area at the nearby CBS Television City studio complex to give a briefing for assigned personnel. It was at this time that problems began to occur in the field and the incident commander was not able to return to the command post. As the event became more violent, the command post was transitioned to the staging area. At some point later

31

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

in the afternoon the West Bureau commanding officer responded to the staging area and became the incident commander.

**Findings**

19. West Bureau's decision not to establish a fully staffed command post after two nights of violent protests resulted in no logistical support for the West Bureau divisions and adversely impacted their ability to manage the large-scale events.

20. There was a lack of personnel assigned to key event action plan positions for the Pan Pacific Park protest. This does not mean that some, if not all, positions were staffed; however, it does raise questions as to whether the command post staff was adequately staffed to handle this event.

21. The lack of fully staffed West Bureau and Pan Pacific Park event command posts hindered the ability of the incident commander to manage the extreme anger and violence exhibited by some of the protestors on Saturday, May 30.

NOTE: It is doubtful that the establishment of fully staffed command posts with well trained personnel would have prevented the criminal behavior. But it is legitimate to ask the question that if they had been in place, would the Department have been able to act more quickly and been able to mitigate the situation.

## (f)  Mutual Aid

Mutual aid is used by law enforcement agencies to call upon county, state, and federal resources to supplement their own resources to ensure the safety of the public under various emergency situations. Instances may include both natural and manmade disasters, terrorist events, and civil unrest. Mutual aid acts as a force multiplier for the requesting agency to return chaotic situations back to order.

As a general matter, differences between requesting and responding agencies' respective policies, policing strategies, and training can create the potential for conflicts between the expectations of the community and the expectations of the agency in need of mutual aid.

**Observations**

On May 30, the fourth day of the protests in Los Angeles, the Mayor determined that additional resources were needed as a force multiplier because the protests turned riotous and the Mayor requested mutual aid. The Department was assisted by the LASD, other regional law enforcement agencies and the National Guard.

The LAPD immediately began to prepare for the arrival of the National Guard. Despite the National Guard numbers rising from 50 to 2,800 in a period of 24 hours, LAPD did a remarkable job controlling this process. For more than nine days, the National Guard operated with clear missions and LAPD

32

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

escorts throughout the City. The National Guard deployment and LAPD's use of this resource was well
documented, and the deployment was consistent with the Department's direction.

The Review Team did not receive information from the Department documenting the activities or uses
of force by the various policing agencies, including the LASD, that responded to the City's mutual aid
request. However, it is believed that the LASD deployed "pepperball" less lethal munitions. This
munition is not approved for Department-wide use, nor was it used by the LAPD during this time. The
LASD may also have other less lethal munitions that the LAPD does not use and may have deployed
them during the protests in Los Angeles. However, making this determination was outside the scope of
this evaluation. Photographs on the internet and social media posts depicting various expended less
lethal munitions did reveal some of those munitions are not in the LAPD inventory.

The approval for the LAPD to deploy tear gas requires a commander or higher. The LAPD has not used
tear gas in a public order policing environment for decades. The LASD is authorized to use tear gas and
only requires the approval of the incident commander, a watch commander or sergeant. LAPD patrol
personnel are not equipped for operating in a teargas environment and have no experience in doing so.
Should teargas be deployed near officers without the proper equipment, it would cause eye and lung
irritation and widespread confusion. The Department asked the LASD not to deploy teargas in the
downtown protests. It does not appear that the LASD deployed tear gas within the City.

**Findings**

22.  The National Guard activation and the LAPD's use of this resource was well documented, and
     the deployment was consistent with the Department's direction.

23.  The fact that the National Guard operated without becoming the story is a testament to both
     the conduct of the National Guard and to the Department's ability to quickly solve problems
     as they surfaced. LAPD's success in facilitating the National Guard's deployment appears to
     be in large part because LAPD personnel with both military and incident command system
     experience were selected to work this assignment throughout the duration of the National
     Guard's deployment to Los Angeles.

24.  The LAPD has various settlement agreements (as described elsewhere in this report) that
     requires the approval of a commander (or higher) to use certain kinds of less lethal
     munitions. The LASD has a lower approval threshold for the deployment of less lethal
     munitions that allow an incident commander or watch commander to approve the use of the
     same munition.

25.  Due to the operational differences between agencies, the LAPD should consider using mutual
     aid agencies for fixed position tasks, such as protecting locations freeing up LAPD officers to
     engage in more dynamic tactical action (skirmish lines and seeking out roving looters).

33

NOTE: It is incumbent on the Department to obtain or review/update mutual aid agreements with partner agencies, especially the LASD, ahead of time outlining the concepts of operation, use of force policies, approvals required, less lethal tools/munitions to be used and use of force reporting.

### Section 4.03    Public Order Policing

For purposes of this report, the term "public order policing" means the discipline of using strategies and tactics to manage and control crowds. LAPD's Emergency Operations Guide describes the Department's public order policing mission as follows:

> The Department's mission is to work in partnership with the public to ensure that the First Amendment rights of all who have gathered are protected and guaranteed by our personnel. We have the responsibility to the public to protect the lives and property of all people. This will be accomplished through the fair and impartial enforcement of laws. It is imperative that when faced with both crowd management and crowd control incidents, those Department personnel utilize planning, communication, openness, and leadership to accomplish our mission. [14]

Public order policing is a complex and challenging endeavor because it entails policing (protecting rights, enforcing laws, keeping the peace) large numbers of people, often in volatile, evolving, and uncertain circumstances.

Crowd management, as distinguished from crowd control, means policing crowd situations that do <u>not</u> involve "civil disorder or unlawful activities". [15] For preplanned events, representatives of the Department meet with the leaders or organizers of the demonstration in advance of the event to plan together to ensure that participants in the event are allowed to exercise their First Amendment rights, and that the event remains peaceful. In such instances, it is common for the police and organizers to share plans so that the event can be peacefully managed. Generally, the police are able to facilitate the crowd through such tactics as stopping traffic and helping plan routes.

Even when the police and organizers work together, there may be instances where individual actors or small groups in the crowd commit unlawful acts. When such instances occur, because a line of communication is open between the police and the organizers/leaders, the police can work with the organizers/leaders to de-escalate the situation by having them "self-monitor" to stop the unlawful acts, thereby eliminating the need for other policing actions, such as making arrests or declaring an unlawful assembly.

When the police are not included in the planning of the protests, they should attempt, when feasible, to identify and work with the formal or informal leaders in the crowd. They should encourage such leaders to assist with self-monitoring of the crowd, to prevent violence and maintain the safety of everyone involved. In most cases of ad hoc, unpermitted demonstrations or marches, police can manage the

---

[14] Emergency Operations Guide (Los Angeles Police Department, n.d.), vol. 5, page 1.
[15] Emergency Operations Guide, vol. 5, page 2.

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

demonstrations and marches to ensure they are conducted peacefully. When members of the crowd commit unlawful acts, the police then must transition from crowd management to crowd control.

Crowds are typically heterogeneous, made up of numerous smaller groups of people from many walks of life, and often with different norms and values. This creates a complex problem for those within the larger crowd and those who are expected to manage the crowd. Police who attempt to manage a large crowd must avoid the mistake of treating the entire crowd as though they were all part of a violent or criminal element. If officials view a crowd as homogeneous and impose a direction or an action such as declaring curfew or an unlawful assembly, conflict can escalate. As such, strategies used by police can either escalate or deescalate crowd behavior. Understanding the dynamic of crowd psychology should be a priority of Department leadership training.

The Department defines crowd control as:

> When a preplanned or spontaneous lawful assembly deteriorates to the point where there is a potential for unlawful activity or threat of violence, the Department has a duty to stop this behavior. The nature of these events has the potential to cause injury, death, damage to property, and infringement of the rights of other members of the public. The Department must react in a lawful, measured, and rapid manner to restore order. The objective will be achieved through the use of appropriate crowd control tactics and the adherence to the law, policies and procedures. If the situation results in a use of force, the force utilized to arrest violators and restore order shall be objectively reasonable.[16]

Basic crowd control tactics include placing officers on skirmish lines to move or block a crowd. The officers on the line are allowed to "push the crowd" with batons if the crowd encroaches on them or the crowd does not move. The Department also has authorized the use of less lethal munitions (described elsewhere in this report) for crowd control. If required, and safe to do so, a squad of officers may enter the crowd, in what is known as an "arrest circle" to detain an individual. It is in these circumstances that the Department may disperse the crowd or make arrests for unlawful assembly or other crimes, such as curfew violations.

**<u>Observations</u>**

Many command officers interviewed indicated they are used to successfully managing and facilitating the movement of crowds and demonstrations in Los Angeles. For example, prior to the protests that are the subject of this report, Central Bureau had experienced anti-gentrification marches in the Hollenbeck Area, several years of weekly demonstrations supporting the removal of District Attorney Jackie Lacey, and recent demonstrations about such matters as tenant's rights and Covid-19. Those demonstrations were peacefully managed by the Department.

---

[16] Emergency Operations Guide, vol. 5, page 3.

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

On many occasions during May-June of 2020, the police become aware of an unplanned or ad hoc demonstration taking place. In such instances the Department arrived on-scene and gauged the temperament and conduct of the crowd to determine whether the crowd was peaceful or engaged in criminal activity. It has long been a standard practice of the LAPD to facilitate unplanned public demonstrations just as they do with preplanned events. This took place on several occasions throughout May-June 2020. Notably, an example occurred in West Bureau, when a large crowd of frustrated protestors marched through an LAPD geographic area to several adjoining jurisdictions only to be prevented from entering those cities. The incident commander and field commander were able to successfully facilitate the crowd movement and exercising of their First Amendment right to protest without violence erupting.

In addition to the formal mission of the Department, one of its informal goals is to "not become the story". This means to avoid becoming involved in controversy by unnecessarily interrupting a march, by using force, or by otherwise diverting attention away from the cause of the organizers and unnecessarily focusing it onto the Department.

It is notable that most of the many demonstrations that occurred in Los Angeles in the wake of George Floyd's killing were peaceful. Community members interviewed said the police generally allowed the demonstrations to proceed without interference. For example, the Department peacefully facilitated the Black Lives Matter demonstration in Hollywood on June 7, which was attended by over 20,000 people.

A major challenge for the LAPD was to determine to which of the numerous protests held over several days to send resources, and then then to determine the mood of the crowd, and how to police it appropriately.

It appears that on occasion during the May-June protests command officers did not transition from crowd management to crowd control as quickly as was necessary. Some command officers expressed reluctance to act quickly out of concern over being unfairly second guessed in the aftermath. While it is understandable that decision-making can be difficult, there were times when more rapid interdiction of unlawful behavior would have been appropriate.

With few exceptions, nearly all commanding officers interviewed for this report said that their level of training and experience was limited prior to these events, and that they did not feel confident in handling these incidents. The few who felt confident in handling all aspects of public order situations indicated that their competence came from prior assignments such as Metropolitan Division or via mentoring from highly knowledgeable peers/superiors. The Review Team was not able to identify any formal training or mentoring programs in place to ensure that commanding officers are proficient in being able to provide command and control in crowd control situations.

The community focus of the protests and demonstrations of May-June was the police and the issue of police abuse, particularly of people of color. Thus, the Department could not always manage the crowd.

36

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

The mere presence of police officers was not necessarily going to quell problems as has been the recent experience of the LAPD, and in fact led to confrontations on occasion.

In addition, most crowds were leaderless. Some smaller groups in some of the crowds who appeared to be attempting to commit unlawful acts seemed to be well prepared, highly mobile and coordinated. Some police commanders, as well as Air Support Division officers, opined that some persons in the crowd may have been monitoring LAPD radio frequencies, as evidenced by their rapid and coordinated movements in response to police communications. Police commanders described the behavior of some groups involved in criminal behavior as similar to "water" where they would commit an unlawful act and quickly disperse, only to reappear at another location, extremely difficult to contain.

As reflected in media video, and according to LAPD accounts, it appeared that in some instances people at the front of the crowd directly facing police officers had their hands raised over their heads, while others stood behind this line and threw objects at police. Many command officers opined that this appeared to be a deliberate strategy, using the general protestors in front as a shield, possibly without their knowledge. Such behavior of small subgroups of people engaging in criminal acts and causing violence, and then hiding behind demonstrators, was a shift from past demonstrations. This behavior was observed at multiple demonstrations across the nation.

Looting often appeared to be well coordinated. Police commanders observed that it looked like there were "scouts" in certain areas observing the actions of police and selecting targets. The looters seemed to be opportunistic and some officers identified gang members in the groups engaged in looting and vandalism. Convoys of up to ten cars were observed driving together in a line to "attack" one location. If police responded to interdict or make arrests, those cars (and occupants) quickly dispersed in all directions, only to reconfigure together elsewhere to attack another target. The wide-spread nature of the looting simultaneously at various locations made it incredibly difficult to contain. At times, the Department did not seem to have enough resources to contain the looting that initially occurred.

**Findings**

26. There were many protests during the evaluation period which the LAPD facilitated peacefully.

27. There was a lack of training to properly prepare command officers for managing large crowds with the possibility of civil unrest and many command officers stated they did not feel confident in handling these incidents.

28. The Department culture inhibits those in in a position to make decisions as they are either afraid to use their best judgment or paralyzed by concerns that they will be second-guessed by their superiors or they fear "becoming the story".

29. The LAPD did not anticipate and was not prepared for the disruptive strategies of swift mobility and coordination of movement used by some criminal groups.

37

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

NOTE: Recommendation No.1 to establish a Strategic Emergency Manager would be key to effectively addressing all-hazards emergency management facing law enforcement today. It is envisioned that the Strategic Emergency Manager will keep abreast of emerging trends in all aspects of public order policing and introduce those concepts to the Department. Public order policing must be enhanced to meet contemporary operational challenges and anticipate future ones. Crowd psychology is a necessary component of training police to better handle dynamic crowd behavior. The civil unrest strategies now used by some groups intent on spreading chaos have allowed them to become more mobile and better planned than historically has been the case. The challenge for police is to facilitate First Amendment rights while at the same time interdicting groups who are attempting to disrupt lawful demonstrations. The Review Team contacted law enforcement professionals and emergency management experts and found that there are crowd psychology professionals independently looking at such issues. The LAPD should be doing the same (see Recommendations section for further). The LAPD is in a unique position, since it is fortunate enough to have a fulltime, large behavioral sciences section embedded within the Department. Psychologists within this section likely have some crowd psychology experience and should be consulted as the Department moves forward. The Department also should contact other law enforcement agencies, academics, and law enforcement experts to understand best practices and to develop strategies for the 21st Century.

### (a)  Mobile Field Force Configuration

In the aftermath of the 1992 civil unrest in Los Angeles, LAPD's Metropolitan Division conducted a best practices in training for crowd management search. Metropolitan Division then created the mobile field force concept, which is still in use today by law enforcement nationwide. The mobile field force concept was codified into the 1993 California Police Officers Standards in Training Crowd Management and Crowd Control Guidelines and incorporated into multiple documents within the LAPD. Mobile field forces use crowd control strategies, such as skirmish lines, but are also a more flexible way of rapidly responding to events. The mobile field force concept was developed to provide a fast and effective method to assemble and deploy a platoon-size, tactical force. It is adaptable to both planned events and spontaneous incidents which require the rapid assembly of large numbers of officers. An important strategy during crowd control events is the use of the mobile field force configuration. The effectiveness of the mobile field force is dependent upon its mobility. As such, the cars must be staged in a relatively safe location and the driver's duty is to stay with the cars to maintain security and be ready to move quickly if necessary.

A mobile field force is defined as:

- A platoon-sized tactical force of one lieutenant, four sergeants, and 45 officers who rapidly assemble specifically capable to respond to events as a unit;
- A standalone group that is capable of mobility, physical presence, supervision and command;
- Tactically trained and capable of mass arrest; and
- Utilized during pre-planned and spontaneous events; and

38

554

- Capable of deployment within 45 minutes.[17]

In addition to mobile field forces, Metropolitan Division deploys what are known as tactical support elements. Tactical support elements are used in coordination with mobile field forces or as a standalone strategy. A tactical support element is a reinforced Metropolitan Division squad of between eight and 22 officers with two sergeants and one lieutenant, with equipment and equipment operators selected based on the assigned mission.

The LAPD also often deploys helicopters (air units) over public policing situations and did so on many occasions during the protest that were triggered by George Floyd's death. Obviously, personnel in helicopters have the advantage of being able to have a far greater view of events as they unfold on the ground. A tactical flight officer's perspective in the air unit adds situational awareness from a unique position and thus provides tactical communications to officers on the ground. The tactical flight officer is often a key component of any crowd control situation, as was the case during the review period.

**Observations**

During the review period, at least six police vehicles from mobile field force configurations were destroyed by arson and others were damaged. This was in part because no officers were left with the cars to protect them from vandalism as the crowds were very mobile, overtaking the locations where police cars were parked. The Department has estimated the repair and replacement cost at nearly $1,000,000.

Numerous officers interviewed by the Review Team, and many of the LAPD officers who participated in the Los Angeles Police Protective League survey, stated that they frequently told supervisors on the ground that the police vehicles needed to be protected by a small group of officers from the mobile field force configuration. However, some supervisors did not take the advice of their subordinates, creating opportunity for small groups of problem people to commit crimes of arson and vandalism on police vehicles, without consequence.

