Carol A Sobel SBN 84483
Weston Rowland SBN  327599
Law Office of Carol A. Sobel
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403
t. (310) 393-3055
e. carolsobellaw@gmail.com
e. rowland.weston@gmail.com

David Loy SBN 229235
Aaron R. Field SBN 310648
First Amendment Coalition
534 4th St., Suite B
San Rafael, CA 94901
t.(415) 460-5060
e. dloy@firstamendmentcoalition.org
e. afield@firstamendmentcoalition.org

Peter Bibring SBN 223981
Law Office of Peter Bibring
2140 W Sunset Blvd # 203,
Los Angeles, CA 90026
t.(213) 471-2022
e. peter@bibringlaw.com

Paul Hoffman, SBN 71244
Michael Seplow, SBN 150183
John Washington, SBN 315991
Schonbrun, Seplow, Harris, Hoffman
& Zeldes LLP
200 Pier Avenue #226
Hermosa Beach, California 90254
t.(310) 396-0731
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. jwashington@sshhlaw.com

Susan E Seager SBN 204824
Law Office of Susan Seager
128 N. Fair Oaks Avenue
Pasadena, CA 91103
t. (310) 890-8991
e. susanseager1999@gmail.com

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

LOS ANGELES PRESS CLUB,
STATUS COUP,

PLAINTIFFS,

v.

CITY OF LOS ANGELES, a municipal
entity,  JIM MCDONNELL, LAPD
CHIEF, sued in his official capacity;

DEFENDANTS.

Case No. 2:25-CV-05423-HDV-E

HON. HERNÁN D. VERA

**VOLUME SEVEN** OF PLAINTIFFS'
EXHIBITS TO' EX PARTE
APPLICATION FOR A TEMPORARY
RESTRAINING ORDER AND ORDER
TO SHOW CAUSE RE
PRELIMINARY INJUNCTION

1

# Exhibit 25

# LOS ANGELES POLICE COMMISSION

**BOARD OF
POLICE COMMISSIONERS**

———

**WILLIAM J. BRIGGS, II**
PRESIDENT

**EILEEN M. DECKER**
VICE PRESIDENT

**DALE BONNER
MARIA LOU CALANCHE
STEVE SOBOROFF**

———

**MARIA SILVA**
COMMISSION EXECUTIVE ASSISTANT II



**ERIC GARCETTI**
MAYOR

**RICHARD M. TEFANK**
EXECUTIVE DIRECTOR

**MARK P. SMITH**
INSPECTOR GENERAL

———

**EXECUTIVE OFFICE**
POLICE ADMINISTRATION BUILDING
100 WEST FIRST STREET, SUITE 134
LOS ANGELES, CA 90012-4112

———

(213) 236-1400 PHONE
(213) 236-1410 FAX
(213) 236-1440 TDD

October 1, 2021

BPC #21-178

The Honorable Eric Garcetti
Mayor, City of Los Angeles
City Hall, Room 303
Los Angeles, CA 90012

The Honorable City Council
City of Los Angeles, Room 395
c/o City Clerk's Office

Dear Honorable Members:

RE:    AFTER-ACTION IMPLEMENTATION PLAN.

At the special meeting of the Board of Police Commissioners held Tuesday, September 28, 2021 the
Board APPROVED the Department's report relative to the above matter.

This matter is being forwarded for informational purposes.

Respectfully,

BOARD OF POLICE COMMISSIONERS

*Maria Silva*

MARIA SILVA
Commission Executive Assistant

Attachment

c:  Chief of Police

## INTRADEPARTMENTAL CORRESPONDENCE

September 27, 2021

TO:      The Honorable Board of Police Commissioners

FROM:    Chief of Police

SUBJECT: AFTER-ACTION REPORT IMPLEMENTATION PLAN

### RECOMMENDED ACTION

1.  It is recommended that the Board of Police Commissioners ADOPT and APPROVE the attached After-Action Report Implementation Plan (AARIP), including the recommendations contained therein.

#### Background

Following the murder of George Floyd and the Civil Unrest in the City of Los Angeles in May and June of 2020, the Board of Police Commissioners established an Advisory Committee to review and report on the Los Angeles Police Department's (Department) policies, procedures, and practices. This led to the publication of the Board of Police Commissioners (BOPC) Advisory Committee's Report (ACR), released on May 21, 2021, which provided the Department with recommendations to maintain and enhance public trust through transparency and oversight. In addition to the ACR, the City, the BOPC, and the Department commissioned three other Safe LA After-Action Reports – all of which were reviewed and presented to the BOPC.

#### Board of Police Commissioners (BOPC) Direction

On April 13, 2021, the Department presented the three Safe LA After-Action Reports to the BOPC. In response, the BOPC directed the Department to prepare a more detailed report including those recommendations deemed appropriate and opine on the feasibility and value of the competing and complimentary recommendations found in the reports. Based on this direction, the Department developed the After-Action Report Implementation Plan (AARIP) contained herein.

#### Source Material

Source material for the AARIP includes the BOPC Advisory Committee Report, the National Police Foundation's After-Action Report, the Chaleff After-Action Report, and the Department's

864

The Honorable Board Police Commissioners
Page 2
1.3


After-Action Report, as well as additional information reviewed as needed by individuals, Advisory Committee members, and/or working groups.

## Approach

In creating the AARIP, the Department understood that it needed to involve a diverse group of voices, to ensure that BOPC, community, academic, and rank and file voices were all heard in the creation of the plan. It is of the utmost importance to the Department that this report is not one that sits on the shelf – rather, it is one that provides a roadmap for implementation and a thoughtful analysis of time, resources, and costs for each of the items. To ensure that this occurred, with the support of BOPC, the Department created an Advisory Committee and four working groups to draft the final AARIP.

### Role of the AARIP Advisory Committee

The purpose of the AARIP Advisory Committee is to allow for input and feedback from people and groups from outside the Department in the creation of the AARIP. The Advisory Committee convened to preview, review, critique, and discuss actionable items that the working groups provided. The final recommendations were reviewed and approved by the Chief of Police and forwarded to the BOPC.

The Advisory Committee was comprised of the following members:

- Assistant Chief Dominic Choi, Office of Support Services;
- Ms. Rasha Gerges Shields, Partner, Jones Day;
- Ms. Eileen Decker, Police Commission Vice President;
- Thomas A. Parham, Ph.D., President, California State University Dominguez Hills;
- Dr. Shindale Seale, CEO, SEADE Coaching & Consulting LLC;
- Luann Pannell, Ph.D., Director, Police Training and Education; and,
- Mr. Michael A. Lawson, President, Los Angeles Urban League.

### Working Group Creation and Charge

Based on the BOPC Advisory Committee Report and a review of the three Safe LA After-Action Reports, it was determined that all of the recommendations would be organized within four overarching categories:

- Community Relations and Trust Building
- Policy Development and Legal Considerations
- Training; and,
- Technology and Equipment.

865

The Honorable Board Police Commissioners
Page 3
1.3

Each Working Group was created with the following charge – that the working group include a diversity of voices and ideas of people who were willing to engage in dialogue on how to improve the Department and build trust with the community. Each group was assigned a Lead and Co-Lead, and the makeup of each Working Group included: a BOPC Commissioner, Department command staff, community member(s), academic(s), subject matter expert(s), a Los Angeles Police Protective League representative, and staff who would assist in drafting the reports. Over the course of four months the groups met regularly to review recommendations, reports, and Departmental data; discuss recommendations; and in some cases, observed training or equipment demonstrations to better understand the recommendations provided in the After-Action Reports.

The working groups were tasked with reviewing each recommendation within their purview (streamlined so that overlapping recommendations from multiple Safe LA After-Action Reports became one single recommendation) and opine on the feasibility of the recommendation, review the potential cost/resource impact, and determine a timeline for implementation.

The reports for each of the four working groups are included in this AARIP – and include a narrative of the working groups' area of focus, group makeup, and analysis of each recommendation with input from the Chief of Police and the Chief of Police Direct Reports.

## Recommendation Prioritization

One of the most difficult tasks given to each group was that of determining which projects were feasible and then determining the priority of each item within the working group. Ultimately, a rank-in-order prioritization was decided to be an inadequate way to address the recommendations since a good number were deemed to be high priority. Rather, the groups reviewed the recommendations and determined the timeframe for implementation. In some cases, recommendations had already been implemented or were currently being implemented. In other cases, there were pieces that need to be put into place before the item could be implemented – for instance, items that required the procurement of technology or equipment. Finally, other recommendations have an inherent long-term time frame, based on the logistics for implementation – for instance, the creation of a new program and the additional training requirements for all sworn officers, etc. All aspects taken into consideration were included in the final reports, providing the BOPC a realistic timeline for implementation of the recommendations.

## Associated Costs

In some cases, the recommendations included within the AARIP have a cost associated with the item. Costs are _only_ included when the projected expense to implement the recommendation is not currently included in the LAPD budget, and the recommendation cannot be implemented with existing resources. In cases where existing resources are available to implement the program, the cost is considered to be zero – though it is understood that in any situation where existing resources are reassigned, there is an associated cost.

866

The Honorable Board Police Commissioners
Page 4
1.3

The costs for each working group are:

Community Relations and Trust Building – Total $899,201

- $338,659- Provide the Diversity, Equity, and Inclusion Officer (DEIO) with additional
  personnel - (1) Management Analyst, (1) Police Officer III, and (1) Police Officer II to
  support the research, correspondence, and project oversight necessary for committee and
  DEIO functions.
- $560,542 - Provide Public Engagement Unit with (2) additional PO III+1 positions to
  bolster engagement efforts.

Policy Development and Legal Considerations – Total $850,980

- $10,000 - Signage for four geographic bureaus and the Department Operations Center.
- $348,130 - (1) Sergeant II authority for Military Liaison Section to assist with the
  National Guard.
- $492,850 – Overtime funds to address field jail training for 500 personnel.

Training – Total $12,559,066

- $5,485,931- Mobile Field Force Cadre - (1) Sergeant II, (15) Police Officer III's.
- $3,817,125 – Overtime funds to train 4,875 personnel for one nine-hour training day (half
  of the Department per year).
- $461,850 - Less-lethal munitions for training.
- $75,000- Hydra Suite Software/Hardware purchase and upgrade.
- $2,073,215 - Hydra Cadre- (1) Sergeant I, (5) Police Officer III's.
- $108,000 - 200 cell phone monthly subscriptions for shadow team members.
- $439,945 - (1) Police Psychologist for employee mental health support.
- $20,000 - Funds for LAPD family day events.
- $78,000 - Trauma and Emergency Medical Technician (EMT) kits.

Technology and Equipment - Total $4,127,852[1]

- $1,500,000 - Department personnel tracking technology.
- $450,000 – Social media software.
- $2,041,852 - (4) Police Officer II's and (4) Crime and Intelligence Analysts for social
  media officers (one each per geographic bureau).
- $6,000 - Funds for 40 medical examinations per year for commercial driver certification.

---

[1] All software acquisitions will be subject to specific guidelines for the adoption of new technology. The specific
guidelines are currently being developed at the recommendation of the ACR.

867

The Honorable Board Police Commissioners
Page 5
1.3

- $100,000 - Fund for emergency food costs for personnel during critical incidents.
- $30,000 - Protective eye wear.

This proposal includes $4,309,975 for overtime for 49,540 student training hours for mobile field force and field jail training. Overtime can be utilized to backfill personnel from operations so there is not a negative deployment effect from personnel attending training. This proposal also includes 13,310 student training hours at a cost of $771,980, that will be absorbed into the regular training, if this proposal is accepted.

The 13,310 student training hours includes:

- Less-lethal device re-certification - 4,875 personnel for two hours;
- Shadow team training - 200 personnel for eight hours;
- Incident management team training - 80 personnel for eight hours;
- Videographer Training - 40 personnel for one hour; and,
- Less-lethal enhanced training - 320 personnel for four hours.

**Changes in Cost Projections**

It should be noted, this report projects a much smaller cost for implementation, as the first review and presentation to the BOPC counted all costs – even if the resources were currently available – which led to the initial assessment of $66,781,453. In the attached AARIP, if all recommendations are implemented, the projected cost would be $18,437,099. This represents a $48,344,354 reduction in cost projections from the first review and presentation to the BOPC.

**Implementation Strategy**

After final direction is given by the BOPC, the Department will work to implement the recommended actions, looking at short-, medium- and long-term projects. The four working groups will continue to convene to track progress, trouble-shoot problems, and ensure continued progress on all initiatives. Overall, the implementation strategy is designed to be more than a traditional project. In holding work status meetings, the team can address issues collectively, remain on task, and reduce potential work redundancies. Updates on the progress of the AARIP will be given to the BOPC every six months.

If you should have any questions regarding this matter, please contact the Office of Support Services at (213) 486-8410.

Respectfully,

MICHEL R. MOORE
Chief of Police

BOARD OF
POLICE COMMISSIONERS
Approved By *September 28, 2021*
Secretary *Maria Silva*

# COMMUNITY RELATIONS & TRUST BUILDING

As part of the Department's After-Action Report Implementation Plan, the Community Relations & Trust Building Working Group was created and tasked with addressing seven of the recommendations stemming from the National Police Foundation's After-Action Report.  The working group undertook the task in partnership with stakeholders who maintain deep ties to the neighborhoods and segments of the broader Los Angeles community that experience some of the highest rates of law enforcement contact.  Due to their positions within City government, non-profit organizations, and community groups, the selected stakeholders were able to represent the voice of the community as the working group developed actionable responses to the recommendations.  The value of their insight cannot be overstated, and the Department is immensely grateful for their continued support.

### Board of Police Commissioners Advisory Committee's Report Recommendations

The Board of Police Commissioners established an Advisory Committee review and report on the Department's policies, procedures, and practices.  This led to the publication of The Board of Police Commissioners Advisory Committee's Report (ACR), which also provided the Department with recommendations to maintain and enhance public trust through transparency and oversight.

The recommendations contained in the ACR spanned the areas of Recruitment and Hiring, Training, Bias-Free Policing, Data and Technology, the Disciplinary Process and Work-Place Incentives/Retention.  These recommendations represent overarching philosophies in addition to directly actionable items, and as such will need a longitudinal approach to address.

Of the several recommendations from the ACR, the Community Relations & Trust Building Working Group placed primary focus on:

- Ensure there is a common understanding and appreciation of the community policing concept throughout the Department, which includes building relationships and solving neighborhood problems.  Community policing should be infused throughout the culture and organizational structure of the organization.
- Disseminate information to the public about policing policies, recruitment, procedures for complaints/commendations, and the rights and responsibilities of community members and officers in interactions with each other.

These two recommendations prove to be the cornerstone of community policing and community engagement.

869

## WORKING GROUP COMPOSITION

Police Commission Representative                    Commissioner Maria Lou Calanche
Chairperson                                         Deputy Chief Emada Tingirides

**Department Partners**
Department Homeless Coordinator, Office of Operations         Commander Billy Brockway
Chief Police Psychologist, Behavioral Science Services              Dr. Edrick Dorian
Diversity, Equity, and Inclusion Officer                       Commander Ruby Flores
Assistant to the Director, Office of Operations             Commander Scott Harrelson
Public Information Officer, Media Relations Division               Captain Stacy Spell
Public Engagement Section, Office of Operations                Sergeant Luq Watkins

**Community Partners**
Founder and CEO, Ignited Light                             Dr. Cassandra L. Bailey
Field Deputy, Council District 8 &
Community Safety Advisory Council Member                        Isaias Benavides
Senior Pastor, Hope Central Watts                          Pastor Jose Hernandez
District Office Director, Council District 8            Fernando Montes-Rodriguez
Founder and CEO, Game Changer                                    Sean Sheppard

### PRIORITIES

After reviewing each of the recommendations and the related reports they were drawn from, the working group elected to cluster the recommendations into three categories.  This decision was made after concluding that many of the proposed actions were interconnected with one another and collectively served to advance more comprehensive concepts.  The selected categories were (in priority order):

- Effective Community Engagement
- Support of First Amendment Assemblies
- Enhanced Employee Wellness.

The order in which the categories appear reflects what the working group determined would have the greatest positive, long-lasting impact on the communities the Department serves.  We believe the narrative that follows will support the intentionality of this priority order, while also demonstrating a commitment to carrying out all three categories.

> **Note:**  A fourth priority appears on the matrix.  The recommendations under this priority were determined to be infeasible at this time.

**Document and Matrix Formatting:**  This document should be reviewed in conjunction with the attached matrix.  Justifications for the staffing requests and anticipated costs that appear in the matrix can be found under the corresponding narratives that appear in the remaining segments of this document.

870

**PRIORITY ONE
EFFECTIVE COMMUNITY ENGAGEMENT**

**After-Action Report Recommendations**

1. **National Police Foundation – Recommendation 5.1.2.**  *LAPD should continue to invest in community policing efforts, including engaging one-on-one or in small groups to build relations and obtain feedback from communities in each bureau.*

2. **National Police Foundation – Recommendation 5.1.3.**  *LAPD should continue to engage in C-PABs, BID meetings, and other community engagement opportunities to provide the community a voice and meaningful involvement in how its police department operations – including strategic hiring and promotions, training, policy development, and other activities to improve community-police relations.*

**Response.**  The Department maintains a number of community engagement entities and assignments, each of which uses one-on-one and small group meetings to build relationships and obtain feedback from communities.  The Department should establish a committee to ensure the varied community engagement meetings and other related engagement efforts are successfully utilized to integrate community voice into Department operations.

**Rationale.**  Presently, the Department's community engagement is carried out by multiple entities – the Community Relations Section, the Community Safety Partnership Bureau (CSPB), and the Office of Operations via Public Engagement Section (PES), Area-level Community Relations Officers, Area-level Senior Lead Officers (SLOs), and Community Liaison Officers assigned to Area Gang Enforcement Detail (GED) units.  There is limited coordination across entities and no organized means of capturing the community feedback so that the Department can take timely, appropriate action.  To address this issue, as well as support the tremendous commitment the personnel in community engagement assignments exhibit, the Department should establish the Community Engagement Best Practices Committee (Committee).

Community Engagement Best Practices Committee.  Because the greatest number of personnel dedicated to community engagement are assigned to the Office of Operations, the Director, Office of Operations, or their designee, will serve as the Committee's chairperson.  The chairperson will be supported by the Commanding Officer, CSPB, and the Department's Diversity, Equity, and Inclusion Officer (DEIO), or their designees.  Their inclusion on the Committee will aid in the integration of Community Safety Partnership values and practices throughout all areas the Committee addresses as well ensure the Committee's actions advance the Department's diversity, equity, and inclusion (DEI) goals.

The Committee will also include representatives from the existing community engagement entities across the Department.  These personnel will be utilized in a manner similar to a Single Purpose Innovation Group (SPIG) to provide firsthand experience and insight as the Committee addresses a variety of matters.  To ensure all Department training is in alignment with emerging

871

best practices, Training Bureau should also have representation on the Committee.  Lastly, the
Committee should also have permanent positions for a Commissioner and community
stakeholders with a background in trust and relationship building.  Additional members with an
expertise related to a particular initiative the Committee is undertaking can be added as such
situations arise.

At its onset, the Committee will be tasked with:

- Crafting a Department mission statement and objectives for community engagement;
- Codifying broadly applicable best practices for community engagement;
- Reviewing existing community engagement notices and orders to ensure they are in
  alignment with the community engagement mission, objectives, and best practices;
- Developing a means for maintaining and expanding the capacity building training
  currently being provided to SLOs via a partnership between Commissioner Calanche and
  the Office of Operations.  The final plan should be crafted in concert with Training
  Bureau and should include a course outline and the establishment of an instructor cadre to
  preserve the integrity of the coursework over time;
- In conjunction with Training Bureau, assessing existing Department training to determine
  where community engagement best practices can be most appropriately incorporated;
- Cataloging the existing community meetings across all Department entities.  Reporting
  should be inclusive of the meetings' frequency, the segment(s) of the community
  reached, the number of community participants, and the current means of capturing
  community feedback;
- Where it does not exist, making recommendations for how specific community meetings
  can capture community feedback;
- For those entities with Citywide functions, establishing a means for collecting, reviewing,
  and disseminating community feedback to the appropriate Department entity so that they
  may act on it;
- Determining if there are gaps in our community engagement and making actionable
  recommendations to address the identified need; and,
- Making recommendations for systems of accountability within the Department to ensure
  community engagement objectives and best practices are being carried out.

**Community Benefit.**  A complete assessment of the Department's community engagement
practices will ensure each meeting and engagement initiative is purposeful, is providing a needed
and effective means of reaching the community where it is implemented, is creating a feedback
loop between the Department and the community, and is maximizing the available resources.

**Cost/Staffing Explanation.**  If there is support for establishing the Committee, many of the
administrative tasks related to internal information gathering can be projected out through the
Office of Operations and managed by personnel assigned to PES.  The demands of the
Committee will likely exceed what can be accomplished by PES without creating an undue
burden on its personnel.  It is thereby recommended that the DEIO receive (1) Management
Analyst, (1) Police Officer III, and (1) Police Officer II position authorities to support existing
organizational demands on the DEIO as well as complete the following tasks critical to

872

increasing the effectiveness of the Department's community engagement meetings and initiatives:

- Capturing and evaluating the feedback provided during Committee meetings;
- Completing timely and comprehensive reports related to the Committee's recommendations;
- Researching the existing Department notices, orders, and best practices documents related to the various community engagement meetings;
- Conducting outreach to other agencies regarding their best practices;
- Authoring appropriate internal documents to codify best practices; and,
- Working in conjunction with Grants Section to submit relevant applications to support these and other ongoing mandates of the DEIO position.

Each of the personnel assigned to work under the DEIO's command should also receive specific training related to DEI principles. This training will enhance their ability to complete all assigned tasks through a DEI lens and thereby bring their resulting work product in greater alignment with the recommendations that contributed to this implementation plan.

**Timeline.** If the proposal is adopted, the work of the Committee can begin as the requested staffing additions are filled. The specific timeline for the full implementation of the stipulated Committee tasks will remain undetermined until the Committee chairperson can craft an initiative-specific strategic plan that takes into consideration the increased workload resulting from the other Department commitments created through this After-Action Report Implementation Plan process. Should this proposal be adopted, it should be done so with the intention of all elements taking no fewer than two years to implement.

**PRIORITY TWO**
**SUPPORT OF FIRST AMENDMENT ASSEMBLIES**

**After-Action Report Recommendations**

1. **National Police Foundation – Recommendation 5.1.1.** *LAPD should continue to identify opportunities to engage community members—particularly those community members and leaders likely to organize and participate in First Amendment assemblies and mass demonstrations – in the preparation and training process.*

2. **National Police Foundation – Recommendation 5.2.2.** *Each LAPD bureau should continue to identify opportunities to engage community members—particularly those community members and leaders likely to organize and participate in First Amendment assemblies and protests in their area – in the preparation and training process.*

873

3. **National Police Foundation – Recommendation 1.2.3.** *LAPD should consider developing special unit(s) to establish contact with activists and demonstrators before, during, and after protests.*

**Response.** The Department should augment the duties and responsibilities of the Public Engagement Unit (PEU) to support the specific task of establishing contact with activists, demonstrators, and those likely to engage in First Amendment assemblies before, during, and after protests.

**Rationale.** The PEU falls under the Office of Operations' Public Engagement Section (PES). The PEU, which has position authorities for one supervisor and four Senior Lead Officers (SLOs), regularly creates forums where community members can gather and participate in facilitated dialogue with police officers. The PEU's various initiatives are implemented in partnership with well-established non-profit organizations, such as the Institute for Non-Violence in Los Angeles (INVLA). Because of their Citywide mission and expertise in one-on-one and small group community engagement, the PEU is uniquely suited to meet these recommendations.

Engagement Before First Amendment Assemblies. The Days of Dialogue program has been a key community engagement tool for PEU for five years. The forums are hosted in partnership with INVLA. In 2019, PEU held 16 Days of Dialogue forums where they invited community members to join officers in facilitated dialogues designed to foster mutual understanding and encourage civic engagement as a means of effecting change. Post dialogue surveys administered by INVLA demonstrated a measurable positive shift in participants feelings toward officers and overall desire to take part in further conversation about matters central to enhancing community safety and police legitimacy.

Though these proactive engagements are an effective tool with community members who are hesitant to speak directly with officers, they have limited impact on the dynamics between the Department and several of the community organizers and grass roots organizations with the greatest voice. This is due, in part, to the stated unwillingness of some groups and community leaders to come to the table.

Where those groups or individuals remain steadfast in their position to not sit down directly with the Department, the Department should seek out persons or organizations that can serve as neutral intermediaries. The purpose of using intermediaries should not be to compel the activists and demonstrators to change their position about the Department. Using the intermediaries in that manner will diminish trust and break whatever tenuous relationship they are able to forge. Instead, the intermediaries should be used to relay the Department's timely response to the groups' or individuals' specific concerns.

Pursuing this means of engagement will need to continuously be evaluated to ensure the frequency of its use is not creating an undue demand on Department administrative personnel or the personnel of the intermediary organization. Similar attention should be given to the impact of this initiative on partner organizations who are willing to interact with the Department using more traditional means. Those partners must never feel their needs and concerns are given less standing because they are willing to engage with us directly.

Page **6** of **9**

874

<u>Engagement During First Amendment Assemblies.</u>  During the Safe LA operation, PEU officers and their supervision were deployed to some of the protests in front of the Police Administration Building.  They used their expertise to engage community members at the assembly in "conscious conversations."

Conscious conversations are spontaneous break-out sessions that allow officers and community members to dialogue with one another and take the critical first steps in developing a shared understanding of one another's experiences and viewpoints.  After the conversation reaches its natural conclusion, the community member rejoins the assembly.  Provided they were willing to share their contact information with the officer, a member of PEU follows up with the community member within 30 days to continue the dialogue and provide feedback on any concerns or questions that emerged during the initial meeting.

The PEU should be tasked with codifying the best practices for this type of spontaneous engagement.  The practices should be reviewed by their chain of command and evaluated for officer safety, efficacy, and, if determined to be effective, means of strengthening the impact of this type of deployment during First Amendment assemblies.

<u>Engagement After First Amendment Assemblies.</u>  In addition to the Days of Dialogue program, PEU is also in the process of implementing the Community Interactive Initiative, Mobile Force Option Simulator (M-FOS).  The M-FOS is a deployable tool that will be used to engage and educate the public about use of force experiences through virtual law enforcement scenarios.  The scenarios the community members participate in help them to understand the split-second decisions that officers are frequently called on to make.  They also establish a cursory knowledge of the tools officers have at their disposal and how they can be deployed.

Following the scenarios, community members move to break out sessions with officers.  By taking part in these virtual scenarios, community members are able to have more informed discussions about how they would like to see officers act in similar circumstances.  The intention of this program, like all other forms of community engagement PEU implements, is not to change the minds of participants.  Instead, its focus is on creating beneficial pathways to address the fears and concerns of the public.

The Community Interactive Initiative grant request for the procurement of the M-FOS system and the related equipment required for its deployment was approved by both the Board of Police Commissioners and the Los Angeles City Council.  The Assistant Officer in Charge, PES, is currently overseeing the final steps of the procurement process.

**Community Benefit.**  More effectively engaging community members likely to participate in First Amendment assemblies has the potential to create channels of communication that allow the Department to be a partner in facilitating safe, lawful gatherings.

**Cost/Staffing Explanation.**  If there is support for advancing each of these initiatives, PEU will require additional staffing.  It is recommended that the unit receive (2) SLO position authorities to increase the frequency with which they can host Days of Dialogue forums, provide adequate

875

personnel for the regular deployment of the M-FOS, as well as support responses to First Amendment assemblies.

**Timeline.**  It is anticipated that codifying best practices for engagement during First Amendment assemblies and cultivating intermediaries for engagement ahead of assemblies with difficult to reach groups will take approximately six months.  This timeline is based on the need for internal review of the best practices from a legal, tactical, and community engagement standpoint.

**PRIORITY THREE**
**EMPLOYEE WELLNESS**

**After-Action Report Recommendations**

1.  **National Police Foundation – Recommendation 4.4.1.**  *Recognizing the impact of COVID-19; extended shifts and cancelled days; violence directed at officers; threats to their families; highly charged rhetoric; and loss of public trust and confidence—LAPD leadership, in particular, as well as elected officials and the LA community should recognize the importance of supporting officers and their families during this challenging period.*

**Response.**  The Department will continue to implement a variety of modalities to engage personnel in conversations concerning their mental well-being.  It will also continue to offer counseling to employees and their significant others via the Department's Behavioral Science Services (BSS).

**Rationale.**  Established in 1968, BSS provides services across four major domains – intervention, assessment, operational support, and organizational consultation – to support law enforcement personnel at all levels of the Department.  Perhaps most significantly, officers and their significant others are eligible to receive individual and relationship counseling through BSS.  By extending their mental health services beyond the officer to their significant other, the psychologists are able to impact family units and offer meaningful guidance on stressors that often originate at work but manifest themselves in the home environment.

To support the specific wellness needs that emerged during 2020, BSS personnel implemented:

- Webinar-based training on the possible negative effects of the crisis in policing and how to protect against them; and,
- Consultation to Department leadership on the impact of the crisis in policing on officers and leadership strategies they could employ to improve officer morale and well-being.

There is an opportunity to increase the direct services to law enforcement families by also offering limited psychological and counselling services to children of Department personnel.  This expansion of services, however, must be done with the understanding that it will fundamentally change the nature of the practice within BSS.  New psychologists with a classification and training specific to children and adolescents will need to be hired and added to the existing BSS team.  Dr. Dorian has shared the concern that the desire for such services may

876

far exceed the number of psychologists the City is willing to hire, and additional funding would be required to support the many logistical and equipment needs necessary to house and provide competent child psychological services. Thus, an alternative approach could be established to fund and support contractual services with community-based child and adolescent therapists who can be trained and vetted by BSS to ensure their law enforcement-related cultural competency. Lastly, as an intermediary measure, the existing BSS team can offer indirect services by providing training to parents and family orientations to children and adolescents that assist them in navigating some of the difficulties that can arise as a result of being a law enforcement family.

The BSS team will continue to assess the conditions under which officers operate to determine how best to augment existing services and develop new ones that support officers' overall well-being.

In conjunction with assessing the services provided, the BSS team will also continually evaluate their staffing levels to determine if they are sufficient to meet employees' and their family members' needs. At the present level of service offerings, BSS is in need of two administrative personnel to support their existing staff.

**Community Benefit.** Addressing employee wellness has an immeasurable indirect benefit to communities. The stressors that are inherent to the law enforcement profession have the potential to become the catalyst to a number of unhealthy behaviors in officers. These unhealthy behaviors can manifest themselves in the workplace and during contacts with members of the public through increased aggression, reduced empathy, and lowered overall resilience. The mental health services offered by BSS are a vital component of the Department's commitment to developing and maintaining a workforce that is capable of entering chaotic situations and acting as the first step in helping to make individuals, families, and communities whole again.

**Cost/Staffing Explanation.** There is currently only one person within BSS who does not perform clinical work and can assist with the administrative tasks needed to support the office. The lack of administrative personnel reduces the responsiveness to requests for appointments and leads to fewer clinical hours being offered due to psychologist losing portions of their day to work that would be more efficiently completed by dedicated office personnel. It is thereby recommended that BSS be allowed to fill the two existing vacant position authorities for administrative support personnel. The cost and staffing for this will not be included in our request, as the funding of the staffing here will not solely go toward these AARIP employee wellness initiatives.

**Timeline.** Providing the additional administrative staffing can be achieved within two to three deployment periods DPs of the recommendation being approved, depending on the timing of the position advertisements and related personnel transfers.

# Board of Police Commissioners Advisory Committee Recommendations
## Community Relations and Trust Building

## RECRUITMENT AND HIRING

- ## Diversity, Equity, and Inclusivity Policy/Guidelines

  Develop and implement a robust diversity, equity and inclusivity policy and guidelines that reflect current best practices to create a diverse workforce, reflecting the broad range of diversity in Los Angeles to include race, gender, language, life experience and cultural/ethnic background. As consistent with California law, the guidelines should include ways to:

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Recruit individuals who reflect the community they serve. | Yes | | In-progress, however:<br>• The Department does not capture persons from "two or more races."<br>• Achieving gender parity will prove challenging. |
| Prioritize the recruitment of applicants from historically underrepresented groups in policing, e.g., female, applicants of color, and LGBTQIA+. | Yes & No | Specific to LGBTQIA+ candidates: The Department does not request identification nor track sexual orientation. | In progress. Current focus on African Americans, Asian American/Pacific Islanders, and women.<br><br>DEI is supporting Recruitment and Employment Division (RED) with its 30x30 initiative to recruit women. |
| Develop effective strategies that:<br>■ *Leverage police officers' community relationships to more effectively recruit from underrepresented communities.*<br>■ *Ensure all images associated with recruitment campaigns highlight the racial, ethnic, and gender diversity of the workforce.* | Yes | | In progress<br>• Active collaborations with employee and community organizations, colleges and universities, military and faith-based institutions.<br>• Advertisements and social media posts spotlight diversity amongst officers |

878

879

## Board of Police Commissioners Advisory Committee Recommendations
## Community Relations and Trust Building

| | | |
|---|---|---|
| • Continue to collaborate with leaders in the community and reach out to colleges, community associations, faith-based organizations, military associations, and affinity groups to recruit diverse applicants.<br><br>• Evaluate the Historically Black Colleges and Universities (HBCUs) outreach and its effectiveness as a recruitment vehicle, and whether this outreach resulted in positive exposure to the LAPD.  Determine whether this recruitment effort is achieving the desired recruitment results as well as whether HBCU students found the exposure to the LAPD to be positive and worth the continued investment.<br><br>• Expand the use of influencer campaigns to recruit candidates from diverse or underrepresented populations.<br><br>• Focus on recruiting groups that are currently underrepresented in the LA Cadet program to join the program.<br><br>• Continue to conduct seminars with a focus on attracting candidates from underrepresented groups, such as from Black, Asian/Pacific Islander, female, and LGBTQIA+ demographics. | | In progress<br><br>• Active collaborations with employee and community organizations, colleges and universities, military and faith-based institutions<br><br>• In September of 2019, a team of RED personnel visited three HBCUs. Many candidates experienced hardships in moving forward with the process due to work, school, or other obligations and the expense to travel to Los Angeles.  RED is strategizing to strengthen relationships, overcome objections, and ease the path from HBCU to LAPD.<br><br>• In collaboration with Personnel Department, Public Safety Bureau, RED has participated in current and past influencer campaigns.  There are ongoing efforts to initiate new campaigns.  Several that are pending negotiations include – John Boyega, Steve McQueen, Chloe Kim, Taylor Rapp, and Chiney Ogwumike.<br><br>• RED manages the Associate Community Officer Program which serves as a bridge to transition LAPD youth program participants to become successful in their quest to become Los Angeles Police Officers. |

# Board of Police Commissioners Advisory Committee Recommendations
## Community Relations and Trust Building

| Recommendation | | | Status |
|---|---|---|---|
| Expand the hiring of female officers to help achieve gender parity and balance consistent with the Department's Strategic Plan. <br> ■ *Develop effective strategies to recruit women and increase their representation, including the use of those strategies mentioned above.* <br> ■ *Measure and publicly report on a regular basis the successes and challenges of achieving gender parity.* | Yes | | In progress and standard practice <br> • COMPSTAT inspections are reported publicly as well as frequent public reports to the BOPC on gender parity successes and challenges. <br> • RED has historically provided quarterly recruitment and hiring updates through the Blake-Justice Consent Decree and Board of Police Commissioners updated fact sheet. <br> • Future hiring seminars: <br> African American – Thursday, 8/26 <br> Hispanic Heritage – Thursday, 9/23 <br> Women – Thursday, 10/21 <br> General – Thursday, 11/18 <br> Info Seminar – Thursday, 12/16 |
| Expand the hiring of candidates from underrepresented groups, such as Black, Asian Pacific Islander and LGBTQIA+ officers consistent with, and in addition to, LAPD's Strategic Plan. <br> ■ *Develop effective strategies to recruit minorities, including those strategies mentioned above.* <br> ■ *Measure and publicly report on a regular basis the successes and challenges of achieving greater ethnic group diversity.* | Yes | | In progress and standard practice |
| Provide mentoring and test preparation assistance, where feasible, to support all | Yes & No | Specific to matching all recruits with a mentor: | Standard practice for all other recommendations |

880

**881**

# Board of Police Commissioners Advisory Committee Recommendations
## Community Relations and Trust Building

| Recommendation | Status | Notes |
|---|---|---|
| candidates during the recruitment and hiring process.<br>• Ensure that all recruits are matched with a mentor and, if requested, with a mentor with similarly diverse background and experiences during the recruiting process.<br>• Provide exam testing seminars and mock interviews.<br>• Ensure the recruitment dashboard is easily accessible, understandable, and user-friendly for the applicants.<br>• Explore alternatives if a hiring practice, e.g., written, oral and/or physical tests, disproportionately disqualifies applicants of color, women, or other underrepresented groups.<br>• Publicly report this data. | | There are over 5,000 candidates in the hiring pool, with an additional 500 plus candidates added per month. Generally, there are 12 Recruiters/Advisors at RED to provide mentorship to candidates. |
| Continue to recruit diverse candidates to serve as Reserve level 1, 2 and 3 police officers. | Yes | |
| Continually evaluate the drop-out rates during both the hiring and academy training processes, particularly for candidates of color, women, LGBTQIA+, or other underrepresented groups.<br>• Collaborate with internal staff, community leaders and civil rights experts to help understand and minimize minority attrition. | Yes | In progress<br>A think tank of community leaders and stakeholders are solicited for advice and recommendations regarding diversity, equity, and inclusion on recruitment and hiring, including attrition of candidates. |

# Board of Police Commissioners Advisory Committee Recommendations
## Community Relations and Trust Building

882

| | | |
|---|---|---|
| • *Publicly report this data on a regular basis.* | | |
| Seek candidates in the hiring process who are likely to police in a fair, impartial and unbiased manner by identifying those who have a facility for, and positive interactions with, people from diverse cultures and backgrounds | Yes | Standard practice |
| Establish guidelines during the hiring process that will take into consideration aspects of cultural sensitivities such as the candidate's socio-economic conditions, lived experiences, and resiliency. | Yes | Standard practice |
| Review and refine the Department's Diversity Campaign with the Diversity Task Force to ensure it has specific, identifiable goals to assist in creating and maintaining a more diverse workforce. Such goals should include:<br><br>• *Evaluate trends and strategies for recruiting diverse candidates and preventing attrition.*<br>• *Develop additional strategies for outreach.*<br>• *Review hiring paradigm to reduce processing times.*<br>• *Ensure that individual candidates are receiving needed support through the hiring process.* | Yes | RED constantly monitors progress made toward goals, develops new strategies to reach prospects, and keeps in contact with candidates in an effort to strengthen the diversity and quality of the candidates appointed to the Academy. |

883

# Board of Police Commissioners Advisory Committee Recommendations
## Community Relations and Trust Building

| | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| • *Ensure goals noted above are actively addressed and achieved.* | | | |

• **Community Outreach and Engagement**
Seek community input from civil rights and community leaders, among others, regarding recruitment and hiring practices to ensure that they reflect community values.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Seek community and officer input when assessing staffing needs, identifying unfilled vacancies, and adjusting staff numbers based on projected population changes in the community. | Yes | | Standard practice |
| Assess recruitment outreach strategies and campaigns to ensure that they:<br>■ *Reflect the mission of serving the public with a police force that mirrors the diversity of the residents it represents.*<br>■ *Reach the broadest potential pool of applicants, with a focus on the target population, to attract high-caliber candidates. Some examples include:*<br>  ○ Evaluate the effectiveness of current advertising tactics and partnerships. | Yes | | Standard practice |

# Board of Police Commissioners Advisory Committee Recommendations
## Community Relations and Trust Building

884

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| ○ Examine engagements with outside experts to determine if effective.<br>○ Expand in-person recruitment opportunities.<br>Continue to develop community recruitment pipeline programs, including the following:<br>▪ *Create youth advisory boards in various communities, including communities of color, and receive their input, feedback, and suggestions about recruitment and hiring in those communities.*<br>▪ *Work closely with the Los Angeles Community Colleges' communities to further develop the Associate Community Officer Program (ACOP) to encourage young people from the community to look upon the LAPD as a desirable and fulfilling career in line with the recruitment messaging mentioned herein.* | Yes | | In progress<br>• RED, in partnership with Personnel Department, has held focus group session with members of the targeted diversity youth.<br>• Currently, ACOP's requirement is for program candidates to be former LAPD youth program participants only; however, in an effort to create opportunities for greater diversity inclusion, an expansion of pathways to the ACOP has been developed and is currently in the review process with Personnel Department. |

- **Guardian Mindset and Community Focus**

Embrace the "guardian mindset" and advance a community-centered culture to attract applicants of all backgrounds. Emphasize the "guardian mentality" in hiring, as opposed to the perceived "warrior mentality."

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Ensure the imagery in recruitment materials, job postings, and advertisements emphasize | | | Standard practice |

# Board of Police Commissioners Advisory Committee Recommendations
## Community Relations and Trust Building

| | | |
|---|---|---|
| the service and guardianship nature of the profession, as opposed to the militaristic/crime-fighting image, as these images can shape the community's stereotype of law enforcement. | | |
| Encourage and support community/relationship-based policing for all officers at all levels. Include in recruitment and ongoing, activities, events, and opportunities within the community, where residents positively interact with officers out of uniform and observe them on a human level engaging with the community. | Yes | |
| Develop software to help track the officers' community engagement/interactions, e.g., provide a disposition code in the vehicle mobile data computer that allows officers to input community interactions. | Yes | |
| Utilize community engagement as a factor in the hiring and promotion of officers. | Yes | Standard practice |
| Focus on hiring officers who have a direct connection to the Los Angeles community and have a community-focused approach to policing based on their background and experiences.  Enhance the hiring practices and screening protocols to help identify the following: | Yes | Standard practice |

885

# Board of Police Commissioners Advisory Committee Recommendations
## Community Relations and Trust Building

- **Enhance Transparency and Trust**
  Disseminate information to the public about policing policies, recruitment, procedures for complaint/commendation, and the rights and responsibilities of citizens and officers in interactions with each other.

    - *Individuals who are joining the force because of a shared value for community, safety, and collaboration.*
    - *Individuals who understand the intersection between oppression, systematic racism, and violence.*
    - *Individuals who have an eagerness to learn and grow.*

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Continue to promote information to help make the community aware of the Department's training, actions, and publicly available reports, e.g., The Annual Use of Force Report. | Yes | | |
| Conduct additional outreach to underscore the positive work officers do every day. | Yes | | Standard practice |

# Board of Police Commissioners Advisory Committee Recommendations
## Community Relations and Trust Building

- **Recruitment Training and Efforts to Attract High-Caliber Candidates**
  Ensure that all candidates hired are of the highest caliber and meet or exceed the employment standards, even if that means hiring fewer than planned.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Examine recruitment campaigns and materials to ensure they reflect and attract the ideal person LAPD is seeking.<br><br>■ Work with staff and community stakeholders to outline the characteristics that describe the ideal candidate, e.g., service-minded, sound judgment, respectful, mature, compassionate, etc.<br><br>■ Ensure the marketing efforts and messaging includes those characteristics.<br><br>■ Include in the evaluation process mechanisms to identify those characteristics, including testing and training staff to effectively identify the "ideal" candidate, e.g., provide them with probing and relevant questions to ask during the interview process to help determine if the candidate reflects the values, characteristics and commitment the Department is looking for in an officer. | Yes | | Standard practice |

887

888

# Board of Police Commissioners Advisory Committee Recommendations
## Community Relations and Trust Building

| Recommendation | | |
|---|---|---|
| Include positive messaging in recruitment efforts and materials to attract high caliber candidates, including the identification of:<br>• Opportunities to significantly and meaningfully effect change in the communities they serve and to shape the future of the LAPD.<br>• Paths to becoming a potential leader in the LAPD and their communities.<br>• Ways to build trust and respect within the communities and transform the way policing is viewed. | Yes | |
| Seek candidates with a higher education and life experiences, where possible.<br>• Evaluate the pros and cons of pending state proposals that may require higher education as a pre-requisite for hiring. | Yes | |
| Consider implementing a scholarship or work-study program that incentivizes individuals to join the Academy. | Yes | Standard practice |

# Board of Police Commissioners Advisory Committee Recommendations
## Community Relations and Trust Building

## TRAINING

- ### Community Policing

Ensure there is a common understanding and appreciation of the community policing concept throughout the Department, which includes building relationships and solving neighborhood problems. Community policing should be infused throughout the culture and organizational structure of the organization.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Adopt and implement policies and training with communities that are rooted in the principles of guardianship and that reinforce a dedication to protecting communities and preserving public safety. | Yes | | |
| Ensure community policing is an operational philosophy within the Department that includes:<br><br>• *Integrating community policing into mission statements, strategic plans, and leadership development programs.*<br>• *Working with community members to establish an overriding mission statement and a strategic plan that integrates community policing into all operations.*<br>• *Articulating the vision, goals, and objectives of community policing and include measurable outcomes across the Department.* | Yes | | |

889

## Board of Police Commissioners Advisory Committee Recommendations
## Community Relations and Trust Building

| | | |
|---|---|---|
| • *Creating strategic plans in coordination with community leaders that lay out strategies for achieving community goals.* | | |
| Train officers to act as role models who should be respected and admired, rather than just enforcers of the law who should be feared. | Yes | |
| Adopt procedural justice as the guiding principle for internal and external policies and practices to guide their interactions with fellow employees and the citizens they serve. | Yes | |
| Continue to facilitate officers meeting the community, including children and teenagers, at public events to better understand cultures, encourage transparency, and help build trust.<br>• *Give officers ample time to engage with community members and help solve community problems.*<br>• *Develop programs that create opportunities for patrol officers to regularly interact with neighborhood residents, faith leaders, and business leaders.*<br>• *Assign officers to specific geographic areas or beats to enable them to get to know residents and become familiar with neighborhoods to reduce implicit bias and lead to better decision-making and more effective law enforcement.* | Yes | |

890

891

# Board of Police Commissioners Advisory Committee Recommendations
## Community Relations and Trust Building

| | | |
|---|---|---|
| - *Encourage officers to get out of their cars and walk the neighborhoods, go into establishments, and visit schools to help build positive relationships in the community.*<br>- *Model this behavior for new recruits/hires to help emphasize the importance of building community relations and trust.* | Yes | |
| The Department and Police Commission should periodically host small dinner dialogues to gain community perspectives and recommendations to inform policy with communities of color and underrepresented individuals. | Yes | |
| Ensure sufficient resources are committed to community policing.<br>- *Use resources efficiently to promote community policing and ensure resources are allocated equitably across neighborhoods.*<br>- *Advocate for more funding for community policing initiatives and investment in social and community services that improve public safety, such as after-school programs, street lighting, and homeless shelters.* | Yes | Funding considerations may limit the viability of this recommendation. |
| Expand LAPD's Community Safety Partnerships (CSP) citywide. | No | The cost of each CSP team, both in draw down on Department personnel and funding needs above base salary. |

892

# Board of Police Commissioners Advisory Committee Recommendations
## Community Relations and Trust Building

| Recommendation | | |
|---|---|---|
| • If funding permits, increase the number of CSP officers.<br>• Continue the CSP model where (1) residents work alongside officers to reduce crime by developing sports, recreation, and other programs tailored specifically to their community; (2) put a heightened focus on tackling quality of life issues; and (3) bridge communication and trust gaps between residents and the LAPD.<br>• Focus on connecting people in need with resources, such as employment training, mobile medical programs, and counseling.<br>• Continue to measure CSP officers by the trust they build, and the relationships made, rather than arrests or citations. | Yes | makes the expansion of CSP teams citywide infeasible at this time. |
| Support community members, government officials, and service providers in working together to create a range of services to support people in crisis such as:<br>• Crisis hotlines<br>• Walk-in centers<br>• Mobile crisis teams<br>• Peer crisis support services, and<br>• Crisis stabilization units | In progress | Department personnel currently work with numerous entities - including Children Exposed to Gun Violence and the Mayor's Office of Gang Reduction & Youth Development - to develop and implement strategies that provide services to people in crisis. They will continue to advance specific initiatives as they are developed in concert with their community partners. |

# Board of Police Commissioners Advisory Committee Recommendations
## Community Relations and Trust Building

893

| | | |
|---|---|---|
| Expand community policing and engagement alternatives as a career track for officers who choose to remain in the workforce in direct community relations. | Yes | In progress<br><br>CSPB and OO, via their Public Engagement Section, already offer opportunities for personnel to advance their career via assignments directly related to community policing. Both entities have advanced paygrade positions at the ranks of Police Officer, Sergeant, and Lieutenant. Additionally, CSPB has three sworn commanding officer positions - one Deputy Chief and two Captains - dedicated to advancing community policing and engagement strategies.<br><br>Within CSPB, personnel that were previously officers and supervisors within the CSP Teams have returned after promoting to higher ranks. |
| Educate and engage the community for input on policing policies and procedures, especially those communities with high rates of enforcement, to be transparent and help build trust. | Yes | Similar opportunities for upgrade positions at various ranks exist across the Office of Operations, via assignment to Area Community Relations Offices and Public Engagement Section, and the Community Relations Section. |

894

## Board of Police Commissioners Advisory Committee Recommendations

### Community Relations and Trust Building

| | | | |
|---|---|---|---|
| ▪ Track the level of trust in police by those communities.<br>▪ Provide annual community surveys, with accepted sampling protocols, to measure how policing in a particular community affects public trust. | | | |

# COMMUNITY RELATIONS AND TRUST BUILDING MATRIX

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action/ Project Instruction | Feasibility (Y/N) | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Community Engagement | National Police Foundation | LAPD should continue to invest in community policing efforts including engaging one-on-one or in small groups to build relations and obtain feedback from communities in each bureau. | 5.1.2 | Establish the Community Engagement Best Practices Committee (Committee) led jointly by the Director, OCJ, and supported by both the Diversity, Equity, and Inclusion Officer and the Commanding Officer, CSPB. | | | | |
| | | | | | Utilize Public Engagement Section personnel to administer projects initiated by the Committee. | | | | |
| | | | | | Use the Committee as a resource to create a feedback loop for effectively integrating community voice into training, policy development, and other activities. | | | | |
| | | | | | Direct administrative personnel assigned to DEI to conduct the necessary research to support Committee's project development and review. | Yes | None - Upon receiving BOPC support, it will be initiated through the establishment of the Committee | $338,659 | 3 |
| | | | | | Provide DEI with additional personnel - (1) Management Analyst, (1) Police Officer 3, and (1) Police Officer 2 to support the research, correspondence, and project oversight necessary for Committee and DEIO functions. | | | | |
| | | | | | Provide personnel assigned to DEIO with DEI-specific training to provide proper foundation for all undertakings. | | | | |
| | Community Engagement | National Police Foundation | LAPD should continue to engage C-PABs, BID meetings, and other community engagement opportunities to provide the community a voice and meaningful involvement in how its police department operates—including strategic hiring and promotions, training, policy development, and other activities to improve community police relations. | 5.1.3 | | | | | |
| 2 | Community Engagement | National Police Foundation | LAPD should continue to identify opportunities to engage community members—particularly those community members and leaders likely to organize and participate in First Amendment assemblies and mass demonstrations—in the preparation and training process. | 5.1.1 | Continue with one of the existing functions of Public Engagement Unit (PEU) to engage community members in pre and post First Amendment assemblies Days of Dialogue. | Yes, presently exists and should be expanded | | | |
| | Community Engagement | National Police Foundation | Each LAPD bureau should continue to identify opportunities to engage community members—particularly those community members and leaders likely to organize and participate in First Amendment assemblies and protests in their area—in the preparation and training process. | 5.2.2 | Document best practices for PEU's engagement via "Conscious Conversations" during First Amendment assemblies. | | PEU is in the process of utilizing a BOPC and Council-approved grant to acquire the necessary equipment to implement the Community Interactive initiative, Mobile Force Option Simulator | $560,542 | 2 |
| | | | | | Identify neutral intermediaries to interact with those group leaders who are reticent to interact with the Department directly. | | | | |
| | Community Engagement | National Police Foundation | LAPD should consider developing special unit(s) to establish contact with activists and demonstrators before, during, and after protests. | 1.2.3 | Implement Community Interactive initiative, Mobile Force Option Simulator. | | | | |
| | | | | | Provide Public Engagement Unit with (2) additional PO 3+1 positions to bolster engagement efforts. | | | | |

895

## COMMUNITY RELATIONS AND TRUST BUILDING MATRIX

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action/ Project Instruction | Feasibility (Y/N) | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 3 | Employee Wellness | National Police Foundation | Recognizing the impact of COVID-19, extended shifts and cancelled days; violence directed at officers; threats to their families; highly charged rhetoric; and loss of public trust and confidence—LAPD leadership, in particular, as well as elected officials and the LA community should recognize the importance of supporting officers and their families during this challenging period. | 4.4.1 | Allow BSS to fill two vacant administrative support positions: (1) Senior Clerk Typist, (1) Management Analyst. The cost for this will not be included in our request, as the funding of the staffing here will not solely go toward the AARIP. | Yes; already being implemented | Continue providing existing mental health services and services and timely training to assist command staff with assessing and taking steps to improve their employees' mental wellbeing. Evaluate if there is sufficient staffing to provide necessary mental health services. | $0 | 0 |
| 4 | — | National Police Foundation | Elected officials and LAPD leadership should weigh the risk and benefits of requesting National Guard assets in future First Amendment assemblies and protests to support police operations, protect critical infrastructure, and provide a neutral police presence. | 1.6.1 | No action. Legal thresholds in the State of California limit the circumstances under which National Guard assets may be request. It does not appear those thresholds were met prior to the request being made on May 31, 2020. In addition, mutual aid generally cannot be enacted as a preventative measure except for high profile, national events (i.e. National Special Security Events) where the magnitude of the planned event is likely to overwhelm existing resources. | No | — | $0 | 0 |

896

## POLICY DEVELOPMENT AND LEGAL CONSIDERATIONS

Following the murder of George Floyd and the Civil Unrest in the City of Los Angeles in May and June of 2020, the City and Department commissioned three After-Action Reports (AAR). In April 2021, the Department received those three AARs. Additionally, the Board of Police Commissioners (BOPC) established an Advisory Committee review and report on the Department's policies, procedures, and practices. This led to the publication of The Board of Police Commissioners Advisory Committee's Report (ACR), which also provided the Department with recommendations to maintain and enhance public trust through transparency and oversight.

The BOPC has now asked the Department to come up with an After-Action Implementation Plan (AARIP) for the recommendations found in the three AARs and the ACR. Prior to adopting the recommendations from any of the four reports, the BOPC has asked the Department to opine on the feasibility and value of the competing and complimentary recommendations found in the reports. Recommendations have therefore been divided up among some of the Offices and Bureaus. The Office of Constitutional Policing and Policy (OCPP) established a working group to address the value and feasibility of 27 different recommendations from the three AARs and 123 recommendations from the ACR.

### Board of Police Commissioners Advisory Committee's Report Recommendations

The recommendations contained in the ACR spanned the areas of Recruitment and Hiring, Training, Bias-Free Policing, Data and Technology, the Disciplinary Process and Work-Place Incentives/Retention. These recommendations represent overarching philosophies in addition to directly actionable items, and as such will need a longitudinal approach to address.

As mentioned in the introduction, the Policy Development and Legal Considerations Working Group was tasked with reviewing 123 recommendations from the ACR for feasibility of adoption and implementation. Of these 123 recommendations, the Policy Development and Legal Consideration Work Group placed a primary focus on the following:

- Consensual Searches; and,
- Policy on the Completion of Field Interview Cards.

These two recommendations represent areas of great public concern. The strong need for robust policy, oversight, and accountability in these areas stands out amongst the ACR recommendations.

**The AARs.** In reviewing the three AARs, there is substantial overlap in the recommendations. In fact, OCPP found that the 27 recommendations could be grouped together to require eight action items. While more fully addressed in the attached spreadsheet, those eight action items in order of priority are as follows:

1. A Revised Emergency Operations Guide;
2. A Review of The Department's Dispersal Order;

Page **1** of 5

897

3.   A Revised Field Jail Manual;
4.   Guidelines for Media External Messaging;
5.   A Guide for Videographers;
6.   Codifying when and how to use Command Posts during Unusual Occurrences;
7.   A Best Practices Mutual Aid and National Guard Manual; and,
8.   A Guide for the Deployment of the Behavioral Science Services during an Unusual
     Occurrence especially when an Unusual Occurrence extends over a significant
     amount of time.

The recommendations from the AARs involved mostly tactical or internal policies and
procedures that, if not unique to the Department are of a specialized nature.  Moreover, the
recommendations stem from the events that transpired in this City in May and June of 2020, the
Department's response to those events, and areas of improvement should the Department face
similar spontaneous events in the future.  Additionally, as to the recommendations that OCPP is
responsible for, many of them are also the subject of litigation.  Thus, the very people OCPP
would normally ask to assist the Department in formulating responses to the AAR
recommendations are in litigation with the Department.  Thus, working with them presents a
serious conflict of interest.  On the other hand, as will be discussed later in this document, the
litigation emphasizes the need and community benefit of the recommendations.

## WORKING GROUP COMPOSITION

To provide the most focused review of the various and diverse subjects, OCPP established an
executive working group that will work on all the above topics.  Additionally, OCPP has
attempted to add Departmental Subject Matter Experts (SME) as well as Community Members
when appropriate.

**Executive Working Group**

| | |
|---|---|
| Police Commission Representative | Commissioner Dale Bonner |
| Executive Advisor | Robert Saltzman (USC School of Law) |
| Chairperson | Director Lizabeth Rhodes |
| Member | Commander Steve Lurie |
| Member | Captain Bryan Lium |

**Department Subject Matter Experts**

| | |
|---|---|
| Commanding Officer Emergency Services Division | Captain Brian Morrison |
| Emergency Services Division | Lieutenant Robert Beckers |
| Emergency Services Division | Sergeants Eric Lee |
| Office of Constitutional Policing and Policy | Sergeant Sonia Rimkunas |
| Office of the Chief of Police | Management Analyst Sonia Mendoza |
| Behavioral Science Services | Doctor Edrick Dorian |
| Office of the Chief of Staff | Sergeant John Moreno |
| Support Services Group | Commander Victor Davalos |

| | |
|---|---|
| Custody Services Division | Captain Orlando Chandler |
| Custody Services Division | Sergeant Brian Valle |
| Administrative Services Bureau | Management Analyst Caroline Langkammerer |
| Media Relations Division | Captain Stacy Spell |
| Media Relations Division | Lieutenant Raul Jovel |

**Community Partners/Outside Advisors**
League of Women Voters
Los Angeles City Attorney's Office

## PRIORITIES

**Rationale.**  The Department's AAR was overseen by OCPP and OCPP provided documents and other materials for the other two AARs.  Additionally, OCPP oversees the Department's Risk Management and Legal Affairs Division (RMLAD).  In this role, OCPP has reviewed and continues to review lawsuits related to Unusual Occurrences, many of which enumerate community concerns and allegations of harms perpetrated on the community or the Department during these events.  Furthermore, the Diversity, Equity, and Inclusion Officer (DEIO) and group report to OCPP and through the DEIO's internal and external outreach and involvement, OCPP has been privy to concerns and lasting requests made by both members of the community and the Department.  With all this information in mind, OCPP assessed the feasibility and value of the above eight action items and prioritized them as listed above.  Having prioritized the action items, it should be noted that some of the most important items will take the most time, so the due dates for the highest priorities may not be the first things that are accomplished.

**Community Benefit for Proposed Actions.**  Below is a summary of the community benefit from each of the eight actions for which OCPP has oversight.

### 1. A Revised Emergency Operations Guide

The Emergency Operations Guide is the foundational document for the Department's response to significant events, including civil unrest.  It provides direction and guidance to the Department and allows personnel to more effectively respond to the unfolding events.  It provides a framework and organization to the Department, allowing for a more unified and effective response.  This improved response is focused on providing better service to everyone in the community affected by the events in question.   This approach increases transparency and further enhances community trust.

### 2. A Review of The Department's Dispersal Order

During this period of Civil Unrest, the demonstrators used a variety of new or at least uncommon techniques.  One of them was to march together in large groups, separate into smaller groups, and then rejoin together into a larger group.  This happened repeatedly in the Downtown Area on multiple days and at Pan Pacific Park on May 30, 2020 when the large crowds divided, blocking roadways, and preventing law enforcement response to calls of looting and violence.

899

When an unlawful assembly is declared, and the dispersal order is given, issues arise when the group disbands and then regroups.  A dispersal order which anticipates such a tactic would help establish a more orderly way for Department personnel to assist in crowd management and allow a crowd to leave the area peacefully after an unlawful assembly has been declared or a curfew has been put in place.

### 3.  A Revised Field Jail Manual

Several days of protests involved criminal activity and violence.  On these days a larger than expected number of people were arrested for a variety of charges.  The transportation resources were quickly overwhelmed which caused delays in processing the arrestees. The jail vans could not accommodate all the requests to transport those taken into custody.  This left several officers and arrestees waiting for significant periods of time for transport and significant wait times at field jails.  It would be a substantial public benefit to make the field jail process more efficient and precise.

### 4.  Guidelines for Media External Messaging

The Department had difficulty in informing the public about various events (both peaceful and unlawful) that were occurring in the City during Safe LA.  Members of the public heard airships and sirens but were not informed from any official source of what was happening.  The Department had trouble setting up press conferences due to the movement of the Chief of Police and other high-ranking Command Staff as they dealt with the dynamics of the protest.  This vacuum of information was unsettling in a time of unrest.  The community would benefit from more information coming from the Department in times of crisis.  Guidelines for Media External messaging should assist in distributing information.

### 5.  A Guide for Videographers

Because videographers were not trained, they did not capture details such as the commander's intent, briefings, crowd size, crowd demeanor, actions taken by officers, uses of force, dispersal orders, arrests, and/or additional evidence and therefore, these details were not documented.  As a result, it is more difficult for the Department to assess the actions of its employees.  When there is a loss of information there is a loss of community trust.  A well-trained cadre of videographers would increase preservation evidence.  Such preservation would increase transparency and therefore help in building trust.

### 6.  Codifying when and how to use Command Posts during Unusual Occurrences

A command post allows the Department to manage and oversee an event effectively thereby protecting individuals who wish to engage in peaceful protests and free speech and making sure that businesses are protected from vandalism and looting.  A command post also provides a central location to coordinate resources with assisting agencies; operationally track and deploy resources assigned to the incident; monitor the location of protest groups; improve situational awareness; and, make decisions – all of which benefits the community.

900

### 7.  A Best Practices Mutual Aide and National Guard Manual

There were challenges associated with the deployment of the National Guard in our City.  First, there was a wise decision not to have them deployed in the Operations South Bureau.  This move was applauded by the community.  We would want to make sure that any future South Bureau leadership understands the history and impact of National Guard deployment.  Additionally, there was confusion related to communication and the rules of engagement on the first days of the National Guard's deployment.  This confusion created delays in deployment where the National Guard was needed.  This adversely impacted the community because the Department had to protect fixed posts (a National Guard responsibility) and was not free to protect protestors.

### 8.  A Guide for the Deployment of the Behavioral Science Services

During Safe LA, the Department saw an unprecedented number of individuals working long hours for days on end.  The work conditions and time negatively impacted the mental and emotional health of officers in the field.  A healthy Department is one that will serve the community better.  Thus, with some previously discussed changes to this recommendation, a Guide for Deployment should help the community and relations between Department personnel and the community.

**Cost/Staffing Recommendations.**  The two major costs associated with these recommendations include $348,130 to restore one Sergeant II position to act as a liaison between the National Guard and the Department, and $492,850 to conduct training of Department personnel on field jail operations.

Total Cost- $840,980

**Timeline.**  The proposed timeline for completion of the eight action items ranges from late August 2021 to April 2022.  The revisions to the Field Operations Guide, Dispersal Order, and Field Jail Guide have been underway for some time and should not trail the adoption of the overall AARIP very long.  Where there is a training component to the action item, the timeline to completion is longer.

901

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

## Policy - RECRUITMENT AND HIRING

- ## Support National Police Misconduct Registry

To ensure that problematic officers are not hired by the Department or elsewhere, participate in the National Police Misconduct Registry, as outlined in the H.R. 7120 George Floyd Justice in Policing Act, Sec. 20, which requires local law enforcement agencies to submit to the Attorney General every 180 days beginning in 2022 certain data regarding officer complaints, discipline, termination, lawsuits, resignation and certification, should this or similar legislation be enacted.

| Recommendation | Feasible (Y/N) | if not feasible, why? | Additional Notes |
|---|---|---|---|
| Continually evaluate hiring qualifications, testing, and practices to ensure that the systems used do not disproportionately or unfairly disqualify or reflect bias against applicants. | Yes | | Current Practice. RED works closely with the Personnel Department to evaluate hiring practices and guidelines for inherent biases or other potential impediments to candidate appointments.  Using monthly statistical data, RED continuously review test parts for disproportionate trends including any that may favor or disqualify applicants based on gender and/or race/ethnicity. |
| Improve and advertise family leave/maternal/ paternal leave policies to attract a more diverse candidate pool. | Yes | | Family leave benefits are currently under review by DEI.  It is standard practice for RED to promote existing benefit policies at recruitment events including, but not limited to, hiring seminars, Candidate Advancement Program sessions, college/university, and other recruitment canvassing. |

902

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

903

| | | |
|---|---|---|
| Request that City Personnel include in its psychological assessments of candidates (1) an evaluation of the social and emotional intelligence and well-being of incoming recruits, and (2) a screening for desirable traits, rather than only undesirable ones. | Yes | Current practice. Interpersonal and digital strategies have been implemented to assist candidates through the hiring process. Advisors are available to candidates and they proactively reach out to them periodically to encourage them to continue through the hiring test parts. Additionally, the application process was digitized to make it more easily accessible to users, reduce document transfer delays and transition to an electronic, paperless system. In addition, advisors are assigned specifically to monitor African American, Asian American/Pacific Islander and female candidates. These candidates are tracked through the hiring system through a Diversity Hiring Committee consisting of RED staff that collaborates with Personnel Department to focus and prioritize advancing them through the hiring system. |
| Provide support to make the hiring process more efficient and prioritize highly valued candidates. | Yes | |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

- **Collaboration Between LAPD and LA City Personnel Offices**

Collaborate with the LA City Personnel Offices to develop joint recruiting and hiring goals annually and publicly present these goals to the Police Commission, the Mayor, and the City Council.

| Recommendation | Feasible (Y/N) | if not feasible, why? | Additional Notes |
|---|---|---|---|
| Establish metrics to assess whether the hiring goals are being satisfied and regularly report to the Commission any problems and successes. | Yes | | Current practice. Hiring statistics are frequently monitored, compared against the Department's Strategic Plan hiring goals, and discussed with Personnel Department to adjusts recruitment and hiring strategies. Analysis of the statistics and strategies are reported quarterly through the chain of command to forward to the Board of Police Commissioners in the Blake Justice update. |
| Continue to conduct regular CompStat briefings on hiring, recruitment, and retention to review the data and assess its impact. | Yes | | Current practice. RED updates CompStat every deployment period, uses these statistics to analyze recruitment and hiring methods, and makes modifications to strategies accordingly. Furthermore, the RED Commanding Officer has meetings periodically with the chain of command up to the Chief of Police to discuss hiring progress and challenges. |

904

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

## TRAINING

| Recommendation | Feasible (Y/N) | if not feasible, why? | Additional Notes |
|---|---|---|---|
| Conduct review of body camera footage to assess officer compliance. | Yes | | Current Practice; Completed by field supervisors, OO Inspection Unit, Audit Division |
| Implement mechanisms to ensure oversight and auditing of policies/training to ensure compliance and effectiveness of training.<br>• <br>• *Ensure that first line supervisors observe and review officers to confirm that they are utilizing the skills and training in accordance with the training curriculum they received.* | Yes | | |
| Establish a consistent and progressive discipline system for violations of use of force policies, including additional training, reassignment and/or discipline. | Yes | | Current Practice |
| Ensure the City's Crisis Response Team and the Department's Family Liaison Unit are deployed to all police use of deadly force encounters. | Yes | | Current Practice |
| Ensure that the families of those involved in police-related deadly force encounters are treated respectfully, provided timely information on a consistent basis, and given access to appropriate resources and services. | Yes | | Current Practice |
| Expand the Systemwide Mental Assessment Response Team (SMART) crisis model, which pairs mental health professionals with police officers to respond to incidents where the police have been called and mental health, emotional crisis, or substance abuse challenges are suspected to be at issue. | Yes | | |

906

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

| | |
|---|---|
| Create a tiered emergency response system that assesses the situation to determine which type(s) of responders are necessary to partner with law enforcement in response to a service call, e.g., crisis counselor, domestic violence advocate, mental health expert, etc.<br><br>• *As the City funds alternative service delivery systems, the Department should also develop a co-responder model, with social service providers and/or mental health advocates, to respond to certain calls for service that are appropriate for such a response.*<br><br>• *As the City funds alternative service delivery systems, the Department should reduce its response to social service calls that are appropriate for a non-law enforcement response.* | Yes |
| Ensure plans are in place to communicate with key community constituents in the aftermath of a crisis. Communications plans should include:<br>• *The affected families*<br>• *Police rank and file*<br>• *Police unions*<br>• *Other city, county, state, and federal leaders*<br>• *Community and faith leaders*<br>• *Youth and school officials*<br>• *Business and philanthropy leaders* | Yes |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

- ## Implicit Bias

Regularly review and enhance the Department's implicit bias training policies and guidelines to ensure they are up-to-date and reflect current best practices, including:

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Offer POST-certified, evidence-based training on implicit bias. | Yes | | |
| Ensure training includes examples of actual cases in which bias policing complaints were filed. | Yes | | |
| Measure before and after implementation of bias-free policies and training to determine effectiveness. | Yes | | |
| Include cultural competency and awareness training regarding minority communities, e.g., Black, Hispanic/Latinx, Asian Pacific American/Asian Pacific Islander (APA/API), Muslim, Arab, South Asian, LGBTQIA+ and other communities, regarding interactions, dress, religious practices, etc. | Yes | | |
| Examine opportunities to incorporate procedural justice into the internal discipline process. | Yes | | |

907

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

- **Police Service Representatives (Dispatcher/911 Operator)**

  Supplement the training and guidance provided to Police Service Representatives on gathering information from callers to be cognizant of bias and to determine the appropriate service response.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Provide Crisis Intervention Training (CIT) to Police Service Representatives so they can more accurately determine which calls require officer and/or some other type of assistance, e.g., mental health, domestic violence, substance abuse, etc., and refer said service calls to the appropriate party. | Yes | | |
| Training should include techniques for identifying signs that a person may be under the influence of drugs or alcohol, suffering from a mental health crisis, or possibly suicidal. | Yes | | |
| Police Service Representatives should gather the appropriate information and dispatch police and/or other agency resources in accordance with situation specific guidelines. These procedures should be guided by data on police responses to incidents reported through 911. | Yes | | |
| Police Service Representatives should relay this information to responding officers through the Computer Aided Dispatch (CAD) system. | Yes | | |
| The Department should invest in call technology updates, where feasible, to allow Communication Centers to receive text messages, videos, and photos. | Yes | | |

908

909

## Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

| | | | |
|---|---|---|---|
| Encourage the community to dial 2-1-1 (LA County), 311 (LA City), and other referral hotlines instead of 911 for non-emergency incidents. | Yes | | |
| Train Police Service Representatives to be cognizant of bias, including implicit bias. Best practices include:<br>• *Train Police Service Representatives to be aware of implicit or explicit bias of individuals reporting incidents.*<br>• *Provide anti-bias training for Police Service Representatives and to relay information without bias.*<br>• *Evaluate and monitor the specific language used in dispatching officers to calls for service to ensure that the language does not inadvertently frame the situation or result in an inappropriate police response.*<br>• *Formulate a process to enable Police Service Representatives to use discretion to inform a caller that an officer will not respond without a legitimate indication of criminal activity, whey they suspect a bias-motivated call*<br>• *Ensure Police Service Representatives training emphasizes procedural justice concepts throughout.* | Yes | | |
| Evaluate methods to continually recognize the critical function that the Communication Center plays in all aspects of law enforcement operations. This is critically important because:<br>• *It is estimated that for every call resulting in the dispatch of a field unit, the average Police Service Representative will answer the phone at least seven times.*<br>• *The Police Service Representative can have a profound impact on the public face of the Department.* | Yes | | |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

## BIAS-FREE POLICING

- **Policies Must Emphasize and Ensure Bias-Free Policing:**

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Consistent with the Department's policy prohibiting biased policing, set forth in Department Manual Section 1/345, the Department must require all personnel to interact with all members of the public in an unbiased, fair, and respectful manner. Department personnel may not conduct any law enforcement activity, including stops and detention, based solely on a person's race, religion, color, ethnicity, national origin, age, gender, gender identity, gender expression, sexual orientation, or disability (to any extent or degree), immigration or employment status, English language fluency or homeless circumstance as a basis for conducting any law enforcement activity. | | | |
| Encourage officers to employ calm and respectful language and behavior, and prohibit officers from using language or taking action that taunts, denigrates, or is derogatory to an individual (such as by using racist or stereotypical language). | Yes | | |
| On an annual basis, review the Department's Policy Prohibiting Biased Policing to ensure that it is comprehensive and reflects best practices and procedures, and update accordingly. | Yes | | |
| The Department's policies currently exceed federal and state law protections for protected classes. During the annual review, assess whether any additional marginalized groups should be included in the policies. | Yes | | |
| Update the Department's policies, including adding:<br>  ▪ *Supervisory responsibilities in the prevention of explicitly or implicitly biased and discriminatory behavior;*<br>  ▪ *Obligations of the Department to provide bias-free policing training at all stages of an officer's tenure;* | Yes | | |

910

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

911

| | | |
|---|---|---|
| - Explicit and concrete definitions of "racial bias," "implicit bias," "explicit bias," "disparate treatment," and other relevant terms to ensure consistent application of principles;<br><br>- Discipline for the use of offensive or derogatory language and behavior associated with an individual's actual or perceived status, such as racial slurs or stereotypes;<br><br>- A comprehensive social media policy that governs the Department-sanctioned and personal use of social media. To the fullest extent permitted by law, prohibit Department personnel from using social media in a manner that could endanger the safety of Department personnel and/or their families, compromise ongoing investigations, or erode public trust and confidence in the Department. Provide training to Department personnel about the appropriate and prohibited uses of social media; and<br><br>- Periodic review of the effectiveness of the Department's policies, practices, and training. | | |
| Continue to conduct periodic audits of Body-Worn Video to ensure that the Department's reverence for human life and commitment to procedural justice (as evidenced in the Department's use of force policies, including Directive No. 16 on tactical de-escalation techniques, and its April 2020 Training Bulletin on procedural justice) are being reflected in everyday contacts with the public. The number of audits conducted and the results of the audits should be reported on an annual basis. | Yes | |
| When officers are eligible for promotion, conduct audits of Body-Worn Video and promote those officers that adhere to the Department's reverence for human life and commitment to procedural justice. | TBD | It is unclear how this would square with Civil Service promotion requirements. OCPP is waiting for a clearer answer from Personnel Division. |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

912

Re-training or other appropriate action, which may include discipline up to and including termination, should be taken if Department personnel fail to activate Body-Worn Video in circumstances required by the Department's policies or when the audits of Body-Worn Video reveal a failure to comply with other policies, such as the Department's de-escalation or procedural justice protocols.

| | Feasible (Y /N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| In an effort to prevent inaccurate perceptions of biased policing, update the Department's procedural justice principles to provide concrete examples and guidance to officers on how to handle situations that often result in complaints of biased policing, including explaining when it is and is not appropriate for an officer to ask if a person is on probation or parole during a routine traffic or pedestrian stop. | TBD | OCPP is waiting for further insight on this from PSB. | |

- **Respect of Religious Beliefs**

Work with community leaders and experts to develop, implement, and train officers on a policy guiding officers' interactions with members of religious communities.

| Recommendation | Feasible (Y /N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| The policy should include, but not be limited to:<br><br>- *Instruction on interacting and searching individuals with garments or coverings of religious significance;*<br>- *Accommodating private searches of women wearing religious head coverings, except when such an accommodation would compromise*<br>  - ○ *officer or public safety; and*<br>- *Respecting and accommodating the religious beliefs of incarcerated* | Yes | | The Jail Operations Manual Section 223 deals with Religious Head Coverings, including the circumstances under which they can be searched, photographed and booked as excess property. |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

| | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| o *individuals, such as respecting religious prayer timing and dietary requirements (including the fasting times for religious holidays).* | | | |

## Respect for Individuals without Regard to Sexual Orientation, Gender Identity or Expression:

Work with community leaders and experts to review and, as necessary, revise policies and practices guiding the Department's interactions with transgender, intersex, and gender nonconforming individuals, including protocols for arrests, pat downs and searches, transportation, and detention (including the Jail Operations Manual), in order to ensure that, at a minimum:

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Terms are properly defined | Yes | | See OCOP Notice, dated November 10, 2012 – Police Interactions with Transgender Individuals |
| Department personnel address, and in documentation refer to, all members of the public, including with transgender, intersex, and gender nonconforming individuals, using the names, pronouns, and titles of respect appropriate to the individual's gender identity as expressed or clarified by the individual | Yes | | |
| Absent exigent circumstances, where same-sex pat downs or searches are required by law or Department policy, Department personnel will respect the gender identity as expressed or clarified by the individual and not rely on proof of the individual's gender identity, such as an identification card | Yes | | See OCOP Notice, dated November 10, 2012 – Police Interactions with Transgender Individuals |
| Absent exigent circumstances, where Department policy requires individuals to not be transported or detained with individuals of a different gender, Department personnel will respect the gender identity as expressed or clarified by the individual and not rely on | Yes | | |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

| | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| proof of the individual's gender identity, such as an identification card | | | |
| Officers are prohibited from inquiring about intimate details of an individual's anatomy, or medical history, except as necessary to serve a valid law enforcement purpose | Yes | | |
| Invasive searches used for the purpose of determining gender identity are prohibited. | Yes | | |

- ## Respect of Individuals with Disabilities:

Work with community leaders and experts to review and, as necessary, revise policies and practices for ensuring effective communication and meaningful access to Department programs, services, and activities for individuals with physical, mental, or developmental disabilities.

| *Recommendation* | | | |
|---|---|---|---|
| These policies should identify specific procedures and responsibilities applicable to circumstances in which officers encounter persons with mental illness, intellectual or developmental disabilities, hearing loss, speech impairment, autism, dementia, blindness, and mobility or other disabilities, including, but not limited to:<br><br> ▪ *Properly defining terms related to individuals with disabilities;*<br> ▪ *Providing reasonable accommodations, to the extent safe and feasible, in order to facilitate officer encounters with individuals with a disability;*<br> ▪ *The arrest and transport of individuals with disabilities or who require the assistance of ambulatory devices;*<br> ▪ *Using qualified and Department-authorized interpreters, consistent with Department policy, to communicate with* | Yes | | |

914

915

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

| | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| individuals with hearing loss or a speech impairment, including for the provision of Miranda warnings • The ability to request alternative forms of assistance, such as from mental health or social services providers. | | | |
| Serve as a resource to assist Department personnel in providing meaningful access to police services for individuals with disabilities; and • Act as a liaison between the Department and individuals with disabilities. | Yes | | |
| • Coordinate the Department's efforts to comply with the ADA • Regularly review the effectiveness and efficiency of policies and training as they relate to individuals with disabilities and report any recommended revisions, if necessary, to ensure compliance with the law; | | | |

Evaluate whether the Department should designate additional Department representatives as Americans with Disabilities Act ("ADA") liaisons who will:

- ## Language Accessibility

Ensure the Department's practice of providing language services is sufficiently formalized into a formal language access policy, and train officers to treat individuals with limited English proficiency fairly.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| The language access policy should: • Provide meaningful and timely access to Department programs and police services for individuals who have a limited ability to speak, read, write, or understand English • Require qualified and Department-authorized interpreters, including for the provision of Miranda warnings. | Yes | | See Training Bulletin – Foreign Language Interpreters and Resources, dated November 2020. |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

916

| | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| The language access policy should be translated into non-English languages that will best suit the needs of Los Angeles residents. | Yes | | See Training Bulletin – Foreign Language Interpreters and Resources, dated November 2020. |
| The language access policy (and translated versions of the policy) should be published on the Department's website and distributed to community-based groups serving limited English proficiency communities in Los Angeles. | Yes | | See Training Bulletin – Foreign Language Interpreters and Resources, dated November 2020. |

- ## Biased Policing Complaints:

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Update the Department's Sworn Penalty Guide for Personnel Complaints to provide that claims of Discourtesy based on a person's actual or perceived membership in a protected class (such as a racial slur or stereotype) shall have the same penalty as biased policing. The guideline for both categories of offenses should be Board of Rights – Recommendation for Removal for the first sustained offense. | TBD | OCPP is waiting for further insight from PSB. | |
| Initiate a biased policing complaint investigation whenever a complaint is filed alleging Discourtesy based on a person's actual or perceived membership in a protected class (such as a racial slur or stereotype). | Yes | | |
| Continue to ensure ease in the submission of complaints. <br> ▪ *Continue to accept complaints in multiple formats, at multiple locations, by phone, online and in person, anonymously and by name, among other means, and ensure no retaliation for doing so.* <br> ▪ *Continue to distribute information about how to file complaints and make it available in many forms and places.* | Yes | | |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

917

| Recommendation | Feasible (Y/N) | if not feasible, why? | Additional Notes |
|---|---|---|---|
| - *Continue to require all officers to summon a supervisor to accept, document, and report any allegation of police misconduct.* | | | |
| Continue to investigate all complaints and require investigators to receive specialized training for investigating biased policing complaints. | Yes | | |
| Produce "Know your Rights" brochures that include information on the Department's investigation process for biased policing complaints and the prohibition against retaliation and distribute them to vulnerable communities. These brochures should be translated as needed to reach all vulnerable communities. | Yes | | |
| Continue to promote the mediation program, operated by the Los Angeles City Attorney's Office, both internally and externally, as a means to resolve biased policing complaints.<br><br>- *Consider expanding the mediation program to a broader category of complaints, beyond biased policing and discourtesy.* | Yes | | |

- ## Biased Policing Complaints Data

Collect, analyze, publicly report, and effectively use biased policing complaints data.

| Recommendation | Feasible (Y/N) | if not feasible, why? | Additional Notes |
|---|---|---|---|
| Prepare regular reports regarding biased policing complaints, and ensure that these reports are broken down to explain the nature and types of complaints, including the:<br><br>• Nature of the allegations made in the biased policing complaints, and the protected status involved (race, color, ethnicity, national origin, sexual orientation, gender identity or | Yes | | |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

| | | |
|---|---|---|
| expression, religion, disability, age, housing, citizenship status, or other); | | |

- Demographic data on all parties involved in a complaint (officer(s) and complainant); and
- Results of the investigations, to include the number of:
  - Complaints made by members of the public;
  - Complaints made by members of the Department;
  - Complaints generated because a complaint alleged discourtesy based on a protected class;
  - Anonymous complaints;
  - Complainants who fail to cooperate in the investigation process;
  - Mediations that take place;
  - Mediations that are offered;
  - Uses or failures to use Body-Worn Video during the incident that is the focus of the complaint;
  - Uses or failures to use procedural justice principles and de-escalation techniques during the incident that is the focus of the complaint; and
  - Unfounded, exonerated, not resolved, sustained, insufficient evidence to adjudicate, or demonstrably false complaints.
- Track and incorporate lessons learned through the investigation and review of biased policing complaints in the Academy and in-service training
- Compare biased policing complaints to other databases, such as stop data information and discipline records, to identify training and performance issues.
- Include biased policing data in the CompStat process, to afford open and robust discussion on the complaints filed, training provided, and managerial approach to bias-free policing efforts.

918

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

919

- **Model Inclusivity**

  Foster a culture of inclusivity and accountability.

| Recommendation | Feasible (Y/N) | if not feasible, why? | Additional Notes |
|---|---|---|---|
| Formalize the mandate of the Department's Racial Equity Coordinator. | Yes | | |
| Ensure Department's administrative processes (i.e., recruitment, assignments, promotions, discipline, etc.) are free from bias and that all Department personnel are treated fairly. | Yes | | |
| Model a diverse workforce and a bias-free environment. Create multiple avenues for officers and departmental staff to provide feedback to command staff on issues in the Department. | Yes | | |

- **Early Warning System**

| Recommendation | Feasible (Y/N) | if not feasible, why? | Additional Notes |
|---|---|---|---|
| Review and update the fields currently being tracked on TEAMS II as necessary to ensure it is capturing all information necessary for supervisory awareness and early identification of problematic individuals and department-wide conduct or signs of stress or other behavior that would benefit from being addressed.  For example, current best practices include the capturing of the following information:<br>• *All uses of force, broken down by level and type;*<br>• *All injuries and deaths to persons in custody;*<br>• *All vehicle pursuits and traffic collisions involving Department equipment;*<br>• *All instances in which force is used and a subject is charged with Failure to Obey, Resisting Arrest, Assault on an Officer,* | Yes | | |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

920

- Disorderly Conduct, Trespassing, or similar charges; or a quality-of-life offense;
- All instances in which an officer issues three or more citations during a single encounter;
- Violations of the Department's Body-Worn Video and In-car camera policies;
- All instances in which the Department learns:
  - That a declination to prosecute any crime or municipal code violation was based upon concerns of the prosecutor about an officer's credibility;
  - That a court has made a negative credibility determination regarding an officer; or
  - That a motion to suppress evidence was granted on the grounds of a constitutional violation by an officer.
- All misconduct complaints, including the disposition of each allegation;
- Judicial proceedings where an officer is the subject of a restraining or protective order, which the Department's policies require officers to report;
- All criminal proceedings initiated against an officer, as well as all civil or administrative claims filed with or against the Department or its agents that result from the actions of sworn Department personnel;
- All disciplinary action taken against the officer;
- All non-disciplinary corrective action required of the officer;
- All awards and commendations received by the officer, including those received from civilians;
- All missed court appearances;
- Officer sick leave usage, especially in concert with regular days off and holidays;
- Training history; and
- Rank, assignment, and transfer history.

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

| | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Supervisors should examine past performance impartially and provide corrective support in a manner that encourages officers to correct problematic behavior. | Yes | | |

## Policy – DATA AND TECHNOLOGY

■ **General Use Technology Policy**

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Implement a general use technology policy that includes: <br><br> • *Clear guidelines, procedures, training, and oversight for each technology used to gather or store electronic data, in order to ensure that the technology is correctly and effectively utilized.* <br> ▪ Electronic data includes, but is not limited to, photographic imagery, audio, video (e.g., Body-Worn Video, in car video, cellular telephone video), emails, and other digital documents created by the officers in the course of their duties. <br> • *Regular supervisory reviews of electronic data to ensure compliance.* <br> • *Regular audits of all electronic data to ensure proper access and usage.* <br> • *Prohibitions on using technology to engage in discriminatory, biased, harassing, or other inappropriate behavior.* <br> • *Consequences for misuse or abuse of technology and its policies or procedures.* | Yes | | |

921

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

## Specific Technologies Used to Gather Data – Body Worn Video (BWV)

| Recommendation | Feasible (Y/N) | if not feasible, why? | Additional Notes |
|---|---|---|---|
| Consistent with LAPD's Special Order 12, dated April 28, 2015 ("BWV Policy"), regularly review the Department's BWV policy to ensure it is up-to-date and reflects current best practices, including evaluating privacy and civil rights issues and:<br><br>▪ Require all field-based personnel to use BWV during their entire assignment and have them powered on while on duty, in accordance with LAPD Special Order 12, dated April 28, 2015.<br><br>▪ Establish that the electronic recording of an investigative or enforcement encounter is mandatory and non-discretionary, except where specifically noted.<br><br>▪ Mandate BWV cameras be activated "prior to an investigative or enforcement activity involving a member of the public" and "until the investigative or enforcement activity involving a member of the public has ended."<br><br>▪ Clearly define "investigative or enforcement" actions, provide examples and state detailed exceptions, such as recording lawful behavior (e.g., political, or religious activity and conversations with confidential informants, child victims, etc.).<br><br>▪ Require officers to test their assigned BWV cameras before each shift, and provide training and guidance on mandatory, discretionary, and prohibited activation of the BWV.<br><br>▪ Require BWV cameras to record at least two minutes of video prior to activation.<br><br>▪ Specify that officers are to inform members of the public that they are being recorded, whenever feasible. | Yes | | |

922

923

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

| | | | |
|---|---|---|---|
| - Require officers to provide written notification when they do not follow BWV policies.<br>- Require all officers to document the existence of BWV footage in applicable reports.<br>- Ensure that there are clear BWV procedures for sensitive encounters, including domestic violence, and child victims and witnesses.<br>- Prohibit the improper access and distribution of footage.<br>- Prohibit department personnel from improperly modifying, altering, copying, editing, or deleting footage and emphasize that doing so could result in disciplinary action, including suspension or termination.<br>- Ensure that BWV cameras are not used for the sole purpose of monitoring activities that are protected by the First Amendment, unless the situation involves civil unrest where the expectation is that the BWV should be activated.<br>- Consistent with current California law, the department should prohibit the use of facial recognition software with BWV, or other devices carried or worn that capture digital images. | | | |
| Provide consistent supervision to enhance compliance and accountability with BWV policies and practices:<br><br>- Supervisors should be responsible for reinforcing BWV policies, and should be regularly evaluated on their efforts to ensure compliance and on their ability to identify non-compliant officers.<br>- Supervisors should regularly review BWV practices with officers to ensure compliance. | Yes | | |
| Conduct regular audits and inspections of BWV to ensure compliance: | Yes | | |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| • Systematic audits should be conducted to consistently monitor the use of BWV cameras, cell phone video and in-car video systems and ensure adherence to department policies. | | | |
| Ensure the establishment and enforcement of a consistent and progressive discipline system for violations of the BWV policy. | Yes | | |

• **Data Quality and Accuracy**

Data quality and accuracy in individual reporting should be enhanced to improve the overall quality of the information in the databases.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Create additional supervisory oversight and internal auditing mechanisms to ensure the information being reported and collected is accurate and prepared in accordance with the Department's policies.<br><br>▪ *Supervisors should conduct regular reviews of their officers' crime reports, statements, Field Identification Cards, SARS reports, RIPA forms, BWV and In-Vehicle footage, etc., to ensure the information reported or captured on video accurately reflects the totality of the incident or acts reported.*<br>▪ *Conduct regular internal audits of its personnel's reporting and data collection practices to ensure compliance.* | Yes | | See Learning Domain 36 – California Law Enforcement Telecommunications System.<br><br>See OCOP Notice – Operator Security Statement – Renamed and Revised, dated September 24, 2019. |
| Outline consequences for noncompliance. | Yes | | |

924

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

- ## Social Media

| Recommendation | Feasible (Y/N) | if not feasible, why? | Additional Notes |
|---|---|---|---|
| Consistent with Chief of Police Notice 2.2.5, dated October 19, 2018, ("Social Media Policy"), regularly review the Social Media Policy to ensure it is up-to-date and reflects current best practices. | Yes | | |
| Develop a personal use social media policy for department personnel. | Yes | | |
| Recognize social media as an integral part of a city's traditional approach to media, and be prepared to communicate accurately, transparently and in a timely manner through social media channels.<br><br>• *Use social media as a tool to provide timely information on events, particularly in the geographic areas where events are taking place.*<br>• *Use social media as a tool to educate the public regarding policing and the efforts of the Department.*<br>• *Review social media in an effort to better understand the communities' feedback regarding policing practices.*<br>• *Do not allow social media to replace traditional approach to media, since some members of the community do not utilize social media as their primary source of information.* | Yes | | |
| Ensure that the media team includes members with expertise in the use of social media. | Yes | | |
| Create a social media protocol for proactive and reactive communications well in advance of an incident to guide response, but also remain flexible and nimble. | Yes | | |

925

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

- **Release Critical Incident Video**

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Consistent with the current Critical Incident Video Release Policy, updated by the Commission on August 25, 2020, and contained in Department Manual Section 1/420.55, regularly review the Critical Incident Video Release Policy to ensure it is up-to-date and reflects current best practices. As part of this process: <br><br> - *Work with community members, elected officials, prosecutors, officer organizations, crime victims' representatives, and other subject matter experts to ensure active input into the process.* <br> - *Evaluate whether the release of critical incident video footage can be made more quickly, without compromising investigations, and while ensuring the completeness of the disclosures.* | Yes | | See Department Manual 1/420.55 – Critical Video Incident Release Policy. |
| Ensure that the release of video footage about critical incidents, including significant uses of force, is done at the earliest opportunity. | Yes | | |
| If information cannot be publicly released, be transparent as to the reasons why. Inform the public that information will be shared as soon as possible. | Yes | | |
| Address privacy concerns: <br><br> - *Footage should be reviewed for potential privacy concerns for members of the public before it is publicly released. For example, blur the images of members of the public who are not involved in the encounter.* <br> - *Ensure policies articulate the privacy protections regarding the release of information related to victims and victims' families.* | Yes | | |

926

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

- **Photo Comparison Policy**

  Evaluate compliance with the Photo Comparison Policy, implemented in January 2021.

- **Stop Data**

  Implement the Inspector General's Recommendations as presented in its report entitled: Report of Stops Conducted by the Los Angeles Police Department in 2019, dated October 27, 2020. Specifically:

  ✓ *Crime Strategy*

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| **Limit Pretextual Stops:** Refocus the Department's strategies for addressing violent crime away from the use of pretextual stops, broadly defined as the use of minor traffic, bicycle, or pedestrian violations for the purpose of conducting a criminal investigation unrelated to that violation. When a stop is conducted on the basis of a minor code violation, an officer should not extend the length or scope of the investigation beyond what is necessary to address the violation unless there is reasonable suspicion or probable cause of other criminal activity. Such decisions should not be based on a mere hunch or on characteristics such as a person's race, gender, age, homeless status, manner of dress, mode of transportation, or presence in a high-crime location. | Yes | | |
| **Consider the Effects of Crime Fighting Strategies on Community Trust and Legitimacy:** Evaluate, on an ongoing basis, the effectiveness of the Department's crime strategies, including the impact on community members and potential for collateral damage on community trust and legitimacy. Such evaluation should combine public feedback with the Department's own evidence-based analysis | Yes | | |

927

Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

| | | |
|---|---|---|
| of the efficacy of its stop practices in identifying and addressing crime. | | |
| **Racial Disparities in Stop Practices:** Set a Department-wide goal of eliminating racial disparities in the enforcement of traffic and minor code violations, particularly with respect to discretionary activities. As part of this process, reinforce the Department's policy on "Equality of Enforcement," which mandates that "[s]imilar circumstances require similar treatment in all areas of the City and for all groups and individuals." | Yes | |
| **Focus Stop Practices on Violations Directly Related to Public Safety:** Consider other approaches to addressing minor equipment and technical violations that are not directly related to public safety. In keeping with the principles of procedural justice, ensure that all officers use their contacts with members of the public as an opportunity to explain and educate members of the public about relevant laws and processes. | Yes | |
| **Revise Measures of Productivity:** De-emphasize simplified enforcement outcomes – such as citations, stops, and FI cards – as a measure of officer or unit productivity or success. Develop and use alternate measures of effectiveness, such as the ratio of contraband found to searches conducted, as well as metrics related to community engagement and community trust. These might include, for example, the tracking of non-enforcement community engagement activities, commendations from members of the community, quality of service reviews, and complaints of discourtesy or other misconduct. Ban informal and formal enforcement quotas of any type. | Yes | |

928

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

➢ **Written Policy**

| Recommendation | Feasible (Y/N) | if not feasible, why? | Additional Notes |
|---|---|---|---|
| **Biased Policing Policy:** Update the Department's Policy Prohibiting Biased Policing to incorporate language from State law. Specifically, the policy should explicitly indicate that officers may not consider race or other protected identity in deciding upon the scope or substance of law enforcement activities following a stop. The activities to be incorporated should include asking questions, frisks, consensual and nonconsensual searches of a person or property, seizing any property, removing vehicle occupants during a traffic stop, issuing a citation, and making an arrest.<br><br>▪ *The Department should also review the best practice recommendations set forth by the RIPA Board in it 2019 Annual Report and modify its policy to comply with relevant recommendations in the report.* | Yes | | See Special Order No. 12 – 2021 – Policy Prohibiting Biased Policing – Revised, dated May 25, 2021. |
| **Policy on Stops and Post-Stop Activities:** In consultation with the OIG and the Commission, develop and incorporate into the Department Manual a policy on pedestrian, vehicle, and bicycle stops. The policy should clearly set forth legal and policy considerations for officers in conducting stops, including consensual encounters, and searches. The policy should also bring together and clearly define rules and parameters related to post-stop activities, such as removing a person from the vehicle, handcuffing, asking consent to search, filling out an FI card, taking photographs, parole and probation searches, and other actions as necessary. | Yes | | In progress |
| **Consensual Searches:** Require that officers receive affirmative, verbal consent for all consensual searches, and that they advise the person that they may both refuse to consent and withdraw their consent any time. This advisement as well as the person's verbal consent should be | Yes | | |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

➢ *Field Interview Cards*

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| captured on camera or, if not practicable, documented on a written form. Requests for consent should clearly indicate the scope of the search being requested. Officers should request consent for a search only where there is an articulable law enforcement purpose, and they should indicate this purpose for the record on the associated video, where practical. Officers should also explain to the person the reason for the request. | | | |
| **Policy on Completion of FI Cards:** Set forth clear policy guidelines as to the circumstances under which FI cards should be filled out. Generally, the policy should set forth the various purposes of an FI card and ensure that the completion of an FI card is not completed at random or as a matter of routine during stops. As part of this revision, and in light of the cessation of the Department's use of the CalGang database, the policy should remove language requiring officers to fill out an FI card during every encounter with a suspected gang member. The FI policy should indicate that officers may not prolong a stop in order to complete an FI card, nor are members of the public obligated to answer questions or display tattoos in order to facilitate the completion of such cards. | Yes | | |
| **Information to be Collected on FI Cards:** Set forth clear guidelines as to what information should be included on the FI card and revise the form as necessary. This should include, for example, the extent to which information gathered from sources other than the interview (previous knowledge, databases, etc.) may be noted and how such information should be characterized. Additionally, the field for Social Security Number should be removed from the form. | Yes | | |

930

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

- The Department should require the officers to complete each FI card during or immediately following the stop. If this is not practicable, officers should note that the information was added later and should take steps to ensure accuracy, including consulting contemporaneous notes or video as needed.

## Policy – THE DISCIPLINARY PROCESS

- **Increase Transparency in the Handling of Complaints and Disciplinary Proceedings**

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Develop "Know Your Rights" brochures and work with community leaders and organizations to increase transparency about the disciplinary process by plainly explaining:<br><br>• *The manner in which complaints can be filed (in person, by phone, online);*<br>• *That complaints can be made anonymously but that anonymity may hinder a full and complete investigation;*<br>• *The Department's process for investigating complaints;*<br>• *The Department's disciplinary process, including the respective roles of the Chief of Police, the Police Commission, and the Board of Rights; and*<br>• *The extent to which Department information can and cannot be released to the public under state law.* | Yes | | |
| Regularly release to the public, to the full extent permitted by relevant state laws, information about disciplinary actions and decisions, including those made by the Board of Rights, and release that information in a readily accessible and easily understood format. | Yes | | |

931

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

932

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| For Board of Rights proceedings that can be disclosed under state law, develop and implement a specific plan for the: <br><br> ■ *Timely release of future Board of Rights proceedings records on an ongoing basis; and* <br><br> ■ *Release of past Board of Rights proceedings records on a rolling basis, prioritizing proceedings involving categorical uses of force or claims that also include allegations of bias or discrimination.* | Yes | | |
| Assess on an annual basis whether the Department's Advocates Unit is sufficiently funded, trained, and staffed, and has continuity in leadership. | Yes | | |
| For the Complaints Process: <br><br> ● *Provide periodic updates to complainants of the status and the results of their complaints, such as through the creation of a public web portal for complainants where they could check the status of their case and upload additional evidence and information relating to their complaint.* <br><br> ● *Release complaints data to the public on a regular basis.* | Yes | | |

## ● Improve Effectiveness of the Complaint Process

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Aim that all investigations of non-complex complaints are completed in six months or less. | Yes | | |
| Develop a procedure for fast-tracking complaints where the conduct at issue in the complaint is captured on Body-Worn Video. | Yes | | |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

- ## Increase Transparency Into the Board of Rights Process

| | Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|---|
| Provide support to officers to help reduce complaints, to include:<br>• *Regularly review complaints and disciplinary proceedings to identify blind spots in Department trainings or policies that lead to allegations of misconduct.*<br>• *Regularly showcase (within the Department and to the general public) examples of the good work officers do every day, particularly examples involving officers modeling the Department's procedural justice principles and de-escalation protocols.*<br>• *Treat all members of the Department fairly and with respect at all times, including through disciplinary proceedings, so that they, in turn, treat others fairly and with respect.*<br>• *Encourage members of the public and officers to participate in mediation to resolve more complaints, even if the complaints do not rise to the level of requiring the imposition of discipline.*<br>• *Provide regular and wraparound mental health support to officers, and allow space for officers to relieve stress and recuperate, including taking time off when necessary.* | | Yes | | |
| Evaluate all options available to make the Board of Rights Process more transparent, in an effort to ensure more accountability for decisions that are made. Include in this evaluation, among other options, whether meetings can become public and whether transcripts of proceedings can be made public. | | Yes | | |
| Establish guidelines for increasing the Office of Inspector General's oversight of the Board of Rights process, including, but not limited to: | | Yes | | |

933

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

934

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| • Reviewing sustained complaints to ensure that penalties recommended by the Chief of Police are applied consistently and equitably; and<br>• Require the Inspector General to audit Board of Rights hearings for procedural errors and other issues, such as arbitrary and inconsistent decision-making. | | | |
| Prepare annual public reports summarizing the Board of Rights proceedings, including:<br>• *The number of directed Board of Rights hearings held;*<br>• *The number of opted Board of Rights hearings held;*<br>• *For each Board of Rights hearings held, include:*<br>  • A general description of the alleged wrongdoing;<br>  • The recommended discipline by the Chief of Police;<br>  • The Board's findings and penalties imposed, if any;<br>  • The composition of the Board, including the number of civilians involved;<br>  • Whether the Board's rulings were unanimous, and, in the event of a non-unanimous ruling, whether the dissenting Board member was a civilian or sworn command staff officer; and<br>  • The length of time that transpired from the initiation of the Board of Rights proceedings to its completion. | Yes | | |

• **Improve Effectiveness of the Board of Rights Process**

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Ensure that the Department is represented by attorneys during Board of Rights hearings. | Yes | | |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

| | | | |
|---|---|---|---|
| Ensure the Department's Advocates Unit, to include attorneys and non-attorneys, has sufficient support, resources, and training from the City Attorney's Office to effectively represent the Department in Board of Rights hearings and to conduct all aspects of its work effectively. | Yes | | |
| Work with the Office of Inspector General to review and revise the Board of Rights Manual to increase transparency and accountability in the process, as well as ensure timely hearings, such as:<br><br>▪ Requiring Board of Rights hearings to be held within 60 days of the filing of the application for a Board of Rights hearing, subject to one 30-day extension permitted upon a showing of good cause;<br><br>▪ Permitting the Department Advocate to introduce victim impact statements or other testimony explaining the impact of the misconduct on a particular victim or community at the penalty phase.<br><br>▪ Requiring the Board to include specific information in its Rationale on Findings and Penalty Rationale that would assist in the annual review and reporting relating to the efficacy of the Board of Rights process, such as information required to be included in the annual report, as set forth above, as well as a description of the officer's past disciplinary record; and<br><br>▪ Evaluating the standards of review that are applied and ensure that it is the appropriate standard of review for evaluating cases. In addition, ensure that all Board Members understand the standard of review and do not confuse it with other review standards. To accomplish this, ensure appropriate instruction on the standard of review to be applied. | Yes | | |
| As part of the Department's report to the City Council regarding the effectiveness of Ordinance No. 186100, which provides an accused officer the option of having a Board of Rights composed of three civilian members, include: | | | |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

- *The breakdown of the number of Board of Rights hearings held that were composed of an all-civilian panel versus a traditional panel;*
- *A comparative analysis of the outcomes of all-civilian panels versus traditional panels (both recent and historical);*
- *A study of Department personnel as to the perceived fairness of all-civilian panels versus traditional panels;*
- *An assessment of whether all-civilian panels result in an increase in procedural errors;*
- *An assessment of whether the all-civilian panels result in a reduction in officer discipline;*
- *An assessment of whether the selection process, including the qualifications sought, for the civilian members is yielding qualified and diverse members;*
- *An assessment of whether the training process is sufficient; and*
- *An assessment of possible City Charter amendments, to include but not be limited to:*
  - *The option of having Board of Rights panels composed of two civilians and one sworn command officer, rather than three civilian panel members. This would allow the two civilian members to*
    - *Any other suggested changes to the Board of Rights Process that the Chief of Police or the Department believes would improve efficiency and accountability. Included in this review should be an assessment of the following:*
- The Chief of Police has publicly spoken about seeking additional authority in the penalty process than he is currently permitted under the Los Angeles City Charter. As a result, the Department should conduct an analysis of the cases involving serious violations of policy where the Chief's recommendation of discipline (whether it was for removal

936

Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

937

| | |
|---|---|
| or another penalty) was lowered by the Board of Rights to a penalty less than the Chief's recommendation and the reasons why the Chief's recommendation was not followed.<br>✓ The Department should analyze and determine whether these cases warrant recommending a Los Angeles City Charter change, whether an alternative modification to the process is supported by the evidence, or whether the evidence supports no additional changes. | |
| Provide the Department's penalty guide to the Board of Rights panels so that they may: (1) better understand the range of penalties the Chief considered for each violation; (2) better appreciate the range of penalties typically used by the Department when evaluating the penalty imposed; and (3) consider this guideline in determining whether they are going to impose a penalty outside of what the Chief of Police recommended. | Yes |
| Assess whether the pool of Civilian Hearing Examiners, who serve on the Board of Rights, adequately reflects the diversity of Los Angeles, and whether the selection process is yielding qualified and diverse civilian members. | Yes |
| Work with community leaders and organizations to distribute applications to be considered for appointment as a Civilian Hearing Examiner, for the opportunity to serve on the Board of Rights, and consider establishing a maximum term of service for Civilian Hearing Examiners.<br>■ *Partner with the City Attorney's Office and community-based experts to ensure that the Civilian Hearing Examiners who serve on the Board of Rights have sufficient training, not only when they are first selected but also receive mandatory continuing education throughout their term of service.*<br>■ *The training should cover technical aspects of the hearing process to avoid procedural errors in the proceedings, as well as* | Yes |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

| | Recommendation | Feasible (Y/N) | if not feasible, why? | Additional Notes |
|---|---|---|---|---|
| | *Issues the Board of Rights routinely considers, such as excessive force, dishonesty, and domestic violence.* | | | |
| | Establish a team of attorneys, preferably employed by the Department and who report to the Chief of Police, to represent the Department in all Board of Rights Hearings, as opposed to the current procedure where the Department is represented by non-attorney advocates and the accused officer is represented by attorneys. | Yes | | |

## Policy – WORK-PLACE INCENTIVES/RETENTION

- ## SALARY BENEFITS

To attract the ideal candidate, ensure the LAPD has a fair and equitable salary and benefit package competitive with or superior to other departments in the Los Angeles area.

| Recommendation | Feasible (Y/N) | if not feasible, why? | Additional Notes |
|---|---|---|---|
| Encourage advanced educational opportunities and ensure that such programs are available and accessible, including maintaining the education subsidy annual allowance to encourage sworn personnel to seek and obtain higher education. | Yes | | |
| Consider, if funding permits, an incentive program to recruit candidates and officers who live in the City of Los Angeles. | Yes | | Recruitment and Employment Division's (RED) hiring efforts are focused on the five local Counties including Los Angeles, Orange, Riverside, San Bernardino and Ventura. The overwhelming emphasis is placed on Los Angeles County and specifically the City of Los |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

939

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Evaluate services needed such as childcare and/or elder care programs and services, particularly programs that are available during non-business hours when police officers may be in the greatest need of assistance. | Yes | | Angeles. There has not been an in-depth discussion or study related to RED regarding incentives for candidates and officers who live in the City. Additional resources and funding for incentives such as a signing or other bonuses may prove compelling for City residents. |

- ## SUPPORT NETWORKS

  Support and promote internal affinity groups and organizations that offer support for diverse officers.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Collaborate with affinity groups, such as associations of Black and Latinx officers, female officers, LGBTQIA+ officers, and others to identify the challenges they face as police officers and to address these challenges to attract and retain more applicants from these groups. | Yes | | |
| Enhance the existing mentorship program and develop a long-term mentoring program to support mid-level officers. | Yes | | |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

- ## ALTERNATIVE POLICE STAFFING MODELS

Explore more flexible staffing (operational) models as a long-term goal to attract more diverse police officer candidates and encourage retention, particularly for officers with sole responsibility for the care of family members.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Create part-time positions and/or job-sharing opportunities.<br><br>▪ Such programs are largely used by law enforcement with respect to non-sworn employees but should be extended to sworn personnel.<br><br>▪ The ability to job share after a certain level of experience is achieved could positively contribute to the retention of long-term employees. | Yes | | |
| Allow for paid leaves of absence and sabbaticals.<br><br>▪ Employees could experience a complete change of pace, perhaps doing community work, going back to school, etc., which would serve to broaden the officer's perspective and help counter cynicism. | Yes | | |

- ## OFFICER REVIEW CRITERIA FOR PROMOTIONS

The criteria for supervisor selection, training, and accountability are essential elements of defining the culture of a department.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Ensure that performance reviews and appraisals reflect and reinforce community policing values and skills.<br><br>▪ Develop performance measures that reflect the principles of community engagement, collaboration, dispute resolution, de-escalation, problem-solving, community engagement, and trust-building. | Yes | | |

940

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

941

| | | | |
|---|---|---|---|
| • When considering an officer for promotion include in their policing metrics trust and community engagement, in addition to their assignment responsibilities. | | | |
| Promotional decisions should be based on merit, performance, qualities, and characteristics that officers exhibit throughout their careers.  Include factors that indicate how officers engage on the job and a review of their discipline and/or complaint records. | Yes | | |
| Evaluating and promoting officers based on their ability and track record in community engagement—not just traditional measures of policing such as arrests, tickets, or tactical skills—is an equally important component of the successful infusion of community policing throughout an organization. | Yes | | |
| Consider officers' misconduct records when promoting officers and integrate the socio-emotional wellbeing of officers into performance evaluation metrics. | Yes | | |
| Ensure that strong leadership skills, community building, trust and legitimacy are foremost regarding selecting supervisors, particularly front-line supervisors who are in most frequent contact with officers. | Yes | | |
| Ensure supervisors are held accountable for reinforcing the core values of the Department in the discharge of their daily responsibilities. | Yes | | |
| Require an advanced degree, leadership, and management training for certain promotions. | Yes | | |
| Ensure specialized training at each promotion level. | Yes | | |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

- ## Assess the Impact of COVID-Driven Early Retirement Programs and Other Budget Issues:

  Evaluate the impact the COVID-driven and fiscally driven staffing changes have had on the civilian and sworn workforce.

| Recommendation | Feasible (Y/N) | if not feasible, why? | Additional Notes |
|---|---|---|---|
| Develop a more strategic approach to civilian re-organization plans. | Yes | | |
| Evaluate and measure workforce impact and morale as a result of backfilling lost civilian jobs with sworn officers. | Yes | | |

- ## APPLY PROCEDURAL JUSTICE PRINCIPLES INTERNALLY

  Promote procedural justice principles within the Department, including:

| Recommendation | Feasible (Y/N) | not feasible, why? | Additional Notes |
|---|---|---|---|
| Remind officers that the work they do matters to the Department and the community they serve. | Yes | | |
| Provide ample opportunities for officers to give meaningful input about their work. | Yes | | |
| Ensure officers are treated fairly by their peers, supervisors, and the Department as a whole. | Yes | | |

942

Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

- **OFFICER HEALTH AND WELL-BEING**

Create a culture that values self-care and safety in all aspects of operations.

| Recommendation | Feasible (Y/N) | if not feasible, why? | Additional Notes |
|---|---|---|---|
| Develop a robust health and wellness plan that monitors officers' well-being, helps them manage their stress, and optimizes their mental fitness capabilities. <br><br> ▪ *Consult with subject matter experts to help educate and coach officers, de-stigmatize mental health issues and promote mental fitness.* <br> ▪ *Implement robust employee assistance programs that offer low-cost or no-cost services including confidential counseling, crisis counseling, stress management counseling, and mental health evaluations.* <br> ▪ *Ensure that these programs are offered anonymously.* <br> ▪ *Ensure that these programs are meeting the needs of all employees* <br> ▪ *Create peer counseling and mentorship programs so officers can support each other.* <br> ▪ *Make available wellness training: incentivize participation in wellness programs and use of wellness resources.* <br> ▪ *Tailor and center wellness offerings through surveys and regularly updating educational programming.* <br> ▪ *Work with the Department and City Personnel to evaluate the psychological screening process, used as part of the officer hiring process, to ensure it is achieving its intended result in providing the Department with the best candidates.* <br> ▪ *Implement periodic psychological screenings to monitor stress levels, biases, coping skills, and overall attitudes for all officers.* | Yes | | Behavioral Science Services is a robust, in-house, health and wellness service that provides psychological, nutritional, and substance abuse services to all employees and their significant others. Most of the recommendations listed are in place and feasible, while some are only partially in place or not immediately feasible. |

# Board of Police Commissioners Advisory Committee Recommendations Policy Development and Legal Considerations

| | | |
|---|---|---|
| • Determine as early as possible additional resources needed for officers to assist them in the execution of their duties, including additional training and supervision where needed.<br>• Require officers who are involved in or witness traumatic events to speak with a counselor and/or receive additional counseling.<br>• Conduct physical and mental health check-ups on an ongoing basis. Question about whether this can be more specifically, such as annually.<br>• Monitor and reduce time pressure, stress, and fatigue.<br>• Offer appropriate protections and incentives to encourage officers to report concerns about the mental condition of themselves or others.<br>• Provide access to a confidential mental health hotline. | | |

944

# After Action Report Implementation Plan Worksheet
## Policy Development and Legal Considerations

945

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action / Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Arrest Transport Field Jail | Chief | Work with both the LASD and MTA to include clauses in their Procurement, Transportation and Release Service Agreement contracts to assist with arrestee transportation during local emergencies. | 6 | Address in Field Jail Manual | Y | Value – High: A transportation plan must be part of any plan that includes the potential of mass arrests. This plan should be developed in advance to assist in mitigating delays and should include exploring contracts with the LASD and the MTA, among others. The Department should also explore the ability to expand their fleet of vehicles designated to transport arrestees. The Department should also maintain an accurate list of Department employees that have commercial driver's licenses with passenger endorsements. | 50,000 | 0 |
| 2 | Arrest Transport Field Jail | LAPD | A transportation plan must be part of any plan that includes the potential of mass arrests. This plan should be developed in advance to assist in mitigating delays and should include exploring contracts with the LASD and the MTA, among others. The Department should also explore the ability to expand their fleet of vehicles designated to transport arrestees. The Department should also maintain an accurate list of Department employees that have commercial driver's licenses with passenger endorsements. | 14 | Address in Field Jail Manual | Y | A LAPD transportation plan is important to mitigate delays in potential mass arrests. In the past the lack of a transportation plan has caused costly litigation and undue aggravation to arrestees. The Department should expand their fleet, as the alternative is LASD transportation & MTA, which is costly if utilized during every 102. The Department should explore and maintain an active Commercial Driver's License, facilitate obtaining the commercial license and maintain an accurate list of Department employee's (Sworn & Civilian). | 50 | 0 |
| 3 | Arrest Transport Field Jail | LAPD | In situations where the processing of arrestees is delayed, alternatives to booking of individuals, such as issuing a Release from Custody should be considered. | 15 | Address in Field Jail Manual | Y | During events or incidents where the potential for mass arrests are likely, the ICS structure should be evaluated to determine if it is more efficient to move Investigative Group to a Branch or Section. This could improve efficiency by reducing the span of control that the Operations Section must maintain. Investigative Branch could include groups and divisions necessary for the processing of arrestees as well as other investigations related to the incident. When mass arrests are likely, a CSO representative should be at each field jail. If there are insufficient personnel working CSO to staff each location, then a representative from CSO should be assigned to Investigative Branch to provide guidance and direction. | 50 | 0 |
|  | Arrest Transport Field Jail | LAPD | The Department should pre-identify locations throughout the City that can be used for field jails. The list of locations should be maintained and verified on an annual basis and made available to Investigative Branch and CSO when needed. | 16 | Address in Field Jail Manual | Y | Value – High, the Department should pre-identify locations throughout the City that can be used for field jails. The list of locations should be maintained and verified on an annual basis and made available to Investigative Branch and CSO when needed. This process is currently being implemented when CSO deploys a field jail at any regional jail. The position is designated as the "Investigative Branch Support Officer". The Department should re-evaluate as they are part of the transportation plan when Van or Bus arrive with arrestees. | 50 | 0 |
|  | Arrest Transport Field Jail | LAPD | The Department should consider having a pre-loaded trailer, or at least a check list and the ability to load a trailer with the needed supplies and a trained cadre of detention personnel to establish field jails in future mobilizations or unusual occurrences. | 6 | Address in Field Jail Manual | Y | Value – High, the Department should be used for field jails. The position can be used for field jails. The Department should be maintained and made available to Investigative Branch Support Officer. Regional jails are the only pre-identified locations that can fulfill all the requirements to support a field jail. | $10,000 | 0 |
| 3 | Deployment and Mobilization | LAPD | At the Staging Area, signage and public address systems should be used to delineate among MFFs, plain clothes officers, check-in, and other necessary assignments. In order to quickly identify resources, one option would be to have the resources grouped by Bureau. The supervisor would gather 15 officers for the initial team and check in. Thereafter, once four strike teams for that Bureau checked in, they would be formed into an MFF and deployed. The Staging Area Manager or Operations Section Chief could deploy the resources as needed during an escalating situation. | 6 | Update the EOG as necessary / Cost: Signage for 4 | Y | *LAPD recommendation for Signage has Strong Value. Waiting to complete a MFF by Bureau is not recommended during critical/emerging incidents and would create delays. This Value for secondary Operational Periods, when exigency has passed. The Department will develop the signs for the geographic bureaus and initially distribute. | $10,000 | 0 |

946

# After Action Report Implementation Plan Worksheet
## Policy Development and Legal Considerations

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action / Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 4 | Deployment and Mobilization | National Police Foundation | LAPD should establish clear processes for identifying and deploying appropriate personnel to planned and spontaneous critical incidents, including First Amendment assemblies and protests. | 2.4.1.1 | | | **NPF recommendation: The Department already has these protocols, existing process/procedures already exist for both planned and spontaneous events/incidents. | | |
| 5 | Deployment and Mobilization | LAPD | All personnel and equipment needed to manage crowds, declare unlawful assemblies, and make arrests should be deployed at the location prior to giving any dispersal order. | 10 | Update the EOG as necessary | Y | Value - High. It has Value as a recommendation/tactical consideration and is discussed in EOG, Vol 5. SME: OGO/CTS08/Metropolitan Division/ESD | 50 | 0 |
| 6 | Deployment and Mobilization | LAPD | A robust Investigative Section staffed by detectives is necessary. A detective should be assigned at the arresting and investigating officer at each incident where a dispersal order is given to ensure the dispersal order and crowd behavior are documented on video; the elements of the crime are met, necessary follow up information is obtained, and evidence (i.e., objects thrown at officers) is collected and/or photographed. Deploying specialized detectives to these assignments and the field jail would maximize the deployment of Bureau resources to manage the incident. Officers should use their BWV to memorialize the detention and ensure that the field jail is provided with the information. | 13 | Part 1- Provide guidelines for quick implementation<br>Part 2- Update the EOG to memorialize where necessary | Y | Value - High.<br>SME: OGO/DIII (protocol). ESD will update and memorialize in EOG. | 50 | 0 |
| 7 | Deployment and Mobilization | LAPD | The command and control of all Department personnel during a major incident has a direct correlation to the success of meeting the incident objectives. The following incident priorities should be the basis for managing the incident and personnel:<br>• Life Safety;<br>• Incident Stabilization;<br>• Evidence/Property Preservation;<br>• Continuity of Operations;<br>• Economy of Force; and,<br>• The overall wellbeing of the Community/Feedback.<br>Department personnel should be reminded of the priorities during a major incident and all available resources should be deployed to the incident unless an exception is given by Command Staff and that deviation should then be relayed to the DOC who has the overall authority on resource allocation and distribution. Non-DO entities should be provided clear direction on assignment during a major incident. | 25 | Write reminder notice | Y | Value - High. Dept has implemented "Assignments During Major Incidents" for all non-DO Command Staff to identify support roles and EOC/DOC staffing (from CTS09). SME: OGO/CTS08/ESD for developing incident priorities and objectives. SME: OGO/FCOS for deployment prioritization of Department command staff and resources. | 50 | 0 |

947

## After Action Report Implementation Plan Worksheet
### Policy Development and Legal Considerations

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action / Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 8 | Employee Wellness First Aid | National Police Foundation | LAPD should consider deploying BSS psychologists to the DOC, and COVID-19 permitting, to divisions to conduct debriefing and debriefings during extended crowd management periods as well as continue employee and family outreach and engagement activities to mitigate trauma and to connect officers to services in real time. | 4.3.1 | Develop program to address | Y | Value - Yes. While there is value in utilizing BSS during extended IOT's (72 hours and beyond), BSS doesn't believe deploying a psychologist to the Department Operation Center is feasible, save for in extraordinary circumstance where a clear need at the DOC is identified. The ideal scenario would be deploying the psychologist to the command post and/or staging location.<br><br>Dr. Dorian explained in more detail the 'Three Unique Needs' this initiative could satisfy and why it would provide value to the Department:<br><br>1. Psychological First Aid (Direct Intervention at time of incident, at CP)<br><br>2. Counsel Command (Provide feedback to Command Staff and/or first line supervision to assist in providing a more robust support for employees)<br><br>3. Serve Later, 'Debriefing' (Close the loop, after the incident is over provide or offer support to the employee and/or significant other. Attend Divisional roll calls and talk as a group while offering future clinical assistance if needed) | 50 | 0 |
| 9 | Internal Communications | LAPD | Unity of command should be established to prevent multiple sources providing conflicting missions. All personnel should receive a briefing that includes the commander's intent, which should be video recorded. If multiple Staging Areas are used, the information needs to be sent to the DOC, Area Command or Planning Section for continuity of operations. | 6 | Part 1: Update EOC to address<br><br>Part 2 - incorporate into rewritten Training | Y | Value - High. Consistent with existing ICS protocols...already exists. SME: OSO/CTSOB/ESD. | 50 | 0 |
| 10 | Media Messaging | Chief | Staff live public information officer position in the incident command system during any major event(s). This position should be responsible to coordinate periodic updates from the Department for the media and the public to keep them informed on the status of the event(s). The personnel assigned should also coordinate with other City leaders to ensure there is a coordinated and consistent message being provided throughout the duration of the event(s). | 13 | Develop guidelines to address | Y | Value - High. Department messaging plays a major role in forming perceptions. The points highlighted to implement the recommendations collaboratively emphasize the importance of the Department's expectation to ensure the public has accurate and timely information. These recommendations have value because they will increase public trust and decrease the chances of a negative reaction to Take information from the public about any major incident. | 50 | 0 |
|  | Media External Messaging | LAPD | The PIO should continue to meet with media in the field when able. The PIO should continue to seek locations to conduct interviews with the Chief of Police and other high-ranking members of the Department during dynamic incidents to provide the public with incident and safety information. Although information provided to the public via social media can be buried, the PIO should continue to push out factual information. The establishment of a Joint Information Center during an evolving incident may enhance the ability to efficiently provide a unified message. | 26 | Develop guidelines to address | Y | For the LAPD recommendations, to the extent that the resources exist to make it happen when needed. For the MFP recommendations, this is not for the Department alone. Requires the lead of other City agencies, including EMD.<br>Value - High; presents a unified message from the City | 0 | 0 |

948

## After Action Report Implementation Plan Worksheet
## Policy Development and Legal Considerations

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action / Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 11 | Media External Messaging | National Police Foundation | The City of Los Angeles should establish a unified narrative and public messaging strategy around first amendment assemblies (before, during, and after) that informs the public about City leadership's position on supporting free speech during First Amendment assemblies, but clearly defines consequences for those responsible for committing violence or destruction during such assemblies. | 3.1.1 | | | | | |
| | Media External Messaging | National Police Foundation | The City of LA and LAPD should develop policies and procedures that use social media to "push" information to the community and quickly disseminate accurate information in response to rumors, misinformation, and false accusations. | 3.1.2 | | | | | |
| | Media External Messaging | National Police Foundation | LAPD should create a clear and detailed media strategy to guide the department's use of traditional news media and social media, particularly during critical incidents. Ensure plans are in place to communicate with key community constituents in the aftermath of a crisis. Communications plans should include: - The affected families - Police unions - Police rank and file - Other city, county, state, and federal leaders - Community and faith leaders - Youth and school officials - Business and philanthropy leaders | 3.2.1 | Develop guidelines to address | Y | SME: OCOP/COS/Media Relations Division. Update Media Guide and EOG as necessary. This is a longer term project, partly because PCG is monitoring SB 98, which deals with media access at demonstrations. Draft of the Strategic Communications Plan was circulated internally in December 2020. Ongoing document. | 50 | 0 |
| 12 | Mobile Field Forces | Chief? | Conduct a thorough review of, and update on, the configuration and deployment of a MFF to include consideration of: (a) The number of officers and supervisors deployed in a MFF; (b) The configuration of the programmed mobile field force; (c) Examination of the form of transportation of the MFF (police car vs vans, etc.); (d) Assessment of whether programmed mobile field configurations should include resources such as shadow teams. The review should use Department expertise and subject matter experts. | 14 | Review current training and update as necessary | Y | SME: OOO/CTSOB/METRO for MFF configuration and tactics. SME: OSS/TB for publication of tactics directives and training bulletin. MFF training already in progress. ** New tactics directive and training bulletin have been produced. * | 50 | 0 |

949

## After Action Report Implementation Plan Worksheet
## Policy Development and Legal Considerations

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action / Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 13 | Mobile Field Forces | LAPD | During the Civil Unrest, the Department learned that MFFs worked best when deployed with specific missions to address criminal activity. The MFF Leader should remain in contact with the Branch Director for an updated deployment mission. During this incident the need to move resources around quickly once they became available was imperative. Based on the demonstrators' practice of splitting up, the Department decided to make changes including splitting up MFFs. The splitting up of MFFs helped in apprehending many looters, making arrests, and using resources more effectively throughout the City. The Department also employed the Air Ship in conjunction with MFFs. The Air Ship guided the MFF into hot spots of criminal activity such as looting. | 18 | | Y | SME: OSO/CTSOB/Metropolitan Division. These tactics are being considered and evaluated by the SME's. | 50 | 0 |
| | | National Police Foundation | LAPD should continue to serve as a national model for law enforcement by developing strategies, tactics, and Mobile Field Force teams to more effectively respond to these types of First Amendment assemblies and protests, which are becoming more frequent in the City and nationwide. | 1.4.1 | | | | | |
| 14 | Mutual Aid | National Police Foundation | The Department needs to have procedures in place for working with the National Guard. | 9 | Develop best practices in relation to the use of the National Guard / Cost: Restore Sgt II authority to Military Liaison | Y | SME: OSS/AGB/ Military Liaison...OR -OCOP/COS/Governmental Liaison Section. The new Sgt II authority would act as a liaison between the Department and the National Guard. / Value- Moderate. | 348,130 | 1 |
| | | LAPD | One idea the Department should consider is appointing and developing command level officer(s) to serve as the National Guard liaisons as an ancillary Department duty. These should be attached to Department positions that will likely not be assigned to other critical field duties in the event of an unusual occurrence, which means outside of the Office of Operations. These liaison officers can meet regularly with National Guard management, keep up on changes to their policies and capabilities, conduct tabletop exercises and complete regular reports back to the Department. This would help ensure that the National Guard is familiar with the City and its policies. It should also allow an IC to assign them tasks more seamlessly. | 1.6.2 | | | | | |
| | | LAPD | The City should develop and widely distribute a well-coordinated message about the deployment of the National Guard, prior to, during and following their deployment in an effort to avoid them being seen as an occupying force. | 2 | | | Value- High; already implemented since Safe LA. | | |
| 15 | Planning Preparedness and ICS | LAPD | The Department should consider an existing facility for use as a CP during extended operational incidents. | 2 | | | Bureau level CP is the future of Incident command. Each Bureau would be responsible for its resources as coordinated through DOC. This will be made more efficient with the creation of a INCIDENT COMMAND SYSTEM DATABASE – which would be centralized within LAPD 366 (possibly) and have the ability to create planned events or create events spontaneously. Data would be live and viewable for defined uses, including the DOC. Bureaus from | | |
| | Planning Preparedness and ICS | LAPD | Each Bureau should establish a CP to maintain operational oversight of events within its area of command and request resources and personnel through the CP. This will ensure a proper request and approval processes are followed. This will also limit span of control of any one Bureau. | 4 | Identify locations and provide options | Y | | 50 | 0 |

950

## After Action Report Implementation Plan Worksheet
## Policy Development and Legal Considerations

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action / Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| | Planning Preparedness and ICS | LAPD | During Citywide incidents, the Department should consider establishing multiple incident commands with appropriate span of control. The DOC should then operate at a level 2 to coordinate Citywide resource and personnel deployment. | 5 | | | | | |
| 16 | Planning Preparedness and ICS | LAPD | The ITB needs to play a larger role in an unusual occurrence operation to coordinate and assist with technological equipment and coordinate with the City of Los Angeles' Information technology Agency. Having a representative from ITB embedded with logistics would have assisted with the coordination of many of those requests. | 21 | Develop ITB logistics response guidelines | Y | Value - High: Having proper hardware technology is imperative at any unusual occurrence. With properly trained CP Cadre members, the ability log into and use Department laptops to track resources saves time and ensure proper documentation of any event. Furthermore, ITB has a myriad of upcoming projects that could benefit a command post during an unusual occurrence, e.g., DxK - system to show cell phone on a large screen and ability to type on a keyboard and use a mouse. This is useful to open FLCAD to view live map of incidents. The live map on the PI Cad shows incidents and resources - significant for an incident commander to have situational awareness. PI CAD updates are also ongoing at ITB, where the GPS mapping on the cell phone is allowing the user to view movements of resources every 10 seconds. Traditional equipment such as laptops, hotspots, encrypted radios could be obtained with an ITB member embedded in logistics. | $0 | 0 |
| 17 | Planning Preparedness and ICS | LAPD | When a Citywide event occur that will affect multiple bureaus, a BOC should be established to manage the large-scale and complex unusual occurrence. | 4 | N/A | Y | Value - High: This is current practice. SME: OSO/CTSOM/ESD and OSS/ASB/Communications Division. | $0 | 0 |
| 18 | Policy and Manual Update | ChiefI | Under the direction of the Strategic Emergency Management Bureau, thoroughly review and update the Emergency Operations Guide. Include:<br>(a) Emphasis on the field jail guide, Volume 6 of the EOG;<br>(b) Inclusion and emphasis on when to establish a Department area command structure.<br>(c) Identification of how the Department is to be organized when an area command is implemented under the directions of an assistant chief.<br>(d) Evaluation and updating of the establishment of staging and command post locations, mass arrest instructions, and the need to activate the field jail unit and transportation detail when mass arrests are planned; and<br>(e) Implement periodic training on how to set up an area command, command posts (including forward operating platforms) and key positions such as staging. | 2 | Update EOG to memorialize these recommendations | Y | Current practice, update EOG as applicable. SME: OSO/CTSOM/ESD. | $0 | 0 |
| | Policy and Manual Update | National Police Foundation | LAPD should synthesize the relevant provisions spread throughout the current Department and to clearly establish guidelines for the coordination, facilitation, and management of First Amendment assemblies and protests. | 1.2.1 | | | There will not be a new Strategic Emergency Management Bureau. | | |
| | Policy and Manual Update | National Police Foundation | LAPD should update and enhance its Emergency Operations Guide: Volume 5 to address all components of First Amendment Assemblies and Mass Demonstrations, as opposed to focusing on crowd management and crowd control. | 2.3.2 | | | | | |

## After Action Report Implementation Plan Worksheet
## Policy Development and Legal Considerations

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action / Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 19 | Policy and Manual Update | Chief? | Emphasize the following upon updating the Field Jail guide: (a) Training of all detective personnel on Field Jail duties during mass arrests, and (b) Inclusion of Field Jail duties and staffing responsibilities related to mass arrests in command officer training; and, (c) Inclusion of Custody Services Division Jail personnel in training on how to process arrestees during mass arrests. | 3 | Update Jail Manual or Create a Field Jail Manual to address | Y | Value - High: This allows staffing of field jails to be done by more Department employees, ensuring the field jails have the resources available to staff field jails and the proper training to ensure the field jails are run properly; Command officers will be able to efficiently and effectively oversee the field jail operations to ensure they are running as required by policy. | $0 | 0 |
| | | | The Field Jail Manual should be reviewed and updated to include current techniques on how to operate a field jail including proper processing and retention of original booking paperwork (i.e., Release from Custody form, etc.). | 15 | Annual Training to reinforce changes for 500 personnel on OT | | | $450,850 | 0 |
| 20 | Policy and Manual Update | LAPD | The Department should develop a guide for videographers to ensure all pertinent information is captured in photographs and videos. This guide can be reviewed with videographers prior to deployment. | 7 | Develop guide | Y | Value - High: This has value because it ensures the Department early and accurately document citizens' and officers' actions on videography equipment; allows the Department videographers to be trained to have technical proficiency with videography equipment in order to appropriately capture content; | $0 | 0 |
| 21 | Policy and Manual Update | LAPD | The Department and City Attorney's Office should review the Department's Dispersal Order to determine if it is reasonable to add a sentence to the end of the dispersal stating that if, once dispersed from a defined location, the assemblage regroups within another larger defined area within a specific time frame, they will be subject to this dispersal order and in violation of Section 409 of the California State Penal Code. Additionally, the Department and City Attorney's Office should determine the necessary documentation and evidence (video). New municipal codes, policies, and technology may obviate the need to continually repeat the dispersal order for the same group at each location where they assemble without unduly restricting the rights of those who are demonstrating. | 11 | Review and update dispersal order | Y | SME: OCPP/RMLAG/RMLAD, and OSO/CTSOB/ESD. This is ongoing with the City Attorneys Office. | $0 | 0 |
| 22 | Record Keeping | LAPD | As to record keeping, which is a significant issue spanning multiple critiques, the Department did not keep good records on the agencies that assisted it during the Civil Unrest. This makes it more difficult to develop future coordinated responses. | 8 | Develop system and memorialize in EOG | Y | Value - High, covered under existing MIMS, SENIS, ICS, procedures. SME: OSO/CTSOB/ESD | $0 | 0 |

951

## After Action Report Implementation Plan Worksheet
## Policy Development and Legal Considerations

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action / Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 23 | Record Keeping | LAPD | The Department should create a standardized approach towards compiling timeline activities, maintaining accurate documentation of incidents and preplanned events, and tracking equipment using ICS Form 133. In doing so, should an event cross Bureau borders, reporting will be uniform. Training on reporting and tracking should be supplied to the Planning Section personnel and Logistics Section Chief in each Bureau.

Further, Finance/Administration Section, Planning Section, and Logistics Section should work together at the CP. This will allow for the quick acquisition and accurate documentation of supplies necessary for the operation. This will also ensure better accountability and assist with potential financial reimbursement.

All personnel, including Command Staff, should accurately complete the ICS Form 214 to ensure personnel, equipment, and actions taken are documented. The Demobilization Unit should ensure all information is accurately captured on the ICS Form 214 prior to releasing personnel from the incident. | 22 | Develop system and memorialize in EOG | Y | Value - High; covered under Existing NIMS, SEMS, ICS, procedures. SME: OSO/ICT/OGB/ESD | 50 | 0 |
| 24 | Review and Assessments | Chief | The Office of the Inspector General must periodically audit the requirements, and Department compliance with, all settlement agreements. | 4 | Audit report back to BOPC | Y | The Office of the Inspector General will handle this recommendation.

Value- High;
• Helps ensure compliance with Department policies and procedures;
• Identify areas where Department policies and procedures need to be strengthened, expanded, or re-envisioned;
• Bring problem areas to the BOPC's attention with recommendations for improvement;
• Minimize civil litigation and liability claims payouts by taking these actions; and,
• Improve public confidence by publishing reports detailing the information above. | 50 | 0 |
| 25 | Review and Assessments | LAPD | The Department should consider modifying its A/B watch schedule during a mobilization to include a mid-shift or adjust the start times of each watch to maximize the number of resources available during the hours of heightened activity.

Review and assess the current mobilization period start times to determine if an additional start of watch time would be appropriate to prevent the fatigue that occurred during this event. Develop several unusual occurrence deployment schemes to fit a variety of occurrences (A/B, A/B/C etc.) to provide for safety and flexibility. A possibility would be to add a 10:00am start time for personnel who would most likely be assigned to missions that would go end of watch after 6:00pm. | 12 | Report back on feasibility. If feasible, provide plan for implementation. | Y | Feasible - Yes. Value; however, this should also be under the Technology and Equipment Working Group, as many issues with Watch changed were exacerbated by lack of emergency equipped Police Vehicles.

SME: OSO/CTD/MTD with EVSM/PSVSMG. | 50 | 0 |

Page 8 of 9

953

## After Action Report Implementation Plan Worksheet
## Policy Development and Legal Considerations

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action / Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 26 | Review and Assessments | | As stated above in the mobilization critique, but for different reasons, the current A/B watch may not be the best for long term events such as the Civil Unrest. The Department should consider using 14hrs for a 24-hour operational period rather than a 12-hour operational period. The Department would have two shifts within one 24-hour operational period. If the Department continues to use 12-hour operational periods, then the communication between the A-watch and B-watch personnel will have to be improved to meet the expectations of each watch. | 24 | | | | $0 | 0 |
| 27 | Review and Assessments | LAPD | The LAPD should have commanders who were directly involved in responding to the SAFE-LA First Amendment assemblies and protests write an after-action report (AAR) that includes input from line level officers and up. | 2.1.3 | N/A | N/A | The Department produced and publish their After Action Report. This satisfies this request. | $0 | 0 |
| 28 | Succession Planning | National Police Foundation / LAPD | Careful consideration must be given to allow LTs and other supervisors to fill the roles and responsibilities. This will enhance the Department's ability to foster an environment that focuses on succession training. For example, if an area is to be broken up into four geographic divisions during an incident, rather than assigning a captain to be in charge of each division, a LT could assume the division supervisor role and a captain would then serve as the branch director to oversee the division. | 5 | Assess and report back on feasibility. If feasible, develop model for implementation. | Y | Value: High, covered under Existing NIMS, SEMS, ICS, procedures. The rank of the individual assigned to a task is at the discretion of the IC, and may change, as the incident evolves. SME: OSO/CTSO8/ESD. | $0 | 0 |
| | | | | | | | **Total** | $850,980 | 1 |

# TECHNOLOGY & EQUIPMENT

As part of the Department's After-Action Report Implementation Plan, the Technology & Equipment Working Group was created and tasked with addressing eleven recommendations stemming from the National Police Foundation's After-Action Report, the Chaleff After-Action Report, and the Department's After-Action Report. The working group included members from the community and business leaders, and the Department is grateful for their insight and continued support.

### Board of Police Commissioners Advisory Committee's Report Recommendations

The Board of Police Commissioners established an Advisory Committee review and report on the Department's policies, procedures, and practices. This led to the publication of The Board of Police Commissioners Advisory Committee's Report (ACR), which also provided the Department with recommendations to maintain and enhance public trust through transparency and oversight.

The recommendations contained in the ACR spanned the areas of Recruitment and Hiring, Training, Bias-Free Policing, Data and Technology, the Disciplinary Process and Work-Place Incentives/Retention. These recommendations represent overarching philosophies in addition to directly actionable items, and as such will need a longitudinal approach to address.

Of the several recommendations from the ACR, the Technology & Equipment Working Group placed primary focus on:

1) Promote Public Engagement & Community Trust

Information Technology Bureau is currently working with the Innovation & Performance Commission (IPC), City of Los Angeles, to stand up a public Use of Force Dashboard. The vision is to contract with private vendor to display non-categorical use of force data available for the public at large. The proposal made it through the IPC Committee on Thursday, September 12, 2021 and is headed to the Los Angeles City Council for approval.

2) Enhance the Information Technology Bureau

Information Technology Bureau (ITB) is in the process of expanding its personnel as it takes on additional responsibilities – including data quality, privacy, and projects to reduce administrative redundancies. A commander position was added to ITB, with the intention of adding sworn and civilian positions to ensure modernization of technology within the Department.

3) Report Demographic & Enforcement Data

As part of public transparency, ITB along with Office of Constitutional Policing and Policy (OCPP) are working together to enhance the Racial and Identity Profiling Act (RIPA), in accordance with California Assembly Bill 953. Information Technology Bureau contracted with a vendor and assisted with subject matter experts to stand up a forward facing publicly accessible

Page **1** of **9**

954

website with demographic and enforcement data from LAPD traffic stops, pedestrian stops, arrests, and detentions.

## WORKING GROUP COMPOSITION

| | |
|---|---|
| Police Commission Representative | Commissioner Steve Soboroff |
| Chairperson | Deputy Chief John McMahon |
| Co-Chair | Commander Randy Goddard |

**Department Partners**

| | |
|---|---|
| Administrative Services Bureau | Police Administrator III Annemarie Sauer |
| Support Services Group | Commander Victor Davalos |
| Traffic Group | Commander Alfred Pasos |
| Emergency Management Division | Captain III Brian Morrison |
| Innovative Management Division | Captain II Timothy Kalkus |

**Community Partners**

| | |
|---|---|
| Chief Information Officer, Cedars-Sinai | Darren Dworkin |
| Former Assistant US Attorney | Mary Genow |
| Chair & Executive Director, City of Oakland Privacy Advisor | Brian Hofer |

## PRIORITIES

After reviewing the recommendations and the related reports, the working group elected to group the recommendations into eleven categories. Many of the proposed actions from the three separate reports were interconnected and collectively served to advance more comprehensive concepts.

The order in which the categories appear reflects the working group's determination of the items having the most significant positive, long-lasting impact on the community. We believe the following narrative will support the intentionality of this priority order while also demonstrating a commitment to carrying out all categories.

## PRIORITY ONE
### Resource & Personnel Tracking

**Chaleff After-Action Report Recommendation:** Explore Department personnel tracking technology to be used for large-scale events to be able to track personnel during staging and deployment, skill sets, certification, and timekeeping for better planning and deployment.

**Response:** Item No. 1 refers to the digitization of the ICS 214s. Here, Information Technology Bureau (ITB) will be assisting the Office of Special Operations (OSO) to leverage technology to increase efficiency and accuracy when tracking and assigning resources to unusual or pre-planned events.

955

**Rationale.** The goal is to expedite and accurately reflect the personnel assigned to an event. Secondarily, it will improve the Department's ability to receive federal reimbursement funds.

**Community Benefit.** The efficiency in staffing results in more time officers have in the community. Less administrative constraints are fiscally responsible, and leveraging technology increases organizational accountability.

**Cost/Staffing Explanation.** The estimated cost associated with the project is $1,500,000. In addition, end-user validation is required. Staffing will consist of Hired Vendors/Contractors Subject Matter Experts (SME) from Office of Operations (OO), Emergency Services Division (ESD), Information Technology Bureau, and Fiscal Group. Information Technology Bureau has the lead on technology development. To date, ESD has already ordered upgraded printers that work off of WIFI and Bluetooth.

**Timeline.** The estimated timeframe for completion is 12 months. ITB concurs with the recommendation.

**PRIORITY TWO**
**Information Gathering**

**Chaleff After-Action Report Recommendation:** Purchase software that can be used to analyze open-source internet and social media content to provide field operations with vetted and useable information and add appropriate staffing.

**National Police Foundation Recommendation:** LAPD should develop a process to ensure that the command structure appropriately incorporates information gathered to improve public safety. This information should be shared promptly and consistently with the Incident Commander and relevant Department and bureau command posts while being factored into planning and preparedness.

**Rationale.** Item No. 2 refers to the Voyager Analytical and Penlinx software that Major Crimes Division is currently using. Major Crimes Division, Robbery Homicide Division, and the geographic bureaus would use the software to leverage open source social media information and cell phone analytical tools to gather and process real-time information for the end-user. ITB is in concurrence that this project should be funded.

**Community Benefit.** Reduction in crime and victimization is accomplished through successful investigations into crime trends.

**Cost/Staffing Explanation.** It will cost $450,000 to purchase ten additional licenses.

**Timeline.** This project can be implemented within a three-month timeframe from purchase to utilization.

**PRIORITY THREE**
**ENHANCED INFORMATION SHARING**

**National Police Foundation Recommendation:** LAPD should work with the community to consider collaborative approaches, technology solutions, and strategies to enhance situational awareness and improve community and officer safety.

**Rationale.** Item No. 3 refers to the recommendation that the Department leverage technology and find more collaborative approaches that will enhance situational awareness and improve community safety by assigning four police officers and four crime and intelligence analysts to fixed-post social media positions within each geographic bureau. The goal is to improve the dissemination of departmental messaging and work more closely with the community to improve safety by leveraging existing social media platforms (Next Door, Twitter, Facebook, NIXEL, etc.). Our only reluctance in supporting this measure is based on its sworn resourcing and associated cost.

**Community Benefit.** Social media officers provide timely communication with the community.

**Cost/Staffing Explanation.** The estimated cost of adding four fixed-post positions, at the rank of Police Officer II, and four Crime and Intelligence Analyst I's is $2,041,852 annually with salary and benefits.

**Timeline.** With fixed-post positions and funding, the recommendation could be implemented in one Deployment Period.

**PRIORITY FOUR**
**DOWNLINK TESTING & STORAGE**

**National Police Foundation Recommendation:** The Department should establish a routine testing schedule for the Air Unit downlinks. Downlink systems that are not working correctly should be fixed and retested to ensure an adequate number are operational and send live video downlinks to multiple receivers. A command officer in an Air Unit can complement the downlink deployment and provide guidance and information to the Operations Section Chief and Incident Commander (IC).

On October 21, 2020, the Board of Police Commissioners (BOPC) approved the Los Angeles Police Foundation's donation of new recording equipment for the video downlink feed-in Air Units. The old equipment, which only allowed viewing of real-time feeds, was supplemented with standalone recorders to allow Command Staff to download and replay recorded video captured by the Air Unit.

**Response.** Item No. 4 refers to the routine testing schedule and recording equipment for Air Support Division's (ASD) Downlink system. ASD has established a monthly testing schedule to ensure the Department has adequate operational downlink systems. They also test the systems before pre-planned events. In October 2020, the Board of Police Commissioners approved the

957

Police Foundation funding of the new recording equipment.  All recordings are handled by the
Major Incident Response Team and will be booked directly with Technical Investigation
Division.  We support the implementation of the project.

**Rationale.**  Testing of downlink provides availability and sustainability of the downlink
software.

**Community Benefit.**  Downlink software ensures Department training can be completed after
each event, providing accountability and best practices established.

**Cost/Staffing Explanation.**  None.

**Timeline.**  Complete.

### PRIORITY FIVE
### Transportation Logistics

**Chaleff After-Action Report Recommendation:** Conduct a periodic review of the number of
buses and vans available to transport arrestees during a mass arrest situation and the number of
personnel certified to drive them.  Include:

(a) An assessment that the total available is sufficient;
(b) Plans to increase the transportation fleet if needed; and,
(c) Whether the Department Operations Center, Communications Division, shall retain a
current list of all certified drivers.

**Response.**  Item No. 5 refers to the periodic review of the number of buses and vans available to
transport arrestees during mass arrest scenarios.  It also covers the number of properly licensed
drivers required to operate those vehicles.  Motor Transport Division is completing this
assessment while Traffic Group addresses the number of licensed drivers for the equipment.  The
working groups support the initiative.  Currently, the Department has 11 buses, 11 passenger
vans, and five custody transportation vehicles.

**Rationale.**  Availability of transportation logistics ensures efficient management of unlawful
assemblies.

**Community Benefit.**  Resolving unlawful assemblies leads to increased public safety and
reduces the risk of further unrest.

**Cost/Staffing Explanation.**  The cost associated with this time would be $6,000 per year.  This
would cover a $150 medical examination for 40 employees.  The medical examination is
required for a commercial drivers' license.

**Timeline.**  The time frame for completion is to be determined.

## PRIORITY SIX
### Field Canteen

**Los Angeles Police Department Recommendation:** The food provided should be something that personnel can grab quickly and take with them.

**Response.** Item No. 6 refers to employee wellness during unusual occurrences.  It has been recommended that the Department replicate the Los Angeles Fire Department credit card purchases of box lunches for field personnel.  Supply Division received a formal project regarding this initiative and forwarded it to Office of Support Services for review.  Fiscal Group has been tasked with identifying permanent funding sources and codes.  Emergency use credit cards would be issued for use with Incident Commander approval.  Protocols will have to be established for authorization of their use.  The LAFD has no spending limit for food during an incident.  Budgetary approval is still pending. The working groups support this initiative.

**Rationale.**  Emergency use credit cards would provide officers sustenance for officers working long hours on skirmish lines.

**Community Benefit.**  Positive morale for sworn personnel would lead to efficiency in resolving civil unrest.

**Cost/Staffing Explanation.**  It was estimated that the cost could be $100,000.

**Timeline.**  In the process, with funding, the recommendation could be implemented in one Deployment Period (DP).

## PRIORITY SEVEN
### Drone Deployment

**Los Angeles Police Department Recommendation**: Additionally, the Department should investigate acquiring counter-drone technology similar to the Los Angeles Port Police.

**Response.** Item No. 7 refers to the Department's use of Small Unmanned Aerial Systems, commonly referred to as "drones."  After careful consideration it was determined that such technology conflicts with the City's best practices, and as such this recommendation will not be proposed for adoption.

**Rationale.**  This recommendation will not be proposed for adoption.

**Community Benefit.**  This recommendation will not be proposed for adoption.

**Cost/Staffing Explanation.**  None.

**Timeline.**  None.

959

**PRIORITY EIGHT**
**Public Mobile Notification**

**National Police Foundation – Recommendation:**  LAPD should consider leveraging new and emerging technologies, including reverse-text alert systems—and continue leveraging social media—to disseminate dispersal warnings and curfew notices.

**Response.**  Item No. 8 encourages the Department to leverage new and emerging technologies to disseminate dispersal warnings and curfew notices.  The Wireless Emergency Alert (WEA) has been developed to tailor specific messaging for targeted areas or citywide distribution.  These messages can contain imminent threat information, general notifications, public safety announcements, evacuation instructions, and unlawful assembly announcements.  The City's Emergency Management Division implemented the contract, and it has been successfully tested. This project is complete.

**Rationale.**  WEA provides increased communication between LAPD and the community.

**Community Benefit.**  The community receives text alerts to advise them when an unlawful assembly has been declared and directs them to safety.

**Cost/Staffing Explanation.**  This recommendation has already been completed and the costs have been absorbed by the City of Los Angeles.

**Timeline.**  Complete.

**PRIORITY NINE**
**Large Scale Maps**

**Los Angeles Police Department Recommendation**: Each geographic bureau should obtain and maintain large maps of their respective bureau.

**Response.**  Item No. 9 recommendation calls for the purchasing of large geographic maps for bureau use during pre-planned or unusual occurrences.  ITB was assigned this project, and it was completed.  Maps are currently available through Supply Division.

**Rationale.**  Maps at command posts provide leadership planning ability with large-scale maps.

**Community Benefit.**  Efficiency in command post-management.

**Cost/Staffing Explanation.**  Complete.

**Timeline.**  Complete.

960

**PRIORITY TEN**
**Radio Encryption**

**Los Angeles Police Department Recommendation**: The Department needs to ensure that it has sufficient encrypted tactical frequencies and the Command Post (CP) uses them.
The Department needs to invest in encrypted radios or another form of private communication.

**Response.**  Item No. 10 refers to encrypted tactical frequencies. ITB was assigned this project. OO agrees that the six current encrypted frequencies are currently sufficient. However, this initiative will be revisited in 2022 when the Department fields the new Land Mobile Radio (LMR) system. It is envisioned that the Department will be required to have all its radio communications encrypted to meet future state privacy guidelines. The end-user equipment portion of this project was completed with the issuance of the new tactical hand-held radios.

**Rationale.**  Item is lower on the priorities due to the fact that LAPD had a pre-planned, approved grant.

**Community Benefit.**  Privacy benefit where personal information that may go over radio frequencies are not available over the air.

**Cost/Staffing Explanation.**  A grant is funding this initiative.  Therefore, no additional funds are needed.

**Timeline.**  Current radio frequencies are complete.  It will take one year to implement the next phase which is not related to AAR as it was previously planned.

**PRIORITY ELEVEN**
**Protective Eyewear**

**Los Angeles Police Department Recommendation**: The Department has issued protective eyewear to its officers as of this report.  This eyewear protects officers from the use of lasers.

**Response.**  Item No. 11 refers to the issuance of protective eyewear to field personnel.  The eyewear was purchased by the Department and issued to all field personnel.  This project is complete.

**Rationale.**  Last priority due to the recommendation being completed.

**Community Benefit.**  Officer safety allows officers to continue to work patrol and less risk of injury.

**Cost/Staffing Explanation.**  The cost associated with purchasing 600 pieces of protective eye wear is $30,000.  This would be an annual cost.

961

**Timeline.**  The purchase of additional eyewear can be accomplished within two weeks.

962

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

## TRAINING

- ## Crisis Intervention

  Periodically review and enhance the Department's crisis intervention training policies and guidelines to ensure they are up-to-date and reflect current best practices, including:

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Enhance and promote the data collected on the SMART program to demonstrate the incidence of crises and the efficacy of crisis response practices.  Include the number of encounters with people in crisis and the nature of the encounter, e.g., mental health, suicide attempt, drug overdoses, disability, etc.<br><br>■ *Track officers' responses and the outcomes of their responses and conduct post-training assessments of officers who respond to crises, as well as the outcomes of those responses, to ensure that programs are effective and that training addresses community challenges.*<br><br>■ *Ensure this data is accessible to the public.* | Yes | | Information Technology Bureau (ITB) discussed this topic with Detective Support Vice Division (DSVD), who oversees Crisis Response and the SMART teams.  DSVD collects and retains data from calls for service (CFS) related to mental health, suicide, drug overdose, etc.  While this data exists, it is not currently available for public view.  Consultation with the City Attorney's Office and Detective Services Group (DSG) is needed to ascertain what data could be provided to the public. |

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

## DATA AND TECHNOLOGY

- **General Use Technology Policy**

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Implement a general use technology policy that includes:<br><br>■ Easily accessible policies on the Department's public-facing website. | Yes, completed | | Currently these items can be found on the public facing Department website under the Policies & Procedures/Training SB 978 section. The Department can continue work to make this information easier to access. |
| When adopting new technology or assessing the effectiveness of existing technology, engage in an evaluation that includes:<br><br>■ *Public engagement and collaboration, including the use of community advisory boards, surveys, public town halls, union representatives, technology experts, data scientists and other subject matter experts to obtain input before adopting new technology.*<br><br>■ *An analysis of best practices in the use of that technology.*<br><br>■ *An assessment gauging the effectiveness of technology.* | Yes | | While most of these items are in current practice with ITB, the Department can explore how to better evaluate, analyze, and assess items prior to on-boarding new technology. Understanding that some systems or operational agreements with other entities can limit the information shared.<br><br>Additionally, prior to the Department entering any contract, existing processes requires the Board of Police Commissioners to conduct a review, request further investigation and solicit public feedback prior to approving the contract for transmittal to City Hall. |

## Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

| | | | |
|---|---|---|---|
| *soliciting input from all levels of the Department, from line officers to leaders.*<br><br>▪ *An assessment of whether the proposed use of the technology is adequate to protect the privacy rights and civil liberties of the public.*<br><br>▪ *An assessment of whether the proposed technology could be used in a discriminatory or biased manner, and, if so, ensure appropriate safeguards are put in place to eliminate such inappropriate use.* | | | |
| *Develop specific guidelines for the adoption of new technology and for existing technology. Those guidelines should incorporate the above and include:*<br><br>▪ *Notification by the Department to the Commission when it wants to acquire new technology.*<br><br>▪ *Submission by the Department, with the help of the Information Technology Bureau, sufficient information about the proposed new technology and its use to the Commission for its review. This information should include:*<br><br>  ○ *Description of technology and how it works.* | Yes | | Will explore model policies from other cities. |

965

966

## Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

| | | |
|---|---|---|
| o Proposed purpose and primary use of the technology. | | |
| o The data or information that can be collected by the proposed technology. | | |
| o The category of individuals who can access or use the collected information, and the rules and processes required. | | |
| o Proposed training needed for the technology. | | |
| o Current data analytic capabilities to ingest and analyze the data. | | |
| o Information about steps to ensure adequate security measures to safeguard the data. | | |
| o The proposed data retention time period. | | |
| o How collected information can be used and/or reviewed by members of the public. | | |
| o Costs of the technology and need/cost for additional personnel. | | |
| o Identification of any potential impact on privacy and civil rights and plans to safeguard those rights. | | |

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

|  |  |  |
|---|---|---|
| ○ Mechanisms to ensure oversight and auditing of the policies to ensure compliance. |  |  |
| ○ A consistent and progressive discipline system for violations of policies. |  |  |

- **Specific Technologies Used to Gather Data**

  - **Body Worn Video (BWV)**

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Advocate for additional funding to supply all remaining sworn personnel with BWV.<br><br>▪ *Continue to issue BWV cameras to police officer recruits in the Academy.*<br><br>▪ *If funding is not available for all remaining personnel, develop a prioritization list for the personnel who do not yet have BWV and seek funding for the highest priority units (such as Detective Bureau).* | Yes |  | While feasible, the Department continues to issue BWV cameras to all new recruits upon graduation of the Academy.  The Department continues to seek funding sources for additional cameras, but the cost of a full deployment, for all sworn personnel, remains large, at approximately $25M over six years.<br><br>The Department will continue to prioritize distribution of available cameras to personnel most likely to interact with the community. |

967

968

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

| | | |
|---|---|---|
| Institute retention practices:<br><br>- *Create a BWV data retention and destruction policy.*<br>- *Conduct a comprehensive review of the need to retain BWV for law enforcement and oversight purposes and determine the length of time that BWV should be retained.*<br>- *Such period should not exceed the five-year guidance provided by the City's Administrative Code, absent specific circumstances supporting longer retention.* | Yes | The Department will work with the City Attorney's Office and review best practices of similar Law Enforcement agencies to institute a retention practice for BWV files. |
| Ensure continuous training of officers on the proper use and maintenance of BWV cameras including:<br><br>- *Immediate activation of BWV cameras at the beginning of encounters.*<br>- *Reinforcing the requirement that BWV cameras remain in the "on" position while on duty.*<br>- *Reinforcing the responsibilities for and restrictions on using BWVs, in accordance with existing policy.*<br>- *Practices to ensure the integrity of recordings, proper usage, and* | Yes | The Department will incorporate the reinforcement of current BWV policy in ongoing Department training and curriculum. |

## Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

| disciplinary actions for failure to follow policy. | Yes | |
|---|---|---|
| Conduct additional analysis of BWV footage to identify patterns of behavior and develop best practices for training purposes including:<br><br>■ *Increase the usage of BWV footage in on-going training by providing examples of officer's behavior, e.g., how officers approach and interact with individuals.*<br><br>■ *Analyze BWV footage more extensively to identify patterns of potential discriminatory, biased, harassing or other inappropriate behavior, including patterns that can be shown across incidents in the aggregate, for the purpose of improving encounters with the public.*<br><br>■ *Assist researchers in building an automatic speech recognition system, or other efficient system, for BWV footage to allow the department to facilitate the review of footage, examine officers' language precisely and systematically, and develop* | Yes | The Department currently utilizes Bureau Inspection Teams, Area Training Units, and Audit Division to inspect BWV for training purpose and identifying patterns.<br><br>ITB continues to work with vendors and research solutions for new features like speech recognition and other efficiency systems to aide in the review of BWV footage. |

969

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

970

| | | | |
|---|---|---|---|
| *strategies for improving officer communication.* | | | |

### • Digital In-Car Video System (DICVS)

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Consistent with Department Manual Section 3/579.13, regularly review the DICVS Policy to ensure it is up-to-date and reflects current best practices, including:<br>■ *Clearly states when and how the DICVS must be activated.*<br>■ *Requires officer training on the proper use of the DICVS.*<br>■ *Requires officers to record certain incidents, including traffic stops, searches, transports, and questioning of victims, suspects, and witnesses.*<br>■ *Requires data be uploaded to a secure storage repository.*<br>■ *Prohibits officers from deleting or otherwise tampering with in-vehicle recording footage.* | Yes | | The Department will incorporate the reinforcement of current DICVS policy in ongoing Department training and curriculum. |
| Provide consistent supervision to enhance compliance and accountability with DICVS policies and practices:<br>■ *Supervisors should be responsible for reinforcing DICVS policies and should be regularly evaluated on their* | | | The Department's current practice of random inspection of DICVS includes evaluation of compliance in use of DICVS. Additional expansion of the inspection process can be explored. |

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

971

| | | |
|---|---|---|
| *efforts to ensure compliance and on their ability to identify non-compliant officers.*<br><br>■ *Supervisors should regularly review DICVS practices with officers to ensure compliance.* | | Supervisors will continue to review DICVS during investigations and provide feedback/training to personnel. |
| Conduct regular audits and inspections of DICVS to ensure compliance:<br><br>■ *Systematic audits should be conducted to consistently monitor the use of DICVS to ensure adherence to department policies.* | Yes | The Department's current practice of random inspection of DICVS includes evaluation of compliance in use of DICVS. Additional expansion of the inspection process can be explored. |
| Establish a consistent and progressive discipline system for violations of the DICVS policies. | Yes | This is currently addressed in the Department's Sworn Penalty Guide for Personnel Complaints, published by Professional Standards Bureau. |
| Institute retention practices:<br><br>■ *Create a DICVS data retention and destruction policy.*<br><br>■ *Conduct a comprehensive review of the need to retain DICVS for law enforcement and oversight purposes and determine the length of time that DICVS should be retained. Such period should not exceed the five-year guidance provided by the City's Administrative Code, absent specific circumstances supporting longer retention.* | Yes | The Department will work with City Attorney's Office and review best practices of similar Law Enforcement agencies to institute a retention practice for DICVS files. |

# Board of Police Commissioners Advisory Committee Recommendations

## Technology and Equipment

- **Automated License Plate Reader (ALPR)**

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Develop and implement a clear ALPR policy that reflects current best practices and includes the following:<br>• Ensures compliance with SB 34.<br>• Ensures compliance with Report issued by State Auditor, dated February 2020.<br>• Establishes the authorized and prohibited uses of the ALPR system.<br>• Specifically defines how the LAPD will monitor and audit the use of the ALPR system to ensure compliance and the security of the data.<br>• Ensures that vendors who have access to ALPR systems adequately protect the information.<br>• Addresses data sharing agreements.<br>• Addresses data retention issues that consider both the usefulness of the ALPR data and individuals' privacy in | Yes | | Currently, all items have been addressed in Special Order No. 31, 2020 – Automated License Plate Recognition Usage and Privacy Policy, approved by BOPC on December 8, 2020. The Department will continue to monitor changes in State law and national best practices. |

972

**Board of Police Commissioners Advisory Committee Recommendations**
**Technology and Equipment**

| | | | |
|---|---|---|---|
| *deciding how long to retain the images.*<br>• *Defines the "Appropriate Users" of ALPR technology:*<br>• Specifically identify the individual users who have access to the ALPR system.<br>• Users should require supervisor approval and ALPR training as a prerequisite for account access.<br>• Suspension of accounts should be required when a user has become "inactive."<br>• Training for "inactive" users should be required to regain active status.<br>• Deletion of accounts should take place when employees separate from the agency.<br>• *Allow ALPR technology to only be used to collect data that is within public view and not be used for the sole purpose of monitoring individual activities protected by the First Amendment.* | | | |

973

974

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

| | | |
|---|---|---|
| Implement internal safeguards to protect against misuse of data and outline consequences for noncompliance. | Yes | Department databases require users to log in using personal identifiers and passwords.<br><br>Additionally, misuse and noncompliant use of data is covered under the Department Manual, Vol 3, Section 405 - Confidential Nature of Department Records, Reports, and Information.<br><br>Violations of this nature would be addressed under the Department's Sworn Penalty Guide for Personnel Complaints. |
| Develop an ongoing evaluation and audit system that determines whether the technology is being used in accordance with policies. | Yes | Per Department policy, currently ITB provides ALPR data to Audit Division for inspections. (Special Order 31, 2020) |
| Develop an ALPR retention policy that balances the need for law enforcement investigations with privacy concerns.<br>■ *Ensure the retention policy is consistent with all other data storage policies.* | Yes | Per Department policy, Retention policy is specified as five years. (Special Order 31, 2020) |

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

- **Suspicious Activity Reports (SARs)**

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Consistent with Department Manual Section 4/271.46, and Special Order 17 (2012) ("SARs Policy"), regularly review the SARs Policy to ensure it is up-to-date and reflects current best practices, including:<br><br>■ *Include SARs in the arrest files for arrests made based on SARs.*<br><br>■ *Ensure that information collected in the SARs is only used for bona fide law enforcement and/or intelligence analysis purposes and/or for defense in civil or administrative actions brought against the Department or its members.*<br><br>■ *Require the department to publicly report on the data submitted in SARs report on a regular basis but not less than once a year.*<br><br>■ *Conduct regular audits to ensure that reports are based on observed behavior reasonably associated with pre-operational planning associated with terrorism or other criminal activity (The Department* | Yes | | The Department will continue to monitor best practices and will update policy as needed. Reviews of data and submitted reports can be conducted by Audit Division and the Office of Constitutional Policy and Policing. |

975

976

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

| | | |
|---|---|---|
| *and federal guidelines also refer to this as potentially having a "nexus to terrorism"), and do not include protected First Amendment activities.* | | |
| Review the findings of the 2019 OIG audit, and ensure all recommendations have been implemented, specifically:<br><br>• *Revisions to Special Order 17 incorporating updated language regarding suspicious activity behaviors and indicators (set forth by the 2015 iteration of the ISE Functional Standard).*<br><br>• *Requiring that analyst notes clearly state the rationale for affirming or denying each SAR and require that the notes explain the rationale for any reversal of an original classification.*<br><br>• *Evaluate options to categorize the racial/ethnic background of the involved persons more effectively (currently listed in the Descent category as "Other") in an effort to minimize the use of the term "other."*<br><br>• *Develop parameters regarding sharing information from any "unfounded" SAR with the Joint* | Yes | The Department published Special Order No. 2, 2020, which updated the language of Suspicious Activity Potentially Related to Foreign or Domestic Terrorism (Renamed and Revised from Suspicious Activity Report).<br><br>Additional recommendations related to this may be analyzed by Counter Terrorism Special Operations Bureau. |

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

- *Regional Intelligence Center ("JRIC") or other outside agencies.*
  - *Review all video and audio recordings associated with a SAR as part of the classification process.*

- **Data Quality and Accuracy**

  Data quality and accuracy in individual reporting should be enhanced to improve the overall quality of the information in the databases.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Establish metrics to track and assess data quality (e.g., number of incomplete or redundant entries in a database, or the amount of data that cannot be analyzed due to formatting or input issues) and perform recurring data quality assurance audits. | Yes | | Currently, ITB monitors, with limited ability, the quality of data entered into Department databases.

The Department is working on a project to update our data systems, which could allow for better tracking and data management. |
| Conduct data quality follow-up as soon as feasible after reporting problems occur. | Yes | | This is a current practice by ITB when notified of identified issues. Currently, ITB is guided by best practices when addressing data quality issues. |

977

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

- **Data Access and Use**
  Ensure that current policies are being followed and that access to the databases is limited to authorized employees for official police business purposes.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| To accomplish this, develop clear policies and procedure for accessing data, including: <br><br> • *Data stored on or available through department systems should only be accessed by authorized employees who are engaged in an active investigation, assisting in an active investigation, or otherwise have a legitimate law enforcement or department business-related purpose.* <br><br> • *Access controls should be streamlined and consistently applied to all data and should require authentication, authorization, and passwords.* <br><br> • *Access to sensitive information should be limited to authorized employees with an express need to review such data.* <br><br> • *Clearly identify personnel who have edit rights to the data and when they can edit said data.* <br><br> • *Employees who should no longer have access rights should immediately be removed from access privileges.* <br><br> • *Outline consequences for noncompliance.* | No | Not all databases or systems accessed by personnel are operated/owned by the Department. Any changes to systems outside of the Department's control would have to be requested and submitted to system owners. <br><br> Changes to systems and databases owned by the Department can be explored. | Currently, Department databases require users to log in, using personal user names and passwords. <br><br> Access to many databases, require a right to know, need to know and in some instances, access is role based. <br><br> Additionally, violations of this topic are covered under Department Manual section, Vol 3, Section 405 - Confidential Nature of Department Records, Reports, and Information. <br><br> Violations of this nature would be addressed under the Department's Sworn Penalty Guide for Personnel Complaints. <br><br> Note: <br> The Department would need to balance efficiencies vs security when exploring additional safeguard measures. |

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
| --- | --- | --- | --- |
| Conduct regular audits to ensure access is limited to authorized users.<br>▪ *Access logs should be routinely audited to ensure compliance with data access policies and procedures.* | Yes | | The Department can explore means to inspect and provide data to Audit Division for review. |

• **Data Retention/Preservation**

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
| --- | --- | --- | --- |
| Develop clear and comprehensive policies and procedures pertaining to the retention and destruction of all data for each technological tool that includes balancing the following:<br>▪ *Evaluating law enforcement needs for the data.*<br>▪ *Considering the privacy considerations of those individuals whose data is being held and how to safeguard those rights.*<br>▪ *Assessing the need for the data in ongoing criminal investigations, prosecution, administrative or civil proceedings.*<br>▪ *Ensuring the need to protect stored data consistent with the applicable cybersecurity structure.* | Yes | | The Department will work with the City Attorney's Office and review best practices of similar Law Enforcement agencies to institute a retention practice for data. |

979

# Board of Police Commissioners Advisory Committee Recommendations

## Technology and Equipment

980

| | | | | |
|---|---|---|---|---|
| Work with the Police Commission and City Attorney's Office to address the applicable law regarding data retention and/or preservation, including California law and Los Angeles City Administrative Code, and bring recommendations to the appropriate governing body to amend these requirements in accordance with the Department's evaluations and findings. | Yes | | | The Department will work with the City Attorney's Office and review best practices of similar Law Enforcement agencies to institute a retention practice for data. |

- ## Study/Collected Data
  Ensure that significant efforts are made to learn from all collected data. These efforts should include:

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Expand work with research specialists, academics, data scientists, and other subject matter experts. | Yes | | The Department has a long history of partnering with academia and research specialists to establish best practices. The Department can continue this history in regard to data collection. |
| Establish metrics for evaluating the utility of the data. | Yes | | The Department has a long history of partnering with academia and research specialists to establish best practices. The Department can continue this history in regard to data utility. |
| Consistently evaluate and review data collected to determine efficacy of policing practices and which ones result in unintended consequences. | Yes | | The Department has a long history of partnering with academia and research specialists to establish best practices. The Department can continue this history in regard to data and its use for efficacy of policing practice. |

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

- **Promote Public Engagement and Community Trust**

  Increase public engagement and community trust by making data public.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Report data publicly (e.g., demographic, enforcement, critical incidents, etc.) and discuss with the community at regular public forums and oversight meetings. | Yes | | The Department's current Racial and Identity Profiling Act (RIPA) Dashboard project will have a public facing report that can be used for public forums. Additional projects to replace outdated data systems can have this functionality built in. |
| Continue to expand open data access and include, where feasible, data summaries/reports in English and Spanish. | Yes | | The Department's current data systems have limited ability to interface with open data. As new data systems are established, the Department can work on expanding access. |
| Update the public-facing website so that data is more easily accessible to the public. | Yes | | The Department is currently updating the public website, which will allow for easier access to information. |
| Data should be presented in a way that promotes true transparency, comprehensibility and encourages public engagement and collaboration through information dashboards, maps, graphical interfaces that use icons, menus, and other visual graphics. | Yes | | The Department will work with internal and external stakeholders to identify the best means to publish and present data to the public. |
| Raw data should be available for download so researchers, academics, and other interested parties can access and analyze it. | Yes | | The Department can explore exporting data to the City's Open Data portal.<br><br>Note: Many data systems currently in use by the Department are limited in their ability to |

981

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

982

| | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Work with community representatives to develop and propose data, privacy, and technology policies and practices that are consistent with best practices for the Commission to consider adopting. | Yes | | be modified, as limited support staff is available. As the Department replaces these systems with new modern products, the Department can work to make this feature part of the new system.

The Department can work with the public to develop best practices on data, privacy and technology policies. |

### • Report Demographic and Enforcement Data

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Consistent with many of the current practices of the Commission and the Department, collect and publicly report:<br>• *Pedestrian and traffic stops*<br>• *Searches*<br>• *Summonses*<br>• *Arrests*<br>• *Reported crimes*<br>• *Complaints (volume and nature of)*<br>• *Officer injuries*<br>• *Officer training* | Yes | | The Department is currently working on the Racial and Identity Profiling Act (RIPA) dashboard that will publish most of this data. This work is ongoing. |
| Disaggregate data by demographics including race, ethnicity, national origin, gender, LGBTQIA+ status, disability, religion, and other relevant demographic identifiers, to help | Yes | | The Department is currently working on the Racial and Identity Profiling Act (RIPA) dashboard that will publish most of this data. This work is ongoing. |

983

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

| | | |
|---|---|---|
| assess the effectiveness of police practices, maintain accountability, and engage the community. | | |
| Include detail sufficient to permit an analysis of possible patterns of biased policing or racial profiling. | Yes | The Department is currently working on the Racial and Identity Profiling Act (RIPA) dashboard that will publish most of this data. This work is ongoing. |
| Regularly review and monitor that data is being made available as soon as practical. | Yes | The Department is currently working on the Racial and Identity Profiling Act (RIPA) dashboard that will publish most of this data. This work is ongoing. |
| Report and make publicly available data regarding the composition of the department including race, gender, age, educational-level, and other relevant demographic data. | Yes | The Department is currently working on the Racial and Identity Profiling Act (RIPA) dashboard that will publish most of this data. This work is ongoing. |
| Disaggregate all data by unit, division, shift, and geographic location. | Yes | The Department is currently working on the Racial and Identity Profiling Act (RIPA) dashboard that will publish most of this data. This work is ongoing. |

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

- **Report Use of Force Data**

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Consistent with the Commission's 2015 directives, and Department's practices, as reflected in the Annual Use of Force year-end review reports, regularly review the Department's use of force policies to ensure they are up-to-date and reflect current best practices. | Yes | | The Department continues to publish the annual Use of Force Year-End Review report and will research best practices to publish and review this data. Additionally, the Department can explore ways of automating the regular review process of policies. |
| Ensure continuous and frequent reporting of all use of force data which should, at a minimum include: <br><br> • *The Annual Use of Force year-end review.* <br> • *Regularly post data online, in addition to the annual report.* <br> • *Police Commission Meetings.* <br> • *Public meetings, including meetings with community groups and organizations; and* <br> • *Annual reports to the federal government, including to the FBI's Criminal Justice Information Services (CJIS) and Bureau of Criminal Apprehension (BCA).* | Yes | | The Department will explore best practices to publish data to different audiences, via various means. <br><br> Note: Many systems currently in use by the Department are limited in their ability to be modified, as limited support staff is available. As the Department replaces these systems with new modern products, the Department can work to make this feature part of the new systems. |
| The data disclosed should include, at minimum, information on officer-involved shootings (OIS), in-custody deaths, and uses of force resulting in serious bodily harm | Yes | | The Department can explore best practices to publish data to different audiences, via various means. |

984

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

985

- **Procure A High-Quality Data Collection System**

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| (collectively referred to as categorical uses of force (CUOF). In addition, reporting of non-categorical uses of force should also continue to take place. | | | Note: Many systems currently in use by the Department are limited in their ability to be modified, as limited support staff is available. As the Department replaces these systems with new modern products, the Department can work to make this feature part of the new systems. |
| The Department should implement and maintain a high-quality, modern data collection system for collecting, storing, and analyzing relevant data. The system may include such modern technology as a friendly graphical user interface, a robust cloud repository with secure databases, and automated search tools. | Yes | | The Department is in the process of updating its data collection system. As the requirements of this project are finalized, these topics can be included. |
| The data collection system should help facilitate the Department's ability to aggregate, normalize and analyze relevant data, including analysis by demographic variables. | Yes | | The Department is in the process of updating its data collection system. As the requirements of this project are finalized, these topics can be included. |
| The Department should ensure that data is not collected or used in a way that would violate privacy, civil or human rights or | Yes | | The Department is in the process of updating its data collection system. As the requirements of this project are finalized, these topics can be included. |

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

986

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| facilitate discrimination against any demographic group. | | | |

- ### Enhance the Information Technology Bureau (ITB)

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Members of the ITB should have experience in implementing and maintaining data collection systems, working with cloud repositories, understanding data taxonomy (cataloging of data), and performing data analytics. | Yes | Not applicable | The Department and ITB will continue employee development in regard to IT support and project management, ensuring training will be modern and cover industry best practices. |
| The ITB should assist the Department in retaining outside subject matter experts with extensive experience in the secure collection, storage, accessibility, transmission, management, audit, and analysis of digital data. Outside subject matter experts will play an integral role in assisting the Department to update and restructure its current databases, procure adequate systems for collecting and storing data, and facilitate the efficient integration and analysis of all existing and newly collected data sets. | Yes | Not applicable | Currently, ITB has several Volunteer Specialists who assist Department personnel in establishing and reaching modern best practices when it comes to IT operations. Additionally, ITB has a long history of working and partnering with the Information Technology Agency (ITA) for available City resources. |
| Secure additional funding and/or resources so that the ITB can implement an information systems architecture that allows for the best practice in secure collection, storage, | Yes | Not applicable | The Department and ITB will continue to research funding opportunities, via Grants etc., for contracted workers, along with working to obtain additional personnel authorities to ensure the design of new |

987

## Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

| Recommendation | | | |
|---|---|---|---|
| accessibility, transmission, management, and analysis of digital data. | | | system architecture is completed to industry best practices. |
| An IT/data manager should oversee the applicable ITB and facilitate the handling of data requests, data analysis, and data risk assessment. | Yes | Not applicable | At this time ITB is working to expand its command, via a civilian position, who could oversee these items with the mission of meeting national best practices. Currently, these topics are overseen by each commanding officer, responsible for their specific project and/or system. |
| The ITB should develop and implement security protocols to mitigate the risk to protected data within the Department's control. | Yes | Not applicable | Currently, ITB has within Information Technology Division an Enterprise Cyber Security Section. This section continually researches national best practices in regard to cyber security and recommends changes to policy and procedures through ITB. |
| The ITB teams should be able to maintain and readily analyze demographic and enforcement data to identify, among other things, possible patterns of biased policing, misallocation of resources, or inadequate training. | No | Staff at ITB are focused on the maintenance and operations of the Department's IT systems. They have limited ability or background to review, identify or provide recommendations on Department field operations. | To work towards this goal, ITB could provide data and access to systems for personnel from the Office of Operations, Audit Division, etc., to conduct these types of reviews. |
| The ITB teams should have a significant level of independence from operational entities within the Department to enhance perception of trustworthiness and integrity of collected, analyzed, and maintained data. | Yes | Not applicable | Currently, ITB's position in the Department's chain of command is as a "direct report" to the Chief of Police. This provides a level of autonomy from other Department Offices. |

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

- **Additional Privacy Considerations**

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Implement privacy practices pertaining to the public's personal information, including:<br><br>• Evaluate the law enforcement purpose for collecting the public's personal data and consider alternatives to doing so.<br>• Limit the collection and retention of such personal information to directly serve a legitimate law enforcement purpose.<br>• Consider the privacy implications of collecting personal information before the collection of such data.<br>• Collect information in ways that does not discriminate against any persons, including marginalized and minority communities.<br>• When possible, offer clear alternatives to the collection of personal information at the time of collection. | Yes | Not applicable | Department databases require users to log in, using personal identifiers and passwords.<br><br>Additionally, this topic is covered under the Department Manual, Vol 3, Section 405 - Confidential Nature of Department Records, Reports, and Information.<br><br>Violations would be addressed under the Department's Sworn Penalty Guide for Personnel Complaints. |
| Manage personal information with diligence.<br><br>• Regularly update software and applications used for the collection and retention of public personal information.<br>• Regularly delete personal information, consistent with the Department's data retention policies. | | | The Department can work to maintain current versions of software and applications for Department use. We can also explore, as means of best practice, encryption and data retention, as allowed by City rules. |

988

989

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

| | | |
|---|---|---|
| • *Encryption and other security measures should be implemented to reduce misuse of personal information.*<br>• *Extend privacy protection to the Department's relationships with third parties and provide personal information only when necessary or required by law.* | | Note: Many of our current systems have limited, if any expansion capabilities. The Department is currently in the beginning phases of replacing these outdated systems. |
| Safeguard individual privacy in public disclosures consistent with the recommendations included herein. | Yes | The Department can work with the City Attorney's Office on this subject. |
| Safeguard individual individual privacy in public disclosures consistent with the recommendations included herein. | | Not applicable |
| Be transparent and open about why and how the Department collects, uses, manages, and shares personal information.<br>• Include these explanations on the Department's public-facing website.<br>• Seek community input on the collection of personal information and how it could be protected. | Yes<br><br>Not applicable | The Department can explore ways of adding privacy disclosures to Department forms and websites. |

990

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

- **Field Interview Cards**

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| **Digitize and Streamline FIs:** Work towards streamlining the FI process by digitizing it and connecting it to AFDR and CAD data in order to reduce the burden on officers. This would also ensure timeliness of data entry, improved accuracy, and less redundancy, and would facilitate better data analysis. In digitizing the system, the Department should also expand character limits to ensure that the card allows for sufficient information to be entered into the system. To the extent that officers continue to use paper forms, the Department should develop a formalized system for tracking and managing these documents, to include a process for ensuring timely entry into the FI database. | Yes | Not applicable | The Department is currently working on a project that would allow for FI, AFDR and CAD data synchronization and reporting contemporaneously during an officer's investigation. This work is ongoing.<br><br>During the continued use of paper forms, the Department can explore ways of better tracking and managing these documents. |
| **Retention Period:** Develop a retention policy for digitized FI cards, which may include the purging of outdated records containing personal identifying information. | No | Department FI reports should be retained for investigative purposes. | The Department could work with the City Attorney's Office and review best practices of similar Law Enforcement agencies. |

# Board of Police Commissioners Advisory Committee Recommendations
## Technology and Equipment

- ## Data Collection

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| **Improve Data Collection Practices:** Expand data validation and performance audits to identify areas of errors or confusion in entering stop data.  Provide training and guidance in these areas. | Yes | Not applicable | The Department is currently working on the Racial and Identity Profiling Act (RIPA) dashboard that will publish most of this data.  Once completed, the Department can explore refining validation of data.  Additionally, the Department is in the process to replace old systems with new modern interfaces.  As this work proceeds, the Department will refine training and guidance for personnel. |
| **Identify Data Improvements:** Identify additions to the required RIPA data fields that might assist in understanding and analyzing stop data, such as the addition of important contextual information.  These might include, for example, the following fields: vehicle/pedestrian/bicycle stop, driver/ passenger/pedestrian, local code violation, homeless status, search-by-search data. | Yes | Not applicable | The Department is currently working on the Racial and Identity Profiling Act (RIPA) dashboard that will publish most of this data.

Currently, the Department is being guided by State Law.  Once the dashboard is completed, the Department can explore gathering additional contextual data, this work is ongoing. |
| **Timely Data Entry:** Require that AFDRs be filled out directly following a stop where practicable.  If this is not practicable, officers should note that the AFDR card was completed later and should take steps to ensure accuracy, including consulting contemporaneous notes or video as needed. | Yes | Not applicable | The Department is currently working on a project that would allow for AFDR reporting contemporaneously during an officer's investigation. This work is ongoing. |

991

# Board of Police Commissioners Advisory Committee Recommendations

## Technology and Equipment

- **Data Analysis and Transparency**

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| **Publish Stop Data:** Publish regular reports on stop data, including data disaggregated by race and gender, geographic area, and post-stop activities. Make all stop data, other than confidential information, available through the City's open data website. | Yes | Not applicable | The Department is currently working on the Racial and Identity Profiling Act (RIPA) dashboard that will publish most of this data. This work is ongoing. |
| **Analyze Stop Data on an Ongoing Basis:** Continue and finalize the process of developing metrics and a system for ongoing analysis of stop data for the purposes of identifying potential disparities, areas of improvement and success, and possible Fourth Amendment issues. Incorporate stop measures into the CompStat process and into officer reviews. | Yes | Not applicable | The Department is currently working on the Racial and Identity Profiling Act (RIPA) dashboard that will publish and allow the review of this data. This work is ongoing |

Board of Police Commissioners Advisory Committee Recommendations
Technology and Equipment

**WORK-PLACE INCENTIVE/RETENTION**

- **Officer Health and Well-Being**

  Create a culture that values self-care and safety in all aspects of operations.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Ensure all officers are provided with sufficient and modern safety equipment.<br><br>▪ Continue to issue BWV and other important technology to police officer recruits in the Academy to ensure the recruits are receiving hands-on training with mission critical systems.<br><br>▪ Ensure that all officers are provided with appropriate safety equipment and monitor their needs (and potentially changing needs) on an ongoing basis.<br><br>▪ Equip officers with on-duty first aid kits and provide regular training on proper techniques for rendering aid in the field.<br><br>▪ Require officers to wear seatbelts and implement regular trainings on importance of safe driving behaviors. | Yes | Not applicable | The Department will continue to issue BWV to new recruits and monitor new emerging technology available to law enforcement.<br><br>Training on first aid and harm reduction will continue to be provided to Department personnel. |

9/16/2021

994

**After Action Report Implementation Plan Worksheet**
**Technology and Equipment**

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action/ Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Technology | Chaleff | Explore Department personnel tracking technology to be used for large scale events to be able to track personnel during staging and deployment, skill sets, certification and timekeeping for better planning and deployment. | 21 | Review and report back on feasibility/desirability. If feasible and desirable, provide technology options for RFP. | y | ITB, IMD, CTSOB, and ESD are working on a system called GAURD (Geographic Area Uniformed Reporting Device). ESD is SME to validate end user feasibility. How this is going to be accomplished is based on the ability to effectively integrate and share information from the different Department systems. As it relates to financial cost of such resource deployment, it is estimated to be $1.5M. | $1,500,000 | 0 |
| | Technology | | Ability to track personnel via GPS and when they enter a geo-location, defined by Command Post, for increased transparency of work actually performed for an event. | | Cost Back Bone of Radio GPS capabilities | | | | |
| | Technology | LAPD | The Department's needs to invest in a more efficient system for tracking its own and additional resources. | 9 | Review and report back on feasibility/desirability. If feasible and desirable, provide software options for RFP. Work with ITB to identify solutions/options. | | | | |
| 2 | Technology | Chaleff | Purchase software that can be used to analyze open-source internet and social media content to provide field operations with vetted and useable intelligence/information and add appropriate staffing. | 20 | Cost Software Solution | | Social Media Software leverages social media data and will allow improved data collection and provide a more holistic background on target subjects. Cell phone analytical tools exist that can be linked to OSINT data to give real time intelligence. These software solutions have been tested and requested by MCD. However, do to lack of funding have not been made available. First 5 licenses - $50,000 Next 5 licenses - $40,000 10 licenses for $450,000 | $450,000 | 0 |
| | Intelligence Gathering | National Police Foundation | LAPD should develop a process to ensure that intelligence and information gathered to improve public safety is appropriately incorporated in the command structure. This information should be shared promptly and consistently with the Incident Commander and relevant department and bureau command posts and is factored into planning and preparedness. | 2.5.2 | CTSOB and MCD have created a Social Media Working Group that meets monthly to build relationships and improve intelligence flow between Operations, Area Bureaus, MCD, RHD, and IRC | y | Note: Community Committee members to participate in policy discussions to ensure privacy concerns are addressed. | | |

9/16/2021

995

Innovation Management Division

After Action Report Implementation Plan Worksheet
Technology and Equipment

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action/ Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| | Intelligence Gathering | LAPD | The Department should seek new technologies and capabilities to gather and analyze open source information and intelligence that can be quickly shared with the Operations Section Chief. | 28 | | | | | |

9/16/2021

**996**

After Action Report Implementation Plan Worksheet
Technology and Equipment

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action/ Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 3 | Intelligence Gathering | National Police Foundation | LAPD should work with the community to consider collaborative approaches and technology solutions and strategies that will enhance situational awareness and improve community and officer safety. | 2.5.1 | Develop guidelines and strategies to address and work with PCG Cost Software Solution | Y | Increase Sworn and Civilian authorities for One Crime Intelligence Analyst (CIAN I) ($215,241.30) One Police Officer II (Salary $295,221.84) PER BUREAU Total - Four CIAN/ Four PO II | $2,041,852 | 8 |
| 4 | Equipment | LAPD | The Department should establish a routine testing schedule for the Air Unit downlinks. Downlink systems that are not working properly should be fixed and retested to ensure an adequate number are operational and able to send live video downlink to multiple receivers. A command officer in an Air Unit can complement the downlink deployment and provide guidance and information to Operations Section Chief and IC. On October 21, 2020, the BOPC approved the Los Angeles Police Foundation donation of new recording equipment for the video downlink feed in Air Units. The old equipment which only allowed viewing of real-time feeds was supplemented with standalone recorders to allow Command Staff to download and replay recorded video captured by the Air Unit. | 17 | Develop testing schedule and upgrade equipment | Y | This is an ASD lead. ASD to schedule monthly testing for each airship to maintain readiness and identify and fix any issues. Pre-incident tests. For pre-planned events, test the airships that will be used that day to ensure Downlink is operational. ASD Schedule to be coordinated with MIRT, DOC, Bureaus that have Downlink. Downlink is recorded and all recordings are booked directly at TID with the included (Preface of "Downlink, Date, and Bureau of recording). The portion recommending a command officer in the airship is a tactical discussion and should be moved to the "Deployment Mobilization" category with the weigh-in of ASD and Metro. | 50 | 0 |

Innovation Management Division

After Action Report Implementation Plan Worksheet
Technology and Equipment

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action/ Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 5 | | Chaleff | (a) An assessment that the total available is sufficient, (b) Plans to increase the transportation fleet if needed, and (c) Whether the Department Operations Center, Communications Division, shall retain a current list of all certified drivers. | 5 | Develop review schedule of equipment and drivers and ensure it's delivery to COMM | Y | MTD is completing assessment of buses and vans. Traffic Group is assessing number of bus drivers and the driver lists will be retained by Traffic Group and the DOC. The lists will be updated monthly. Currently, the Department as 11 passenger Vans, 11 Buses, and 5 Custody Transportation vehicles. MOA with LASO and MTA for use of buses. | $6,000 | 0 |
| 6 | Equipment | LAPD | Conduct a periodic review of the number of buses and vans available to transport arrestees during a mass arrest situation and the number of personnel certified to drive them. Include: | 6 | $150 for 40 medical examinations each year | Y | Currently, the Department as 11 passenger Vans, 11 Buses, and 5 Custody Transportation vehicles. | $100,000 | 0 |
| | Employee Wellness First Aid | | The food provided should be something that personnel can grab quickly and take with them. | | Implement Annual Cost | Y | Contacted Supply Division who advised a formal project for this was already sent though OSS for a pre-authorized contract. FG to possibly identify/establish permanent funding source and code. It is recommended that all DOC W/C's obtain Emergency Use Credit Cards and be delegated the authority to place the food order on the approval of the Incident Commander. There needs to be protocols established that identify minimum criteria for authorization and if any other approval is necessary. | | |

## After Action Report Implementation Plan Worksheet
### Technology and Equipment

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action/ Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 7 | Equipment | LAPD | Possible to utilize current fleet to achieve goal.<br><br>Additionally, the Department should investigate acquiring **COUNTER DRONE TECHNOLOGY** such as that used by the Los Angeles Port Police. | 3 | Cost- Counter Drone Technology With 30K annual recurring | N | Such technology conflicts with the City's best practices. | $0 | 0 |
| 8 | Technology | National Police Foundation | LAPD should consider leveraging new and emerging technologies including reverse-text alert systems—and continue leveraging social media—to disseminate dispersal warnings and curfew notices. | 3.2.2 | Develop guidelines for implementation in an unusual occurrence.<br><br>Cost<br>Software solution | Y | WEA – Wireless Emergency Alert<br><br>Utilizing the Everbridge software, the Wireless Emergency Alert (WEA) is a mass notification, incident communication tool. It provides the capability to send out a forced notification message to a cell phone to a group or people in a selected, target area. The forced mass notification message provides informative and descriptive insight or direction before, during and after critical events. Using template options created and tailored to meet specific needs, a WEA can be sent either citywide or a targeted area. Options for use include an Imminent Threat, General Notification, Public Safety Awareness, Wildfire Evacuations and Civil Unrest. The system has been successfully deployed. | $0 | 0 |
| 9 | Planning, Preparedness and CS | LAPD | Each geographic Bureau should obtain and maintain large maps of their respective bureau. | 2 | Provide maps<br>Cost- 12 Printed Large Scale Maps | N/A | ADSD has made maps available through Supply Division. | $0 | 0 |

**After Action Report Implementation Plan Worksheet**
**Technology and Equipment**

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action/ Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 10 | Technology | LAPD | The Department needs to make sure that it has sufficient encrypted tactical frequencies and the CP uses them. | 3 | Provide needs assessment and report back Provide options for RFP. | Y | OO agrees the current six encrypted frequencies is sufficient until the new Land Mobile Radio (LMR) system is installed in 2022. | $0 | 0 |
| | Internal Communications | LAPD | The Department needs to invest in encrypted radios or another form of private communication. | 3 | Cost Communication Solution | Y | Complete | $0 | 0 |
| 11 | Equipment | LAPD | As of this writing, the Department has issued protective eyewear to its officers. This eye wear protects officers from the use of lasers. | 19 | Review and report back on options Additional 600 Glasses per year @$50 per pair | Y | Protect sworn officers and supervisors from harmful lasers utilized by protestors. | $30,000 | 0 |
| | | | | | | | Total | $4,127,852 | 8 |

# TRAINING

As part of the Department's After-Action Report Implementation Plan, the Training Working Group was created and tasked with addressing 17 of the recommendations stemming from the three different completed After-Action Reports as well as recommendations from the Board of Police Commissioners Advisory Committee (Advisory Committee) report. The working group undertook the task in partnership with stakeholders who hold deep ties to the neighborhoods and segments of the broader Los Angeles community and provided expertise from different, professional, academic, and civic areas.

### Board of Police Commissioners Advisory Committee's Report Recommendations

The Board of Police Commissioners established an Advisory Committee review and report on the Department's policies, procedures, and practices. This led to the publication of The Board of Police Commissioners Advisory Committee's Report (ACR), which also provided the Department with recommendations to maintain and enhance public trust through transparency and oversight.

The recommendations contained in the ACR spanned the areas of Recruitment and Hiring, Training, Bias-Free Policing, Data and Technology, the Disciplinary Process and Work-Place Incentives/Retention. These recommendations represent overarching philosophies in addition to directly actionable items, and as such will need a longitudinal approach to address.

Of the several recommendations from the ACR, the Training working group placed primary focus on:

- Review and improve training policies and programs to ensure they are up-to-date and reflect current best practices; and,
- Training should focus on critical thinking, social intelligence, implicit bias, fair and impartial policing, historical trauma, de-escalation, and other topics that address capacity to build trust and legitimacy in diverse communities and offer better skills for gaining compliance without the use of physical force.

These two areas of primary focus represent critical areas of training that must be constantly reinforced, updated, and emphasized.

## WORKING GROUP COMPOSITION

Police Commission Representative                     Commissioner William J. Briggs II
Chairperson                                                         Deputy Chief Marc R. Reina

**Department Partners**
Director, Police Training and Education                        Dr. Luann Pannell
Commanding Officer, Training Division                         Captain Jon Pinto
Director, Los Angeles Police Protective League       Sergeant Dave Abdalian
Sergeant, Training Bureau                                     Sergeant Andrew Cullen

Page **1** of **11**

1000

**Community Partners**

Professor, DEI Program Chair - Unix                                    Dr. Shindale Seale
Executive Director, Historic Core BID                                  Blair Besten
Director, Boys and Girls Club                                          Jesus Gonzalez

## PRIORITIES

After reviewing each of the recommendations and the related reports they were drawn from, the
working group elected to cluster the recommendations into nine categories.  This decision was
made after concluding that many of the proposed actions were interconnected with one another
and collectively served to advance more comprehensive concepts.  The selected categories were
(in priority order):

> 1. Mobile Field Force and Field Jail Training;
> 2. Less Lethal Munitions Study;
> 3. Emergency Operations Guide, Incident Command System, and Command Staff
> Training;
> 4. Training Cycles;
> 5. Shadow Teams Procedures and Training;
> 6. Mental Health Support Training;
> 7. Videography Training;
> 8. First Aid Training; and,
> 9. Incident Management Training Bureau.

The order in which the categories appear reflects what the working group determined would have
the greatest positive, long-lasting impact on the training the Department conducts to better serve
the citizens of Los Angeles.  We believe the narrative that follows will support the intentionality
of this priority order, while also demonstrating a commitment to carrying out all nine categories.

In addition to the narrative below, attached is a matrix that delineates the recommendations that
have been combined, and addressed together due to similar goal, mission or subject matter.

### PRIORITY ONE
### Mobile Field Force / Field Jail Training

**After Action Report Recommendations**

> 1. Train entire Department on the new Mobile Field Force (MFF) course
> 2. Adopt a 2-year training cycle for Mobile Field Force Training
> 3. Update Mobile Field Force training as shadow team training is finalized
> 4. Continue Command and Control training for employees
> 5. Continue to discuss MFF in Field Training Officer, Supervisor, Watch Commander
> and Command Development schools
> 6. Develop protocols for Field Jail Trailer Operations

**Response.**  Changes in types of protests and tactics implemented by agitators within lawful protests necessitates the need to enhance training, exposure, and continual certification with less lethal tools to ensure that Department personnel are proficient in MFF operations as well as command and control.

In addition to MFF training the need to develop and establish protocols for Field Jail Trailer operations is needed to ensure that when Field Jails are utilized during Unusual Occurrences that operations are consistent and to Department standards.

**Rationale.**  These training goals are needed to establish safer operation for 1st Amendment gatherings and the implementation is in process and nearly complete.

**Community Benefit.**  Department personnel will be trained in the most current policies and procedures regarding MFF operations as well as updates to less lethal operations.   Department personnel will maintain continued exposure and proficiency with these activities to ensure that intervention needed by the Department at future unlawful assemblies will be responded to and addressed quickly and with minimal impact to lawful participants in 1st Amendment activities. This course discusses implicit bias, procedural justice and integrate active bystandership.

**Cost/Staffing Explanation.**  Currently the MFF Training Cadre is staffed with Metropolitan Division Personnel.  A dedicated Less Lethal Training cadre would be created for this course. This would create a new unit that would conduct all MFF training, Enhanced Less Lethal Cadre Training, and Less Lethal Qualification.

The Mobile Field Force Training is implemented over a 2-year training cycle for 9,750 personnel (4,875 per year).  This is currently conducted with all personnel being on an on-duty capacity with no backfill to operations while personnel are in training.  Overtime can be utilized to back fill personnel from operations so there is not a deployment effect by personnel attending this 9-hour course.

Cost Breakdown:
- General Overtime rate is $87 dollars an hour
- Mobile Field Force Training is 9 hours long
- 4,875 Personnel will be trained annually
- Total Cost back filled overtime          $3,817,125.00

Mobile Field Force Cadre:
- (1) Sergeant II                          $  402,436.15
- (15) Police Officer III                  $5,083,495.24

Total Cost –                               $9,303,056.39

**Timeline.**  This training is ready for implementation upon adoption and recommendation from the Board of Police Commissioners.

**PRIORITY TWO**
**Less Lethal Munitions and Study**

**After-Action Report Recommendations**

    1. Form Less Lethal Best Practice Working Group;
    2. Identify if additional product evaluations need to be completed;
    3. Evaluate if 40mm non-target specific munitions should replace 37mm;
    4. Identify if there is any new technology that can be utilized in crowd control;
    5. Draft recommendations regarding Less Lethal Cadres in MFF;
    6. Create an Enhanced Less-Lethal Cadre and training, one per Bureau, with 40 Officers; and
    7. 2-year recertification for all Department employees who carry less lethal to include training/law/policy updates.

**Response.** This study and identification of additional tools will continue to ensure the Department is on the forefront of best practices and utilization of less lethal munitions in not only Mobile Field Force environments but also field operations. Re-certification will allow officers to maintain base-proficiency and provide a formal environment to review changes to laws, policies and any updates needed. Discussion about active bystandership, implicit bias and procedural justice will be integrated into all discussions revolving around Use of Force.

A Less Lethal Cadre for MFF situations will be created in each Bureau. This will be composed of 40 officers per Bureau that will receive enhanced less lethal munitions training. In the event of pre-planned or unusual occurrences the officers from this cadre will be placed within each MFF unit as dedicated trained personal for utilizing 40MM and 37MM in crowd control environments.

**Rationale.** New policies around the usage of less-lethal force for 1st Amendment assemblies which may reduce injuries and liabilities.

**Community Benefit.** Department personnel will continue to be updated on changes to policies and law as well as integrating de-escalation, and procedural justice. This will ensure the community has proficient and knowledgeable officers on the use of less lethal devices in operations, and if less lethal munitions need to be utilized in a crowd control environment, the officers utilizing them will have enhanced training suitable for a MFF crowd control situation.

(This space intentionally left blank)

1003

**Cost/Staffing Explanation**

Cost Breakdown:
- Less Lethal Re-Certification for 4,875 Sworn Personnel Annually
  - (2) 40MM at $17.00 per round
  - (2) Bean Bags at $5.00 per round
  - (2) 37MM at $17.00 per round
    - *Sub-total*:                                    $380,250
- Less Lethal Enhanced Course for 160 personnel every 6 months
  - (10) 40MM at $17.00 per round: $170
    - $170 x 2 x160=            $  54,400
  - (5) 37MM at $17.00 per round: $85
    - $85x2x160=                 $  27,200
  - Sub-total:                   $  40,800 x 2 = $  81,600
- Total Cost –                                    $461,850

**Staffing.** No additional staffing requirements are needed but each geographic bureau needs to identify 40 field personnel to be trained and deployed to pre-planned unusual occurrences as dedicated MFF less lethal operators.

**Timeline.** The Less Lethal Munitions study can be completed in six months from approval. The creation of an enhanced less lethal course that is approved by California POST will take between three to six months with any additional one-two months needed to train the cadre.

**PRIORITY THREE**
**Emergency Operations Guide, Incident Command System, Command Staff Training**

**After-Action Report Recommendations**

1. Update Emergency Operations Guide (EOG) with Emergency Service Division (ESD)
2. Develop Command Staff Training for Command Development, LEADS Training, and Scenario Incident Command Post (ICP) Training, explore cross staff training with City/County Leadership to include logistics
3. Integrate Incident Command System (ICS) documentation into EOG and reiterate Less lethal munitions documentation (2-year Command Staff Training cycle)
4. Reopen HYDRA Suite for command officers
5. Command Staff to attend Texas A&M Engineering Extension Services (TEEX) Incident Command System (ICS) training
6. Ensure Implicit Bias, Procedural Justice, de-escalation, and duty to intervene are discussed in the training

**Response.** The need for a current and updated source document in the Emergency Operations Guide (EOG) is critical to provide useable quality reference materials for Department command staff. With the EOG complete, training will be updated to reflect changes for all command staff outreach and ongoing enrichment will be completed with TEEX Incident Command System Training for command staff.

1004

Finally, the reinforcement of the training and ongoing assistance in proficiency will be completed in the re-opened HYDRA Suite with a dedicated command staff training team. The increased need for command staff training has placed an increased demand for Emergency Services Division. The training unit would be supplemented with six additional personnel in order to provide additional training, research, and development of the HYDRA Suite.

**Rationale.** Review of training has begun with expanded course content and an updated Emergency Operations Guide. This content will ensure that Command Staff has the needed skill sets and proficiencies to provide leadership during Unusual Occurrences (UO) and situations needing MFF intervention.

**Community Benefit.** This training will provide management within the Department with the skill set to lead in the community during UOs and minimize the impact of police intervention and potentially reduce the time needed to restore order to the community when illegal activity stems from the UO.

**Cost/Staffing Explanation.** Currently the HYDRA Suite is no longer in operation, both hardware and software are no longer serviceable and will need to be replaced. Managed attrition collapsed the prior unit that ran the training. The newly supplemented training unit at ESD would provide HYDRA Suite training, command staff training, supervisor school, watch commander school and any other incident management training department wide.

Cost Breakdown:

- HYDRA Suite Software/Hardware purchase and upgrade -    $    75,000.00
- 1 Sergeant I at                                                                      $  378,716.86
- 5 Police Officer III at                                                            $1,694,498.41

Total Cost –                                                                            $2,148,215.27

**Timeline.** Six months for training of ESD Training unit, upgrade of HYDRA Suite, and creation of HYDRA scenarios. Command Staff TEEX training is ongoing until completion of all command staff training. Emergency Operations Guide completion in six months. Command Staff LEADS and Development training is ongoing and will continue.

**PRIORITY FOUR**
**Shadow Teams Procedures Training**

**After-Action Report Recommendations**

    1. Create 8-hour Shadow Team training course
    2. Update UC Operations Training Bulletin to include concepts taught in UC Operations
    3. Update MFF Training classroom portion to include UC Operator to include shadow team concepts
    4. The Shadow Team training will be incorporated into Vice and Narcotics schools
    5. Technology updates (location app, live stream, texting, proper use of phones)

6. City Attorney opinion on the discovery of content utilized
7. All current Vice and Narcotics officers to receive Shadow Team training
8. Shadow Team recertification every two years

**Response.**  Shadow Teams are critical to ensure timely identification and arrest of illegal activity that jeopardizes the free exercising of 1st Amendment rights.  Training is needed to provide officers with safe and uniform operation standards.

**Rationale.**  Training to be created and refined based on actual officer experiences and what standards should be applied Department wide to ensure standardized approach, tactics and safe operations of undercover operations in a MFF environment.

**Community Benefit.**  By training Department personnel to identify individuals within crowd control situations that are escalating illegal activity, it will enable Department personnel to quickly identify and remove individuals who are breaking the law.  This will work to protect most of the public who are peacefully expressing their 1st Amendment rights.  This training will incorporate implicit bias and active bystandership to ensure that our undercover operators are working to preserve all community members' right to free assembly.

**Cost/Staffing Explanation**

Cost Breakdown:

- 200 Cell Phones and monthly subscriptions ($45 dollars per month) – $108,000 per year
- Staff – No new staff authorities will be needed to enable this recommendation

Total Cost –                                                                          $108,000 per year

**Timeline.**  It is anticipated that this can be completed and implemented by Fall 2022.

**PRIORITY FIVE**
**Mental Health Support Training**

**After-Action Report Recommendations**

1. Robust educational agenda and outreach for Department personnel and family members via BSS website, email, and social media;
2. Mandatory 2-year cycle for a "Check-in" with a Psychologist;
3. Check-in with a Psychologist during Police Science Leadership (PSL) 1 and PSL 2;
4. BSS response to the Command Post during all major critical incidents (list in progress);
5. If involved in major civil unrest, then a mandatory critical debrief with a psychologist similar to directed Officer Involved Shooting (OIS) incidents and Traffic Resiliency program;

Page **7** of **11**

1006

6. Line Budget item for all personnel to participate in a Physical Fitness test and receive monetary incentive similar to bonus shoot program;
7. Enhance the Peer Support program;
8. LAPD Family Days;
9. BSS informational handout for personnel;
10. Increase the number of psychologists on staff and ensure the numbers are proportionate to the demographics of Department personnel; and,
11. Research feasibility and potential cost of a Health/Fitness incentive, similar to education incentive.

**Response.** Ongoing mental health outreach and training is needed to increase morale and ensure that Department personnel are able to perform at a high level.

**Rationale.** Preparing for stressors is essential to morale, good decision-making, and job performance. By providing a set schedule of check-ins and dedicated responses to new incidents it will continue to provide Department employees with timely and needed wellness checks to keep personal and job performance at a peak. This combined with a health/fitness incentive will ensure a healthy workforce.

**Community Benefit.** Healthy personnel provide better service to communities and saves the City as well as the Department injury costs and the staffing lost cost due to stress related incidents.

**Cost/Staffing Explanation**

Cost Breakdown:

- 1 Police Psychologist I - $439,945.40
- 4 LAPD Family Days per year - ($5,000 each) $ 20,000.00

Total Cost – $459,945.40

**Timeline.** Full implementation can begin in Fall 2022, and once staffing is increased check-ins with PSL classes can begin immediately.

**PRIORITY SIX**
**First Aid Training**

**After-Action Report Recommendations**

1. POST mandated Basic First Aid will continue on a 2-year cycle;
2. Pilot Tactical Emergency First Aid for Department-wide considerations with a 2-hour recertification every year;
3. Messaging (roll call video regarding legal protections and hesitancy about rendering aid/vs legal requirement);
4. Tracking of aid given;
5. Use data from other agencies; and,

6. First Aid classes will be added to LAPD University.

**Response.** Reverence for human life is the guiding principle for Department operations and updating messaging revolving around First Aid as well as providing a more robust life saving aid training will demonstrate the Department's ongoing commitment to being community servants.

**Rationale.** This training will demonstrate the Department's commitment to reverence for human life and ensure that officers are well trained and proficient when the need arises.

**Community Benefit.** As officers respond to critical incidents, this enhanced training and current training will provide a better opportunity to begin administering aid, even before LAFD or other medical personnel arrive at scene. Given the critical timeline of trauma needing immediate action, this will ultimately result in life saving.

**Cost/Staffing Explanation.** The current POST mandated First Aid is currently being taught and ensuring that Department Personnel are trained to provide aid as soon as possible. At this time, it isn't feasible to roll out a more robust trauma aid course given the current training demands of the Department until the entire Department completes the POST mandated First Aid training. The enhanced trauma course would also have added equipment costs with Trauma kits and EMT kits. If priorities or training demands were to change, a pilot could be started to test for feasibility.

Cost Breakdown:

| | |
|---|---|
| • 150 Trauma Kits at $100 each | $15,000 |
| • 42 EMT Kits – two per Geographic Area at $1,500 each: total | $63,000 |
| • Staff – Current staffing will be available to provide this training and no further staffing needs are anticipated. | |

Total Cost –                                                                      $78,000

**Timeline.** The current POST mandated First Aid is currently being taught and it is not feasible to begin new training until the entire Department completes the POST mandated First Aid training.

**PRIORITY SEVEN**
**Videography Training**

**After-Action Report Recommendations**

1. Volt & Film Units to create Training Video on videography;
2. Ensure personnel assigned to videography duties complete training; and,
3. One-hour recertification each year for cadre members to include legal/tactical updates.

**Response.** This training has a relatively small impact on current operations with the potential benefit of providing better information for the Department and public to learn from and recognize police activity with the potential of reducing or minimizing civic financial liability.

1008

Each geographic bureau would identify 10 personnel to be trained on videography during unusual occurrences and each Special Events Unit would ensure that a member of this cadre would be assigned to Special Events.

**Rationale.**  Representing an insightful perspective is extremely valuable and can validate/invalidate a verbal account.

**Community Benefit.**  Providing training for Department documenters will provide a more robust and complete picture of police activity during unusual occurrences.

**Cost/Staffing Explanation.**  None

**Timeline.**  Full implementation can be completed by January 2022.

**PRIORITY EIGHT**
**Training Cycles**

**After Action Report Recommendations**

    1. Propose a 2-year plan for approval (in progress);
    2. Incorporate an Implicit Bias and Procedural Justice module; and,
    3. Need for database to track all training (CRM).

**Response.**  Having a written identifiable standard of ongoing professional development assists in making sure that all Department personnel continue to maintain their needed training and certification.  Subject Matter Experts will provide a list of required and needed training to be completed by all Department members every two years.  By tying ongoing training to the perishable skills training requirements, it creates a mindset of growth and flexibility with officers to ensure as law and expectations change Department personnel are provided with the training to reinforce these changes.

This training cycle will assist in ensuring that as procedural justice, de-escalation, implicit bias and active bystandership is incorporated into new and existing training that all personnel will continue to learn and grow and incorporate these critical skills into their work life.

**Rationale.**  Requires agreed-upon standards but will ensure officers skills will be updated every two years with the most current practices.

**Community Benefit.**  This initiative will ensure that all Department personnel are continually being updated on all changes to law and policy and their proficiencies are kept up in case of high civic liability incidents in the future.  Skills and changes in policing to better meet the needs of the community are regularly being incorporated into new and existing training.  By having a 2-year cycle officers will not fall through the cracks in receiving these valuable skills and insights into their professional life.

**Cost/Staffing Explanation.** None

**Timeline.**  It will take approximately three months to have a proposal for the Chief of Police and the Board of Police Commissioners regarding an ongoing 2-year training plan.  Implementation of Implicit Bias, Procedural Justice, active bystandership and de-escalation is currently ongoing throughout all training in the Department.

The Community Relationship Management (CRM) project (Microsoft Dynamics) is in process and a timeline of expected launch is unknown.  Once CRM begins, it is anticipated it will take nine to12 months to implement needed training modules.

**PRIORITYNINE**
**Incident Management Training/Bureau**

**After Action Report Recommendations**

>    1. Update Training guidelines based on emerging data
>    2. ICS Training to reflect community diversity
>    3. Revisit procedures on Use-of-Force and De-Escalation techniques
>    4. Incident Management Teams (IMT) (eight total, two per Bureau) for Major Incidents
>    5. Review best practices from other cities with similar events

**Response.**  The cost of a new Bureau is extremely costly and not needed.  This does not alleviate the importance of Incident Management Teams who can respond to major incidents throughout the City.  Each geographic bureau will identify personnel to create two Incident Management Teams.  These teams will be trained on managing major incidents, incident command posts and are familiar with MFF utilization.

In the event of a major incident occurring within a geographic bureau, an IMT can be deployed to run an incident command post and ensure that proficient skilled individuals are in positions to ensure that these incidents have the best chance of a positive resolution.

**Rationale.**  These skills must be updated regularly in conjunction with Crowd Management and MFF concepts.  By having two IMTs in each geographic bureau it will ensure that should the need of a major incident arise, a team of trained individuals is ready to respond and provide the needed expertise.

**Community Benefit.**  A trained group of experts will be present in each geographic bureau and able to provide timely response to major incidents.  This will help give major planned and unplanned incidents the best opportunity to have a positive outcome, but more importantly that there is minimal impact to the community at large and that the Department is able to facilitate and maintain order.

**Cost/Staffing Explanation.**  None

**Timeline.**  These teams can be identified over the next three months and another year to ensure all training is completed by members of these cadres.

# Board of Police Commissioners Advisory Committee Recommendations
## Training

## RECRUITMENT AND HIRING

- **Recruitment Training and Efforts to Attract High-Caliber Candidates**

  Ensure that all candidates hired are of the highest caliber and meet or exceed the employment standards, even if that means hiring fewer than planned.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Train every officer on how to recruit candidates.<br>• *Starting in the LAPD Academy (Academy), emphasize that every interaction with the public should be an opportunity to highlight and reinforce the Department's commitment to serve the community.*<br>• *Ensure the Department's leadership continually embraces this Department-wide training philosophy to help attract and build a service-oriented and community-minded culture and workforce.* | Yes | | |
| Reinstate the recruitment bonus program that previously existed, to reward current officers who successfully recruit officer candidates. | Yes | | This was discontinued in the past due to it resulted primarily in candidates belonging to over representative diversity groups. |
| Provide cultural awareness training to officers and personnel, including but not limited to the hiring staff, applicant interviewers, and those who serve on interview panels.<br>• *Request that City Personnel seek interviewers and panelists who represent a variety of diverse backgrounds.* | Yes | | |

1011

# Board of Police Commissioners Advisory Committee Recommendations

## Training

Review and improve training policies and programs to ensure they are up-to-date and reflect current best practices, including:

### TRAINING

- **General Training Principles and Instruction**

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Continue to promote the Department's "whole person" approach in the selection process and ensure that it includes psychological fit, desired traits, emotional intelligence, and desired outcomes. | Yes | | This is a current practice |
| Ensure training conforms to established POST guidelines for basic Academy, full-time peace officers, and level 1, 2 and 3 reserve police officers.<br><br>- *Continue to meet and exceed POST standards.*<br>- *Publish POST guidelines.* | Yes | | This is a current practice |
| Consistently evaluate and reinforce all training programs and strategies through Academy and in-service training.<br><br>- *Ensure that Department's mission, vision, and values are infused in all trainings.*<br>- *Incorporate the principles of procedural justice into all aspects of the trainings.*<br>- *Incorporate bias-free policies and principles into all aspects of training.*<br>- *Continually evaluate the training programs to include all important aspects of current policing and continue to* | Yes | | This is a current practice |

1012

1013

# Board of Police Commissioners Advisory Committee Recommendations

## Training

- supplement, when necessary, due to current events or changed circumstances.
- Ensure there is an emphasis on upholding the rule of law, honor, service to the community, and guardianship.
- Explore contemporary adult education techniques that are geared toward experiential training, reflection, problem solving, and discussion, to prepare officers for the application of skills in the real world (i.e., when interacting with members of communities) and account for different learning styles.
- Continue to evaluate and use innovative training modules, tactics, and technology to best engage and teach officers skills needed, and to increase program effectiveness.
  - Continually develop and utilize training modules and situational training techniques, including real-life scenarios and computer simulation-based training, wherever appropriate.
    - Ensure training modules include varied and numerous "best practice" examples from Body-Worn Video (BWV) footage.
- Enhance training through rigorous review of officer complaints, Office of Inspector General (OIG) audits, officer involved shootings, use of force reports, etc.
- Evaluate whether Academy and in-service training time, assignments, and distribution of both, are sufficient, or should be increased or modified to ensure compliance and optimize training experience.
- Consider and evaluate up-to-date and alternative training models to determine if LAPD's model constitutes best practices and best prepares its officers for the communities it serves.
- Engage subject matter experts, police and community leaders, university researchers, government agencies, and mental health providers in training.

# Board of Police Commissioners Advisory Committee Recommendations

## Training

- *Continue to work with the Community Advisory Committee in developing new training techniques, protocols, and programs.*
  - *Use engaged and enthusiastic instructors with course materials grounded in everyday policing practices.*
  - *Ensure that the different training opportunities offered throughout the Department enhance skills and knowledge such that officers perceive the training is an effective tool to serve their needs and make their job easier, rather than a chore imposed on them.*
  - *Obtain evaluations from all trainees to constantly improve and develop training programs aimed at appealing to and meeting the professional needs of officers.*

- **Training should address and reflect community diversity**

  Training should focus on critical thinking, social intelligence, implicit bias, fair and impartial policing, historical trauma, de-escalation, and other topics that address capacity to build trust and legitimacy in diverse communities and offer better skills for gaining compliance without the use of physical force.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Include diverse members of the community in the development and participation of the Department's training programs, including subject matter experts, community leaders, university researchers and police who specialize in use of force/de-escalation, crisis intervention, implicit bias and procedural justice training. | Yes | | This is a current practice |
| Address issues of cultural competency, sensitivity, and responsiveness in training programs. | Yes | | This is a current practice |

1014

1015

# Board of Police Commissioners Advisory Committee Recommendations Training

- Training should cover interactions with the LGBTQIA+ population, including issues such as determining gender identity for arrest placement, interaction with the Muslim, Arab, and South Asian communities, and immigrant or non-English speaking groups, as well as reinforcing policies for the prevention of sexual misconduct and harassment.

| | Feasible (Y/N) | If not feasible, why? | |
|---|---|---|---|
| | Yes | | This is a current practice |

- **Emphasis on De-Escalation, Crisis Intervention, Implicit Bias, and Procedural Justice Training:**

  On an on-going basis, emphasize and incorporate into the Academy and all in-service or other training programs for all staff and officers current principles and best practices of de-escalation, crisis intervention, implicit bias, and procedural justice.

- **Peer Intervention Training:**

  Provide peer intervention training so that officers know how to comply with their duty to intervene to stop misconduct by fellow officers or superiors.

- **Measure and Audit Effectiveness of Training**

  Measure before and after implementation of use of force/de-escalation, crisis intervention, implicit bias and procedural justice policies and training to determine effectiveness

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Complete and maintain accurate and up-to-date records of training curricula, materials, and attendance. | Yes | | This is a current practice |
| Develop an ongoing evaluation and audit system to determine whether the training programs, tactics, and time allotments are effective, and revise training policies and protocols accordingly (e.g., | Yes | | PTE has requested the staffing in order to maintain Course Audits to report back on |

# Board of Police Commissioners Advisory Committee Recommendations

## Training

| | | | |
|---|---|---|---|
| Establish metrics to assess the above. | Yes | | effectiveness. Without staffing it is not feasible. |
| seek written evaluations from participants, review training test scores, post-training performance) and aggregate Department-wide performance trends over time. | | | |

- ## Evaluate Alternative Training Models

  Evaluate up-to-date and alternative training models to determine if LAPD's model constitutes best practices and best prepares its officers for the communities it serves. The Department should evaluate alternative training methodologies to ensure that training at the Academy reflects best practices, and that the Department's training leads the nation in modern police training practices, such efforts should include:

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Evaluate the European Model, and other widely used models of training, to determine whether those practices can be incorporated or followed, such as:<br><br> ■ *The European model involves an alternating rotation between the field and the Academy over a period of 12-18 months. This allows the recruit to balance the theoretical and the operational in a much more thorough fashion.*<br><br> ■ *Such a model of training may offer additional benefits over models that place greater emphasis on the absorption of large amounts of information followed by an exam to determine the degree to which that information has been absorbed. Subtle nuances (e.g., communicating with a mentally ill person experiencing a crisis) can get lost once the exam has been completed.* | No | This would create a logistical and possible POST issue and would need to be explored and researched to see if it is possible. | |

1016

# Board of Police Commissioners Advisory Committee Recommendations
## Training

- **Professional Development**

  Provide professional development opportunities to Department personnel to help them develop leadership and team management skills throughout their careers. Standards and programs need to be established for every level of leadership from the first line to middle management to executive leadership.

## SPECIFIC TRAINING AREAS

- **Use of Force/De-Escalation**

  Periodically review and continually enhance the Department's use-of-force and de-escalation training policies and guidelines to ensure they are up-to-date and reflect current best practices, including:

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Comprehensive policies should include training, investigations, prosecutions, data collection, and information sharing | Yes | | This is a current practice |
| Policies must be clear, concise and continue to be openly available for public inspection. | Yes | | This is a current practice |
| Training should emphasize positive engagement with the community and continue to emphasize de-escalation and alternatives to use of physical force in situations where appropriate. | Yes | | This is a current practice |

1017

1018

# Board of Police Commissioners Advisory Committee Recommendations
## Training

| | | |
|---|---|---|
| Include at a minimum, annual training that includes shoot/do not shoot scenarios and the use of less lethal technologies. | Yes | This is a current practice |
| Incorporate into the training subject matter experts, police and community leaders, and university researchers who specialize in use of force and de-escalation training. | Yes | This is a current practice |
| Actively use scenario-based methodology/reality-based training to teach officers the skills of how to de-escalate individuals in crisis (e.g., realistic scenarios where police officers face interactions with real people acting as citizens). | Yes | This is a current practice |
| Emphasize de-escalation of interactions with community based on verbal and non-verbal cues, use of time, distance, available resources, and actions in all LAPD programs. | Yes | This is a current practice |
| De-escalation training should emphasize the need to show respect, even when the community member is perceived as being disrespectful or hostile. | Yes | This is a current practice |
| Ensure advanced de-escalation training is paired with all updates of the use of force policy. | Yes | This is a current practice |
| Training should also focus on conflict resolution, applied skills and emotional intelligence scenario training and role-playing. | Yes | |

# Board of Police Commissioners Advisory Committee Recommendations

## Training

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Increase supervision and shadowing with experienced officers so less experienced officers can learn and observe more effective ways, both verbally and physically, to de-escalate a situation. | Yes | | This would be conducted and facilitated through Office of Operations |
| Regularly evaluate existing early detection and intervention systems that alert supervisors and command staff where warning signs of excessive use of force may exist to determine if they are up-to-date best practices and effective. | Yes | | This is a current practice and is done through TEAMS II automatic Action Items. If a modification to the automatic notification is needed, ITB would facilitate it. |

- ## Crisis Intervention

   Periodically review and enhance the Department's crisis intervention training policies and guidelines to ensure they are up-to-date and reflect current best practices, including:

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Require mandatory training on crisis intervention as part of the Academy, in-service, and basic training for new recruits, and regularly thereafter for all officers. | Yes | | This is a current practice as all recent graduates from the academy attend Mental Health Intervention Training just prior to completing probation. |
| Incorporate into the training mental health professionals and advocates, including interactions with persons with mental illness and other disabilities and their family members, to help officers become more knowledgeable about these areas and have access to mental health resources. | Yes | | This is a current practice in MHIT. |

1019

# Board of Police Commissioners Advisory Committee Recommendations

## Training

| | | |
|---|---|---|
| Review and enhance the Department's Mental Health Training program and continue to require all officers to participate in it. | Yes | This is a current practice |
| Review and implement best practices regarding crisis intervention training protocols to help reduce police-related injuries for people with mental health, substance abuse/addiction, or other disabilities, including:<br><br>▪ *Educate and train officers to identify individuals with mental health conditions, disabilities, or substance abuse/addiction, so the officers will know when to request support from appropriate medical and mental health professionals.*<br><br>▪ *Emphasize training that includes a trauma focused approach that equips officers to deal with individuals in crisis or living with mental disabilities (as part of both basic recruit and in-service officer training) as well as instruction in the disease of addiction and effective social interaction and tactical skills.* | Yes | This is a current practice |
| Actively use real-life scenario-based methodology to teach officers the skills of how to de-escalate individuals in crisis. | Yes | This is a current practice |
| Continue to train with and develop effective working relationships with partnership programs, such as DART (Domestic Abuse Response Teams), SART (Sexual Assault Response Teams), GRYD (Gang Reduction Youth Development) and other specialized service providers including: | Yes | This is a current practice |

1020

# Board of Police Commissioners Advisory Committee Recommendations

- *Mental health response teams that include mental health professionals, social workers, crisis counselors, and other professionals making decisions alongside the police officers regarding planning, implementing, and responding to mental health crisis situations (the SMART program mentioned above).*
- *Homelessness, substance abuse, human trafficking, child abuse, and domestic violence.*
- *LGBTQIA+ social service providers.*
- *Other services as the needs of the City, its residents, and the Department evolve.*

## • Implicit Bias

Regularly review and enhance the Department's implicit bias training policies and guidelines to ensure they are up-to-date and reflect current best practices, including:

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Educate all officers regarding the historical bias against minority communities, including Black, Hispanic/Latinx, APA/API, Muslim, Arab, South Asian, LGBTQIA+ and other communities. | Yes | | This is a current practice |
| Incorporate in the training subject matter experts, police and community leaders, and university researchers who specialize in implicit bias training. | Yes | | This is a current practice |

**Training**

1021

# Board of Police Commissioners Advisory Committee Recommendations
## Training

Develop standards on how to handle and report hate crimes and include information publicly online.

- Ensure officers take statements and reports of hate crimes, report, and investigate them.

Train officers to be cognizant of bias. Best practices include:

- Train officers to be aware of implicit or explicit bias of individuals reporting incidents.
- Provide anti-bias training for police officers.

- ## Procedural Justice

Consistent with the Department's Training Bulletin, Volume XLIX, Issue 3, dated April 2020 (Procedural Justice policy), periodically review and enhance the Department's Procedural Justice policy to ensure it is up-to-date and reflects current best practices, including:

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Develop robust procedural justice training that provides clear guidelines and examples of the four seminal principles -- trustworthiness, respect, neutrality, and voice -- and integrate those principles into the Department's policies, procedures, and practices. | Yes | | This is a current practice |
| Educate the Department about these principles, how to apply them both internally and externally, and the ultimate goals, e.g., building trust and legitimacy both | Yes | | This is a current practice |

(Develop standards... row) | | Yes | | This is a current practice |

(Train officers... row) | | Yes | | This is a current practice |

1022

1023

# Board of Police Commissioners Advisory Committee Recommendations
## Training

| | | |
|---|---|---|
| within the Department and in the communities it serves. | | |
| Incorporate into the training subject matter experts, police and community leaders, and university researchers who specialize in procedural justice training. | Yes | This is a current practice |
| Ensure the entire Department is trained on the procedural justice principles and ensure they are reinforced in all training programs.<br><br>▪ *Starting in the Academy, educate on the importance of procedural justice, and provide clear examples of how to build trust and confidence in the communities they serve.*<br><br>▪ *Ensure the Department's leadership continuously models and integrates the principles of procedural justice in its interactions with its own officers and staff, as well as the community.* | Yes | This is a current practice |
| Evaluate procedural justice training programs in other jurisdictions and the feasibility of implementing a similar program at the LAPD. | Yes | |

# Board of Police Commissioners Advisory Committee Recommendations Training

- ## Other Training Areas

  Continue to develop, enhance, and evaluate the training policies, guidelines, techniques, modules, and situational training tactics regarding the following areas to ensure they integrate principles of procedural justice and are up-to-date and reflect current best practices:

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Racial Profiling | Yes | | This is a current practice |
| Gender Identification | Yes | | This is a current practice |
| LGBTQIA+ Interaction | Yes | | This is a current practice |
| Mental/Physical disability | Yes | | This is a current practice |
| Immigrant or non-English Speaking Groups | Yes | | This is a current practice |
| Mass Demonstrations | Yes | | This is a current practice |
| Preventing Sexual Misconduct | Yes | | This is a current practice |

1024

# Board of Police Commissioners Advisory Committee Recommendations

## Training

- **History of Los Angeles Policing**

  Include historical information about LA and the LAPD's policing practices in the Academy and in-service training.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Such training should be made available to all officers and include: <br><br> • *Historical information about LA, its richness, culture, people, and establishments.* <br> • *The history of the LAPD, its policing practices, and relationship with the community, to help new recruits and officers understand why some segments of the population have a distrust or fear of law enforcement.* <br> • *The historical and political overview of the 19th and 20th century origins of modern policing.* <br> • *Members of the community should participate in the planning and execution of the above training.* | Yes | | This is in process. |
| Implement a Robust History, Truth, and Reconciliation Program <br><br> • *Review programs successfully implemented by other police departments throughout the country, and work with scholars and community members to develop a robust program in Los Angeles.* <br> • *Encourage other components of the City of Los Angeles to engage in this effort.* | Yes | | |

1025

# Board of Police Commissioners Advisory Committee Recommendations

## Training

- ### Development of Field Training Officers

  Recognize the importance of Field Training Officers (FTOs) in the professional development of new officers by ensuring that significant care is given to the selection, training, and supervision of FTOs.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Develop robust programs to train FTO, so that FTO programs align with Department and community need and values. | Yes | | This is a current practice |
| Ensure that FTOs are well-trained and embrace community centered policing models, and cultural awareness of the communities they serve.<br><br>• FTOs should be experienced officers who are up to date with in-service training, are sufficiently skilled in core areas (e.g., impartial policing and de-escalation) and have shown a commitment to community policing in their performance.<br>• Ensure that the discipline records of FTOs are reviewed and considered. | Yes | | This is a current practice |
| Treat FTO service as an important career step that factors into promotional decisions to attract candidates who reflect the values of the Department. | Yes | | This is a current practice |
| Continue to assess and review the FTO program to identify how to incorporate technology and increase program effectiveness. | Yes | | This is a current practice |

1026

1027

# Board of Police Commissioners Advisory Committee Recommendations

## Training

- **Professional Development**

  Provide professional development opportunities to Department personnel to help them develop leadership and team management skills throughout their careers. Standards and programs need to be established for every level of leadership from the first line to middle management to executive leadership.

## BIAS-FREE POLICING

- **Recognize and Reduce the Adverse Impact of Unconscious Bias**

  As discussed above in the training section, the Department should provide more extensive and frequent cultural competency, bias-free policing, and de-escalation training. The Department should also:

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Continue to incorporate best practices learned through Body-Worn Video and the mediation and investigation of complaints. | Yes | | This is a current practice |
| Work with communities with traditionally adversarial relationships with law enforcement to develop training and immersion in cultural diversity to build trust and legitimacy in diverse communities. | Yes | | |

1028

## Board of Police Commissioners Advisory Committee Recommendations Training

| | Yes | This is a current practice |
|---|---|---|
| Work with community leaders and experts to ensure the Department's bias-free policing training covers the following topics:<br><br>• *The Department's bias-free and impartial policing policies;*<br>• *Refreshers of topics covered in Procedural Justice training;*<br>• *The existence of implicit bias and how to minimize its impact on policing;*<br>• *The importance of police legitimacy and how it is impacted by implicit bias and discriminatory policing;*<br>• *Methods and strategies for more effective policing that relies upon nondiscriminatory factors;*<br>• *Police and community perspectives related to discriminatory policing;*<br>• *The protection of civil rights as a core pillar of our country and a central part of the police mission, which is essential to effective policing;*<br>• *The existence and impact of arbitrary classifications and stereotyping;*<br>• *Identification of key decision points where prohibited discriminatory policing can take effect at both the incident and strategic-planning levels;*<br>• *Methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including problem-oriented policing strategies;*<br>• *Cultural competency training that prepares officers to interact effectively with people from diverse communities, including, but not limited* | | |

# Board of Police Commissioners Advisory Committee Recommendations

## Training

| | | |
|---|---|---|
| to, people of color, LGBTQIA+ individuals, religious minorities, and immigrants;<br><br>• Recognizing when a person has a physical, intellectual, developmental or mental disability, including protocols for providing timely and meaningful access to police services for individuals with disabilities;<br><br>▪ The history of anti-blackness in policing and the historical bias against the Black community;<br>▪ The specific history and racial challenges in the City of Los Angeles;<br>▪ The appropriate use of social media; and<br>▪ The value of proactive, community-oriented policing. | | |
| Ensure that bias-free policing training is incorporated in other training, such as explaining how officers should conduct various police actions, including stops, frisks, searches, arrests, and use of force in a non-discriminatory manner. | Yes | This is a current practice |
| Through training and supervision, reinforce to Department personnel that they are prohibited from making routine or spontaneous law enforcement decisions based solely on an individual's membership in a protected class or on substitutes or stereotypes for protected classes, such as manner of dress, mode of transportation, or language ability. | Yes | This is a current practice |

1029

# Board of Police Commissioners Advisory Committee Recommendations

## Training

- ### Respect for Religious Beliefs

  Work with community leaders and experts to develop, implement, and train officers on a policy guiding officers' interactions with members of religious communities.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Provide cultural sensitivity training about religious groups that educates officers about religious practices, including religious practices that do not constitute "suspicious" activity, such as public prayer or communal prayers. | Yes | | This is a current practice |

- ### Respect for Individuals with Disabilities

  Work with community leaders and experts to review and, as necessary, revise policies and practices for ensuring effective communication and meaningful access to Department programs, services, and activities for individuals with physical, mental, or developmental disabilities.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Develop a training bulletin that provides guidance on interactions with people with disabilities, including:<br><br>• *Recognizing and responding to conduct or behavior that is related to an individual's* | Yes | | This is a current practice |

1031

## Board of Police Commissioners Advisory Committee Recommendations
### Training

| | | |
|---|---|---|
| *disability, including qualifying medical conditions such as dementia, epilepsy, and other physical, mental or developmental disabilities;*<br><br>■ *Providing effective communication and minimizing barriers to communication, including by incorporating sign language and other modes of communication used by people with hearing loss or who have a speech impairment during police-community interactions;*<br><br>■ *Attending to the specific needs of individuals with disabilities, such as mobility devices, prosthetics, and service animals; and*<br><br>■ *Recognizing and responding to identified abuse, neglect, or exploitation of individuals with disabilities, including making any notifications required by Department policy or the law.* | | |

# Board of Police Commissioners Advisory Committee Recommendations

## Training

- **Language Accessibility**

Ensure the Department's practice of providing language services is sufficiently formalized into a formal language access policy, and train officers to treat individuals with limited English proficiency fairly.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Train officers on how to interact with individuals with limited English proficiency to ensure that arrests are not made (or other police actions taken) because of deficient language skills or poor translators, particularly in the context of immigrant domestic violence survivors. | Yes | | This is a current practice |

## DATA AND TECHNOLOGY

- **Data Quality and Accuracy**

Data quality and accuracy in individual reporting should be enhanced to improve the overall quality of the information in the databases.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Emphasize in training, and systematically thereafter, the importance of detailed and accurate reporting and collection of all data. To achieve this, ensure the implementation of the following best practices:<br>■ *Data should be recorded or memorialized contemporaneous to the act, or as close in time to the act as possible.* | Yes | | This is a current practice |

1032

# Board of Police Commissioners Advisory Committee Recommendations

## Training

- *Provide clear definitions of terms, including examples to help eliminate any ambiguity, that officers can rely on for reporting information.*
  - *Educate the entire organization about systems and processes; ensure understanding of the importance of avoiding data errors, inconsistencies, and incompleteness.*
    - Starting in the Academy, educate on the importance of detailed and accurate reporting on all forms (written or electronic) to ensure accountability and accuracy.
    - Ensure that the Department's leadership continuously stresses the importance of data quality to help build a culture of competency, transparency, and trust.

- **Internal Audits and Accountability**

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| **Take Accountability Measures:** Provide ongoing training on Fourth Amendment principles; conduct regular internal audits and reviews of stops, searches, and seizures; and hold officers accountable for violations of these policies. | Yes | | This is a current practice |

1033

1034

# Board of Police Commissioners Advisory Committee Recommendations

## Training

### WORK-PLACE INCENTIVES/RETENTION

- **Officer Health and Well-Being**

  Create a culture that values self-care and safety in all aspects of operations.

| Recommendation | Feasible (Y/N) | If not feasible, why? | Additional Notes |
|---|---|---|---|
| Train supervisors on how to recognize warning signs and identify those who may need or benefit from counseling or stress management training. | Yes | | |
| Enhance trainings to focus more on health and wellness.<br>• *Examine how these factors influence officer decision-making to uncover patterns for training and suggest improvements.*<br>• *Review other similar programs that have been developed in other professions, such as, medicine, law, and other high-stress fields.* | Yes | | |

After Action Report Implementation Plan Worksheet Training

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action/ Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Mobile Field Force and Field Jail Training | Chaleff | Conduct a thorough review of mobile field force training: (a) Adjust accordingly to any updated, contemporary tactics for crowd control as identified during the mobile field force review by the Department experts as stated in recommendation No. 1, and any updated California State guidelines. (b) Training Bureau should conduct this review in coordination with personnel with appropriate expertise. If the Department adopts the Strategic Emergency Manager' recommendation, Training Bureau and the Director of Police Training and Education should coordinate the update with this executive-level officer, and; (c) Require that hands on mobile field force training be conducted every two years for lieutenants and below and annually for command officers. | 15 | 1.Train Entire department on the new course 2.Adopt 2-year training cycle 3.Update training as Shadow team training is finalized 4.Command and Control training for employees 5.Continue to discuss MFF in FTO, Supervisor, Watch Command and Command Development schools 6.Develop protocols for Field Jail Trailer Operations | Y | Revised Mobile Field Force Training is in process. Policies, Procedures and Training revolving around Field Jail& is nearly finalized and ready to be implemented. | | |
| | | LAPD | In October 2020, Metropolitan Division began training personnel on updated crowd management and crowd control which included lessons learned during the Civil Unrest. Some of the training focused on new techniques, use of MFF during crowd control, splitting MFFs into squads to address isolated incidents, vehicle movement, and less-lethal munitions. The Department should continue to revise its MFF training to address new tactics employed by demonstrators while meeting the requirements of previous settlement agreements. | 18 | | | | $9,303,056.39 | 16 |

1035

1036

After Action Report Implementation Plan Worksheet Training

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action/ Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| | | LAPD | The Department used a significant amount of less-lethal munitions to protect the City and restore order. The Department should continue to research and seek best practices related to the deployment of less lethal munitions. This should include an examination of the Department's current less lethal capabilities and new available technologies. A clear understanding regarding when to deploy less lethal and the level of approval necessary should be reiterated and clarified to avoid confusion. When less lethal is deployed, when available it should be used in conjunction with Body Worn Cameras to capture the activity leading up to the decision to use less lethal. Officers trained in less lethal should attend annual weapons manipulation training. | 18 | Cost Mobile Field Force Cadre (1)Sergeant II $402,436.15 (15) Police Officer III $5,083,495.24 General Over time cost is $87 dollars an hour Mobile Field Force is 9 hours long 4875 Personnel will be trained annually Total Cost back filled overtime $3,837,125 | | | | |
| | | LAPD | The Department should pre-identify locations throughout the City that can be used for field jails. The list of locations should be maintained and verified on an annual basis and made available to Investigative Branch and CSD when needed. | 16 | | | | | |
| | | Chaleff | The Department should consider having a pre-loaded trailer, or at least a check list and the ability to load a trailer with the needed supplies and a trained cadre of detention personnel to establish field jails in future mobilizations or unusual occurrences. | | | | | | |
| | | | Undertake an extensive study of all less lethal munitions, including the 40 mm round, to examine performance, consistent velocity, potential for ricochet, influence of the plastic wrapping or banding around the sponge projectile and other aspects of the round. Included in that study should be any potential new technology for use in public order policing operations. | 7 | | | | | |

1037

## After Action Report Implementation Plan Worksheet
### Training

| 2 | Less Lethal Munitions and Study | LAPD | The Department used a significant amount of less-lethal munitions to protect the City and restore order. The Department should continue to research and seek best practices related to the deployment of less lethal munitions. This should include an examination of the Department's current less lethal capabilities and new available technologies. A clear understanding regarding when to deploy less lethal and the level of approval necessary should be reiterated and clarified to avoid confusion. When less lethal is deployed, when available it should be used in conjunction with Body Worn Cameras to capture the activity leading up to the decision to use less lethal. Officers trained in less lethal should attend annual weapons manipulation training. | 18 | 1. Form Less Lethal Best Practice Working Group<br>2. Identify if additional product evaluations need to be completed<br>3. Evaluate if 40mm non-target specific munitions should replace 37mm<br>4. Identify if there is any new technology that can be utilized in crowd control<br>5. Draft recommendations regarding Less Lethal cadre's in MFF<br>6. Create an Enhanced Less-Lethal Cadre and training, 1 per Bureau, with 40 Officers<br>7. 2-year recertification for all Department employees who carry less lethal to include training/law/policy updates | Y | None | $461,850 | 0 |
| | | Chalef | Establish protocols that:<br>(a) Only trained (certified) members of Metropolitan Division or officers who receive consistent and periodic instruction and certification in the 40mm system should be allowed to deploy the 40mm during crowd control situations.<br>(b) Retain the use of the 40mm system for all other officers during patrol duties and ensure annual retraining of weapon manipulations during shotgun qualification, and<br>(c) Mandate the use of BWV (when feasible) to record problem behavior of individuals in the crowd when officers decide to use the target specific 40mm in a crowd control situation. | 10 | Cost<br>Less Lethal Re-Certification for 4875sworn Annually, (2)40MM at $17.00 per round, (2)Bean Bags at $5.00 per round, (2)37MM at $17.00 per round = $380,250<br>Less Lethal Proficiency Course for 160 every 6 months: (10)40MM at $17.00 per round, (5)37MM at $17.00 per round, = $40,800 x 2 = $81,600 | | | | |

1038

After Action Report Implementation Plan Worksheet - Training

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action/ Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 3 | | National Police Foundation | Create an LAPD two-year training plan that is aligned with the State training cycle that is reviewed and updated every year to include: | | 1.Update emergency operations guide with ESD. | Y | Command Staff TEEX training is ongoing until completion of all command staff training | $2,148,215.30 | 6 |
| | | Chaleff | **(a)** All required training mandates by various entities including the State, City, Police Commission. **(b)** All litigation settlement terms, or previous applicable reports. **(c)** The topics and methods for training and delivery. **(d)** Who is mandated to attend. **(e)** Frequency, number of hours required. **(f)** A cost analysis of time, dollar amount, and what training is not going to be able to occur. **(g)** Identification of where the training should be integrated to replicate real life experiences, and; **(h)** Formal plan approval by the Chief of Police with any modifications documented. | 11 | 2.Develop Command Staff Training for Command Development, LEADS Training, and Scenario ICP Training, explore Cross staff training with City/County Leadership to include logistics | | | | |
| | | National Police Foundation | LAPD should establish a clear policy, process, and documentation requirement for requesting and receiving less lethal munitions, particularly during the response to First Amendment assemblies and protests. | 1.3.1 | 3.Integrate ICS documentation into EOG and reiterate less lethal munitions documentation 12-year Command Staff Training cycle) | | Command Staff LEADS and Development and training is ongoing and will continue. | | |
| | | Chaleff | Update the use of force tactical directives to include more detailed instruction regarding the use of less lethal tools in crowds and the approval level required for the deployment of each the less lethal tools. | 9 | 4.Reopen Hydra Suite for command officer training (cycle) 5.Command Staff to attend Texas A&M Engineering Extension Services (TEEX) Incident Command System (ICS) Training | | | | |
| | | National Police Foundation | LAPD should establish a clear policy, process, and documentation requirement for requesting and receiving less lethal munitions, particularly during the response to First Amendment assemblies and protests. | 1.3.1 | | | | | |
| | | Chaleff | Design and implement an inventory system to audit and track the amount of less lethal munitions, including the 37mm and 40mm rounds, expended during any public order policing incidents. | 8 | 6.Ensure implicit Bias, Procedural Justice, de-escalation, and duty to intervene are | | | | |
| | | National Police Foundation | LAPD should consider developing an overarching 'response to fluid protests and civil unrest policy that provides decision models that explain at what points uses of force and relevant tools are permitted to be used by LAPD officers. | 1.7.1 | | | | | |

1039

After Action Report Implementation Plan Worksheet

Training

| | | | Cost |
|---|---|---|---|
| Chaleff | Undertake an extensive study of all less lethal munitions, including the 40 mm round, to examine performance, consistent velocity, potential for ricochets, influence of the plastic wrapping or banding around the sponge projectile and other aspects of the round. Included in that study should be any potential new technology for use in public order policing operations. | 7 | discussed in the training |
| Chaleff | Establish protocols that:<br><br>**(a)** Only trained (certified) members of Metropolitan Division or officers who receive consistent and periodic instruction and certification in the 40mm system should be allowed to deploy the 40mm during crowd control situations.<br><br>**(b)** Retain the use of the 40mm system for all other officers during patrol duties and ensure annual retraining of weapon manipulations during shotgun qualification, and<br><br>**(c)** Mandate the use of BWV (when feasible) to record problem behavior of individuals in the crowd when officers decide to use the target specific 40mm in a crowd control situation. | 10 | HYDRA Suite Software/Hardware purchase and upgrade - $75,000<br><br>(1) Sergeant 1 at $378,716.86<br><br>(5) Police Officer III at $1,694,498.41 |
| Chaleff | Train command staff annually on the ICS, including:<br><br>**(a)** Exercising all-hazards events (fires, earthquakes, pandemics, demonstrations, etc.) through hands-on, scenario-based training, and<br><br>**(b)** Activating the incident management teams' concept as outlined in the Emergency Operations Guide as part of the training plan. | 12 | |
| LAPD | Command Staff should receive training on the roles, responsibilities, duties of each position in ICS. Training should include table top exercises, practical application, and exercises. | 1 | |
| LAPD | The Department should incorporate training for Command Staff on the personnel and equipment needed to manage crowds, declare unlawful assemblies, and make arrests should be deployed at the location prior to giving any dispersal order. | 10 | |
| National Police Foundation | All City of Los Angeles elected officials, and personnel from each of the relevant City offices and agencies, should complete the appropriate level of ICS training if they have not already done so, and take regular refresher courses. | 2.2.3 | |

After Action Report Implementation Plan Worksheet Training

| EOC, ICS, Command Staff Training | | | |
|---|---|---|---|
| | National Police Foundation | The City of Los Angeles and LAPD should conduct joint, regularly-scheduled First Amendment assemblies, protest, mass violence, and other critical incident tabletop and full-scale exercises. | 2.2.4 |
| | National Police Foundation | City and LAPD leaders should continue to build strong working relationships and prioritize planning, preparation, management, and training for First Amendment assembly and protest response. | 2.1.1 |
| | National Police Foundation | City officials, councilmembers, relevant City agencies, and LAPD leadership should ensure that a city-wide plan, consistent with the National Incident Management System (NIMS), is used to manage First Amendment assemblies and protests, and that all City agencies understand and participate in, the development and implementation of the plan. | 2.2.1 |
| | National Police Foundation | LAPD should practice establishment of ICS in different scenarios and should develop lists of personnel with the appropriate training and capacities to fill the necessary leadership positions in each section. | 2.3.3 |
| | LAPD | The Department used a significant amount of less-lethal munitions to protect the City and restore order. The Department should continue to research and seek best practices related to the deployment of less lethal munitions. This should include an examination of the Department's current less lethal capabilities and new available technologies. A clear understanding regarding when to deploy less lethal and the level of approval necessary should be reiterated and clarified to avoid confusion. When less lethal is deployed, when available it should be used in conjunction with Body Worn Cameras to capture the activity leading up to the decision to use less lethal. Officers trained in less lethal should attend annual weapons manipulation training. | 18 |

1040

1041

After Action Report Implementation Plan Worksheet
Training

| Responsible | Recommendation | # |
|---|---|---|
| Chaleff | Establish protocols that: **(a)** Only trained (certified) members of Metropolitan Division or officers who receive consistent and periodic instruction and certification in the 40mm system should be allowed to deploy the 40mm during crowd control situations. **(b)** Retain the use of the 40mm system for all other officers during patrol duties and ensure annual retraining of weapon manipulations during shotgun qualification, and **(c)** Mandate the use of BWV (when feasible) to record problem behavior of individuals in the crowd when officers decide to use the target specific 40mm in a crowd control situation. | 10 |
| LAPD | Vehicles with the required emergency lights and sirens should be identified and staged for use by detectives or other personnel who do not have emergency equipped vehicles assigned to them. The MTD should be used as a resource to identify those vehicles needed and assist Staging with coordination of these vehicles. | 6 |
| LAPD | Videographers should be requested prior to an incident, preferably during the planning phase. | 7 |
| LAPD | Personnel should be assigned to the Finance/Administrative Section as soon as practicable when a large incident occurs. As a result of the COVID-19 pandemic, several civilian employees in our Department have been trained in cost recovery. This training should be expanded to additional civilian employees. In doing so, sworn employees can be redeployed to the tactical incident. | 22 |
| National Police Foundation | LAPD should establish a planning team that includes command staff, training, equipment, communications, logistics, and intelligence to ensure plans receive the necessary attention to detail in these areas. | 2.3.1 |
| LAPD | The Incident Commander (IC) should ensure the commander's intent is understood and communicated to all personnel assigned to the event. | 3 |
| LAPD | All Command Staff and personnel assigned need to know and use their proper and full designation on frequencies so the IC and others at the CP can efficiently track resources and personnel. | 3 |

After Action Report Implementation Plan Worksheet Training

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action/ Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 4 | Shadow Teams Procedures | LAPD | The Operations Section Chief should provide clear communication and direction to the Branch Directors and MFF leaders as to the commander's intent and the expectation that resources be tracked and redeployed to evolving situations as quickly as possible. | 18 | 1.Create 8-hour Shadow Team training course 2.Update UC Operations Training Bulletin to include concepts taught in UC Operations 3.Update MFF Training Classroom portion to include UC Operator to include Shadow team concepts 4.The Shadow team training will be incorporated into Vice and Narcotics schools 5.Technology updates (Location app, live stream, texting, proper use of phones) 6.City Attorney opinion on the discovery of content utilized 7.All current vice and narcotics officers to receive Shadow Team training 8.Shadow Team Recertification every two years | Y | None (Note – The cost (200) Cell Phones and monthly subscriptions ($45 dollars per month) ~ $108,000 per year) | $108,000 | 0 |
| | | LAPD | A clear and concise commander's intent should be provided to supervisors and officers at the beginning of any large incident or event. Part of the intent should include groups entering the freeway and arrest posture. A crowd can be detained and arrested for entering the freeway and blocking traffic. These themes should be included in all crowd management and control training. | 20 | | | | | |
| | | LAPD | The DOC needs to receive accurate and timely information from Staging to coordinate multi-Bureau and multi-location incidents within the City. As an example, each Bureau would establish an Incident Command and then the DOC, activated to level II, would take on the role similar to Area Command. As such, the DOC would coordinate Citywide personnel and resources to the areas with the highest priority. | 27 | | | | | |
| | | LAPD | Establish training on how and where to establish a Command Post. | 2 | | | | | |
| | | LAPD | Department-issued smartphones should be given to plain clothes officers during demonstrations to immediately provide the Operations Section Chief with photographs and briefs on the incidents occurring in the crowd. Any changes to reporting procedures should be shared with plain clothes officers so that they may provide the CP with information in a timely manner. Also, consideration should be given to the use of Observation Points, location in which officers can observe activity and report back to the CP, to assist with establishing good situational awareness and the coordination of resources. Finally, those who receive communications from plain clothes officers must relay those communications to the appropriate section and person at the CP so that the Department can make the most out of the intel provided by plain clothes officers. | 23 | | | | | |

1042

1043

After Action Report Implementation Plan Worksheet
Training

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action/ Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| | | Chaleff | Establish Department-wide, consistent shadow team protocols and training to manage the risk that shadow teams endure, including establishing a clear line of communication so information is received and acted upon rapidly by the incident commander to enable quick arrests when necessary or to potentially retrieve the shadow team officers if needed. | 16 | | | | | |
| | | National Police Foundation | | 4.2.1 | 1.Robust educational agenda and outreach for Department personnel and family members via BSS website, email, and social media 2.Mandatory 2-year cycle for a "Check-in" with a Psychologist 3.Check-in with a Psychologist during PSL 1 and PSL 2 4.BSS response to the Command Post during all major critical incidents (List in | | | | |

After Action Report Implementation Plan Worksheet
Training

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action/ Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 5 | Mental Health Support Training | BOPC | LAPD should continue to support the capacity of Behavioral Science Services, the Peer Support Team, and other aligned groups to assist Department personnel and their families address trauma, build resiliency and support physical and mental health. | 9 | progress) 5.If involved in major civil unrest, then a mandatory critical debrief with a psychologist similar to directed OIS incidents and Traffic Resiliency program 6.Line Budget Item for all personnel to participate in a Physical Fitness test and receive monetary incentive similar to bonus shot program 7.Enhance the Peer Support program 8.LAPD Family Days 9.BSS informational handout for personnel 10.Increase the number of psychologists on staff and ensure the numbers are proportionate to the demographics of Department personnel 11.Research feasibility and potential cost of a Healthy/Fitness incentive, similar to education incentive. (1)Police Psychologist I - $439,945.40 (4) LAPD Family Days per year - $20,000 ($5,000 each) | Y | None | $459,945.40 | 1 |
| 6 | First Aid Training | Chaleff | Establish a more robust Department basic first aid and EMT program. (a) Develop a consistent reporting process to document all instances of rendering general first aid using the first aid kits provided to all officers, (b) Develop a consistent reporting process to document all incidents when a trained EMT renders aid, (c) Support the EMT program in terms of the cost of the equipment and on-duty time needed to retain State certification, and (d) Consider providing a bonus pay incentive for those employees who are EMT certified. | 19 | 1.POST mandated basic first aid will continue on a 2-year cycle 2.Pilot Tactical Emergency First Aid for department-wide considerations with a 2-hour recertification every year 3.Messaging (roll call video regarding legal protections and hesitancy about rendering aid/vs legal requirement) 4.Tracking of aid given 5.Use data from other agencies 6.First Aid classes will be added to LAPD University | Y | Current First Aid POST mandated course is in process and being trained. | $78,000 | 0 |

1044

1045

After Action Report Implementation Plan Worksheet Training

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action/ Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 7 | | LAPD | The Department has considered expanding the EMT cadre to assist both injured officers and community members during demonstrations and other major incidents. This, however, would not have been an effective option for this event as officers were frequently assaulted as they tried to facilitate protests or extract a lawless individual from within a previously peaceful crowd. Therefore, while it is something to consider for other events, the Department is cognizant of the additional training and equipment that would be required. | 18 | Cost Trauma Kits (150) - $15,000 EMT Kits (42) - (2) per Geographic Area at $1,500 each – total $63,000 | | | | |
| | Videography Training | LAPD | The Department should develop a course on proper videography for all videographers and camera operators to ensure proper video and photographic documentation of the commander's intent, briefings, crowd size, crowd demeanor, actions taken by officers, uses of force, dispersal orders, arrests, and additional evidence are recorded. Also, videographers should be trained on how to properly narrate the events that they are observing. For example, they should at least describe where they are (with words and visual evidence if possible) as well as the actions of individuals in the crowd (i.e., throwing frozen water bottles at officers). Furthermore, proper documentation and storage with Technical Investigation Division should be reviewed. Videos need to be downloaded, labeled, and stored each day. | 7 | 1.Volt & Film Units to create Training Video on videography 2.Ensure personnel assigned to videography duties complete training. 3.1-hour recertification each year for cadre members to include legal/tactical updates | Y | Full implementation can be completed by January 2022 | $0 | 0 |

1046

After Action Report Implementation Plan Worksheet
Training

| Priority | Category | After Action Report | Recommendation | Number | Proposed Action / Project Instruction | Feasibility Y/N | Actions Taken | Cost $ | Staffing |
|---|---|---|---|---|---|---|---|---|---|
| 8 | Training Cycles | Chaleff | Create an LAPD two-year training plan that is aligned with the State training cycle that is reviewed and updated every year to include:<br><br>(a) All required training mandates by various entities including the State, City, Police Commission.<br>(b) All litigation settlement items, or previous applicable reports.<br>(c) The topics and methods for training and delivery.<br>(d) Who is mandated to attend.<br>(e) Frequency, number of hours required.<br>(f) A cost analysis of time, dollar amount, and what training is not going to be able to occur.<br>(g) Identification of where the training should be integrated to replicate real life experiences, and,<br>(h) Formal plan approval by the Chief of Police with any modifications documented. | 11 | 1.Propose a 2-year plan for approval (In progress)<br>2.Incorporate an Implicit Bias and Procedural Justice module<br>3.Need for database to track all training (CRM) | Y | This is in Process and awaiting completion of the CRM | 50 | 0 |
| 9 | Incident Management Training/Bureau | Chaleff | Establish a Department Strategic Emergency Bureau to be commanded by a deputy chief or civilian equivalent who has expertise in public order policing, incident command systems, liaising with outside agencies, etc. This position should report directly to the Chief of Police. | 1 | RECOMMENDATIONS:<br>1.Update Training guidelines based on emerging data<br>2.LCS Training to reflect community diversity and De-Escalation techniques<br>3.Revisit procedures on Use-of-Force and De-Escalation techniques<br>4.Incident Management Teams (IMT) (4 Total) for Major Incidents<br>5.Review best practices from other cities with similar events | Y, but modified to not include:<br>(3) months and another (1) year to ensure all training is completed by members of this cadre. | This team can be identified over the next | 50 | 0 |
| | | LAPD | The Department should re-establish the Major Incident Response Team. | 1 | | V, but modified to not include:<br>Strategic Emergency Bureau | | | |
| | | LAPD | The region must continue to work together to develop coordinated responses to manage significant incidents. | 8 | | | | | |
| | | National Police Foundation | The City of Los Angeles should establish one citywide incident management team (IMT)72 to lead its response to future large-scale First Amendment assemblies and incidents that involve a multi-agency, multi-jurisdiction response. | 2.2.2 | | | | | |

| | Total Cost | $12,559,066 | 23 |
|---|---|---|---|

# Exhibit 26



# Echo Park Rehabilitation

After Action Report

**Los Angeles Police Department**

1048

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
LOS ANGELES POLICE DEPARTMENT

## Table of Contents

INTRODUCTION ................................................................................................................ 4

BACKGROUND ................................................................................................................. 5

   Increasing Homelessness ................................................................................................ 5

   Outreach Efforts ............................................................................................................. 6

   Decision to Close the Park ............................................................................................. 7

   Police Involvement ......................................................................................................... 8

      Homelessness in Echo Park ........................................................................................ 9

      Social Activism in Echo Park .................................................................................... 12

      Closing the Park ......................................................................................................... 14

      COVID-19 Pandemic ................................................................................................. 15

   Revisiting the Closure .................................................................................................... 18

PLANNING ...................................................................................................................... 21

   Efforts to Mitigate City Liability ................................................................................. 21

   Mitigation of Department Liability ............................................................................... 21

   Operational Planning and Organization ........................................................................ 22

NARRATIVE .................................................................................................................... 26

   Pre-Operational Events and Protests ............................................................................. 26

   March 24, 2021 - March 25, 2021 (1st Operational Period) ......................................... 29

      Decision to Launch Operation Early .......................................................................... 30

      Use of Strobe Lights .................................................................................................. 31

      Use of Less Lethal Munitions .................................................................................... 33

      Declaration of Unlawful Assembly ............................................................................ 33

      Return to Normal Operations ..................................................................................... 36

   March 25, 2021 (2nd Operational Period) ..................................................................... 36

      Press Conference at CD 13 ......................................................................................... 37

      Preparation for Scheduled Protests ............................................................................ 39

      Officer Needs Help Call ............................................................................................. 39

      Crowd Management .................................................................................................... 40

   March 25, 2021 – March 26, 2021 (3rd Operational Period) ........................................ 41

      Use of Strobe Lights .................................................................................................. 42

      Declaration of Unlawful Assembly ............................................................................ 43

1049

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

Concessions for Members of the Media ............................................................. 44

Arrests for Failure to Disperse......................................................................... 45

Use of Less Lethal Munitions........................................................................... 46

Field Investigation and Arrestee Processing ................................................... 47

Return to Normal Operations ........................................................................... 48

March 26, 2021 (4th Operational Period) .......................................................... 48

Arrests Inside the Park ..................................................................................... 49

March 26, 2021 – March 27, 2021 (5th Operational Period)............................. 50

March 27, 2021 (6th Operational Period) .......................................................... 51

CRIMES ................................................................................................................ 52

ARRESTS .............................................................................................................. 52

Felony Arrests .................................................................................................. 52

Misdemeanor/Infractions Arrests ..................................................................... 52

Journalists and Legal Representatives............................................................... 53

USE OF FORCE .................................................................................................... 54

Non-Deadly Force ............................................................................................ 55

Deadly Force .................................................................................................... 56

Less-Lethal Usage ............................................................................................ 57

DAMAGES & COSTS ........................................................................................... 59

Outreach: January 2020 to February 2021 ........................................................ 59

Closure: March 24, 2021 and March 25, 2021.................................................. 59

Cleanup: March 26, 2021 and March 27, 2021 ................................................. 60

Park Rehabilitation: March 28, 2021 to Present ............................................... 61

PERSONNEL ......................................................................................................... 62

LOGISITICS.......................................................................................................... 64

CRITIQUE ............................................................................................................. 65

Lessons Learned ............................................................................................... 65

    1.   Pre-Operational Events and Resources ................................................ 65

Recommendations on Pre-Operational Events and Resources............................ 65

    2.   Record-Keeping of Personnel and Less-Lethal.................................... 66

Recommendations on Record-Keeping of Personnel and Less Lethal................ 66

    3.   Photographers and Videographers ....................................................... 67

1050

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
LOS ANGELES POLICE DEPARTMENT

Recommendations Regarding Photographers and Videographers ..................................... 67

4.    Field Jails and Arrestee Processing ......................................................................... 68

Recommendations Regarding Field Jails and Arrestee Processing.................................... 68

5.    Detention of Journalists and Legal Observers........................................................ 68

Recommendations on Detention of Journalists and Legal Observers ................................ 69

6.    Communication on IC Authorization of Less Lethal ............................................. 69

Recommendations on Communication of Authorization of Less Lethal ............................ 69

7.    Partnering with City Entities ................................................................................. 70

Recommendations for Partnering with City Entities ......................................................... 70

8.    New Equipment – Strobe Lights and Drones ........................................................ 71

Recommendations on New Equipment .............................................................................. 71

APPENDIX ........................................................................................................................... 72

Appendix A: Acronyms ..................................................................................................... 72

Appendix B: Glossary Terms ............................................................................................ 74

Appendix C: Laundry Vouchers given to Echo Park ........................................................ 76

Appendix D: Safe Park Initiative ...................................................................................... 77

Appendix E: Summary of Echo Park Services................................................................... 78

Appendix F: Echo Park Closure Notice ............................................................................ 79

Appendix G: Motion for Bathroom Access ....................................................................... 81

Appendix H: Motion for Storage Facility ......................................................................... 84

Appendix I: Board Approved Park Improvements Dated 3/18/21...................................... 88

Appendix J: Board Approved Park Improvements Project ................................................ 92

Appendix K: Incident Objectives (ICS 202) ..................................................................... 98

Appendix L: Organization Assignment List (ICS 203) ..................................................... 99

1051

# INTRODUCTION

On March 24, 2021, at the direction of Council District 13, the Los Angeles Department of Recreation and Parks began the process of closing Echo Park Lake to conduct critical repairs to the park's extensively damaged environment and infrastructure.  To prevent members of the public from entering an active construction zone and protect City employees from interference during the rehabilitation process, a mile-long fence was erected around the perimeter of the 29-acre park.

Council District 13 requested assistance from Los Angeles Sanitation and Environment, the Department of Transportation, the Los Angeles Police Department, and the Los Angeles Fire Department to remove health hazards from inside the park, address problems with the park's ecosystem, and provide safety for critical work during the closure.  The Los Angeles Police Department was asked to provide security for the City contractor responsible for erecting the fence around the park, while also maintaining a safe perimeter around the park so that City workers could travel to and from the location without hinderance during the closure.

This report was prepared to fully and accurately document the complex and intensive process that led to closing a popular recreation area.  For the Los Angeles Police Department (LAPD or Department), this report offers a detailed overview of the planning and preparation process, as well as lessons learned and recommendations for future police involvement in cooperative operations where the Department is not the lead entity, and when enforcement action is not the primary objective.

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
**LOS ANGELES POLICE DEPARTMENT**

# BACKGROUND

Sitting in the shadow of Los Angeles' famous skyline, Echo Park is a 29-acre public park featuring a large man-made lake.  The lake, which boasts towering fountains, lush flora, and picturesque views, is a popular recreation destination for visitors and residents alike. After undergoing a 45-million-dollar renovation that was completed in 2013, the park provides guests with access to picnic tables, walking paths, a playground, and white swan pedal boats that can be rented from the boat house on the east side of the lake.

Like many neighborhoods near Downtown Los Angeles, the value of real estate in Echo Park has risen dramatically over the last decade.  While many residents and property owners welcome the gentrification, there is a segment of society that resents the displacement of lower income families who have lived in the area for generations.  The change in neighborhood demographics and the lack of affordable housing, compounded by subsequent COVID-19 restrictions and the country's fractured political climate, led several social activist groups to use Echo Park as a stage for reform.



## Increasing Homelessness

In November of 2019, an organized and well-equipped group of people experiencing homelessness (PEH) took control of the northwest corner of Echo Park when they began erecting tents and make-shift shelters near Glendale Boulevard and Park Avenue.[1]  Almost immediately, the park's environment began to suffer from continuous and unprecedented human habitation.  In the months that followed, individuals within the group became increasingly aggressive with maintenance staff from Recreation and Parks (RAP) and Los Angeles Park Rangers (Park Rangers) who were providing upkeep and maintenance to ensure that visitors could continue to enjoy the park.



---

[1] The group that began populating the park in November of 2019 arrived in the park well equipped with new tents, camping supplies, and electronics.  Additionally, the group was regularly supplied with food and water through an interconnected group of activists.

1053

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

As the elected representative for Council District 13 (CD13), Councilmember Mitch O'Farrell began receiving complaints regarding public safety and the quality of life in the park. Visitors, as well as the park's maintenance staff, reported seeing drug paraphernalia (needles), buckets of human waste, trash, rotting food, and animal carcasses in heavily frequented areas. In the park's public bathrooms, sinks and toilets were ripped out, and the plumbing was modified to be used as showers. Streetlights and electrical boxes were broken open and live electrical lines were run across the ground to power televisions and heaters inside tents.[2]

## Outreach Efforts

In response to the growing public health crisis, CD 13 and RAP utilized a multifaceted, wholistic approach, by providing vital services including housing and weekly cleanups. To provide a more permanent solution, RAP contacted the Unified Homelessness Response Center (UHRC) to



assist with coordination of services. The Los Angeles Homeless Services Authority (LAHSA), a sitting participant of the UHRC, conducted regular outreach and attempted to place the park's occupants into more stable housing. To meet the immediate needs of those PEH, CD 13 provided access to showers, storage, and laundry services (See DAMAGES & COSTS). Despite the considerable resources that were offered, most of the people living inside of the park continued to reject the City's assistance and refused to move elsewhere.[3]

To address sanitary concerns and to maintain the park for visitors, CD 13 organized weekly cleanups with RAP and Los Angeles Sanitation (LASAN). The cleanups were met with immediate, and hostile, resistance from the new encampment. When Park Rangers or LAPD officers showed up to provide security for the cleaning crews, activists took to social media and organized protests to stop City trucks from even entering the park. During one encounter in February of 2020, an altercation broke out between City employees and activists, resulting in a representative of the group being arrested for assaulting a Park Ranger.

---

[2] According to an estimate that was submitted to the Board of Recreation and Park Commissioners, the damage done to the bathrooms and street lights would cost approximately $109,000.
[3] Current LAHSA policy prevents them from sharing statistics with law enforcement, so the exact results are unknown.

1054

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
**LOS ANGELES POLICE DEPARTMENT**

## Decision to Close the Park

In 2011, the City spent $45 million dollars to completely renovate Echo Park Lake. During the rehabilitation project, the park was completely fenced off and closed to the public. After two years of construction, during which the lake was drained, and the famous lotus beds restored, the park re-opened in 2013 with new walking paths, new informational signs, a new observation deck, and new landscaping.[4]



By March of 2020, less than a decade after its major update, Echo Park was once again in a state of disrepair. To prevent any permanent damage, Councilmember O'Farrell decided to close the park to allow RAP and City contractors to conduct extensive waste removal, plumbing repair, electrical repair, and ecological rehabilitation.



Activists & Homeless organizations
protest and disrupt cleaning efforts.
January 2020

Park Rangers increase enforcement & met
with resistance by w/ individuals in Echo Park.
February 2020

January 28, 2020
LAPD Command Staff met with reps from
the unhoused population in Echo Park.

---

[4] "Echo Park Lake to Reopen with Eco-Friendly Improvements" KCET, June 5, 2013 available at
https://www.kcet.org/green-living/echo-park-lake-to-reopen-with-eco-friendly-improvements

At the time, fair-housing advocates and social justice organizations were increasingly critical of the City's efforts to address the homelessness crisis. Using their sizeable social media following, they routinely organized protests to demonstrate their public opposition to any action that was perceived to lead to the displacement of PEH. As the Echo Park encampment grew, so did the activist's claims of ownership over the public space. RAP leadership determined that any attempt to close the park would be framed as displacement in support of the activist's narratives, justifying further resistance and attempts to repopulate the park during the rehabilitation process. Therefore, RAP decided that the entire park would have to be fenced off. Like any large-scale maintenance or construction project, the fence would prevent passersby from entering a hazardous work area, while also allowing City workers to conduct the necessary repairs without interference or threats of harm. Due to the size of the park and the expectation of protest actions, CD 13 and RAP concluded that the Park Rangers did not have the necessary personnel to enact the closure alone.[5] To ensure the safety of City workers, and to maintain public peace during the initial stage of the rehabilitation phase, CD 13 requested that the Department assist with the operation by providing a secure presence during the erection of the fence.


## Police Involvement

*This section is an overview of the events that led to the closure of the park from the perspective of the LAPD.*

From the onset, the LAPD was hesitant to involve itself in an operation that could potentially lead to the relocation of PEH. Across the country, large cities are struggling to address the increasing number of PEH. According to the U.S. Department of Housing and Urban Development's most recent Annual Homeless Assessment Report, California's homeless population grew five percent between 2019 and 2020, and 22 percent between 2007 and 2020. As of January 2020, Los Angeles City and County led the country's major metropolitan areas with 51,290 people who were counted as experiencing homelessness. More concerning is the fact that Los Angeles City and County had the second highest percentage (84.1 percent) of PEH who were "unsheltered."[6]

| CoC Name | Homeless Individuals |
|---|---|
| **Major City CoCs** | |
| Los Angeles City & County CoC, CA | 51,290 |
| New York City | 36,394 |
| San Jose/Santa Clara City & County, CA | 8,802 |
| Seattle/King County, WA | 8,008 |
| Oakland, Berkeley/Alameda County, CA | 7,646 |

---

[5] The Park Ranger Division is typically a deployment of 65 Park Rangers overseeing six regional parks and all "pocket parks", with Echo Park being considered a "pocket park." However, when Park Rangers conducted a merger with LAPD Security Services half of the Park Rangers went to Security Services and additionally budgetary concerns became a factor. With those factors only 31 Park Rangers, including the Chief were assigned to handle the City of Los Angeles Regional Parks and "pocket parks."

[6] The 2020 Annual Homeless Assessment Report to Congress; The U.S. Department of Housing and Urban Development, Office of Community Planning and Development, defines an "unsheltered homeless" as when the

1056

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

Before moving forward, the Department carefully examined current City ordinances, the Department's policies regarding lawful interactions with PEH, applicable court decisions, and its experiences with the activist groups in Echo Park. As part of the assessment, the Department sought out legal advice from the City Attorney's office on potential risk management concerns and civil liability. Lastly, the Department conducted a thorough assessment of efforts made by partnering City agencies to ensure that involvement in the park closure was appropriate and would not expose the Department to risk management concerns.



### Homelessness in Echo Park

For years, Echo Park hosted a small number of people who used the park for overnight shelter. Historically, those unhoused individuals who slept in the park were cooperative, did not cause excessive damage to the park, and complied with directions from the Park Rangers and LAPD officers. Their cooperation allowed visitors to enjoy the park and ensured that maintenance staff had the opportunity to conduct necessary repairs to the park's structures and grounds.

---

individual experiencing homelessness resides in a place not meant for human habitation, such as cars, parks, and sidewalks. Additionally, "CoC" stands for Continuums of Care, which are local planning bodies responsible for coordinating the full range of homelessness services in a geographic area, which may cover a city, county, metropolitan area, or an entire state.

1057

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

In November of 2019, a distinctly different group of individuals began erecting tents in the
northwest quadrant of the park. The arriving population appeared to have an unusual level of
external support with easy access to resources like food, camping equipment, and electronics.
Unlike the park's prior unhoused population, the new group of individuals became instantly
aggressive and threatening (verbally and physically) with City employees when they were asked
to move or take down their tents.

Rampart Area Senior Lead Officers (SLOs) began working diligently to address the growing
encampment by educating the group on the various Los Angeles Municipal Code (LAMC)
sections restricting overnight lodging in public parks.[7] When education failed to ease tensions,
dissuade aggressive behavior, or decrease the size of the encampment, officers utilized Release
from Custody (RFC) and Administrative Citation Enforcement (ACE) citations to sanction
illegal activity.[8]

Enforcement of the LAMC sections through citation was ineffective. Instead, self-proclaimed
"representatives" from the growing encampment began arguing with SLOs and Park Rangers,
contending that Section 63.44 of the LAMC did not apply to them.[9] These representatives
argued that they had received "legal advice" that they did not have to leave the park.



[7] Each of the LAPD's 21 geographic Areas selects officers to address reoccurring quality of life issues that naturally
arise in neighborhoods. These officers are known as *"Senior Lead Officers"* or *"SLOs."*
[8] A Release from Custody (RFC) is a citation given to Misdemeanor offenses that may be released from custody as
long as they do not meet any of the conditions to remain in custody (See LAPD Manual Volume 4, Section 216.65
Release from Custody). The Administrative Citation Enforcement Program, (ACE) within the Community Justice
Initiative, is a non-criminal approach to nuisance abatement and quality of life offenses - using fines (instead of
arrest, incarceration and criminal records) - for people who violate the Los Angeles Municipal Code.
[9] 63.44 LAMC is Prohibition on Using Park Area or Facility for a Purpose Contrary or Inconsistent to its Specific or
Designated Purpose

1058

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT



**SARA**

**S**CANNING

**A**NALYSIS

**R**ESPONSE

**A**SSESSMENT

When it became apparent that traditional dialogue, communication, referrals for services, and enforcement were failing to positively impact the growing health and environmental concerns inside Echo Park, the Commanding Officer of Rampart Area directed the SLOs to initiate a SARA Project. A "SARA Project" is a Department problem solving model designed to address reoccurring crime and quality of life issues. The acronym "SARA" represents: **S**canning, **A**nalysis, **R**esponse, and **A**ssessment.[10] In place of proactive enforcement, which can be interpreted as punitive in nature, the Department assessed the problem and developed a wholistic response in partnership with other City entities. Collaboration was the underlying foundation of the Department's philosophy of outreach and engagement moving forward. Between January of 2020 and March of 2021, Rampart Area SLOs recorded 52 education and outreach activities geared towards the PEH in Echo Park.[11] Instead of giving citations, they issued warnings for quality of life violations. Rather than arresting people for sleeping in the park, they provided security for cleanups and outreach efforts led by City partners.[12]

Despite the Department's efforts to provide information and services, the people associated with the encampment in the park resisted the City's efforts to keep the park clean and free from hazards. In addition to the increased number of persons sleeping in the park, City workers observed a growing contingent of homeless-advocates whose actions hindered City efforts to address the situation. Trash cleanups and other sanitary initiatives were suddenly being interrupted by organized protestors wielding signs and banners, and occasionally physically impeding the work. These interventions were frequently followed up by social media posts



City entities meet for "Tent Removal Operation" for Echo Park.
March 12, 2020

COVID-19 spreads across the state.
Stay-at-Home Order Issued.
March 19, 2020

March 2020
CD13 conducts outreach in Echo Park.

---

[10] Office of the Chief of Police Notice, titled "Community-Police Problem Solving Form – Renamed and Revised," dated January 28, 2021.

[11] Rampart 2020 SARA and 2020 Neighborhood Engagement Area (NEA) Projects. Neighborhood Engagement Areas (NEA) are locations identified by an Area ACCIC where crimes have increased over the past year and where SLOs, patrol officers, residents and businesses begin to take more responsibility for reducing crime. The Department will use the well-established academic principles of "SARA" problem-solving techniques to address issues within NEAs; implement location-based solutions; provide services to those who need assistance; and, engage the community to assist with education and prevention.

[12] An Office of Operations Notice titled, "Department Role in City-Led Initiative to Eliminate Homelessness," states that the Department is committed to embracing a "Service-Led" approach to contacting persons who are experiencing homelessness. Dated February 20, 2020.

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

condemning normal park maintenance as attempts to "sweep" the homeless from the area, while simultaneously painting the advocates as noble protectors of the poor.  It became increasingly clear that the growing encampment in Echo Park was unique and would require unconventional solutions.

### Social Activism in Echo Park

Nationwide, social activism in support of more affordable housing has been growing with support from various media and social media influencers.  As an example, in December of 2020, several city blocks outside of Portland, Oregon, were barricaded by protestors attempting to prevent the eviction of a family who lost their home to foreclosure.[13]  Similar incidents have occurred locally.  In El Sereno, vacant homes owned by Caltrans have been taken over, or "reclaimed" (with much opposition), by unhoused families seeking shelter during the pandemic.  For years, Los Angeles has experienced one of the most significant affordable housing crises in the country and the emergence of COVID-19 with its economic impacts only exacerbated the issue.



Beginning in December of 2019, the Twitter account @StreetWatchLA began regularly posting regarding the encampment at Echo Park.  In the year that followed, several similar homeless-advocacy groups joined Street Watch LA in supporting the continued encampment within Echo Park.  The presence and influence of these activists, who are often confrontational and resistant to any intervention from Park Rangers and other law enforcement, made it increasingly difficult for the City to adequately address basic health and safety concerns.



---

[13] Oregon Eviction Protest Fueled by History of Gentrification, Associated Press,
https://www.usnews.com/news/politics/articles/2020-12-09/portland-barricades-still-up-in-anti-gentrification-protest
Dated December 9, 2020.

1060

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

On January 24, 2020, RAP cleanup crews and Park Rangers were met with significant opposition when they attempted to conduct a scheduled clean-up inside the park.  During the cleanup, people living inside the park were asked to move their belongings to another area of the park while maintenance was conducted.  Though no one was displaced, and no "sweep" was planned, the encampment dwellers, along with a group of 50 homeless activists (including several minor children), conducted a sit-down protest to block the cleanup.  To de-escalate the incident, RAP cancelled the clean-up, and only minor maintenance to clean the area around the tents was performed.

Staff and command officers from the LAPD met with representatives from the unhoused population living in the park on January 28, 2020.  During the meeting, three self-identified spokespersons (accompanied by a member of the National Lawyers Guild) stated that they would not leave Echo Park unless they were provided with permanent housing.  In addition to permanent housing, the group made three demands:

> (1) That the police refrain from enforcing any laws within the park (specifically Section 63.44 of the LAMC);
> (2) That the City cease conducting any park clean-ups; and,
> (3) That police refrain from waking them at night.[14]

The meeting concluded without any agreement between the parties.



---

[14] According to LAMC Section 63.44, City parks close at 10:30 p.m.  After consulting with the City Attorney's office, Rampart Area SLOs made a concerted effort to notify everyone in the park that the law precluded anyone from being in the park past 10:30 p.m.

1061

After the impasse, the size of the group living in the park grew even larger. With more people living in the park, the effects of continuous habitation, something for which the park was not constructed nor environmentally able to sustain, caused the park's overall conditions to deteriorate quickly.  The growing presence of trash, drug paraphernalia, and human waste began discouraging visitors, especially families, from using park.  Less than a decade after its 45-million-dollar renovation, Echo Park was rapidly returning to a state of decay.

As the park's environment and infrastructure continued to spiral downward, so did the relationship between the encampment dwellers and law enforcement. In one instance, one of the more vocal figures, an ex-fashion model named Davon Brown, took to live streaming on Instagram after being shot by a suspected gang member from the "Echo Park" criminal street gang.  In his video, Brown claims that Mayor Garcetti and Chief Moore were behind the shooting and, in response, threatens both officials by repeatedly yelling "you're dead Mayor Garcetti" and "you're dead Chief Moore."[15]

On February 26, 2020, Park Rangers and RAP maintenance staff met in the park to conduct a routine cleanup and remove bulky items as allowed by 63.44 LAMC.[16] During the cleanup, which was supervised by Chief Park Ranger Joseph Losorelli, Davon Brown became irate when he was not allowed into a section of the park being attended to by RAP maintenance crews.  Brown attempted to push past a Park Ranger, striking the Ranger in the process.  An altercation ensued, and Brown was arrested for 243(B) PC – Battery on a Peace Officer.[17]

## Closing the Park

To address the public's concerns regarding the health and safety issues caused by the encampment, and to rehabilitate the park's ecosystem, CD 13 and RAP began searching for a comprehensive solution to the growing problem.  After carefully considering several options, CD 13 decided to fully close the park for rehabilitation.

It should be emphasized that closing the park was a **last resort**. The complexity of the homelessness crisis in Los Angeles is well understood by elected officials and in each of the City's departments. Based on their years of experience in dealing with

> ### CALLS FOR SERVICE
>
> During 2020, Calls for Service in and around Echo Park increased nearly 20 % compared to 2018 and 2019.

---

[15] Davon Brown Instagram profile. Dated December 1, 2020. https://www.instagram.com/tv/CIRC93Xn-DR/?utm_medium=copy_link

[16] In 2015, Councilmember Mike Bonin, from Los Angeles' 11th Council District, requested that an ordinance be drafted to restrict people from bringing bulky items onto park property.  Los Angeles City Council Ordinance No. 1083761, amending Subsections B and I of Section 63.44 of Chapter VI of the Los Angeles Municipal Code. Ordinance was signed July 8, 2015 and became effective July 18, 2015.

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
**LOS ANGELES POLICE DEPARTMENT**

homelessness, City leaders were hesitant to embark upon an initiative that could hurt some of Los Angeles' most vulnerable residents.  Out of compassion, before moving forward with any closure, the Mayor's Office insisted that every unhoused person inside the park had to be provided with an appropriate housing offer.



The LAHSA is the entity responsible for the delivery of homeless services in the City and County of Los Angeles.  The organization, which was created in 1993 as an independent entity with joint authority in the City and County, has substantial control over federal, state, and local funding for all homeless services, including housing.  As the sole conservator of the governmental funding for homelessness, LAHSA coordinates with more than 100 partnering agencies to provide a variety of services.  Unfortunately, for several reasons, LAHSA was hesitant to provide statistics regarding the success of their housing efforts in Echo Park.  Without a clear understanding of how successful LAHSA's outreach efforts were, CD 13 was forced to look to outside entities for help meeting the Mayor's requirements.

To comply with the Mayor's guidance, the City reached out to Community Based Organizations (CBOs) and religious organizations to identify enough beds to shelter everyone that was camping in the park.  In one instance, the Rampart Commanding Officer was able to work with Saint Athanasius Episcopal Church, which is located directly across the street from the park, to open a shelter and supply beds for the unhoused in Echo Park. Before opening its doors, the church attempted to conduct outreach and build relationships in the park.  Unfortunately, church volunteers were met with the same hostility shown to City employees.  The hostile interactions were so severe that the church canceled the agreement.

## COVID-19 Pandemic

In March of 2020, before CD 13's planned closure could be carried out, the COVID-19 pandemic created a global health emergency that caused the City to issue restrictive health and safety orders based on guidance from the Los Angeles County Department of Public Health



1063

(DPH) and the Centers for Disease Control and Prevention (CDC).  Specifically, the DPH recommended that persons experiencing homelessness who could not shelter indoors should shelter in place inside their tents, as the tent provided protection from the spread of COVID-19. In accordance with the Mayor's direction, the plan to rehabilitate the park was postponed to protect the unhoused people sheltering there. [18]



As the pandemic continued, COVID-19 shelters were established across the City to aid individuals experiencing homelessness.  One of these COVID-19 shelters was opened at the Echo Park Recreation Center. The emergence of a new shelter attracted PEH from across the City and the population of individuals sleeping in the park grew to 70 individuals and 140 tents by the close of 2020.

During the pandemic, the group in the park began marketing themselves as an autonomous community that was struggling, but managing, to care for society's disenfranchised citizens.[19] Physical structures began popping up throughout the park. On the lake's western shore, a tarp was fastened to wooden cabinets to create a "community kitchen."  Makeshift showers were constructed using plywood and 5-gallon water jugs. CBOs staffed cellphone charging stations using solar powered batteries.

---

[18] DOC Notice, Updated Guidance of the Mayor's Safer at Home Initiative, sent to Department personnel on March 29, 2020
[19] Story of Echo Park Lake's Homeless Community: "Where Are We Going to Go" (https://www.youtube.com/watch?v=iY3LwDH72-c) Dated October 20, 2020.

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
**LOS ANGELES POLICE DEPARTMENT**

Below the surface, life in the park was less than utopian. At CD13, Councilmember O'Farrell's deputies began hearing rumors that people inside the encampment were using force and fear to profit from the situation by charging rent to sleep in tents within the park.  Furthermore, individuals who were willing to accept the City's assistance were being threatened with violence if they left the park, so they can remain within Echo Park and continue to collect payments.



By the fall of 2020, damage to the park's environment and infrastructure had reached catastrophic levels.  Plant life throughout the park, including all of the park's grass, was destroyed after the park's irrigation systems were disabled to prevent sprinklers from showering tents with water.  Human feces, jugs of urine, hypodermic needles, and trash littered the lake's shores and walking paths.  Light poles were broken into and electrical systems modified so the people sleeping inside the park could charge their personal electronic devices, such as computers and cellular phones, and operate microwaves.

Nearby residents began complaining that people from the park were trespassing in their yards and knocking on their doors in the middle of the night.  Calls for service began to increase within



1065

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
LOS ANGELES POLICE DEPARTMENT

the area surrounding Echo Park and community members began to express their concerns to CD 13.

Sadly, poor quality of life and property damage were ultimately overshadowed by loss of life. Five people died in the park in 2020.[20]  One of the victims, an eighteen-year-old girl from Orange County, was found dead from an overdose just days before she was scheduled to start college.[21]

For many Angelenos living in the area, the situation was perceived to be out of control, neglected and unsustainable.  As people began to emerge from their homes after a year in quarantine, the deterioration of the recently renovated grounds, the presence of human waste, and the rise in crime, caused residents and visitors to cry out for intervention.

## Revisiting the Closure

The CDC guidance that led the City family to postpone closing the park stated that individuals experiencing homelessness should be allowed to shelter in their tents **if no indoor quarantine options are available.**  Additionally, the DPH order advised that homeless encampments should not be cleared *unless* individual housing units were available.[22]  By the end of 2020, the City and County of Los Angeles had gone to great lengths to provide various shelter programs for people experiencing homelessness and beds were available for everyone in the park.

Unfortunately, over the previous year, the remaining people living in the park had made it clear that they had no desire to relocate to temporary housing.  In an interview with ABC 7, Jed Parriott, a 'community organizer' with Street Watch LA, was recorded saying:

> "Shelters are not the solution; permanent housing is the solution. So, we really need to be accommodating people and not sweeping them out of sight. We need to be telling these



---

[20] 06/16/2020 – DR 200211412, Overdose
   08/09/2020 – DR 200213547, Overdose
   10/01/2020 – DR 200215650, Overdose
   10/25/2020 – DR 200216708, Death Investigation
   12/31/2020 – DR 200219188, Drowning
[21] Los Angeles Magazine, The Homeless Republic of Echo Park: Life (and a Death) in L.A.'s Fastest-Growing Tent City. Dated December 23, 2020.
[22] Los Angeles County Department of Public Health, Guidance for Homeless Service Agencies and Outreach Teams Last Updated May 15, 2020.

1066

property owners and homeowners, 'Sorry, you're going to have to tough this out. I'm sorry that you have to see this; that you have to see poverty. You're going to have to see it right now until we get permanent housing for everybody. Sorry.'"[23]

As the neighboring community's pleas for intervention grew louder, it became evident that something had to be done. In direct response to the publics demands, CD 13 reintroduced their plan to close and rehabilitate the park in December of 2020. Again, LAPD was asked to support the operation by providing security for other City workers.

Unfortunately, during the holidays, COVID-19 positive cases exploded among Department personnel. Between December 1, 2020, and January 31, 2021, 1,684 LAPD employees tested positive for COVID-19 and were forced to quarantine for at least 14-days. The loss of such a significant portion of the Department's workforce created massive ripples across the organization that drastically effected the Department's ability to conduct daily operations.



Simultaneously, the Office of Operations (OO) and half of its geographical bureaus experienced a transition in leadership. The Director of OO, and the Commanding Officer of Operations-Central Bureau (OCB), both of whom approached the request with fresh perspective, were uncomfortable with sending an already depleted workforce into a situation where more officers would be placed at risk of exposure. Additionally, both leaders objected to the possible displacement of PEH at a time when the City and County were experiencing such a drastic spike in positive COVID-19 cases.

To ensure that the closure was implemented as smoothly as possible, and to protect LAPD personnel and members of the public from unnecessary exposure and infection, the Department requested that CD 13 postpone the operation until the spike in COVID-19 cases subsided. A new approach was developed by CD 13. The focus would be on bringing Echo Park's homeless indoors in order to close the park without displacement. Access to Project Roomkey



Urban Alchemy is contracted to conduct outreach & house individuals within Echo park.
**January 2021**

City notices an increase of homeless individuals moving to Echo Park to get priority on services.
**February 2021**

**February 2021**
Urban Alchemy continues to successfully place homeless into housing.

---

[23] Video link: https://abc7.com/echo-park-homeless-cleanup-lake/5845914/ [date]

beds now made this possible.   Due to the lack of information from LAHSA, in January of 2021,
CD 13 entered into a $350,000 contract with Urban Alchemy (UA) to provide additional access
to housing for people sheltering in the park.[24]

Urban Alchemy's experienced approach at building trust led to immediate success in their
outreach efforts.  In the first three months of 2021, Urban Alchemy was able to place over 100
unhoused individuals into stable housing using Project Roomkey and other COVID-19 sheltering
programs.[25]  Because UA openly shared their results data, CD 13 could actively manage the
housing stock and transportation infrastructure.  Unlike the previous year, there was no shortage
of available housing to those living in the park.  The COVID-19 pandemic had caused state and
local governments to fund numerous projects to house and protect their vulnerable unhoused
citizens from contracting the deadly and contagious disease.  Still the City family continued to
encounter uncooperative individuals who refused to accept offers of housing.  In contrast, UA's
success in placing eager individuals only served to highlight that a segment of those claiming to
be part of the unhoused population in Echo Park had ulterior motives for their continued
presence beyond obtaining shelter.

By March of 2021, CD 13 could confidently report that everyone in the park had been given an
offer of housing.  CD 13 informed the LAPD that they could no longer delay closing and
rehabilitating the park.  Due to the confrontational demeanor of the remaining population in the
park and the potential for large scale protests, the Department agreed to participate in the closure
by providing the necessary resources to maintain order and public safety while the park closure
went into effect.



---

[24] Urban Alchemy is a community-based organization (CBO), that was founded in 2018 to *"bring a sense of peace
and respect to America's most chaotic urban areas that are struggling with the intersection of extreme poverty,
addiction, mental illness, and hopelessness."* According to their website, Urban Alchemy *"utilizes the
transformative power of love, passion, respect, and a sense of belonging to reshape the lives of society's most
vulnerable members, into society's most valued members."* See Urban Alchemy website, http://urban-
alchemy.us/our-impact.

[25] Project Roomkey was developed by the California Department of Social Services (CDSS) in response to the
COVID-19 pandemic. According to their website, the purpose of Project Roomkey is to provide non-congregated
shelter options for people experiencing homelessness using trailers and local hotel/motels.

1068

# PLANNING

To properly repair the park's extensive damage, RAP determined that the entire area would need to be fenced off to prevent repopulation of the park, which would only serve to delay requisite renovations, escalate costs, and cause setbacks.  Identifying how to erect the fence with minimal interference from opposing activist groups became a significant area of in-depth discussion, requiring scheduling, flexibility and continuous attention.  As the entity responsible for public safety, and due to the sheer number of personnel that would be required to successfully secure such a larger perimeter while the fence was being constructed, the LAPD took a leading role in operationalizing the closure.  Once the fence was secured, focus would then shift to RAP and LASAN's efforts to remove hazardous waste, legally impound and store other personal property, and assess the damage to the park.

## Efforts to Mitigate City Liability

During each phase of the City's response to the situation in Echo Park, the involved City departments relied heavily on legal advice from the City Attorney's office.  Before CD 13 initially decided to close the park, RAP sought advice on the enforcement strategies to keep the park safe and free of hazard.  The CD 13 decision to close the park the first time in March of 2020, was only made after consulting with the City Attorney's office on the legal requirements needed to close a public area for construction.  When COVID-19 began to spread in Los Angeles, the City's decision to allow people to remain in their tents was based on input from the City Attorney's office.

During the planning phase of the operation in March of 2021, the City Attorney's office provided CD 13 and RAP with guidance on several legal requirements related to the potential displacement of PEH, unattended property, and what notice should be given prior to closing a park.

## Mitigation of Department Liability

Any enforcement action involving members of the homeless community is complicated and carries significant legal risk. In its response to the situation in Echo Park, the Department focused heavily on ways to mitigate any potential civil liability.  For this reason, the Department met with City Attorney's office on seven separate occasions between December of 2019 and March of 2021.

In November of 2019, Rampart Area's initial response to the growing homeless problem in Echo Park, and the creation of a SARA project, was based on legal advice given by the City Attorney's office.  The standard, that every person in the park should be given an offer of

1069

housing, was also based on direction from the Mayor's Office in consultation with the City
Attorney's office.

While planning the Echo Park Operation, the Department focused on the best way to maintain
order and public safety while the fence was being constructed.  After several meetings with the
City Attorney's office, Police General Counsel, the Department decided the creation of a "public
safety perimeter" was the best course of action.

Department staff and command officers continually communicated that the goal of operation was
to close and rehabilitate the park.  The possible displacement, or arrest, of the unhoused
individuals in the park was a potentially unfortunate consequence of the closure, but not the goal
of the operation.  The division of responsibilities was clearly reiterated throughout the process.
While the Department would handle security and public safety, other City departments would be
responsible for conducting outreach, allocating available housing, providing tangible resources,
and offering access to intervention specialists.

## Operational Planning and Organization

The operation to close Echo Park was organized into a unified command with RAP, the Los
Angeles Fire Department (LAFD), DOT, CD 13 and the LAPD identified as unified
commanders.  Using the unified objective Special Events Unit (SEU) at OCB took the lead role
in planning, requesting the required resources, and publishing the final Event Action Plan for
review by the Office of Operations and the Chief of Police.

After consulting with the City Attorney's office, RAP elected to provide encampment dwellers
with 24 hours' notice before forcing anyone to leave the park.  To accommodate the advanced
notice, six Operational Periods (OP) were planned over a three-day period.  As described below,
each Operational Period was planned with specific goals and missions.

**Operational Period One (B Watch, 1800 to 0600)**
After a sustained week of outreach by UA and CD 13, and the Department, with the
assistance of DOT, would be assigned to secure a public safety perimeter and provide
security for the City contractor hired by RAP to install the fence.  Response Mobile Field
Force (MFF) squads consisting of LAPD officers would stage nearby in the event any
demonstrations became violent and interfered with City workers or contractors.

Simultaneously, Park Rangers and Rampart SLOs would be tasked with providing
everyone inside the park with written notice of the closure that would take place in 24
hours. In addition to the written notice, signage would be posted around the perimeter of
the park.

1070

**Operational Period Two (A Watch, 0600 to 1800)**
Throughout Operational Period Two (OP 2), officers would be assigned to the perimeter
to keep anyone not already inside Echo Park from entering the expansive fenced-off
perimeter of the closed park. Meanwhile, LAHSA, UA, and CD 13 would conduct
extensive outreach and attempt to gain voluntary compliance from all the unhoused
people inside the park to accept the offer of shelter and leave the park.

**Operational Period Three (B Watch, 1800 to 0600)**
Consistent with the City Attorney's office advice, at 10:30 p.m., having given 24-hours'
notice to anyone remaining in the park, RAP Rangers, assisted by LAPD officers, would
close the park to encampment dwellers and attempt to obtain voluntary compliance with
exiting. Only as a last resort Park Rangers and LAPD would arrest anyone refusing to
leave for a violation of LAMC Section 63.44 (B)(7).

Additional LAPD assets would monitor the perimeter and respond, if needed to any
unruly demonstrations.

**Operational Period Four (A Watch, 0600 to 1800)**
With the park clear of persons and the closure in effect, city workers from RAP and
LASAN would begin removing personal property and trash from the park. Personal
property would be impounded and stored for retrieval.

LAPD officers would be staged at fixed posts along the fence's perimeter to provide
security for the workers inside the park. Fixed posts would be responsible for preventing
unauthorized persons from entering the park.

**Operational Period Five (B Watch, 1800 to 0600)**
LAPD officers would continue to be assigned to fixed posts throughout the night, to
ensure that unauthorized people were unable to enter the park.

**Operational Period Six (A Watch, 0600 to 1800)**
LAPD officers would continue to provide security for City workers inside the park. At
the completion of the cleanup, the operation would be turned over to Rampart Area for
further monitoring.

On March 23, 2021, the day before OP 1, the SEU held a final briefing in the Roll Call room at
Central Station. Representatives from LAPD, LAFD, the California Highway Patrol (CHP),
DOT, and RAP attended to discuss the operational plan and offer last minute advice. During the
meeting, SEU informed the group that the Los Angeles Times (the Times) had released an article
early that morning, advising readers that the park would be closed and fenced on Thursday.[26]

---

[26] LA Times Article, "City Plans to Close Echo Park Lake and Clear Homeless Encampment.
https://www.latimes.com/homeless-housing/story/2021-03-23/city-plans-to-close-echo-park-lake-and-clear-
homeless-encampment Dated March 23, 2021.

1071

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

Throughout the planning phase, CD 13, RAP, and the Department made every effort to keep the park's impending closure confidential.  This was not done out of spite, but out of caution.  Based on previous activism within the park, the Incident Management Team (IMT) was concerned that a flood of protestors would entrench themselves in the park if news of the closure was made public.

As expected, in response to the Times article, social media activists began calling for reinforcements to flood the park and "stand in solidarity with our unhoused neighbors." Despite the fact that the Times article indicated that the closure would take effect on Thursday, a rally in Echo Park was scheduled for Wednesday morning.



With the element of surprise no longer available, members of the IMT deliberated whether an additional operational period should be created to monitor demonstrations planned for the morning of March 24, 2021.  Opponents of the idea argued that the presence of LAPD officers in MFF squads during daylight hours on Wednesday would only attract more attention and invite additional protestors, making it more difficult for the fence to be erected that night.

Rather than showing up in force, and escalating a sensitive and highly publicized situation, proponents of the original plan argued that a minimal police presence would prevent any large gathering from gaining traction on social media and in the news.  Available information indicated that people would begin to arrive as early as 7:00 a.m., which made it likely that the congregation would lose momentum and disperse organically before the planned operation later that night.

In the end, the operational plan remained the same.  Instead of allocating operational resources for the early protests, the Rampart Patrol Commanding Officer would monitor the event with their SLOs to limit the often-imposing presence of law enforcement in the area.

1072

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
**LOS ANGELES POLICE DEPARTMENT**

Another thoroughly discussed topic during the tactics meeting was the plan to erect the fence with people still inside of the park.  There was a concern that anyone allowed to remain in the



park would use the 24-hours' notice to gain a position of advantage which could potentially make it impossible to remove them during the OP 3.  Instead, it was suggested that Park Rangers enter the park on Tuesday night and give the 24 hours' notice, so on Wednesday night, during the first operational period, the Department would have grounds to remove resistant individuals before the fence was erected.

In the end, it the IMT decided that encampment dwellers inside the park would be notified of the closure by Park Rangers while the fence was being constructed.  Despite the tactical challenges that it presented, the IMT ultimately decided to adhere to the original plan because it had already been discussed extensively with the City Attorney's office.  The Department was intent on ensuring that it protected the rights of all individuals involved, followed sound legal advice, and, to the extent possible, shielded the City from liability.

1073

# NARRATIVE

*This narrative is an overview of what transpired during the Echo Park Operation from March 24, 2021 through March 27, 2021. It gives the reader context for the critique and recommendations that follow and allows the reader to assess and evaluate those recommendations based on the facts present during the event.*

## Pre-Operational Events and Protests

On March 24, 2021, after 14 months of collaboration and outreach, City departments were ready and prepared to close Echo Park for extensive renovation and rehabilitation. Despite the City's desire to keep the operation confidential, rumors of the closure were leaked in the news and on social media three days earlier. Consequently, at 7:00 a.m. on March 24th, 11 hours before the first operational period was scheduled to begin, a group of 100 protestors gathered outside of Councilmember O'Farrell's field office to protest the closure. [27]

The IMT planning team was aware of the early protests but decided to move forward with the operation as it was originally planned. Instead of adjusting to provide resources in the morning, they assigned monitoring responsibilities for the early protests over to a small contingent of officers assigned to Rampart Area. This decision was made not to escalate the incident by not providing, what could ultimately be seen, as an antagonistic presence that would draw additional protestors.

Rampart Area's Commanding Officer, Captain Alfonso Lopez, was scheduled to serve as the Operations Section Chief starting with the first Operational Period at 6:00 p.m. that night and was unavailable to handle the early protests. On Wednesday morning, the Rampart Patrol Commanding Officer, Captain Adrian Gonzalez, identified himself as the Incident Commander (IC) and assigned several of his SLOs to monitor the group.

In addition to the group protesting outside Councilmember O'Farrell's field office, Captain Gonzalez began receiving intelligence reports that a second group was forming near the



---

[27] Operation Echo Park was broken down into six operational periods, the first one being March 24, 2021 from 6:00 p.m. to March 25, 2021 at 6:00 a.m. The second operational period being March 25, 2021, 6:00 a.m. to 6:00 p.m. Third operational period being March 25, 2021, 6:00 p.m. to March 26, 2021, at 6:00 a.m. Fourth operational period being, March 26, 2021, at 6:00 a.m. to 6:00 p.m. Lastly, March 26, 2021, from 6:00 p.m. to March 27, 2021 at 6:00 a.m. With the sixth operational period being turned over to Rampart Area.

northwest corner of Echo Park.  At 7:50 a.m. Communications Division broadcast that a person had called to report that a group of protestors at Park Avenue and Lemoyne Street (at the north end of Echo Park) was in the street and blocking traffic.

Around 8:00 a.m., the group of 100 protestors at CD 13's field office began marching southbound on Lemoyne Street and converged with a group of 200 protestors in Echo Park.  The



combined group soon grew to approximately 500 people, and several radio calls were generated for excess noise and obstruction of traffic.  Despite the increased size of the group, Rampart personnel continued to monitor the situation at a distance and did not observe any significant threats to safety or public order.

At the time, due to a Department-wide freeze on promotions, OCB was operating without an Assistant Commanding Officer.  During the Commanding Officer's absence from command, alternating senior Captains from OCB's five geographical Areas were serving as Acting Assistant Commanding Officers.  On March 24th, Hollenbeck Area Commanding Officer, Richard Stabile, was the Acting Assistant Commanding Officer of OCB.

As the IC of the incident in Echo Park, Captain Gonzalez continuously provided Captain Stabile with updates on the situation.  At 8:30 a.m., out of an abundance of caution, Captain Stabile contacted the SEU at OCB and requested that each Central Bureau Area provide a squad of 1 supervisor and 12 officers in case the group in Echo Park continued to grow and become disruptive.

At 10:40 a.m., Captain Gonzalez had received enough officers to fill an entire MFF (60 officers). Before deploying them to observation posts around the park, Captain Gonzalez ensured that each



1075

officer had a clear understanding of the Commander's Intent for the incident.[28]  That intent, which had been clearly articulated during the planning of the operation, was to allow First Amendment demonstrations to continue in an obstructed manner with minimal intervention or engagement from the Department.  Unless officers observed violent or destructive behavior, they were told to remain at a distance and allow people to voice their opposition.

Though the crowd was larger than anticipated, demonstrations remained peaceful.  At 11:45 a.m., after several speeches, the crowd began to disperse on its own.  Instead of releasing the officers assigned to the MFF, Captain Gonzalez placed the squad on standby to monitor a reoccurring protest that was scheduled to be held nearby at the Los Angeles Police Protective League (LAPPL) headquarters at 3:00 p.m.



The "Fund Services Not Police" protest held in front of the LAPPL building was organized by Black Lives Matter (BLM) and had been held every Wednesday during the month prior to the park closure.  In prior weeks, the protests consisted of approximately 100 people and had always been peaceful.  Despite the functional relationship the Rampart command had established with organizers, intelligence reports indicated that the group would march from the LAPPL building and continue their protest in Echo Park.

To prepare for the possibility of a long march and necessary traffic control, Captain Gonzalez kept the MFF on standby.  The protest began as scheduled, at 3:00 p.m. and was handled by lieutenants from Rampart Area.  The crowd and tenor of the event were similar to the previous protests and the standby MFF was never utilized.  When the event ended, and the crowd dispersed without marching, Captain Gonzalez released the personnel assigned to the MFF and directed them to return to their divisions.  Rampart SLOs continued monitoring a smaller group that remained in the park throughout the day.



---

[28] The term "Commander's Intent" refers to the guiding principles and strategies outlined in an incident's Event Action Plan (EAP).

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
LOS ANGELES POLICE DEPARTMENT

## March 24, 2021 - March 25, 2021 (1st Operational Period)

At approximately 5:00 p.m., Captain Lopez, the Operations Section Chief for the first operational period, drove by the park to assess the situation and estimate the size of the crowd. Captain Lopez determined that there were only approximately 150 protesters remaining inside of Echo Park.

Roll call for the OP 1 was scheduled to begin at 6:00 p.m. at the Command Post (CP). Before roll call, Captain Gonzalez met with Commander Graham, the IC for OP 1, to discuss the day's events.

At 6:00 p.m., Commander Graham held roll call for OP 1. Staff Officers from every Department office and representatives from participating City entities were present for the briefing. During the briefing, Assistant Chief Girmala and Commander Graham relayed the Commander's Intent by strongly emphasizing that the Department was participating in the closure in a supporting role, by providing necessary security for RAP while they closed the park. Captain Lopez identified the Crespo area and gave further direction regarding officer safety, necessary equipment, and the use of less lethal force.[29] Specifically,



Captain Lopez encouraged officers to use their BWV to clearly articulate circumstances where it became necessary to deploy less lethal munitions.[30]



---

[29] See Journalists and Legal Representatives Section. Los Angeles Police Department Uniformed Services Group Notice 8.2.3, Media Relations in Crowd Control Situations, July 8, 2002.

[30] "Tell your story" is a commonly used phrase in the LAPD. It is used to encourage officers to verbally narrate their observations, so that their BWV captures their individual perceptions in real time.

## Decision to Launch Operation Early

At 7:07 p.m., the Twitter account @VPS_Reports posted three photos of the staging area and the just completed roll call on social media with a caption urging people to respond to Echo Park to "help with defense." The primary goal of OP 1 was to erect the fence around the park. The increased presence of people inside the park would make it more difficult for the City contractor to build the fence. Concern that a social media push for reinforcements would cause the park to become heavily populated by a large number of protestors caused the IMT to reassess the operational timeline.



Although the closure was not scheduled to begin until 10:00 p.m., at 7:50 p.m. Commander Graham made the decision to launch the operation early and deploy Department personnel as soon as practicable to prevent a large group from gathering inside the park. This proved to be challenging. DOT was responsible for establishing the outer perimeter by shutting down vehicular traffic into the park. When the IC launched the operation early, DOT was not in place, which forced Captain Lopez to make quick changes to the planned deployment of officers.

At 8:26 p.m. the CP requested a crowd estimate. According to the Air Unit, there were 100 protesters in the roadway at Glendale Boulevard and Park Avenue, with an additional group of 150 at Glendale Boulevard and Bellevue Avenue. The airship advised that both groups were being bolstered by a steady flow of people entering the area from side streets. Based on his knowledge of the area, Captain Lopez made the decision to leave the CP to gain better situational awareness of the incident. With Captain Lopez deployed to the field, Captain McGuyre, the Deputy Operations Chief, remained at the CP with the Incident Commander. Although leaving



1078

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
**LOS ANGELES POLICE DEPARTMENT**

the CP contradicts ICS principals, Captain Lopez felt that being in the field would give him better understanding of what was happening and allow him to make better operational decisions.

As squads focused on shutting down vehicular and pedestrian traffic around the park, SLOs from Rampart Area began posting signs around the park, notifying that the park would be officially closed in 24 hours. The SLOs recorded the posting of signs on their BWV to prove that the entire park had been given the required notice of the closure.

By 9:04 p.m. there were approximately 100 demonstrators on the north side of Echo Park and an additional 200 demonstrators to the south on Glendale Boulevard. To address both groups, Captain Lopez coordinated two skirmish lines to keep the groups from converging or impeding construction of the fence. As soon as the skirmish lines were in place, protestors began taunting officers with insults and profanity.

## Use of Strobe Lights

During the Civil Unrest in 2020, protestors constantly utilized new tactics to impede Department efforts. One of the more harmful tactics was the use of laser pointers and strobe lights to blind officers assigned to skirmish lines. In response, the Department issued laser protective eyewear to all sworn personnel to prevent injuries caused by the green lasers that were used by protestors.

LAMC Section 55.07 prohibits possession of certain items while attending or participating in any public demonstration, rally, protest, pricket line, or public assembly. After the Civil Unrest in



31 | P a g e

2020, the City Council amended LAMC Section 55.07 to include laser pointers.[31]  Green lasers are known to cause temporary blindness, and in some instances, permanent visual impairment when pointed directly into a person's eye.  Lasers directed at aircraft in flight bring additional safety concerns as they can brightly illuminate the cockpit of the aircraft, potentially blinding the pilot.  This leads to the visual loss of the pilot's aircraft controls and flight path, causing significant public safety concerns.  On November 3, 2020, the requested amendment went into effect.



Including laser pointers in Section 55.07 of the LAMC allowed police to arrest agitators in the crowd for using lasers to interfere with an officer's vision.  In response to the new legislation, protestors found a new way amendment interfere with officer's vision by using high intensity strobe lights to cause flash blindness. 'Flash blindness' is a type of blindness that results from sudden exposure to bright light.[32]

Any visual impairment is extremely dangerous for an officer assigned to a skirmish line.  Repeated or prolonged blindness in a crowd control situation prevents officers from being able to defend themselves from projectiles or assaults, and potentially having the ability to disarm officers.  In addition to other rare side effects, some individuals, like those who suffer from epilepsy, can experience seizures after being exposed to flashing lights.[33]



Second Dispersal Order Given at Santa Ynez & Glendale.
10:50 PM

Third Dispersal Order Given at Santa Ynez & Glendale.
11:22 PM

11:21 PM
Protesters increase to 400 at Santa Ynez and Glendale.

[31] City Council voted on adding laser pointers as a prohibited item in protests, rallies, etc.  The motion occurred on October 28, 2020 and was approved by the Mayor on October 29, 2020.  See https://cityclerk.lacity.org/lacityclerkconnect/index.cfm?fa=ccfi.viewrecord&cfnumber=20-1362
[32] Ray, P. L., Cox, A. P., Jensen, M., Allen, T., Duncan, W., & Diehl, A. D. (2016). Representing vision and blindness. *Journal of biomedical semantics*, *7*, 15. https://doi.org/10.1186/s13326-016-0058-0.
[33] https://www.epilepsy.com/learn/triggers-seizures/photosensitivity-and-seizures

1080

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

At approximately 9:30 p.m., Commander Graham and Captain Lopez conferred via cellular phone. Commander Graham established the objective of keeping the current group on the streets occupied until 10:30 p.m. at which time the park would close to anyone not inside. Captain Lopez began negotiating with protest leaders to move south on Glendale Boulevard. While not quite cooperative, the group continued south. While moving the crowd southbound on Glendale Boulevard, officers reported their first encounters with individuals using strobe lights. The strobe lights had a disorienting effect on officers due to the strobe light's effects, one MFF leader requested a plain clothes officers to the area to identify the individual using the strobe light against officers. Meanwhile, the crowd of protesters continued to shine strobe lights and spotlights, yell, chant, and bang on instruments to create chaos and make it difficult for Department personnel to communicate.



### Use of Less Lethal Munitions

Shortly before 10:00 p.m., protestors in the crowd began lighting illegal fireworks and smoke bombs. As a white blanket of smoke began to cover Glendale Boulevard, officers on the skirmish line lost their ability to see threats further down the street. To make matters worse, activists took to social media to report that LAPD had deployed tear gas, which was not accurate. The crowd became more confrontational and a beanbag round was fired towards a protestor identified as an individual who attempted to take an officer's baton.

### Declaration of Unlawful Assembly

The combination of fireworks and flashing strobe lights presented a clear and present danger to the officers assigned to the skirmish line.[34] At 10:00 p.m., based on the crowd's violent behavior, Captain Lopez decided to declare an unlawful assembly and requested a sound-truck to

---

[34] Department policy outlines two circumstances in which an assembly may be declared unlawful. The first circumstance requires an unlawful act. The second circumstance is when people assemble to do a lawful act in a "violent, boisterous or tumultuous manner." In order to be considered violent, boisterous or tumultuous, the manner in which the people are acting must be violent or pose a clear and present danger of imminent violence.

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
**LOS ANGELES POLICE DEPARTMENT**

respond to the area of Glendale Boulevard and Santa Ynez Street.[35]  To ensure that the operation would have necessary resources in the event things continued to escalate, Commander Graham issued a Citywide Tactical Alert.  Captain Lopez called Commander Graham to update him on the situation.  Captain Lopez requested permission to deploy 37mm Less Lethal Launcher.  While tensions were high and there were individual acts of agression, Commander Grahama did not find justification and denied permission.

By 10:20 p.m., the Air Unit assessed that there were approximately 200 protestors at the intersection of Glendale Boulevard and Santa Ynez Street and an additional 200 protestors further south on Glendale.  As Captain Lopez organized MFF squads into blocking forces and in preparation for the dispersal order, protestors began moving trashcans into the street to impede the MFF squads' ability to move in a uniform manner.  This tactic was commonly seen during the Civil Unrest in 2020.

At 10:25 p.m., a dispersal order was given at Santa Ynez Street and Glendale Boulevard.  By 10:34 p.m., approximately 100 protesters remained at the intersection.  Those who remained, continued to yell, chant, and bang on instruments with little regard for the community members who were trying to sleep or get home to their residences.



---

[35] The Department dispersal order is read verbatim in both English and Spanish over an amplified speaker. The dispersal order specifically states, "Section 409 of the Penal Code prohibits remaining present at an unlawful assembly. If you remain in the area which was just described, regardless of your purpose in remaining, you will be in violation of Section 409." Routes for dispersal and reasonable time frame are also given to the crowd. See Emergency Operations Guide, Volume 5 – Guidelines for Crowd Management and Crowd Control, 2009, p. 43

1082

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

While LAPD officers were dealing with the protesters on Glendale, Park Rangers and the fencing contractor continued building the fence around the outside of the park.  This caused a



certain level of chaos as Department personnel were required to deal with aggressive protesters while simultaneously providing protection for fellow City employees and contractors. However, strong communication between field commanders and the CP allowed for general situational awareness and good decision making.

A second dispersal order was given at 10:50 p.m. stipulating that remaining protestors had five minutes to leave the area.  The number of protesters at this point increased to approximately 400. As the number of protestors increased, aggressive violent tactics continued against officers.  Captain Lopez advised that protesters were now launching fireworks at Santa Ynez Street and Glendale Boulevard, and at 11:21 p.m., a third dispersal order was given by an MFF supervisor, Q210,

advising that protesters had ten minutes to disperse.  Protesters once again defied orders and remained in the area, continuing to yell at officers and bang on instruments.



On the east side of the Park, Rampart SLOs encountered two protestors who were attempting to block construction of the fence.  Officers attempted to gain compliance from the individuals and informed them that they could stand inside, or outside, of the fence, but they could not block construction. After a short impasse, the protestors agreed to move and allowed the fence construction to continue.



Fourth Dispersal Order Given at
Santa Ynez & Glendale.
11:50 PM

11:48 PM
Crowd assessment of 250 protesters at
Santa Ynez & Glendale.

11:55 PM
Crowds diminished & one arrest made
for 409 PC.

1083

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
**LOS ANGELES POLICE DEPARTMENT**

By 11:48 p.m., the Department had issued three dispersal orders with little to no effect on demonstrators. Prior to refueling, the Air Unit assessed that there were approximately 250 protesters still in the area of Santa Ynez Street and Glendale Boulevard. At 11:50 p.m. a fourth dispersal order was given, and the number of protesters finally started to diminish. Eventually, only one individual remained in the street. That person continued to yell and shine a bright light in officers' faces. Since several dispersal orders had been given, Department personnel arrested the individual for 409 PC – Failure to Disperse.

## Return to Normal Operations

By midnight, it appeared that most of the protestors were gone; however, approximately 50 people remained inside of the park. Following the advice from the City Attorney's office, those people that remained in the park were still within the 24-hour grace period. By 1:20 a.m. Commander Graham canceled the Tactical Alert and at 2:00 a.m. the CP began releasing unneeded units from the incident.

At the close of the first operational period, the top objectives had been completed: the fence around Echo Park was in place and written notice of the park's closure was fully posted. In accordance with the Commander's Intent, Department personnel went to great lengths to allow demonstrators to exercise their First Amendment rights. Despite the protests, the strobe lights, the fireworks, and the repeated dispersal orders, by the end of the first operational period, only one person had been arrested for 409 PC (Failure to Disperse).

## March 25, 2021 (2ⁿᵈ Operational Period)

At 6:00 a.m., the IMT from OP 1 met with the oncoming IMT assigned to OP 2 to conduct a transfer of command and a situational debrief. During the discussion, Commander Graham informed Commander Rimkunas, the IC for OP 2, that the population dropped to 30 people inside the park.

After the transfer of command, Commander Rimkunas conducted roll call for A-Watch personnel assigned to OP 2. Like Chief Girmala the night before, Commander Rimkunas emphasized the Department's role as a supporting entity for CD 13 and RAP. Commander Rimkunas stressed his desire that the Department allow people to exercise their First Amendment rights by allowing them to speak and protest. Commander Rimkunas advised the



## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

sergeants and lieutenants to learn lessons from the 2020 Civil Unrest and make sure that officers activated their BWV during any enforcement or crowd control situations.  He also discussed the different ranges and criteria necessary for the deployment of less lethal munitions and encouraged supervisors to ensure the officers under their command were familiar with the Department's various policies.



Captain Stabile, the Operations Chief for OP 2, reinforced that the Department's primary mission was to protect the park and the fence around it. He advised officers to be cognizant of the media and the Crespo location.  Captain Stabile also discussed tactics and various responses depending on the actions of the protesters that were anticipated to show up. As the Deputy Operations Chief, and the person most familiar with events leading up to the operations, Captain Gonzalez provided background on the City's decision to close and rehabilitate the park.

At 7:30 a.m., Captain Gonzalez began driving around the park's perimeter to verify that remaining B-Watch personnel assigned to fixed post security assignments were relieved by their A-Watch counterparts.  Implementing lessons learned from OP 1, Captain Gonzalez added additional postings west of the lake at the stairs leading down to Glendale Boulevard.


### Press Conference at CD 13

Meanwhile, outside his field office on Sunset Boulevard, Councilmember O'Farrell held a press conference, where he announced that, since January of that year, City partners had been able to house 166 people who had previously been sheltering in Echo Park.  More than just housing, Councilmember O'Farrell stated that individuals were being given



1085

three meals each day, access to medical services, and access to counseling services. The Councilmember emphasized that Urban Alchemy would continue offering resources to every person remaining in the park.

During the press conference, Dr. Lena Miller, the Chief Executive Officer for Urban Alchemy explicitly stated, "we had one goal, and that was to make sure that everybody in this park who wanted housing, was housed." Dr. Miller, who is not a City employee, proclaimed that the operation was a model of how these situations should be handled and commended CD 13 for doing things 'the right way' and making sure that every single person was moved into safety.

At 9:15 a.m., Park Rangers, LAHSA and Urban Alchemy went into the park to offer housing to the individuals remaining within the fence line. Although the City Attorney's office, advised that housing was not required to close the park; councilmember O'Farrell made the prerequisite for closing the park, was everyone inside was given an offer of housing. To facilitate the movement of those who accepted the services, DOT provided buses and bus drivers to transport encampment dwellers and PEH within Echo Park to hotels being paid for through Project Roomkey.

The morning and early afternoon remained generally uneventful. Aside from a small group of protestors near the Crespo area at Glendale Boulevard and Park Avenue, there was no significant activity to report. Officers maintained their fixed security posts around the fence to ensure that no one entered the park while outreach workers were inside. The area surrounding the park remained closed to vehicle and pedestrian traffic.



At 10:15 a.m. the CP held an operational command briefing. Captain Stabile advised Department personnel to allow LAHSA and Urban Alchemy to handle any issues or inquires related to housing and property storage. Again, there was emphasis placed on the fact that the Department was only involved to provide safety to fellow City entities and members of the community though maintaining the integrity of the perimeter.



LAHSA advises they will be in park offering services.
9:15 AM

Crowd assessment of 20 protesters.
12:15 PM

10:15 AM
Command Briefing Held.

### ECHO PARK REHABILITATION AFTER ACTION REPORT
#### LOS ANGELES POLICE DEPARTMENT

## Preparation for Scheduled Protests

In the afternoon the CP began reviewing tactical plans and resources in preparation for a protest that was scheduled for 5:00 p.m. According to intelligence reports discussed during the 3:00 p.m. command briefing, the protest was getting attention from several activist groups including Antifa.[36] By 3:10 p.m. all necessary Department personnel were deployed with additional personnel on standby. The LAPD Traffic Branch was on post and working closely with the DOT. regional jail locations were staffed and ready to receive arrestees. The CHP and LAFD were at the CP and ready to provide assistance when requested. In summary, the unified command was prepared and ready to handle what the evening had.



At 4:20 p.m., the Department Operations Center (DOC) notified the CP that there were individuals spray-painting "House keys, not handcuffs" on the sidewalk in front of the CD 13 field office. Plain clothes officers were requested to monitor the group, but the responding team was unable to locate the suspects.

## Officer Needs Help Call

By 5:00 p.m. there were no significant changes within Echo Park, however, the group in front of CD 13's field office was beginning to impede traffic on Sunset Boulevard and Lemoyne Street. In response, Captain Stabile requested that a sound truck respond to advise protesters to remain on the sidewalk. At 5:20 p.m. an "officer needs help" was broadcasted over Rampart frequency behind Councilman O'Farrell's field office. The sound truck had responded as requested and



Received intel of protest happening
at 5 PM involving Antifa & BLM.
12:15 PM

Protesters at O'Farrell's Office,
sound truck requested.
5:00 PM

3:10 PM
Protesters spray painting sidewalk in
front of O'Farrell's Office.

---

[36] "Antifa is a left-wing anti-fascist and anti-racist political movement. It is highly decentralized and comprises an array of autonomous groups that aim to achieve their objectives through the use of both nonviolent and violent direct action rather than through policy reform."

was being surrounded by hostile protesters who were hitting the truck and throwing cones and objects with unknown liquids. [37]

Officers inside the sound truck attempted to remove themselves from the scene, however, two protesters placed themselves in front of the vehicle and placed their hands on the hood to prevent the truck from leaving the area.  In fear of their safety, officers very slowly drove forward, forcing the protesters to move backwards until the trucks was able to drive away from the location.  Luckily no officers or protesters were injured during this incident.  However, the truck received several dents and other damage from the crowd.  In lieu of taking immediate action to identify and arrest the perpetrators, the IC elected to instead take a vandalism report and follow up on the crimes at a later date in an attempt to de-escalate the situation.



## Crowd Management

Meanwhile, at the intersection of Lemoyne Street and Park Avenue, a second group of protesters was beginning to congregate.  This became an area of great concern due the presence of an unfenced service entrance into the park located in the area.  To prevent the group from traveling southbound into the closed park, Captain Stabile placed a skirmish line on the north side of the intersection of Lemoyne Street and Park Ave.  Functionally, this turned Lemoyne into an artery for protestors to freely move between the protest at Sunset and Lemoyne Street, and the protest at Lemoyne Street and Park.

Sometime after 5:30 p.m., an officer was assigned to the skirmish line at Lemoyne Street and Park Avenue observed an individual on a bicycle shine a laser at him.  The officer immediately advised the skirmish line and his supervisor, however, due to the increasing size of the crowd, the suspect was able to dissipate into the sea of protesters.  Fortunately, the officer was wearing the protective eyewear issued by the Department and did not sustain any injury.  Later, after

---

[37] A Department Sound Truck is a vehicle that is equipped with amplified sound speaker system to communicate with crowds.

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

being relieved, the officer documented the incident on an Assault with a Deadly Weapon on a Police Officer investigative report.



By 5:45 p.m. the number of protesters at both sites had increased dramatically.  To maintain order and public safety, Captain Stabile directed the Traffic Branch to initiate traffic closures on Sunset Boulevard and the smaller streets leading towards Echo Park.  This closure was enacted to protect protesters who were exercising their First Amendment rights.

At 6:00 p.m. a transfer of command briefing was held at the CP and Commander Graham, the IC for OP 3, took control of the operation.  Due to the growing protests at Lemoyne Street and Sunset Boulevard and Lemoyne Street and Park Avenue, personnel assigned to the field, including command staff, were unable to be relieved from their posts.

## March 25, 2021 – March 26, 2021 (3ʳᵈ Operational Period)

By 6:20 p.m. the transfer of command was complete, and the third operational period was underway. As 7:00 p.m. arrived, Captain Hurtado, who was managing the protest on Sunset Boulevard, informed the CP that the crowd had grown to nearly 1,000 people.

Groups opposed to the park closure were unwilling to believe that the encampment dwellers inside the park had left voluntarily.  After the demonstrations the previous night, tensions and anger towards the Department flared online.  Despite the fact that the LAPD had not arrested a single person inside the park, social media was aflame with claims that the LAPD, armed in riot gear, was responsible for sweeping PEH from the park.[38]



---

[38] Twitter Profile, dated March 26, 2021. https://twitter.com/speedy_slighter/status/1375593121799499777

41 | P a g e

1089

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

Anger over the Department's involvement in the closure exploded when an audio recording of helicopter pilots telling jokes about dumping helicopter fuel onto protestors was released online. The initial report indicated that the voices on the recording belonged to LAPD officers flying



the Air Unit. The audio recording caused significant outrage and was presented as proof of the Department's disdain for the people in the park. Later, further investigation revealed that the conversation was not between Department employees, but between other helicopters in the area.[39] Unfortunately, those finding could not be substantiated and subsequently released until days after the operation had concluded.

### Use of Strobe Lights

As daylight began to wane over Echo Park, protestors at Sunset Boulevard and Lemoyne Street began migrating southbound to Park Avenue and Lemoyne Street. As the group at Park Avenue and Lemoyne Street grew, they became confrontational with officers on the skirmish line. When the sun had gone down completely, agitators in the crowd began using high intensity strobe lights to blind officers on the skirmish line. This tactic was



clearly antagonistic and intended to interfere with officers on the skirmish line's ability to see. As officers attempted to shield their eyes, the protesters would reposition their lights to shine directly underneath the officer's visors. Making matters worse, officers reported that the protective goggles that were meant to protect against lasers only made the effects of the strobe lights worse. This forced officers to choose between wearing the googles to protect their eyes

---

[39] LAPD HQ Twitter Profile. Posted on March 25, 2021 https://twitter.com/LAPDHQ/status/1375267135828623363

1090

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
**LOS ANGELES POLICE DEPARTMENT**

against permanent damage from green lasers, or not wear the googles and protect themselves from immediate disorientation and temporary blindness. Almost immediately, officers on the skirmish line were asking to be relieved.

Shortly before 7:30 p.m. the skirmish line began taking projectiles from unknown individuals in the back of the crowd. With their vision impaired by the incessant flash of bright strobe lights, officers on the skirmish line found themselves in a dangerous position without the means to defend themselves against the incoming bombardment of objects. A final announcement was made with a megaphone, directing the crowd to, "back away from the officers, and stop flashing the lights or we are going to do an unlawful assembly." The crowd did not comply.



Declaration of Unlawful Assembly

Based upon the crowd's previous acts of vandalism and violence directed towards the sound truck; the laser that was used to assault an officer on the skirmish line; the crowd's refusal to cease attacking officers with strobe lights; and the crowd's organized efforts to interfere with the arrest of individual agitators; Captain Stabile determined that the Department had no choice but to declare an Unlawful Assembly. The only other option would have been to abandon the position, which would have allowed the crowd unfettered access to Echo Park and the service workers who were attempting to provide services to the PEH and complete maintenance at the park.

With the sound truck already in position, the Department began issuing repeated dispersal orders for the area of Parke Avenue and Lemoyne Street. The first dispersal order was given at 7:30 p.m., followed by additional orders at 7:40 p.m., 7:50 p.m., 8:00 p.m., and 8:10 p.m. In total, the

1091

dispersal order was read five times in English and two times in Spanish.   Despite the repeated orders, the crowd, which included member of the media, legal observers and internet "bloggers," failed to heed the Department's orders.



[40] Instead, the crowd remained, continued to use strobe lights, continued yelling, and continued directing profanity at officers.

To allow those people protesting peacefully to continue exercising their First Amendment rights, Captain Stabile organized arrest teams to target and detain only those agitators who were using strobe lights so that the others could remain.  Unfortunately, the protestors recognized the Department's stacked formations.  Before the arrest squads could push through to reach the agitators, protesters at the front of the crowd locked their arms together to prevent officers from accessing anyone behind the first line.  Despite the interference, Officers held the line and allowed the protest to continue.

## Concessions for Members of the Media

The Department encourages its MFF leaders and field commanders to avoid interfering with legal observers and members of the media, whenever possible.  However, according to California Penal Code Sections 407 and 409, as delineated in the Department's Media Relations Handbook, members of the media are not exempt from dispersal orders and are subject to arrest for failure to disperse.[41]



**James Queally** ✓ @Ja... · 2d  ···
Gonna try and do this objectively. Some facts: Yes, @LAPDHQ declared a dispersal order. They gave people well over 20 minutes to disperse. They had been getting hit with strobe lights and been taunted, but I didn't see anything thrown at them until after they charged the crowd.

💬 1    ⟲ 28    ♡ 158    ⬆

Consistent with the Department's stated orientation, the captains on Park Avenue and Lemoyne Street made a concerted effort to avoid arresting anyone from the media or National Lawyers Guild.  At 8:05 p.m., 35 minutes after the first dispersal order was given, a bull horn was used to specifically address members of the media and National Lawyers Guild. Repeated

---

[40] '*Legal observers*,' commonly referred to as 'green hats,' are representatives from the National Lawyers Guild of Los Angeles, who respond to protest incidents to record civil-rights violations against demonstrators.  According to their website, legal observers are not required to be California Bar certified attorneys.  Anyone over the age of 18 can become a legal observer after completing the required NLG training. https://nlg-la.org/legal-observing-program/
[41] See Media Relations Handbook, Page, 6

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

twice, these supplemental announcements directed, "any members of the media, or the National Lawyers Guild, disperse to the north now!"



## Arrests for Failure to Disperse

When the dispersal orders failed to have any effect on the crowd, Captain Stabile ordered the skirmish line to begin pushing the group north. As the forward command was announced, the crowd responded by linking arms, stopping the line from moving forward. Without any ability to disperse the crowd, Captain Stabile, Captain Gonzalez, and Captain McGuyre decided that the only remaining option was to surround and arrest anyone remaining for Failure to Disperse. At 8:15 p.m., after three hours of attempts to facilitate the demonstration, Captain Stabile declared that everyone remaining at Park and Lemoyne was under arrest for Failure to Disperse.



1093

Based on the crowd's acts of aggression, both towards the sound truck and officers on the line, in conjunction with the ineffectiveness of attempts to push the crowd with batons, Captain Gonzalez received telephonic approval from Commander Graham to use the 37 mm to disperse the crowd if necessary.

To contain the group that had just been placed under arrest, Captain Gonzalez deployed four MFF squads in crossbow formation from the east/west alley just north of Park Ave.[42]  The MFF squads cut across Lemoyne Street, sequestering a group of approximately 180 people between the northern skirmish line and the southern skirmish line.  During the containment, approximately 50 protestors were able to escape northbound on Lemoyne Street and avoid containment.

With the aim of preventing another crowd from forming, Captain Gonzalez directed MFF squads to push the remaining uncontained crowd northbound on Lemoyne.  As the MFF squads began pushing forward, demonstrators refused to move and began pushing against the skirmish line, causing one officer to fall backwards.



Because the crowd had become a physical threat to the officers, the 37mm Less-Lethal Launcher was deployed and proved to be effective at creating distance and getting the crowd to move.

## Use of Less Lethal Munitions

Once again, communication between field commanders and the CP played a critical role in the decision making.  Commander Graham and Captain Lopez were aware that Captain Stabile had over 180 detained and was in the process of making arrests. Therefore, they directed the Captains on Sunset Boulevard to disperse those crowds by pushing them out of the area.  The alternative, another mass arrest situation, would have overtaxed the incident resources and caused unreasonably long detentions.  Captain Gonzalez and Captain Hurtado, with assistance from Metropolitan Division, began dispersing various crowds that were



Six Dispersal Orders given over
12 minutes.
8:18 PM

8:05 PM
Lawyers Guild Media
Dispersal Order Given.

8:20 PM
Protesters at Lemoyne &
Park arrested for 409 PC.

---

[42] Crossbow is a crowd control formation and coordinated unit tactics utilized by law enforcement to control crowds, stop unlawful activity, and disperse and/or arrest violators.

1094

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
**LOS ANGELES POLICE DEPARTMENT**

gathering on Sunset Boulevard, and in the parking lot south there. During the movement, the 37mm Less-Lethal Launcher, a non-target specific round, was used to disperse violent crowds, while the 40mm Less-Lethal Launcher and Beanbag Shotgun were used against several individuals perceived to be of immediate threat. The use of Less Lethal Munitions was documented by MFF squad leaders on the narrative portion of the ICS 214 form as required by Department policy.

## Field Investigation and Arrestee Processing

Meanwhile, teams from the B-Watch Investigative Branch, led by Lieutenant Heredia from Rampart Area, began overseeing the arrest process at Lemoyne and Park. Building on lessons learned during the Civil Unrest of 2020, members of the investigative team were posted prior to the declaration of unlawful assembly to witness the behavior of the crowd, document the dispersal orders, and coordinate completion of necessary paperwork. Additionally, offers of restroom breaks were documented on logs for Metropolitan Detention Center (MDC) and 77th Regional Jail).



During the processing of arrestees, three known members of the media identified themselves from within the detained crowd. In response, the CP dispatched supervisors from Media Relations Division (MRD) to provide specialized guidance on their detention. In the end, despite a legal justification for arrest, all three members were released without being cited (See Arrests/Journalists and Legal Representatives).

By 10:18 p.m., less than two hours after the declaration of arrest, jail transportation buses were loaded and heading to MDC and 77th Regional Jail. With the mass arrest handled, all remaining A-Watch resources were relieved and released to go home.



1095

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

### Return to Normal Operations

At approximately 10:30 p.m. the CP was informed that crowds were continuing to diminish. To decrease the size of the Department's footprint, Captain Lopez began to redeploy resources away from Sunset and back to the park. Inside the park, Park Rangers, Urban Alchemy, and Rampart SLOs conducted outreach and offered housing to those people remaining in the park. At 10:56 p.m., more than 24-hours after notice of closure, Captain Lopez requested that the Air Unit make announcements over the park, informing those inside that the park was closed and they could exit through the gate at Lemoyne Street and Park Avenue.

After midnight, on March 26, 2021, RAP notified the CP that, out of the 10 people that were inside the park, eight had accepted offers of housing. The remaining two people, both known as activists, were adamant that they would not leave the park on their own free-will. After a brief conversation with the Chief of Police, Commander Graham conferred with Chief Park Ranger Joseph Losorelli and they decided to leave the two individuals and have the next operational period make one more attempt to gain voluntary compliance.



Around 12:20 a.m., the DOC notified the CP that an arrestee was streaming video on a jail transportation bus via a Black Lives Matter South Pasadena social media account. Lieutenant Heredia dispatched officers who were able to locate and take possession of the phone until the person was cited and released, at which point the phone was returned.

By 2:21 a.m., all remaining protestors had dispersed. Outside of fence security, the CP released most personnel by 4:00 a.m. Due to the significant decrease in protest activity, with only two PEH inside the park, the Planning Chief significantly decreased the number of personnel needed for the fourth operational period.

## March 26, 2021 (4th Operational Period)

At 6:15 a.m., the A-Watch IMT met with the B-Watch IMT to discuss outcomes from the previous night. Commander Graham informed Commander Rimkunas that there were still two people remaining in the Park. At 7:15 a.m., A-Watch conducted roll call and the Planning Chief relayed the days assignments. Outside of perimeter security, the main objective of the operational period was to provide security for RAP and LASAN to begin cleaning the park and storing belongings. For the safety of the workers assigned to the cleanup, the remaining two

individuals inside the park would be given one more opportunity to accept housing before placing them under arrest and allowing the crews to enter the park.

## Arrests Inside the Park

Commander Rimkunas and Captain Stabile remained at the CP while Captain Gonzalez responded to the park to oversee the transfer of duties from B-Watch to A-Watch. By 8:20 a.m., B-Watch had been relieved, and A-Watch was on post. At 8:30 a.m., at the direction of Commander Rimkunas, Captain Gonzalez began requesting resources to address the two individuals inside the park. At 9:35 a.m., Captain Gonzalez entered



the park with representatives from CD 13 and Urban Alchemy. Inside they met with the two remaining activists. Both individuals were offered housing, and they both refused. With the park having been closed for 24-hours, both individuals were placed under arrest for violation of LAMC Section 63.44(B)(7) - *Prohibition on Using Park Area or Facility for a Purpose Contrary or Inconsistent to its Specific or Designated Purpose.* They were both transported to MDC, where they were cited and released within two hours.



At 9:40 a.m., the CP directed the Traffic Branch to reopen the streets surrounding the park. Glendale Boulevard and Park Avenue remained closed to accommodate the large trucks coming in and out of the park.

With the park empty, LASAN and RAP began the intensive process of clearing trash and storing personal belongings. Los Angeles Sanitation and Environment workers found, and photographed, containers of needles, tents filled with trash, buckets of urine and feces,



Friday
March 26, 2021

12:18 AM
CP notified only two individuals left residing in Echo Park.

Arrestee streaming live from
Jail Transport Bus.
12:20 AM

2:21 AM
Remainder of protesters disperse.

4th Operational Period begins.
6:00 AM

1097

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

rotting food, and dead animal carcasses.  Salvageable items free of hazardous material were clearly marked and documented before being placed in storage containers for owners to claim later.  At 11:25 a.m. Park Rangers were conducting their routine patrol within Echo Park and discovered a loaded firearm in the boathouse.  Investigators responded to the scene and handled the investigation.

The day continued without notable activity.  With no indication of further protests, the Planning Section prepared to decrease the number of officers needed for the next operational periods.  CD 13 contracted a private security company to supplement Park Rangers inside the park, leaving LAPD to protect the fence line and the entrance to the park.



## March 26, 2021 – March 27, 2021 (5th Operational Period)

Full transfer of command took place at 6:00 p.m. and the fifth operational period began shortly thereafter.  Very minimal activity occurred throughout the night.

At 7:30 p.m. there was a handful of protesters using bullhorns who were causing a disturbance at Santa Ynez Street and Glendale Boulevard.  Officers in the area were directed to monitor the situation, which eventually dissipated on its own. At 9:00 p.m. the Air Unit checked the perimeter of Echo Park and advised the area was clear.  By 11:00 p.m. the CP began releasing



## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

some officers from the Echo Park Operation, and LASAN advised they were done for the night and would return in the morning on March 27, 2021.

The early morning hours were calm and minimal activity was occurring.  The CP advised the next operational period would be the last and only needed very minimal staffing.

## March 27, 2021 (6th Operational Period)

As the final operational period transitioned into command, the situation in and around the park remained calm.  The CP maintained staffing, confirming no protests to occur in the Echo Park area.  By 3:30 p.m. most Department personnel were released from the incident.  LASAN advised the Department that they discovered a firearm magazine with ammunition while cleaning. Officers met LASAN at the park entrance off Glendale to retrieve the property.

At 6:20 p.m., the CP held its final briefing.  With zero activity related to the Echo Park Operation, the CP was set to demobilize at 7:00 p.m., officially ending the operation.  Moving forward, Rampart Area would be responsible for supervising a small contingent of officers assigned to the area surrounding the park.



1099

# CRIMES

Unlike other major incidents in Los Angeles, the decision to close Echo Park was not spontaneous. The operation was carefully planned and organized. The Department remained ready to assist and was able to allocate and deploy the necessary personnel to maintain order and public safety. The extensive size of the lake and the surrounding fence required a significant allocation of officers to fully ensure the perimeter remained secure.

The only crimes related to the closure were crimes against officers and Department property, committed by protestors. The following crimes reports were taken over the course of three days:

> (1) Vandalism report was taken for damage done to a Department Sound-Truck during Operational Period Three

> (1) Assault with a Deadly Weapon (ADW) report was taken for an officer who had a laser shined into his eyes during Operational Period Three.

# ARRESTS

The City Attorney's office guided the Department throughout the pre-planning of the Echo Park Operation. Specifically, the City Attorney's office and the Department discussed which sections should be enforced against those individuals refusing to vacate the park after being offered housing.

Most arrests occurred during the third operational period (March 25, 2021-March 26, 2021).

## Felony Arrests

From March 25, 2021 through March 27, 2021 there were six operational periods. Out of the six operational periods, there were no felony arrests made.

## Misdemeanor/Infractions Arrests

Between March 24, 2021 and March 27, 2021, there were 187 misdemeanor arrests that were made related to the Echo Park Operation. The arrests are broken down as follows:

| Operational Period No. 1: | (1) Protestor arrested for 409 PC – Failure to Disperse |
| Operational Period No. 2: | (2) Bystanders arrested for 148(A)PC – Resisting Arrest |

Operational Period No. 3:     (182) Protestors arrested for 409 PC – Failure to Disperse

Operational Period No. 4:     (2) Individuals arrested for 63.44(B)(7) Los Angeles
                              Municipal Code (LAMC) – Prohibition on Using Park Area
                              or Facility for a Purpose Contrary or Inconsistent to its
                              Specific or Designated Purpose.


## Journalists and Legal Representatives

After Los Angeles hosted the Democratic National Convention in 2000, the lawsuit *Crespo vs. Los Angeles* led the Department to re-evaluate how it handles media during crowd control situations.  One of the changes implemented was the requirement for the Department to identify a specific area for media to cover the event.[43]  This designated media zone is commonly referred to as a "Crespo Area."  Consistent with Department policy, the Event Action Plan for the Echo Park closure included a Crespo Area on the northwest corner of Park and Glendale.  This area was chosen for its unobstructed view of the northwest corner of Echo Park, where the population of unhoused persons was the densest.



Despite having identified a Crespo area, during the mass arrest situation that took place at the start of the third Operational Period, six persons who identified themselves as members of the media were detained when the Department surrounded a large group of protestors that had failed to disperse after an unlawful assembly was declared. Several MRD supervisors were dispatched to the scene from the CP. Upon their arrival, they identified and released three known members of the media.  Ultimately, three internet bloggers and video streamers were arrested and transported to MDC, where they were cited for 409 PC and released from custody.

As stated in the Department's Media Relations Handbook, California Penal Code Sections 407 and 409 state that the media is not exempt from the requirement to disperse after an unlawful assembly has been declared.  Department policy further states that, "After declaring an unlawful assembly, the Department will designate a dispersal route for all persons present, including the news media, to use when evacuating." (See Footnote #30).  During the Echo Park Operation, seven dispersal orders were given, with two additional orders given specifically to media, directing them to disperse to the north.

---

[43] Los Angeles Police Department Uniformed Services Group Notice 8.2.3, Media Relations in Crowd Control Situations, July 8, 2002.

In the aftermath of the operation, news outlets were critical of the Department, specifically officers and front-line supervisors, for not immediately releasing members of the media who identified themselves after the group was detained. One of the journalists, James Queally, who writes for the Los Angeles Times, admitted to hearing the dispersal order and knowing where the Crespo area was, but, in his words, "if I'm covering a protest, it's a fluid situation, I can't stay in a pen."[44] Queally also admitted that he did not identify himself until he was detained. It was at that point, during the process of detaining the large group, that Queally expected to be immediately released.

The process of conducting mass-arrests, in arrest team formations, does not allow officers the latitude to pick and choose who is handcuffed, and who is not. The arrest of a large group involves a large number of people utilizing processes and systems identified ahead of time. During the Echo Park Operation, the system that was utilized was ultimately successful, as evidenced by the fact that the three legitimate media representatives were identified and released without being booked.

> **Note:** The LAPD conducted a thorough evaluation of the circumstances and actions that led to the detention of members of the media during the mass arrest situation on March 25th, 2021. During the analysis, it was determined that the sergeant who responded to Queally's supervisor request made an improper remark. The supervisor's conduct is being investigated as part of a personnel complaint and the reasonableness of the detention will be included in the adjudication.

# USE OF FORCE

The Department's guiding principle when using force is reverence for human life. Officers are taught to make every attempt to control an incident by using time, distance, communication, and available resources to deescalate a situation whenever it is safe, feasible and reasonable to do so.[45] In many situations, de-escalation requires that officers avoid creating situations where a tense encounter is likely to lead to an application of force. Instead, officers are trained to find creative ways to achieve their desired goals without physical force.

The entire year leading up to the closure was an exercise in de-escalation. City family, and the Department, made repeated attempts to prevent the destruction of Echo Park without relying heavily on enforcement of LAMC sections. Similarly, during the planning of the park closure, RAP and CD 13 went to great lengths to obtain voluntary compliance from the people living inside the park to avoid using Park Rangers or LAPD officers for enforcement action. Additionally, during each operational period, it was clearly stated that the objective was to provide security for construction of the fence while allowing demonstrators to safely exercise their First Amendment rights.

---

[44] Conversation with MRD Sergeant Guzman after Queally was released. Conversation is recorded on BWV.
[45] See Los Angeles Police Department Manual, Section 1/556. 10, Policy on Use of Force.

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

During the operation, field commanders and officers showed immense restraint in allowing
protestors to have a voice. The following are only a few examples of steps the Department took
to avoid enforcement action or application of force in order to facilitate First Amendment
activity:

- During the first operational period, Captain Lopez declared three different dispersal
orders and only arrested one individual, even though the crowd was launching illegal
fireworks.
- On the night of March 25, 2021, officers assigned to the skirmish line at Park Avenue
and Lemoyne Street held their position for three hours despite a constant barrage of
insults, verbal threats, and blinding strobe lights.
- That evening, the crowd was warned to stop their behavior to prevent an unlawful
assembly. Once the unlawful assembly was declared, the Department issued seven
orders before resulting to mass arrests.

However, despite the Department's attempts to avoid confrontations with the crowd, there were
instances when force was used. For reference, Departmental policy characterizes the use of force
in two forms: non-deadly force and deadly force.

## Non-Deadly Force

Non-Deadly Force is defined as only that force which is "objectively reasonable" to:

- Defend themselves;
- Defend others;
- Effect an arrest or detention;
- Prevent escape; or
- Overcome resistance.

Non-Deadly Force incidents are investigated as a Non-Categorical Uses of Force (NCUOF) and
are investigated by an uninvolved supervisor. All NCUOFs are adjudicated through an
employee's chain of command with review and oversight of Critical Incident Review Division.

In a crowd control situation, a Use of Force Report is not required when officer(s) become
involved in an incident where force is used to push or move individuals who exhibit unlawful or
hostile behavior and who do not respond to verbal directions by the police; or where a baton
strike is used in response to threatening or violent behavior.[46] In these instances, LAPD policy
dictates that supervisors document the force used on the ICS, Forms 211/214, or as directed by
the IC. A NCUOF report is only required when an officer(s) becomes involved in an isolated

---

[46] See Los Angeles Police Department Use of Force Tactics Directive No. 11.1, Crowd Management, Intervention,
and Control, dated October 2020 – Page 5, Note, indicates that strikes should be reported to a supervisor and
appropriately documented.

incident with an individual during a crowd control situation, which goes beyond the mission of the skirmish line.

During the closure of Echo Park, officers reported using a range of force options including, but not limited to, baton pushes; baton strikes; sock rounds fired from Beanbag Shotguns; 40mm sponge rounds fired from the 40mm Less-Lethal Launcher; and foam rubber baton rounds fired from the 37mm Less-Lethal Launcher. Except for a single incident that is being investigated as a NCUOF, applications of non-deadly force were utilized by officers working in organized squads and were appropriately reported on ICS 214s as required by Department policy.

> **Note:** Though most of the non-deadly force utilized was recorded on ICS 214s, personnel complaints were generated for any complaints of excessive force or other alleged misconduct.  At the time of this report, 12 separate personnel complaints have been generated regarding police action at Echo Park during the closure.

# Deadly Force

Deadly force shall only use force upon another person when the officer reasonably believes, based on the totality of circumstances, that such force is necessary for either of the following reasons:

- To defend against an imminent threat of death or serious bodily injury to the officer or to another person; or,
- To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended.

Incidents of deadly force are investigated as a Categorical Use of Force (CUOF). The Force Investigation Division investigates all CUOF incidents.  The categories for CUOF include, but are not limited to:

- An incident involving the use of deadly force (e.g., discharge of a firearm) by a Department employee;
- A use of force incident resulting in an injury requiring hospitalization commonly referred to as a law enforcement related injury (LERI);
- All intentional head strikes with an impact weapon or device (e.g., baton, flashlight, etc.) and all unintentional head strikes that result in serious bodily injury, hospitalization or death.[47]

---

[47] <u>See</u> Los Angeles Police Department Manual, Section 3/792.05, Definitions- Categorical Use of Force.

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
LOS ANGELES POLICE DEPARTMENT

Though deadly force was not used during the Echo Park operation, it should be noted that an individual who was struck by an officer's baton did claim to have sustained a broken arm.[48]  The individual incident was investigated by Force Investigation Division, and it was determined that the incident did not rise to the level of a CUOF because the individual was not admitted to the hospital.  As described in the next section, the use of a baton on approved target areas (center body mass and limbs) is not considered a use of deadly force unless the individual is unintentionally struck in the head or admitted to the hospital for injuries sustained by the use of force.

## Less-Lethal Usage

Since the Safe LA Civil Unrest that occurred during the summer of 2020, the Department has faced increased scrutiny concerning its use of less-lethal munitions during crowd control situations.  In Federal court, opposition groups seeking to limit the Department's ability to use the less-lethal projectiles during demonstrations have claimed that LAPD officers, *"...engaged in the indiscriminate use of less lethal weapons and baton strikes contrary to law."[49]*

There were three less-lethal munitions systems utilized by the Department during instances of volatile protests during the closure of Echo Park: the 40mm Less-Lethal Launcher (40mm LLL); the Beanbag Shotgun; and the 37mm Less-Lethal Launcher (37mm LLL). [50]   According to Department policy, the 40mm LLL and the Beanbag Shotgun are both target specific munitions that can be "*used on a hostile individual which may or may not be in a crowd that poses an immediate threat of violence of physical harm."*  The 37mm LLL is a non-target specific munition that can be used *"as a crowd control tool when a dispersal order has been issued and/or immediate action is necessary, to stop violence, to ensure public safety, and to restore order." [51]*

---

[48] On March 25, 2021, Isaac Scher posted a picture on Instagram stating that the LAPD had broken his arm while he was protesting in Echo Park.  Van Nuys Division initiated a Level I NCUOF investigation.  This incident is also being investigated by IAG as part of a personnel complaint.
[49] Black Lives Matter Los Angeles, Congress (DBA Los Angeles Community Action Network), Linus Shentu, Weston Rowland V. City of Los Angeles, Complaint for Damages and Declaratory and Injunctive Relief
[50] Metropolitan Division has access and authorization to use additional weapons systems. Those systems are rarely utilized and were not used during the Echo Park Operation.
[51] Los Angeles Police Department Use of Force Tactics Directive No. 11.1, Crowd Management, Intervention, and Control, dated October 2020

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
**LOS ANGELES POLICE DEPARTMENT**

Less-lethal munitions used during crowd control situations are documented in the narrative portion of a squad leader's ICS 214.  According to the ICS forms submitted by squad leaders at the end of each operational period, the following less-lethal force munitions were utilized in crowd control situations:

| Less-Lethal Munitions Used | |
|---|---|
| 40mmFoam Round | 5 |
| Bean Bag Sock Round | 12 |
| 37mm Foam Baton | 6 |

1106

# DAMAGES & COSTS

The rehabilitation of Echo Park involved a coalition of City departments that included: Council District 13 (CD13), Los Angeles Department of Recreation and Parks (RAP), Los Angeles Sanitation (LASAN), Los Angeles Department of Transportation (LADOT), the Los Angeles City Attorney's office, and the LAPD.  Any analysis of the City's response to the homeless crisis in the park must consider that the situation was fluid and changing for nearly 15 months.  When the population in the park initially began to grow, the City Family went to great lengths to address the issue without closing the park.  Resources and expenditures during this outreach phased are included in this report.  In summary, costs incurred by City entities in response to the increase of unhoused persons sheltering in Echo Park are broken down into four categories: outreach; closure; cleanup; and rehabilitation.

## Outreach: January 2020 to February 2021

When the population of people using Echo Park for temporary shelter began to grow in November of 2019, representatives from every City department went to great lengths to provide the unhoused population with access to vital services and housing options.  Closing the park and relocating the unhoused population was a last resort.  In the 15 months prior to the park's closure, the City Family conducted regular outreach, provided access to laundry, toilets, showers, and safe storage areas.  For entities like LASAN and the LAPD, many of the services provided were part of routine operations, and specific estimates were not obtained.  The following figures are estimates of costs provided by each entity:

| | | |
|---|---|---|
| CD 13 | Storage Facility at 1146 Glendale Blvd | $291,355 |
| CD 13 | Aroma Laundry Vouchers | $1,195 |
| CD 13 | Mobile Hygiène Site | $720,000 |
| CD 13 | Portable Toilets | $9,206 |
| CD 13 | Contract with Urban Alchemy | $350,000 |

**Total   $1,371,756**

## Closure: March 24, 2021 and March 25, 2021

In order to prevent the repopulation of the park, CD 13 determined that the park would have to be fully fenced off in order for cleaning and maintenance crews to work in safety.  Due to the size of the lake, the contractor estimated that it would take approximately eight hours to construct the fence.  During that time, DOT closed the area to vehicle access while LAPD provided security around the lake.

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
**LOS ANGELES POLICE DEPARTMENT**

LAPD's costs were spread across the entire operation, which encompassed both the closure, and the clean-up portions of the operation.

Entities involved in the closure of the park incurred both salary and hard costs for services rendered.[52]

| DOT | Parking Enforcement Personnel | $5,170 |
| DOT | Transit Personnel | $12,187 |
| LAPD | Air Unit Operation (Maintenance and Fuel) | $5,397 |
| LAPD | Mobile Command Response Unit Equipment | $687 |
| LAPD | Personnel: Regular Salary Costs | $782,998 |
| LAPD | Personnel: Overtime Hours (Code 17) | $510,730 |

**Total   $1,317,169**

## Cleanup: March 26, 2021 and March 27, 2021

After the fence around the park was secured, and the two remaining protestors were removed, the majority of the clean-up activities were the responsibility of RAP and LASAN.  Over the course of two days, LASAN removed over 35 tons of trash and hazardous materials. Meanwhile, LAPD maintained fixed posts around the park in order to protect the cleanup.

| LASAN | March 26th Clean-up (46 LSD Personnel) | $34,240 |
| LASAN | March 27th Clean-up (24 LSD Personnel) | $17,637 |
| LASAN | Clean Harbors | $29,800 |
| LASAN | Disposal – 35.70 Tons | $2,660 |
| LAPD | Personnel: Regular Salary Costs | $343,425 |
| LAPD | Personnel: Overtime Hours (Code 17) | $395,912 |

**Total   $823,674**

---

[52] Salary costs are estimates only.  City employees have varying salaries based on rank and experience.  In order to provide this number, averages salaries were multiplied by number of personnel and hours worked.

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
LOS ANGELES POLICE DEPARTMENT

## Park Rehabilitation: March 28, 2021 to Present

At the time of this report, Echo Park is still in the process of being rehabilitated. Therefore, reported costs are estimated figures provided by CD 13 and RAP.

| | | |
|---|---|---|
| RAP | Lawn Refurbishment and Irrigation Repair | $90,000 |
| RAP | Replace Drinking Fountains | $50,000 |
| RAP | Install Covers on Light Poles | $20,000 |
| RAP | Replace (4) Light Poles | $20,000 |
| RAP | Replace Damaged Restroom Fixtures | $12,000 |
| RAP | Replace (20) Restroom Doors | $30,000 |
| RAP | Replace Locks on (20) Restroom Doors | $15,000 |
| RAP | Replace Restroom Lighting | $12,000 |
| RAP | Repair Bridge | $7,500 |
| RAP | Paint Restrooms, Bridge, and Boathouse | $45,000 |
| RAP | Repair View Deck | $50,000 |
| RAP | On-Site Security During Rehabilitation | $80,000 |
| RAP | Perimeter Fencing | $104,000 |
| RAP | Installation of 33 Security Cameras | $200,000 |

**Total  $735,500**



# PERSONNEL

Personnel assignments were documented on ICS 211/214 forms. Officers assigned to the incident were instructed to check-in and out with the Staging Unit located at a Dodgers Stadium parking lot.  When a person went end of watch (EOW), supervisors were instructed to complete and turn in their ICS 211/214 forms to the Demobilization Unit collocated with Staging.  The Planning Section then stored the forms for each date.

In the tables below personnel have been broken down into two categories (Supervisory Roles and Sworn Personnel) solely related to the Echo Park Operation.  Again, the counting of personnel was solely based on ICS 211/214 forms that were submitted to the Demobilization Unit. Personnel have been broken up into each operational period configuration starting with March 24, 2021 for all personnel assigned.



1110

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT



Supervisory Role Personnel Numbers

| | Operational Period #1 | Operational Period #2 | Operational Period #3 | Operational Period #4 | Operational Period #5 | Operational Period #6 |
|---|---|---|---|---|---|---|
| Lieutenants | 4 | 8 | 5 | 5 | 4 | 2 |
| Sergeants | 49 | 29 | 44 | 11 | 38 | 10 |
| Detective Supervisors | 22 | 103 | 14 | 39 | 7 | 1 |
| Motor Supervisors | 1 | 1 | 2 | 2 | 1 | 1 |



Officer Personnel Numbers

| | Operational Period #1 | Operational Period #2 | Operational Period #3 | Operational Period #4 | Operational Period #5 | Operational Period #6 |
|---|---|---|---|---|---|---|
| Detectives | 13 | 168 | 4 | 40 | 2 | 7 |
| Police Officers | 433 | 432 | 415 | 225 | 349 | 108 |
| Motor Officers | 10 | 9 | 12 | 15 | 10 | 7 |

# LOGISITICS

For this event the Command Post and Staging Area were in one location and was set up at a Dodger Stadium parking lot.  Not only was this the official Check-in and Demobilization location for all resources responding to the Echo Park Operation, but this is where CP staff and other agency liaisons would oversee the operation.  Below is the equipment that was staged and used at the Command Post and Staging Area:

- Mobile 3 Command Tractor and Trailer
- Plans Trailer
- Alternate Department Operations Center Trailer
- Tractor with attached 25kw Generator (CP power)
- Light Trailer
- Portable Restrooms
- Laptops
- EZ Up Canopies
- Tables
- Chairs
- Portable Satellite System (WIFI for CP)

The following vehicles were used to logistically support the incident with the movement of supplies and equipment to the CP, the Staging Area, and various field locations:

- Stake Bed Truck with left gate
- Box Truck with lift gate
- Pickup Trucks

1112

# CRITIQUE

The critique portion of this After-Action Report is based on information provided by a variety of sources, including the Department's General Staff assigned to the management of this incident, chronological information logs, videos, body-worn video, social media, media outlets, pictures, communication recordings, and subject matter experts. The critique will focus on recommendations for areas of improvement and are organized to correspond to the narrative section when possible.  As with the other sections of this report, it should be noted that Department personnel were strictly operating in a role of support for the City Family.  The Department was only one part of this operation to protect and serve all City entities involved with this operation.  In accordance with the Department's core value of "Quality Through Continuous Improvement," the purpose of this section is to improve in the future by learning from the past.  This is achieved by discussing the events transparently and respectfully.

## Lessons Learned

### 1.  Pre-Operational Events and Resources

The day before the operation was scheduled to begin, the IMT received intelligence that a protest was scheduled for the morning of March 24, 2021, before the first operational period.  Instead of organizing resources to monitor the event, the IMT team elected to have the local Area handle the incident internally.  The decision was made tactically, to prevent an unnecessary encounter between police and protesters that could escalate into a major disturbance.

The protest on the morning of the 24th ended up being larger than expected, causing the Acting Commander of Operations-Central Bureau to direct the Special Events Unit to send last-minute personnel requests to each area in Central Bureau.  Ultimately, the protest action remained lawful, and the personnel who were called in were never deployed.

### Recommendations on Pre-Operational Events and Resources

The presence of uniformed officers at certain demonstrations tends to increase the size and duration of the events.  Regarding the Echo Park Operation, the Department was only involved in a support capacity.  The decision to maintain a low profile for the period leading up to the event was sound.  The fact that extra resources were called in and not deployed supports the original decision to allow the local Geographic Area to monitor the situation.

In hindsight, an additional operational period could have been created to cover the early protest.  During that time, assigned resources could have been placed on stand-by at the CP to maintain the desired low-profile.  This is a best-case scenario and should be considered in future operations if resources are available.

1113

## 2.  Record-Keeping of Personnel and Less-Lethal

The organization and maintenance of thorough records during an event is a critical function. During the Echo Park Operation, the CP maintained its incident chronological log and situational status reports.  During the operation there was only one source tracking all pertinent events and was several vital information points were not properly recorded.  In addition, the Finance/Administration Section, Planning Section, and Logistics Section did not work together causing an inability to accurately capture resources (personnel, equipment, supplies) deployed to the incident.  The system used for the tracking of resources proved to be inadequate. At the end of the incident, it was difficult to locate supplies, resources, and personnel.  Further, all personnel did not accurately document unit designations, personnel assigned, resource requests, missions, uses of force, injuries, etc.

Shortly after the Echo Park Operation, a federal judge granted a Temporary Restraining Order (TRO) restricting the Department's ability to use less lethal munitions during crowd control situations.  In response to the TRO, the Office of Constitutional Policing and Policy requested detailed information regarding the Department's deployment of less-lethal munitions during the Echo Park Operation.  That information was not readily available or captured in a way that could be referenced without significant research.

Following the incident, entities inside and outside of the Department requested information regarding the number of officers deployed during the operation.  Like the issue regarding less lethal usage, the necessary deployment information was not readily available.  Afterwards, in order to determine the correct number of officers deployed, ICS Forms 211 and 214 were counted by hand.  The Department experienced a similar problem after the Civil Unrest in 2020.

## Recommendations on Record-Keeping of Personnel and Less Lethal

Currently, there is a large gap between the level of documentation that goes into a traditional NCUOF incident, and the level of reporting and investigation that accompanies the same type of force used during a crowd control situation.  While acknowledging that crowd control situations are complex, and chaotic, the Department should devise a system for accurately capturing all relevant information regarding deployment of less lethal munitions.  After being assigned to a scrimmage line for several hours, it is unrealistic to expect an officer, and their supervisor, to be able to recall all the detailed information the Department needs to manage liability.

Requiring officers and their supervisors to review BWV before turning in their ICS 214 Log becomes troublesome when the BWV runs out of battery before the conclusion of the event and/or demobilization.  Though this is not always the case, it happens enough that BWV should not be used as the foundation for reporting less lethal munitions.  Instead, the Department should correct the current Demobilization form to capture specific details regarding the use of less lethal munitions.  Specifically, the form should capture the date, time, officer serial number, type, and number of munitions used by any officer deploying less-lethal munitions.

At the end of each operational period, the Planning Section should compile this information and record it in a way that makes the information easily retrievable in the short and long term.

*Modernize Technology* is one of the primary goals listed in the Department Strategic plan for 2020 and beyond. During large scale events, the Department needs to utilize technology to track the number of less lethal systems and munitions that are deployed in the field.

## 3. Photographers and Videographers

After the Civil Unrest in 2020, the Department held a citywide training for videographers. However, despite the training, the Echo Park Operation was unable to deploy effective videographers to record vital information. Of the four videographers utilized, only one captured quality, useful footage. This occurred, in part, because officers from other assignments were inserted into these positions and sent into the field without proper training or direction. As a result, very limited details were captured, and most of the details that were captured were missing vital narration and time stamps. Photographers were not assigned to the incident at all.

## Recommendations Regarding Photographers and Videographers

Photographers were a missing resource during this event. Photographers can be used to document evidence and capture before and after pictures of protest areas. In preparing this report, there were no photographs of the damage to Echo Park or relevant pictures of protestors' actions against officers. The Department had to rely on other means of photography by outside entities or compile still frames from video that can be potentially grainy. Having pre-designated photographers at each event/incident is vital and necessary.

Regarding videographers, it is imperative that only personnel that have completed the Citywide training be assigned to such positions. Additionally, a refresher course for videographers should be generated in which they are trained on how to properly narrate the events that they are observing. For example, they should at least describe where they are (with words and visual evidence if possible) as well as the actions of individuals in the crowd (i.e., throwing frozen water bottles at officers).

In order to maximize the number of personnel who have this knowledge, Training Bureau should consider this for regular routine Department Schools. The Department should develop a guide for videographers to ensure all pertinent information is captured in photographs and videos. This guide can be reviewed with videographers prior to deployment. Each geographic Bureau should identify personnel as videographers and ensure they receive the proper training prior to deployment as a videographer. This position would be an ancillary duty. Videographers should be requested prior to an incident, preferably during the planning phase. To further their training and expertise in filming, videographers should be assigned to a variety of events to understand and gather experience in all scale and types of events. Having videographers not only assigned to MFF squads but assigning additional videographers with the Department sound truck and/or jail buses so the Department can capture all vital information that may be needed at a later date.

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
**LOS ANGELES POLICE DEPARTMENT**

## 4.  Field Jails and Arrestee Processing

There were several lessons learned during the Department's response to the Civil Unrest in 2020 that were successfully incorporated into the plan for closing Echo Park for maintenance and repair.  Detective Teams consisting of two investigators were assigned to each MFF which proved especially beneficial during the subsequent arrest and documentation process.  Use of the new two-sided Pre-Booking Arrestee Information Sheet played a vital role regarding arrest documentation and report completion.

After leaving the scene, Transportation Teams consisting of two officers were assigned to vans and buses to provide transportation of the arrestees from the location of arrest to a jail facility for processing.  Field Jail Teams consisting of PM-Watch Detectives were assigned to Metropolitan Jail Section and 77th Regional Jail Section, appropriately selected locations, to work in partnership with Custody Services Division personnel.

### Recommendations Regarding Field Jails and Arrestee Processing

During the 3rd OP, the Investigative Section Chief assigned an investigative team to monitor the protest on Park Ave and Lemoyne Street.  From behind the skirmish line, that investigative team was able to document the crowd's actions, and specifically notate the times of each dispersal order.  This role proved to be extremely valuable for the detective assigned to filing the charges for the mass arrest.

Moving forward, the Department should consider expanding MFF squads to include two imbedded investigators, one being a supervisor.  In addition to important investigative documentation, imbedded investigators could also be responsible for documenting vital information on the use of force and less lethal munitions.

A robust Investigative Section, staffed by officers with investigative experience, is a necessity. Additionally, having experience personnel in these vital positions would decrease delays and ensure that necessary information is correctly captured.

## 5.  Detention of Journalists and Legal Observers

Dealing with the influx of self-identified 'media' has become increasingly difficult during protests incidents.  During the Echo Park Operation, officers on skirmish lines were constantly met by individuals claiming to be members of the media trying to get through the line of officers. Many of these individuals were identified by a simple patch or hats with the label, "media." Based on the antagonistic demeanor displayed by some of the nontraditional reporters, officers had difficulty distinguishing between legitimate media and social media 'influencers.'[53]

---

[53] The Department has routine interactions with several social media 'influencers' who create content for their personal social media accounts.  Unlike traditional news organizations, these individuals make no attempt to remain neutral, and often interfere police actions.

Additionally, officers encountered several legitimate members of the media who expressed outrage at being detained in the large group that was surrounded on Park Ave and Lemoyne Street. As stated previously, the media is not exempt from an order to disperse from an unlawful assembly.

In the aftermath of the operation, news outlets were critical of the Department, specifically officers and front-line supervisors, for not immediately releasing members of the media who only identified themselves after the group was detained. The process of conducting mass-arrests, in arrest team formations, does not allow officers the latitude to pick and choose who is handcuffed, and who is not.

## Recommendations on Detention of Journalists and Legal Observers

The Department needs to provide formal guidance to address the rise of independent journalists, reporters, and "observers" in today's culture. In Los Angeles, many activists double as online reporters for alternative news sources. These individuals expect to be given free access during crowd control situations, while antagonizing officers and impeding police action.

Currently, Department policy states that members of the media who remain at scene after an unlawful assembly has been declared are subject to arrest.[54] Though policy states that the Department will make efforts to accommodate the media, policy does not state that members of the media should be automatically released after they are detained at the scene of an unlawful assembly. Officers and front-line supervisors, who do not have specialized training, should not be put in a position to fail if they come across an accredited member of the media while working in an arrest team in MFF configuration. The Department should consider publishing a formal policy or specific guidance regarding what actions field supervisors and officers should take when they detain someone at the scene of an unlawful assembly.

## 6. Communication on IC Authorization of Less Lethal

During the third operational period, the IC gave telephonic authorization to deploy the 37 MM at Park and Lemoyne. The authorization was then passed on to Metropolitan Division, who later used the 37mm Less-Lethal Launcher on Sunset Boulevard. When the Captain managing the dispersal of another violent group on Sunset asked communications if 37 mm Less-Lethal Launcher approval had been granted, he was told that it had not.

## Recommendations on Communication of Authorization of Less Lethal

Authorization for the 37 mm Less-Lethal Launcher should be clearly broadcast over the radio so there is no confusion and appropriate documentation can be inputted. Additionally, when feasible, field commanders should acknowledge the authorization to ensure consistency.

---

[54] Los Angeles Police Department, Media Relations Handbook

## 7. Partnering with City Entities

The physical and costly damage done to Echo Park was the result of a large homeless encampment that was allowed to expand for over a year. From the start, RAP, CD 13, and LASAN utilized different strategies to address the issue to prevent the problem from growing out of control. Despite their efforts, and partially due to the emergence of COVID-19, their strategies were unsuccessful. As the City begins addressing similar homeless situations in other City managed parks, there are specific areas in which there is room for improvement.

The structure and organization of City departments creates confusion regarding which entity holds final authority over public spaces. All City parks fall under the oversight of RAP, however, only a select few are regularly monitored by the Park Rangers. In the case of Echo Park, the limited size and resources of the Park Rangers forced the Department to become involved in an incident that should have been handled by RAP.

For an entire year, CD 13 and RAP relied on LAHSA to provide outreach and services to the PEH inside Echo Park. When COVID-19 created a public health emergency, direction from the Mayor's Office required that every person inside Echo Park be provided with an offer of housing before being removed. To ensure that each person had been given that change, CD 13 went outside of the City to obtain the help they needed from a private company. As the City's primary homeless service provider, LAHSA should have been able to fulfill that need.

Since the Civil Unrest in 2020, many Americans, and Angelenos alike, have begun insisting that local governments provide unarmed, alternatives response units, to handle non-violent requests for service. Non-emergency situations involving homelessness are a perfect example of the type social issues that are best handled by a non-enforcement entity. Unfortunately, as one of two City departments that responds around-the-clock, the LAPD is often required called upon to use enforcement orientated resources to address non-violent civil problems. Echo Park was no exception.

## Recommendations for Partnering with City Entities

Council District 13's leadership was the primary factor that led to the closure of Echo Park. As an elected representative, Councilmember O'Farrell had the ability, and took the initiative, to act when opposing groups made conflicting demands. In the case of Echo Park, CD 13 was the entity that coordinated and requested the help of each supporting agency. CD 13 was also responsible for making the difficult decision to close the park. In the future, the decision to close a public space for renovation, when doing so creates a negative outcome for one segment of society, must continue to be made by elected officials with the expertise and responsibly of handling political decisions.

1118

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
**LOS ANGELES POLICE DEPARTMENT**

Had the encampment in Echo Park been adequately addressed in its early stages, there never would have been a need for a full-scale closure.  Currently, Park Rangers are missing nearly half their allotted positions.  They simply do not have the resources to monitor every park in the City. To prevent another encampment from establishing itself in a popular public space, the City should make fully staffing the Park Rangers a top priority.

In three months, Urban Alchemy placed more people in housing than LAHSA did in an entire year.  Urban Alchemy's success should be the new standard for homeless services in the City. Their compassionate attitude and approach allowed CD 13 to close the park with minimal enforcement activity against the PEH population.

## 8.  New Equipment – Strobe Lights and Drones

After the Civil Unrest in 2020, the City Council included laser pointers in 55.07 LAMC, which gave police the authority to arrest agitators in the crowd for using lasers to interfere with an officer's vision.  During the closure of Echo Park, protesters found a way around the amendment by using high intensity strobe lights to cause flash blindness.  These lights were not designated as contraband under 55.07 LAMC.

Additionally, protesters used the drones to stream live video of the officers' deployment and search for plain clothes officers. Drones were also seen over demonstrations causing dangerous conditions for the Air Units flying in the same air space.

### Recommendations on New Equipment

Similar to actions taken after the Civil Unrest of 2020, the Department needs to request that the City Council add strobe lights to the prohibited items enumerated in Section 55.07 of the LAMC. In order to allow peaceful protestors to exercise their First Amendment rights, the Department must have the ability to target and arrest agitators.  Otherwise, field commanders have no choice but to declare the whole event to be an unlawful assembly.

1119

# APPENDIX

## Appendix A: Acronyms

| Acronym | Meaning |
|---------|---------|
| AC | Assistant Chief |
| BLM | Black Lives Matter |
| CA | City Attorney |
| CBO | Community Based Organization |
| CD13 | Council District 13 |
| CDC | Center for Disease Control |
| CHP | California Highway Patrol |
| COP | Chief of Police |
| CP | Command Post |
| DA | District Attorney |
| DC | Deputy Chief |
| DOC | Department Operations Center |
| DOT | Department of Transportation |
| DPH | Department of Public Health |
| DTLA | Downtown Los Angeles |
| EOW | End of Watch |
| ETA | Estimated Time of Arrival |
| IAG | Internal Affairs Group |
| IC | Incident Commander |
| ICS | Incident Command System |
| IMT | Incident Management Team |
| LA | Los Angeles |
| LAFD | Los Angeles Fire Department |
| LAHSA | Los Angeles Homelessness Services Agency |
| LAMC | Los Angeles Municipal Code |
| LAPD | Los Angeles Police Department |
| LAPPL | Los Angeles Police Protective League |
| LASAN | Los Angeles Sanitation Department |
| MDC | Metropolitan Detention Center |
| MFF | Mobile Field Force |
| OP | Operational Period |
| OCB | Operations-Central Bureau |

| Acronym | Meaning |
|---------|---------|
| OSB | Operations-South Bureau |
| OSS | Office of Support Services |
| OWB | Operations-West Bureau |
| OVB | Operations-Valley Bureau |
| PEH | People Experiencing Homelessness |
| PR | Person Reporting |
| RAP | Recreation and Parks |
| RFC | Release from Field Custody |
| RHD | Robbery Homicide Division |
| SARA | Scanning, Analysis, Response, Assessment |
| SEU | Special Events Unit |
| SLO | Senior Lead Officer |
| TSE | Tactical Support Element |
| UHRC | Unified Homelessness Response Center |
| | |
| | |

# Appendix B: Glossary Terms

- **Assistant Chief (AC):** An Assistant Chief is the second highest rank in the Department. The AC commands one of the four organizational Offices and holds the title of "Director" of his or her Office. The AC is a member of the Chief of Police's Direct Reports and Senior Staff.

- **Blocking Force:** Personnel deployed in an organized fashion to prevent access of an advancing crowd.

- **Captain:** A captain is assigned to a geographic Area, detective division, or specialized division. There are three paygrade advancements: Captain I, II, and III. Each higher level assumes a more complex and difficult level of responsibility. This position is promoted from the rank of lieutenant and is a part of the COP's General Staff.

- **Civil Disobedience:** An unlawful event involving a planned or spontaneous demonstration by a group of people.

- **Commander:** A commander acts as the Assistant Commanding Officer at the four geographic Bureaus or Commanding Officer of a specialized group within the Department. A commander is promoted from the rank of Captain and is a part of the COP's Senior Staff.

- **Crowd Control:** Law enforcement response to a pre-planned or spontaneous event, activity or occurrence where there is a potential for unlawful activity or the threat of violence.

- **Crowd Management:** Strategies and tactics employed by law enforcement agencies to deal with lawful assemblies in an effort to prevent escalation of events into an unlawful assembly or riot.

- **Deputy Chief (DC):** A deputy chief is the third highest rank in the Department. The DC is assigned as the commanding officer of a major organizational component such as a geographic operations Bureau, Detective Bureau, or Professional Standards Bureau. This position may be promoted from a captain or commander and is a part of the COP's Senior Staff.

- **Incident Action Plan (IAP):** Contains objectives reflecting the overall incident strategy and specific tactical actions and supporting information for the next operational period. The plan may be oral or written. When written, the Plan may have a number of forms as attachments (e.g. traffic plan, safety plan, communications plan, map, etc.).

- **Incident Command System (ICS):** A standardized on-scene emergency management concept specifically designed to allow its user(s) to adopt an integrated organizational

structure equal to the complexity and demands of single or multiple incidents, without being hindered by jurisdictional boundaries.

- **Incident Commander (IC):** The individual responsible for the management of all incident operations at the incident site.

- **Less-Lethal Impact Munitions:** Projectiles launched or otherwise deployed for the purpose of overcoming resistance, effecting arrest or addressing the threat of serious injury to an officer or suspect with less risk of causing death than the use of a firearm.

- **Mobile Field Force (MFF):** A fast and effective method to assemble and deploy a platoon-sized, tactical forces from existing on-duty personnel. The MFF is adaptable to both pre-planned and spontaneous events, which require the rapid assembly of large numbers of officers.

- **Senior Staff:** The COP's Senior Staff is comprised of Assistant Chiefs, Deputy Chiefs, and Commanders and civilian equivalents of the Department.

- **Serious Bodily Injury:** is defined by but not limited to loss of consciousness, concussion, bone fracture, protracted loss or impairment of function of any bodily member organ, a wound requiring extensive suturing, and serious disfigurement (California Penal Code Section 243(f)(4)).

1123

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
**LOS ANGELES POLICE DEPARTMENT**

## Appendix C: Laundry Vouchers given to Echo Park



1124

## Appendix D: Safe Park Initiative



A SAFE PLACE TO PARK EVERY NIGHT

**SERVICE AREAS**

–Hollywood      – East Hollywood
–Echo Park

–Connection to resources and pathway into housing

–Financial assistance services: smog check, auto repair, insurance, registration, driver's license renewal, & move–in assistance

**CALL OR APPLY ONLINE**

(323)210–3375 | M–F 8AM–4:00PM
www.safeparkingla.org
intakes@safeparkingla.org

**MITCH O'FARRELL**
COUNCILMEMBER • 13TH DISTRICT
CITY OF LOS ANGELES

**NOBODY PLANS TO BE HOMELESS**

1125

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
LOS ANGELES POLICE DEPARTMENT

## Appendix E: Summary of Echo Park Services



OUTREACH SERVICES Los Angeles County oversees all services for homeless individuals living within the City of Los Angeles. If you would like to request services, you can call 2-1-1 anytime of the day. You can also make a request for services through the LA-Homeless Outreach Portal website: la-hop.org.

Councilmember O'Farrell has also hired Urban Alchemy to provide direct outreach services to people experiencing homelessness at Echo Park Lake. Outreach workers are at the lake five days a week helping the unhoused connect with resources to get them into housing.

ECHO PARK SAFE STORAGE FACILITY There are 85 spaces available to store personal items. No identification is necessary, you get one storage bin per person, and must be 18 years or older. The site is open Monday – Friday from 7:30am to 3:30pm and is located at 1146 Glendale Blvd. Los Angeles, CA 90026. For more information, please call (213) 926-2445.

SAFE PARKING The Safe Parking Program in Echo Park can accommodate up to 14 vehicles for people experiencing homelessness in their motor vehicles. There is an additional Safe Parking Site in Hollywood with spaces for up to 25 vehicles.

Both sites serve clients from 8:30pm to 6:30am, seven days a week, with on-site security and case management services for all clients.

You can apply for a safe parking space online at SafeParkingLA.org, call (323) 210-3375 or email intakes@safeparking.org.

MOBILE HYGIENE SERVICE provides access to showers and restrooms for people experiencing homelessness. The services can be accessed at two Echo Park locations:

| ECHO PARK UNITED METHODIST CHURCH (EPUMC) ON ALVARADO & RESERVOIR
EVERY TUESDAY & 3RD THURSDAY FROM 8:30AM - 1PM

| 1146 GLENDALE BLVD. IN ECHO PARK
EVERY THURSDAY & FRIDAY FROM 8AM - 1PM

ECHO PARK LAUNDRY SERVICES PARTNERSHIP
Since 2019 Councilmember O'Farrell has provided funding for laundry service vouchers for people experiencing homelessness in Echo Park. The vouchers can be used for eight loads of laundry, including detergent and use of the dryer.

| VOUCHERS ARE AVAILABLE AT:
AROMA LAUNDRY - 1448 N. ALVARADO ST., LA, CA 90026



FOR MORE INFORMATION ON SERVICES & CONCERNS IN ECHO PARK, YOU MAY CONTACT FIELD DEPUTY JUAN FREGOSO AT (213) 207-3015 OR EMAIL AT: JUAN.FREGOSO@LACITY.ORG

IN PARTNERSHIP WITH

**MITCH O'FARRELL**
COUNCILMEMBER • 13TH DISTRICT
CITY OF LOS ANGELES

WWW.CD13.COM                                              #CD13

1126

## Appendix F: Echo Park Closure Notice



# NOTICE: PARK CLOSURE

STORAGE OF PERSONAL PROPERTY IN THIS PARK IS PROHIBITED

PLEASE REMOVE ALL PERSONAL PROPERTY FROM THIS PARK BY:

## 10:30 p.m. on Thursday, March 25, 2021

Personal Property cannot be stored in any City of Los Angeles park (Los Angeles Municipal Code Section 63.44.(B)(26)(f)).  Personal Property remaining in the park after the date and time referenced above is being stored in this park in violation of Section 63.44.(B)(26)(f) and may be removed by the City.  Any Personal Property stored in violation of this LAMC Section will be collected by the City, identified, bagged, and stored at Chrysalis, located at 1146 Glendale Boulevard, Los Angeles, CA 90026.  If the impounded property is not claimed within 90 days, the property may be discarded by the City.  Information about the location and retrieval of any impounded property, or about voluntary storage can be obtained by calling (213) 926-2445 or visiting [Insert website url].

**GENERAL DESCRIPTION OF THE
PERSONAL PROPERTY TO BE REMOVED:**

All personal property remaining anywhere in this park after 10:30 pm on Thursday, March 25 2021, including, but not limited to, tents, chairs, tables, backpacks, bags, and personal items will be removed and stored at Chrysalis, as indicated.

All items that pose an immediate threat to the health or safety of the public will be immediately removed and discarded.

POSTING LOCATION: _____

POST DATE: _____ , TIME: _____ , SR NUMBER #: _____

1127

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
**LOS ANGELES POLICE DEPARTMENT**

### IMPORTANT - PLEASE READ IMMEDIATELY

### ECHO PARK IS BEING CLOSED AND FENCED OFF

Echo Park will be closed to the public for repairs and maintenance no later than Wednesday, March 24, 2021, at 10:30 PM.  The only exception is for people who have been living in the park prior to March 22, 2021 – they have until no later than Thursday, March 25, 2021, at 10:30 PM to leave the park and remove their possessions.  Perimeter fencing will be installed to facilitate the repairs and maintenance and to ensure no one enters the park until the work is completed.

### WHAT THIS MEANS FOR PEOPLE LIVING IN THE PARK

**MANDATORY DEPARTURE**
**All persons who have been living within the park must leave the park and remove all belongings from the park within 24 hours of the park closure – no later than Thursday, March 25, 2021, at 10:30 PM.**  Except for City staff and contractors, no one will be allowed to enter any portion of Echo Park during the fence installation process or while the park is temporarily closed.

**ALTERNATIVE SHELTER LOCATIONS**
Outreach workers from Urban Alchemy have been in the park daily, offering shelter to people dwelling in Echo Park since December 28, 2020.  Other outreach workers have been offering shelter on a regular basis for the last month.  Sufficient shelter options exist for anyone who has been living in Echo Park since before March 22, 2021.  If you have been living in Echo Park since before March 22, 2021, please seek out a representative for Urban Alchemy for remaining shelter options.  Transportation to alternative shelter sites is available at no charge.

Persons refusing alternative shelter and those who began living in Echo Park after Monday, March 22nd, must leave Echo Park and relocate to another unrestricted public area, such as sidewalks.  Relocation to another park is not allowed as overnight camping is not permitted in City parks under Section 63.44D.4 of the Los Angeles Municipal Code.

**PERSONAL PROPERTY STORAGE**
Posted signs posted make clear that no personal property may be left in Echo Park after the park closure.  People relocating to shelters will be allowed to take a limited quantity of property with them.  All property that is remaining in the park after closure will be dismantled and stored for your retrieval, unless it is hazardous or contraband.  You can retrieve your property by contacting the Chrysalis Center, 1146 Glendale Boulevard, Los Angeles, CA 90026 ((213) 926-2445.  Stored property will be destroyed if you do not reclaim it within 90 days.

In preparation for the storage of personal property:
1. Deconstruct tents and other structures;
2. Place trash in large bins that will be located in the park to accommodate garbage.
3. Pack non-hazardous belongings in 60-gallon bags that will be provided by the City.
4. Until full, voluntary storage is available one block from Echo Park at the Chrysalis Center.  If you transport your property and use the voluntary storage at the Chrysalis Center, you will be given a receipt to make it easier to get your property back.

**ASSISTANCE FOR DISABLED PERSONS**
On Thursday, March 25th, representatives from the City's Department will be available to offer assistance.

1128

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
**LOS ANGELES POLICE DEPARTMENT**

## Appendix G: Motion for Bathroom Access

> T  CITY CLERK FOR PLACEMENT ON NEXT
> REGULAR COUNCIL AGENDA TO BE POSTED    #52

**MOTION** For Wed, 1/29/20

The Echo Park area is facing urgent hygiene and public health issues due to a recent increase in necessity for restroom access. To address hygiene needs of the public, it is necessary to provide increased access to the overutilized restrooms at the northwest end of the Lake.

Urgent action is needed to amend the Municipal Code to temporarily allow for expanded hours of accessibility to Echo Park Lake restrooms by the public for a six-month period.

I THEREFORE MOVE that the City Attorney be requested to PREPARE and PRESENT an ORDINANCE with an URGENCY CLAUSE to amend the Los Angeles Municipal Code to temporarily allow 24-hour access to park restrooms located on the northwest portion of Echo Park adjacent to the corner of Glendale Boulevard and Park Avenue for a six-month period, in order to address urgent hygiene and public health needs in the area.

PRESENTED BY: _____

MITCH O'FARRELL
Councilmember, 13th District

SECONDED BY: _____

JAN 2 4 2020

1129

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

ORDINANCE NO. 186592

An ordinance amending Subsection S of Section 63.44 of the Los Angeles Municipal Code to allow for 24-hour access to the park restrooms at Echo Park Lake.

THE PEOPLE OF THE CITY OF LOS ANGELES
DO ORDAIN AS FOLLOWS:

Section 1.  Subdivision 2 is added to Subsection S of Section 63.44 of the Los Angeles Municipal Code to read as follows:

2.      Between the hours of 10:30 p.m. and 5:00 a.m, no individual who is utilizing the facilities in the multi-stall restroom building located on Park Avenue at Echo Park Lake for personal hygiene, or traversing the pedestrian pathway immediately between the Park Avenue sidewalk and the multi-stall restroom building for the purpose of utilizing the facilities for personal hygiene, shall be cited or arrested for violating LAMC 63.44(B)(14)(a).  The provisions of this subdivision shall be repealed and terminate six months from the effective date of this subdivision.

Sec. 2.  **Urgency Clause.**  The City Council finds and declares that this ordinance is required for the immediate protection of the public peace, health and safety for the following reason:  The area around Echo Park Lake area is facing urgent hygiene and public health issues due to a lack of access to 24-hour public restrooms. The City Council, therefore, with the Mayor's concurrence, adopts this ordinance to become effective upon publication pursuant to Los Angeles City Charter Section 253.

1130

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

Sec. 3.  The City Clerk shall certify to the passage of this ordinance and have it published in accordance with Council policy, either in a daily newspaper circulated in the City of Los Angeles or by posting for ten days in three public places in the City of Los Angeles:  one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall; one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall East; and one copy on the bulletin board located at the Temple Street entrance to the Los Angeles County Hall of Records.

Approved as to Form and Legality

MICHAEL N. FEUER, City Attorney

By _____

MICHAEL DUNDAS
Assistant City Attorney

Date   2/19/20

File No. _____

M:\GENERAL COUNSEL DIVISION\ORDINANCES AND REPORTS\ORDINANCES - FINAL\LAMC 63.44 - Echo Park 24-hour Restrooms.docx

The Clerk of the City of Los Angeles hereby certifies that the foregoing ordinance was passed by the Council of the City of Los Angeles, **by a vote of not less than three-fourths** of all its members.

CITY CLERK                           MAYOR

Ordinance Passed 04/07/2020          Approved 04/20/2020

Published Date: 04/23/2020

1131

## Appendix H: Motion for Storage Facility

HOMELESSNESS AND POVERTY

### MOTION

According to the Los Angeles Homeless Services Authority Point-In-Time Count in 2019, there are approximately 36,165 individuals experiencing homelessness in the City of Los Angeles, of which 2,953 are in Council District 13.

In the community of Echo Park, a pilot program to offer safe parking at Edendale Branch Library is about to launch. The Mobile Pit Stop Program, which provides restroom facilities to maintain hygiene and keep our streets healthy, has been met with great success. And, my office has been partnering with a local business to offer free laundry services and provide access to clean clothes and bedding for people experiencing homelessness.

A permanent supportive housing project is being planned, which will accommodate up to 100 affordable units and offer supportive services, as well as provide recreational space for local youth. The City is also in the process of amending the municipal code to temporarily allow 24 hour public access to Echo Park restrooms for a six-month period.

The ability to store belongings in a safe place is an essential service for unsheltered individuals who seek access to social services and housing. Due to the increase of the unsheltered homelessness in the area, there is a need for storage near Echo Park Lake. Therefore, staff should be instructed to evaluate City properties in the area that may be feasible for a storage facility.

**I THEREFORE MOVE** that the Council instruct the City Administrative Officer, with the assistance of relevant City departments, to evaluate the feasibility of utilizing the Department of Transportation Lot #676 at 1146 Glendale Boulevard in Echo Park for a storage facility and report on potential capacity, security needs, and hours of operation; and

**I FURTHER MOVE** that the Council instruct the City Administrative Officer and Chief Legislative Analyst to identify funds, including capital and operational funding, for a storage facility at the site, including, but not limited to State Homeless Housing, Prevention, and Assistance Grant.

PRESENTED BY: _____
MITCH O'FARRELL
Councilmember, 13th District

SECONDED BY _____

JAN 3 1 2020

pa

1132

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

**MOTION** ~~TO CITY CLERK FOR PLACEMENT ON NEXT~~    #53
~~REGULAR COUNCIL AGENDA TO BE POSTED~~

On February 14, 2020, a motion was introduced (C.F. 20-0214), instructing staff to evaluate City-owned and private properties to provide emergency shelter to the unsheltered homeless population in the community of Echo Park. St. Paul's Commons Church has been identified as a suitable site for overnight shelter for up to 30 individuals and First to Serve has been identified to operate the site. The shelter will operate at this site for a minimum of eight (8) weeks. An alternate site, with up to 60 beds, is being identified to continue services beyond this time.

Additionally, on February 21, 2020, Council adopted a motion (C.F. 20-0140), which instructed staff to evaluate the feasibility of utilizing Department of Transportation Lot #676 at 1146 Glendale Boulevard in Echo Park for a storage facility. Staff has determined the site to be feasible for storage and has identified Chrysalis Enterprises as the operator. The site consists of nine parking spaces, which will be removed in order to accommodate CONEX boxes with storage bins.

In order to ensure rapid commencement of these critical storage services in the Echo Park community, the City Council should instruct the Los Angeles Homeless Services Authority to use existing City funding for this purpose through June 30, 2020 and authorize the transfer of funds to the Bureau of Sanitation for costs associated with establishing the new storage facility. Additional funds should also be approved to continue to operate these facilities in Fiscal Year 2020-21.

**I THEREFORE MOVE** that the Council find that a significant number of persons within the immediate vicinity of Echo Park Lake are without the ability to obtain shelter, resulting in a threat to their health and safety; and that First to Serve, a non-profit corporation, currently contracted with the Los Angeles Homeless Services Authority (LAHSA) to provide shelter services, is qualified to meet the needs and serve public purposes which benefit the City of Los Angeles.

**I FURTHER MOVE** that the Council, subject to approval of the Mayor:

1. REQUEST the Los Angeles Homeless Services Authority (LAHSA) to:
    a. Use Program Year 25 Emergency Solutions Grant emergency shelter funding, in the amount of up to $256,800, to contract with First To Serve to operate a temporary shelter for up to one (1) year in the vicinity of Echo Park as follows:
        i. At least eight weeks at St. Paul's Commons Church,
        ii. Additional time, up to a total of one (1) year, pending site identification; and
    b. Use a total of $314,622 in City General Funds, including existing City General Funds allocated to LAHSA for CES Navigation Centers operations ($84,622) and funds recommended in this Motion ($230,000), to contract with Chrysalis Enterprises to operate a storage facility at the Department of Transportation Lot #676 at 1146 Glendale Boulevard beginning no sooner than March 15, 2020 through June 30, 2021;

2. APPROVE $291,355 from the Additional Homeless Services line item within the General City Purposes No. 100/56 for the storage facility at 1146 Glendale Boulevard as follows:
    a. $230,000 to operate the facility for one (1) year beginning on July 1, 2020;
    b. $61,355 for Department of Public Works, Bureau of Sanitation costs to clear and prepare the site for use as a storage facility; and
    c. Authorize HCIDLA to add $230,000 to the City's FY 2020-21 General Fund contract with LAHSA for this storage program.

MAR 0 6 2020

1133

I FURTHER MOVE that the City Council Authorize the Controller to:

1. Transfer $291,355 from the Additional Homeless Services line item within the General City Purposes No. 100/56 as follows:
   a. Transfer $230,000 to the Housing and Community Investment Department Fund 10A/43S795 Coordinated Entry System (CES) Navigation Centers for costs associated with operating a storage facility at the Department of Transportation Lot #676 at 1146 Glendale Boulevard for one (1) year, beginning July 1, 2020;
   b. Transfer $6,250 to the Solid Waste Resources Revenue Fund, Fund 508/50 Department RSC 530100, Reimbursement from Other Funds for costs associated with clearing and preparing the Department of Transportation Lot #676 at 1146 Glendale Boulevard for a storage facility; and
   c. Transfer $55,105 to the Department of Public Works – Bureau of Sanitation, Fund 100/82 Appropriation Unit 006020, Operating Supplies for costs associated with clearing and preparing the Department of Transportation Lot #676 at 1146 Glendale Boulevard for a storage facility.

I FURTHER MOVE that the CAO and Housing and Community Investment Department be directed and LAHSA be requested to: (a) expedite the siting and location of temporary shelter beds within the immediate vicinity of Echo Park Lake; and ensure program readiness by March 15, 2020; (b) enter into a contract with First to Serve to operate up to 60 beds of overnight shelter within the vicinity of Echo Park Lake for a period of up to one (1) year, starting on or around March 15, 2020.

I FURTHER MOVE that the Department of Transportation be instructed to remove the nine parking spaces, parking meters, and posted signs from the parking lot to accommodate the storage facility; and

I FURTHER MOVE that the City Administrative Officer, with the assistance of other departments as necessary, be directed to prepare Controller instructions or make any necessary technical and/or accounting corrections or clarifications consistent with the Mayor and Council action in this matter, and authorize the Controller to implement these instructions.

PRESENTED BY: _____
MITCH O'FARRELL
Councilmember, 13th District

SECONDED BY: _____

1134

# FREE Personal Property STORAGE



Register for a completely free 60 gallon storage bin.

➤ No identification necessary.
➤ One storage bin per person.
➤ Must be 18 years or older.

## The Bin: Echo Park

1140 Glendale Blvd. Los Angeles, CA 90026

### (213) 926-2445

Hours of Operations

Monday-Friday: 7:30 AM- 3:30 PM

1135

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

# Appendix I: Board Approved Park Improvements Dated 3/18/21

**A**PPROVE**D**

MAR 18 2021

BOARD OF RECREATION
AND PARK COMMISSIONERS

**BOARD REPORT**

NO. _____ 21-045 _____

DATE _____ March 18, 2021 _____

C.D. _____ 13 _____

**BOARD OF RECREATION AND PARK COMMISSIONERS**

SUBJECT:  ECHO PARK – PARK IMPROVEMENTS (PRJ21471) PROJECT –
COMMITMENT OF PARK FEES – CATEGORICAL EXEMPTION FROM THE
PROVISIONS OF THE CALIFORNIA ENVIRONMENTAL QUALITY ACT (CEQA)
PURSUANT TO ARTICLE III, SECTION 1, CLASS 1(1) [INTERIOR AND
EXTERIOR ALTERATIONS INVOLVING MINOR CONSTRUCTION WHERE
THERE BE NEGLIGIBLE OR NO EXPANSION OF USE], CLASS 1(12)
[OUTDOOR LIGHTING FOR SECURITY AND OPERATIONS], CASS 2
[REPLACEMENT OF EXISTING STRUCTURES WHERE THE NEW
STRUCTURE WILL BE LOCATED ON THE SAME SITE AS THE STRUCTURE
REPLACED AND HAVE SUBSTANTIALLY THE SAME PURPOSE AND
CAPACITY], CLASS 4(3) [NEW GARDENING AND LANDSCAPING] AND CLASS
4(12) [MINOR TRENCHING AND BACKFILLING] OF CITY CEQA GUIDELINES
AND ARTICLE 19, SECTIONS 15301(a), 15302, 15304(b) AND 15304(f) OF
CALIFORNIA CEQA GUIDELINES

AP Diaz _____   M. Rudnick _____
H. Fujita _____   C. Santo Domingo _____ DF _____
V. Israel _____   N. Williams _____

_M. Shull_
General Manager

Approved _____ X _____   Disapproved _____   Withdrawn _____

RECOMMENDATIONS

1.  Approve the scope of work of the Echo Park – Park Improvements (PRJ21471) Project
(Project), as described in the Summary of this Report;

2.  Approve the Project to be bid and constructed through the Department of Recreation and
Parks (RAP) list of pre-qualified on-call contractors;

3.  Authorize Department of Recreation and Parks (RAP) Staff to commit from the following
fund and work order numbers, a maximum of Six Hundred Thousand Dollars
($600,000.00) in Park Fees, for the proposed Project:

| Funding Source | Fund/Dept/Acct No. | Work Order No. |
|---|---|---|
| Park Fees | 302/89/89716H | QT073929 |

1136

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

BOARD REPORT

PG. 2    NO.    21-045

4.    Approve the authorization of change orders as authorized under Board Report No.
06-136, for the construction contracts for this Project in the budget contingency amounts
for such contracts as stated in this Report;

5.    Determine that the proposed Project is categorically exempt from the provisions of the
California Environmental Quality Act (CEQA) pursuant to Article III, Section 1, Class 1(1)
[Interior and exterior alterations involving minor construction where there be negligible or
no expansion of use], Class 1(12) [Outdoor lighting for security and operations], Cass 2
[Replacement of existing structures where the new structure will be located on the same
site as the structure replaced and have substantially the same purpose and capacity],
Class 4(3) [New gardening and landscaping] and Class 4(12) [Minor trenching and
backfilling] of City CEQA Guidelines and to Article 19, Sections 15301(a), 15302, 15304(b)
and 15304(f) of California CEQA Guidelines and direct RAP Staff to file a Notice of
Exemption (NOE) with the Los Angeles County Clerk;

6.    Authorize RAP's Chief Accounting Employee or designee to prepare a check to the Los
Angeles County Clerk in the amount of $75.00 for the purpose of filing a NOE; and,

7.    Authorize RAP staff to make technical corrections as necessary to carry out the intent of
this Report.

SUMMARY

Echo Park is located at 751 North Echo Park Boulevard in the Echo Park community of the City.
This 28.14-acre park provides a lake and boathouse, recreation center, two children's play areas,
tennis courts, skate park, and a walking path. Echo Park is City of Los Angeles Historic Cultural
Monument No. 836.  Approximately 18,431 residents live within a one-half mile walking distance
from Echo Park.  Due to the facilities, features, programs, and services it provides, Echo Park
and its Recreation Center meets the standard for a Community Park, as defined in the City's
Public Recreation Plan.

PROJECT SCOPE

The scope of the proposed Project includes the following:

- Replacement of playground surfacing at the north playground
- Restroom improvements, including new fixtures and doors and painting
- Upgrade of restroom interior and exterior lighting fixtures to light-emitting diode (LED)
- Replacement of five (5) drinking fountains with new hydration stations
- Improvements to various light poles around the park, including the upgrade of several
existing solar lighting fixtures to LED
- Improvements to the exterior of the boathouse, including painting
- Improvements to the lake bridge, including replacement of handrails and planks

1137

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

BOARD REPORT

PG.  3   NO.   21-045

- Turf refurbishments
- Irrigation improvements

The proposed Project will be constructed by RAP on-call contractors.

PROJECT FUNDING

Upon approval of this Report, Six Hundred Thousand Dollars ($600,000.00) in Park Fees can be committed to the proposed Project.

The total amount of funding available for the proposed Project is Six Hundred Thousand Dollars ($600,000.00).

These Park Fees were collected within five (5) miles of Echo Park, which is the standard distance for the commitment and allocation of the Park Fees for community recreational facilities pursuant to Los Angeles Municipal Code Section 12.33 E.3.

The anticipated pre-qualified on-call contracts will be for Park Facility Construction.  The budget contingency for the Park Facility Construction contracts will be Sixty Thousand Dollars ($60,000).

FUNDING SOURCE MATRIX

| Source | Fund/Dept/Acct | Amount | Percentage |
|--------|---------------|--------|------------|
| Park Fees | 302/89/89716H | $600,000.00 | 100% |
| Total | | $600,000.00 | 100% |

PROJECT CONSTRUCTION

RAP Staff has determined that sufficient funding has been identified and construction of the proposed Project is anticipated to begin in March 2021.

TREES AND SHADE

This proposed Project will have no impact on the existing trees and shade at Echo Park.

ENVIRONMENTAL IMPACT

The proposed Project consists of interior and exterior alterations involving minor construction where there be negligible or no expansion of use; outdoor lighting for security and operations; replacement of existing structures where the new structure will be located on the same site as the structure replaced and have substantially the same purpose and capacity; new gardening and landscaping and minor trenching and backfilling. As such, staff recommends that the Board of Recreation and Park Commissioners (Board) determines that it is categorically exempt from the

1138

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

BOARD REPORT

PG. 4   NO.   21-045

provisions of the California Environmental Quality Act (CEQA) pursuant to Article III, Section 1, Class 1(1), Class 1(12), Class 2, Class 4(3) and Class 4(12) of City CEQA Guidelines as well as to Article 19, Sections 15301(a), 15302, 15304(b) and 15304(f) of California CEQA Guidelines. RAP Staff will file a Notice of Exemption (NOE) with the Los Angeles County Clerk upon the Board's approval.

FISCAL IMPACT

The approval of the commitment of Park Fees will have no fiscal impact on RAP's General Fund. The estimated costs for the design, development, and construction of the proposed park improvements are anticipated to be funded by Park Fees or funding sources other than RAP's General Fund.  The maintenance of the proposed park improvements can be performed by current staff with minimal impact to existing maintenance service at this facility.

STRATEGIC PLAN INITIATIVES AND GOALS

Approval of this Board Report advances RAP's Strategic Plan by supporting:

**Goal No. 1:** Provide Safe and Accessible Parks
**Outcome No. 2:** All parks are safe and welcoming

**Result:** The improvements to Echo Park will increase safety and enhance the park users' experience.

This Report was prepared by Darryl Ford, Superintendent, Planning, Maintenance and Construction Branch.

1139

**ECHO PARK REHABILITATION AFTER ACTION REPORT**
LOS ANGELES POLICE DEPARTMENT

# Appendix J: Board Approved Park Improvements Project

APPROVED
MAY 06 2021
BOARD OF RECREATION
AND PARK COMMISSIONERS

BOARD REPORT                                    NO.___21-083___

DATE___May 06, 2021___                          C.D.____13____

**BOARD OF RECREATION AND PARK COMMISSIONERS**

SUBJECT:    ECHO PARK – PARK IMPROVEMENTS (PRJ21471) PROJECT – COMMITMENT OF PARK FEES – CATEGORICAL EXEMPTION FROM THE PROVISIONS OF THE CALIFORNIA ENVIRONMENTAL QUALITY ACT (CEQA) PURSUANT TO ARTICLE III, SECTION 1, CLASS 1(1) [EXTERIOR ALTERATIONS INVOLVING REMODELING AND MINOR CONSTRUCTION WHERE THERE BE NEGLIGIBLE OR NO EXPANSION OF USE], CLASS 1(3) [MAINTENANCE AND MINOR ALTERATION OF EXISTING DRIVEWAYS, PARKING LOTS AND PAVED AREAS], CLASS 3(4) [INSTALLATION OF NEW EQUIPMENT REQUIRED FOR SAFETY AND THE PUBLIC CONVENIENCE INVOLVING NEGLIGIBLE OR NO EXPANSION OF USE], CLASS 4(3) [NEW GARDENING, TREE PLANTING, AND LANDSCAPING], CLASS 4(12) [MINOR TRENCHING AND BACKFILLING WHERE THE SURFACE IS RESTORED], CLASS 6(2) [BASIC DATA COLLECTION ACTIVITIES WHICH DO NOT RESULT IN SERIOUS OR MAJOR DISTURBANCES TO AN ENVIRONMENTAL RESOURCE] AND CLASS 11(5) [SIGNS LOCATED ON CITY PROPERTY MANAGED BY A CITY DEPARTMENT WHICH HAS A SIGN POLICY ADOPTED BY ITS BOARD OF COMMISSIONERS] OF CITY CEQA GUIDELINES AND ARTICLE 19, SECTIONS 15301(a), 15301(c), 15303, 15304(b), 15304(f) 15306 AND 15311(a) OF CALIFORNIA CEQA GUIDELINES

AP Diaz _____  +u   M. Rudnick _____
H. Fujita _____      C. Santo Domingo  DF
J. Kim _____        N. Williams _____

_M. Oluee_
General Manager

Approved _____X_____    Disapproved _____    Withdrawn _____

RECOMMENDATIONS

1.    Approve the revised scope of work of the Echo Park – Park Improvements (PRJ21471) Project (Project), as described in the Summary of this Report;

2.    Authorize Department of Recreation and Parks (RAP) Staff to commit from the following fund and work order numbers, a maximum of Five Hundred Thousand Dollars ($500,000) in Park Fees, for the proposed Project:

| Funding Source | Fund/Dept/Acct No. | Work Order No. |
|---|---|---|
| Park Fees | 302/89/89716H | QT074377 |

1140

# ECHO PARK REHABILITATION AFTER ACTION REPORT
## LOS ANGELES POLICE DEPARTMENT

BOARD REPORT

PG. 2    NO.    21-083

3.    Approve the change order for Change Order No. 1 as further set forth in this Report in the amount of Two Hundred Thirty Five Thousand, Three Hundred Forty Three Dollars ($235,343), which represents 42.2% of the original contract award amount to Chris Kelly dba Childs Play for this Project;

4.    Authorize the Additional Contract items of the Additional Improvements (as more fully set forth below in this Report) be bid and constructed through the Department of Recreation and Parks (RAP) list of pre-qualified on-call contractors  in an amount not to exceed Three Hundred Six Thousand Seven Hundred Twenty Three Dollars ($306,723.00);

5.    Approve the authorization of change orders as authorized under Report No. 06-136, for the construction contracts for the Additional Contract Items in the budget contingency amounts for such contracts as stated in this Report

6.    Determine that the revised scope of work for Project is categorically exempt from the provisions of the California Environmental Quality Act (CEQA) pursuant to Article III, Section 1, Class 1(1) [Exterior alterations involving remodeling and minor construction where there be negligible or no expansion of use], Class 1(3) [Maintenance and minor alteration of existing driveways, parking lots and paved areas], Class 3(4) [Installation of new equipment required for safety and the public convenience involving negligible or no expansion of use], Class 4(3) [New gardening, tree planting, and landscaping], Class 4(12) [Minor trenching and backfilling where the surface is restored], Class 6(2) [Basic data collection activities which do not result in serious or major disturbances to an environmental resource] and Class 11(5) [Signs located on City property managed by a City department which has a sign policy adopted by its Board of Commissioners] of City CEQA Guidelines and Article 19, Sections 15301(a), 15301(c), 15303, 15304(b), 15304(f) 15306 and 15311(a) of California CEQA Guidelines and direct RAP Staff to file a Notice of Exemption (NOE) with the Los Angeles County Clerk;

7.    Authorize RAP's Chief Accounting Employee or designee to prepare a check to the Los Angeles County Clerk in the amount of $75.00 for the purpose of filing a NOE; and,

8.    Authorize RAP staff to make technical corrections as necessary to carry out the intent of this Report.

SUMMARY

Echo Park is located at 751 North Echo Park Boulevard in the Echo Park community of the City. This 28.14-acre park provides a lake and boathouse, recreation center, two children's play areas, tennis courts, skate park, and a walking path. Echo Park is City of Los Angeles Historic Cultural Monument No. 836.  Approximately 18,431 residents live within a one-half mile walking distance from Echo Park.  Due to the facilities, features, programs, and services it provides, Echo Park

1141

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

BOARD REPORT

PG.  3   NO.   ___21-083___

and its Recreation Center meets the standard for a Community Park, as defined in the City's
Public Recreation Plan.

PROJECT SCOPE

On March 18, 2021, the Board of Recreation and Park Commissioners (Board) approved the
following scope for the Project (Report No. 21-045):

- Replacement of playground surfacing at the north playground
- Restroom improvements, including new fixtures and doors and painting
- Upgrade of restroom interior and exterior lighting fixtures to light-emitting diode (LED)
- Replacement of five (5) drinking fountains with new hydration stations
- Improvements to various light poles around the park, including the upgrade of several
  existing solar lighting fixtures to LED
- Improvements to the exterior of the boathouse, including painting
- Improvements to the lake bridge, including replacement of handrails and planks
- Turf refurbishments
- Irrigation improvements

The proposed Project is currently in construction.  The above improvements are currently being
implemented by Chris Kelly dba Childs Play, one of RAP's on-call contractors who was selected
for the Project, through an as-needed park facility construction contract.  To date, approximately
Five Hundred Fifty Seven Thousand, Nine Hundred Thirty-Four Dollars ($557,934) of the Project
funding has been encumbered or expended on the above scope of work

Following the temporary closure of Echo Park for the initiation of the Project, RAP Staff was
subsequently able to perform a more detailed assessment of Echo Park and has identified various
additional improvements that are needed at the park.  RAP Staff is recommending that the
previously approved Project scope of work be modified to include the following (Additional
Improvements):

- Restoration of Restroom Door Frames (Change Order No. 1)
- Cleaning and painting of park light poles (Change Order No. 1)
- Cleaning and painting of park benches (Change Order No. 1)
- Cleaning and painting of trash can enclosures (Change Order No. 1)
- Painting and Removal of Graffiti (Change Order No. 1)
- Installation of Security Signage and Banners (Change Order No. 1)
- Improvement of the decomposed granite in the picnic area. (Change Order No. 1)
- Mulching of various planting areas (Change Order No. 1)
- Installation and maintenance of new turf in various planter areas (Change Order No. 1)
- Additional Irrigation System renovations (Change Order No. 1)
- Replacement of Shrubs and Landscaping (Change Order No. 1)
- Installation of 8 new trees (Change Order No. 1)
- Survey of Nesting Birds (Additional Contract)

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

BOARD REPORT

PG. 4   NO.  ___21-083___

- Replacement of damaged bird netting for the Boathouse Heating, Ventilation and Air Conditioning (HVAC) unit (Additional Contract)
- Renovation of the driveway and parking area adjacent to the maintenance yard, including restriping installation of new (2) removable bollards. (Additional Contract)
- Replacement of Informational/Educational Signage (Additional Contract)
- Installation of new security cameras (Additional Contract)
- Replacement of shade canopies at the north playground  (Additional Contract)

It is important to note that some of the previously approved Project scope of work and these identified Additional Improvements are due to the impacts from the encampment at Echo Park, some are new improvements, and others are the result of deferred maintenance.  Of the above previously approved Project scope of work and the proposed Additional Improvements, the following items are considered by RAP Staff to be deferred maintenance items:

- Improvements to the exterior of the boathouse, including painting
- Improvements to the lake bridge, including replacement of handrails and planks
- Restoration of Restroom Door Frames
- Installation and maintenance of new turf in various planter areas
- Installation of 8 new trees

<u>CHANGE ORDER NO. 1</u>

As previously stated in Report No. 21-045, the budget contingency for the original scope of the Project under the as-needed park facility construction contract is Sixty Thousand Dollars ($60,000).

Change Order No. 1 for the Project is for various items in the Additional Improvements noted above, which include restroom door frame restoration, cleaning and painting of park light poles, cleaning and painting of park benches, cleaning and painting of trash can enclosures, painting and removal of graffiti, installation of security signage and banners, improvement of the decomposed granite in the picnic area, mulching of various planting areas, installation and maintenance of new turf in various planter areas, additional irrigation system renovations, replacement of shrubs and landscaping, and installation of 8 new trees.

The total cost of Change Order No.1 is Two Hundred Thirty Five Thousand, Three Hundred Forty Three Dollars ($235,343), which exceeds the budget contingency for this Project.  RAP staff requests approval for this Change Order No. 1. Change Order No. 1 would be issued to the current contractor for the original scope of the Project, Chris Kelly dba Childs Play, under the as-needed park facility construction contract.

<u>ADDITIONAL CONTRACT ITEMS</u>

Certain of the Additional Improvements will require the services of additional pre-qualified RAP contractors.  These items are noted above as Additional Contract items. RAP staff requests the Board approve these Additional Contract items to be bid and constructed through RAP's list of

1143

BOARD REPORT

PG. 5   NO.  __21-083__

pre-qualified on-call contractors in an amount not to exceed Three Hundred Six Thousand Seven Hundred Twenty Three Dollars ($306,723.00).  The anticipated pre-qualified on-call contracts for the Additional Contract items will be for: Asphalt Construction and Retrofit; Sports Netting/Fencing Installation; Environmental Impact Analysis and Special Studies; Purchase and Installation of Playground and Recreation Related Equipment; and Electrical Construction and Retrofit. .  The budget contingency for each of these anticipated contracts will be Five Thousand Dollars ($5,000), Five Thousand Dollars ($5,000), Five Thousand Dollars ($5,000), Eight Thousand Dollars ($8,000), and Forty Thousand Dollars ($40,000) respectively.

PROJECT FUNDING

The Board previously approved the commitment of Six Hundred Thousand Dollars ($600,000.00) in Park Fees for the Project.

As previously noted, approximately Five Hundred Fifty-Seven Thousand, Nine Hundred Thirty-Four Dollars ($557,934) of the Project funding has been encumbered or expended.  Therefore, the Project is left with a remaining unencumbered amount of approximately Forty-Two Thousand, Sixty-Six Dollars ($42,066), which is insufficient to complete the identified additional scope of work proposed in this Report.

Upon approval of this Report, an additional Five Hundred Thousand Dollars ($500,000) in Park Fees can be committed to the proposed Project.

The total amount of funding available for the Project upon approval of this Report, including previously committed Park Fees, is One Million Dollars ($1,100,000.00).

These Park Fees were collected within five (5) miles of Echo Park, which is the standard distance for the commitment and allocation of the Park Fees for community recreational facilities pursuant to Los Angeles Municipal Code Section 12.33 E.3.

Upon approval of this Report, and the execution of Change Order No. 1 previously discussed in this report, the remaining funding for the Project will be approximately Three Hundred Six Thousand, Seven Hundred Twenty-Three Dollars ($306,723.00).

FUNDING SOURCE MATRIX

| Source | Fund/Dept/Acct | Amount | Percentage |
|---|---|---|---|
| Park Fees | 302/89/89716H | $1,100,000.00 | 100% |
| **Total** | | $1,100,000.00 | 100% |

PROJECT CONSTRUCTION

Construction of the Project began in March 2021.

1144

BOARD REPORT

PG. 6   NO. ___21-083___

TREES AND SHADE

Approximately eighteen trees will be removed as a part of the proposed revised scope of work for the Project, most of which are located on the south end of the lake.  These trees are recommended for removal for a variety of reasons.  Several of these trees are dead or dying. Some of these trees are blocking light and will cause hardscape damage if allowed to continue growing, and some are suppressed below the canopy of other trees and have nowhere to grow.

Eight new trees will be installed as a part of the Project.

ENVIRONMENTAL IMPACT

The proposed modified Project consists of exterior alterations involving remodeling and minor construction where there be negligible or no expansion of use; maintenance and minor alteration of existing driveways, parking lots and paved areas; installation of new equipment required for safety and the public convenience involving negligible or no expansion of use; new gardening, tree planting, and landscaping; minor trenching and backfilling where the surface is restored; basic data collection activities which do not result in serious or major disturbances to an environmental resource and signs located on City property managed by a City department which has a sign policy adopted by its Board of Commissioners.  As such, RAP Staff recommends that the Board determines that it is categorically exempt from the provisions of the California Environmental Quality Act (CEQA) pursuant to Article III, Section 1, Class 1(1), Class 1(3), Class 3(4), Class 4(3), Class 4(12), Class 6(2) and Class 11(5) of City CEQA Guidelines as well as to Article 19, Sections 15301(a), 15301(c), 15303, 15304(b), 15304(f) 15306 and 15311(a) of California CEQA Guidelines. Staff will file a Notice of Exemption with the Los Angeles County Clerk upon the Board's approval.

FISCAL IMPACT

The approval of the commitment of Park Fees will have no fiscal impact on RAP's General Fund. The estimated costs for the design, development, and construction of the proposed park improvements are anticipated to be funded by Park Fees or funding sources other than RAP's General Fund.  The maintenance of the proposed park improvements can be performed by current staff with minimal impact to existing maintenance service at this facility.

STRATEGIC PLAN INITIATIVES AND GOALS

Approval of this Board Report advances RAP's Strategic Plan by supporting:

**Goal No. 1:** Provide Safe and Accessible Parks
**Outcome No. 2:** All parks are safe and welcoming
**Result:** The improvements to Echo Park will increase safety and enhance the park users' experience.

This Report was prepared by Darryl Ford, Superintendent, Planning, Maintenance and Construction Branch.

1145

# Appendix K: Incident Objectives (ICS 202)

## INCIDENT OBJECTIVES (ICS 202)

| 1. Incident Name:<br>Echo Park | 2. Operational Period #1: Date From: 03/24/2021    Date To: 03/25/2021<br>Time From: 1800 hours    Time To: 0600 hours |
|---|---|

**3. Management Objective(s):**
1. Protect life, property and facilities.
2. Protect the Constitutional Rights of all participants and spectators.
3. Provide for safety of all responders, participants, and observers and maximize the protection of public health and welfare through clear leader's intent with established work prioritization and implementation of fundamental principles utilizing thorough risk informed decisions.
5. Maintain close, interagency relationships through a Unified Command.
6. Gather intelligence and information from appropriate resources to develop situational awareness.
7. Provide accurate and up to date information to the community, event organizers, public stakeholders and media as necessary.
8. Minimize the financial and resource impact on the City of Los Angeles

**4. Control Objective(s):**
1. Establish a Public Safety Perimeter around Echo Park to protect the Recreation and Parks personnel as they install a fence around the park. This perimeter should limit access to authorized City personnel and residents of the closed area only.
2. Establish a 1st Amendment Area for peaceful, free expression.
3. Demonstrators wishing to march will not be allowed access into the Public Safety perimeter. Marches shall be facilitated by LAPD personnel, to the extent possible, to maximize the safety of the public and demonstrators.
4. Static demonstrations shall, to the extent possible, be monitored from a distance.
5. If custodial arrests become necessary, ensure that all arrestees are expeditiously photographed by arresting officers and that the appropriate criminal charge with a short narrative is complete on the Mass Arrest Task Force Form before any arrestee is transported.
6. Ensure the expeditious transportation of any misdemeanor or felony arrestee to a Department Custodial facility.
7. Ensure that arrestees are supervised during the detention process and that they are given opportunities to use restroom facilities.
8. Ensure all arrestees and are masked and socially distanced as defined in Los Angeles Department Policy.
9. Persons to be cited for an infraction or an Administrative Citation shall be released from scene.
10. All persons asking about social services from LAPD personnel be advised that City Sponsored housing and transportation will be available beginning at 0900 hours on March 25 at Echo Park.

**5. Officer Safety Information:**
- Police Officers shall wear appropriate uniform/equipment to assignment.
- Police personnel shall have appropriate crowd management equipment (helmet w/cover, face shield, ballistic vest, baton, Taser, issued bodyworn video, etc.).
- Plainclothes officers shall be introduced and identified at briefings by Shadow Branch, and all personnel shall be informed of a recognizable item of clothing, which will be worn by plainclothes personnel in the event police action is undertaken for purposes of identification.
- Supervisors shall monitor their personnel for signs of dehydration and ensure their personnel hydrate accordingly.
- Personnel are reminded to wear their reflective traffic vests when assigned to traffic control.
- All members should be vigilant and maintain situational awareness. Always work in pairs, wear appropriate PPE's as necessary.
- Continued on the ICS 208.

**6. Site Safety Plan Required?** Yes ☐ No ☒
   **Approved Site Safety Plan(s) Located at:**

**7. Incident Action Plan** (the items checked below are included in this Incident Action Plan):

| | | Other Attachments: |
|---|---|---|
| ☒ ICS 203 | ☒ ICS 207 | |
| ☒ ICS 204 | ☒ ICS 208 | ☒ 55.70 LAMC, Dispersal Order and 41.20 LAMC |
| ☒ ICS 205 | ☒ Map/Chart | ☒ LAPD Filing Memo-Trespass |
| ☒ ICS 205A | ☐ Weather Forecast/Tides/Currents | ☒ RAP Enforcement Sections |
| ☒ ICS 206 | | ☒ Timeline of Events from Rampart Area_____ |

**8. Prepared by:** Name: Boyle #35469    Position/Title: Sergeant    Signature: _____

| LAPD ICS202 | EAP Page __1__ | Date/Time: March 3, 2021 1400 hours |
|---|---|---|

# Appendix L: Organization Assignment List (ICS 203)

## ORGANIZATION ASSIGNMENT LIST (ICS 203)

| 1. Incident Name: Echo Park | | 2. Operational Period #1: Date From: 03/24/2021    Date To: 03/25/2021 Time From: 1800 hours    Time To: 0600 hours | | |
|---|---|---|---|---|
| **3. Incident Commander(s) and Command Staff:** | | **7. Finance/Administrative Section:** | | |
| IC/UCs | Commander Graham | Chief | N/A | |
| Deputy | | Deputy | | |
| COVID/Safety Officer | Ofcr. Villegas | Time Unit | | |
| Public Info. Officer | TBD | Procurement Unit | | |
| Liaison Officer | Ofcr. Delgado | Comp/Claims Unit | | |
| | | Cost Unit | | |
| **4. Agency/Organization Representatives:** | | **8. Operations Section:** | | |
| | | Chief | Captain Lopez | |
| CHP | TBD | Deputy Chief | Capt Nguyer | |
| RAP | Chief Losorelli | Staging Area | Ofcr. Pineda | |
| DOT | Lupe Sandoval | **Interior Branch** | | |
| Sanitation | Deputy Chief Wong | | | |
| CD13 | Jeanie Min | Branch Director | Lt. Ling | Q110 |
| Fire | Captain Moody | Deputy | | |
| | | | | |
| **5. Planning Section:** | | Group | Sgt. Santiago | Q120 |
| Chief | Sergeant Boyle | Group | Sgt. Grasso | Q130 |
| Check-In/Demobilization | Officer Guerrero | **Perimeter Branch** | | |
| Situation Unit | Officer Mancia | Branch Director | Lt. Humphris | Q210 |
| Documentation Unit | PSR | Deputy | | |
| | | Group | Sgt. Gomez | Q220 |
| | | Group | Sgt. Pasillas | Q230 |
| | | Group | Sgt. Witzer | Q240 |
| **6. Logistics Section:** | | Group | Sgt. Langsdale | Q250 |
| Chief | Sgt Zavala | | | |
| Deputy | | | | |
| **Support Branch** | | | | |
| Director | | **Traffic Control Branch** | | |
| Supply Unit | | Branch Director | Lt. Mylonakis | Q310 |
| Facilities Unit | | Deputy | | |
| Ground Support Unit | | Group | Sgt. Olivera | Q320 |
| **Service Branch** | | Group | Sgt. Smith | Q330 |
| Director | | Group | Sgt. Amancio | Q340 |
| Communications Unit | | Group | Sgt. Gasca | Q350 |
| Medical Unit | | Group | Sgt. Steussie | Motor Squad |
| Food Unit | | | | |
| **8. Prepared by:** Name: Boyle #35469    Position/Title: Sergeant    Signature: Date/Time: March 3, 2021 1400 hours | | | | |
| **LAPD ICS202** | EAP Page __2__ | | | |

## ECHO PARK REHABILITATION AFTER ACTION REPORT
### LOS ANGELES POLICE DEPARTMENT

### ORGANIZATION ASSIGNMENT LIST (ICS 203)

| 1. Incident Name: Echo Park | | 2. Operational Period #2: Date From: 03/25/2021    Date To: 03/25/2021    Time From: 0600 hours    Time To: 1800 hours | | |
|---|---|---|---|---|
| **3. Incident Commander(s) and Command Staff:** | | **7. Finance/Administrative Section:** | | |
| IC/UCs | Commander Rimkunas | Chief | | |
| Deputy | | Deputy | | |
| COVID/ Safety Officer | Ofcr. Rodriguez | Time Unit | | |
| Public Info. Officer | Lt. Joval | Procurement Unit | | |
| Liaison Officer | Ofcr. Padilla | Comp/Claims Unit | | |
| | | Cost Unit | | |
| | | **8. Operations Section:** | | |
| **4. Agency/Organization Representatives:** | | Chief | Captain Stabile | |
| CHP | Investigator Dan Keene | Deputy Chief | Captain Hurtado | |
| RAP | Chief Losorelli | Staging Area | Lt Smith | |
| DOT | Lupe Sandoval | | | |
| Sanitation | Deputy Chief Wong | Interior/Arrest Team | | |
| CD13 | Jeanie Min | Branch Director | Lt. Garland | Q510 |
| Fire | | | | |
| | | Deputy | | |
| **5. Planning Section:** | | Division/Group | Sgt. Bielma | Q520 |
| Chief | Sergeant Vandersall | Division/Group | Sgt. Washington | Q530 |
| Check-In | Officer Balchowsky | Perimeter | | |
| Situation Unit | Officer Archuleta | Branch Director | Lt. Lopez | Q610 |
| Demobilization Unit | Officer | Deputy | | |
| Documentation Unit | PSR TBD | Division/Group | Sgt. Corwin | Q620 |
| | | Division/Group | Det. Ehrenburg | Q630 |
| | | Division/Group | Det. Siordia | Q640 |
| **6. Logistics Section:** | | Division/Group | Sgt. Martinez | Q650 |
| Chief | Sgt. Lara | | | |
| Deputy | | | | |
| Support Branch | | | | |
| Director | | | | |
| Supply Unit | | Traffic Control | | |
| Facilities Unit | | Branch Director | Lt. Wong | Q710 |
| Ground Support Unit | | Deputy | | |
| Service Branch | | Division/Group | Sgt. Jordan | Q720 |
| Director | | Division/Group | Sgt. Costello | Q730 |
| Communications Unit | | Division/Group | Sgt. Brawner | Q740 |
| Medical Unit | | Division/Group | Sgt. Alpert | Q750 |
| Food Unit | | Division/Group | Ofcr. Saenz | Motor Strike Team |
| 8. Prepared by:  Name: Boyle #35469    Position/Title: Sergeant         Signature: | | | | |
| Date/Time: March 3, 2021 1400 hours | | | | |
| LAPD ICS 202 | EAP Page ___2___ | | | |

1148