UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES PRESS CLUB et al.,

Plaintiffs

v.

CITY OF LOS ANGELES et al.,

Defendants.

Case No. 2:25-cv-05423-HDV-E

**ORDER GRANTING TEMPORARY RESTRAINING ORDER [16]**

I.    **INTRODUCTION**

On June 9, 2025, photojournalist Michael Nigro took his position on the Temple Street bridge, a pedestrian bridge offering a view of the protests in front of Edward R. Roybal Federal Building.  Declaration of Michael Nigro ("Nigro Decl.") ¶¶ 5–6 [Dkt. No. 26].  Though he was high above the protests below, he soon heard the telltale sound of less-lethal munitions ("LLMs") hitting a pole near his head—a sound he recognized from covering conflict zones.  *Id.* ¶ 7.  Later that day, he was shot in the head with an LLM by a Los Angeles Police Department ("LAPD") officer.  *Id.* ¶ 10.

Nigro's experience was far from unique.  Plaintiffs, Los Angeles Press Club and Status Coup, proffer at least thirty-five troubling instances between June 6 and June 19, 2025 in which the LAPD hit journalists with LLMs, exposed them to tear gas, forced them away from public places, or used other forms of physical force.  Plaintiffs seek a temporary restraining order prohibiting the City of Los Angeles and Chief Jim McDonnell (collectively "Defendants") from removing journalists from closed areas, detaining or arresting journalists, and using LLMs and chemical agents against journalists ("Application").  [Dkt. No. 16].

Defendants contend in the main that these media-related incidents in June are old news, and cavil that there is no upcoming "emergency" to justify such an order.  Opposition to Application ("Opposition") at 1 [Dkt. No. 42].  The Court disagrees.  Plaintiffs have shown a likelihood of success on their First Amendment claims and have established to the Court's satisfaction that they are likely to suffer irreparable harm covering continuing protests in Los Angeles.  Indeed, given the fundamental nature of the speech interests involved and the almost daily protests throughout Southern California drawing media coverage, the identified harm is undoubtedly imminent and concrete.  The Application is granted, with the modifications and additions noted below.  The Court will issue a briefing schedule for a preliminary injunction hearing.

II.    **BACKGROUND**

A.    **Factual Background**

On June 6, 2025, protestors gathered in downtown Los Angeles to protest the federal government's immigration raids.  Media from around the world scrambled to cover the protests.

2

This was not the LAPD's first experience with mass protest. Protests around the 2000 Democratic National Convention led to a settlement setting out parameters for press access. Declaration of Carol Sobel ("Sobel Decl.") ¶ 16, Ex. 21 [Dkt. No. 33]. Yet, during the 2020 George Floyd protests, the LAPD fired on non-violent protestors with 40 mm and 37 mm weapons. A court in the Central District of California granted a temporary restraining order limiting the LAPD's use of such weapons and finding that the use of such weapons at close range likely violated Plaintiffs' Fourth Amendment rights. *Black Lives Matter Los Angeles v. City of Los Angeles*, No. CV 20-5027 CBM (ASX), 2021 WL 3162706, at *1, 3–4 (C.D. Cal. Apr. 19, 2021).

In response to these incidents, the California Legislature enacted new protections for media covering protests. Sen. Pub. Safety Comm. Analysis, S.B. 98, 2021–2022 Reg. Sess., at 3–4. Senate Bill 98 ("SB 98"), codified at California Penal Code § 409.7, affirmed the right of members of the press to remain in closed areas. Assembly Bill 48 ("AB 48"), codified at California Penal Code § 13652, limited the use of kinetic energy projectiles and chemical agents—including LLMs and tear gas—to circumstances where it is "objectively reasonable to defend against a threat to life or serious bodily injury to any individual, including any peace officer, or to bring an objectively dangerous and unlawful situation safely and effectively under control," and only in accordance with certain requirements. Cal. Penal Code § 13652(b), (d). *See also* Sobel Decl. ¶¶ 30–31, Ex. 80 (memorandum from then-LAPD Chief of Police to the Board of Police Commissioners on December 8, 2021, outlining the new requirements set out by SB 98 and AB 48).

