Carol A Sobel SBN 84483
Weston Rowland SBN 327599
Law Office of Carol A. Sobel
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403
t. (310) 393-3055
e. carolsobellaw@gmail.com
e. rowland.weston@gmail.com

David Loy SBN 229235
Aaron R. Field SBN 310648
First Amendment Coalition
534 4th St., Suite B
San Rafael, CA 94901
t. (415) 460-5060
e. dloy@firstamendmentcoalition.org
e. afield@firstamendmentcoalition.org

Peter Bibring, SBN 223981
Law Office of Peter Bibring
2140 W. Sunset Blvd. #203
Los Angeles, CA 90026
t. (213) 471-2022
e. peter@bibringlaw.com

Paul Hoffman, SBN 71244
Michael Seplow, SBN 150183
John Washington, SBN 315991
Schonbrun, Seplow, Harris,
Hoffman & Zeldes LLP
200 Pier Avenue #226
Hermosa Beach, California 90254
t.(310) 396-0731
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. jwashington@sshhlaw.com

Susan E Seager SBN 204824
Law Office of Susan Seager
128 N. Fair Oaks Avenue
Pasadena, CA 91103
t. (310) 890-8991
e. susanseager1999@gmail.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES PRESS CLUB, STATUS COUP,<br><br>                    PLAINTIFFS,<br><br>v.<br><br>CITY OF LOS ANGELES, a municipal entity, JIM McDONNELL, LAPD CHIEF, sued in his official capacity;<br><br>                    DEFENDANTS. | Case No. 25-cv-05423 HDV-E<br><br>**PLAINTIFFS' EX PARTE APPLICATION FOR CONTEMPT; SANCTIONS**<br><br>Hon. Hernán D. Vera<br><br>Date:  N/A<br>Time:  10:00 A.M..<br>Ctrm:  5B Hon. Hernán Vera |

PLAINTIFFS' EX PARTE APPLICATION FOR CONTEMPT; SANCTIONS

# CONTENTS

I.    INTRODUCTION.................................................................................1

II.   STATEMENT OF FACTS AND PROCEDURAL HISTORY ......................3

   A.    The Temporary Restraining Order.................................................3

   B.    LAPD's History of Violating the Rights of the Press...................4

   C.    Newsgathering Is a Protected First Amendment Activity ...........5

   D.    The Events of Augusts 8, 2025 ....................................................6

   E.    Plaintiffs' Attempts To Reach A PIO Or Commanding Officer ...............10

III.  LEGAL STANDARD .......................................................................11

IV.   ARGUMENT .................................................................................12

   A.    The City Violated This Court's Injunction ................................12

   B.    The City Failed to Take Reasonable Steps to Prevent Violations.............12

   C.    The Court Should Order the City to Show Cause Why Contempt Sanctions Should Not Issue ....................................................13

     1.    The Court Should Modify the TRO Order to Add Batons and Other Force and Require a PIO Liaison..........................................13

     2.    The Court Should Appoint of a Special Master....................13

     3.    Sanctions are Warranted to Prevent Continuing Violations of the Court's Order ....................................................15

   D.    Reasonable Attorney's Fees.........................................................16

V.    CONCLUSION ...............................................................................16

PLAINTIFFS' EX PARTE APPLICATION FOR CONTEMPT; SANCTIONS

Table of Authorities

Page(s)

Cases

*Burlington N. R. Co. v. Dep't of Revenue of State of Wash.*,
  934 F.2d 1064 (9th Cir. 1991) ................................................................. 14

*Fed. Trade Comm'n v. Enforma Nat. Prods., Inc.*,
  362 F.3d 1204 (9th Cir. 2004) ................................................................. 11

*Gen. Signal Corp. v. Donallco, Inc.*,
  787 F.2d 1376 (9th Cir. 1986) ................................................ 12, 15, 16

*Harcourt Brace Jovanovich Legal & Pro. Publications, Inc. v. Multistate Legal Stud., Inc.*,
  26 F.3d 948 (9th Cir. 1994) ..................................................................... 16

*Hoptowit v. Ray*,
  682 F.2d 1237 (9th Cir. 1982) ................................................................. 14

*Hous. Rts. Ctr. v. Sterling*,
  2004 WL 3610228 (C.D. Cal. Dec. 29, 2004) ........................................ 16

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
  10 F.3d 693 (9th Cir. 1993) ..................................................................... 11

*In Re: Crystal Palace Gambling Hall Inc.*,
  817 F.2d 1361 (9th Cir. 1993) ................................................................. 12

*Index Newspapers LLC v. United States Marshals Serv.*,
  977 F.3d 817 (9th Cir. 2020) ............................................................. 5, 6, 7

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
  774 F.3d 935 (9th Cir. 2014) ............................................................ 15, 16

*Kelly v. Wengler*,
  822 F.3d 1085 (9th Cir. 2016) ................................................................. 12

