HYDEE FELDSTEIN SOTO, City Attorney (SBN 106866)
DENISE C. MILLS, Chief Deputy City Attorney (SBN 191992)
KATHLEEN KENEALY, Chief Assistant City Attorney (SBN 212289)
CORY M. BRENTE, Senior Assistant City Attorney (SBN 115453)
GABRIEL S. DERMER, Assistant City Attorney (SBN 229424)
200 North Main Street, 6th Floor, City Hall East
Los Angeles, CA 90012
Phone No.: (213) 978-7558 / Fax No.: (213) 978-7011

Attorneys for Defendants CITY OF LOS ANGELES and JIM MCDONNELL

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES PRESS CLUB, STATUS COUP, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF LOS ANGELES, a municipal entity, JIM MCDONNELL, LAPD CHIEF, sued in his official capacity; <br><br> Defendants. | **CASE NO. 25-CV-05423 HDV-E** <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

I.    INTRODUCTION ...................................................................................................... 1

II.   RELEVANT BACKGROUND ................................................................................. 2

III.  LEGAL ARGUMENT ............................................................................................... 4

  A.   PLAINTIFFS' CLAIMS SHOULD NOT BE HEARD IN THIS COURT ........................ 4

    1.   The Lacking Supplemental Jurisdiction Over Plaintiffs' Claims ..................................... 4

      a.   Plaintiffs' media access claim is uniquely state law ................................................. 5

      b.   Plaintiffs' other state law claims ............................................................................ 6

    2.   *Pullman* Abstention .............................................................................................. 7

    3.   Plaintiffs Lack Standing ......................................................................................... 8

  B. PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF.................................... 10

    1.   Legal Standard ..................................................................................................... 10

    2.   Plaintiffs Are Unlikely To Succeed On The Merits ...................................................... 11

      a.   The City's Policies Preclude *Monell* Liability .................................................... 11

      b.   Plaintiffs Cannot Establish A Likelihood of Success ............................................... 12

      c.   Plaintiffs' Derivative Claims ............................................................................... 23

    3.   Plaintiffs Are Not Likely To Suffer Irreparable Harm ................................................. 23

    4.   The Balance Of Equities And Public Interest............................................................. 24

  C. PROPER SCOPE OF INJUNCTION ........................................................................ 24

IV.  CONCLUSION........................................................................................................ 25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

**Cases**

*Amer. Freedom Defense Initiative v. King Cnty.*, 796 F.3d 1165 (9th Cir. 2015) ...................... 23

*Animal Protection and Rescue League, Inc. v. Cnty. of Riverside*,

    111 Cal. App. 5th 914 (Cal. Ct. App. 2025) ........................................................ 23

*Arroyo v. Rosas*, 19 F.4th 1202 (9th Cir. 2021) ........................................................... 5

*Askew v. Hargrave*, 401 U.S. 476 (1971).................................................................. 7

*Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023) ...................................................... 10, 23

*Bay Area Rapid Transit Dist. v. Sup. Ct.*, 38 Cal. App. 4th 141 (Cal. Ct. App. 1995) ............... 23

*Capp v. Cnty. of San Diego*, 940 F.3d 1046 (9th Cir. 2019) ..................................... 13

*Cedar Shake & Shingle Bureau v. City of L.A.*, 997 F.2d 620 (9th Cir. 1993) ....................... 7

*Cheairs v. City of Seattle*, __ F.4th __, 2025 WL 2178577 (9th Cir. Aug. 1, 2025) ................. 14

*City of L.A. v. Lyons*, 461 U.S. 95 (1983) ............................................................... 8

*Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791 (9th Cir. 2001)................... 7, 8

*Courtney v. Goltz*, 736 F.3d 1152 (9th Cir. 2013)...................................................... 8

*Cuviello v. City of Vallejo*, 944 F.3d 816 (9th Cir. 2019) ........................................... 7

*Dang v. City of Garden Grove*, 2011 WL 3419609 (C.D. Cal. Aug. 2, 2011) ........................... 23

*FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ................................ 8, 9, 10

*Gibson v. U.S.*, 781 F.2d 1334 (9th Cir. 1986)........................................................ 11

*Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*, 546 U.S. 418 (2006)................. 13

*Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir. 2001) ............................................ 11

*Immigrant Defenders Law Center v. Noem*, 2025 WL 2080742 (9th Cir. July 18, 2025)............. 9

*Kowalski v. Tesmer*, 543 U.S. 125 (2004)............................................................. 9

*Leiserson v. City of San Diego*, 184 Cal. App. 3d 41 (Cal. Ct. App. 1986)........................... 12

*Lujan v. Defs. Of Wildlife*, 504 U.S. 555 (1992) ..................................................... 8

*Monell v. Dep't of Soc. Servs. Of City of N.Y.*, 436 U.S. 658 (1978)............................... 11

*Pell v. Procunier*, 417 U.S. 817 (1974)............................................................... 5

*Penigar v. Cnty. of San Bernardino*, 2012 WL 12878320 (C.D. Cal. Apr. 12, 2012)................ 12

*Rancho Palos Verdes Corp. v. City of Laguna Beach*, 547 F.2d 1092 (9th Cir. 1976) ................ 7

DEFENDANTS' OPPOSITION TO PLAINTIFFS' P.I. MOTION

*Rodriguez v. City of San Jose*, 930 F.3d 1123 (9th Cir. 2019)....................................................... 10

*Slidewaters LLC v. Wash. State Dep't of Labor & Indus.*, 4 F.4th 747 (9th Cir. 2021) ............... 7

*The Satanic Temple v. Labrador*, No. 24-1243, Slip Opn. at 15 (9th Cir. August 11, 2025) ........ 9

*Trevino v. Gates*, 99 F.3d 911 (9th Cir. 1996) ........................................................................... 11

*Trump v. CASA, Inc.*, 145 S.Ct. 2540, 2562-63 (2025) .............................................................. 24

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ..................................................... 10, 24

**Statutes**

28 U.S.C. § 1367 ........................................................................................................................... 5

Cal. Civ. Code § 52.1 ................................................................................................................... 23

Cal. Penal Code § 409.7 ...................................................................................................... 1, 4, 12

Cal. Penal Code § 13652 ............................................................................................................. 12

DEFENDANTS' OPPOSITION TO PLAINTIFFS' P.I. MOTION

1

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

**I.**    <u>**INTRODUCTION**</u>

3
4
5
6
7

"Jen and Chief – Just want to say a thank you to your teams last night in the height of the mess treating us fairly and professionally as things were unfolding. Same all week. I know we can be a pain in the booty to your field teams but they have been fair. And once things calmed down they were all smiles. Anyway thank you for keeping us safe and not hitting us with less lethal. Happy Father's Day to the fathers out there."

8
9
10
11
12

ABC News Correspondent Alex Stone's kind message on June 15, 2025 to Chief McDonnell and LAPD Public Information Director Jennifer Forkish reflects LAPD's goal to partner with news media and shows that LAPD takes care to ensure journalists can perform their important and necessary newsgathering roles and does not, contrary to Plaintiffs' contention, target or retaliate against journalists.

