HYDEE FELDSTEIN SOTO, City Attorney
DENISE C. MILLS, Chief Deputy City Attorney (SBN 191992)
KATHLEEN KENEALY, Chief Assistant City Attorney (SBN 212289)
CORY M. BRENTE, Senior Assistant City Attorney (SBN 115453)
GABRIEL S. DERMER, Assistant City Attorney (SBN 229424)
200 North Main Street, 6th Floor
Los Angeles, CA 90012
Phone No.: (213) 978-7558/ Fax No.: (213) 978-7011

Attorneys for Defendants CITY OF LOS ANGELES and
POLICE CHIEF JIM MCDONNELL

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES PRESS CLUB, STATUS COUP,<br><br>                    Plaintiffs,<br><br>     vs.<br><br>CITY OF LOS ANGELES, a municipal entity, JIM MCDONNELL, LAPD CHIEF, sued in his official capacity;<br><br>                    Defendants. | CASE NO. 25-CV-05423 HDV-E<br><br>DECLARATION OF COMMANDER RYAN WHITEMAN IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

1

I, RYAN WHITEMAN, declare:

1.    I am employed by the City of Los Angeles as a Commander with the Los Angeles Police Department ("LAPD"). My current assignment is Assistant Commanding Officer of Operations for South Bureau. I have been employed by the LAPD since 1998. During my 27-year career, I have worked in a variety of assignments, including Commanding Officer of the Community Safety Partnership and Commanding Officer of the West Los Angeles Patrol Division. As a Lieutenant, I was the Commanding Officer of the Newton Area Detective Division and was the Officer-in-Charge of the Newton and Hollenbeck Gang Impact Teams. Most recently, I served as the Incident Commander for the civil unrest occurring from June 9, 2025, to June 16, 2025, in response to the federal government's immigration enforcement actions. I understand that Plaintiffs Los Angeles Press Club and Status Coup ("Plaintiffs") contend that LAPD "deliberately targeted" journalists who were covering this civil unrest. I further understand that Plaintiffs are seeking a preliminary injunction enjoining LAPD from: (1) prohibiting a journalist from entering or remaining in closed areas; (2) interfering with or obstructing journalists from newsgathering; (3) detaining journalists who are in closed areas; and (4) using less-lethal munitions ("LLMs") and other crowd control weapons against journalists who are not posing a threat of imminent harm to an officer or another person. I submit this declaration in opposition to Plaintiffs' motion for preliminary injunction. If called to testify, I could and would competently do so of my own personal knowledge.

2.    I have received comprehensive training on crowd management and responding effectively to complex incidents, including courses on Advanced Strategies for Command and Control, Crowd Control, Mass Violence Tactical Response, and Leadership in Mass Events. In 2025, I served as Incident Commander over the Palisades Fire, the Grammy Awards, and the protests in 2020 in West Los Angeles related to the Armenian conflict. In 2023, I was the Deputy Incident Commander over the Academy Awards and the U.S. Open Golf Championship.

3.    LAPD uses three different types of LLMs: the 40 mm less-lethal launcher,

the 37 mm less-lethal launcher, and the FN 303 less-lethal launcher.  These LLMs are used either to defend against a threat to life or serious bodily injury, or to bring a dangerous situation safely and effectively under control.  The 40 mm fires a single sponge round to directly hit an individual committing violent acts.  The 37 mm, on the other hand, is non-direct.  An officer fires the 37 mm at the ground five to ten feet in front of a violent portion of a crowd and five foam rounds bounce up and strike them.  The FN 303 fires a single inert plastic projectile to directly hit an individual committing violent acts.  LAPD understands that Penal Code section 13652 prohibits law enforcement from using "kinetic energy projectiles," which include LLMs, "to disperse any assembly, protest, or demonstration."

4.      The civil unrest in June 2025 was far more violent, confrontational, and strategic than the civil unrest that followed George Floyd's murder in the summer of 2020.  During the 2020 civil unrest, I served as the Mobile Field Force Leader, which provides a rapid response of LAPD personnel and resources to a specific area.  In 2020, activists assaulted officers then retreated.  In June 2025, however, activists stood their ground and were prepared to violently confront law enforcement.  Activists also infiltrated LAPD radio communications and moved protest groups based on what they heard.  Activists distributed shields, helmets, gas masks, and other gear in an attempt to undermine LAPD's crowd control tactics.  In fact, some activists formed logistical hubs to efficiently distribute those supplies to protestors.  Activists also moved and separated protest groups in a deliberate effort to stretch thin LAPD resources and undermine law enforcement's effectiveness in controlling the crowd and preventing property destruction.  On several occasions law enforcement observed activists preparing to break into government buildings and unload wrenches and other tools.