Most command staff interviewed stated that the Metropolitan Division tactical support elements were used effectively and supported the mobile field forces as they were made up of smaller groups of officers, thus more mobile. The West Bureau commander who was present at the Pan Pacific Park protest on May 30 was able to start to control problem areas using the tactical support elements, which he stated were a "huge help". The tactical support elements developed a plan based on their situational awareness, gave a dispersal order, and then, when the crowd did not disperse, they moved the crowd in the direction of an alley where they could be surrounded and arrested for curfew. A review of dispatch audio, corroborated by command officer interviews, indicates that the air units from the LAPD Air

---

[17] Emergency Operations Guide, vol. 5.

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

Support Division was used effectively throughout the events, helping to coordinate officers on the ground.

Groups of individuals who engaged in criminal behavior were using new methods to cause disruption that the LAPD had never encountered before. Thus, it was difficult for officers to separate and isolate those who were committing unlawful acts. Command and line officers noted that the heavy reliance on traditional crowd control tactics of skirmish lines, described as "Napoleonic tactics" in which officers stand in static lines and attempt to push the crowds, were simply not effective during the protests. As such, the highly mobile groups within crowds, as well as roving looters, made the officers on the ground less effective.

The LAPD air units developed a tactic to deal with the looters during the Pan Pacific Park unrest which was then used in other problem locations throughout the City. On Monday, June 1, the air unit broke up mobile field forces and used other available officers to make small squads of one sergeant and ten officers. The tactical flight officers identified convoys of looters and then directed the officers on the ground to intercept and arrest the looters. In addition, once the LAPD was fully mobilized so as to provide additional personnel, and the National Guard was on-scene, police resources were freed up to interdict roving convoys of looters. This tactic proved to be effective. The traditional Mobile field force configuration of 45 officers was not effective in many instances during the unrest of 2020. The LAPD recognized that the mobile field force configuration needed more personnel to be operationally effective and keep the cars protected. Subsequently, the LAPD increased the number of officers in a mobile field force from 45 to 60.

**Findings**

30. The traditional mobile field force configuration of 45 officers was not effective in many instances during the protests of 2020 and additional personnel were needed to be able to protect the police vehicles and manage the crowds. The LAPD has since increased the size of the mobile field force from 45 to 60 personnel.

31. The LAPD adjusted tactics mid-way through the unrest when the air unit designed a tactic that broke up mobile field force units into smaller squads. This tactic proved effective.

32. Officers occasionally expressed concern to supervisors that the mobile field force police vehicles needed to be guarded, however, in some instances these warnings were ignored.

### (b) Shadow Teams

Shadow teams are a strategy the Department has used frequently during past crowd management events. Shadow teams consist of undercover officers who are in the crowd to monitor the mood of the crowd and to provide operational information to the incident commander. Such a strategy can be extremely effective if information can be quickly communicated to the incident commander. For example, the immediate arrest of a few agitators can potentially deescalate an incident by removing the

40

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

trouble-maker intent on creating chaos or engaging in criminal behavior from the crowd with minimal disruption.

**Observations**

The Department deployed shadow teams in crowds at various points during the May-June 2020 protests. The use and assignment of shadow teams has been successful historically. During these protests, shadow teams were utilized by some incident commanders. Many of the crowds were violent and hostile, which raised concerns about the safety of the officers. There were also communications problems between shadow team members, and uncertainty about whom they should be communicating within the incident command system. This created a lack of information that could be acted upon in a timely manner.

**Findings**

33. There are no standard Department protocols or training documents on the use of shadow teams.

34. Communications and information from the shadow team's observations were not distributed in a timely manner. The Department now assigns shadow teams and a uniformed cover team to the mobile field force. This will allow for a more direct line of communication between shadow teams and mobile field force leaders while providing the shadow teams with a dedicated security team.

### Section 4.04    Less Lethal Tools

Trained LAPD officers were authorized to use four types of less lethal tools during the May-June 2020 events. Those tools were:

#### (a)  40mm Launcher Deploying the 40 mm eXact iMpact Sponge Round

The 40mm fires a single foam projectile that weighs 0.96 oz and travels at 325 feet per second. The minimum range for the eXact iMpact round is five feet and the maximum effective range is 131 feet (Note: LAPD limits this range to 110 feet). The round is intended for direct impact (target specific) application.[18] The 40mm is a standard tool for patrol operations.

LAPD policy on the 40mm is documented in a directive which states that less lethal force options are only permissible when an officer reasonably believes that a suspect or subject is violently resisting arrest or poses an immediate threat of violence or physical harm.[19] The 40mm shall not be used to target the head, neck, face, eyes, or spine unless lethal force is authorized. The 40mm launcher may be used in

---

[18] 40mm eXact iMpact Sponge Round Spec Sheet (Defense Technologies, December 30, 2020), www.defense-technologies.com.
[19] USE OF FORCE - TACTICS DIRECTIVE:  40mm LESS-LETHAL LAUNCHER, 1.

41

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

crowd control situations against a single subject/suspect as a target-specific less lethal option. [20]
Because the 40mm round is target specific, it cannot be used to disperse a crowd. The LAPD 40mm
launchers are outfitted with an EOTech sight. The cost of the 40mm system with a sighting system is
approximately $2,000. (A repurposed shotgun that uses a beanbag shotgun round can cost one fourth of
that amount.) The 40mm rounds cost approximately $25 per round making it too expensive to certify
(requalify) the entire Department on a regular basis.

### (b)  37mm Launcher Deploying the 37 mm Foam Baton Black Powder Round

The foam baton round consists of five foam rubber projectiles that are discharged at once. The LAPD
uses the 37mm foam baton rounds as a non-target specific impact tool. The LAPD only allows the foam
baton rounds to be skip fired. The range of the round is 15 to 30 feet.[21]

LAPD policy states in part, "the 37mm foam baton round is a non-target specific round used for crowd
control. With the approval of the incident commander, the 37mm foam baton round may be used as a
crowd control tool when a dispersal order has been issued and/or immediate action is necessary, to stop
violence, to ensure public safety, and restore order."[22]

### (c)  Beanbag Shotgun

The beanbag shotgun is a Remington 870 shotgun which has been configured with a green slide handle
and stock, rifled barrel, and side saddle ammunition holder. The beanbag shotgun deploys a "super-sock
round" which is a 12-gauge cartridge containing a shot-filled fabric bag. These rounds are designed to be
non-penetrating, and upon striking a target distribute energy over a broad surface area. According to
LAPD policy, the beanbag shotgun may be used in crowd control situations against a single
subject/suspect as a target-specific less-lethal option.[23]

The beanbag shotgun is also a standard less lethal tool/munition used during patrol operations. Most
officers in the Department have been certified during the academy in the use of the beanbag shotgun
trained for use in patrol functions. Like the 40 mm round, the beanbag shotgun is not to be fired at the
head, neck, face, eyes, or spine.

---

[20] USE OF FORCE - TACTICS DIRECTIVE:  40mm LESS-LETHAL LAUNCHER, 2.

[21] 37mm Foam Baton Black Powder Round Spec Sheet (Defense Technologies, December 30, 2020), www.defense-technologies.com.

[22] USE OF FORCE - TACTICS DIRECTIVE No. 11.1 CROWD MANAGEMENT, INTERVENTION, AND CONTROL (Los Angeles Police Department, October 2020), 5, http://lapd-lapd-lapd-assets.lapdonline.org/assets/pdf/tac-dir11-crowd-mgmt.pdf.

[23] USE OF FORCE - TACTICS DIRECTIVE No. 6.3 BEANBAG SHOTGUN (Los Angeles Police Department, July 2018).

42

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

### (d) Hornets Nest Sting Grenade, .60 Caliber Rubber Balls

Hornets Nest Sting Grenade (sometimes referred to as a "stinger" round) is a "rubber ball diversionary device that produces approximately 130 decibels at five feet and emits 1-2 million candelas. In addition to the light and sound, the device disperses 25, .60 caliber, rubber balls in a 360-degree pattern."[24]

The Department did not provide documentation relative to the deployment approval of the Hornets Nest Sting Grenade round. However, the Department did provide information that states that only the Special Weapons and Tactics Team (SWAT) has this less lethal tool and is authorized to deploy it. There is some confusion among the Department command staff as to who may authorize the deployment of this tool in crowd control situations. The MacArthur Park 2007 settlement agreement as well as information in the Emergency Operations Guide and lesson plans indicate that only a person of the rank of commander or higher may authorize its usage in crowd control situations. However, there is a belief by command staff that only the Chief of Police may authorize its usage. Regardless, members of SWAT deployed rounds of this less lethal tool on May 30, during the Pan Pacific Park situation with the direct approval of the Chief of Police who was on-scene.

For detailed information on the above less lethal weapons see Appendix 12.

### (e) Less Lethal Use

The goal of less lethal tools is to control or stop the actions of the subject while minimizing the potential for serious injury to the suspect. Less lethal tools may reduce the likelihood of using deadly force.[25]

The Department was asked for but did not provide the number of less lethal munitions used between May 27 and June 7. Less lethal munitions were not used after June 3. As of this writing, no accounting of less lethal munitions has been received. However, rough inventory records indicated that over 3,500 rounds of 40mm and over 6,200 rounds of 37mm munitions were not returned to the Department armory. Whatever the exact number was, it appears that the Department expended a great deal of less lethal rounds during the protests.

Of note, the Review Team received information from the Department that there are six serious use of force investigations (for a definition of categorical use of force incident see Appendix 9) that are related to the protests. Those cases will be investigated by a specialized LAPD investigative team assigned to Professional Standards Bureau and findings will be reviewed by the Board of Police Commissioners.

There are over 140,000 body worn camera videos associated with this review period and the LAPD technology makes it exceedingly difficult to separate out videos related to the various events throughout the City. Therefore, the Review Team was not able to view every video in which less lethal munitions were deployed. Thus, the Review Team did not attempt to investigate the appropriateness of

---

[24] Hornets Nest Sting Grenade, .60 Cal. Rubber Balls, Produce Code ALSG10160 (ALS, December 30, 2020), www.lesslethal.com.
[25] Sid Heal, *Concepts of Nonlethal Force: Understanding Force from Shouting to Shooting* (Brooklyn: Lantern Publishing & Media, 2020), chap. 6.

43

individual uses of less lethal munitions. Nor could a determination be made about the amount of less lethal munitions expended other than that a large amount was used.

It is believed that the majority of injuries reported occurred from the deployment of the 40mm rounds because of the reasons stated below.

The Department first approved use of the less lethal 40mm system in 2000. At that time, only personnel from Metropolitan Division were authorized to use the 40mm and trained frequently on its use.

The LAPD later undertook a pilot program to examine the deployment of the 40mm Department-wide. This was largely due to the increased safety of the 40mm round vs. the beanbag round and the increased effective range of the 40mm. The pilot program was successful. The 40mm system was authorized for Department-wide patrol operations use in 2017 upon approval of the Board of Police Commissioners after the Inspector General's evaluation.

In 2017, when the Department transitioned to the 40mm for patrol, officers were trained during the Integrated Communications, De-escalation, and Crowd Control (ICDC) ten-hour class. Two hours of this course was dedicated to the 40mm transition. At that time, the Department also integrated training on the 40mm in the Basic Recruit Training Course. To the best of the Review Team's knowledge, the Department determined that officers would only need to qualify one time during the class to be able to carry and use the weapon in the field.

A primary benefit of the 40mm system, its greater effective range, is also a factor that complicates the deployment in crowd control situations. The effective range of the round makes precise, target-specific shots at distance possible, but also magnifies issues such as marksmanship (or lack thereof) and movement of the intended target. The movement of others in the crowd creates the potential for other persons to be impacted by the round. The officer operating the 40mm must be very precise in its application to strike the intended target and minimize the risk potential to bystanders. Given the longer-range capabilities of the 40mm system and the environment in which the round is used in, a greater level of training, marksmanship and competency is necessary.

**Findings**

35. It appears the majority of reported injuries that were sustained by persons in crowds were the result of less lethal munitions from the 40mm. Many who reported being injured claim that they were not involved in any violent or hostile acts.

36. Injuries reported ranged from minor to significant, some in the head, the back, the neck, and the eye.

37. Limited viewing of video indicated that there were instances where officers quickly fired the 40mm rounds at distant targets which increases the likelihood of hitting an unintended target.

44

38. The deployment of less lethal munitions was not always done at the direction of a supervisor or officer. In some instances, officers were directed to be in front of a skirmish line and left to deploy less lethal tools, including the 40 mm, with no direction or coordination.

39. Over 7,800 personnel were trained (certified) to deploy the 40mm during a two-hour block of instruction at the ICDC course. However, the Review Team did not find the two hours of training to be sufficient given the skill level needed to deploy the 40mm in a chaotic public order policing environment.

40. Officers are required to be trained one time on the 40mm system. Deploying the 40mm in public order policing situations requires recurring certification and training.

41. The skill level required to deploy the 40mm in chaotic public order policing situations is high. Officers must be extremely competent and possess excellent marksmanship skills. It is unlikely that all officers trained possess the marksmanship skills necessary to competently deploy the 40mm system under those circumstances.

42. The last training for the 40mm for officers, other than those going through recruit training, was in 2018.

43. Most supervisors and officers who deploy less lethal munitions are outfitted with body worn video and could use the video audio capabilities to record information about their use of less lethal munitions. This should become a protocol during crowd control situations.

44. The Department's Use of Force Tactics directive authorizing the use of 40mm has no detailed guidance on use in public order policing situations.

45. The 40mm can be an effective tool in a crowd control situation when utilized by officers who are well trained and experienced in its use.

### (f)  Handheld Baton

During crowd control situations the use of the baton is authorized only to push a crowd and not as an impact weapon unless the officer or another person is physically threatened.

**Observations**

LAPD personnel used the handheld baton throughout the protests in 2020. The Review Team was not able to determine if the baton use was appropriate. Lawsuits filed indicated that some plaintiffs claimed they were hit with batons but were not engaged in any violent or threatening behavior. Any allegations of inappropriate use of batons will be investigated by the Department.

**Findings**

None

45

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

## Section 4.05    Planning for Mass Arrests and Citations

An agency must have a clearly articulated plan for how to handle the various issues related to mass arrests. For example, the plan must include appropriate transportation, provide access to water and restroom facilities and have an adequate number of personnel to process arrestees in a timely manner.

**Observations**

The type of large-scale mass arrests that occurred in Los Angeles in May-June 2020 requires significant planning. The LAPD arrested more than 4,000 people. Nearly all those arrests occurred during a five-day period from Friday, May 29 to Tuesday, June 2. The breakdown of the arrests over those five days was 265 on Friday, 866 on Saturday, 700 on Sunday, 1,242 on Monday, and 956 on Tuesday. There is no evidence, however, that the Department prepared for a situation where mass arrests might be in order. Even after Wednesday and Thursday nights - when protesters shut down the freeway and vandalized property, including police headquarters and police vehicles, threw objects at police officers and dragged one officer into a crowd - there is no indication that planning had begun for mass arrests.

The LAPD's field jail guide (Volume 6 of the Department's Emergency Operations Guide) lays out the planning process that should be used by a logistics chief assigned to an event in which mass arrests are a possibility. The field jail guide outlines how to set up a field jail unit, which is a temporary unit that must be stood up to identify and process arrestees, evidence and property in the field. A field jail unit set-up requires time, equipment and personnel. It requires preparation and planning, and it is essential that the logistics section within the incident command structure appoint someone with experience and knowledge to set up the field jail.

On Saturday, May 30, 866 arrests were made by the LAPD. At that time, the Department did not have a fully staffed, properly set up logistics branch within the area command configuration. This led to the Department being unprepared to handle the mass arrests.

**Findings**

46. The LAPD failed to plan ahead for mass arrests, which resulted in a last-minute, uncoordinated effort to manage the arrests of more than 4,000 individuals.

### (a)  Citations Related to Mass Arrests

A violation of PC Section 409 (failure to disperse) requires an announcement of unlawful assembly with a route to leave, and a reasonable amount of time to do so. PC Section 415 (disturbing the peace) and LAMC Section 8.78 (curfew violation) are sections individuals can be arrested for, while LAMC Section 80.02 (failure to obey a lawful order of a police officer) is an infraction. An infraction is like a traffic ticket, in that the person arrested is only required to show proof of identification and sign a promise to appear in order to be released at the location of the traffic stop.

46

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

### Observations

The first instance in which the LAPD consulted with the City Attorney as to what charges to use for those arrested during the protests was Friday night, May 29. At that time, LAPD only inquired about the use of PC Section 409 (failure to disperse at the scene of a riot or unlawful assembly) and PC Section 415 (disturbing the peace).

On the night of Friday, May 29, however, the Department arrested 265 people for violation of LAMC Section 80.02, failure to obey a lawful order of a police officer, which is an infraction under the law. In this instance, the Department arrested, detained, and transported individuals to a Department facility to be booked or cited, and then released. Many, if not all, of those arrested were detained for hours, while remaining handcuffed, and citations were ultimately issued at the police facility where the arrestees were taken. This treatment of the arrestees in 2020 is nearly identical to the treatment of those arrested in 2011 at Occupy LA, and then again in 2014 during the Ferguson protests, except that in 2020 it occurred in the middle of a public health crisis.