But over the last month, the past proved prologue. Despite section 409.7's protections, the LAPD repeatedly ordered journalists to leave closed areas. On June 8, LAPD officers held a group of approximately 20 to 30 journalists from MSNBC, CNN, the AP, and other outlets in a "press area" approximately 150 feet from protests under threat of arrest. Declaration of Constanza Eliana Chinea Mercado ("Chinea Decl.") ¶¶ 12–21 [Dkt. No. 22]. On June 9, the LAPD detained CNN reporter Jason Carroll and his crew while they were live on air, warning that he would be arrested if he returned to the area. Declaration of Adam Rose ("Rose Decl.") ¶ 39 [Dkt. No. 19], Ex. 50 [Dkt. No. 37]. On June 10, Tina Berg, a journalist with Status Coup, was forced from her position on an embankment, over 100 feet from protestors. Declaration of Tina Berg ("Berg Decl.") ¶¶ 2–4 [Dkt.

3

No. 28]; Declaration of Jordan Chariton ("Chariton Decl.") ¶ 2 [Dkt. No. 25].  On June 11, a group

of press, including a Fox News journalist and freelancers, was kettled in front of City Hall.[1]  Rose

Decl. ¶ 48, Exs. 61–64 [Dkt. No. 37].  And on June 19, LAPD officers arrested journalist Anthony

Orendorff while he was covering an ICE raid.  Declaration of Anthony Orendorff ("Orendorff

Decl.") ¶¶ 2–3 [Dkt. No. 21].  Despite informing Chief McDonnell that he was a journalist,

Orendorff was held for four days.  *Id.* ¶¶ 4–5.

When journalists persisted in documenting the protests, it appears from the evidence

presented that they faced an onslaught of projectiles and other shows of physical force.  On some

occasions, LAPD officers purportedly targeted individuals who were clearly identifiable as members

of the press.  These alleged incidents—all plausibly and sufficiently alleged in Plaintiffs' *ex parte*

briefing—include the following:

- On June 8, Lauren Tomasi of 9News Australia was speaking into a professional TV camera,
  dozens of feet from the line of officers behind her.  Rose Decl. ¶ 26, Ex. 30 [Dkt. No. 37]
  (news footage of the incident).  No protestors are visible near her.  *Id.*  Despite this, an LAPD
  officer appears to aim at Tomasi, hitting her leg with a rubber bullet.  *Id.*

- On the same day, freelance journalist Sean Beckner Carmitchel, along with other journalists,
  were forced by LAPD to leave an underground parking garage.  Declaration of Sean
  Beckner-Carmitchel ("Beckner-Carmitchel Decl.") ¶¶ 1, 5 [Dkt. No. 20].  While he was
  fleeing, he documented an unidentified woman photographer with press identification and
  multiple professional cameras walking away from officers.  Rose Decl. ¶ 30, Ex. 38 [Dkt.
  No. 37]; Beckner-Carmitchel Decl. ¶ 6, Ex. 37 [Dkt. No. 37].  One LAPD officer pushed her
  and a mounted officer ran his horse into her from behind.  *Id.*

- On June 9, 2025, Michael Nigro, a photographer whose work is regularly published by Getty
  Video, AP Wire, and others, stood on a pedestrian overpass, which offered views of the
  protest from above.  Nigro Decl. ¶¶ 2, 5–6.  Though he was clad in a helmet and vest clearly

---

[1] "Kettling" refers to a tactic employed by police in protests in which they use one or more police lines
to surround an assembly so that participants are not free to leave.  Rose Decl. ¶ 47.

reading PRESS and was far from the protest activity, he heard LLMs hit a pole near his head three times.  Nigro Decl. ¶¶ 5–7, 16.  Later in the day, he was shot in the head by an LLM, less than ten feet from a line of officers.  *Id.* ¶¶ 10–11, Ex. 17 [Dkt. No. 32].