*Lacey v. Maricopa Cnty.*,
  693 F.3d 896 (9th Cir. 2012) ..................................................................... 7

*Leigh v. Salazar*,
  677 F.3d 892 (9th Cir. 2012) ..................................................................... 5

*McComb v. Jacksonville Paper Co.*,
  336 U.S. 187 (1949) ................................................................................. 12

*Nat'l Org. For the Reform of Marijuana L. v. Mullen*,
  828 F.2d 536 (9th Cir. 1987) ............................................................. 14, 15

*O'Connor v. Midwest Pipe Fabrications, Inc.*,
  972 F.2d 1204 (10th Cir. 1992) ............................................................... 15

*Peltz v. City of Los Angeles*,
  2025 WL 1412479 (C.D. Cal. Feb. 20, 2025) .......................................... 5

*Robinson v. Delicious Vinyl Recs. Inc.*,
  2014 WL 1715520 (C.D. Cal. Apr. 30, 2014) ........................................ 11

*Shillitani v. United States*,
  384 U.S. 364 (1966) ................................................................................. 11

*Sloane v. Karma Enters., Inc.*,
  2008 WL 11343430 (C.D. Cal. Nov. 25, 2008) ...................................... 11

*Spallone v. United States*,
  493 U.S. 265 (1990) ................................................................................. 11

iii

PLAINTIFFS' EX PARTE APPLICATION FOR CONTEMPT; SANCTIONS

*Stone v. City & Cnty. of San Francisco*,
   968 F.2d 850 (9th Cir. 1992) ............................................................................ 11, 14

*United States v. Sherman*,
   581 F.2d 1358 (9th Cir. 1978) ................................................................................ 5

*United States v. Suquamish Indian Tribe*,
   901 F.2d 772 (9th Cir. 1990) ................................................................................ 14

*United States v. United Mine Workers of Am.*,
   330 U.S. 258 (1947) ............................................................................................ 15

**Statutes**

18 U.S.C. § 401 .................................................................................................... 15

California Penal Code §409.7 ............................................................................. 2, 9

**Rules**

Fed. R. Civ. P. 53 .................................................................................................. 14

Fed. R. Civ. P. 53(a) ............................................................................................. 14

Fed. R. Civ. P. 53(b) ............................................................................................. 14

PLAINTIFFS' EX PARTE APPLICATION FOR CONTEMPT; SANCTIONS

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

What will it take to get the LAPD to respect the constitutional rights of journalists?

Once again, and less than a month after this Court issued a Temporary Restraining Order in this action, LAPD's past unlawful treatment of the press "proved prologue."  Order Granting Temporary Restraining Order, p.1. [Dkt. 44] ("TRO Order").

On July 10, 2025, the Court issued its TRO Order prohibiting the Los Angeles Police Deparment ("LAPD") from barring journalists from entering closed areas at protests; from "[i]ntentionally assaulting, interfering with, or obstructing any journalist" who is reporting at a protest; and from "[c]iting, detaining, or arresting a journalist who is in a closed area for failure to disperse," TRO Order at 12-13. Yet less than one month later, the LAPD attacked a peaceful protest and reporters present and violated each one of these terms.

On August 8, 2025, LAPD officers formed a skirmish line and began forcing peaceful protestors away from the immigration detention facility in downtown Los Angeles without declaring an unlawful assembly, giving a dispersal order, or making any provision for journalists. The line of LAPD officers advanced on journalists openly displaying press identification and shoved them to the ground and hit them with batons — even as journalists yelled that they were press or held their press identification up for officers to see, as shown in Exhibit 109:



PLAINTIFFS' EX PARTE APPLICATION FOR CONTEMPT; SANCTIONS

Only after the initial assaults, forcing the assembly back a block, did the LAPD give a dispersal order.  While most of the protestors left, approximately 20 remained with nearly all of the press.  Beckner-Carmitchel Dec. ¶ 20. The LAPD kettled the remaining protestors and the press, forcing  them into a side street.  The journalists were detained, ordered to stand against a wall and zip-tied,  including those with press credentials still hanging from them prominently displayed, for one to two hours, as shown in Exhibit 107.  While some journalists were released on site with a Field Interview Card alleging failure to disperse after an unlawful assembly order, LAPD transported two up to its detention facilities on Temple and Los Angeles streets.

These violations occurred even after the Court directed LAPD to distribute a summary of



the TRO Order to all members of the Department, which LAPD did, and voluntarily incorporated the broader definitions of "journalist" codified by the California Legislature in California Penal Code §409.7.[1] And these violations occurred even as Plaintiffs identified themselves as press and made repeated attempts to obtain a supervisor or Public Information Officer ("PIO") representative on the scene and to get LAPD officers who answered the phone at the Department's PIO office to address the unfolding situation.