13
14
15
16
17
18
19
20
21
22
23
24
25

This is not the sole evidence demonstrating this reality. Defendants submit policies, officer body-worn video, and other evidence that either directly refute Plaintiffs' evidence or provides necessary perspective and context.  Here are two examples: Michael Nigro contends he was shot at by law enforcement (he doesn't specify which agency), because he was standing on a bridge and heard three pings on a pole next to his head. That bridge has no pole, however. Plaintiffs also rely on video of Australian reporter Lauren Tomasi being hit by an LLM munition, concluding based on that video that LAPD was targeting journalists. But officer body-worn video shows the officer was targeting people near Ms. Tomasi who were throwing bottles at officers. And if there was any ambiguity, the officer was narrating that he was targeting the bottle-throwers—making no mention of Ms. Tomasi as she was embedded in a crowd of protestors.  That Ms. Tomasi was struck is unfortunate and regrettable, but there was clearly no intent to hit her.  Plaintiffs are wrong in contending that journalists were away from protesters who were attacking officers, and wrong that LAPD targeted journalists.

26
27
28

Despite the prominence of this evidence, the heart of Plaintiffs' case is their claim that LAPD improperly restricted media access to certain areas, in violation of Cal. Penal Code § 409.7. The evidence refutes this contention as well, as LAPD routinely granted media members

1

access to areas closed to the general public. What is also clear are the ambiguities regarding what Section 409.7 requires: Must law enforcement allow "duly authorized representatives" of news organizations to flow like water in and out of police lines?  How closely in front or behind of a police line is the press (and their crews) allowed to stand while newsgathering?  Must law enforcement accommodate a duly authorized representative's desire to get the perfect shot—even if that interferes with law enforcement operations or presents a safety risk? Who is a "duly authorized representative"? A reporter *and* their security team?  And who decides?

Before answering any of these substantive questions, there are threshold questions of what claims the Court can hear and what claims the Court should hear. As discussed below, Plaintiffs have not demonstrated supplemental jurisdiction over their state law claims, but even if they could, they lack standing to bring their claims and to seek a preliminary injunction. And even if Plaintiffs make these showings, *Pullman* abstention applies because the substantial issues of ambiguous California law that Plaintiffs raise should be decided in the first instance by a California court.

Plaintiffs are not entitled to the "extraordinary remedy" of a preliminary injunction. Not only have they failed to demonstrate a likelihood of success on the merits of their claims, but they also have not demonstrated the necessity of injunctive relief at this preliminary stage rather than after trial following full discovery to present the full picture of what happens at events like those of June 8-16.

## II.    RELEVANT BACKGROUND

The civil unrest from June 8-16, 2025 was far more violent, confrontational, and strategic than the civil unrest that followed George Floyd's murder in the summer of 2020. In contrast with those protests, when activists assaulted officers and then retreated, in June activists stood their ground and were prepared to violently confront law enforcement. Activists also infiltrated LAPD radio communications and moved protest groups based on what they heard. Activists distributed shields, helmets, gas masks, and other gear in an attempt to undermine LAPD's crowd control tactics. In fact, some activists formed logistical hubs to efficiently distribute those supplies to protestors.  Activists also moved and separated protest

groups in a deliberate effort to stretch thin LAPD resources and undermine law enforcement's effectiveness in controlling the crowd and preventing property destruction. On several occasions law enforcement observed activists preparing to break into government buildings and unload wrenches and other tools. (Declaration of Ryan Whiteman ["Whiteman Decl."], ¶ 4.)

What may have started as protests against federal immigration actions devolved into wanton criminal activity against LAPD officers on the afternoon of Sunday, June 8, 2025. (*Id.*, ¶ 5.) Around 3:30 p.m., protestors hurled materials from a nearby construction site at officers. (*Id.,* ¶ 6.)  Around 3:47 p.m., two motorcyclists drove into a skirmish line, injuring two LAPD officers. Emergency Medical Technicians treated the officers at the scene but had trouble transporting them because of the massive crowd. Around 5:00 p.m., activists threw Molotov cocktails and commercial grade fireworks at officers near the Roybal Federal Building. Around 5:15 p.m., activists torched two Waymo self-driving cars near the intersection of Los Angeles Street and Arcadia Street. LAPD learned that activists would summon a Waymo to their location in order to destroy it. Around 5:30 p.m., law enforcement saw activists attempt to scale the fence surrounding the Metropolitan Detention Center. Given the growing crowd and chaos, around 6:30 p.m., public transportation had to bypass the area. Around 7:10 p.m., on Spring Street north of Temple Street, activists created a barricade using the pink metal infrastructure from Grand Park and motorcyclists pulled up to it. A few minutes later, the crowd behind the barricade began to fling commercial grade fireworks and pieces of concrete curb at officers. LAPD used tear gas to bring the dangerous situation under control and then officers disassembled the barricade. (*Id.*, ¶ 6, Exs. D - G.)  About an hour and a half later, protestors created a barricade across Main Street using wrought iron fencing and when officers attempted to disassemble and surmount the barricade, an incendiary device exploded in an officer's face. (*Id.*, ¶ 7, Ex. H.)

On Monday, June 9, 2025 at around 9:00 p.m., officers reported protestors throwing projectiles at them. Around 10:00 p.m., an officer was struck with a projectile requiring a rescue ambulance. Protestors also set several fires. Around 11:45 p.m., protestors set a vehicle on fire; homemade spike strips prevented the LAFD from responding to the scene.  (*Id.*, ¶ 8.)

On Tuesday, June 10, at around 1:28 p.m., at the intersection of Alameda Street and Temple Street, protestors blocked traffic lanes, so that opposing traffic would travel in the wrong lanes, risking a head-on collision. The crowd ignored officers' orders to get on the sidewalk and disperse. Throughout the afternoon, officers reported that protestors were hurling projectiles at them. (*Id*.)

On Wednesday, June 11, at around 6:00 p.m. at the Hill and Third Street intersection, the crowd swelled to 800-900 people and officers reported protestors hurling commercial grade fireworks at them. Throughout the evening and night, officers continued to report projectiles, including mortars, being hurled at them. Officers arrested two individuals for assault with a deadly weapon. (*Id*.) On Thursday, June 12, at around 6:46 p.m., a crowd arrived at the intersection of Alameda Street and Aliso Street with shields. At around 7:42 p.m., at First Street and Broadway, officers reported that protestors were throwing rocks and bottles at them. (*Id*.)

On Friday, June 13, a Waymo executive informed LAPD it was suspending its operation in the area given the vandalism to its fleet. At around 3:30 p.m., officers found a bag of rocks near Motor Transport Division, the facility where LAPD stores its fleet of vehicles. LAPD was concerned that activists placed this bag of rocks at this location to use later against officers and property. (*Id*.) On Saturday, June 14, No Kings Day, the crowd swelled to almost 30,000 at City Hall in the early afternoon. At around 3:00 p.m., protestors attempted to evade officers positioned around the building and breach the building. Officers attempted to divert the crowd away from the federal building. At around 3:45 p.m. and throughout the afternoon, officers reported that protestors threw projectiles at them, including from high ground. (*Id*., ¶ 9.)

On Sunday, June 15, and on Monday, June 16, the protests grew smaller, and slowly calm and normalcy returned to the area. (*Id*.) LAPD was on tactical alert because of protest activity in the downtown Los Angeles area from June 9 to 16, 2025. (*Id*., ¶ 7.)

## III.    LEGAL ARGUMENT

### A.  PLAINTIFFS' CLAIMS SHOULD NOT BE HEARD IN THIS COURT

#### 1.  The Lacking Supplemental Jurisdiction Over Plaintiffs' Claims

Plaintiffs are not entitled to a preliminary injunction based on their state law claims

DEFENDANTS' OPPOSITION TO PLAINTIFFS' P.I. MOTION

because there is no supplemental jurisdiction over their claims arising out of Cal. Penal Code §
409.7 challenging media access and because the Court should decline to exercise supplemental
jurisdiction over Plaintiffs' remaining state law claims. While the scope of these latter claims
has some overlap with Plaintiffs' federal law claim (violation of the First Amendment), the
claims predominantly rely on state laws different in scope from federal law, and which require
novel interpretations of state law. Plaintiffs are transparent about this, noting that "[b]oth
statutes codify explicit protections for journalists that stand independent from federal law." Mot.
at 15, ECF No. 56 at 20.