5.      What may have started as peaceful demonstrations against federal immigration actions devolved into wanton criminal behavior directed at local law enforcement, including LAPD, on the afternoon of Sunday, June 8, 2025.  At around 1:00 p.m., the crowd swelled around the federal buildings, including the Roybal Federal

3

Building and U.S. Courthouse, in between Temple Street and Aliso Street, and Los

Angeles Street and Alameda Street, and blocked traffic.  At around 2:00 p.m., LAPD

declared an unlawful assembly in order to prevent the crowd from blocking traffic and to

protect the federal buildings.  At around 2:30 p.m., the crowd began hurling projecticles

at officers.  Below is a photograph that accurately demonstrates the conditions officers

faced at around 2:30 p.m. while they attempted to protect the federal buildings on

Alameda.  In this photograph, officers are facing southbound, the crowd of approximately

3,500 is facing northbound, and the federal buildings are on the right-hand side.  The

press were embedded within this crowd



6.     At around 3:30 p.m., protestors retrieved debris from a construction site near

the intersection of Alameda and Temple, and hurled it at officers.  A protestor hurled a

rock at an officer's face, injuring the officer.  At around 3:47 p.m., two motorcyclists

drove into a skirmish line, injuring two LAPD officers.  Emergency Medical Technicians

treated the officers at the scene but had trouble transporting them because of the crowd.

At around 5:00 p.m., activists threw Molotov cocktails and commercial grade fireworks

at officers near the Roybal Federal Building.  At around 5:15 p.m., activists torched two

Waymo self-driving cars near the intersection of Los Angeles Street and Arcadia Street. LAPD also learned that activists would summon a Waymo to their location in order to destroy it.  At around 5:30 p.m., law enforcement saw activists attempt to scale the fence surrounding the Metropolitan Detention Center.  Given the growing crowd and chaos, at around 6:30 p.m., public transportation had to bypass the area.  At around 7:00 p.m., activists removed the pink metal infrastructure from Grand Park and used it to form a large barricade across Spring Street.  Motorcyclists pulled up behind the barricade.  From behind the barricade, activists threw projectiles and M-80s and launched commercial grade fireworks at officers.  Activists also chipped the concrete curb, slid the debris over to people behind the barricade, and then those people hurled it at officers.  LAPD used tear gas to bring this dangerous situation under control and then officers disassembled the barricade.[1]  Generally, tear gas does not require hospitalization or follow-up care.

7.    At around 8:30 p.m., activists formed another barricade across Main Street using wrought iron fencing.  I am attaching as Exhibit H a true and correct excerpt of an officer's body worn video [Chu BWV 20:28:49 – 20:29:16].  Exhibit H shows that while officers attempted to disassemble and surmount the barricade, an incidentiary device exploded in an officer's face, seriously injuring him.[2]

8.    On Monday, June 9, 2025, at 6:00 a.m., I began my tenure as Incident Commander over the protest activity.  At around 9:00 p.m., officers reported protestors throwing projectiles at them.  At around 10:00 p.m., an officer was struck with a

---

[1] Social media clips depict the barricades, the projectiles hurled at officers, and the deployment of tear gas on June 8. https://www.instagram.com/p/DK3KO9tPh8U/; https://www.instagram.com/p/DKz8tTQSQZn/; https://www.instagram.com/p/DKqd4Y0xfPH/; https://www.instagram.com/p/DKqe-7ngQsD/?hl=en.  True and correct copies of these clips are lodged as Exhibits D, E, F and G. Activists also threw tear gas cannisters back at officers.