Over the course of several days of protests, prior to the declaration of a curfew, most of the arrests by LAPD were for disobeying a lawful order of a police officer. After the curfew declaration on Saturday night, LAMC Section 8.78, violation of curfew, was the primary arrest section used. Those arrested for curfew were detained and handcuffed for hours, without water or bathroom breaks, before being transported to the jail facility for booking. This occurred during the worst pandemic in 100 years and subjected those arrested, and officers providing security, to be in close proximity to one another for extended periods of time with the possibility of becoming infected with Covid-19. Ultimately, the looters were detained and the curfew violators were released. During the protests, very few arrests were made for violation of PC Section 409, failure to disperse. The reasons for not using this section are unknown, but it could be that the requirements of the section would have been difficult to meet due to excessively loud noise levels or not wanting to disperse people out of one area, just to have them relocate to another area where unrest was occurring.

### Findings

47. The arrests made on Thursday, Friday, and Saturday were made under a Municipal Code Section that is an infraction requiring a citation and release in the field.

48. On Thursday, Friday and Saturday, the LAPD arrested and detained individuals for exceedingly long periods of time, and transported individuals to a Department facility for processing.

49. Those arrested were detained for hours while handcuffed and were not provided with water or the use of bathroom facilities and were held in close conditions without masks during a pandemic environment.

47

---

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

---

50. The LAPD has not corrected the issues related to detention and arrests identified in the 2011 Occupy LA and the 2014 Ferguson protests. Those lawsuit settlements regarding arrest problems resulted in the City paying over $3,000,000.

### (b) Transportation of Arrestees

Factors LAPD considers when setting up a field jail include the number of officers required to process arrestees. Typically, approximately 50-80 officers are required to handle the intake of 200-300 arrestees per hour.[26] To assist with the timely processing of arrestees, the field jail may activate the Automated Mass Arrest Booking System (AMABS) whenever the Department has exhausted, or anticipates to exhaust, its routine capabilities (reached at approximately 300-400 arrestees). The AMABS is a computer-based system operated by the LASD. When activated, Department personnel need only to complete the arresting officer's portion of an LASD mass arrest report and an arrest report narrative. At the time the incident commander activates the AMABS, it is recommended that they communicate the need for jail buses to the on-duty watch commander at LASD. This allows time for drivers to be notified and buses to be scheduled while the LAPD identifies a location for a field jail. LASD personnel and buses will ultimately transport the arrestees.

**<u>Observations</u>**

On May 30, 866 arrests were made by LAPD. A request was made to secure buses from LASD for arrestee transportation. The LAPD was not able to secure buses as the LASD buses were already dedicated to other functions. The LAPD had also requested buses from the MTA, but, per MTA policy, MTA will not assist the LAPD unless the LASD has officially refused to do so. After several hours of trying, the LAPD command post was finally able to secure MTA buses.

The delayed identification of a source of buses caused even longer delays in the field. Additionally, as the violence began to escalate throughout the City, it became increasingly difficult for the buses to reach their designated pick-up location, leaving officers in the field holding arrestees for hours while awaiting transportation. In some instances, officers resorted to obtaining vans from police stations to remove arrestees from the field.

The lack of buses or other vehicles for transportation also necessitated that field officers remain with the arrestees for hours. This prevented them from assisting with crowd control efforts.

It appears that minimal pre-planning was done by LAPD in regard to setting up the appropriate mass arrest organization, including a field jail and transportation plan, until after problems arose on Saturday, May 30. After three nights of demonstrations, some with significant violence including arson and looting, LAPD was not timely in establishing the field jail and obtaining the resources needed to operate it. In addition, on May 30, the Central Bureau command post did not have sufficient nor experienced

---

[26] Emergency Operations Guide, page 1.

48

staff to develop the organization needed to manage this growing incident, causing troublesome delays in getting buses to transport arrestees and processing of arrestees.

**Findings**

51.  The lack of planning and preparation for mass arrests resulted in an insufficient number of personnel assigned to process the arrestees and a lack of buses or vans to transport the arrestees to the field jails. Arrestees were seated on curbs while handcuffed for exceedingly long periods of time before buses were available for transportation.

52.  The lack of an efficient mass arrest procedure negatively impacted field operations. Officers in the field were often forced to maintain custody of arrestees for lengthy periods of time making it impossible for them to return to crime control or public order policing operations.

NOTE: The current Prisoner Transportation and Release Services Agreement between LAPD and LASD expires on June 30, 2021. It addresses service fees, contractual requirements and limitations for prisoner transportation from jail facilities to court locations. It does not include an emergency clause regarding the transportation of arrestees during a local emergency.

### (c)  Field Jails

The incident commander must consider several factors when determining the most appropriate location for a field jail unit. These factors as outlined in the field jail guide include accessibility to the involved area, proximity to the incident command post, number of arrestees, sufficient space for processing, detention, supplies, lighting, restrooms and other factors.

Further, the field jail guide notes that,

> "Arrestees should not be held at a Field Jail Unit long enough to require feeding. However, the formal booking facility (Jail Division, County jails) that ultimately receives the prisoners must be prepared to feed them. The facility should be alerted if a large volume of arrestees is foreseen. Liaison should be established with the prosecutor's office and the local courts to expedite arraignment of arrestees".

**Observations**

West Bureau selected the Jackie Robinson Stadium, at the University of California, Los Angeles (UCLA) located in West Los Angeles, as the location to setup a field jail. The location was freeway close, large, and secure, preventing protestors from wandering in while resources were staging, and arrestees were being processed. The selection of the UCLA venue was problematic as the optics of using the Jackie Robinson Stadium, a stadium named after an iconic civil rights movement symbol, to process arrestees protesting police abuse of people of color was insensitive. UCLA administrators complained because their students were arrested and objected to the use of the stadium. This resulted in the location being

49

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

used for one 24-hour period before the Department was required to move to a location in the San Fernando Valley.

The field jail locations were miles from the locations of arrest. People were released late in the evening and early morning hours during the curfew period, placing them again in violation of the curfew declaration. Further, there was no public transportation available, and people were not able to call for someone to pick them up without also placing that individual in jeopardy of being arrested for a curfew violation.

**Findings**

53.  The lack of selection of an appropriate location for the field jail unit resulted in the Jackie Robinson Stadium location being used for one 24-hour period before the Department was asked to relocate, requiring personnel to move to a location in the San Fernando Valley and set up a new field jail.

54.  The field jail locations were miles from arrest locations and when people were released, they were again in violation of the curfew.

55.  Personnel assigned to the field jail had not received training on field jail procedures.

56.  The use of the UCLA Jackie Robinson Stadium as a field jail was inappropriate during these protests.

## Section 4.06    Preparedness and Training

Federal Emergency Management Agency (FEMA) identifies four phases of disaster management as preparedness, response, recovery, and mitigation. The emergency preparedness phase is defined by the Department of Homeland Security (DHS) and FEMA as a "continuous cycle of planning, organizing, training, equipping, exercising, evaluating, and taking corrective action in an effort to ensure effective coordination during incident response." Preparedness guidelines "promote a common understanding of the fundamentals of risk-informed planning and decision making to help planners examine a hazard or threat and produce integrated, coordinated, and synchronized plans."[27] Preparedness is a constant cycle that allows an agency to prepare for all-risks, all-hazards incidents (see Appendix 11). The concept of preparedness refers to the ability of an organization to anticipate and plan for effective responses to current, imminent or potential events. The preparedness cycle specifically refers to the actions such as planning, organizing, training, etc., taken as a precautionary measure when the organization has the luxury of time.



---

[27] FEMA: Developing and Maintaining Emergency Operations Plans: Comprehensive Preparedness Guide (CPG) 1010, version 2.0 (November 2020)

50

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

Training should include an all-hazards approach to policing. An all-hazards approach is an integrated approach to emergency preparedness planning that focuses on developing capacities and capabilities for a full spectrum of emergencies or disasters.[28] Such a training philosophy prepares law enforcement for a multitude of incidents they may face and creates a more agile response to complex incidents when needed. Training must go beyond lecture-based teaching of the fundamentals. It is incumbent upon police agencies to provide training that will prepare and instill confidence in their membership. LAPD provides its personnel with an abundance of training, much of which is excellent, evidenced by agencies across the country participating in or seeking out LAPD's curriculum.

## Observations

Post-1992 civil unrest, Metropolitan Division was directed to develop a 16-hour mobile field force and crowd management course to include lessons learned from the unrest and began delivery to LAPD personnel.[29] By 1993, 6,500 Department personnel had been trained. In 1993 the State of California adopted the mobile field force concept and the 16-hour training course. As other training demands increased overtime needs, the mobile field force refresher course was reconfigured in 1994 to be a four-hour, eight-hour, or twelve-hour version of the course to be delivered on an as needed basis. At that time, the mobile field force training was added to the Supervisory Development School.[30]

In July 1999, preparations for the 2000 Democratic National Convention began and Metropolitan Division trained approximately 500 patrol officers and 350 supervisors in the eight-hour mobile field force refresher course which included crowd control techniques. Sporadic training on crowd management and mobile field force occurred between 2000 and 2007.

In 2007, after the MacArthur Park incident, the Chief of Police directed Incident Management and Training Bureau (now Training Bureau) to conduct Department-wide training on command and control on a regular basis consistent with the California State Commission on Police Standards and Training two-year training cycle. The recommendation was that scenario-based, classroom and e-learning training would be viable methods of training. Additionally, command staff officers would continue training on an annual basis as recommended in the 2007 MacArthur Park report. Due to the Chief of Police's concerns regarding command staff's lack of experience in facilitation of demonstrations and crowd control incidents, an incident management team mentoring program was introduced. This mentoring program created teams of command officers who would be assigned newly appointed command staff as mentees. The incident management teams would then be assigned to pre-planned protests, demonstrations, celebrations, parades, etc. Those who were inexperienced would shadow the mentors, providing opportunity for learning and gaining of experience. This program assisted in preparing future leaders of the Department.

---

[28] The Department of Homeland Security, Federal Emergency Management Agency (FEMA) Continuity Guidance Circular 2(CGC 2) July 22, 2010 https://.fema.gov/pdf/about/org/ncp/coop/cont_guidance2.pdf
[29] LAPD Tactical Crowd Control Course, course number: SK 43.
[30] LAPD Tactical Crowd Control Course, course numbers: SK 43, 114 & 115.

51

During 2007-2009 all Department sworn personnel attended a ten-hour Crowd Management/Crowd Control course. Areas trained together with their commanding officers in which groups of over 150 personnel at a time would train thus being able to replicate actual field scenarios with large numbers of demonstrators. Over 9,500 personnel were trained. During this time, all command staff also completed incident command system training annually. The incident management team mentoring program continued during that time.

During 2009-2012, the Multiple Assault-Counter Terrorism Action Capabilities ten-hour course incorporated a brief overview of the mobile field force concept and was conducted Department-wide. This allowed large numbers of personnel to train at one time, allowing for replication of actual field scenarios. All officers, supervisors, and command staff were required to attend. Over 9,100 personnel were trained. Incident command system training also occurred at the quarterly command staff training each year. The incident management team mentoring program continued, on an informal level.

During 2013-2014, some crowd management training was conducted through e-learning for line personnel and hands on training in the basic recruit course for all new officers. Incident command system and crowd management training occurred in the command staff quarterly training each year. Additionally, a program was introduced to address concerns over succession planning for command staff called Conversations in 21st Century Policing. Seminars were offered to all command level personnel and lieutenants in which panels discussed topics such as crowd management/facilitations, building community relationships, etc.

Since 2015, there is no evidence of ongoing training and/or a mentoring plan for mid-level managers (lieutenants and captains) or executive-level managers (commanders and chief officers) as was developed and implemented in the aftermath of MacArthur Park 2007. Both the incident management team mentoring program and Conversations in 21st Century Policing were discontinued. Other than the command officer course for lieutenants and newly appointed captains, training on protests, crowd management, crowd psychology, mobile field force, etc., was sparse. The priority for training had shifted away from public order policing to other topics. The hands-on training of the past had given way to more classroom lecture training.

In 2017 the Department required mobile field force and crowd management training to be reduced to a four-hour block embedded in a ten-hour course, mostly classroom, with some practical exercise. At that time, the Department introduced the 40mm less lethal system into patrol operations. Two hours of the four-hour block introduced personnel to the less lethal weapon, demonstrated how it functions, and each officer fired the weapon. Upon completion of the course personnel were considered certified to carry and deploy the 40mm. The curriculum was reviewed and found to be silent on the subject of using the 40mm in crowd control situations.

In most instances during May-June 2020, officers performed as trained. They responded professionally to complex and dangerous incidents involving large crowds of demonstrators which included those who were peacefully and loudly attempting to exercise their First Amendment rights, and groups who came

52

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

to engage in criminal acts of violence, assaults, vandalism, arson, and looting. Line personnel responded as directed by supervisors and command staff.

LAPD commanding officers were not trained or regularly exercised on crowd dynamics and crowd psychology. Such training and exercising are necessary to manage and take command of public order policing incidents. This was also noted in the MacArthur Park 2007 report. Public order policing demands command level training extend beyond a one-day mobile field force/crowd management training.

**Findings**

57. A review of crowd management curriculum in place prior to 2017 revealed that the eight-hour and ten-hour courses adequately covered basic mobile field force and crowd management concepts and included crowd dynamics. The 2017 four-hour mobile field force training did not adequately cover the material.

58. In the aftermath of the May-June 2020 demonstrations, the Department conducted a ten-hour mobile field force and crowd management course. As of the close of 2020, over 4,000 personnel were trained. The training curriculum is adequate for the basic mobile field force and basic crowd management topics.

59. Annual, hands on training on public order policing for command staff diminished over time resulting in many command staff in 2020 not being prepared for the civil unrest.

60. Most LAPD command staff have completed the basic incident command system training. However, the events of the summer of 2020 make it clear that additional training and mentoring in crowd control tactics and specific incident command system positions, such as incident commander, operations chief, logistics, etc. is needed and should be conducted on an annual basis.

61. The incident management team mentor program was dismantled resulting in numerous command staff lacking experience with public order policing.

62. Training on the 40mm system use during crowd control situations was insufficient.

## Section 4.07    Wellness

It is imperative that those in decision making roles as well as the officers who are in skirmish lines, facing hostile crowds and people throwing dangerous objects at them, be clear headed, have proper protective gear, have patience, and not be sleep deprived. Any agency which has emergency medical team (EMT) programs must ensure personnel are properly equipped to handle incidents in the field for the safety of the officers and the individuals they encounter.

53

569

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

### Observations

The Department mobilized on the night of May 30, going into the morning of May 31. The process of deployment of the A-B watch configuration (where A watch starts at 6:00am and B watch starts at 6:00pm) often took hours to accomplish. Most of the demonstrations during this timeframe occurred later in the day or mid-afternoon and the A-watch personnel were committed to incidents that stretched far beyond their scheduled end of watch time.

Many officers worked 16 to-20-hour days, some standing on skirmish lines for hours without relief. At the same time there were officers who were being held in reserve and for unknown reasons never were deployed. Some remained in holding for entire shifts. Command officers were subject to the same long hours without relief.

An overwhelming concern from all sworn and civilian personnel is the mental health aspect of the LAPD and morale. A Department psychologist interviewed said that there has been a significant increase in the number of officers and civilian employees experiencing mental health problems since the protests. From a review of the Los Angeles Police Protective League survey results it is clear that morale is impacted by the Department, the Board of Police Commissioners, and City leaders, with these results:

- 86.33% do not feel supported by Department leadership (executive leadership and the Board of Police Commissioners).
- 99.1% do not feel supported by the Mayor.
- 99.1% do not feel supported by the City Council.

While some will see this as an important problem that needs immediate attention, others may say that Department personnel are simply complaining. Nevertheless, the survey results should be taken seriously by the Department and City leadership.

During the protests, the Department personnel and the media observed that some subgroups within the crowd and people standing on apartment balconies at various locations used green laser pointers to attack officers by focusing on the officers' eyes. At least one officer sustained significant eye damage. News reports indicate that the officer lost sight in one eye and has balance difficulty and migraine headaches. The use of lasers in Los Angeles and in other places, such as Portland, was at times unrelenting.

Some officers were attacked with bricks, fireworks, containers filled with urine, frozen water bottles, and caustic chemicals such as bleach. One police captain noted that someone fired a firework/explosive narrowly missing his head; the blast concussion caused the captain to lose vision and hearing for approximately a minute. Other personnel also noted they were struck with chemicals and/or fireworks. A review of the injuries sustained by police personnel during the review period noted several officers injured from projectile strikes, many suffering injuries to their hands.

There were several people (protestors and officers) injured during the May-June protests. Many of the seriously injured were provided medical care by the Los Angeles Fire Department. However, there were

54

instances where the Fire Department was not able to reach the injured individual due to crowd size and activity. There was at least one incident were police officers provided care to a person during a protest and other instances where they rendered aid to a fellow officer. It is likely police personnel provided medical care to other persons during the protest. These incidents are not captured by the Department in a consistent manner.

In 2014 officers were provided with updated training and first aid kits. As a result, there are several instances over the years in which officers rendered first aid and, in some cases, saved lives. The Department identifies expectations that employees "should provide basic and emergency assistance to all members of the community, including victims, witnesses, subjects, suspects, persons in custody, subject of use of force, and fellow officers" within their training and experience.[31]

The LAPD Emergency Medical Technician (EMT) program (officers voluntarily undergo additional training and maintain EMT certification) is also of significance. The first aid kits and accompanying training and the EMT program are important to support safety and wellness during general police operations. These valuable resources could potentially play a significant role in addressing injuries occurring during civil unrest when it may be difficult for the Fire Department to reach the injured due to crowd behavior as occurred on occasion during the 2020 protests in Los Angeles.