- On June 11, photographer Montez Harris, who carried two large professional cameras and wore a visible press pass, informed an LAPD officer on horseback that he was a member of the press.  Declaration of Montez Harris ("Harris Decl.") ¶ 5 [Dkt. No. 27].  Moments later, the same officer ran into him with his horse and threatened to hit him with his baton for failing to disperse quickly enough.  *Id.* ¶ 6.  Another officer shot him in the back of the leg with an LLM.  *Id.*

- On June 14, photojournalist Héctor Adolfo Quintanar Perez was covering the aftermath of the No Kings protest, wearing a large press badge and carrying two professional cameras.  Declaration of Héctor Adolfo Quintanar Perez ("Perez Decl.") ¶¶ 2–3 [Dkt. Nos. 23–24]; Rose Decl. ¶ 54, Ex. 13 [Dkt. No. 32].  While he was taking photos of the skirmish line, an LAPD officer—standing close enough to see his press badge—shot him with an LLM in the knee.  Perez Decl. ¶¶ 7–8; Rose Decl. ¶ 54, Ex. 10 [Dkt. No. 32] (showing the distance from which the LAPD officer fired).  To this day, Perez lives with pain and walks with a cane.  *Id.* ¶ 11.

- On the same day, ABC News chief national correspondent Matt Gutman was reporting live, many feet from the protestors, when an officer shoved him from behind.  Rose Decl. ¶ 51, Exs. 68–69 [Dkt. No. 37].

On other occasions, the evidence presented credibly suggests that the LAPD fired indiscriminately at crowds which included members of the press.  For example, on June 8, the LAPD discharged "skip-fire" rounds into a group of protestors and journalists, hitting CalMatters reporter Sergio Olmos.[2]  Rose Decl. ¶ 32, Ex. 40 [Dkt. No. 37].  On June 14, LAPD officers fired rubber bullets into the crowd, hitting photographer Marshall Woodruff, slicing open his right eye, and

---

[2] "Skip-firing" refers to the practice of firing LLM rounds into the ground so that they bounce towards people.  Rose Decl. ¶ 32 n.11.

1  leaving him with potentially permanent vision loss.  Rose Decl. ¶ 53, Ex. 70 [Dkt. No. 37].  On the

2  same day, an LAPD mounted officer charged 82-year-old photographer David Healy with his horse,

3  knocking Healy to the ground and breaking one of his ribs.  Rose Decl. ¶ 55, Ex. 72 [Dkt. No. 37].

4  Other members of the media were tear gassed while among the crowds.  *See, e.g.*, Rose Decl. ¶ 44,

5  Ex. 57 [Dkt. No. 37] (Lauren Day of ABC News reporting being tear gassed in Little Tokyo on June

6  10); *id.* ¶ 57 (photojournalist Tod Seelie teargassed multiple times); Chinea Decl. ¶¶ 25–28

7  (reporting being teargassed on June 14, without warning).  As CNN anchor Erin Burnett remarked,

8  while being shoved by an advancing line of LAPD officers, "They knew we're media. They were

9  just as happy to push me as to push anybody else."  Rose Decl. ¶ 38, Ex. 49 [Dkt. No. 37].

10      In total, Plaintiffs have compiled at least 35 instances in which the LAPD excluded members

11  of the media from public areas or used projectiles, tear gas, or other forms of force against them.

12      **B.      Procedural Background**

13      On June 16, 2025, Plaintiffs Los Angeles Press Club and Status Coup initiated the instant

14  action against the City of Los Angeles and LAPD Chief Jim McDonnell, alleging: (1) violations of

15  Plaintiffs' First and Fourteenth Amendment rights in violation U.S. Code, title 42, section 1983; and

16  (2) violations of the Bane Act, Cal. Civ. Code § 52.1.  Complaint ¶¶ 45–53 [Dkt. No. 1].  The Los

17  Angeles Press Club is a 501(c)(3) nonprofit organization, with about 1,000 member journalists in

18  Southern California, which describes itself as working to support, promote and defend quality

19  journalism.  Rose Decl. ¶ 2.  Status Coup is a "progressive independent investigative reporting

20  network and media outlet," with over 3,000 members.  Chariton Decl. ¶ 1.