Defendants' actions evince a blatant disregard for the First Amendment and an unwillingness or an inability or both on the part of the City to take steps necessary to ensure

---

[1] A copy of the LAPD's notice to all department personnel is attached at Exhibit 110.

PLAINTIFFS' EX PARTE APPLICATION FOR CONTEMPT; SANCTIONS

compliance with this Court's Injunction. This Court has broad authority to enforce its orders through civil contempt. Plaintiffs submit that a finding of contempt and issuance of appropriate sanctions are both justified and necessary to ensure Defendants comply with the Court's order in the future.  Specifically, Plaintiffs request that the Court:

- Modify the TRO Order to expressly encompass use of batons and any other type of force and to require LAPD to have a designated liaison from the Office of Operations at every protest or First Amendment-protected event.

- Find Defendants in Contempt and set a hearing on and Order to Show Cause why further sanctions against Defendants should not issue;

- Impose civil contempt remedies as appropriate, including but not limited to monetary santctions; violations of the TRO Order and

- Appoint a Special Master to investigate  the LAPD's conduct on August 8, 2025 and report back to the Court with findings on the reasons for noncompliance and recommendations for how to ensure compliance with the TRO Order and any subsequent Preliminary Injunction going forward;

- Award reasonable attorneys' fees incurred in responding to Defendants' violations and this application.

## II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.    The Temporary Restraining Order

On July 10, 2025, the Court issued a Temporary Restraining Order that provided, in key sections, the following restrictions on the LAPD:

2.  If LAPD or another law enforcement agency establishes a police line or rolling closure at a demonstration, march, protest, or rally where individuals are engaged in activity that is protected pursuant to the First Amendment to the United States Constitution, LAPD is enjoined from:
a. Prohibiting a journalist from entering or remaining in the closed areas.
b. Intentionally assaulting, interfering with, or obstructing any journalist who is gathering, receiving, or processing information for communication to the public (including by restricting journalists to areas from which they do not have sufficient opportunity to observe and report on protests, including the interaction between police and protestors).

PLAINTIFFS' EX PARTE APPLICATION FOR CONTEMPT; SANCTIONS

   c. Citing, detaining, or arresting a journalist who is in a closed area for failure to
   disperse, curfew violation, or obstruction of a law enforcement officer for gathering,
   receiving, or processing information. If LAPD detains or arrest a person who claims
   to be a journalist, that person shall be permitted to promptly contact a supervisory
   officer of the rank of captain or above for purposes of challenging that detention,
   unless circumstances make it impossible to do so.

3.  LAPD is further enjoined from using less-lethal munitions ("LLMs") and other crowd
control weapons (including kinetic impact projectiles ("KIPs"), chemical irritants, and
flash-bangs) against journalists who are not posing a threat of imminent harm to an officer
or another person.

4.  Within the next 72 hours, LAPD management is ordered to summarize this Order and
disseminate its contents to all LAPD officers responding to a protest in Los Angeles.

TRO Order at 12-13.

The evidence submitted by Plaintiffs in support of this motion for contempt demonstrates
that Defendants violated each of these prohibitions on August 8, 2025.

**B.      LAPD's History of Violating the Rights of the Press**

Plaintiffs' Ex Parte Application for a Temporary Restraining Order, Dkt. Nos. 16-37,
detailed the LAPD's long and tortured history of violating the rights of the press and violating
settlement agreements meant to end these unlawful practices.  In *Crespo v City of Los Angeles*,
2:00-cv-08869 GHK (RC) C.D. Cal. 2000) LAPD was sued for clubbing reporters and shooting
them with less lethal weapons during the 2000 Democratic National Convention. LAPD entered
into a settlement with the ACLU, requiring the police recognize the rights of journalists to cover
protests even if an unlawful assembly is declared and an order to disperse is given. As part of the
settlement, the City also agreed to assign a liaison to work with members of the press and to
designate areas for journalists to observe from. Complaint at ¶8 and Exhibit 21.

Just a few years later, the LAPD once again assaulted members of the press when the LAPD
attacked a peaceful immigrant rights rally on May 1, 2007 in MacArthur Park.  In a damning report,
the LAPD conceded that it had failed to incorporate the lessons learned after the 2000 DNC debacle.
Complaint at ¶ 9 and n.1 ("After-Action Report").  The After-Action Report for the 2007 MayDay
protest explicitly noted the LAPD's failure to implement or monitor any of the prior settlements
protecting the rights of journalist.  See, "An Independent Examination of the Los Angeles Police
Department 2020 Protest Response," by Independent Counsel Gerald Chaleff ("Chaleff Report"),

PLAINTIFFS' EX PARTE APPLICATION FOR CONTEMPT; SANCTIONS

4

Ex. 23 Vol 5 Dk 34 pp. 10-11, 96-97.