District courts "have supplemental jurisdiction over all other claims that are so related to
claims in the action within such original jurisdiction that they form part of the same case or
controversy under Article III of the United States Constitution." 28 U.S.C. § 1367. Claims form
part of the same case or controversy when they both "derive from a common nucleus of
operative fact and are such that a plaintiff would ordinarily be expected to try them in one
judicial proceeding." *Arroyo v. Rosas*, 19 F.4th 1202, 1209 (9th Cir. 2021). Even if claims meet
this standard, two circumstances where a district court may decline supplemental jurisdiction are
(1) the claim raises a novel or complex issue of State law and (2) the claim substantially
predominates over the claim or claims over which the district court has original jurisdiction. *Id*.

### a. Plaintiffs' media access claim is uniquely state law

Plaintiffs' claim under Cal. Penal Code § 409.7 largely shares no common nucleus of
operative facts with the First Amendment claim. This is because Section 409.7 permits certain
journalists to enter areas closed to the public, a right not conferred by the First Amendment: The
First Amendment, "does not guarantee the press a constitutional right of special access to
information not available to the public generally"; nor does it confer a "right of access to the
scenes of crime or disaster when the general public is excluded." *Pell v. Procunier*, 417 U.S.
817, 833-34 (1974). Plaintiffs' Motion relies substantially on contentions that journalists were
precluded from accessing areas closed to the public. *See* Mot. at 6-8. Therefore, there is no basis
for supplemental jurisdiction over Plaintiffs' challenge to journalist access to areas closed to the
public.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' P.I. MOTION

### b. Plaintiffs' other state law claims

Plaintiffs' other state law claims rely on facts that could also support a claim for a First Amendment violation, but the Court should exercise its discretion to deny supplemental jurisdiction because these claims largely require novel interpretation of state law and they predominate over Plaintiffs' First Amendment claim. Plaintiffs' state law claims largely arise out of two California Penal Code sections that have only been in effect since 2022, Sections 409.7 and 13652. According to Westlaw, no California Court of Appeal has interpreted either section, and, in fact, this Court was the first court to ever reference Section 409.7. Plaintiffs' claims will likely require this Court to be the first to interpret certain aspects of Section 409.7, such as, what constitutes a "duly authorized representative" and who decides who is a "duly authorized representative"? Such a determination seems ripe for challenges of viewpoint discrimination; in fact, Governor Newsom vetoed SB 629, a prior version of Section 409.7, in part out of concerns of granting access to undesirable viewpoints. Veto Message from Gov. Gavin Newsom (Sept. 30, 2020), *available at* https://www.gov.ca.gov/wp-content/uploads/2020/09/SB-629.pdf ("This could include those individuals who may pose a security risk - such as white nationalists, extreme anarchists or other fringe groups with on online presence.").

Further, are the rights conferred by Section 409.7 absolute? Are there limits on the movement of a duly authorized representative? Or does Section 409.7 require law enforcement to allow duly authorized representatives to move freely in and out of police lines, no matter how it impacts officer safety or official law enforcement duties? Does Section 409.7 require also allowing a security detail behind a police line? These are all questions that a California court should answer in the first instance. Finally, Section 13652 utilizes various ambiguous restrictions such as "if appropriate," "in a manner that is proportional to the threat," "shall minimize the possible incidental impact," and "when it is reasonable and safe to do so."

As to the latter point, that Plaintiffs' state law claims predominate is apparent from Plaintiffs' Motion, which spends about 3 pages on the merits of the federal law claims and about 10 pages on the merits of the state law claims. *See* Mot. at 11-14. Tellingly, Plaintiffs ask the

Court to rely on California law, instead of federal law, to issue an injunction, and, as Plaintiffs suggest, their claims could be entirely resolved by California law because California's speech protections are broader than the First Amendment's. *Cuviello v. City of Vallejo*, 944 F.3d 816, 826 (9th Cir. 2019) ("As we have recognized, the California Constitution's protection of free speech can be broader in some respects than the protection provided by the First Amendment.").

### 2. *Pullman* Abstention

This Court should dismiss Plaintiffs' state law claims and abstain from hearing the federal claim due to *Pullman* abstention. "Under *Pullman* abstention the 'federal courts have the power to refrain from hearing cases . . . in which the resolution of a federal constitutional question might be obviated if the state courts were given the opportunity to interpret ambiguous state law.'" *Slidewaters LLC v. Wash. State Dep't of Labor & Indus.*, 4 F.4th 747, 761 (9th Cir. 2021); *see also Cedar Shake & Shingle Bureau v. City of L.A.*, 997 F.2d 620, 622 (9th Cir. 1993) ("A district court abstaining under *Pullman* must dismiss the state law claim and stay its proceedings on the constitutional question until a state court has resolved the state issue."). Courts utilize three criteria for determining the application of the *Pullman* doctrine: "First, the case must touch on a sensitive area of social policy upon which federal courts ought not to enter unless no alternative to its adjudication is open. Second, it must be plain that the constitutional adjudication can be avoided if a definite ruling on the state issue would terminate the controversy. Finally, the possible determinative issue of state law must be uncertain." *Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 802 (9th Cir. 2001).

All three criteria for abstention are met here. First, the issues of media access during protests and law enforcement use of kinetic energy projectiles and chemical agents are sensitive areas of social policy which go to the heart of California's police power. *See Rancho Palos Verdes Corp. v. City of Laguna Beach*, 547 F.2d 1092, 1095 (9th Cir. 1976) ("Federal courts must be wary of intervention that will stifle innovative state efforts to find solutions to complex social problems."). Second, Plaintiffs concede that the federal constitutional question may be obviated by interpretating California law, as they invite this Court to rule on Plaintiffs' state law claims in the first instance without even considering the federal law issues. Mot. at 14-15; *see*

DEFENDANTS' OPPOSITION TO PLAINTIFFS' P.I. MOTION

*also Askew v. Hargrave*, 401 U.S. 476, 478 (1971) (per curium) (abstention appropriate where state law claims, if sustained, will obviate the necessity of determining federal constitutional question). Third, as noted above, the issues of state laws are uncertain. *Courtney v. Goltz*, 736 F.3d 1152, 1163-64 (9th Cir. 2013) ("An issue of state law is 'uncertain' if 'a federal court cannot predict with any confidence how the state's highest court would decide an issue of state law.'"); *see Columbia Basin Apartment Ass'n*, 268 F.3d at 806 (issue of state law uncertain where no state court ruling).

### 3. Plaintiffs Lack Standing

Both Plaintiffs lack Article III standing to seek a preliminary injunction. First, for much of the alleged harm Plaintiffs contend they suffered, the relief they seek in this lawsuit will not redress that harm. Second, other harm alleged, such as Status Coup contending that its business model is at risk, is too speculative to confer standing.

To establish Article III standing, a plaintiff must demonstrate that: (1) it suffered an injury in fact that is concrete, particularized, and actual or imminent (not conjectural or hypothetical); (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560-61 (1992). "And when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 381 (2024) ("*Hippocratic Medicine*"). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief…if unaccompanied by any continuing, present adverse effects." *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983).