[2] The time in the upper right-hand corner of body worn video reflects the local time zone, Pacific Time, using a 24-hour clock.

projectile requiring a rescue ambulance.  Protestors also set several fires.  At around
11:45 p.m., protestors set a vehicle on fire, but homemade spike strips prevented the
LAFD from responding to the scene.  On Tuesday, June 10, at around 1:28 p.m., at the
intersection of Alameda Street and Temple Street, protestors blocked traffic lanes, so that
opposing traffic would travel in the wrong lanes, risking a head-on collision.  The crowd
ignored officers' orders to get on the sidewalk and disperse.  Throughout the afternoon,
officers reported that protestors were hurling projectiles at them.  On Wednesday, June
11, at around 6:00 p.m. at the intersection of Hill Street and Third Street, the crowd
swelled to 800-900 people and officers reported protestors hurling commercial grade
fireworks at them.  Throughout the evening and night, officers continued to report
projectiles, including mortars, being hurled at them.  Officers arrested two individuals for
assault with a deadly weapon.  On Thursday, June 12, at around 6:46 p.m., a crowd
arrived at the intersection of Alameda Street and Aliso Street with shields.  At around
7:42 p.m., at First Street and Broadway, officers reported that protestors were throwing
rocks and bottles at them.  On Friday, June 13, a Waymo executive informed LAPD that
it was suspending its operation in the area given the vandalism to its fleet.  At around
3:30 p.m., officers found a bag of rocks near Motor Transport Division, the facility where
LAPD stores its fleet of vehicles.  LAPD was concerned that activists placed this bag of
rocks at this location to use later against officers and property.

9.    On Saturday, June 14, No Kings Day, the crowd swelled to almost 30,000 at
City Hall in the early afternoon.  At around 3:00 p.m., protestors attempted to evade
officers positioned around the federal building and breach the building.  Officers
attempted to divert the crowd away from the federal building.  At around 3:45 p.m. and
throughout the afternoon, officers reported that protestors threw projectiles at them.  At
around 4:00 p.m., individuals were throwing rocks and bottles at officers from high
ground at Los Angeles and Temple.  The Los Angeles County Sherrifs Department and
LAPD used tear gas to bring this dangerous situation under control.  On Sunday, June 15,

and on Monday, June 16, the protests grew smaller, and slowly calm and normalcy returned to the area.

10. From Monday, June 9, 2025, to Monday, June 16, 2025, LAPD was on tactical alert because of protest activity in the downtown Los Angeles area. A tactical alert is the preliminary stage of the Department Mobilization Plan for unusual occurrences. It provides for the controlled redistribution of on-duty personnel to achieve the personnel level necessary to control a major police incident. A tactical alert may be declared for a specific geographic area or Citywide. The tactical alert may expand or contract based upon the circumstances of the incident.

11. I understand Plaintiffs partially base their request for injunctive relief on Penal Code section 409.7, which allows a "duly authorized representative" of the press access to a closed area. I am attaching as Exhibit I, which is an LAPD Training Bulletin entitled "Crowd Management, Intervention, and Control – Part II Media," dated May 2025. Exhibit I instructs officers on how to comply with Penal Code section 409.7 and states the following: "Representatives of the media include anyone representing a news service, online news service, newspaper, radio, television station or network. Those persons may enter closed areas for the purpose of gathering, receiving, or processing information for communication to the public. Closed areas include any area where officers have closed access to the public, including but not limited to the immediate areas surrounding any emergency field command post, police/skirmish line, or other rolling closure at any demonstration, march, protest, rally, or where individuals are primarily engaged in any activity that is protected by the First Amendment to the United States Constitution or Article I of the California Constitution." The Training Bulletin notes that although "[a]uthorized members of the media are allowed behind police lines[,]…the Department may restrict media access to the command post, or **crime scenes** for the purpose of the preservation of evidence." The Training Bulletin further notes that "[n]othing precludes officers from enforcing other applicable laws if the member of the media is engaged in activity that is otherwise unlawful or **is interfering with official law**

7

**enforcement duties** including, but not limited to, collecting evidence and making arrests."

12.    A skirmish line is a line of officers standing about three to five feet apart that controls the movement of a crowd.  An inner perimeter, on the other hand, is formed by officers conducting a mass arrest.  The officers contain the arrestees and pull each individual arrestee out of the inner perimeter for processing and then gradually close the perimeter.  While Penal Code section 409.7 allows duly authorized members of the press into closed areas, such as behind a skirmish line, it does <u>not</u> give the press permission to enter (or remain in) a crime scene, such as an inner perimeter.

13.    During riotous activity, the officers forming the skirmish line do their best to allow all press to pass through despite not having the bandwidth to meaningfully determine whether someone actually qualifies as a "duly authorized" member of the press.  Since the vetting process becomes hurried, inevitably someone with false credentials or a desire to interfere with official law enforcement duties will get behind the skirmish line.  This situation presents a potential officer safety issue because, among other reasons, individuals allowed behind the skirmish line are not searched for contraband.  Therefore, LAPD is forced to position officers behind the skirmish line to monitor everyone there, which further stretches resources thin.