**Findings**

63. The Department did not appear to have plans in place to relieve personnel in the middle of a tactical operation. This resulted in personnel at all ranks experiencing sleep deprivation.

64. The Department mobilized using the traditional A and B watch configuration. This caused numerous personnel to be sleep deprived during the events due to the rigidity of the A/B configuration.

65. The LAPD ordered special eye protection for every officer to prevent the damaging effects of lasers. (The City of Los Angeles passed legislation making lasers a prohibited item at a demonstration, LAMC Section 55.07, which should be strictly enforced during future events.)

66. The LAPD ordered shields after the unrest to better protect the officers from the crowds and they are being trained in how to effectively use them.

67. The LAPD has a "rendering aid" philosophy and EMT program. There is not a consistent process to document when officers render first aid during crowd management and crowd control instances. The EMT program is voluntary and takes effort by the officers to keep their State certification current.

---

[31] LAPD Training Bulletin: Rendering Medical Aid, July 2019.

It is incumbent upon the Department that the safety and wellness of officers be of paramount importance as it is directly correlated to the safety and wellness of the communities it serves. Emphasis on this critical concern should be a priority as the Department moves forward.

### Section 4.08    Community Input

The Review Team had discussions with a number of community members who participated in many of the demonstrations between May 27 and June 7. Access to these community members was provided to the Review Team by City Council members who identified them with the belief they would be forthright in discussing their experiences. These discussions revealed that most of the interviewees did not have personal apprehension or concern about attending the organized demonstrations. Most of the participants attended more than one event during this time period and saw people of all ages and races, young families with children, and older folks watching out for one another during peaceful protests, enjoying a sense of camaraderie. Some said they wore masks and tried to practice social distancing.

Most of them expected or accepted a police presence but they are not police supporters. They believe that the current policing system in general is not working and they want a reallocation of community resources. Most stated that the police need to have more empathy toward demonstrators and not be so eager to anticipate violence from them. They stated that there is a disconnect between officers and the community, that police "need to listen to what is said at a protest," and that to have police watching them "incites us to say more things and exercise our right to free speech more loudly." However, they also believe that when things did escalate during May and June, it was because of "outside agitators" and "Trump supporters" who came with the intent to cause trouble. It was noted by most that when it started to get dark, it seemed like a new group of people would appear who were more "rowdy" than the daytime group. One of the interviewed community members stated that there were intoxicated individuals and some with mental health issues who caused a lot of disruption at a downtown protest, and that person gave the police credit, saying, "even then, the police let the crowd get their message out." One person left a demonstration at the Hall of Justice after the group started marching later in the day and she saw a "younger crowd coming in . . . it gave me a bad vibe."

None of the community members interviewed personally witnessed any violence, and none had complaints about officer misconduct. Nearly all agreed that the police, while appearing intimidating, were restrained. "The police gave us a chance to protest and give our planned speeches."

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

## V. Conclusion

Looking to the future, public order policing is going to become even more relevant and complex. Evolving crowd tactics, rising public expectations of police and the increase in civil discord are but a few of the challenges. This report recommends that the LAPD create an executive-level position of Strategic Emergency Manager to be responsible for preparing, planning, researching, and exercising the Department to meet those all-hazards policing needs facing the 21st Century.

It is incumbent that the Department prepare now for events that have a reasonable likelihood of occurring in the future. As identified in this examination, the LAPD did not prepare for handling mass arrests, staging of resources, and training in incident command systems. Nor did the Department provide meaningful strategic public order policing to command officers, mobile field force training for officers, and 40mm training for patrol officers during public order policing incidents, and otherwise did not give public order policing the focus that it deserves.

This report does not ignore the fact that 106 police officers suffered injuries from dangerous objects being thrown at them, lasers used to injure their eyes, and other methods used to injure the officers and incite the crowd of protestors. Nor does this report ignore the reporting of 141 LAPD patrol cars severely damaged and six destroyed by fire and other forms of vandalism. It does not excuse the behavior of those who used the protests as an opportunity to commit criminal acts or those protesting who got caught up in the violence or hostility. But it does recognize that, despite the provocations, the police must be able to effectively address those who are committing criminal acts and causing disruption. One of the fundamental duties of policing is to protect the First Amendment right to free speech, assembly and the right to petition the government for redress of grievances. The shift in protest dynamics seen in many cities including Los Angeles in 2020, makes protecting First Amendment rights more complex. Traditional crowd management techniques and tactics seem ill equipped to handle this new trend.

There were three key decisions that worked as a force multiplier and supported the Department in restoring order in June 2020: (1) the mobilization of the Department personnel; (2) the curfew implementation; and (3) the support of the National Guard. Although the Department was operating in a difficult and complex environment there were several notable deficiencies in seven areas:  planning, command and control, public order policing, use of less lethal tools, mass arrests, preparedness and training, and wellness.

This report encourages the Department to review and evaluate the Department's public order policing operational doctrine and training as well as less lethal tools training, certification, and less lethal use related to crowd control situations. There are 67 findings identified in this report that resulted in a total of 22 specific recommendations. The recommendations are designed to integrate policies, procedures, and protocols into the Department culture, so reforms are sustainable going forward. By establishing an executive-level person with appropriate support staff (Recommendation No.1) who is responsible for preparing the Department to meet future strategic challenges, it is hoped that the LAPD will seriously engage in a continuous cycle of improvement.

57

573

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

## VI. List of Findings

**Planning Findings**

1.  The Department did not follow the basic principles of the incident command system and did not set up an appropriate area command post immediately when protests became widespread by designating the Central Bureau as the Department command post overseen by an assistant chief. Related Recommendation Nos. 1, 2, 12.

2.  The Central Bureau command post did not become fully staffed until May 31. Some personnel assigned lacked experience and training in command post operations. (All of the issues with this command post are fully explained in Section 4.02 Command and Control (b) Operations Central Bureau Command post.) Related Recommendation Nos. 1, 12.

3.  There was a lack of firm executive-level direction to the Department command officers to prepare and plan for potential widespread civil unrest and demonstrations which contributed to the problems cited throughout this report. It is unlikely that proper planning would have totally prevented the problems experienced in Los Angeles. However, preplanning and preparation could have mitigated the issues. Related Recommendation Nos. 1, 12, 16.

4.  It does not appear that either the Department or City leaders had a plan for messaging to the public, to the media, or to Department personnel. Related Recommendation No. 13.

5.  There was a lack of a unified message from City leaders to de-escalate the violence so that peaceful protestors could exercise their First Amendment rights. Related Recommendation No. 13.

**Command and Control Findings**

6.  A lack of clear command and control led to diverted resources and at times, an inability to accomplish basic policing tasks given by the incident commander or operations chief. Related Recommendation Nos. 12, 16.

7.  The lack of a known and clear chain of command resonated in some incidents examined. Related Recommendation No. 12.

8.  The lack of a dedicated unit to analyze information, along with the fact that the Department does not have software to assist with the analysis, weakened the process and created a significant disadvantage. Related Recommendation No. 19.

9.  Interviews and a lack of any documentation to the contrary support the conclusion that the Department has no specific or consistent direction on how individual commands are supposed to monitor the internet and social media. Related Recommendation No. 19.

58

10. There is no training within the City or Department to develop employees in the skills necessary to perform the intelligence function. Related Recommendation No. 19.

11. There is no current robust intelligence function to gather information, analyze it and then distribute it effectively and quickly during large, wide-spread events. While current budget deficits could prevent the Department from staffing dedicated intelligence positions, it would be beneficial for the Department to develop a plan on how it would monitor the internet and social media when staffing does become available. Related Recommendation No. 19.

12. Software and technology is available to analyze the flow of information, which would provide meaningful intelligence to those who need it during an event. Related Recommendation No. 19.

13. The Department does not have established protocols on how intelligence/information is going to be distributed during major events so that all personnel know how to obtain the information and that there is consistency throughout the Department. Related Recommendation No. 19.

14. The Department should have set up a separate area command under the direction of an assistant chief using the Department Operations Center. No information was provided to the Review Team that any assistant chief assumed formal operational command of Department operations at any time during the review period. Having Central Bureau act as the area command placed an unnecessary burden on the entire Central Bureau incident command structure. In addition, it exceeded the span of control as recommended by incident management best practices. Related Recommendation Nos. 1, 2.

15. The initial designation of the Central Bureau staging area as the Department staging area was problematic. Personnel from throughout the City had to respond to this location and in some instances were then sent back to their home bureaus or to locations in the City in other geographic bureaus outside of Central Bureau, causing delays in response Related Recommendation No. 2.

16. Personnel assigned to the staging area in many cases had never received training on how to run a staging area or command post. They had to devise staging procedures on the fly, at the very time that personnel demands were the greatest in the field. Related Recommendation No. 2.

17. Problems with the staging area included the location, long delays in processing personnel, a lack of restrooms and proper lighting, and lack of protection from the extreme heat during the day (temperatures over 100 degrees Fahrenheit). Related Recommendation Nos. 2, 19, 20.

18. Personnel assigned to the staging area were forced to use paper forms and white boards to receive, organize, track, and then dispatch hundreds of officers, causing further delays. Related Recommendation No. 20.

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

19. West Bureau's decision not to establish a fully staffed command post after two nights of violent protests resulted in no logistical support for the West Bureau divisions and adversely impacted their ability to manage the large-scale events. Related Recommendation No. 2.

20. There was a lack of personnel assigned to key event action plan positions for the Pan Pacific Park protest. This does not mean that some, if not all, positions were staffed, however, it does raise questions as to whether the command post staff was adequately staffed to handle this event. Related Recommendation Nos. 1, 2.

21. The lack of fully staffed West Bureau and Pan Pacific Park event command posts hindered the ability of the incident commander to manage the extreme anger and violence exhibited by some of the protestors on Saturday, May 30. Related Recommendation Nos. 1, 2.

22. The National Guard deployment and the LAPD's use of this resource was well documented, and the activation was consistent with the Department's direction. No recommendation.

23. The fact that the National Guard operated without becoming the story is a testament to both the conduct of the National Guard and to the Department's ability to quickly solve problems as they surfaced. LAPD's success in facilitating the National Guard's deployment appears to be in large part because LAPD personnel with both military and incident command system experience were selected to work this assignment throughout the duration of the National Guard's deployment to Los Angeles. No recommendation.

24. The LAPD has various settlement agreements (as described elsewhere in this report) that requires the approval of a commander (or higher) to use certain kinds of less lethal munitions. The LASD has a lower approval threshold for the deployment of less lethal munitions that allow an incident commander or watch commander to approve the use of the same munition. Related Recommendation No. 1.

25. Due to the operational differences between agencies, the LAPD should consider using mutual aid agencies for fixed position tasks, such as protecting locations freeing up LAPD officers to engage in more dynamic tactical action (skirmish lines and seeking out roving looters). Related Recommendation No. 1.

**Public Order Policing Findings**

26. There were many protests during the evaluation period which the LAPD facilitated peacefully. No recommendation.

27. There was a lack of training to properly prepare command officers for managing large crowds with the possibility of civil unrest and many command officers stated they did not feel confident in handling these incidents. Related Recommendation Nos. 1, 11, 12, 14, 15, 16, 21.

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

28. The Department culture inhibits those in in a position to make decisions as they are either afraid to use their best judgment or paralyzed by concerns that they will be second-guessed by their superiors or they fear "becoming the story". Related Recommendation No. 21.

29. The LAPD did not anticipate and was not prepared for the disruptive strategies of swift mobility and coordination of movement used by some criminal groups. Related Recommendation Nos. 1, 9, 11, 12, 13, 14, 15, 16, 19, 21.

30. The traditional mobile field force configuration of 45 officers was not effective in many instances during the protests of 2020 and additional personnel were needed to be able to protect the police vehicles and manage the crowds. The LAPD has since increased the size of the mobile field force from 45 to 60 personnel. Related Recommendation Nos. 13, 14.

31. The LAPD adjusted tactics mid-way through the unrest when the air unit designed a tactic that broke up mobile field force units into smaller squads. This tactic proved effective. No recommendation.

32. Officers occasionally expressed concern to supervisors that the mobile field force police vehicles needed to be guarded, however, in some instances these warnings were ignored. Related Recommendation Nos. 11, 13, 14, 16.

33. There are no standard Department protocols or training documents on the use of shadow teams. Related Recommendation No. 15.

**Less Lethal Tools Findings**

34. Communications and information from the shadow team's observations were not distributed in a timely manner. The Department now assigns shadow teams and a uniformed cover team to the mobile field force. This will allow for a more direct line of communication between shadow teams and mobile field force leaders while providing the shadow teams with a dedicated security team. Related Recommendation No. 15.

35. It appears the majority of reported injuries that were sustained by persons in crowds were the result of less lethal munitions from the 40mm. Many who reported being injured claim that they were not involved in any violent or hostile acts. Related Recommendation Nos.1, 7, 9, 10.

36. Injuries reported ranged from minor to significant, some in the head, the back, the neck, and the eye. Related Recommendation Nos. 1, 7, 9. 10.

37. Limited viewing of video indicated that there were instances where officers quickly fired the 40mm rounds at distant targets which increases the likelihood of hitting the wrong target. Related Recommendation Nos. 1, 7, 9, 10.

38. The deployment of less lethal munitions was not always done at the direction of a supervisor or officer. In some instances, officers were directed to be in front of a skirmish line and left to

61

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

deploy less lethal tools, including the 40 mm, with no direction or coordination. Related Recommendation Nos. 1, 7, 9, 10.

39.  Over 7,800 personnel were trained (certified) to deploy the 40mm during a two-hour block of instruction at the ICDC course. However, the Review Team did not find the two hours of training to be sufficient given the skill level needed to deploy the 40mm in a chaotic public order policing environment. Related Recommendation Nos. 7, 9, 10.

40. Officers are required to be trained one time on the 40mm system. Deploying the 40mm in public order policing situations requires recurring certification and training. Related Recommendation Nos. 7, 9, 10.

41. The skill level required to deploy the 40mm in chaotic public order policing situations is high. Officers must be extremely competent and possess excellent marksmanship skills. It is unlikely that all officers trained possess the marksmanship skills necessary to competently deploy the 40mm system under those circumstances. Related Recommendation Nos. 7, 9, 10.

42. The last training for the 40mm for officers, other than those going through recruit training, was in 2018. Related Recommendation Nos. 7, 8, 10.

43. Most supervisors and officers who deploy less lethal munitions are outfitted with body worn video and could use the video audio capabilities to record information about their use of less lethal munitions. This should become a protocol during crowd control situations. Related Recommendation No. 10.

44. The Department's Use of Force Tactics directive authorizing the use of 40mm has no detailed guidance on use in public order policing situations. Related Recommendation Nos. 1, 9.

45.  The 40mm can be an effective tool in a crowd control situation when utilized by officers who are well trained and experienced in its use. Related Recommendation Nos. 7, 8, 10.

**Planning for Mass Arrests Findings**

46. The LAPD failed to plan ahead for mass arrests, which resulted in a last-minute, uncoordinated effort to manage the arrests of more than 4,000 individuals. Related Recommendation Nos. 1, 2, 3, 5, 6.

47. The arrests made on Thursday, Friday, and Saturday were made under a Municipal Code Section that is an infraction requiring a citation and release in the field. No recommendation.

48. On Thursday, Friday and Saturday, the LAPD arrested and detained individuals for exceedingly long periods of time, and transported individuals to a Department facility for processing. Related Recommendation Nos. 2, 3, 5, 6.

49. Those arrested were detained for hours while handcuffed and were not provided with water or the use of bathroom facilities and were help in close conditions without masks during a pandemic environment. Related Recommendation Nos.2, 3, 5, 6.

50. The LAPD has not corrected the issues related to detention and arrests identified in the 2011 Occupy LA and the 2014 Ferguson protests. Those lawsuit settlements regarding arrest problems resulted in the City paying over $3,000,000. Related Recommendation Nos. 1, 2, 3, 4, 5, 12, 21.

51. The lack of planning and preparation for mass arrests resulted in an insufficient number of personnel assigned to process the arrestees and a lack of buses or vans to transport the arrestees to the field jails. Arrestees were seated on curbs while handcuffed for exceedingly long periods of time before buses were available for transportation. Related Recommendation Nos. 1, 2, 3, 4, 12, 21.

52. The Lack of an efficient mass arrest procedure negatively impacted field operations. Officers in the field were often forced to maintain custody of arrestees for lengthy periods of time making it impossible for them to return to crime control or public order policing operations. Related Recommendation Nos. 2, 3, 5.

53. The lack of selection of an appropriate location for the field jail unit resulted in the Jackie Robinson Stadium location being used for one 24-hour period before the Department was asked to relocate, requiring personnel to move to a location in the San Fernando Valley and set up a new field jail. Related Recommendation Nos. 2.

54. The field jail locations were miles from arrest locations and when people were released, they were again in violation of the curfew. Related Recommendation Nos. 2, 3.

55. Personnel assigned to the field jail had not received training on field jail procedures. Related Recommendation No. 3.

56. The use of the UCLA Jackie Robinson Stadium as a field jail was inappropriate during these protests. Related Recommendation Nos. 2, 3.