21      Plaintiffs filed the present Application on July 3, 2025.  Plaintiffs seek an emergency order

22  directing the City and LAPD Chief McDonnell to comply with California Penal Code sections 409.7

23  and 13652.  Notice of *Ex Parte* Application 1 [Dkt. No. 16].  In particular, Plaintiffs seek to prevent

24  Defendants from "dispersing, citing, arresting, or assaulting journalists present at any demonstration,

25  march, protest, or assembly" or from using LLMs or other force against journalists who pose no

26  imminent threat of serious harm, and to clarify the means by which the LAPD identifies journalists.

27  *Id.*  Defendants oppose, contending that Plaintiffs fail to evince a pending emergency warranting *ex*

28  *parte* relief.  Opposition at 1.

1    **III.    LEGAL STANDARD**

2    A temporary restraining order is an extraordinary remedy, and Plaintiffs have the burden of

3    proving the propriety of such emergency relief.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972

4    (1997).  A party seeking a temporary restraining order must make a clear showing (1) of a likelihood

5    of success on the merits, (2) of a likelihood of suffering irreparable harm in the absence of

6    preliminary relief, (3) that the balance of hardship tips in her favor, and (4) that a temporary

7    restraining order in is in the public interest.  W*inter v. Natural Resources Defense Council, Inc.*, 555

8    U.S. 7, 20 (2008) (articulating standard for preliminary injunction); *Stuhlbarg Int'l Sales Co., Inc. v.*

9    *John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001), *overruled on other grounds by*

10   *Winter*, 555 U.S. at 20 (noting that the standard for a preliminary injunction and a temporary

11   restraining order are "substantially identical").  If the party opposing injunctive relief is a

12   government entity, the third and fourth factors merge.  *Fellowship of Christian Athletes v. San Jose*

13   *Unified*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc).  But the propriety of a temporary restraining

14   order hinges on a significant threat of irreparable injury that must be imminent in nature.  *See*

15   *Caribbean Marine Serv. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988).

16   In the Ninth Circuit, a party seeking injunctive relief may alternatively show: (1) that there

17   are "serious questions going to the merits," (2) a likelihood of suffering irreparable harm in the

18   absence of preliminary relief, (3) that the balance of hardships "tips sharply" in favor of the moving

19   party, and (4) the injunction is in the public interest.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d

20   1127, 1131–32 (9th Cir. 2011) (citation omitted).

21   **IV.    DISCUSSION**

22   **A.    Standing**

23   As an initial matter, Defendants contend that Plaintiffs lack standing to seek prospective

24   injunctive relief.  Opposition at 7–8.  Plaintiffs establish Article III standing for prospective

25   injunctive relief when they allege "either 'continuing, present adverse effects'" of a defendant's past

26   illegal conduct, "or 'a sufficient likelihood that [they] will again be wronged in a similar way.'"

27   *Villa v. Maricopa Cty.*, 865 F.3d 1224, 1229 (9th Cir. 2017) (first quoting *O'Shea v. Littleton*, 414

28   U.S. 488, 495–96 (1974), then quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).

Plaintiffs' risk of future injury is far from speculative. In *Index Newspapers LLC v. United States Marshals Service*, the Ninth Circuit found standing where Plaintiffs provided evidence of an "ongoing, sustained pattern of conduct," including declarations and photographic and video evidence of "dozens of instances in which the [Defendants] beat plaintiffs with batons, shot them with impact munitions, and pepper sprayed them." 977 F.3d 817, 826 (9th Cir. 2020); *Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 507 (9th Cir. 1992) (noting that "the possibility of recurring injury ceases to be speculative when actual repeated incidents are documented"). So too here. Plaintiffs proffer declarations from nine journalists and video exhibits documenting dozens of instances in the past month where LAPD officers shot LLMs at journalists, exposed them to chemical agents, shoved them, and rammed them on horseback.