The events of August 8, 2025 are more in a long line of Defendants' constitutional violations of the rights of journalists, including "restricting or retaliating against the press for attempting to gather news on police activity, [and] detaining members of the press without probable cause" — a description this Court previously recognized was "not mere hyperbole." *Peltz v. City of Los Angeles*, No. 2:22-CV-03106-HDV(AGRX), 2025 WL 1412479, at *10 (C.D. Cal. Feb. 20, 2025).

**C.      Newsgathering Is a Protected First Amendment Activity**

As the Court previously recognized, newsgathering is protected by the First Amendment. *Leigh v. Salazar*, 677 F.3d 892, 897, 900 (9th Cir. 2012); *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978). Order at p.10 [Doc. 44]. "Just as streets and sidewalks historically have been recognized as being open to the public, the press has long been understood to play a vitally important role in holding the government accountable." *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 831 (9th Cir. 2020).

Under the First Amendment, the Ninth Circuit in *Index Newspapers* upheld an injunction which provided that "journalists and legal observers" covering ongoing protests "shall not be subject to arrest for not dispersing following the issuance of an order to disperse," provided they do "not impede, block, or otherwise physically interfere with the lawful activities" of law enforcement officers. *Id.* at 823, 831. The injunction listed indicia to help identify journalists and legal observers, "such as press passes, people standing off to the side of protests not engaging in protest activities, people not intermixed with protest activities, and people carrying professional-grade photographic equipment." *Id.*

As the Ninth Circuit acknowledged, dispersing the press is not "essential or narrowly tailored to serve the government's interests," where "trained and experienced law enforcement personnel are able to protect public safety without dispersing journalists and legal observers and can differentiate press from protesters, even in the heat of crowd control." *Id.* at 832–33.

It is incomprehensible that the LAPD cannot follow the law where, as in *Index Newspapers*, there is a "mountain of evidence" that LAPD violated these settled principles of First Amendment

law by repeatedly attacking or targeting journalists who were easily identifiable by well-recognized indicia. *Id.* at 831. Despite the clear holding of *Index Newspapers* and the Temporary Restraining Order that press are permitted to remain and continue documenting events when a dispersal order is given, in this instance journalists were detained, zip-tied and held for over an hour for failure to comply with an order to disperse.  Dec. of Beckner-Carmitchel at ¶ 18 and Exhibit 86 ("FI" card).

### D.    The Events of Augusts 8, 2025

Since the Department of Homeland Security ("DHS") began detaining people arrested on immigration violations at the federal Metropolitan Detention Center on Alameda in Downtown Los Angeles, protestors have gathered at the site and the press has been there to document the police response to the protests. Multiple videos of these recent ICE protests submitted with this Ex Parte Application show LAPD skirmish lines moving toward the protestors and using batons to strike people they ordered to move, including members of the press with visible identification.  See, e.g., Exhibit 82 at 1:01.



The main difference between Defendants' unlawful conduct before the Court's TRO Order issued and now is that before, LAPD officers seemed primarily to use 40mm launchers to disperse protestors.  On August 8, they seem to have used primarily batons.

No matter which form of force LAPD uses, the result is the same because both "being shot with less-lethal munitions … or being shoved by a law enforcement officer would chill a person of

ordinary firmness from continuing to exercise their First Amendment rights." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012); *Index Newspapers*, 977 F.3d at 827 n.4, cited in TRO at p.10.

On August 8, 2025, protestors rallied at the Home Depot in Westlake, just outside of Downtown Los Angeles, and, over the course of approximately two hours, peacefully marched from the Home Depot to the federal MDC, until about 100 people were assembled on Alameda Street outside the garage entrance to the MDC. Beckner-Carmitchel Dec. at ¶¶ 4-6; Romano Dec. ¶ 4. The group remained peaceful. A short time after the protestors arrived, shortly before 9 p.m., LAPD officers drove up in police vehicles. Shortly after that, more LAPD officers ran down Alameda and formed a line across the street. Romano Dec. ¶ 6 and Exhibit 100. Then, with no warning and no dispersal order, the officers started shouting "move back" as they quickly advanced, shoving the assembled group and striking them with batons. Romano Dec. ¶¶ 7-10 and Exhibit 101; Beckner-Carmitchel Dec. ¶ 7; Berg Dec. ¶¶ 3-5 and Exhibits 82, 84.

As the police assaulted the protestors to force them to move back more, there was no area where press could be to observe and document the protest and the police response without being assaulted by the LAPD. When members of the press asserted their right to remain, to have a PIO or command officer called and the Court's Order affirming their rights, officers ignored them or told them to wait (*see, e.g.*, Exh. 106 at 1:25 through 2:20 (officer repeats "not right now")), Exh. 95 at 1:45), which begs the question: If not then, when?