**Press Club.** Press Club alleges the following injuries: (1) it "has been required to divert resources, money and staff time that it would otherwise have been able to devote to its pre-existing mission of improving the quality of journalism," Compl. at 6, ¶ 15; (2) its "members have also suffered excessive force and harassment by LAPD officers in the recent ICE protests and, as these protests continue, to be threatened with such injuries and violations of the law challenged by this action," Compl. at 6, ¶ 15; and (3) its staff had to divert time and resources

away from normal tasks, including a June 22, 2025 event, to respond to the alleged violations,
Rose Decl., ¶ 20, ECF No. 19.

As to Press Club's contentions that it had to divert resources to respond to the alleged
wrongful conduct, the Supreme Court has confirmed that is inadequate to confer standing: "The
medical associations respond that . . . standing exists when an organization diverts its resources
in response to a defendant's actions. . . . That is incorrect." *Hippocratic Medicine*, 602 U.S. at
395. Rather, a plaintiff must show that the alleged wrongful conduct "directly affected and
interfered" with its "core business activities." *Id.* Press Club has made no such showing here.
Nor could it, as, responding to alleged press rights violations by law enforcement is one of its
core purposes. *See The Satanic Temple v. Labrador*, No. 24-1243, Slip Opn. at 15 (9th Cir.
August 11, 2025) ("To the extent that TST's pre-existing core mission is to promote abortion,
the Idaho statutes at issue do not curtail TST's ability to support its members' beliefs or provide
information or advocacy on abortion."). Press Club alleges its mission is "to support, promote
and defend quality journalism." Compl. at 6, ¶ 15; *see also* Tips for Safely Covering Protests,
LOS ANGELES PRESS CLUB (Feb. 7, 2022), *available at* https://lapressclub.org/tips-for-safely-
covering-protests-updated-2022/. Further, Press Club's representative, Adam Rose, is press
rights chair. Rose Decl., ¶¶ 7-9. This is not like *Immigrant Defenders Law Center v. Noem*
("*ImmDef*"), where the plaintiff had to hire additional staff, expand its office space, conduct
additional fundraising efforts, and increase travel to Mexico. 2025 WL 2080742, at *9 (9th Cir.
July 18, 2025). Unlike in *ImmDef*, the only specific project that Press Club references it had to
take resources away from was planning a party on June 22, 2025.

But even if Press Club's party was considered a "core business activity," Press Club
would still lack standing because the injunction sought could not redress that injury as the event
already occurred. Similarly, the only other remaining injury Press Club alleges is uses of force
and harassment against third-party journalists, but Press Club has not demonstrated third-party
standing. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (requiring showing of a "close"
relationship with person who possesses allegedly violated right and a "hindrance" in the
possessor's ability to protect her own interests).

DEFENDANTS' OPPOSITION TO PLAINTIFFS' P.I. MOTION

1    **Status Coup.** Status Coup alleges the following injuries, "Status Coup reporters were

2    subjected to force, including being struck by various Kinetic Impact Projectiles ('KIPs') as they

3    attempted to film the LAPD officers' response to the protests. In addition, Status Coup reporters

4    were barred by the LAPD from areas of the protests where, by law, they should have been

5    permitted access." Compl. at 6, ¶ 15. Further, Status Coup contends that limitations on

6    journalists' access will hurt its business model and that instead of focusing on journalism it has

7    been "forced to dedicate precious time towards a lawsuit." Jordan Chariton Decl. at 2-3, ¶¶ 7-8,

8    ECF No. 25.

9    As with Press Club, Status Coup's allegations of improper uses of force against its

10   reporters would not be redressed by an injunction, and, like with Press Club, Status Coup's

11   contention that its reporters were not granted access to situations fails to establish a "real and

12   immediate threat of repeated injury." In regard to Press Club's contention that limitations on its

13   access hurts its business model, such an alleged injury is much too attenuated to confer standing.

14   *See Hippocratic Medicine*, 602 U.S at 383 ("The causation requirement also rules out attenuated

15   links—that is, where the government action is so far removed from its distant (even if

16   predictable) ripple effects that the plaintiffs cannot establish Article III standing."). Finally, that

17   Status Coup expended resources to bring a lawsuit cannot confer standing. *Rodriguez v. City of*

18   *San Jose*, 930 F.3d 1123, 1134 (9th Cir. 2019) (cannot manufacture the injury by incurring

19   litigation costs).

20   **B.  PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF**

21   **1.  Legal Standard**

22   "[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear

23   showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555

24   U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must establish that they are likely

25   to succeed on the merits, that they are likely to suffer irreparable harm in the absence of

26   preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the

27   public interest. *Id*. at 22. A court need not consider the other factors if a movant fails to show a

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' P.I. MOTION

likelihood of success on the merits. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). When the nonmovant is the government, the last two *Winter* factors merge. *Id*.

### 2. Plaintiffs Are Unlikely To Succeed On The Merits

Plaintiffs are unable to demonstrate a likelihood of success on the merits because the evidence demonstrates that the City took its obligations seriously and enacted policies and trainings to reasonably ensure that journalists' rights would not be violated, precluding *Monell* liability. Further, the City's evidence, largely consisting of officer body-worn video ("BWV"), either directly refutes or provides necessary context to Plaintiffs' videos, and demonstrates LAPD did not intentionally retaliate against any journalists, routinely granted journalists access to closed off areas, and properly utilized LLMs or KIPs—even if unintended and unfortunate results sometimes occurred.

### a. The City's Policies Preclude *Monell* Liability

In order to prevail on their Section 1983 claims, Plaintiffs must establish that the alleged constitutional injuries were the "implement[ation] or execut[ion] [of] a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. Of City of N.Y.*, 436 U.S. 658, 690 (1978). A plaintiff makes this showing by (1) proving that a public entity's employee committed the alleged constitutional violation pursuant to a formal policy or a longstanding practice or custom, which constitutes the standard operating procedure of the government entity; (2) establishing that the individual who committed the constitutional tort was an official with "final policy-making authority" and that the challenged action itself thus constituted an act of official government policy; or (3) proving that an official with final policy-making authority ratified an unconstitutional decision or action. *Hopper v. City of Pasco*, 241 F.3d 1067, 1083 (9th Cir. 2001).

Plaintiffs fail to show that any action by Defendants was the moving force behind the alleged First Amendment retaliation. Rather, their evidence requires the speculative and unsupported assumption that, because these injuries happened, there must have been some policy causing it. This is inadequate to justify issuance of a preliminary injunction. *See Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996) ("When one must resort to inference, conjecture and

speculation to explain events, the challenged practice is not of sufficient duration, frequency and consistency to constitute an actionable policy or custom."); *Gibson v. U.S.*, 781 F.2d 1334, 1337-38 (9th Cir. 1986) (protestors' First Amendment retaliation claim dismissed due to failure to attribute the alleged tortious acts to an established city policy or procedure); *Penigar v. Cnty. of San Bernardino*, Case No. CV 11-6805, 2012 WL 12878320, at *4 (C.D. Cal. Apr. 12, 2012) ("Plaintiff presents no evidence of an employee acting pursuant to an expressly adopted official policy, of an employee acting pursuant to a longstanding practice or custom, or of an employee acting as a final policy maker. . . . [S]peculation is insufficient to support Plaintiffs' *Monell* claim.").

Further precluding Plaintiffs from demonstrating *Monell* liability are LAPD's various policies regarding the issues in this lawsuit. (Whiteman Decl., ¶¶ 3, 11.) Plaintiffs in fact acknowledge these policies. Mot. at 30.

### b.  Plaintiffs Cannot Establish A Likelihood of Success

As the Court will see below, Defendants largely discuss the evidence declarant-by-declarant, rather than claim-by-claim. Accordingly, Defendants first set forth the legal standards for each claim, and then discuss the evidence by individual.