14.    It is also unclear to LAPD whether security guards that work for news organizations qualify as "duly authorized" members of the press.

15.    I understand that in support of their preliminary injunction motion Plaintiffs have submitted declarations from Adam Rose, the secretary and press rights chair of Los Angeles Press Club, and Jordan Chariton, the founder and CEO of Status Coup, as well as seven people who identify as journalists: Tina Berg, Montez Harris, Michael Nigro, Hector Perez, Constanza Mercado, Anthony Orendorff, and Sean Beckner-Carmitchel.  I understand that these nine declarations collectively discuss about 40 incidents of LAPD purportedly targeting journalists covering the ICE protests.  Given the limited timeframe, I could not personally review all these incidents, but I did review eight of them.  I provide

the following perspective for the Court's consideration:

a.    **Lauren Tomasi**: According to paragraph 26 of Adam Rose's declaration, on June 8, 2025, "an LAPD officer appeared to aim his weapon and intentionally shoot" Australian reporter Lauren Tomasi in the leg with an LLM.  Mr. Rose based his testimony on Exhibits 30 and 31, which are two YouTube videos.  I have reviewed Exhibits 30 and 31, as well as the body worn video of the officer who fired the LLM.  I am attaching as Exhibit J [Officer Lopez BWV 17:08:57-17:10:57] a true and correct two-minute excerpt of the officer's body worn video.

As demonstrated by Exhibit J, the officer who fired the 37 mm did not intend for any of the five skip-fired foam baton rounds to strike Ms. Tomasi; instead, he was targeting a group of individuals near Ms. Tomasi who were throwing projectiles at the officers on the skirmish line.  Specifically, at 17:09:19, the officer is scanning the crowd for threats.  A second later, at 17:09:20, Ms. Tomasi is seen in the lower left-hand corner of the video wearing jeans and a green jacket with her back to the skirmish line.  At 17:09:38, the officer fires a 37 mm round and then explains to his colleagues on the skirmish line that he did so because a "group right there with the flags" were "throwing" things at the officers.  The group with the flags is seen at 17:09:44 in the lower left-hand corner.  No officer intentionally shot Ms. Tomasi.

Notably, Exhibit J also demonstrates the chaotic and dangerous situation facing the officers on the skirmish line.  At 17:09:36 and 17:10:30 commercial grade fireworks explode near the skirmish line.  At 17:10:33-17:10:54 the officer can be heard warning his colleagues on the skirmish line that people are "throwing fireworks and bottles" and "people are hiding behind cars and throwing items."

b.    **Michael Nigro**: According to paragraph 37 of Mr. Rose's declaration, on June 9, 2025, an LAPD officer shot photojournalist Michael Nigro in the head with an LLM, but he was "saved from serious injury" by the helmet he was wearing.  According to Mr. Nigro's declaration, he had two encounters with LAPD officers on June 9, 2025.  First, at around 5:43 p.m., "LLMs hit a pole near [his] head three times" as he "stood on

9

the Temple Street Bridge, a pedestrian overpass over East Temple Street." (Declaration of Michael Nigro, ¶¶ 5-9 ["the first incident"].) Next, about two hours later, at around 7:28 p.m., in Little Tokyo near the Savoy Condominiums, he testified that he "was shot in the head with an LLM by LAPD" while wearing a "combat helmet." (Declaration of Michael Nigro, ¶¶ 10-15 ["the second incident"].) Mr. Nigro attached to his declaration Exhibit 16, which is a photograph of him wearing the helmet with what he describes as a "noticeable white-streak impact mark of a[n] LLM." He also attached Exhibit 17, a video of the "shooting." I have reviewed Exhibits 16 and 17.