**Preparedness and Training Findings**

57. A review of crowd management curriculum in place prior to 2017 revealed that the eight-hour and ten-hour courses adequately covered basic mobile field force and crowd management concepts and included crowd dynamics. The 2017 four-hour mobile field force training did not adequately cover the material. Related Recommendation Nos. 1, 12, 14, 15, 17.

58. In the aftermath of the May-June 2020 demonstrations, the Department conducted a ten-hour mobile field force and crowd management course. As of the close of 2020, over 4,000 personnel were trained. The training curriculum is adequate for the basic mobile field force and basic crowd management topics. No recommendation.

63

59. Annual, hands on training on public order policing for command staff diminished over time resulting in many command staff in 2020 not being prepared for the civil unrest. Related Recommendation Nos. 1, 12, 14, 15, 16, 22.

60. Most LAPD command staff have completed the basic incident command system training. However, the events of the summer of 2020 make it clear that additional training and mentoring in crowd control tactics and specific incident command system positions, such as incident commander, operations chief, logistics, etc. are needed and should be conducted on an annual basis. Related Recommendation Nos. 12, 14, 15, 16.

61. The Incident Management Team mentor program was dismantled resulting in numerous command staff lacking experience with public order policing. Related Recommendation No. 21.

62. Training on the 40mm system use during crowd control situations was insufficient. Related Recommendation Nos. 9, 10.

**Wellness Findings**

63. The Department did not appear to have plans in place to relieve personnel in the middle of a tactical operation. This resulted in personnel at all ranks experiencing sleep deprivation. Related Recommendation No. 18.

64. The Department mobilized using the traditional A and B watch configuration. This caused numerous personnel to be sleep deprived during the events due to the rigidity of the A/B configuration. Related Recommendation No. 18.

65. The LAPD ordered special eye protection for every officer to prevent the damaging effects of lasers. (The City of Los Angeles passed legislation making lasers a prohibited item at a demonstration, LAMC Section 55.07, which should be strictly enforced during future events.) Related Recommendation No. 1.

66. The LAPD ordered shields after the unrest to better protect the officers from the crowds and they are being trained in how to effectively use them. Related Recommendation No. 1.

67. The LAPD has a rendering aid philosophy and EMT program. There is not consistent process to document when officers render first aid during crowd management and crowd control instances. The EMT program is voluntary and takes effort by the officers to keep their State certification current. The City plays a role in supporting this effort. Related Recommendation No. 19.

64

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

## VII.  Recommendations

| | Recommendations |
|---|---|
| 1 | *Recommendation*<br>Establish a Department Strategic Emergency Bureau to be commanded by a deputy chief or civilian equivalent who has expertise in public order policing, incident command systems, liaising with outside agencies, etc. This position should report directly to the Chief of Police.<br>*Rationale*<br>The Strategic Emergency Manager should be responsible for ensuring that the Department:<br>(a) Is on the cutting edge of organization, strategy, tactics, safety equipment and technology in dealing with all-hazard events by establishing contacts with personnel within the Department, throughout the Nation and in the world on this subject,<br>(b) Is responsible for working with Training Group and the existing committee (Tactics Training Review Committee) on developing and implementing procedures and training on this subject,<br>(c) Is responsible for advising the Chief of Police on what needs to be done to ensure the Department is always trained and prepared for any all-hazard events,<br>(d) Is responsible for periodic and thorough review of the Emergency Operations Guide. The position should chair the Unusual Occurrence Evaluation Board as outlined in the Emergency Operations Guide, Volume 1,<br>(e) Is responsible for review of all settlements, litigation, and after action reports and ensuring that items related to incident command system, emergency management, operations and respective training are fulfilled,<br>(f) Identifies and reviews safety equipment to better protect officers from anticipated assaults against them during public order policing operations, and<br>(g) Is responsible for obtaining or reviewing mutual aid agreements with partner agencies, especially the LASD, ahead of time outlining the concepts of operation, use of force policies, approvals required, less lethal tools/munitions to be used and use of force reporting.<br>*Funding*<br>Budget for this position and support staff.  This position will in fact minimize liability and save costs to the Department and the City by helping to reduce lawsuits and judgement awards that will occur if nothing is done.<br>*Responsibility*<br>City Council, Board of Police Commissioners, Chief of Police |

581

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

| | **Recommendations** |
|---|---|
| 2 | *Recommendation*<br>Under the direction of the Strategic Emergency Management Bureau, thoroughly review and update the Emergency Operations Guide. Include:<br>(a) Emphasis on the field jail guide, Volume 6 of the Emergency Operations Guide,<br>(b) Inclusion and emphasis on when to establish a Department area command structure,<br>(c) Identification of how the Department is to be organized when an area command is implemented under the directions of an assistant chief,<br>(d) Evaluation and updating of the establishment of staging and command post locations, mass arrest instructions, and the need to activate the field jail unit and transportation detail when mass arrests are planned, and<br>(e) Implement periodic training on how to run an area command, command posts (including forward operating platforms) and key positions such as staging.<br>*Rationale*<br>This report identified that the Emergency Operations Guide is outdated in numerous areas and it was not used during the review period to streamline processes.<br>*Funding*<br>No budgetary impact<br>*Responsibility*<br>Chief of Police |
| 3 | *Recommendations*<br>Emphasize the following upon updating the field jail guide:<br>(a) Training of all detective personnel on field jail duties during mass arrests, and<br>(b) Inclusion of field jail duties and staffing duties related to mass arrest in command officer training, and,<br>(c) Inclusion of Custody Services Division jail personnel in training on how to process arrestees during mass arrests.<br>*Rationale*<br>This report identified that the field jail guide within the Emergency Operations Guide is outdated in numerous areas and on several occasions, it was not used during the review period to streamline processes.<br>*Funding*<br>No budgetary impact<br>*Responsibility*<br>Chief of Police |

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

| | **Recommendations** |
|---|---|
| 4 | *Recommendation*<br>The Office of the Inspector General must periodically audit the requirements, and Department compliance with, all settlement agreements.<br>*Rationale*<br>A search of Board of Police Commissioner public documents on settlements involving protests and/or civil unrest revealed no current settlement agreement audit or inspection reports. Ongoing audits or inspections of the requirements of Department and City settlements should have identified some of the deficiencies identified in this report.<br>*Funding*<br>No budgetary impact<br>*Responsibility*<br>Board of Police Commissioners |
| 5 | *Recommendation*<br>Conduct a periodic review of the number of buses and vans available to transport arrestees during a mass arrest situation and the number of personnel certified to drive them. Include:<br>(a) An assessment that the total available is sufficient,<br>(b) Plans to increase the transportation fleet if needed, and<br>(c) Whether the Department Operations Center, Communications Division, shall retain a current list of all certified drivers.<br>*Rationale*<br>Currently there are few LAPD personnel properly licensed (Class B with appropriate endorsements) and the Department should identify an appropriate number of drivers needed for this function.<br>*Funding*<br>Cost to certify and license personnel: unknown budgetary impact until the Department identifies the number of personnel needed and the cost of licensing. The cost of buses and vans.<br>*Responsibility*<br>City Council, Board of Police Commissioners, Chief of Police |
| 6 | *Recommendation*<br>Work with both the LASD and MTA to include clauses in their Prisoner Transportation and Release Services Agreement contracts to assist with arrestee transportation during local emergencies.<br>*Rationale*<br>To prevent arrestee transportation delays and employee relations conflicts between agencies as noted in the events of 2020.<br>*Funding*<br>Unknown budgetary impact.<br>*Responsibility*<br>City Council, Board of Police Commissioners, Chief of Police |

67

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

| | **Recommendations** |
|---|---|
| 7 | *Recommendation*<br>Undertake an extensive study of all less lethal munitions, including the 40 mm round, to examine performance, consistent velocity, potential for ricochets, influence of the plastic wrapping or banding around the sponge projectile and other aspects of the round. Included in that study should be any potential new technology for use in public order policing operations.<br>*Rationale*<br>While manufacturers conduct research on the various less lethal rounds, the LAPD should conduct its own studies and look for emerging technologies.<br>*Funding*<br>Minor budgetary impact-cost of munitions.<br>*Responsibility*<br>Board of Police Commissioners, Chief of Police |
| 8 | *Recommendation*<br>Design and implement an inventory system to audit and track the amount of less lethal munitions, including the 37mm and 40mm rounds, expended during any public order policing incidents.<br>*Rationale*<br>The Department was unable to provide an accurate accounting of these munitions used during the 2020 protests.<br>*Funding*<br>No budgetary impact.<br>*Responsibility*<br>Board of Police Commissioners, Chief of Police |
| 9 | *Recommendation*<br>Update the use of force tactical directives to include more detailed instruction regarding the use of less lethal tools in crowds and the approval level required for the deployment of each the less lethal tools.<br>*Rationale*<br>Currently there is no use of force tactical directive relative to the 37mm less lethal tool.  The information contained in the use of force tactical directive for the 40mm system does not contain adequate instruction on the use of the round in crowd control situations.<br>*Funding*<br>No budgetary impact.<br>*Responsibility*<br>Chief of Police |

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

| | **Recommendations** |
|---|---|
| 10 | *Recommendation*<br>Establish protocols that:<br>(a) Only trained (certified) members of Metropolitan Division or officers who receive consistent and periodic instruction and certification in the 40mm system should be allowed to deploy the 40mm during crowd control situations,<br>(b) Retain the use of the 40mm system for all other officers during patrol duties and ensure annual retraining of weapon manipulations during shotgun qualification, and<br>(c) Mandate the use of body worn video (when feasible) to record problem behavior of individuals in the crowd when officers decide to use the target specific 40mm in a crowd control situation.<br>*Rationale*<br>The Department certified nearly 8,000 officers to deploy the 40mm munitions in patrol functions and deployment of that system in crowd control situations. Limiting the deployment of the 40mm munitions during crowd control situations to officers with enhanced and on-going training may enhance effectiveness and reduced unintended strikes during use under such conditions. Manipulations of the 40mm system could easily be retrained/tested during the annual shotgun qualification cycle after the shotgun qualification with minimal impact to deployment concerns. This would guarantee that the perishable skill involving weapon manipulation is addressed annually.<br>*Funding*<br>No budgetary impact.<br>*Responsibility*<br>Chief of Police |

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

| | **Recommendations** |
|---|---|
| 11 | *Recommendation*<br>Create an LAPD two-year training plan that is aligned with the State training cycle that is reviewed and updated every year to include:<br>(a) All required training mandates by various entities including the State, City, Police Commission,<br>(b) All litigation settlement items, or previous applicable reports,<br>(c) The topics and methods for training and delivery,<br>(d) Who is mandated to attend,<br>(e) Frequency, number of hours required,<br>(f) A cost analysis of time, dollar amount, and what training is not going to be able to occur,<br>(g) Identification of where the training should be integrated to replicate real life experiences, and,<br>(h) Formal plan approval by the Chief of Police with any modifications documented.<br>*Rationale*<br>It was evident that many executive-level officers throughout the Department's history, including the Board of Police Commissioners, and the City placed numerous well-intentioned training requirements on the Department with little understanding of the overall impact on deployment, training mandates, costs, and/or the organization. Likewise, these same executive officers frequently cut training without understanding the overall impact on the Department and training mandates put in place by litigation, legal mandates, etc. This will allow those recommending or mandating additional training to address the impact the proposed training would have on Departmental operations and the current training plan, and the cost to the Department. This process would document when and why training modifications occurred and ensure lessons learned from the past and training advances such as those of the Consent Decree are not lost.<br>*Funding*<br>No budgetary impact.<br>*Responsibility*<br>Chief of Police |

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

| | **Recommendations** |
|---|---|
| 12 | *Recommendation*<br>Train command staff annually on the incident command system, including:<br>(a) Exercising all-hazards events (fires, earthquakes, pandemics, demonstrations, etc.) through hands-on, scenario-based training, and<br>(b) Activating the incident management teams concept as outlined in the Emergency Operations Guide as part of the training plan.<br>*Rationale*<br>This will reinforce in all command officers what their designations mean in the incident command system configurations and provide for certainty and uniformity in the chain of command from the incident commander and improve situational awareness to direct field operations.<br>*Funding*<br>No budgetary impact at this time.<br>This training could be included in the current rotation of quarterly command staff training session.<br>*Responsibility*<br>Chief of Police |
| 13 | *Recommendation*<br>Staff the public information officer position in the incident command system during any major event(s). This position should be responsible to coordinate periodic updates from the Department for the media and the public to keep them informed on the status of the event(s). The personnel assigned should also coordinate with other City leaders to ensure there is a coordinated and consistent message being provided throughout the duration of the event(s).<br>*Rationale*<br>The importance of keeping the media and the public informed on the status of any event is critical to ensure that there is transparency, rumors are managed, misinformation can be corrected, and/or information clarified. The lack of providing these periodic updates can provide people with agendas that do not serve the public, to fill the gap with information that is inaccurate and at times can endanger lives. The need to include the City leadership in this process is also critical so that there are no mixed messages which can lead to the public questioning the credibility of the information being provided.<br>*Funding*<br>No budgetary impact at this time.<br>*Responsibility*<br>Chief of Police |

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

| | **Recommendations** |
|---|---|
| 14 | *Recommendation*<br>Conduct a thorough review of, and update on, the configuration and deployment of a mobile field force to include consideration of:<br>(a) The number of officers and supervisors deployed in a mobile field force,<br>(b) The configuration of the preplanned mobile field force,<br>(c) Examination of the form of transportation of the mobile field force (police car vs vans, etc.), and<br>(d) Assessment of whether preplanned mobile field configurations should include resources such as shadow seams.<br>The review should use Department expertise and subject matter experts.<br>*Rationale*<br>Under the current mobile field force configuration, a driver must remain with each police car, which only carries four officers.  This change could allow for less vehicles and less personnel needed to be assigned to vehicle protection upon arrival.<br>*Funding*<br>No budgetary impact at this time.<br>*Responsibility*<br>Chief of Police |
| 15 | *Recommendation*<br>Conduct a thorough review of mobile field force training:<br>(a) Adjust accordingly to any updated, contemporary tactics for crowd control as identified during the mobile field force review by the Department experts as stated in recommendation No.1, and any updated California State guidelines,<br>(b) Training Bureau should conduct this review in coordination with personnel with appropriate expertise. If the Department adopts the Strategic Emergency Manager recommendation, Training Bureau and the Director of Police Training and Education should coordinate the update with this executive-level officer, and,<br>(c) Require that hands on mobile field force training be conducted every two years for lieutenants and below and annually for command officers.<br>*Rationale*<br>Mobile field force skills are perishable and need to be trained on a consistent basis to ensure competency. Currently no Department representative is specifically designated to reach out to other agencies, experts or scholars for best practices to learn what tactics are being used by protestors around the nation or the world. A consensus of the people interviewed for this review stated that many of the tactics used by protestors during this event had not been seen before by the LAPD.<br>*Funding*<br>No budgetary impact.<br>*Responsibility*<br>Chief of Police |

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

| | **Recommendations** |
|---|---|
| 16 | *Recommendation*<br>Establish Department-wide, consistent shadow team protocols and training to manage the risk that shadow teams endure, including establishing a clear line of communication so information is received and acted upon rapidly by the incident commander to enable quick arrests when necessary or to potentially retrieve the shadow team officers if needed.<br>*Rationale*<br>Shadow teams are for the safety of the crowd and the officers facilitating crowd movement. Well-coordinated teams with clear missions can coordinate the quick removal of individuals committing crimes and/or prevent a potential "blue on blue" situation in which undercover police officers may not be recognized by uniformed personnel.<br>*Funding*<br>No budgetary impact.<br>*Responsibility*<br>Chief of Police |
| 17 | *Recommendation*<br>Explore the possibility of adding public order policing scenarios to the Department's force-on-force training (training simulators/systems) library. Include scenario training for command staff, supervisors and officers.<br>*Rationale*<br>The Department does not currently use public order policing scenarios in its force-on-force training simulators/systems. Force option simulation training will enhance decision making and competency in using the less lethal tools.<br>*Funding*<br>Unknown cost of new force options simulator or other technology.<br>*Responsibility*<br>Chief of Police |
| 18 | *Recommendation*<br>Review and assess the current mobilization period start times to determine if an additional start of watch time would be appropriate to prevent the fatigue that occurred during this event.  Develop several unusual occurrence deployment schemes to fit a variety of occurrences (A/B, A/B/C etc.) to provide for safety and flexibility. A possibility would be to add a 10:00am start time for personnel who would most likely be assigned to missions that would go end of watch after 6:00pm.<br>*Rationale*<br>The Department currently uses two start of watch times, 6:00am-6:00pm, for most all personnel. During these events it was common for personnel who began watch at 6:00am to be assigned to missions that caused them to work 18 or 20-hour shifts, severely limiting the time they had to rest and recover. This can cause levels of fatigue that can lead to flawed decision making.<br>*Funding*<br>This recommendation may save funds as overtime should be reduced.<br>*Responsibility*<br>Chief of Police |