Plaintiffs have also documented "injuries to members of the press [since] the date the complaint was filed[.]" *Index Newspapers LLC*, 977 F.3d at 826. For example, independent journalist Anthony Orendorff avers that he was arrested on June 19, 2025 and not released under June 23, 2025. Orendorff Decl. ¶¶ 2–3, 5. Plaintiffs further proffer evidence that since they filed the instant Application, the LAPD has continued to restrict journalists from public areas and use force against them. Supplemental Declaration of Sean Beckner-Carmichel ("Supplemental Beckner-Carmitchel Decl.") ¶¶ 2–5, Ex. 81 [Dkt. No. 43-1] (describing how he, along with many other journalists, were pushed back and kettled during a protest on July 4); Supplemental Declaration of Adam Rose ("Supplemental Rose Decl.") ¶¶ 2–6 [Dkt. No. 43-2] (describing an incident where an LAPD officer shoved a photographer).

Protests of federal immigration policy continue in Los Angeles.[3] Declarant journalists aver that they intend to continue to cover such events. Orendorff Decl. ¶ 7 ("Journalists are going to continue to cover these events."); Chariton Decl. ¶¶ 3–4, 6 (averring that Status Coup's mission

---

[3] *See, e.g.*, Supplemental Beckner-Carmitchel Decl. ¶¶ 2–5 (describing protests on July 4); Supplemental Rose Decl. ¶¶ 2–6 (same); Amanda Castro & Jenna Sundel, *Protestors Confront ICE, Military in Los Angeles Park* Raid, Newsweek (July 7, 2025), https://www.newsweek.com/ice-raids-la-protests-military-immigration-deportations-2095641.

requires "journalists to be embedded into" such protests and to "go out into the field in tense

situations"); Berg Decl. ¶ 5 ("To do my job I need to be close to the protests."); Rose Decl. ¶ 61.

The likelihood of repeated confrontations—together with the evidence evincing Defendants'

sustained pattern of conduct—suffices to show that Plaintiffs risk recurrent future injury.[4]

### B.    TRO Factors

#### 1.    Likelihood of success on the merits

Plaintiffs have amply demonstrated that they are likely to succeed on their First Amendment

claims.  "The Supreme Court has recognized that newsgathering is an activity protected by the First

Amendment."  *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978).  *See also Askins v.*

*U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018)) ("The First Amendment

protects . . . the right to record law enforcement officers engaged in the exercise of their official

duties in public places.").  In asking "whether plaintiff[ journalists] have a constitutionally protected

right to access the public forum where the protests [were] staged," the Ninth Circuit applies the two-

step *Press-Enterprise II* test.  *Index Newspapers*, 977 F.3d at 829 (citing *Press-Ent. Co. v. Superior*

*Court of Cal.*, 478 U.S. 1 (1986)).  First, courts ask "whether the place and process has historically

been open to the press and general public" and "whether public access plays a significant positive

role in the functioning of the particular process in question."  *Id.* (quoting *Press-Ent.*, 478 U.S. at 8).

If a qualified right of access exists, the government can overcome that right and bar the public

insofar as it has "an overriding interest based on findings that closure is essential to preserve higher

values and is narrowly tailored to serve that interest."  *Id.* (quoting *Press-Ent.*, 478 U.S. at 9).

Here, Plaintiffs allege incidents that took place on the City's public streets and sidewalks,

"the archetyp[ical] . . . traditional public forum."  *Snyder v. Phelps*, 562 U.S. 443, 456 (2011).

Moreover, the press' access to law enforcement actions during mass protests plays a critical role in

preventing constitutional violations.  *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573

---

[4] The Court acknowledges that a temporary restraining order in a parallel case against Defendants Kristi Noem and the U.S. Department of Homeland Security was denied, without prejudice as to a regularly noticed motion for a preliminary injunction.  *Los Angeles Press Club et al v. Kristi Noem, et al.*, No. 2:25-cv-05563-SVW-MAA [Dkt. No. 19].