Extensive video evidence documents LAPD's assault, set forth in the following exhibits (listed in approximate chronological order): Exhibit 102 (LAPD officers talking to protesters); Exhibit 100 (more LAPD officers arriving on the scene); Exhibits 101, 82, and 84 overlap in time showing different angles of LAPD's initial assault; Exhibits 83, 88, 89, and 90 overlap in time showing LAPD's continuing push; Exh 106 shows the LAPD line after they have pushed protesters away from the entrance to MDC; Exh. 94, 95, 105, and 96 show the LAPD (after pushing a small group of protesters down a side street) kettling, detaining, and zip-tying journalists over their repeated objections that their arrest violates the law and they want to talk to a supervisor or PIO.

Set forth below are some of the specific injuries caused by the LAPD at the ICE detention

PLAINTIFFS' EX PARTE APPLICATION FOR CONTEMPT; SANCTIONS

7

center on July 8, 2025, which support a finding of contempt.

**SEAN BECKNER-CARMITCHEL**: Sean Beckner-Carmitchel was carrying several professional cameras and wearing his press identification card from the Los Angeles Press Club, which is a laminated photograph of him and the words "PRESS" in 72-point font, on a lanyard attached to his clothes. Beckner-Carmitchel Dec. at ¶ 4. At one point, while the officers were not moving the skirmish line forward, Beckner-Carmitchel asked to speak with a supervisor or PIO but was told move back. When he repeated his request, an LAPD officer shoved him and hit him in the ribs with a baton, causing bruising and pain. Beckner-Carmitchel asked multiple times that LAPD officers call a PIO officer, as provided for in the Court's Order. The response was blank stares except for one officer who responded: "That's not important right now." Beckner-Carmitchel Dec. at 11.

It was not until well after LAPD officers forcibly pushed the protestors back a block from the federal MDC that a dispersal order was given. While most of those assembled then left, approximately 20 protestors remained along with members of the press. Once the group was forced into a small side street, LAPD officers ordered everyone remaining to get up against a nearby wall, and told them they were under arrest. LAPD officers placed the journalists, along with the 20 or so protestors, in zip-ties and held them against the wall for more than an hour. Although Beckner-Carmitchel again and repeatedly asserted his rights under California Penal Code Sec. 409.7 and the Court's TRO, the officers ignored him and one responded that "it didn't matter right then." Beckner-Carmitchel asked for a supervisor or PIO about 10 more times, all to no avail. See, e.g., Exhs. 95, 96, 105; Exh. 106 (at 1:25 ("not right now")),. Ultimately, Beckner-Carmitchel was released with a Field Information ("FI") card filled out by an officer, noting he was "Detained during an illegal assembly. Failed to disperse after multiple dispersal orders." See Exh. 86.

**NICHOLAS STERN:** Photojournalist Nicholas Stern was struck in the face by LAPD officers. Before he was struck, Stern showed the officer his press identification, which was on a lanyard around his neck. The officer did not care and continued to advance on Stern, assaulting him and causing a cut and bleeding on Stern's chin. A screenshot taken from Exhibit 84 depicts Stern holding up his press pass at approximately 54 seconds into the video. The adjacent screenshot,

PLAINTIFFS' EX PARTE APPLICATION FOR CONTEMPT; SANCTIONS

also taken from Exhibit 84 at 59 seconds, depicts his injury.    The video is available at: https://drive.google.com/file/d/1O3LPcuWbrEFKKEKwTgFADYok7ovSN2Rs/view?usp=drive_link. Exhibit 83 is a video from a different vantage point showing the Officer striking Nick Stern as he holds his press credential up in front of his face for the officer to see.

 

**TINA BERG:** Tina Berg was present at the federal MDC when LAPD officers arrived shortly before 9 p.m. Berg observed them form a skirmish line across Alameda, blocking the sidewalks on both sides of the street. Berg did not hear a dispersal order before the LAPD skirmish line began advancing on the assembly. Almost immediately, Berg observed officers jabbing and striking protestors with batons. Exhibit 82 is a video taken by Berg. https://drive.google.com/file/d/1ZvmGaGwhdJNL3pZqNv8xv1URsIuUlQJN/view?usp=sharing.

At 2:41 on Exhibit 82, Berg asked officers to deescalate, specifically speaking to Officer Aulick. At all times during this interaction, Berg's press credential was around her neck in a lanyard and clearly visible. At 3:01 in Exhibit 82, officer Aulick advances in Ms. Bergs direction. He jabs her with his baton, She is then pushed again and can be heard crying out in pain. Officer Aulick responds by yelling "get back" and hits her hard again with his baton. Shortly there after she realized that the interaction had ripped open the distal phalanx of her fifth digit. Berg decl. ¶ 12.

The following is a still shot taken from the 5:28 mark of Exhibit 82.