**Cal. Penal Code § 409.7.** Plaintiffs cannot demonstrate a likelihood of success on their lack of access claim in violation of Cal. Penal Code § 409.7. The evidence demonstrates that members of the news media were routinely granted access to closed off areas and, when access was restricted, it was out of necessity due to law enforcement operations and public safety concerns. While there is no authority confirming such a justification for restricting access, a decision interpreting the similar Cal. Penal Code § 409.5 recognizes such a justification. *Leiserson v. City of San Diego*, 184 Cal. App. 3d 41, 51 (Cal. Ct. App. 1986) ("Accordingly, press representatives must be given unrestricted access to disaster sites unless police personnel at the scene reasonably determine that such unrestricted access *will interfere* with emergency operations.").

**Cal. Penal Code § 13652.** Plaintiffs cannot establish a likelihood of success on their claim that the Department violated Cal. Penal Code § 13652. Section 13652 sets forth various

restrictions on use of kinetic energy projectiles and chemical agents: they may only be used by a peace officer who has received "training on their proper use by the Commission on Peace Officer Standards and Training for crowd control if the use is objectively reasonable to defend against a threat to life or serious bodily injury to any individual, including any peace officer, or to bring an objectively dangerous and unlawful situation safely and effectively under control" and in accordance with 11 different requirements. The evidence discussed below refutes Plaintiffs' contention that the Department was either aiming at journalists or deploying kinetic energy projectiles or chemical agents in an objectively unreasonable manner, precluding a finding that Plaintiffs have established a likelihood of success. Plaintiffs' argument here suffers from the same flaw as its arguments as to other claims: it assumes that because someone who should not have been hit in a place where that person should not have been hit was targeted intentionally, and Plaintiffs' argument ignores the circumstances surrounding the deployment of the less-lethal munitions. By ignoring these key elements, Plaintiffs are necessarily unable to establish a likelihood of success. *See Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*, 546 U.S. 418, 429 (2006) ("[B]urdens at the preliminary injunction stage track the burdens at trial.").

**First Amendment Retaliation.** Plaintiffs' sole federal claim is for First Amendment retaliation. Plaintiffs fail to establish a likelihood of success on this claim because they cannot establish that any protected activity was a substantial or motivating factor causing the alleged wrongful conduct. In addition to the policies discussed above, Plaintiffs' ability to establish this element is further refuted by the myriad evidence demonstrating a lack of retaliatory animus toward members of the news media.

To establish a First Amendment retaliation claim, a plaintiff must establish that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct. *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019). Ultimately, a plaintiff must establish a causal connection between the defendant's retaliatory animus and the plaintiff's subsequent

1  injury. *Id.* "Specifically, a plaintiff must show that the defendant's retaliatory animus was a but-

2  for cause, meaning that the adverse action against the plaintiff would not have been taken absent

3  the retaliatory motive." *Id.* (internal quotation marks omitted); *see also id.* at 1055 ("[A]n

4  allegation is not plausible where there is an 'obvious alternative explanation' for alleged

5  misconduct.").

6        Here, Plaintiffs' Motion fails to establish a likelihood of success of demonstrating that

7  any injuries were caused by retaliatory animus. Plaintiffs' argument regarding alleged retaliatory

8  animus is limited to the following conclusory statement unsupported by any evidentiary citation:

9  "Defendants repeatedly and deliberately targeted Plaintiffs with 40mm munitions, striking them

10  in the head, face, and upper body, all prohibited target areas because of the increased likelihood

11  of serious physical harm from striking vital organs and the brain." Mot. at 14. With no evidence

12  establishing retaliatory animus, Plaintiffs cannot be entitled to a preliminary injunction based on

13  their First Amendment retaliation claim. *See Cheairs v. City of Seattle*, __ F.4th __, 2025 WL

14  2178577, at *10-11 (9th Cir. Aug. 1, 2025) (that person standing near protestors filming was

15  subjected to force does not alone establish First Amendment retaliation).

16        Notwithstanding Plaintiffs' failure to meet their burden, the evidence discussed below

17  demonstrates a lack of discriminatory animus toward members of the news media.

18        In addition to the evidence discussed below, additional evidence precludes Plaintiffs from

19  demonstrating a likelihood of success on their claims:

20        •  Commentary from media that, during the subject protests, LAPD treated them

21  "fairly and professionally" and "have been good to just try to get us media out of the way

22  safely." (Declaration of Jennifer Forkish ["Forkish Decl."], ¶¶ 4-5, Exs. B, C.);

23        •  LAPD prepared and distributes a media relations guide to provide Department

24  personnel with policies, procedures, best practices, and relevant laws to be aware of when

25  interacting with media. The guide includes references to Cal. Penal Code § 409.7 and the *Crespo*

26  settlement. (Forkish Decl., Ex. A.);

27        •  Officers responding to the protests were specifically reminded of the Department's

28  use of force policies, crowd control policies, the *Crespo* settlement, and Cal. Penal Code §

1    409.7. (Declaration of Lt. Jasmin Gomez ["Gomez Decl."], ¶ 26.)

2        **The Evidence Countering Plaintiffs' Claims**[1]

3        Plaintiffs filed numerous declarations in support of their Motion. Defendants' evidence

4    directly refutes Plaintiffs' contentions or provides necessary context, precluding Plaintiffs from

5    demonstrating a likelihood of success:

6        **Michael Nigro.** Nigro identifies two incidents on June 9 in his declaration, one at 5:43

7    p.m. and one at around 7:28 p.m. With the first incident, Nigro can be disbelieved because he

8    contends he was targeted due to munitions hitting a pole next to his head three times, but the

9    place where he testifies he was standing has no poles. (Whiteman Decl., ¶ 15(b).) Further, Nigro

10   acknowledges there were law enforcement agencies other than LAPD in the area; he does not

11   contend any munitions were deployed by LAPD, and BWV demonstrates that LAPD officers in

12   the area were not targeting him. (*Id.*) With the second incident, Nigro contends a white streak on

13   his helmet reflects when he was struck at 7:28 p.m., but other footage shows the white streak on

14   his helmet at 6 p.m. (and it is not clear that the white streak is residue from a munition).

15   Regardless, BWV reflects that Mr. Nigro was embedded with protestors who were surrounding

16   officers, leading to the deployment of a 37mm skip round munition. Nigro may have been struck

17   by this munition, but he was not the target. (*Id.*)

18       **Adam Rose.** Rose submits a declaration attesting to various incidents based on video

19   clips and photos he allegedly reviewed; Defendants address those here:

20       **Lauren Tomasi**: BWV demonstrates the officer who fired the 37 mm did not intend to

21   strike Tomasi; instead, he was targeting a group of individuals near Tomasi who were throwing

22   projectiles at the officers on the skirmish line. Specifically, at 17:09:19, the officer is scanning

23   the crowd for threats. A second later, at 17:09:20, Tomasi is seen in the lower left-hand corner

24   of the video wearing jeans and a green jacket with her back to the skirmish line. At 17:09:38 the

---

[1] Due to the limited resources and time to prepare this Opposition, Defendants have not been able to marshal and review evidence for every incident identified by Plaintiffs, but the evidence below responds to nearly all of the incidents identified by Plaintiffs. BWV timestamps reflect the time on the video. In addition, page limitations prevent a full discussion of every incident raised.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' P.I. MOTION

1   officer fires a 37 mm round and then explains to his colleagues on the skirmish line that he did

2   so because a "group right there with the flags" were "throwing" things at the officers. The group

3   with the flags is seen at 17:09:44 in the lower left-hand corner. No officer intentionally shot

4   Tomasi. (Whiteman Decl., ¶ 15(a).)

5      **Erin Burnett**: BWV reflects Burnett was standing in the way of an advancing skirmish

6   line; an LAPD supervisor instructed Burnett to move out of the way, but she did not, requiring

7   an officer to push Burnett forward. Burnett then stopped in front of the skirmish line, once again

8   preventing it from moving forward, so officers pushed Burnett forward again. This was a

9   reasonable amount of force necessary to simply move Burnett from blocking the skirmish line as

10  she was not responding to instruction. Burnett likely would not have been entitled to stand

11  where she was except for being a journalist, but she was moved because she was impeding the

12  skirmish line, and not because she is a journalist. (Whiteman Decl., ¶ 15(c).)