With respect to the first incident, as an initial matter, according to paragraph 6 of Mr. Nigro's declaration, he saw "LAPD *and National Guard* officers carrying weapons with signature orange tips and orange stocks that deploy LLMs." So, even if LLMs were fired near or at Mr. Nigro, he cannot definitively state that LAPD was responsible for those shots. Nor can he rule out the federal police who also wear "dark blue uniforms" like LAPD. (See Declaration of Michael Nigro, ¶ 6.) Next, as demonstrated by body worn video during the timeframe and at location at issue, the officers were not targeting Mr. Nigro. I am attaching as Exhibit K [Officer Del Papa BWV 17:40:50-17:42:44] a true and correct approximately two-minute excerpt of an officer's body worn video. Specifically, at 17:40:50-17:41:09 officers give a dispersal order, telling people to "leave the area," then shout descriptions to each other of people who are throwing things at them. At 17:41:11the officers warn each other of someone spraying something ahead of them. At 17:41:53 the officers approach the pedestrian overpass, and Mr. Nigro is seen standing on the overpass. At 17:42:03, Mr. Nigro can be plainly seen still standing on the overpass. At 17:42:15-17:42:17, Mr. Nigro can be seen ascending the pedestrian overpass. At 17:42:39, Mr. Nigro can still be seen standing on the overpass in the distance and then he walked out of sight. I see no evidence of LAPD targeting Mr. Nigro when he claims they did. Finally, Mr. Nigro testifies that LLMs hit a "pole" on the pedestrian overpass, but as demonstrated by the below picture, no pole exists on the overpass. For all these reasons, I disbelieve Mr. Nigro's account of the first incident.



    With respect to the second incident, based on my review of an officer's body worn video at the timeframe and location at issue, officers did not deliberately target Mr. Nigro.  I am attaching as Exhibit L [Officer Zambrano BWV 19:27:38-19:31:41] a true and correct approximately four-minute excerpt of an officer's body worn video. Specifically, at 19:27:42-19:28:03, Mr. Nigro can be seen at the right-side of the frame holding an orange-colored cellphone mount on his camera and wearing attire labeled "PRESS."  About a minute earlier, officers had given several dispersal orders, which were ignored by this crowd. At 19:29:12, an officer skip fires a 37 mm round at the ground.  He was not targeting Mr. Nigro.  At 19:30:29, Mr. Nigro can be plainly seen filming an individual screaming at officers on the skirmish line.  The individual aggressively screamed at the officers "you can take it, you can take it, you got riot gear!"  The individual seemed to be suggesting that officers should not react to having projectiles repeatedly hurled at them.  Given his stance and hostile manner, the individual seemed to be challenging the officers and inciting the crowd against them.  At 19:31:27, a group of

11

officers encircle this individual (forming an "arrest circle") after he continued to scream "you got riot gear, you got riot gear!"  The crowd began to approach and surround the arrest circle, which presents an officer safety issue.  At 19:31:31, an officer fires a 37 mm at the ground and Mr. Nigro can be seen flinching.  Based on Mr. Nigro's personal recording of the incident (Exhibit 17), I believe the second incident is captured at 19:31:31.  The officer who fired the 37 mm at this time aimed at the ground to control the dangerous situation facing the officers forming the arrest circle—he was not targeting Mr. Nigro. A few second later, at 19:31:39, Mr. Nigro can be seen still filming the skirmish line.  Notably, Mr. Nigro testifies that Exhibit 16 reflects the "white streak" of that LLM that allegedly hit him around 7:28 p.m., but the below image, taken from body worn video, shows that the "white streak" was there at 6:00 p.m.  I cannot testify with any certainty that the white streak was the result of an LLM being deployed by LAPD or any other law enforcement agency, nor can I testify as to when it was caused.



c. **Erin Burnett**: According to paragraph 38 of Mr. Rose's declaration, on June 9, 2025, "nationally recognizable" CNN anchor Erin Burnett was "shoved by an advancing line of LAPD officers" while broadcasting live.  Mr. Rose based his testimony on Exhibit 49, which is a 41 second clip of the incident.  I have reviewed Exhibit 49.  I am attaching as Exhibit M [Officer Sanchez BWV 18:12:20-18:14:26] a true and correct