589

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

| | **Recommendations** |
|---|---|
| 19 | *Recommendation*<br>Establish a more robust Department basic first aid and EMT program.<br>(a) Develop a consistent reporting process to document all instances of rendering general first aid using the first aid kits provided to all officers,<br>(b) Develop a consistent reporting process to document all incidents when a trained EMT renders aid,<br>(c) Support the EMT program in terms of the cost of the equipment and on-duty time needed to retain State certification, and<br>(d) Consider providing a bonus pay incentive for those employees who are EMT certified.<br>*Rationale*<br>The Department currently does not document these instances in a consistent manner. Establishing a more formal and expanded EMT program to include patrol officers will provide potentially lifesaving care.<br>*Funding*<br>Cost of a bonus based on the number of employees EMT certified, the cost of replacing used equipment and keeping equipment updated.<br>*Responsibility*<br>City Council, Board of Police Commissioners, Chief of Police |
| 20 | *Recommendations*<br>Purchase software that can be used to analyze open-source internet and social media content to provide field operations with vetted and useable intelligence/information and add appropriate staffing.<br>*Rationale*<br>To provide real-time analysis of information.<br>*Funding*<br>Council to consider approving funding or Department could potentially use federal Urban Areas Security Initiative (UASI) grant funds.<br>*Responsibility*<br>City Council, Board of Police Commissioners, Chief of Police |
| 21 | *Recommendation*<br>Explore Department personnel tracking technology to be used for large scale events to be able to track personnel during staging and deployment, skill sets, certification and timekeeping for better planning and deployment.<br>*Rationale*<br>The current process is to conduct Department personnel check-in and check-out using pencil/paper and can take hours to accomplish.  Technology could improve efficiencies, effectiveness, minimize errors, improve personnel safety, and assist with administration of mutual aid and assistance reimbursement agreements.<br>*Funding*<br>Council to approve funding. Budgetary impact is the cost of technology.<br>*Responsibility*<br>Board of Police Commissioners, Chief of Police |

| Recommendations | |
|---|---|
| 22 | *Recommendations*<br>Establish a five-year succession plan.<br>*Rationale*<br>The LAPD has been experiencing an unusually large number of retirements in all ranks over the past ten years taking with them leadership experience and expertise and leaving a gap in experience. This was identified as a problem throughout this report and if the Department does not have the resources to develop a formal succession plan, an outside consultant may be of assistance.<br>*Funding*<br>No budgetary impact unless an outside consultant is determined to be useful. |

*This was intentionally left blank*

75

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

# VIII. Appendix

## Appendix 1:    Review Team Members and Other Contributors

### Review Team Members
**Gerald Chaleff**

Mr. Chaleff joined LAPD in 2003 under Chief William J. Bratton as the civilian Commanding Officer of the Consent Decree Bureau, tasked with overseeing the implementation of the reform provisions of the 2001 Consent Decree which the Department and the City of Los Angeles entered into with the United States Department of Justice. In 2009, Mr. Chaleff became the Special Assistant for Constitutional Policing to Chief Charlie Beck. During his tenure with the Department, Mr. Chaleff also oversaw the operations of the Department Risk Manager, as well as the Civil Rights Integrity, Planning and Research, Legal Affairs, Internal Audits, and Fiscal Operations Divisions.

Before joining LAPD, Mr. Chaleff was appointed to the Los Angeles Board of Police Commissioners, serving as President from 1999 to 2001. During this time he was selected by the City to be part of the team negotiating with the United States Department of Justice the terms of the 2001 Consent Decree. He is also a former President of the Los Angeles County Bar Association and served as a Deputy General Counsel to the Webster Commission.

After receiving his Bachelor of Science degree from UCLA and his law degree from Harvard Law School, Mr. Chaleff worked for the office of the Los Angeles County District Attorney and the office of the Los Angeles County Public Defender. He then entered private practice, first at his own law firm, and later as a partner at a large, multinational firm. He is a nationally recognized expert in criminal defense, with extensive experience in both state and federal courts and is a member of the prestigious American College of Trial Lawyers.

Mr. Chaleff has served as a consultant on constitutional policing issues to the New York Police Department and assisted the City of New Orleans in their negotiations with the Department of Justice, which resulted in a Consent Decree. Mr. Chaleff is presently a member of the National Research Advisory Board of the Data Collaborative for Justice, at John Jay College and the National Advisory Committee for the Early Intervention System of the University of Chicago Crime lab. He recently assisted in the evaluation of the Community Safety Partnership by UCLA as a member of the Advisory Committee. He has previously served as a member of the Board of Advisory of the Luskin School of Public Affairs, at UCLA.

### Gloria Grube

Gloria Grube is a retired LAPD Police Administrator III, a Deputy Chief equivalent and the highest ranking civilian position in the Police Department. She spent the last five of her 35 years with the LAPD as the Bureau Chief of the Administrative Services Bureau, a command of 1600 employees. She has overseen or managed most of LAPD's support entities including Personnel, Recruitment, Communications (dispatch center), Records and Identification, Information and Technology, Motor Transport (fleet services), Facilities Management, Evidence and Property Management, and Custody Services Divisions.

592

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

She also had oversight over the military liaison unit and was responsible for Department-wide personnel deployment.

**Stephen R. Jacobs**

Stephen Jacobs is a retired LAPD Deputy Chief who spent the last five years of his career as the Chief of Staff for Chief of Police Charlie Beck. As the prior Commanding Officer of Metropolitan Division and one of the original incident management team leaders he has extensive experience in crowd management, crowd control and the incident command system.

**Sandy Jo MacArthur**

Sandy Jo MacArthur is a law enforcement consultant (e.g., Chicago, Detroit, New York, Cincinnati) an associate professor at Pepperdine University, and a retired LAPD Assistant Chief. She has extensive experience in policing training, LAPD consent decree and settlement agreements and implementation, use of force, and employee wellness. In 2007 she was the Commanding Officer of Incident Management and Training Bureau and has experience in designing and implementing public order policing training programs. Sandy Jo has her Masters Degree in Negotiations and Conflict Management and for over ten years was a member of the City of Los Angeles City Attorney's Officer Community Dispute Resolution program. She currently a member of the University of Chicago Crime Lab National Advisory Committee on Police Early Intervention Systems and a member of an Advisory Committee for the UCLA evaluation of the Community Safety Partnership program.

**Rosa Moreno**

Rosa Moreno is a retired LAPD Captain III who spent 32 years with the LAPD. She has more than nine years of patrol experience, more than ten years of detective experience and over 12 years of administrative experience. At the time of her retirement, she was the Commanding Officer of Legal Affairs Division. She was an incident management team member, has experience with the Department Operations Center and extensive knowledge of the Department consent decrees, settlements, and lawsuits, including those that pertain to crowd control, mass arrest, and field jail procedures.

**Rick Webb**

Rick Webb is a retired LAPD Commander with over 35 years of service. He currently provides consultation and expert testimony for law enforcement firms and police agencies in police practices, police management, use of force, police tactics, internal discipline and biased policing. While with the LAPD he spearheaded key projects including collaborating with various law enforcement agencies across the country to design new police strategies and tactics to manage large scale active shooter incidents and acts of terrorism.

**Appreciation for professionalism in representing their constituents and clients.**
Rachel Brashier, Deputy Chief of Staff, Office of Councilmember Harris-Dawson, Council District 8
Muna Busailah, Law Firm of Stone Busailah, LLP, Command Officer's Association

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

Krista Kline, Deputy Chief of Staff, Office of Councilmember Bonin, Council District 11
The Los Angeles Police Protective League Board of Directors, representing LAPD Officers to Lieutenants

**Appreciation to the professionals who were interviewed and contributed to this report.**
All those who agreed to be interviewed and made this report possible.
Special thanks to Dr. Ian Mitroff, PhD, Professor Emeritus from the Marshall School of Business and the
Annenberg School for Communication, University of Southern California. He is currently a Senior
Research Affiliate in the Center for Catastrophic Risk Management at the University of California,
Berkeley

Bret Burton, Sergeant Portland Police Department
Craig Dobson, Commander Portland Police Department
Phil Fontanetta, Retired Commander LAPD
Robert Green, Retired Deputy Chief LAPD
Leland Klauzer, Sergeant Portland Police Department
Jeffery McDaniel, Sergeant Portland Police Department
Mark Pazin, Chief of California Office of Emergency Services
Eric Rose, LAPD Reserve Officer and Partner and Crisis/Media Strategist with Englander, Knabe & Allen

78

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

### Appendix 2:   Methodology and Limitations

**Methodology:**  The Review Team reviewed documents, policies, directives and tactics of the LAPD and conducted in-depth interviews with over 100 members of the LAPD (more than 50 of whom were members of the leadership team), and City and plaintiff attorneys.

Although most after action reports rely on open discussion participation with those involved in the incident, this report is a hybrid. While the Review Team was not given access to a true after action review meeting with key individuals involved in the protests and civil unrest, the Chief of Police provided an opportunity to obtain voluntary interviews from command staff to officers on the ground. The team was able to obtain over 50 interviews of sworn and civilian command officers. In addition, the team was able to interview over 30 sworn members of the rank of lieutenant and below and reviewed the responses to the LAPPL membership survey regarding the events of May and June 2020, from over 3,000 sworn members. After conducting a thorough review and analysis, recommendations for improvement were identified. A full list of recommendations is found in Section VIII of this report.

City Council members provided the Review Team with a list of community members and advocates who participated in the various protests. The Review Team obtained interviews from ten individuals who were able to provide invaluable information regarding their perspective of the Los Angeles events during May and June of 2020.

**Limitations:**  It is not possible to review and evaluate every incident and interaction between members of the public and the police that occurred during the review period. There are logical, logistical, and legal limitations in the Review Team's ability to evaluate individual actions. Those limitations include:

Each incident and parts of an incident is unique. Police use of force must be evaluated based on the facts and circumstances facing the officer at the time of the force incident. To accurately assess reasonableness, the articulation expressed by the officer and a thorough examination of the facts and evidence surrounding the use of force is required for each incident. Given the thousands of interactions between officers and members of the public during May-June 2020, it was not feasible to examine each incident.

According to LAPD policy, reporting of force used by officers in crowd control situations, such as baton strikes or pushes and deployment of less lethal munitions, is summarized on incident command system forms. This is unlike use of force incidents occurring during normal policing operations where there is an on-scene supervisory investigation, canvassing for witnesses and thorough documentation of all aspects of the incident. Reporting force procedures used in crowd control incidents must consider the fact that the scenes are often dynamic and there may be multiple instances of force used by officers in often unsafe and rapidly unfolding conditions. For these reasons, such uses of force are reported after the incident has calmed or subsided.

In crowd control situations, police supervisors are required to document as much information as they can (the name of the officer(s) using force, the type of force tool used, and the approximate time). Usually, the identification of the subject of the use of force is not known or available and the reporting is

79

done after the incident has concluded or at the end of the shift. Generally, given the numbers of incidents, the chaotic and on-going nature of crowd control situations, and the delay in reporting, the information documented is typically very general in nature.

All allegations of serious misconduct, including allegations of excessive force are investigated by Internal Affairs Group, Professional Standards Bureau. Officers under investigation, and witness officers, have certain rights afforded to them by the Peace Officers Bill of Rights, California Government Code Section 3300-3311. The Bill of Rights guides the way the investigation is conducted. The Review Team does not have the authority to investigate allegations of misconduct, compel officers to cooperate with an investigation, interview witnesses, canvass for evidence, evaluate the report for consideration of criminal referral, or otherwise make recommendations about individual cases. Further, any effort by the Review Team to investigate or question officers about an occurrence under investigation by the Department could unreasonably interfere with an on-going Department investigation.

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

### Appendix 3:   1992 After-Action Report Findings

| Table of 1992 LAPD After Action Report Findings |
|---|
| After the video recording of an LAPD use of force incident against a Black man (Rodney King) that was viewed by most of the nation, four Los Angeles police offices were tried for excessive force and acquitted. The trial of the officers was broadcast live on television for several weeks. All four officers were acquitted. Soon after the acquittal, violence erupted. Over the following six days, 63 people were killed. The National Guard and other mutual aid law enforcement agencies were deployed into the City. The property damage from arson and looting was estimated at over $1 billion. Below are findings from the LAPD After Action Report. |
| **Problems with call up rosters:** Individual commands were directed to revitalize mobilization rosters, update employee "call-up" and notification plans, develop a ratio of officers to available police vehicles for transportation to areas impacted by civil unrest, and develop platoon size teams to respond to looters. |
| **Preparedness:**  Only a small number of staff officers within the Department believed there was a possibility of violence, while the majority did not and did not follow through on making plans for potential unrest. |
| **Preparedness/Training:**  Although commands were advised to train line personnel in civil disorder tactics, there was no evidence that any training occurred. |
| **Planning:**   A high-level staff officer conducted a meeting with other Department staff and command personnel a month prior to the release of the jury's decision and requested that plans be developed for the possibility of civil unrest in the event that the officers were acquitted of charges. However, planning did not begin until 37 days into the trial. |
| **Planning:**  There was no centralized Department-wide effort to develop plans should there be unrest. Instead, commands were left to devise their own plans, resulting in 18 separate Area plans, four Traffic Division plans, and one Metropolitan Division plan to respond to possible civil unrest. |
| **Area Command:**  There was no centralized direction to conduct outreach to community leadership which may have afforded the Department valuable intelligence that an acquittal most likely would spark community outcry and possible violence. |
| **Preparedness:**  The LAPD experienced organizational complacency, as few problems with civil unrest had occurred within the City since the 1965 Watts Riots. |
| **Incident Command System:** Command post and staging discipline and deployment of resources was poorly executed. |
| **Communication:**  Communications and interoperability difficulties. |
| **Intelligence:**  Lack of intelligence gathering capabilities. |
| **Command and Control:**  Command and control deficiencies noted throughout the report. |
| **Planning and Preparedness:**  Department incident action plans for pre-planned events, emergency action plans for unplanned events, and after-action reports created by the LAPD did not include specific areas in planning, command and control, and accurate and timely information.[32] |

---

[32] July 8, 1992, Los Angeles Police Department After-Action Report 1992 April/May Riot.

81

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

### Appendix 4:    2001 Consent Decree Details

| Federal Department of Justice Civil Rights Consent Decree<br>June 2001 Agreement |
|---|
| The Consent Decree was intended to promote police integrity within the Department and prevent conduct that deprives individuals of their rights, privileges, or immunities protected by the Constitution of the United States.  The Consent Decree placed emphasis on the following nine areas. |
| 1.  Management and supervisory measures to promote civil rights integrity |
| 2.  Critical incident procedures, documentation, investigation and review |
| 3.  Management of gang units |
| 4.  Management of confidential informants |
| 5.  Program development for response to persons with mental illness |
| 6.  Training |
| 7.  Integrity audits |
| 8.  Operations of the Police Commission and Inspector General |
| 9.  Community outreach and public information |
| In May 2013, U.S. District Judge Gary Feess formally lifted the binding agreement the U.S. Department of Justice imposed on the Department. Judge Feess said that the Department had sufficiently complied with reforming itself and no longer required the oversight of a monitor. |

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

### Appendix 5:   2000 DNC National Lawyers Guild Settlement Information

| National Lawyers Guild V. City of Los Angeles June 2005 Settlement | |
|---|---|
| **Helicopters** | Must operate at reasonable altitudes and not be used with the intent to deny response to emergency. |
| **Marches** | Crowds can use the public sidewalk adjacent to the street but may not disrupt businesses. |
| **Motorcycles/Bicycles** | Not allowed to strike lawfully assembling demonstrators as a crowd control strategy. |
| **Use of Less Lethal Tools** | May be deployed on aggressive and/or combative suspects in crowd control situations on subjects armed with weapons other than firearms, and on subjects who are destroying property.  Not allowed to be used on lawfully dispersing individuals or crowds, individuals or crowds who are retreating. Department must publish a notice that require stinger weapons to be used ONLY with the approval of a staff officer and only in riotous situations. |
| **Public Assemblies** | Prior to declaring an assembly unlawful, Department personnel shall refer to the LAPD guidelines for crowd management and control, Volume 5 of the Emergency Operations Guide. All incident commanders shall be trained in crowd management strategies and tactics. Before declaring an unlawful assembly, the incident commander should evaluate the feasibility of isolating and arresting those responsible for the unlawful conduct. |