(1980) (noting that the media functions "as surrogates for the public"); *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012) ("The free press is the guardian of the public interest, and the independent judiciary is the guardian of the free press.").  Although the City may overcome this qualified right, Plaintiffs adduce evidence that the City restricted access and used LLMs and chemical agents even without any indication of public safety concerns.  *See, e.g.*, Nigro Decl. ¶¶ 10–12, 19, Ex. 17 (averring that LAPD began deploying LLMs into the crowd though he did not see "any protestors engage[d] in violence toward the LAPD officers"); Chinea Decl. ¶¶ 25–28 (averring that the LAPD officers trampled protestors on horseback and deployed tear gas and LLMs without any dispersal order and when she saw "no indication" of "illegal or destructive acts").  At the very least, this raises serious questions as to whether Defendants can meet their burden to overcome Plaintiffs' right of access.

Similarly, Plaintiffs establish a likelihood of success on retaliation.  The First Amendment prohibits government officials from subjecting individuals to retaliation for engaging in protected speech.  *Hartman v. Moore,* 547 U.S. 250, 256 (2006).  To establish a retaliatory arrest claim, a plaintiff must show that: (1) they were engaged in a constitutionally protected activity; (2) Defendant's actions would "chill a person of ordinary firmness from continuing to engage in the protected activity"; and (3) "the protected activity was a substantial or motivating factor in [Defendant's] conduct."  *Index Newspapers*, 977 F.3d. at 827.

The parties do not meaningfully dispute that Plaintiffs were engaged in constitutionally protected activities and that being arrested, "being shot with less-lethal munitions," being exposed to tear gas, or "being shoved by a law enforcement officer" would deter individuals of ordinary firmness from continuing to engage in the protected activity.  *Lacey v. Maricopa County*, 693 F.3d 896, 917 (9th Cir. 2012); *Index Newspapers*, 977 F.3d. at 827 n.4.  In *Index Newspapers*, the Ninth Circuit found that Defendants' use of force even when "plaintiffs were standing nowhere near protesters" constituted "exceptionally strong evidentiary support [that Defendants] were motivated to target journalists in retaliation for plaintiffs' exercise of their First Amendment rights."  977 F.3d. at 829.  Similarly, Plaintiffs proffer several instances in which the LAPD appeared to target journalists observing protestors from afar.  *See, e.g.*, Rose Decl. ¶ 26, Ex. 30 (showing an LAPD officer appear

10

1  to aim at a television anchor speaking into the camera, far from any protestors); Nigro Decl. ¶¶ 2, 5–

2  7, 16 (averring that an LAPD officer fired LLMs at him though he was on an overpass far from

3  protestors and wearing an helmet and vest emblazoned with PRESS). This suffices to raise serious

4  questions as to retaliation.[5]

5              **2.    Irreparable harm**

6          Defendants also contend that Plaintiffs fail to establish irreparable harm because they fail to

7  demonstrate a likelihood of prospective harm. Opposition at 5–9. For the reasons discussed above,

8  the Court rejects this argument. *See supra* Part IV.A. As both the Ninth Circuit and the Supreme

9  Court have repeatedly affirmed, "[t]he loss of First Amendment freedoms, for even minimal periods

10 of time, unquestionably constitutes irreparable injury." *Klein v. City of San Clemente*, 584 F.3d

11 1196, 1208 (9th Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "[A] party seeking

12 preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient

13 to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim."

14 *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (quotation marks omitted).

15 Plaintiffs have done so here.

16             **3.    Balance of hardships and public interest**

17         Finally, the balance of hardships "tips sharply" in favor of Plaintiffs. *All. for the Wild*

18 *Rockies*, 632 F.3d at 1131–32. Where, as here, Plaintiffs raise "serious First Amendment

19 questions, . . . the balance of hardships tips sharply in [their] favor." *Cmty. House, Inc. v. City of*

20 *Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (citation omitted). "It is always in the public interest to

21 prevent the violation of a party's constitutional rights." *Index Newspapers*, 977 F.3d at 838 (citation

22 omitted). In contrast, limited injunctive relief poses little additional burden to Defendants because

23 the LAPD is already required to allow journalists access to closed areas and to limit the use of LLMs

24 and chemical agents. Sobel Decl. ¶¶ 30–31, Ex. 80. The Court's injunction does not prohibit the use

25 of appropriate measures against protestors who engage in "violence, arson and looting, and assault

26

27

28 [5] Because Plaintiffs' First Amendment claims suffice to support an injunction, the Court does not
consider their likelihood of success on their other claims.