### E.    Plaintiffs' Attempts To Reach A PIO Or Commanding Officer

Both Adam Rose and Sean Beckner-Carmitchel attempted to get Defendants to comply with the Court's Order. Adam Rose, of the Plaintiff Los Angeles Press Club, was monitoring the assembly on live stream.  He called the LAPD's Public Information Office (PIO) on the LAPD's 24/7 hotline and spoke with Officer Madison. Rose informed the on-duty PIO what was occurring at the ICE MTD.  Rose asked that the PIO call Chief McDonnell and asked for someone from PIO to come to the scene immediately.  Officer Madison told Rose he would "monitor" the situation. Rose attempted, again, to convey the urgency of the situation.  Rose then texted Deputy Mayor for Communications Zach Seidl, providing a link to several journalist's social media posts with firsthand accounts of the events at the MDC, with no response. Declaration of Adam Rose at ¶ 19.

At approximately 10:00 p.m., Rose again called the PIO number and spoke with Officer Madison. Rose told him he was required by the Order to call in a Captain and notify him of the press complaint. In response, Officer Madison said it was up to the Incident Commander in the field and there was nothing for him to do. Rose Dec. at ¶ 21.

A few minutes later, when Rose learned that several journalists had been detained/arrested

PLAINTIFFS' EX PARTE APPLICATION FOR CONTEMPT; SANCTIONS

1   and were being held zip-tied, he emailed information on the incident to LAPD Chief McDonnell,

2   Captain Alex Chogyoji from PIO, Public Information Director Jennifer Forkish, two general office

3   emails for PIO, Los Angeles Police Commission President Erroll Southers, and Mayor Karen

4   Bass's office, and City Attorney Hydee Feldstein Soto, among other City officials and employees.

5   His email included the names of the detained reporters and demanded their immediate release. He

6   also provided information on three reporters who were injured and left to get medical care for their

7   wounds. Rose Dec. ¶¶ 23 & Exh. 103.

8         Over the course of the next hour, Rose repeatedly attempted to contact LAPD and City

9   officials for the release of the journalists. Ultimately, all but two -- Nate Gowdy and Carrie Shreck

10  – were released in the field. Gowdy and Shreck were taken to the LAPD Metropolitan Detention

11  Center on Los Angeles Street.

## III. LEGAL STANDARD

13        "Courts have inherent power to enforce their orders through civil contempt." *See Spallone*

14  *v. United States*, 493 U.S. 265, 276 (1990) (citing *Shillitani v. United States*, 384 U.S. 364, 370

15  (1966)). "A district court has wide latitude in determining whether there has been a contemptuous

16  defiance of one of its orders." *Sloane v. Karma Enters., Inc.*, No. CV085094MMMVBKX, 2008

17  WL 11343430, at *2 (C.D. Cal. Nov. 25, 2008) (citing *Stone v. City & Cnty. of San Francisco*, 968

18  F.2d 850, 856 (9th Cir. 1992).

19        In a motion for an order to show cause regarding contempt, "the moving party has the

20  burden of showing by clear and convincing evidence that the contemnors violated a specific and

21  definite order of the court. The burden then shifts to the contemnors to demonstrate why they were

22  unable to comply." *Fed. Trade Comm'n v. Enforma Nat. Prods., Inc.*, 362 F.3d 1204, 1211 (9th

23  Cir. 2004) (citation and quotation marks omitted) "The defendant's conduct 'need not be willful'

24  to violate a consent judgment.'" *Robinson v. Delicious Vinyl Recs. Inc.*, No. 2:13-CV-04111-CAS,

25  2014 WL 1715520, at *1 (C.D. Cal. Apr. 30, 2014) (citing *In re Dual-Deck Video Cassette*

26  *Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). As the court in Robinson noted, "there

27  is 'no good faith exception to the requirement of obedience.'" *Id.*

28

PLAINTIFFS' EX PARTE APPLICATION FOR CONTEMPT; SANCTIONS

**IV. ARGUMENT**

    **A.    The City Violated This Court's Injunction**

    Plaintiffs' evidence establishes clear and convincing evidence that the City violated this Court's injunction when it attacked and arrested members journalists documenting the protest outside the ICE Metropolitan Detention Center. Plaintiffs need not show more to support a finding of contempt. They do not need to support evidence as to why Defendants attacked them. Specifically, they need not show that these violations were willful for the Court to find the City in civil contempt. *In Re: Crystal Palace Gambling Hall Inc.,* 817 F.2d 1361, 1365 (9th Cir. 1993); *see also McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) ("it matters not with what intent the defendant did the prohibited act").

    **B.    The City Failed to Take Reasonable Steps to Prevent Violations**

    As noted above, the Court's Order imposed limitations on the use of the 40mm launchers. Just because the LAPD did not shoot any member of the press does not excuse Defendants' unlawful actions in this instance. The City cannot defend against a finding of contempt here by arguing that it has substantially complied with the injunction.