13     **Jason Carroll**: Neither Carroll nor his crew were arrested or cited; instead, officers

14  escorted Carroll and his crew out of an inner perimeter during a mass arrest, which is an active

15  crime scene.  At 8:34 p.m., officers advised the crowd of protestors that they were being arrested

16  after refusing to disperse following an order to disperse.  As BWV reflects, officers then told

17  Carroll that he and his crew were going to be escorted out of the perimeter.  An officer

18  specifically told Carroll that he was not being arrested because he was press, but that Carroll and

19  his crew were going to be escorted out one-by-one, which is what happened. (Whiteman Decl., ¶

20  15(d).)

21     **Kyung Lah**: BWV reflects officers permitting Lah and her cameraman to get behind a

22  skirmish line, but not her two security guards who were unable to produce press credentials.

23  Neither Lah nor her crew were wearing clothing that made it obvious they were members of the

24  press. (Whiteman Decl., ¶ 15(e).)

25     **Matt Gutman**: Rose identified two incidents involving Gutman. For the first, Gutman

26  was standing in the way of a skirmish line; when he refused to get out of the way of the skirmish

27  line, an officer pushed him out of the way. In the second, Gutman put his hand on the back of an

28  officer in a skirmish line and officers told Gutman not to touch the officer and to stand back.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' P.I. MOTION

The officers were wearing gas masks, which make it difficult to clearly communicate. As with Burnett, Gutman likely would not have been standing where he was except for being a journalist, but he was moved because he was interfering with official law enforcement duties, and not because he is a journalist. (Whiteman Decl., ¶ 15(f).)

**Associated Press Videographer:** In Paragraph 35, Rose testifies that an Officer "lines up a shot at the videographer" and there is "no evident threat or justification for the officer to fire." BWV reflects that officers were responding to at least two individuals throwing items, including rocks, and they specifically asked media members to get out of the way. (Gomez Decl., Ex. Z [14:32:30-14:35:10] ("Black over black threw a rock … you all [Press] gotta get outta my way … black over black has a fuck'n rock.  Threw it … watch out watch out watch out . . . Brown jersey is throwing shit . . .").)

**David Healy:** In Paragraph 55, Rose discusses a photographer being charged by an officer on a horse. BWV reflects that Healy was not wearing a press credential or anything else that would give him the appearance of being a member of the news media. The camera he was holding was not dissimilar to cameras being held by a number of other protestors in the same area. As the mounted unit line advanced to clear the area, Healy did not move out of the area and was knocked over by a horse that veered to the left, possibly after another protestor grabbed one of the reins. (Gomez Decl., Ex. AA [16:02:05-16:05:35] and Ex. BB [16:05:00-16:05:30].)

**Jeremy Cuenca:** In Paragraph 27, Rose discusses Cuenca being hit with LLMs. BWV does not reveal the specific moment Cuenca was hit. But at the approximate time and location where Cuenca was hit, people in the crowd were charging and attacking officers, throwing rocks and bottles at officers, and a motorcyclist rammed into several officers. Cuenca was likely hit because he was embedded with the crowd. Other video from around that time and location reflect officers repeatedly allowing press to pass through the police line after showing credentials. (Gomez Decl., Ex. CC [15:31:17-15:32:00, 15:39:10-15:39:20, 15:46:50-15:47:20 (motorcycle)]; Ex. DD [14:25:30-14:27:05, 14:46:15-14:48:15, 14:54:45-14:58:55] ("They're press. They're good.").)

**Kayjel Mairena:** In Paragraph 58, Rose states that Mairena was tear-gassed while

standing with other press. BWV shows he was likely subjected to tear gas from a cannister

thrown by a protestor. (Gomez Decl., Ex. EE [16:00:30-16:01:00, 16:04:45-16:09:30, 16:16:00-

16:16:30]; Ex. FF [16:09:15-16:10:10, 16:12:00-16:17:45].)

**Livia Albeck-Ripka:** In Paragraph 28, Rose claims that N.Y. Times reporter Ripka was

hit by a LLM round. Based on contemporaneous BWV of the area, officers were not targeting

reports, but protesters throwing bottles and rocks at the police line from across a wide

intersection. (Gomez Decl., Ex. PP [23:51:40-23:52:15; 23:52:27-23:52:50; and 23:52:57-

23:55:16]; and Ex. QQ [23:53:00-23:53:15; and 23:54:00-23:54:1.].)

**Sergio Olmos:**  In Paragraph 32, Rose claims that Olmos was hit in the chest with an

LLM. Plaintiffs claim Olmos was hit was around 1539 hours, *i.e.*, the same time protesters were

throwing projectiles at the officers. Several officers responded to the protesters' violence by

deploying LLMs. Contrary to Plaintiffs' claims, even their own exhibit demonstrates that no

officer specifically targeted Olmos or any member of the press. (Gomez Decl., Ex. TT

[15:38:30-15:39:45 and 15:39:40-15:40:15]; Ex. UU [15:39:06-15:39:55]; Ex. VV [15:22:40-

15:22:52; 15:24:45-15:25:06; and 15:39:01-15:39:30].)

**Romi De Frias:**  In Paragraph 50, Rose claims that a Univision reporter was "run into"

by a mounted unit. But contemporaneous BWV shows officers moving the crowd southward on

the west sidewalk of Spring Street toward Grand Park, when an unruly protester picked up a

heavy traffic cone while adjacent to Frias. At worst, a horse nudged Frias while its officer is

focused on the protester carrying the traffic cone. (Gomez Decl., Ex. RR [18:34:40-18:35:00;

18:35:15-18:35:35; and 18:36:00-18:36:15] and Ex. SS [18:34:30-18:36:18].)

**<u>Anthony Orendorff.</u>** Plaintiffs fail to mention that Orendorff, who had no press

credentials, was arrested after attacking an officer, resisting arrest, and attempting to flee.

(Declaration of Sergio Moreno, Ex. A [10:39:50 - 10:42:35].)

**<u>Montez Harris</u>.** The video embedded in Harris' declaration shows that he was an unruly

protester who was refusing to comply and leave an area long after LAPD issued a dispersal

order. Nothing any video supports Harris' claimed press status, including Plaintiffs' false claim

that Harris had on that day a "visible press ID." Indeed, Harris made no protest or response

1    when one officer stated to Harris regarding his lack of press credentials, "You don't have a

2    pass." (Gomez Decl., Ex. GG [18:51:30-18:51:50]; *see also* Ex. CC [15:38:15-15:38:55] (Harris

3    without credentials).) Harris threatened officers that there would be a problem if "I get moved,"

4    said "Don't let that horse touch me," and pushed the horse at least twice. (*Id.*, Ex. GG [18:51:51-

5    18:52:40] and HH [18:52:23-18:52:40].) Harris's actions prompted a nearby LAPD officer to

6    fire a single LLM round at Harris's direction, but he did so because Harris was attacking a

7    mounted officer's horse, not because Harris was a member of the press. (*Id.*, Ex. II [18:51:57-

8    18:52:40].)