12

approximately two-minute excerpt of an officer's body worn video.  Specifically, at 18:12:39, Ms. Burnett can be seen on the left-hand side of the frame wearing black clothing, a black baseball hat, and a gray sweatshirt tied around her waist.  Although Mr. Rose described her as "nationally recognizable," at this point she had her back to the skirmish line.  Not only was she very casually dressed, but she displayed no visible press credentials or CNN logo.  Nonetheless, it was obvious she was a journalist because while she stood in front of the skirmish line, a cameraman is in front of her, presumably filming her.  The skirmish line moved forward and at 18:12:42, a female supervisor instructed an officer to get Ms. Burnett "out of here," meaning that Ms. Burnett was blocking the forward movement of the skirmish line and needed to move out of the way.  At 18:12:42, the officer pushed Ms. Burnett forward.  At 18:14:19, Ms. Burnett again stopped in front of the skirmish line, preventing it from advancing forward once again, so an officer nudged her forward.  At 18:14:25, an officer pushed Ms. Burnett forward and away from the skirmish line.  Based upon my review of the body worn video, the officers did not push or nudge Ms. Burnett because she was a journalist; instead, they pushed or nudged Ms. Burnett to prevent her from repeatedly interfering with the forward advancement of the skirmish line.  As the video makes clear, Ms. Burnett was blocking forward progress of officers but was treated professionally and not subjected to any violence.  The press should not expect an advancing skirmish line to stop, slow down, or move around them.  No one—not even a "nationally recognizable" journalist—should be allowed to interfere with legitimate law enforcement actions in such a manner.  Furthermore, officers want physical space between themselves and civilians, including members of the press.

d. **Jason Carroll**: According to paragraph 39 of Mr. Rose's declaration, on June 9, 2025, LAPD officers "detained" CNN reporter Jason Carroll, "ordered [him] to put his hands behind his back, and escorted [him] away from the police line."  Mr. Rose based his testimony on Exhibits 50, 51, and 52, which are various social media clips of the incident.  Mr. Rose further stated that it was his "understanding" that two CNN security guards were arrested and cited as well, but he did not disclose any basis for this

"understanding" nor did he identify these security guards.  I reviewed Exhibits 50, 51, and 52.

I am attaching as Exhibit N [Officer Costello BWV 21:05:38-21:07:49] a true and correct approximately two-minute excerpt of an officer's body worn video.  Based on my review of Exhibit N, Mr. Carroll was not detained.  In fact, officers respectfully extracted Mr. Carroll and his crew from an inner perimeter during a mass arrest and escorted them out.  As I already discussed above, an inner perimeter is an active crime scene, and the press is not allowed to remain inside of it.

Following repeated orders to disperse, at around 8:34 p.m., the crowd at the location was advised that they were no longer free to leave the area, they were being arrested for violating Penal Code section 409 (unlawful assembly following an order to disperse), and that they would be taken into custody.  At 21:05:38, a man approached an officer who was part of the inner perimeter, identified himself as a former LAPD officer, and explained that he was a security guard for a CNN crew.  The officer asked the man to identify who was also part of the CNN crew and to call them over.  At 21:06:09, Mr. Carroll approached the officers, and the officer explained that he was not under arrest because he was press, but they were going to escort him out of the inner perimeter.  The officer informed Mr. Carroll not to return, or he would be arrested.  Two officers escorted him out of the inner perimeter.  The officer further explained to Mr. Carroll that his entire crew would be taken out of the inner perimeter one-by-one in a similar manner.  The man from Mr. Carroll's crew, who initially approached the officers and identified himself as CNN security, was not arrested.  Instead, like the other members of the CNN crew, he was simply escorted out of the inner perimeter.  I saw no evidence on this body worn video of LAPD arresting any member of Mr. Carroll's crew or security team.

e.  **CNN crew split up while broadcasting**: According to paragraph 42 of Mr. Rose's declaration, on June 10, 2025, LAPD officers "split up" a CNN crew.  Mr. Rose based his testimony on Exhibit 55, which is a BlueSky clip of the incident.  I have reviewed Exhibit 55.

I am attaching as Exhibit O [Officer Nam 14:36:00-14:36:27] a true and correct twenty-seven second excerpt of an officer's body worn video. Based on my review of Exhibit O, at 14:36:03, CNN reporter Kyung Lah approached a skirmish line that was arriving at the scene of a mass arrest, and she showed the officers her press credential. Officers allowed Ms. Lah and her cameraman to get behind the skirmish line, but not her two security guards. Since her two security guards were unable to produce press credentials, the officers ordered them to get away from the skirmish line. Notably, Ms. Lah and her entire crew were very casually dressed and bore no visible CNN logos, so it was very difficult for officers to readily determine who was a legitimate member of her crew and who was not. I am attaching as Exhibit P [Officer Lankford 15:08:43-15:09:24] a true and correct forty-one second excerpt of an officer's body worn video from a mass arrest. Based on my review of Exhibit P, at 15:08:55, Ms. Lah's two security guards were extracted from the inner perimeter formed around the mass arrest and escorted out.