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

### Appendix 6:   2007 MacArthur Park Settlement

| Multi-Ethnic Immigrant Workers Organizing Network V. City of Los Angeles<br>June 2009 Settlement<br>May Day 2007 | |
|---|---|
| **Basic Principles** | All persons have a right to demonstrate/protest.<br>Government may impose reasonable and narrowly tailored restrictions on the demonstrations. Restrictions must be justified based on public safety and public health. |
| **Helicopters** | Must fly at reasonable altitudes and used for emergencies. |
| **Marches** | Demonstrators/protestors can use sidewalks. LAPD will consider the practicality of facilitating demonstrations that may temporarily block traffic and include these procedures in the manual. |
| **Motorcycles/Bicycles/ Motor Vehicles** | Such vehicles may be used for observation and traffic control. They may not be used to strike demonstrators as a method or strategy to control or disperse crowds. |
| **Horses** | Ensure that during crowd control training the curriculum addresses the subject of the impact of the use of horses on crowd behavior. |
| **Less Lethal Weapons** | Less lethal weapons may be deployed on aggressive or combative subjects in crowd control situation, against a physical threat or aggressive or combative behavior and to prevent the destruction of property. Less lethal weapons may not be used on lawfully dispersing or retreating persons or crowds. When feasible, notice should be given before deploying less lethal in a crowd control incident or for dispersal.  Where feasible, the warning should be given in language(s) spoken by participants.<br>If LAPD resumes the use of Stinger rounds, LAPD must publish a notice that Stinger round use requires the approval of a staff officer and only in riotous situations. |
| **Batons** | Batons are not to be used against dispersing individuals or crowds who are unable to move or pose no imminent threat. Batons can be used in a pushing motion against individuals who intentionally refuse to move or when behavior is threatening or violent. Batons may be used as an impact weapon in accordance with LAPD policy. |
| **Assemblies** | The incident commander and supervisors shall make every effort to ensure the police missions are created and communicated with the highest regard for dignity and liberty. Prior to declaring an assembly unlawful, the Department shall refer to Volume 5 of the Emergency Operations Guide and the incident commander shall evaluate the feasibility of isolating the problem individuals. |
| **Declaration of Unlawful Assembly** | Announce the unlawful assembly under the requirements of CA Penal Code 409, follow procedures in Volume 5 of the Emergency Operations Guide and use an amplified loudspeaker system to warn. If feasible, send personnel to the far side of the crowd to record the unlawful assembly order, and the order shall be made repeatedly and reasonably calculated to be heard by the entire crowd in English and other languages. The unlawful assembly order shall include: an objectively reasonable period of time to disperse and provide a safe route(s) to disperse and a warning that police action may include the use of less lethal munitions. |
| **Crowd management Training** | Training shall include the understanding of the impact that a Department show of force has on crowd behavior. Metropolitan Division shall undergo training annually. Every officer above the rank of Sergeant I shall undergo training at a minimum interval of two years on crowd control and use of fore policy developed as the result of this settlement. Training may be live or by e-module or both. |
| **Policy** | All policies shall be included in the Emergency Operations Guide by July 1, 2009. (Plaintiffs were given opportunity to provide input prior to the approval.) |

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

### Appendix 7:   2011 Occupy Los Angeles

| | Occupy of Los Angeles<br>2011 Settlement |
|---|---|
| 1 | Demonstrators shall not be "kettled" by officers when they are attempting to comply with a dispersal order. |
| 2 | Arrestees shall not be placed on transportation buses with tight handcuffs for an extended period of time. |
| 3 | Arrestees shall not be denied access to bathroom facilities or water while held in police custody. |
| 4 | Arrestees shall be released on their own recognizance if charged only with a misdemeanor, pursuant to California Penal Code 853.6 |

85

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

### Appendix 8:   2014 Ferguson

| | Ferguson Demonstration<br>2014<br>Settlement |
|---|---|
| **1** | Demonstrators shall be given a dispersal order prior to arrest and given the opportunity to leave. |
| **2** | Demonstrators shall not be "kettled" after being given a dispersal order. |
| **3** | Arrestees shall not be zip-tied for extended periods of time. |
| **4** | Arrestees shall not be incarcerated for extended periods of time. |
| **5** | Arrestees shall not be denied "OR" (released on their own recognizance) for misdemeanor charges pursuant to California Penal Code 853.5pc |

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

### Appendix 9:    Key Terms

*Categorical Use of Force:*  LAPD Manual Section 3/795 defines categorical uses of force (CUOF) as:
- An incident involving the use of deadly force (e.g., discharge of a firearm) by a Department employee;
- All uses of an upper body control hold by a Department employee, including the use of a modified carotid, full carotid or locked carotid hold;
- All deaths while the arrestee or detainee is in the custodial care of the Department (also known as an In-Custody Death or ICD);
- A use of force incident resulting in death;
- A use of force incident resulting in an injury requiring hospitalization, commonly referred to as a law enforcement related injury or LERI;
- All intentional head strikes with an impact weapon or device (e.g., baton, flashlight, etc.) and all unintentional (inadvertent or accidental) head strikes that results in serious bodily injury, hospitalization or death;

**Note**:  Serious bodily injury, as defined in California Penal Code Section 243(f)(4), includes, but is not limited to, the following:
- Loss of consciousness;
- Concussion;
- Bone fracture;
- Protracted loss or impairment of function of any bodily member or organ;
- A wound requiring extensive suturing; and,
- Serious disfigurement.

(All other unintentional head strikes shall be investigated as Level I Non-Categorical Use of Force incidents;)
- Officer-involved animal shootings and non-tactical unintentional discharges;
- An incident in which a member of the public has contact with a Department canine and hospitalization is required. Under Department policy, a canine contact is not a use of force but has been included in this category to satisfy the provisions of the Consent Decree; and,
- Incidents where the Department has agreed to conduct similar critical incident investigations for a non-Department entity, such as a Los Angeles Fire Department Arson Unit.[33]

*Civil Disturbance:*  A gathering that constitutes a breach of the peace or any assembly of persons where there is a threat of collective violence, destruction of property, or other unlawful acts. Such a gathering may also be referred to as a riot or unlawful assembly.[34]

*Crowd Control:*  Techniques used to address civil disturbances, to include a show of force, crowd containment, disperse equipment and tactics, and preparation for multiple arrests.[35] LAPD doctrine states that the Mission and Objectives of crowd control during a civil disorder is to restore conditions to normal as rapidly and efficiently as possible.[36]

*Crowd Management:*  Techniques used to manage lawful assemblies before, during, and after the event for the purpose of maintaining lawful status though event planning, pre-event contact with event organizers, issuance of permits where applicable, information gathering, personnel training and other means.[37] LAPD doctrine states that

---

[33] Manual of the Los Angeles Police Department, Vol 3/795.
[34] Crowd Management (Alexandria, Va: International Association of Chiefs of Police, April 2019), https://www.theiacp.org/sites/default/files/2020-08/Crowd%20Management%20FULL%20-%2008062020.pdf.
[35] Crowd Management
[36] Supervisor's Field Operations Guide (Los Angeles Police Department, n.d.), vol. 2 page 16.
[37] Crowd Management.

87

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

the Mission and Objectives of crowd management situation is to "preserve public order while at the same time protecting the constitutional rights of the individuals involved.[38]

*Command and Control:* The use of active leadership to direct others while using available resources to coordinate a response, accomplish tasks and minimize risk. *Command* uses active leadership to establish order, provide stability and structure, set objectives, and create conditions under which the function of control can be achieved with minimal risk. *Control* implements the plan of action while continuously assessing the situation, making necessary adjustments, managing resources, managing the scope of the incident (containment), and evaluating whether existing Department protocols apply to the incident.[39]

*Demonstration:* A lawful assembly of persons organized primarily to engage in free speech activity. These may be scheduled events that allow for law enforcement planning. They include, but are not limited to, marches, protests, and other assemblies intended to attract attention. Lawful demonstrations can devolve into civil disturbances that necessitate enforcement action.[40]

*Department Operations Center:* The Department Operations Center (DOC) is part of Communications Division and serves as the Department command post during serious or major unusual occurrences. It is staffed to coordinate and provide police services, personnel, equipment, and supplies to incidents. It is located in the City's Emergency Operations Center and is capable of communicating with all City Departments and selected outside agencies.[41]

*Emergency Operations Center:* The Emergency Operations Center (EOC) is the facility established by the City to coordinate the City's overall response and support to an emergency. Representatives from various City Departments and agencies, including the Police Department, staff the EOC.

*Review Period:* The time frame from May 27 through June 7, 2020.

*Failure to Disperse:* California Penal Code Section 409 states: Every person remaining present at the place of any riot, rout, or unlawful assembly, after the same has been lawfully warned to disperse, except public officers and persons assisting them in attempting to disperse the same, is guilty of a misdemeanor.[42]

*Impact Projectiles:* Projectiles designed and intended to deliver non-penetrating impact energy from safer range. These may include direct fire or non-direct skip-fired rounds. The latter are projectiles that are discharged toward the ground in front of a target, theoretically delivering the energy to the subject following contact with the ground.[43]

*Mobilization:* The principal Department plan to marshal personnel resources for control of a major unusual occurrence. The preliminary stage of a mobilization is a tactical alert. A mobilization includes the immediate implementation of 12-hour A and B watches, the deferment of days off, and the recalling of off-duty officers.

*Objective Reasonableness:* Police use of force is judged pursuant to a "reasonable objective standard" per the United States Supreme Court Decision known as Graham v. Connor. "Graham" specifically states, and is repeated, in part, in the Los Angeles Police Department use of force policy: "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody the allowance for the fact that police officers are often forced to make split-second judgements – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation. The test of reasonableness is not capable of precise

---

[38] Supervisor's Field Operations Guide, vol. 2, page 16.

[39] TRAINING BULLETIN: COMMAND AND CONTROL (Los Angeles Police Department, July 2018), 1, http://lapd-lapd-lapd-assets.lapdonline.org/assets/pdf/tac-dir11-crowd-mgmt.pdf.

[40] Crowd Management.

[41] LAPD Media Relations Guide

[42] California Penal Code Section 409.5 - California Attorney Resources - California Laws, accessed October 1, 2020, https://law.onecle.com/california/penal/407.html.

[43] Crowd Management

definition or mechanical application. The force must be reasonable under the circumstances known to the officer at the time the force was used."[44]

*Public Order Policing:* A term that is widely used in Canada and Europe. For purposes of this report, public order policing is crowd control AND crowd management.

*Riot:* California Penal Code Section 404 defines a riot as: Any use of force or violence, disturbing the public peace, or any threat to use force or violence, if accompanied by immediate power of execution, by two or more persons acting together, and without authority of law, is a riot. (Amended by Stats. 1995, Ch. 132, Sec. 1. Effective January 1, 1996.)[45]

*Staging Area:* A location approved by the incident commander and used for the collection, storage, maintenance, disbursement, and accounting of personnel, vehicles, supplies, and equipment used or available. The staging area may also be used for the temporary storage of booked property and impounded vehicles.

*Unlawful Assembly:* California Penal Code Section 407 defines an unlawful assembly as: Whenever two or more persons assemble together to do an unlawful act, or do a lawful act in a violent, boisterous, or tumultuous manner, such assembly is an unlawful assembly.[46]

*Non-Categorical Use of Force:* LAPD Manual Section 4/245.02 defines Non-Categorial Use of Force (NCUOF) as: an incident in which any on-duty or off-duty Department employee whose occupation as a Department employee is a factor, uses physical force or a control device to:

- Compel a person to comply with the employee's direction;
- Defend themselves;
- Defend others;
- Effect an arrest or detention;
- Prevent escape; or,
- Overcome resistance.

The following incidents are **not** reportable NCUOF incidents:

- Any incident investigated by Force Investigations Division (Department Manual Section 3/794.10);
- The use of a C-grip, firm grip, or joint lock which does not result in an injury or complained of injury to the subject;
- The use of a joint lock walk-down or body weight to overcome a subject's passive resistance which does not result in an injury or complained of injury to the subject;
- In a crowd control situation, a use of force report is not required when officer(s) become involved in an incident where force is used to push, move, or strike individuals who exhibit unlawful or hostile behavior and who do not respond to verbal directions by the police. This applies only to officers working in organized squad and platoon sized units directly involved in a crowd control mission. Additionally, should force be utilized under these circumstances, officers shall notify their immediate supervisor of the use of force once the tactical situation has been resolved. The supervisor shall report the action on the incident command system (ICS), Form 214(Activity Log), or as directed by the incident commander. When a suspect has been taken into custody, the booking number, or Division of Records (DR) number of the related report shall be cross-referenced on the incident command system form; and,

---

[44] Los Angeles Police Department Use of Force Policy - Revised (Los Angeles Police Department, March 2017).

[45] California Penal Code Section 404 (2016) - California Codes, accessed December 19, 2020, https://california.public.law/codes/ca_penal_code_section_407.

[46] California Penal Code Section 409 (2016) - California Codes, accessed December 19, 2020, https://california.public.law/codes/ca_penal_code_section_407.

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

- The discharge, including tactical discharge, of a projectile weapon (e.g., beanbag shotgun, 37mm or 40mm projectile launcher or compressor air projectile system), electronic control device (Taser), or any chemical dispenser that does not make contact with an individual or their clothing is not a reportable use of force.[47]

---

[47] Manual of the Los Angeles Police Department, Section 4/245.02.

90

606

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

### Appendix 10:  Incident Command System Structures

**Single Incident**



**Multiple Incidents**



**Description of incident command system positions:**

**Area Command:**  In some instances, there are several incidents occurring simultaneously in the same general area and often of the same general kind (e.g., multiple structure fires, multiple wildland fires, collapsed buildings, medical events, civil disturbances, planned everts, earthquake, etc.). Typically, these kinds of incidents compete for the same resources."[48] In these instances, an area command is

---

[48] Managing Large Scale Incidents - Area Command, ICS 420-1.3, 1.

91

established. The area command places a hybrid of an incident command system organization over several incident command system organizations handling similar incidents.

**Incident Commander:** The person who has overall responsibility and authority over the incident. The incident commander is supposed to provide a "commander's intent" with missions and directives to achieve an overall mission to bring an incident to a conclusion.

**Logistics Section**: (Logs Chief) provides personnel, equipment and support for the command center. They handle the coordination of all services involved in the response, from locating rescue equipment to coordinating the response for volunteer organizations.[49]

**Finance Section:** Responsible for accounting for funds used during the response and recovery aspect of the disaster. They monitor costs related to the incident and provide accounting analyses.[50]

**Operations Section:** (Ops Chief) handles tactical operations, coordinates the command objectives, and organizes and directs all resources to the disaster site.

**Planning Section:** (Planning Chief) provides the necessary information to the command center to develop the action plan that will accomplish the objectives. They also collect and evaluate information as it is made available.

**Sectoring (Divisions):**  In disbursed incidents, (such as wide-spread civil unrest) the geographic territory around the incident may be divided into smaller areas that are then place under control of subordinate leadership with resources. This ensures that resources are maintained and not over-deployed to other areas or taken away from those divisions.

**Staging:**  Key components of comprehensive resource management are logistics and staging.  The logistics chief is supposed to arrange for resources, including personnel to respond to the event. staging is typically under the command of the operations section chief. At staging, resources, such as police officers, respond to an area with the intention of being re-deployed to the incident. The "staging manager" is supposed to receive, organize, track and account for those resources while in the staging area. In law enforcement, the staging manager is responsible for reconfiguring those resources into pre-determined tactical packages such as mobile field force platoons (if not already done) and then dispatch the resources per the directions of the incident commander.

---

[49] Overview: The Incident Command System.
[50] Overview: The Incident Command System.

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

### Appendix 11:  LAPD and FEMA National Concepts of Emergency Management

The LAPD Emergency Operations Guide states the following: "The 21st Century emergency-preparedness strategies, i.e., all-hazards, special events and criminal terrorist incidents include regional response, mutual aid, and specialized command expertise. No longer can the planning and command of high consequence events be limited to rank or position within the organization. Today's complex events need to be managed by highly trained specialists.  An incident management team is a team of specialists familiar with all aspects of emergency management. They are experienced leaders, decision makers and strategic thinkers, self-actualized and willing to develop themselves into a cohesive team focused on managing large, complex, high consequence incidents. Incident management teams are intended to address all-hazards incidents, i.e., earthquakes, fires, evacuations and other man-made or natural disasters; special events including marches, rallies, and public assemblages; crowd management strategies, mobile field force resources, and sophisticated crime scenes. Furthermore, incident management teams must be agile enough to integrate into regional, allied agencies."[51]

The LAPD emergency management doctrine follows that of the federal government.  The Federal Emergency Management Agency (FEMA) identifies the four phases of disaster management as preparedness, response, recovery, and mitigation. The preparedness phase is defined by the Department of Homeland Security (DHS) and FEMA: Emergency Management Preparedness is the continuous cycle of planning, organizing, training, equipping, exercising, evaluating, and taking corrective action in an effort to ensure effective coordination during incident response." Preparedness guidelines "promotes a common understanding of the fundamentals of risk-informed planning and decision making to help p lanners examine a hazard or threat and produce integrated, coordinated, and synchronized plans."[52]



*Figure 4: Phases of Disaster Management*

---

[51] LAPD Emergency Operations Guide.

[52] FEMA: Developing and Maintaining Emergency Operations Plans: Comprehensive Preparedness Guide (CPG) 1010, version 2.0 (November 2020).

93

**AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE**

## Appendix 12:  LAPD Less Lethal Tools

### 40mm Launcher, Deploying the 40mm eXact iMpact Sponge Round

The 40mm launcher has a rifled barrel and is equipped with a holographical sighting system that uses a single foam projectile.  According to the manufacturer, the projectile weighs 0.96 oz (27 g) and travels at 325 feet per second (99mps). The round is 1.6 in (40mm) in diameter and 2.60 inches (6.6 cm) long. The minimum safe range for the eXact iMpact round is five feet (1.5m) and the maximum effective range is 131 feet (40 m). The round is intended for direct impact (target specific) application.[53]  LAPD policy on the 40mm is documented in a directive which states that less-lethal force options are only permissible when an officer reasonably believes that a suspect or subject is violently resisting arrest or poses an immediate threat of violence or physical harm.[54] The 40mm shall not be used to target the head, neck, face, eyes, or spine unless lethal force is authorized. The 40mm launcher may be used in crowd control situations against a single subject/suspect as a target-specific less-lethal option. [55]  Because the 40 mm round is target specific, it cannot be used to disperse a crowd.