11

1    towards the officers."  Opposition at 4.  It merely spares journalists from becoming targets of police

2    responses to such incidents.

3         **C.      Scope of Relief**

4         The Ninth Circuit has long held that injunctive relief "must be tailored to remedy the specific

5    harm alleged."  *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) (quoting *Lamb-Weston,*

6    *Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)).  An injunction against state actors

7    must not "require more of state officials than is necessary to assure their compliance with the

8    constitution."  *Gluth v. Kangas*, 951 F.2d 1504, 1509 (9th Cir. 1991) (internal quotation marks

9    omitted).  Accordingly, the Court limits its injunctive relief to the constitutional harms on which

10   Plaintiffs have established a likelihood of success.

11        **D.      Bond Requirement**

12        Federal Rule of Civil Procedure 65(c) requires that, prior to granting injunctive relief, the

13   Court require a movant to pay security "in an amount that the court considers proper to pay the costs

14   and damages sustained by any party found to have been wrongfully enjoined or restrained."

15   "Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as

16   to the amount of security required, if any."  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir.

17   2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)) (quotation modified).

18   Accordingly, the Court waives the bond requirement here, as it is unlikely that Defendants will incur

19   any significant cost and requiring a bond "would have a negative impact on plaintiff's constitutional

20   rights, as well as the constitutional rights of other members of the public."  *Baca v. Moreno Valley*

21   *Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996) (citation omitted).

22   **V.     CONCLUSION**

23        The Court grants Plaintiffs' Application against Defendants as follows:

24   1.  As used herein, "journalist" includes any duly authorized representative of any news service,

25       online news service, newspaper, or radio or television station or network.

26   2.  If LAPD or another law enforcement agency establishes a police line or rolling closure at a

27       demonstration, march, protest, or rally where individuals are engaged in activity that is

28

protected pursuant to the First Amendment to the United States Constitution, LAPD is
enjoined from:

    a.  Prohibiting a journalist from entering or remaining in the closed areas.

    b.  Intentionally assaulting, interfering with, or obstructing any journalist who is
gathering, receiving, or processing information for communication to the public
(including by restricting journalists to areas from which they do not have sufficient
opportunity to observe and report on protests, including the interaction between
police and protestors).

    c.  Citing, detaining, or arresting a journalist who is in a closed area for failure to
disperse, curfew violation, or obstruction of a law enforcement officer for gathering,
receiving, or processing information.  If LAPD detains or arrest a person who claims
to be a journalist, that person shall be permitted to promptly contact a supervisory
officer of the rank of captain or above for purposes of challenging that detention,
unless circumstances make it impossible to do so.

3. LAPD is further enjoined from using less-lethal munitions ("LLMs") and other crowd control
weapons (including kinetic impact projectiles ("KIPs"), chemical irritants, and flash-bangs)
against journalists who are not posing a threat of imminent harm to an officer or another
person.

4. Within the next 72 hours, LAPD management is ordered to summarize this Order and
disseminate its contents to all LAPD officers responding to a protest in Los Angeles.

5. This Order shall expire fourteen (14) days after its filing, unless otherwise extended by the
Court.

6. A preliminary injunction hearing is set for July 24, 2025 at 9:00 a.m. Plaintiffs shall file their opening brief and related submissions no later than July 15, 2025. Defendants shall file their opposition no later than July 21, 2025. No reply brief will be accepted. The Court will accept a stipulated briefing schedule extending these dates on the condition that the parties agree to an extension of the temporary restraining order.

Dated: July 10, 2025

_____
Hernán D. Vera
United States District Judge