    While "substantial compliance" is a defense to contempt, it rests not on the extent to which the City has complied with the Court's injunction, but instead, on whether the defendant took "all reasonable steps" to comply with the order. "If a violating party has taken all reasonable steps to comply with the court order, technical or inadvertent violations of the order will not support a finding of civil contempt." *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986) (internal quotations removed, emphasis added). See also *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) ("A contemnor in violation of a court order may avoid a finding of civil contempt only by showing it took all reasonable steps to comply with the order" (emphasis in original)). The violations in this instance are by no means "technical or inadvertent." Defendants deliberately and repeatedly struck people with batons and refused to allow the press to remain in violation not only of this Court's Order but department policy on dispersal orders and the use of batons.

**C.    The Court Should Order the City to Show Cause Why Contempt Sanctions Should Not Issue**

Based on the showing submitted in this Ex Parte Application, Plaintiffs request that the Court find Defendants in contempt and set a hearing on an Order to Show Cause why Defendants should not be sanctioned for contempt of the Court's TRO Order, on the basis of LAPD's actions on August 8, 2025.  Plaintiffs respectfully request that the Court order LAPD Chief Jim McDonnell to appear personally at the hearing on the Order to Show Cause to explain the Department's conduct on August 8, 2025.

At such a hearing, the Court can determine additional civil contempt remedies as appropriate, including but not limited to setting penalties for further violations of the TRO Order and modifying the TRO Order to expressly encompass use of batons and any other type of force and to require LAPD to have a designated liaison from the Office of Operations at every protest or First Amendment-protected event.

**1.    *The Court Should Modify the TRO Order to Add Batons and Other Force and Require a PIO Liaison***

On July 10, 2025, in *Los Angeles Press Club v. City of Los Angeles,* Case No. 2:25-cv-05423-HDV-E, the District Court entered a temporary restraining order restricting, *inter alia*, the use of Kinetic Impact Projectiles against journalists.  Specifically, the Court ordered that "(3) the LAPD is further enjoined from using less lethal weapons ("LLMs") and other crowd control weapons, including kinetic impact projectiles ("KIPs"), chemical irritants, and flash bangs against journalists who are not posing a threat of imminent harm to an officer or another person."  TRO Order at 13.  In order to avoid any doubt or confusion, Plaintiffs request that the Court modify this list to expressly add any form of force, including but not limited to batons, to the restrictions on LAPD interactions with journalists who are not posing a threat of imminent harm.

Additionally, the Court should modify the TRO Order to require LAPD to have a designated liaison from the Office of Operations at every protest or First Amendment-protected event who is primarily responsible for ensuring that the Department complies with the TRO Order or any subsequent orders in this case.

**2.    *The Court Should Appoint a Special Master***

Plaintiffs request that this Court appoint a Special Master at the City's expense to conduct

PLAINTIFFS' EX PARTE APPLICATION FOR CONTEMPT; SANCTIONS

an independent investigation into the LAPD's violation of the preliminary injunction during the June 2025 protests. The violations supporting this motion indicate that the LAPD as an institution has failed utterly to incorporate this Court's clear directives to protect peaceful protestors. A prompt report from an independent investigator about the LAPD's recent conduct along with recommendations for further actions to make this Court's Order more effective would enable this Court to fashion further action to an independent set of facts.

Fed. R. Civ. P. 53 authorizes the courts to appoint a Special Master under "exceptional conditions." Fed Rules Civ Proc R 53(a). "Rule 53 contemplates that the master will assist the court with specific tasks and exercise necessary power." *Burlington N. R. Co. v. Dep't of Revenue of State of Wash.*, 934 F.2d 1064, 1071 (9th Cir. 1991). The "appointment of a special master is generally an interlocutory order and not appealable." *Nat'l Org. For the Reform of Marijuana L. v. Mullen*, 828 F.2d 536, 540 (9th Cir. 1987).

The Ninth Circuit has interpreted the "exceptional" standard to include cases involving complex litigation, or when there are "**problems associated with compliance with the district court order**." *United States v. Suquamish Indian Tribe*, 901 F.2d 772, 775 (9th Cir. 1990) (emphasis supplied); *see also Hoptowit v. Ray*, 682 F.2d 1237, 1263 (9th Cir. 1982) (upholding Special Master appointment based, in part, on the need to monitor compliance with the district court's order enjoining the State from using "unnecessary physical force against prisoners" and ordered supervision of the penitentiary). *See also Stone v. City & Cty. of S.F.*, No. 91-16927, 1992 U.S. App. LEXIS 14436, at *27 n.18 (9th Cir. June 25, 1992) (approving a Special Master "to investigate, report, and recommend actions that the City could take to ensure compliance with the consent decree.")