9        **Constanza Eliana Chinea Mercado.** BWV demonstrates that the protests were not

10   peaceful, and that Mercado was not mistreated and her rights were respected notwithstanding the

11   violence. On June 8, officers allowed Mercado to pass from the protesters' line through the

12   LAPD line to an area of safety behind the LAPD officers. (Gomez Decl., Ex. JJ [15:04:00-

13   15:04:15].) Mercado and others claiming to be press were merely directed to stay back from the

14   skirmish line so that officer could perform their duties, which included moving freely behind the

15   skirmish line and readily accessing their equipment. (Declaration of Bryan Dameworth

16   ["Dameworth Decl."], ¶¶ 5-10, Ex. C [15:04:22 – 15:07:48].) Mercado's allegations of the

17   peaceful nature of the June 8 protests are false, and BWV shows LAPD officers pelted with

18   bottles and rocks thrown by the protesters. (*Id.*, Ex. C [15:09:15-15:09:50]; Gomez Decl., Ex. JJ

19   [15:03:10-15:03:52].) On June 14, Mercado claims she observed calm and peaceful protests

20   from around 10:00 a.m. But shortly after 4:00 p.m., protesters began attacking officers with

21   bottles and rocks. (Gomez Decl., Ex. KK [16:06:36-16:07:19].) LAPD requested members of

22   the press to move out of the LAPD line. (*Id*. [16:09:05-16:09:22].) LAPD eventually deployed

23   gas cannisters, but it did so in response to the protesters' observed violence, and protestors threw

24   deployed gas cannisters back at LAPD. (*Id*. [6:09:50-16:10:12; 16:15:55-16:16:18].)

25       **Sean Beckner-Carmitchel.** Plaintiffs cite to the Beckner-Carmitchel Declaration to

26   support their claims that press were targeted or somehow retaliated against, the reality is that

27   press were permitted to embed themselves with protestors, and were requested to leave the area

28   only when everyone was asked to leave the area.

1    Beckner-Carmitchel cherry-picks just a few of his posts to BlueSky containing video and

2    commentary regarding the June 8, 2025 protest activity; a review of Beckner-Carmitchel's other

3    posts to that platform on the same day reveal a more complete picture of the relevant events,

4    including the violent actions of a crowd launching fireworks and throwing objects at police

5    officers prior to the officers' deployment of gas to control the crowd. For example, he reported

6    "[a] Roman candle from the crowd now" in a post to BlueSky on June 8, 2025 at 7:23 p.m.; this

7    post immediately precedes the one labeled Ex. 36 and linked in Paragraph 5 of his declaration.

8    https://bsky.app/profile/acatwithnews.bsky.social/post/3lr5d3eqmes2i. The video accompanying

9    his 7:23 p.m. post also shows a series of fireworks and other objects launched from the

10   protestors at the line of officers on Spring Street in front of City Hall in the minutes leading up

11   to the officers' deployment of gas on Spring Street depicted in the video attached as Ex. 36 to

12   his declaration. Protestors continued to throw objects at the police line on Spring Street in front

13   of City Hall in the video attached as Ex. 36, triggering the use of gas to control the crowd.

14   It is near-impossible to discern any press affiliation on the small lanyard worn by the

15   unidentified female "photographer" who was moved by an officer and mounted unit while

16   officers were directing everyone to move away from a scene where a crowd had been violently

17   hurling fireworks and objects at a line of officers in front of City Hall. (*See* Beckner-Carmitchel,

18   Ex. 37; *see also* Gomez Decl., Ex. LL [19:31:15-19:32:29] (depicting female with cameras

19   holding cell phone, while presumably filming, very close to horse's face, and officers instructing

20   everyone to "move, everybody get out").)

21   Contrary to Beckner-Carmitchel's claim that "officers appeared to take pot shots with an

22   LLM at an unidentified photographer with a yellow helmet holding up a professional camera to

23   film the officers…", BWV reveals the LLM—which did not hit the photographer—was not

24   targeted at any photographer, and was instead used in response to an object being thrown at

25   officers from a protestor located nearby. (Gomez Decl., Ex. MM [19:32:58-19:33:33]; Ex. NN

26   [19:33:01-19:33:33].) Far from being denied access or targeted, another individual with two

27   professional cameras is seen taking photos in the vicinity during this incident. (Gomez Decl.,

28   Ex. NN [19:33:01 – 19:33:33].)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' P.I. MOTION

1    When an officer can be heard saying "media, go" at approximately 2:49 p.m. on June 8,

2    2025, LAPD officers were in the process of clearing the area around the intersection of Alameda

3    and East Aliso streets of *all* individuals in the crowd, including protestors and media alike, and

4    directing them all to move southbound on Alameda Street away from the 101 Freeway toward

5    Temple Street. (Beckner-Carmitchel Decl. ¶ 8, Ex. 42; Gomez Decl., Ex. OO [14:47:12 –

6    14:51:44] (depicting protestor verbally provoking attacking an officer, and Matt Gutman of

7    CNN reporting with a camera crew in the midst of the protest area, just before officers begin

8    clearing the entire area of all individuals).)

9    The same member of the press depicted in Beckner-Carmitchel's video wearing a white

10   cap with headphones and carrying camera and microphone equipment (Ex. 42) is again seen

11   moments later—with other members of the press—in the midst of the crowd moving

12   southbound on Alameda when an officer tells a colleague "hey it's good, they're press…they're

13   good", and then merely asks the media to stay behind the police line while moving the crowd

14   southbound on Alameda. (Gomez Decl., Ex. OO [14:54:46-14:56:13].)

15   This is consistent with other interactions captured in BWV from just minutes earlier,

16   when an officer approached two separate members of the press to tell them they could stay

17   where they were recording protest activity, but asks them just not to get too close.  (Gomez

18   Decl., Ex. OO [14:53:18-14:54:27].)

19   As to Rose and Beckner-Carmitchel's supplemental declarations regarding July 4,

20   officers advised that everyone was to leave the area pursuant to a dispersal order. As

21   demonstrated by the BWV, individuals identifying themselves as members of the press tell the

22   LAPD they are allowed to remain, citing 409.7. After an officer on scene calls the commanding

23   officer to request a media escort, the LAPD escorts the press away from the MOCA parking lot

24   in the direction they wanted to go. There is no violation of Section 409.7. (Gomez Decl., Exs. T

25   [19:45:40-19:47:41] and U [19:44:04-19:48:32].)

26   **Tina-Desiree Berg.** Contrary to Berg's contentions that (a) on June 10, 2025, she was

27   "accosted by an LAPD officer" (Berg Dec. at ¶ 2), (b) was told she needed to go (*id*.) and (c)

28   LAPD forced her leave the civic center (*id*., at ¶¶ 3-4), as demonstrated by the relevant BWV,

1   LAPD was requiring everyone to leave the area. (Gomez Decl., Ex. V [20:15:15-20:16:25].) In

2   fact, Berg was first noticed by the LAPD officer while the officer was escorting individuals to

3   their shelter. (*Id.* [20:25:41-20:27:06]. Indeed, unlike Berg, those individuals were told to

4   remain in the shelter or risk arrest. (*Id.* [20:25:41- 20:26:57].) Conversely, Berg was expressly

5   advised by LAPD the area was being cleaned out and there was a designated spot for the press

6   where she was welcome to go. (*Id.* [20:27:16-20:27:22 and 20:28:21-20:28:24]. Rather than

7   move to that area, Berg left the civic center area without force. (*Id.* [20:28:21-20:28:47].)