I also understand that in Exhibit 55, as officers allowed Ms. Lah through the skirmish line, an officer said to her, "Are you grabbing me? Get away from me!" Although that may not have been the politest way to communicate with Ms. Lah, officers are on high alert during civil unrest and generally do not want to be casually or even incidentally touched by civilians, including members of the press. Furthermore, as demonstrated by Exhibit 55, the scene was loud and yelling became necessary to be heard. Helicopters were circling above, protestors and police were using amplified sound, and hundreds of people were congregating and talking in the vicinity.

f. **Matt Gutman**: According to paragraph 51 of Mr. Rose's declaration, on June 14, 2025, while ABC News correspondent Matt Gutman was reporting live, an officer physically moved him out of the way ("incident 1") and, in a separate incident, officers yelled and pushed him back ("incident 2"). Mr. Rose based his testimony on Exhibits 68 (incident 1) and 69 (incident 2), which are social media clips. I have reviewed Exhibits 68 and 69.

1    With respect to incident 1, I am attaching as Exhibit Q [Officer Messaoudi

2 17:48:59-17:49:39] a true and correct excerpt of an officer's body worn video.  At

3 17:49:04, the officers begin to form a skirmish line along a marked crosswalk and Mr.

4 Gutman can be seen in the middle of the frame.  A white sedan is stopped in the

5 crosswalk such that the officers in the skirmish line and the driver of the white sedan

6 were facing each other. At 17:49:20, Mr. Gutman can be seen standing directly in front of

7 the white sedan within the skirmish line.  At 17:49:22, the officer, who is wearing a gas

8 mask, told Mr. Gutman and his crew to get out of the skirmish line.  At 17:49:24, the

9 officer pushed Mr. Gutman out and away from the skirmish line.  Mr. Gutman's crew

10 dutifully followed him away from the skirmish line.  At 17:49:39, Mr. Gutman can be

11 seen reporting with his back to the skirmish line and a few feet away from it.  Based on

12 Exhibit Q, I believe that Mr. Gutman interfered with the officers' ability to form a

13 skirmish line.

14    With respect to incident 2, I am attaching as Exhibit R [Officer Polen 17:50:44-

15 17:51:25] a true and correct approximately forty-one second excerpt of an officer's body

16 worn video.  At 17:50:44, the officer was standing in a skirmish line facing east.  He was

17 wearing a gas mask, as were most of the other officers in the frame, because tear gas was

18 either recently dispersed or will be imminently dispersed.  At 17:50:53, the officer turned

19 around because Mr. Gutman put his hand on the officer's upper back from behind.  The

20 officer and his colleagues told Mr. Gutman to step back and stop touching the officer.

21 Mr. Gutman denied touching the officer and repeatedly stepped toward the officers.  In

22 fact, Mr. Gutman's security guard held Mr. Gutman back from further advancing toward

23 the officers. At 17:51:02, an officer pushed Mr. Gutman away from them.  During this

24 conversation, the officers yell at Mr. Gutman because they were wearing gas masks,

25 which make it difficult to clearly communicate at a normal volume.  In other words, an

26 officers must yell to be heard and understood while wearing a gas mask, and this is

27 especially true during a loud protest.  At 17:51:25, Mr. Gutman turned from the skirmish

28 line and continued to broadcast.

I am attaching as Exhibit S [Officer Soria 17:50:44-17:51:18] a true and correct excerpt of another officer's body worn video who was standing in the same skirmish line facing west. At 17:50:44, Mr. Gutman and his crew can be seen approaching the skirmish line and at 17:50:47, Mr. Gutman touched the back of the officer who was facing east. I have included a still image capturing the exact moment that Mr. Gutman touched the officer's back. To be clear, for officer safety reasons, no one—not even a member of the press—should approach an officer from behind and touch him while he is standing in a skirmish line. Officers are trained to maintain physical distance from civilians, including members of the press.



16.    In summary, officers are certainly aware of the press during civil unrest—in fact, there appeared to be a salient and large amount of press in the videos I reviewed—yet officers did not target the press or deliberately interfere with their reporting. If anything, some press interfered with official law enforcement duties, but even so, officers are plainly not targeting press with LLMs or anything else. As discussed in paragraph 11, LAPD trains its officers to observe the rights of the media to gather, receive, and process information.

17

1    I declare under penalty of perjury under the laws of the United States of America

2    that the foregoing is true and correct.  Executed this  18th  day of August, 2025, in Los

3    Angeles, California.

4

5    Commander Ryan Whiteman

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18