### 37 mm Launcher, Deploying the 37mm Foam Baton Round

The foam baton round consists of five foam rubber projectiles that are discharged at once. The 37 mm launcher has a smooth bore barrel with standard iron sights. According to the manufacturer, "...each foam rubber projectile should be used as a pain compliance round for crowd control.  It is most suitable in close to medium ranges of fire, approximately 15 to 30 feet.  Beyond 30 feet, the lightweight foam batons may move off target and lose most of their impact energy. The round is intended to be fired at a target, however, may be skip fired at the direction of the operator. [56]  The LAPD uses the 37mm weapon as a non-target impact weapon. LAPD policy states in part, "the 37mm foam rubber baton round is a non-target specific round used for crowd control. With the approval of the incident commander, the 37 mm foam rubber baton may be used as a crowd control tool when a dispersal order has been issued and/or immediate action is necessary, to stop violence, to ensure public safety, and restore order.[57]



Officers deploying the 37 mm launcher are limited to firing a "foam baton" round by skipping the round off of the ground in front of the intended targets to disperse the crowds.

---

[53] 40mm EXact IMpact Sponge Round Spec Shee" (Defense Technologies, December 30, 2020), www.defense-technologies.com.

[54] USE OF FORCE - TACTICS DIRECTIVE:  40mm LESS-LETHAL LAUNCHER, 1.

[55] USE OF FORCE - TACTICS DIRECTIVE:  40mm LESS-LETHAL LAUNCHER, 2.

[56] 37mm Foam Baton Black Powder Round Spec Sheet (Defense Technologies, December 30, 2020), www.defense-technologies.com.

[57] USE OF FORCE - TACTICS DIRECTIVE No. 11.1 CROWD MANAGEMENT, INTERVENTION, AND CONTROL (Los Angeles Police Department, October 2020), 5, http://lapd-lapd-lapd-assets.lapdonline.org/assets/pdf/tac-dir11-crowd-mgmt.pdf.

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

### Beanbag Shotgun, Deploying the Beanbag Super-Sock Round

The beanbag shotgun is a Remington 870 shotgun which has been configured with a green slide handle and stock, rifled barrel, and side saddle ammunition holder. The color green is used to signify that the shotgun is for the beanbag super-sock round which is a 12-gauge cartridge containing a shot-filled fabric bag.  These rounds are designed to be non-penetrating, and upon striking a target distribute energy over a broad surface area."  According to LAPD policy the beanbag shotgun may be used in crowd control situations against a single subject/suspect as a target-specific less-lethal option. [58]

The beanbag shotgun is also a standard less lethal tool used during patrol operations.  Most officers on the Department have been certified during the academy in the use of the beanbag shotgun trained for use in patrol functions.

   

### Hornets Nest Sting Grenades, Deploying .60 Caliber Rubber Balls

The Hornets Nest Sting Grenade (sometimes referred to as a "stinger" round) is a "rubber ball diversionary device that produces approximately 130 decibels at five feet and emits 1-2 million candelas.  In addition to the light and sound, the Hornets Nest Sting Grenade is designed to disperse approximately 25, .60 caliber, rubber balls in a 360-degree pattern."[59]

The Department did not provide documentation relative to the deployment approval of the Hornets Nest Sting Grenade Round.  However, the Department did provide information that stated that only the Special Weapons and Tactics Team possesses this less lethal tool and is authorized to deploy it. There appears to be some confusion in the Department as to who may authorize the deployment of this less lethal tool in crowd control situations. The Review Team located lesson plans which indicated a person of the rank of commander or higher may authorize its usage.

---

[58] USE OF FORCE - TACTICS DIRECTIVE No. 6.3 BEANBAG SHOTGU" (Los Angeles Police Department, July 2018).

[59] Hornets Nest Sting Grenade, .60 Cal. Rubber Balls, Produce Code ALSG10160 (ALS, December 30, 2020), www.lesslethal.com.

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

### Appendix 13:  History of Training 1992-2020

| History of Development and Training[60]<br>Mobile Field Force and Crowd Control/Management<br>Prepared by Training Group July 2007 for the May Day 2007 Examination Report. | |
|---|---|
| 1992 | Metropolitan Division developed a 16-hour mobile field force course and began delivery to LAPD personnel after working with the Miami Police Department who were responding to Miami riots from both 1988 and 1989. The training consisted of conventional crowd control tactics; counter ambush tactics; lessons learned from 1992; mass arrest procedures; mobile field force concept; personnel and vehicle assignment; use of force; and exercises in arrest and control, chemical agents, citizen rescue, gang convoy stops, mobile tactics, patrolling hostile areas, and squad formations. |
| 1993 | 6,500 Department personnel and 1,000 personnel from outside agencies (California Highway Patrol, Los Angeles County Sheriff's Department) had completed the course. |
| 1993 | The State of California adopted the mobile field force concept and codified it into the 1993 California Police Officer's Standards in Training (POST) Crowd Management and Crowd Control Guidelines. |
| 1995 | The Department introduced a new situational use of force continuum to officers that labeled categories of individual behaviors as the following: *cooperative, no response to commands, uncooperative, aggressive/combative and life threatening* and established it as LAPD policy. Various force options available to officers to control a situation were listed and correlate to behavioral categories.  At that time, the Department published a Use of Force Handbook and trained all sworn employees to the use of force continuum. It was immediately added to the Recruit Basic Course, Supervisor, Watch Commander, and Command Development schools. The subject of use of force was added to roll call training and provided on a regular basis. |
| 1996 | The Department issued a training bulletin entitled "Use of Force-Baton Part II Crowd Management and Control". This bulletin became the document cited in training to describe the amount of force an officer is able to use during crowd control incidents. |
| 1998 | The mobile field force and crowd control course was added to the Recruit Basic Academy Course. |
| 2001 | The in-service mobile field force lesson plan was updated during a routine review and at that time the use of force section in the mobile field force lesson plan included a very brief section on use of force that stated that " there is no exception to the use of force policy during crowd control situations other than the reporting requirements." There was no further information documented in the lesson plan regarding details of the use of force policy or the appropriate application of baton strikes during crowd control events. There is no ability to now prove if any additional information was provided in the course regarding use of force, except through discussions with individuals who were students or instructors of the course. Additionally, the section of the course that pertained to the use of the baton during crowd control situations focused totally on technical skills. Therefore, from 2001 forward, the class discussion surrounding use of force at crowd control situations and the behaviors that allow for the use of the baton during crowd control incidents is complicated. In 2001, the settlement requirement in the *Crespo* v *City of Los Angeles* lawsuit *to* train officers on issues involving the media was added |

---

[60] LAPD Report to the Board of Police Commissioners: An Examination of May Day 2007, Appendix 2, pgs.87-89.

96

| | |
|---|---|
| | to the lesson plans. However, the detail in the lesson plans is insufficient to clarify what specifically, was taught to the students in these areas. |
| 2003 | Use of force was one of several topics covered in the in-service training program that all in-service sworn employees attended. In 2003 Metropolitan Division updated the mobile field force course and created a four, eight and ten-hour version for delivery on an "as needed" basis. At the request of the Office of Operations, Metropolitan Division modified the mobile field force training into a five-hour course that was combined with a five-hour course on immediate action and rapid deployment for a ten-hour training day. Combining the two courses was done to help with the growing concern over crime suppression and deployment demands. At this time, the focus of the training continued to be technical skill development due to the reduction in time allotted. When the lesson plan was modified to five hours, the use of force section and the media section were removed from the lesson plan. Metropolitan Division instructors voiced concerns about the inadequate time now allotted for the two vastly different subject matters. However, the training proceeded. It was also incorporated into the Supervisory Development School in 2003. The lesson plan did not cover three critical areas: use of force, when the use of the baton is warranted during crowd control situations, and, policy related to the media at crowd management incidents. The lesson plans clearly focus on techniques rather than policy. |
| 2004 | Amid rising concern over crime suppression and field deployment needs, much of the "non-required" training was scaled back at the request of Office of Operations. The chief of police supported the reduction of "non-required" training to allow for a strong focus on Consent Decree training compliance and crime suppression. Mobile field force training for in-service officers was not mandated by the Department or State and, therefore, was not a priority and was among the many training courses that were scaled back. |
| 2005 | The Office of Operations director halted the Basic Metro Course and scaled back Metropolitan Division's regularly scheduled monthly training from two days per month to one due to a growing concern over crime suppression. The cut back of training allowed for Metropolitan Division to be deployed in crime suppression details and assist other commands throughout the City. The Chief of Police approved the recommendation to scale back training with the understanding that the subject should be revisited periodically. By 2005, the information regarding the media policy was added back into the lesson plan during the annual update. Few officers or supervisors attended training conducted with this lesson plan. |
| 2006 | As the Department continued to struggle with more officers retiring than new hires coming into the Academy, mobile field force training was sidelined altogether. The Metropolitan Division Basic course remained shut down. |
| | **Miscellaneous Training Information MacArthur Park After Action Report 2007**<br>• To date (July 2007) every sworn employee in the Department had received training on the use of force policy on more than one occasion and had been trained on the techniques and appropriate use of the baton as it pertains to use of force policy.<br>• Traditionally, Metropolitan Division platoons were allowed two training days every four weeks - one firearms and one tactics. Since 2004, Metropolitan Division platoons were generally allowed to conduct one tactics training day and one firearms training day every four weeks, January through May, and only one training day, June through December. On several occasions the training day(s) were cancelled as a result of special assignments and/or pre-planned events. A review of the tactics training day topics generally focused on dignitary protection duties and other tactics not related to crowd control events. |

97

| History of Training Post 2007 May Day Report<br>Information based on documents provided by the LAPD for purposes of this report.<br>January 2021 | |
| --- | --- |
| 2007-2009 | Crowd Management/Crowd Control, 10-hours. Department-wide in which areas trained together with their commanding officers. Groups of over 150 personnel at a time would train thus being able to replicate actual field scenarios with large numbers of demonstrators. Over 9,500 personnel were trained. Incident command system and crowd management training occurred in the command staff quarterly training. |
| 2009-2012 | Multiple Assault-Counter Terrorism Action Capabilities, 10-hours. Department-wide in which large numbers of bureau personnel would train at one time thus being able to replicate actual field scenarios. All supervisors and command staff were required to attend. Over 9,100 personnel were trained. Incident command system and crowd management training occurred in the command staff quarterly training each year. |
| 2013-2014 | Some crowd management training was conducted through e-learning for line personnel. Incident command system and crowd management training occurred in the command staff quarterly training each year. Additionally, a program was introduced to address concerns over succession planning for command staff called Conversations in 21st Century Policing. These were seminars offered to all command level personnel and lieutenants in which panels discussed topics such as crowd management/facilitations, building community relationships, etc. This program appears to have been discontinued in 2015 without any documentation as to why. |
| 2015-2016 | Training Bureau planned a Department-wide rollout of mobile field force/crowd management training. However, when this plan discussed with executive staff the training was tabled per the Office of Operations assistant chief and the Chief of Police to address deployment needs and the rising concern over issues surrounding use of force, de-escalation, and crime trends. |
| 2017-2018 | Training Bureau again raised the issue of conducting Department-wide mobile field force/crowd control training with executive staff. At that time, a decision was made to take the eight-hour and 10-hour courses approved by the State and the Department and condense it into a four-hour block to accommodate other training needs. Over 9,200 personnel were trained. |
| 2019-2020 | Training Bureau again raised the issue of conducting Department-wide mobile field force/crowd control training with executive staff with no decision to plan for a Department-wide rollout in 2019. In 2020 the Covid-19 pandemic had engulfed the deployment needs of the Department and created restrictions on training. Therefore, most training was tabled. |

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

## IX.  Bibliography

37mm Foam Baton Black Powder Round Spec Sheet. Defense Technologies, December 30, 2020. www.defense-technologies.com.

40mm EXact IMpact Sponge Round Spec Sheet. Defense Technologies, December 30, 2020. www.defense-technologies.com.

Acohido, Byron. "Microsoft Engages Cybergang That Stole $500 Million, June 6, 2013. http://www.usatoday.com/story/cybertruth/2013/06/06/hackers-microsoft-fbi-citadel-botnet-500-million-robbery/2396693/.

Ahluwalia, Muninder K, and Laura Pellettiere. Sikh Men Post-9/11: Misidentification, Discrimination, and Coping. *Asian American Journal of Psychology* 1, no. 4 (2010): 303–14. https://doi.org/10.1037/a0022156.

Active Shooter Incident and Resulting Airport Disruption. Los Angeles World Airports, March 18, 2014.

CA Codes (Pen:830-832.17), 2014. http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=00001-01000&file=830-832.17.

CA Codes (Pen:833-851.90), 2014. http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=00001-01000&file=830-832.17.

California Penal Code Section 404 (2016) - California Codes. Accessed December 19, 2020. https://california.public.law/codes/ca_penal_code_section_407.

California Penal Code Section 409 (2016) - California Codes. Accessed December 19, 2020. https://california.public.law/codes/ca_penal_code_section_407.

California Penal Code Section 409.5 - California Attorney Resources - California Laws. Accessed October 1, 2020. https://law.onecle.com/california/penal/407.html.

Core Values of the LAPD - Los Angeles Police Department. Accessed December 21, 2020. http://www.lapdonline.org/inside_the_lapd/content_basic_view/845.

Crowd Management. Alexandria, Va: International Association of Chiefs of Police, April 2019. https://www.theiacp.org/sites/default/files/2020-08/Crowd%20Management%20FULL%20-%2008062020.pdf.

Deorle v. Rutherford, No. 99–17188 (United States Court of Appeals, Ninth Circuit March 26, 2001).

Emergency Operations Guide. Los Angeles Police Department, 2009.

Employment and History of the Bay Area Rapid Transit District Police Department, 2014. http://www.bart.gov/about/police/employment.

EMSI. History of ICS. Accessed December 19, 2020. http://www.emsics.com/history-of-ics/.

Hornets Nest Sting Grenade, .60 Cal. Rubber Balls, Produce Code ALSG10160. ALS, December 30, 2020. www.lesslethal.com.

Heal, Sid. *Concepts of Nonlethal Force: Understanding Force from Shouting to Shooting*. Brooklyn: Lantern Publishing & Media, 2020.

Hornets Nest Sting Grenade, .60 Cal. Rubber Balls, Produce Code ALSG10160. ALS, December 30, 2020. www.lesslethal.com.

AN INDEPENDENT EXAMINATION OF THE LOS ANGELES POLICE DEPARTMENT 2020 PROTEST RESPONSE

ICS Organizational Structure and Elements. Federal Emergency Management Administration, March 2018. https://training.fema.gov/emiweb/is/icsresource/assets/ics%20organizational%20structure%20and%20elements.pdf.

Lesson Plan:  Integrated Communications, De-Escalation and Crowd Control Expanded Course Outline. Los Angeles Police Department, October 16, 2018.

Los Angeles Police Department Use of Force Policy - Revised. Los Angeles Police Department, March 2017.

Managing Large Scale Incidents - Area Command, ICS 420-1.3, January 2020. https://firescope.caloes.ca.gov/ICS%20Documents/ICS%20420-1.3.pdf.

Manual of the Los Angeles Police Department. Los Angeles Police Department, Fall 2020. http://lapdonline.org/lapd_manual/volume_3.htm#794.10.

Mitroff, Ian I, and Ralph H. Kilmann. The Psychodynamics of Enlightened Leadership:  Cping with Chaos, 2020.

OVERVIEW OF LESS-LETHAL FORCE TOOLS AND DEPLOYMENT. Inspector General, Los Angeles Board of Police Commissioners, February 22, 2017.

Overview: The Incident Command System. Accessed December 15, 2020. https://www.nationalservice.gov/sites/default/files/olc/moodle/ds_online_orientation/viewf265.html?id=3139&chapterid=908.

American Legal Publishing Corporation. SEC. 103.111. PARADES AND ASSEMBLIES. Accessed December 22, 2020. https://codelibrary.amlegal.com/codes/los_angeles/latest/lamc/0-0-0-192090.

Supervisor's Field Operations Guide. Los Angeles Police Department, n.d.

The Mission Statement of the LAPD - Los Angeles Police Department. Accessed December 21, 2020. http://www.lapdonline.org/inside_the_lapd/content_basic_view/844.

TRAINING BULLETIN:  COMMAND AND CONTROL. Los Angeles Police Department, July 2018. http://lapd-lapd-assets.lapdonline.org/assets/pdf/tac-dir11-crowd-mgmt.pdf.

USE OF FORCE - TACTICS DIRECTIVE:  40mm LESS-LETHAL LAUNCHER. Los Angeles Police Department, July 2018. http://lapd-lapd-lapd-assets.lapdonline.org/assets/pdf/tac-dir11-crowd-mgmt.pdf.

USE OF FORCE - TACTICS DIRECTIVE:  BEANBAG SHOTGUN. Los Angeles Police Department, July 2018. http://lapd-lapd-lapd-assets.lapdonline.org/assets/pdf/tac-dir11-crowd-mgmt.pdf.

USE OF FORCE - TACTICS DIRECTIVE No. 6.3 BEANBAG SHOTGUN. Los Angeles Police Department, July 2018.

USE OF FORCE - TACTICS DIRECTIVE No. 11.1 CROWD MANAGEMENT, INTERVENTION, AND CONTROL. Los Angeles Police Department, October 2020. http://lapd-lapd-lapd-assets.lapdonline.org/assets/pdf/tac-dir11-crowd-mgmt.pdf.