"There are no judicial decisions requiring a final determination of constitutional violation before an 'exceptional condition' justifying reference to a master can arise under Rule 53(b)." *National Organization For the Reform of Marijuana Laws*, 828 F.2d at 543. Nor is there any "circuit authority that requires a determination of intentional disregard of court orders before a special master may be appointed under Fed. R. Civ. P. 53(b). *Id.* "[T]he prospect of non-compliance is an 'exceptional condition' that justifies reference to a master." *Id.* at 542. That

PLAINTIFFS' EX PARTE APPLICATION FOR CONTEMPT; SANCTIONS

14

prospect is real in this instance.

Here, both the complexity of the litigation and the obvious need to investigate and monitor Defendants' compliance with the preliminary injunction support the appointment of a Special Master who could assist the Court to ensure compliance with the Orders in both this case and *BLM, et al. v. City of Los Angeles, et al.*, Case No. 2:20-cv-05027-CBM-AS. The Special Master's findings on the reasons for violations of the Court's TRO Order could inform additional measures to achieve compliance in the future and help ensure that the LAPD's past is no longer prologue to its treatment of journalists.

### 3.   *Sanctions are Warranted to Prevent Continuing Violations of the Court's Order*

"Courts have statutory authority to punish both civil and criminal contempt pursuant to 18 U.S.C. § 401." *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 955 (9th Cir. 2014). After a finding of contempt, a court may issue sanctions for two purposes: "to compel or coerce obedience to a court order" and "to compensate the contemnor's adversary for injuries resulting from the contemnor's noncompliance[.]" *O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir. 1992) (citation omitted).

When determining the amount of a monetary sanction like the one requested here, the Court should consider "the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947); see also *General Signal Corp.*, 787 F.2d at 1378. The City of Los Angeles has a yearly operating budget of approximately $10.5 billion. For the fiscal year 2024-2025, by far the greatest liability payments were for lawsuits against the Los Angeles Police Department, topping $100,000,000.  *See* Jordan Rynning, *As LA veers toward a financial crisis, $320M in liability payouts play a big role*, LAist (Mar. 14, 2025), at https://laist.com/news/politics/los-angeles-liability-payments-rise-nearing-fiscal-emergency. Although the City has declared a fiscal emergency, the budget problems are attributable in large part to liability payments for actions against the Los Angeles Police Department. *Id.* Defendants should not be permitted to avoid sanctions because of a monetary crisis caused by their own wrongdoing.

PLAINTIFFS' EX PARTE APPLICATION FOR CONTEMPT; SANCTIONS

15

**D.    Reasonable Attorney's Fees**

"If the party bringing and prosecuting contempt proceedings prevails, that party may recover its costs and fees incurred in so doing." *Id.* (citing *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 958 (9th Cir. 2014)).The court has broad discretion to award Plaintiffs' attorney's fees as compensatory damages. *Harcourt Brace Jovanovich Legal & Pro. Publications, Inc. v. Multistate Legal Stud., Inc.*, 26 F.3d 948, 953 (9th Cir. 1994). If Defendants had followed the Court's preliminary injunction, Plaintiffs would have no reason to bring this motion to compel obedience. Therefore, Plaintiffs also request reasonable attorney's fees to compensate Plaintiffs for the time and expenses incurred by bringing this motion. *Hous. Rts. Ctr. v. Sterling*, No. CV 03-859 DSF, 2004 WL 3610228, at *3 (C.D. Cal. Dec. 29, 2004). Plaintiffs request the Court allow Plaintiffs to submit a request for fees following the Court's ruling on this motion, to account for the full amount of fees expended to bring this motion.

**V.    CONCLUSION**

Plaintiffs have provided clear and convincing evidence that the City has violated the Court's Temporary Restraining Order just weeks after it issued.  These brazen violations show they will continue to do so unless and until this Court takes further steps to enforce its order. Plaintiffs request the Court find the City in civil contempt and issue an Order to Show Cause re: Civil Contempt Sanctions. Plaintiffs also request appointment of a Special Master to perform an independent investigation of these events.

If the Court sets a hearing on Plaintiffs' Ex Parte Application, or sets a hearing on an Order to Show Cause, Plaintiffs request that Chief McDonnell be ordered to appear and testify as to what steps he took and now plans to take to ensure compliance with the Court's Order and clearly established law.  Finally, Plaintiffs request the Court issue attorney fees and coercive sanctions to prevent further violations and to remedy the harm caused by the City's violations.

Dated: August 12, 2025                    Respectfully submitted,

                                          Law Office of Carol A. Sobel
                                          First Amendment Coalition
                                          Law Office of Peter Bibring
                                          Schonbrun, Seplow, Harris, Hoffman & Zeldes

PLAINTIFFS' EX PARTE APPLICATION FOR CONTEMPT; SANCTIONS

16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Law Office of Susan Seager

        /s/  Carol A. Sobel    .

By: Carol A. Sobel
Attorneys for Plaintiffs

PLAINTIFFS' EX PARTE APPLICATION FOR CONTEMPT; SANCTIONS

17