8   Significantly, Berg was told to leave the location for her own safety as well as the LAPD's,

9   which Berg denied. (*Id.* [20:27:34-20:27:40 and 20:27:56-20:28:02].) The LAPD officer

10  thanked Berg and her companion for their cooperation. (*Id.* [20:28:46-20:28:47].) These facts,

11  and any declaration from the companion, are curiously omitted from Berg's declaration.

12      In addition, Plaintiffs and Berg suspiciously fail to advise the court that Berg was present

13  at a protest the following day, June 11, 2025, where she was on the front line with other

14  members of the press. (Gomez Decl., Ex. W [19:12:35-19:14:35] and Ex. X [19:13:05-19:14:35.

15  As demonstrated by the BWV, LAPD respectfully requests the press to remain behind the police

16  line. (*Id.*, Ex. X [19:13:31- 19:13:45].) Berg even apologizes to the members of the LAPD for

17  certain language she used. (*Id.*, Ex. W [19:13:02-19:13:05].) Berg is present while Sheriffs are

18  being taunted by protestors, one of whom throws an item at the Sheriffs resulting in the Sheriffs

19  using non-lethal force against the protestors, as does the LAPD in providing back-up. (*Id.*, Ex.

20  W [19:12:41-19:12:46 and 19:13:07-19:14:35]; Ex. X [19:14:00-19:14:18].) Berg thereafter

21  remains on the front lines along with other members of the press, and an unidentified voice from

22  LAPD is heard on the video telling the officer who used non-lethal force "not the press", to

23  which the officer responded "I know, I banged over there sir." (*Id.*, Ex. X [19:14:18-19:14:23].)

24      **Hector Perez.** Hector Perez was not "targeted" because he was a journalist or at all. He

25  was standing within a crowd of protestors, and did not leave when officers were in the process

26  of dispersing the crowd. (Gomez Decl., Ex. Y [16:03:42-16:05:14].) Further, Mr. Perez's

27  photograph of the officer who he contends shot him clearly shows that the officer was not

28  aiming at him. (Dkt. 132 at 131.)

DEFENDANTS' OPPOSITION TO PLAINTIFFS' P.I. MOTION

### c.  Plaintiffs' Derivative Claims

Plaintiffs cannot establish a likelihood of success on their derivative claims for violation

of the California Constitution and the Bane Act as those claims are premised on violations of

their other claims, which they have not demonstrated for the reasons above. Additionally,

Plaintiffs do not have standing under the Bane Act to bring claims for its violation. *Bay Area*

*Rapid Transit Dist. v. Sup. Ct.*, 38 Cal. App. 4th 141, 144 (Cal. Ct. App. 1995) ("[The Bane

Act" is limited to plaintiffs who themselves have been the subject of violence or threats."); *see*

*also Dang v. City of Garden Grove*, Case No. SACV 10–00338, 2011 WL 3419609, at *10

(C.D. Cal. Aug. 2, 2011) ("Defendants are correct that the Bane Act creates only a personal

cause of action for the individual actually subjected to violence or threats that interfere with a

constitutional right."). To the extent Plaintiffs' Bane Act claims are premised on threats of

unlawful arrest or citation, or any other type of speech, that cannot give rise to a Bane Act

violation. *Animal Protection and Rescue League, Inc. v. Cnty. of Riverside*, 111 Cal. App. 5th

914, 924 (Cal. Ct. App. 2025); Cal. Civ. Code § 52.1(k) (speech alone is insufficient to state a

claim).

### 3.  Plaintiffs Are Not Likely To Suffer Irreparable Harm

Plaintiffs' argument that they are likely to suffer irreparable harm is premised on their

argument that they are likely to succeed on their claims, so both arguments fail together. Further,

because Plaintiffs' Motion primarily rests on alleged violations of California statutory claims,

even if they were able to establish a likelihood of success on those claims, they are not entitled

to the presumption of irreparable harm sometimes accorded to violations of constitutional rights.

*See Baird*, 81 F.4th at 1042; *but see Amer. Freedom Defense Initiative v. King Cnty.*, 796 F.3d

1165, 1172 (9th Cir. 2015) ("[A]lthough a First Amendment claim certainly raises the specter of

irreparable harm and public interest considerations, proving the likelihood of such a claim is not

enough to satisfy *Winter*."). Demonstrating an unlikelihood of future harm, Plaintiffs' evidence

does not show that officers were categorically precluding members of the news media from

accessing closed areas, but only that there were restrictions in particular circumstances. Finally,

Plaintiffs suggest that an injunction is necessary, otherwise, "LAPD is free to use less lethal

23

1  munitions against nonviolent journalists," but they ignore the Department's polices and trainings

2  clearly prohibiting such conduct—as they admit later in their brief. Once again, simply because

3  persons who should not have been struck with less-lethal munitions in places where they should

4  not have been struck does not establish an intent, policy, or practice to do so. For all these

5  reasons, Plaintiffs fail to establish a likelihood of irreparable harm. *Winter*, 555 U.S. at 22

6  ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent

7  with our characterization of injunctive relief as an extraordinary remedy that may only be

8  awarded upon a clear showing that the plaintiff is entitled to such relief.").

9          **4.  The Balance Of Equities And Public Interest**

10        As with irreparable harm, Plaintiffs' claims largely rest on state law rights, and they are

11  not entitled to any presumption that the balance of equities and public interest weigh in their

12  favor. Further, the injunction sought poses a risk to public safety and officer safety to the extent

13  it requires officers to provide absolute access to journalists, no matter how it interferes with law

14  enforcement operations, such as the establishment of a skirmish line or requiring the deployment

15  of officers to accompany persons granted access to areas behind skirmish lines. (*See, e.g.*,

16  Dameworth Decl., ¶¶ 5-10; Whiteman Decl., ¶ 15(c), (f).)

17          **C.  PROPER SCOPE OF INJUNCTION**

18        Should the Court determine a preliminary injunction is warranted, its scope should be

19  narrower than the TRO. Any injunction should be limited to providing relief to the parties to the

20  lawsuit. *See Trump v. CASA, Inc.*, 145 S.Ct. 2540, 2562-63 (2025) (injunctions should not be

21  broader than necessary to provide complete relief to each plaintiff with standing to sue). Further,

22  any injunction should include reasonable limitations, such as when the journalist's access to an

23  area would interfere with legitimate law enforcement operations or risk the safety of the

24  journalist or an officer. Additionally, any injunction should provide a clear solution to the

25  tension of the press wanting unfettered access to all areas of a protest, including being embedded

26  with protestors and then being unintended victims of deployed LLMs intended for legitimate

27  targets. Finally, any injunction should provide clear guidance as to how the LAPD should

28  determine whether someone is a "duly authorized" representative of a news service, online news

DEFENDANTS' OPPOSITION TO PLAINTIFFS' P.I. MOTION

service, newspaper, or radio or television station or network.

## IV.    **CONCLUSION**

Plaintiffs' Motion for Preliminary Injunction should be denied.


Date:  August 18, 2025              HYDEE FELDSTEIN SOTO, City Attorney
                                    DENISE C. MILLS, Chief Deputy City Attorney
                                    KATHLEEN KENEALY, Chief Asst City Attorney
                                    CORY M. BRENTE, Senior Assistant City Attorney
                                    GABRIEL S. DERMER, Assistant City Attorney

                                    By:  /s/ Gabriel S. Dermer
                                         GABRIEL S. DERMER, Assistant City Attorney
                                         Attorneys for Defendants

DEFENDANTS' OPPOSITION TO PLAINTIFFS' P.I. MOTION