1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10   LOS ANGELES PRESS CLUB et al.,          Case No. 2:25-cv-05423-HDV-E

11

12                Plaintiffs,                **ORDER GRANTING PLAINTIFFS'**
                                             **MOTION FOR PRELIMINARY**
13                                           **INJUNCTION [56]**

14           v.

15

16   CITY OF LOS ANGELES et al.,

17

18                Defendants.

19

20
21
22
23
24
25
26
27
28

1

1    **I.    INTRODUCTION**

2         It is déjà vu all over again.

3         Plaintiffs Los Angeles Press Club ("LA Press Club") and Status Coup contend that, in the

4    wake of this summer's protests against immigration raids in Los Angeles, the Los Angeles Police

5    Department ("LAPD") dispersed or targeted Plaintiffs' members and other journalists in violation of

6    state law and the First Amendment.  In total, Plaintiffs have compiled at least 35 instances between

7    June 6 and July 4, 2025 in which the LAPD excluded members of the media from public areas or

8    subjected them to kinetic impact projectiles, tear gas, and other forms of physical force.  As CNN

9    anchor Erin Burnett remarked, while being shoved by an advancing line of LAPD officers, "They

10   knew we're media.  They were just as happy to push me as to push anybody else."  Declaration of

11   Adam Rose ("Rose Decl.") ¶ 38 [Dkt. 19], Ex. 49 [Dkt. 37].  Plaintiffs accordingly seek an order

12   prohibiting the City of Los Angeles and Chief Jim McDonnell (collectively "Defendants") from

13   removing journalists from closed areas, detaining or arresting members of the press, and using

14   kinetic impact projectiles and chemical agents against them ("Motion").  [Dkt. 56].[1]

15        The present action forms the latest chapter in a long and unfortunate saga of the LAPD's use

16   of unlawful force against members of the media.  In 2000, journalists were struck by projectiles, hit

17   by batons, and subjected to other force as they recorded the LAPD's dispersal of protests

18   surrounding the Democratic National Convention.  Declaration of Carol Sobel ("Sobel Decl.") ¶ 16

19   [Dkt. 18], Ex. 21 at 1 [Dkt. 33].  The ensuing litigation produced the *Crespo* settlement, which set

20   forth the standards for the LAPD's treatment of media.  *See id.*

21        Then, in 2007, the LAPD "deployed a total of 146 less-lethal impact munitions and over 100

22   uses of the baton" against media and protestors, peaceful or not, at a May Day rally in MacArthur

23   Park.  *Multi-Ethnic Immigr. Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621, 624

24   (C.D. Cal. 2007).  In the aftermath, the LAPD acknowledged that the treatment of the media at the

25   rally failed to comply with previous settlements.  Sobel Decl. ¶ 23, Ex. 22, at 10–11, 48 [Dkt. 33].

26

27   _____

28   [1] Plaintiffs provided supplemental briefing in support of a preliminary injunction, which the Court
     will construe as a Motion for Preliminary Injunction.

1    The death of George Floyd in May of 2020 sparked protests across the country.  Again, the

2    LAPD deployed batons, bean bag shotguns, 37mm and 40mm munitions, and a stinger grenade,

3    including against individuals who were not engaged in criminal behavior.  *Id.* ¶ 24, Ex. 23 at 8 [Dkt.

4    34] (acknowledging that this was attributable "at times [to] a lack of adequate training"); *Id.* ¶ 25,

5    Ex. 24 at 19 [Dkt. 35] (recognizing "journalists' right to cover public protests even if an unlawful

6    assembly is declared and an order to disperse is issued").

7    Less than a year later, the LAPD used 40mm and 37mm less-lethal launchers at close range

8    on peaceful demonstrators in Echo Park.  *Black Lives Matter Los Angeles v. City of Los Angeles*, No.

9    CV-20-5027-CBM-ASX, 2021 WL 3163306, at *2 (C.D. Cal. Apr. 28, 2021).  The LAPD took the

10    position that "the media [were] not exempt from the requirement to disperse after an unlawful

11    assembly has been declared."  Sobel Decl. ¶ 28, Ex. 26 at 53 [Dkt. 36].

12    At that point, the California Legislature stepped in.  "[I]n response to the use of force against

13    journalists covering protests, marches etc," the California Legislature enacted new protections for

14    media covering protests.  Sen. Pub. Safety Comm. Analysis 5, Sen. Bill 98, 2021–2022 Reg. Sess.

15    Senate Bill 98, codified at California Penal Code section 409.7, clarified that "duly authorized"

16    members of the press may access areas closed due to a protest, march, or other demonstration.  Cal.

17    Penal Code § 409.7(a)(1).  Assembly Bill 48 ("AB 48"), codified at California Penal Code

18    section 13652, limited the use of kinetic energy projectiles and chemical agents—including kinetic

19    impact projectiles and tear gas—to "objectively reasonable" circumstances and only in accordance

20    with certain requirements.  Cal. Penal Code § 13652(b), (d).[2]  In summary, the California legislature

21    weighed the competing interests of local police departments, journalists, and the public and

22    concluded that the media must be exempt from dispersal orders and protected from indiscriminate

23    volleys of crowd control weapons.

24

25    _____

26    [2] *See also* Sobel Decl. ¶¶ 30–31, Ex. 80 [Dkt. 37] (memorandum from then-LAPD Chief of Police to

27    the Board of Police Commissioners on December 8, 2021, outlining the new requirements set out by SB 98 and AB 48).

28

1    This action tests whether these protections have any teeth.  Plaintiffs maintain that the plain

2    language of sections 409.7 and 13652 prohibits Defendants' practices, and warrants injunctive relief

3    given the cannonade of evidence submitted here.  The Court agrees.  After a careful and thorough

4    review of the record presented, the Court concludes that the LAPD's heavy-handed efforts to police

5    this summer's protests violated state law, as well as the federal Constitution.  If the rule of law is to

6    have any effect, it must protect Plaintiffs here.  Plaintiffs' Motion is granted.

7    **II.    BACKGROUND**

8         **A.    Factual Background[3]**

9              **1.    Dispersals and detentions of journalists**

10   Plaintiffs present numerous declarations (many with supporting video) attesting to dispersals

11   and/or detentions of journalists by LAPD officers.  The Court summarizes the most salient examples

12   here.

13   • On June 8, LAPD officers held a group of approximately 20 to 30 journalists from MSNBC,

14   CNN, the AP, and other outlets in a "press area," behind their SUVs, from which the officers

15   retrieved equipment.  Declaration of Constanza Eliana Chinea Mercado ("Chinea Decl.")

16   ¶¶ 12–21 [Dkt. 22], Ex. 43 [Dkt. 37]; Declaration of Officer Bryan Dameworth ("Dameworth

17   Decl.") ¶¶ 5–10 [Dkt. 69-68], Ex. C [Dkt. 69-6] (requiring members of the press to back up

18   behind LAPD vehicles).  LAPD body worn video shows that the journalists did not interfere

19   with officers' access to their vehicles.  *Id.*

20   • That same evening, photographer Montez Harris was kettled alongside a group of protestors.

21   Despite informing officers that he was press, LAPD officers pushed Harris and the group

22   against a wall.  Declaration of Montez Harris ("Harris Decl.") ¶¶ 2, 4, 8 [Dkt. 27].

23

24   _____

25   [3] The Court denies Defendants' evidentiary objections.  [Dkt. 69-2].  Because of the extraordinary
     nature of a motion for injunctive relief, "a district court may consider evidence outside the normal
26   rules of evidence, including: hearsay, exhibits, declarations, and pleadings."  *Nat'l Rifle Ass'n of
     Am. v. City of Los Angeles*, 441 F. Supp. 3d 915, 926 (C.D. Cal. 2019) (citing *Johnson v. Couturier*,
27   572 F.3d 1067, 1083 (9th Cir. 2009).  To the extent that declarants render improper opinion
     testimony or legal conclusions, the Court does not consider them.

28

- On June 9, the LAPD detained CNN reporter Jason Carroll and his crew while they were live on air, warning that he would be arrested if he returned to the area.  Rose Decl. ¶ 39, Ex. 50 [Dkt. 37].  While Carroll and his crew were not arrested, they were nonetheless forced to leave the area.  Declaration of Commander Ryan Whiteman ("Whiteman Decl.") ¶ 15d [Dkt. 69-47], Ex. N [Dkt. 69-12].

- On June 10, an LAPD officer forced Tina Berg, a journalist with Status Coup and a member of the LA Press Club, from her position on an embankment, over 100 feet from protestors.  Declaration of Tina Berg ("Berg Decl.") ¶¶ 2–4 [Dkt. 28]; Declaration of Jordan Chariton ("Chariton Decl.") ¶ 2 [Dkt. No. 25].  The officer advised that it was for her safety.  Declaration of Lt. Jasmin Gomez ("Gomez Decl.") ¶ 21 [Dkt. 69-4], Ex. V at 20:26:58–20:48:46 [Dkt. 69-69].

- On June 10, LAPD officers on the corner of Fourth and Olive chased away multiple people wearing helmets clearly labeled "PRESS" and carrying large cameras, ordering them to leave the area.  Rose Decl. ¶ 43, Ex. 56 [Dkt. 37].  No protestors are visible in the vicinity.  *Id.*

- On June 11, the LAPD kettled a group of press, including a Fox News journalist and freelancers, in front of City Hall.  Rose Decl. ¶ 48, Exs. 61–64 [Dkt. 37].  Though they pointed out that they were credentialed media, the journalists were not permitted to leave.  *Id.*

- On July 4, LAPD officers kettled Sean Beckner-Carmitchel, Lexis-Olivier Ray, and other members of the press in the MOCA Geffen parking lot.  Supplemental Declaration of Sean Beckner-Carmitchel ("Supplemental Beckner-Carmitchel Decl.") ¶ 4 [Dkt. 43-1]; Supplemental Declaration of Adam Rose ("Supplemental Rose Decl.") ¶ 5 [Dkt. 43-2].  The LAPD eventually escorted the press away after calling a commanding officer to request a media escort.  Gomez Decl. ¶¶ 19–20, Ex. T at 19:45:40–19:47:41 [Dkt. 69-18], Ex. U at 19:44:04–19:48:32 [Dkt. 69-19].

## 2.    Use of Force

When journalists were able to remain among the protestors, they faced an onslaught of physical force.  On multiple occasions, the LAPD used projectiles, tear gas, or other uses of force on individuals who bore markers distinguishing them as press and (in some cases) stood apart from protestors.[4]

- On June 8, freelance journalist and LA Press Club member Sean Beckner-Carmitchel and other journalists were forced to leave a parking garage, as the LAPD teargassed protestors throwing fireworks and other projectiles.  Declaration of Sean Beckner-Carmitchel ("Beckner-Carmitchel Decl.") ¶¶ 1, 5–6 [Dkt. 20], Ex. 37 [Dkt. 37]; Rose Decl. ¶ 30, Ex. 38 [Dkt. 37]; Gomez Decl. ¶ 39, Ex. LL at 19:31:15–19:32:29 [Dkt. 69-36].  In the aftermath, video evidence shows an LAPD officer pushing an unidentified woman photographer with press identification and multiple professional cameras as she attempts to disperse.  Beckner-Carmitchel Decl. ¶¶ 5–6, Ex. 36 [Dkt. 37].  A mounted officer ran his horse into her from behind.  *Id.*  Video evidence does not show any violent activity near the photographer.  Gomez Decl. ¶ 39, Ex. LL at 19:31:15–19:32:29.

- On the same day, Lauren Tomasi of 9News Australia was speaking into a professional TV camera, dozens of feet from the line of officers behind her.  Rose Decl. ¶ 26, Ex. 30 [Dkt. 37] (news footage of the incident).  Protestors are visible behind, but not immediately near her.  *Id.*  Despite this, an LAPD officer aims in Tomasi's direction, hitting her leg with a rubber bullet.  *Id.*; Gomez Decl. ¶ 9, Ex. J [Dkt. 69-8].  The officer shouts that the protestors are "throwing" objects, but this is not visible from the officer's body worn video before or at the time he shoots Tomasi.  *Id.* at 17:09:37.

- On June 9, Michael Nigro, a photographer whose work is regularly published by Getty Video, AP Wire, and others, stood on a pedestrian overpass, which offered views of the protest from above.  Declaration of Michael Nigro ("Nigro Decl.") ¶¶ 2, 5–6 [Dkt. 26].

---

[4] LAPD uses three different types of LLMs: the 40mm less-lethal launcher, the 37mm less-lethal launcher, and the FN 303 less-lethal launcher.  Whiteman Decl. ¶ 3.  The Court collectively refers to these as "crowd control weapons."

Though he was clad in a helmet and vest clearly reading PRESS and was far above the protest activity, he heard projectiles hitting the bridge near him three times at approximately 5:43 p.m. *Id.* ¶¶ 5–7, 16.  LAPD body worn video confirms Nigro is standing on the bridge far from protest activity just before 5:43pm.  Whiteman Decl. ¶ 15b, Ex. K at 17:41:56–17:42:45 [Dkt. 69-9]; *id.* at 17:41:57 (three shots audible).

- On June 9, an LAPD officer shot Jeremy Lindenfeld, a Capital & Main reporter and member of the LA Press Club, with a rubber bullet in the abdomen from approximately 25 feet away. Rose Decl. ¶ 36, Ex. 46 [Dkt. 37].  Mr. Lindenfeld wore a press ID and a helmet emblazoned with "PRESS." *Id.*

- On June 11, Harris, who carried two large, professional cameras, informed an LAPD officer on horseback that he was a member of the press.  Harris Decl. ¶ 5.  The officer stated that Harris did not have a pass, so he would need to leave.  Gomez Decl. ¶¶ 34–35, Exs. GG, HH [Dkts. 69-31, 69-32].  Harris began to walk away, but the officer ran into him with his horse and threatened to hit him with his baton for failing to disperse quickly enough.  Harris Decl. ¶ 6; Gomez Decl. ¶¶ 34–35, Exs. GG, HH.  Another officer shot him in the back of the leg with an LLM.  Harris Decl. ¶ 6.; Gomez Decl. ¶ 36, Ex. II at 18:52:15–18:52:37 [Dkt. 69-33].

- On June 14, photojournalist Héctor Adolfo Quintanar Perez was covering the aftermath of the No Kings protest, wearing a large press badge and carrying two professional cameras. Declaration of Héctor Adolfo Quintanar Perez ("Perez Decl.") ¶¶ 2–3 [Dkts. 23–24]; Rose Decl. ¶ 54, Ex. 13 [Dkt. 32].  While Perez was taking photos of the skirmish line, an LAPD officer—standing close enough to see his press badge—shot him with an LLM in the knee. Perez Decl. ¶¶ 7–8; Rose Decl. ¶ 54, Ex. 10 [Dkt. 32] (showing the distance from which the LAPD officer fired); Gomez Decl. ¶ 24, Ex. Y [Dkt. 69-23].  As of the date of his declaration, Perez lives with pain and walks with a cane.  Perez Decl. ¶ 11.

- On the same day, ABC News chief national correspondent Matt Gutman was reporting live, many feet from the protestors, when an officer shoved him from behind.  Rose Decl. ¶ 51, Ex. 68 [Dkt. 37]; Whiteman Decl. ¶ 15f., Ex. Q [Dkt. 69-61].  The LAPD avers that Gutman interfered with their ability to form a skirmish line along that crosswalk.  *Id.*  Not long after,

officers yelled at and shoved Gutman for brushing past an officer's back, again many feet from protestors.  Rose Decl. ¶ 51, Ex. 69 [Dkt. 37]; Whiteman Decl. ¶ 15f., Exs. R, S [Dkts. 69-16, 69-17].

On other occasions, the evidence presented credibly shows that the LAPD fired indiscriminately at crowds that included members of the press.  For example, on June 8, the LAPD discharged "skip-fire" rounds into a group of protestors and journalists, hitting CalMatters reporter Sergio Olmos.[5]  Rose Decl. ¶ 32, Ex. 40 [Dkt. 37]; Gomez Decl. ¶ 47, Ex. TT [Dkt. 69-44].  On June 14, LAPD officers fired rubber bullets into the crowd, hitting photographer Marshall Woodruff, slicing open his right eye, and leaving him with potentially permanent vision loss.  Rose Decl. ¶ 53, Ex. 70 [Dkt. 37].  On the same day, an unidentified reporter for Agence France-Presse wearing a helmet with AFP stickers and a press patch across their chest was shot in the face and leg, approximately 90 feet from police.  Rose Decl. ¶ 56, Exs. 73–74 [Dkt. 37].  And an LAPD mounted officer charged 82-year-old photographer David Healy with his horse, knocking Healy to the ground and breaking one of his ribs.  *Id.* ¶ 55, Ex. 72.  *See* Gomez Decl. ¶¶ 28–29, Ex. AA at 16:02:05–16:05:35 [Dkt. 69-25] and Ex. BB at 16:05:00–16:05:30 [Dkt. 69-26] (showing LAPD officers pushing Healy, who had no visible press pass but carried two professional cameras, and running into him on horseback).

Other members of the media were tear gassed while among the crowds.  *See, e.g.,* Rose Decl. ¶ 44, Ex. 57 [Dkt. 37] (Lauren Day of ABC News reporting being tear gassed in Little Tokyo on June 10); *id.* ¶ 57 [Dkt. 37] (photojournalist Tod Seelie teargassed multiple times on June 14); Chinea Decl. ¶¶ 25–28, Ex. 78 [Dkt. 37] (reporting being teargassed on June 14, without warning).

**B.    Organizational Plaintiffs**

The LA Press Club is a 501(c)(3) nonprofit organization, offering scholarship and fellowship opportunities, educational and professional networking events, and awards programs for 1,000 member journalists, as well as non-member journalists, in Southern California,.  Rose Decl. ¶¶ 2, 5.

---

[5] "Skip-firing" refers to the practice of aiming munitions rounds at the ground in front of protestors so that they bounce toward people rather than hitting them directly.  Rose Decl. ¶ 32, n.11.

In the wake of the George Floyd protests in 2020, the LA Press Club created the role of Press Rights Chair to track journalists' interactions with law enforcement, lobby for greater protections for press, and engage law enforcement agencies and civic officials about the rights of journalists. *Id.* ¶¶ 6–10, 15–17, 22–23. For example, the LA Press Club worked with a coalition of press advocacy groups to support SB 98 and AB 48. *Id.* ¶ 8. Since June 6, the LA Press Club has diverted significant time and resources to assist injured journalists with medical and legal services, provide tips on safety and access during protests, and document press rights violations, including the alleged violations here. *Id.* ¶¶ 20–21, 24. Because of these efforts, Secretary and Press Rights Chair Adam Rose had to divert time and resources from fundraising and award programs, including its annual Journalism Awards Dinner, devoting over a 100 hours in the first month alone. Rose Decl. ¶¶ 1, 20.

Status Coup is a progressive, independent investigative reporting network and media outlet, providing on-the-ground reporting to over 3,000 paying members. Chariton Decl. ¶ 1. In service of its mission, Status Coup devotes significant resources to in-field and investigative reporting of protests, strikes, political rallies, and other mass events. *Id.* ¶ 3. Status Coup's mission relies on its journalists' ability to be in close proximity to police and protestors during these events. *Id.* ¶ 4; *id.* ¶ 7 (noting that it derives a large portion of its income from licensing videos captured at protests and other exigent events). The LAPD's response to protests since June 6 has frustrated Status Coup's ability to provide the "on the ground" coverage on which it prides itself and on which its business model depends. *Id.* ¶¶ 6–10. Instead, Status Coup has been forced to make and distribute content advocating for its journalists' safety. *Id.* ¶ 8.

### C.    Expert Declarations

Plaintiffs produce declarations from Roger Clark, a police practices expert, and Dr. Rohini Haar, a licensed physician specializing in Emergency Medicine. Declaration of Roger Clark ("Clark Decl.") [Dkt. 56-2]; Declaration of Dr. Rohini Haar ("Haar Decl.") [Dkt. 56-3]. The Court finds each is a qualified, credible, and persuasive expert witness, and considers their testimony herein.

#### 1.    Roger Clark

Clark draws on his twenty-seven year career at the Los Angeles County Sheriff's Department ("LASD"). Clark Decl. ¶¶ 3–4. While staffed on the LASD Emergency Operations Bureau, Clark

1  wrote and trained personnel on procedures for natural disasters and civil disorders.  *Id.* ¶ 4.  He

2  applied these procedures when he held command responsibilities during the Rodney King Uprisings

3  of April and May 1992, and during the 1984 Olympics.  *Id.*  Since his retirement, Clark has provided

4  expert reports and testimony on litigation arising from police responses to civil disturbances in Los

5  Angeles, Long Beach, San Diego, and Davis, California.  *Id.* ¶ 9.

6        Based on his expertise, Clark opines that the LAPD is amply capable of protecting civilians,

7  themselves, and property without deploying crowd control weapons against members of the media

8  who pose no threat of imminent harm.  *Id.* ¶ 10.  He further opines that the LAPD is capable of

9  permitting journalists in closed areas without sacrificing public safety or its own safety.  *Id.* ¶ 11.

10                  **2.**      **Dr. Rohini Haar**

11        Dr. Haar is an attending physician in the Department of Emergency Medicine at Kaiser

12  Hospital in Oakland, California, and adjunct professor at the University of California, Berkeley

13  School of Public Health.  Haar Decl. ¶¶ 3–4.  Dr. Haar's research focuses on the impacts of violence

14  and human rights violations on health, including the use and abuse of crowd control weapons like

15  tear gas and kinetic impact projectiles.  *Id.* ¶¶ 4, 6–10, Ex. A.

16        Based on her research and experience, Dr. Haar concludes that crowd control weapons can

17  cause significant and long-lasting health harms—from respiratory damage to blunt force trauma to

18  serious injury, permanent disability and death—if they impact critical parts of the body.  *Id.* ¶¶ 17–

19  28, 44–64.  In particular, some kinetic impact projectiles can be as lethal as conventional live

20  ammunition.  *Id.* ¶¶ 19, 22–28.

21           **D.**      **Procedural Background**

22        LA Press Club and Status Coup initiated the instant action against the City of Los Angeles

23  and LAPD Chief Jim McDonnell in his official capacity.  Complaint [Dkt. 1].  Plaintiffs allege that

24  the LAPD violated Plaintiffs' First Amendment right of access and right to be free from retaliation;

25  violated Plaintiffs' rights under Article I of the California constitution; violated California Penal

26  Code sections 409.7 and 13652; and violated the Tom Bane Civil Rights Act, Cal. Civil Code § 52.1.

27  *Id.* ¶¶ 45–53.

28

On July 3, 2025, Plaintiffs moved for a temporary restraining order enjoining Defendants from dispersing, citing, arresting, or assaulting journalists present at protests and from using crowd control weapons or other force against journalists who pose no imminent threat of serious harm. *Ex Parte* Application for Temporary Restraining Order 1 [Dkt. No. 16]. On July 10, 2025, the Court granted Plaintiffs' Application and enjoined the LAPD from prohibiting journalists from entering or remaining in closed areas and from using crowd control weapons against journalists who are not posing a threat of imminent harm to an officer or another person ("TRO Order"). [Dkt. 44]. The Court ordered the LAPD to summarize the TRO Order and disseminate its contents to all LAPD officers within 72 hours. *Id.* at 13. The Court also set a briefing schedule for a hearing on a preliminary injunction. *Id.* at 14.

The parties twice stipulated to extend the TRO. [Dkts. 46, 59]. On August 13, 2025, Plaintiffs moved for contempt against Defendants. *Ex Parte* Application for Contempt [Dkt. 63]. The Court heard argument on Plaintiffs' Motion for a Preliminary Injunction and Motion for Contempt. [Dkt. 78]. Following the hearing, the Court extended the TRO by 14 days or until the Court issues a decision on Plaintiffs' Motion for a Preliminary Injunction. [Dkt. 79].

## III.   LEGAL STANDARD

To prevail on a motion for a preliminary injunction, the movant must establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in its favor, and (4) a preliminary injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024). Where the non-movant is a government entity, "the third and fourth factors . . . merge." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc).

In the Ninth Circuit, the *Winter* factors may be evaluated on a sliding scale such that "a stronger showing of one element may offset a weaker showing of another." *Id*. at 684 (citing *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017)). "When the balance of equities tips sharply in the plaintiff's favor, the plaintiff must raise only serious questions on the merits—a lesser showing than likelihood of success." *Id*. (citation omitted).

1    **IV.    DISCUSSION**

2        **A.    Supplemental Jurisdiction**

3        Defendants first contend that this Court does not have supplemental jurisdiction over

4   Plaintiffs' section 409.7 claim.  Opposition at 5 (citing 28 U.S.C. § 1367; *Pell v. Procunier*, 417 U.S.

5   817, 833–34 (1974)).  More specifically, Defendants argue that the California claim shares no

6   common nucleus of operative facts with the federal First Amendment claims since the former, but

7   not the latter, gives journalists a right to enter areas closed to the public.  *Id.*  The Court disagrees.

8        Claims that arise from the same "transaction or occurrence" undoubtedly share a "common

9   nucleus of operative fact," but the common nucleus test is broader than that: it "requires only that the

10   jurisdiction-invoking claim and the supplemental claim have some loose factual connection."  *See*

11   *Elements Spirits, Inc. v. Iconic Brands, Inc.*, No. 15-cv-02692-DDP-AGRx, 2015 WL 5470297, at

12   *4 (C.D. Cal. Sept. 17, 2015); *Pac. Steel Grp. v. Commercial Metals Co.*, 600 F. Supp. 3d 1056,

13   1079 (N.D. Cal. 2022); 13 Wright & Miller's Federal Practice & Procedure § 3567.1 (3d ed. 2025).

14   Plaintiffs' claims under section 409.7 certainly share this loose factual connection and arise out of a

15   common nucleus of operative facts with their federal First Amendment claim.  The alleged

16   violations of both sources of law occurred at the same protests, on the same days, involving the same

17   people—both journalists and officers.

18        Moreover, while section 409.7 does grant journalist a right of access to areas closed to the

19   public, Cal. Pen. Code § 409.7(a)(1), it also protects them from assault and interference with

20   newsgathering, *id.* § 409.7(a)(2), and from certain penalties for failure to disperse, *id.* § 409.7(a)(3).

21   These latter provisions are even more closely aligned with the First Amendment's protections.

22   Indeed, many of the same facts that establish violations of section 409.7(a)(2) will also support an

23   inference of First Amendment retaliation.  And injunctions guaranteeing the rights protected by

24   409.7(a)(3) have been issued and upheld on First Amendment grounds.  *See Index Newspapers*

25   *LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 823, 831 (9th Cir. 2020) (denying Defendants' motion for

26   a stay).  To draw a line between section 409.7(a)(1) on the one hand and sections 409.7(a)(2) and (3)

27   and the First Amendment on the other and say they rest on different facts is to slice the salami too

28   thin.  The Court has supplemental jurisdiction over Plaintiffs' section 409.7 claims.

1      Defendants next ask this Court to decline supplemental jurisdiction over Plaintiffs' state law

2  claims, on the basis that they require novel interpretation of state law and predominate over

3  Plaintiffs' federal claim.  Opposition at 6–7; *see* 28 U.S.C. § 1367(c)(1), (2).  The Court refuses to

4  do so.  While Defendants correctly note that no other court has analyzed and applied either section

5  409.7 or 13652 (both of which have only been in effect since 2022), this does not justify a rejection

6  of the Court's responsibility to apply state law.  Here, the Court need not advance a novel or

7  complex application of state law because the plain meaning of the statute and the legislature's clear

8  intent suffices to resolve the question before it.[6]  As discussed, *infra*, section 409.7 parallels section

9  409.5, which *has* been interpreted, answering many of the open questions troubling Defendants.  *See*

10  *Leiserson v. City of San Diego*, 184 Cal. App. 3d 41 (1986); 67 Cal. Op. Att'y Gen. 535 (1984).  In

11  short, this Court is competent and able to adjudicate Plaintiffs' state law claims.

12      The Court similarly finds that Plaintiffs' state law claims do not predominate in a way that

13  justifies declining supplemental jurisdiction.  As already discussed, the claims are likely to overlap

14  in terms of proof and in terms of the scope of relief.  *See United Mine Workers of Am. v. Gibbs*, 383

15  U.S. 715, 726–27 (1966) ("[I]f it appears that the state issues substantially predominate, whether in

16  terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought,

17  the state claims may be dismissed without prejudice and left for resolution to state tribunals.").  The

18  Court will therefore exercise its discretion to assert supplemental jurisdiction over Plaintiffs' state

19  law claims.

---

[6] The Court applies the California Supreme Court's clear guidance:

> [O]ur task is to ascertain the intent of the Legislature so as to effectuate the purpose
> of the enactment. We look first to the words of the statute, which are the most reliable
> indications of the Legislature's intent. We construe the words of a statute in context,
> and harmonize the various parts of an enactment by considering the provision at issue
> in the context of the statutory framework as a whole.  If the statutory language
> supports more than one reasonable construction, then we may look to extrinsic aids,
> including the ostensible objects to be achieved and the legislative history.

*Rodriguez v. Superior Ct.*, 15 Cal. 5th 472, 496–97 (2023) (cleaned up).

1        **B.    *Pullman* Abstention**

2        Defendants also assert that the Court should abstain from hearing this case pursuant to

3    *Railroad Comm'n of Tex. v. Pullman Co*., 312 U.S. 496 (1941).  A court has discretion to abstain

4    under *Pullman* only in very limited circumstances where: (i) a case touches on a sensitive area of

5    social policy that is best left to the states; (ii) a federal constitutional issue could be avoided (or

6    mooted or narrowed) by a definitive state court ruling on state law issues; and (iii) proper resolution

7    of the state law issue is uncertain.  *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 939–40

8    (9th Cir. 2002).  The Ninth Circuit has further cautioned that abstention is generally inappropriate in

9    First Amendment cases, since (1) there is a risk that the delay that results from abstention will chill

10   the exercise of the rights the plaintiffs seek to protect, and (2) the guarantee of free expression is

11   always an area of particular federal concern.  *See Chula Vista Citizens for Jobs and Fair

12   Competition v. Norris*, 782 F.3d 520, 528 (9th Cir. 2015); *Wolfson v. Brammer*, 616 F.3d 1045, 1066

13   (9th Cir. 2010).

14       *Pullman* abstention "is intended . . . to avoid a collision between the federal courts and

15   state . . . legislatures," as well as "to prevent the premature determination of constitutional

16   questions."  *Porter v. Jones*, 319 F.3d 483, 492 (9th Cir. 2003) (citations omitted).  In the

17   paradigmatic case, courts may abstain to enjoin state or local officers from enforcing an allegedly

18   unconstitutional state law, on the theory that the state courts may cabin a statute to moot the federal

19   constitutional concern.  Here, the Court is presented with the reverse situation—*i.e.*, where

20   California's state law is more protective of Plaintiffs' rights than the federal constitution.  In this

21   instance, there is no argument that sections 409.7 and 13652 are unconstitutional, and there is no risk

22   of conflict between this federal court and the California Legislature.

23       As the Court has already explained, the fact that the state courts have not yet interpreted and

24   applied these particular statutes does not leave this Court completely rudderless.  *See Fireman's

25   Fund*, 302 F.3d at 940 ("The fact that a state court has not ruled on the precise issue at stake in this

26   case does not mean that the proper resolution of the state law issue is 'uncertain.'"); *see also Pearl

27   Invest. Co. v. City & Cnty. of San Francisco*, 774 F.2d 1460, 1465 (9th Cir. 1985) ("Uncertainty for

28

14

1    purposes of *Pullman* abstention means that a federal court cannot predict with any confidence how

2    the state's highest court would decide an issue of state law.").

3        Finally, abstention is particularly inappropriate here, where Plaintiffs present First

4    Amendment issues—an area of particular federal concern—and where any delay will chill the

5    exercise of those same rights.

6        **C.    Standing**

7        To establish the "irreducible constitutional minimum of standing," a plaintiff must have

8    suffered an "actual or imminent" injury in fact, such that the injury is "fairly trace[able]" to the

9    defendant's challenged conduct and the injury is likely to be "redressed by a favorable decision."

10    *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted).  Plaintiffs establish standing

11    for prospective injunctive relief when they allege "either 'continuing, present adverse effects'" of a

12    defendant's past illegal conduct, "or 'a sufficient likelihood that [they] will again be wronged in a

13    similar way.'"  *Villa v. Maricopa Cnty.*, 865 F.3d 1224, 1229 (9th Cir. 2017) (first quoting *O'Shea v.

14    Littleton*, 414 U.S. 488, 495–96 (1974), and then quoting *City of Los Angeles v. Lyons*, 461 U.S. 95,

15    111 (1983)).  Moreover, Plaintiffs may show that an injury is likely to recur in "at least two ways:"

16    they may show that the injury "stems from" the defendant's written policy, or that the harm is "part

17    of a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.'"

18    *Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014) (first quoting *Armstrong v. Davis*, 275 F.3d

19    849, 861 (9th Cir. 2001) and then quoting *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985)).

20        An organization may sue on behalf of its members when: "(1) its members would otherwise

21    have standing to sue in their own right; (2) the interests it seeks to protect are germane to the

22    organization's purpose; and (3) neither the claim asserted nor the relief requested requires the

23    participation of individual members in the lawsuit."  *Am. Unites for Kids v. Rousseau*, 985 F.3d

24    1075, 1096 (9th Cir. 2021) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343

25    (1977)).  Absent a member with standing, an organization may still have standing to vindicate its

26    own interests if it was injured in its own right.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379

27    n.19 (1982).  Direct organizational standing can be satisfied if the organization alleges that a

28    defendant's actions "affected and interfered with [a plaintiff organization's] core business

activities[.]" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).  The
Ninth Circuit has "further specified that an organization has direct standing to sue where a
defendant's behavior has 'frustrated its mission and caused it to divert resources in response to that
frustration of purpose.'" *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 987 (9th Cir. 2025)
(quoting *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021)).

Here, LA Press Club and Status Coup have standing on behalf of their members as well as
for their own injuries.  Both organizations have members who suffered injuries sufficient to confer
standing in their own right.  *See* Beckner-Carmitchel Decl. ¶¶ 1, 5–6, Ex. 36 (member of LA Press
Club dispersed from closed area); Berg Decl. ¶¶ 2–4 and Rose Decl. ¶ 40 (Status Coup journalist and
member of LA Press Club dispersed from closed area); Rose Decl. ¶ 36, Ex. 46 (member of the LA
Press Club shot in the abdomen); *id.* at ¶ 19 (at least seven LA Press Club members affected since
June 6).  Both organizations seek to protect the right of journalists to safely "cover and report news
without government interference," an interest clearly germane to their purposes.  *Cal. First Amend.
Coal. v. Calderon*, 150 F.3d 976, 981 (9th Cir. 1998); Rose Decl. ¶¶ 2, 5; Chariton Decl. ¶¶ 3–7.
And "neither the First Amendment claim nor the injunctive relief requested requires the participation
of individual members" not already named in the instant action.  *Cal. First Amend. Coal.*, 150 F.3d
at 981 (9th Cir. 1998).[7]

Insofar as Defendants challenge injury, Plaintiffs' showing suffices to establish that their
injuries are likely to recur.  Where, as here, "actual repeated instances are documented," the
likelihood of recurrence "ceases to be speculative."  *Index Newspapers*, 977 F.3d at 826 (quoting
*Thomas v. Cnty of Los Angeles*, 978 F.2d 504, 507 (9th Cir. 1992)).  Plaintiffs proffer evidence that
some journalists faced repeated violations.  *See* Nigro Decl. ¶¶ 5–7, 10–11 (averring that he was

---

[7] Both Plaintiffs have also established organizational standing.  If journalists lack access to hotspots
of protest activity, media outlets like Status Coup cannot fulfil their "core business activit[y]" of
delivering content from the frontlines of exigent events.  *Food & Drug Admin. v. All. for
Hippocratic Med.*, 602 U.S. at 395; Chariton Decl. ¶¶ 3–10.  Similarly, the Defendants' assault on
journalists defeats LA Press Club's core mission of "support[ing], promot[ing] and defend[ing]
quality journalism."  Rose Decl. ¶¶ 2, 6–10, 17, 21–23 (describing how DHS actions have frustrated
the LA Press Club's longstanding efforts to expand press rights and to fundraise to maintain its
programming).

targeted on a bridge and later shot in the head by a projectile); Beckner-Carmitchel Decl. ¶¶ 1, 5–6
and Supplemental Beckner-Carmitchel Decl. ¶ 4 (dispersed on June 8 and kettled again on July 4).
And Defendants' conduct has "persisted for weeks and [is] ongoing," as Plaintiffs moved for
contempt on August 13, contending that the LAPD again denied journalists access. *Ex Parte
Application for Contempt.*

Protests are certain to continue in the weeks and months to come.  LA Press Club members
and Status Coup journalists intend to cover these events, placing themselves in the LAPD's line of
fire.  Rose Decl. ¶ 61; Chariton Decl. ¶¶ 3–4, 6; Berg Decl. ¶ 5 ("To do my job I need to be close to
the protests.").  In light of the LAPD's history, *see supra* Part I, Defendants are unlikely to
spontaneously comply with statutory and constitutional requirements.  *Multi-Ethnic Immigr.
Workers*, 246 F.R.D. at 628 ("Although steps were taken in the immediate aftermath of previous
litigation, nevertheless new instances of misconduct occurred.").  And unlike in *City of Los
Angeles v. Lyons*, 461 U.S. 95 (1983)—where plaintiff could avoid further injury by
"avoid[ing] . . . illegal conduct"—Plaintiffs were injured engaging in newsgathering.  *Hodgers-
Durgin v. de la Vina*, 199 F.3d 1037, 1041 (9th Cir. 1999) (citing *Spencer v. Kemna*, 523 U.S. 1, 15
(1998)).  Taken together, "no string of contingencies [is] necessary to produce an injury."  *Id.* at
1041–42.[8]

---

[8] The Court is cognizant of the discussion of standing in Justice Kavanaugh's very recent
concurrence in *Noem v. Vasquez Perdomo*.  606 U.S. __, 2025 WL 2585637, at *2–3 (Kavanaugh,
J., concurring) (discussing *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)).  Plaintiffs' theory of
standing here is distinguishable from that in *Vasquez Perdomo* and in *Lyons*.  There, plaintiffs
alleged that they were stopped by law enforcement—in *Vasquez Perdomo*, without reasonable
suspicion of unlawful presence, and in *Lyons*, that he was subsequently subjected to an unlawful
chokehold.  The Court in *Lyons* and Justice Kavanaugh in *Vasquez Perdomo* found that plaintiffs
"ha[d] no good basis to believe that law enforcement will unlawfully"—or imminently—"stop them
in the future."  2025 WL 2585637 at *2.  There was thus not a "sufficient likelihood" that the
plaintiffs, as opposed to "any other citizen of Los Angeles," would "again be wronged in a similar
way."  *Id.* (quoting *Lyons*, 461 U.S. at 111).

The same is not true here.  Plaintiffs' injuries recurring does not depend on them happening to be in
the wrong place at the wrong time, such that they, as opposed to someone else, encounter law
enforcement's unlawful actions.  Instead, Plaintiffs aver that they intend to continue covering the
protests where these very actions are happening.  *See* Rose Decl. ¶ 61; Chariton Decl. ¶¶ 3–4, 6;
Berg Decl. ¶ 5.  And they are well within their rights to do so; indeed, they are protected by the First

1    **D.    Likelihood of Success**

2        **1.    State law claims**

3            **a.    <u>Section 409.7</u>**

4    As discussed, California Penal Code section 409.7 codifies specific protections for journalists

5    and the news media when officers close the areas surrounding command posts or establish a police

6    line or rolling closure at a protest.  It provides that duly authorized representatives of news services

7    may enter closed areas without being cited for failure to disperse, curfew violations, or obstruction.

8    Cal. Pen. Code § 409.7(1), (3).  It also provides that officers shall not intentionally assault, interfere

9    with, or obstruct such representatives in the gathering, receiving, or processing information for

10   communication to the public.  *Id.* § 409.7(2).

11   Plaintiffs have presented credible (and persuasive) evidence of numerous instances in which

12   LAPD officers appear to aim at individuals easily identifiable as members of the press.  Jeremy

13   Lindenfeld, for example, was shot in the abdomen from approximately 25 feet away while he was

14   wearing a press ID and a helmet emblazoned with "PRESS."  Rose Decl. ¶ 36, Ex. 46.  Michael

15   Nigro was shot at while he stood on a pedestrian overpass far from the protest activity, clad in a

16   helmet and vest clearly reading PRESS.[9]  Nigro Decl. ¶¶ 2, 5–7, 16; Whiteman Decl. ¶ 15b, Ex. K at

17   17:41:56–17:42:45; *id.* at 17:41:53 (three shots audible).  Héctor Adolfo Quintanar Perez, wearing a

18   large press badge and carrying two professional cameras, was shot with a projectile in the knee by an

19   LAPD officer standing close enough to see his press badge.  Perez Decl. ¶¶ 2, 7–8; Rose Decl. ¶ 54,

20

21   _____

22   Amendment.  *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012) ("[T]he Supreme Court has long
23   recognized a qualified right of access for the press and public to observe government activities.");
     *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018) ("The First Amendment
24   protects the right to photograph and record matters of public interest.").

25   Because Plaintiffs intend to continue to be present at ongoing protests, protests at which Defendants
26   target or fire indiscriminately upon the press, the risk of recurrence of their injuries is not speculative
     in the way it was in *Lyons* or *Vasquez Perdomo*.

27
     [9] The Court acknowledges, however, that Nigro averred that he saw both LAPD and National Guard
28   officers carrying crowd control weapons.  Nigro Decl. ¶ 6.

1  Exs. 13, 10; Gomez Decl., Ex. Y.[10]  This is strong evidence of "intention[al] assault[s]" by LAPD

2  officers on "duly authorized representative[s]" of "news service[s]" who are "gathering, receiving, or

3  processing information for communication to the public."

4      On other occasions, LAPD officers forced journalists to leave closed areas, as they did to

5  CNN reporter Jason Carroll and his crew while they were live on air.  Rose Decl. ¶ 39, Ex. 50;

6  Whiteman Decl. ¶ 15d, Ex. N.  Tina Berg, a Status Coup journalist who was forced from her position

7  on an embankment over 100 feet from protestors purportedly for her own safety, Berg Decl. ¶¶ 2–4;

8  Gomez Decl. ¶ 21, Ex. V at 20:26:58–20:48:46, and a group of multiple people wearing "PRESS"

9  helmets and carrying large cameras were dispersed from the corner of Fourth and Olive.  Rose Decl.

10  ¶ 43, Ex. 56.  This violates Penal Code section 409.7, which expressly permits journalists to be in

11  areas closed to the public.  Cal. Pen. Code § 409.7(a)(1).[11]  Section 409.7 countenances dispersal of

12  _____

13  [10] To be sure, these are not isolated instances: Montez Harris, who carried two large professional
14  cameras, was run into with a horse, threatened with a baton, and shot in the back of the leg with an
    LLM while walking away.  Harris Decl. ¶¶ 5–6; Gomez Decl. ¶¶ 34–36, Exs. GG, HH, II at
15  18:52:15–18:52:37.  An unidentified woman photographer with press identification and multiple
    professional cameras was pushed and run into by a horse while walking away from officers.
16  Beckner-Carmitchel Decl. ¶¶ 5–6, Ex. 36; Gomez Decl. ¶ 39, Ex. LL at 19:31:15–19:32:29.  Officers
    shoved both Matt Gutman and Erin Burnett while they were reporting on live TV.  Rose Decl. ¶ 51,
17  Ex. 69; Whiteman Decl. ¶ 15f, Exs. R, S; Rose Decl. ¶ 38, Ex. 49.

18  [11] The legislative history answers several of the questions the City raises regarding 409.7 and renders
19  irrelevant many of their factual disputes regarding the application of that section to these facts.

20  It is clear, for example, that the question of who counts as a "duly authorized representative" of the
    news media is decided by the news media, not the officers on scene.  Opposition at 2.  *See* 67 Cal.
21  Op. Att'y Gen. 535, 539 (1984) (interpreting the same phrase in section 409.5 to refer to "the news
    station, newspaper, or radio or television station or network having 'duly authorized' the individual
22  to be its representative at the site," not "someone authorized to be in the area by the law enforcement
    officer"); *compare* Sen. Bill 98, 2021–2022 Reg. Sess. (May 20, 2021) ("A duly authorized
23  representative of any news service . . . may enter the closed areas described in this section *upon
24  receiving authorization from a commanding officer on scene*." (emphasis added)) *with* Cal. Pen.
    Code § 409.7 (which does not include the italicized).
25

26  The legislative history also clarifies that "safety" alone is not a permissible reason to exclude
    journalists from closed areas.  Gomez Decl. ¶ 21, Ex. V at 20:26:58–20:28:46 (telling Berg to leave
27  the location for her and the LAPD's safety).  Indeed, *Leiserson*, in interpreting the adjacent section
    409.5—which the legislature intended to guide the application of section 409.7—reasoned that
28  journalists' access *could not* be limited by safety arguments, as the Legislature contemplated the

1  journalists from these closed areas only if "police personnel at the scene reasonably determine that

2  such unrestricted access *will interfere* with emergency operations," and even then the restrictions

3  must be "for only so long and only to such an extent as is necessary to prevent actual interference."

4  *Leiserson*, 184 Cal. App. 3d at 51 (emphasis in original); Ass. Pub. Safety Comm. Analysis 6, Sen.

5  Bill 98, 2021–2022 Reg. Sess. (citing same).  Defendants proffer no evidence here that these

6  journalists were interfering with emergency law enforcement operations.[12]

7       In other instances, the LAPD forced journalists to remain within certain areas.  Harris was

8  kettled and pushed against a wall with a group of protestors.  Harris Decl. ¶¶ 2, 4, 8.  Another group

9  of press, including a Fox News journalist and freelancers, were kettled in front of City Hall and not

10  permitted to leave.  Rose Decl. ¶ 48, Exs. 61–64.  Yet another group of press was kettled in the

11  MOCA Geffen parking lot and was not permitted to leave for some time.  Supplemental Beckner-

12  Carmitchel Decl. ¶ 4.  All of these people identified themselves as press to the relevant officers.  In

13  another instance, LAPD officers held a group of approximately 20 to 30 journalists from MSNBC,

14  CNN, the AP, and other outlets in a designated "press area" behind their SUVs.  Chinea Decl. ¶¶ 12–

15  21, Ex. 43; Dameworth Decl. ¶¶ 5–10, Ex. C.  This, too, violates section 409.7.  Cal. Pen. Code

16  409.7(a)(1), (2); *Leiserson*, 184 Cal. App. 3d at 50 ("We [] have serious concerns about how a

17  designated press area . . . comports with a statute which specifically authorizes representatives of the

18  press to enter closed areas.").  Yet again, Defendants proffer no evidence that journalists were

19  interfering with police operations.  Indeed, in the last incident, body worn video shows that the

20  journalists did not interfere with officers' access to their vehicles.  Chinea Decl. ¶¶ 12–21, Ex. 43;

21  Dameworth Decl. ¶¶ 5–10, Ex. C.

22  _____

23  existence of a safety hazard and "concluded that the public's right to know is more important."  184
   Cal. App. 3d at 50.  *See* July 12, 2021 Assembly Committee on Public Safety Report, at 6 (citing

24  *Leiserson*, 184 Cal. App. 3d at 51) ("In regards to access, the author submits that case law
   adequately addresses an[y] potential problems that may arise.").

25

26  [12] Commander Whiteman avers that Carroll and his crew were in "an inner perimeter during a mass
   arrest," but the Court can evince no evidence that they were interfering with the officers' operations.

27  Whiteman Decl. ¶ 15.d.  Insofar as Defendants contend that this area is a "crime scene," from which
   media must be excluded to preserve evidence, such an interpretation would render section 409.7 a

28  dead letter.  *Id.* ¶¶ 11, 15.d., Ex. I.

### b. Section 13652

Penal Code section 13652 permits the use of "kinetic energy projectiles" or "chemical agents" to disperse protests "only . . . if the[ir] use is objectively reasonable to defend against a threat to life or serious bodily injury to any individual . . . or to bring an objectively dangerous and unlawful situation safely and effectively under control, and *only* in accordance with *all* of the following requirements:"

    (2) "Repeated, audible announcements are made announcing the intent to use kinetic energy
        projectiles and chemical agents . . . when objectively reasonable to do so."

    (4) "[K]inetic energy projectiles or chemical agents are targeted toward those individuals
        engaged in violent acts.  Projectiles shall *not* be aimed indiscriminately into a crowd or group
        of persons."

    (6) "Officers shall minimize the possible incidental impact of their use . . . on [*inter alia*]
        journalists[.]"

Cal. Pen. Code § 13652(b) (emphases added).

The evidence before the Court establishes a substantial likelihood that the LAPD has violated several of these provisions.  As noted *supra*, far from minimizing the impact on journalists, the LAPD appeared to target journalists.  On other instances, LAPD officers aimed projectiles "indiscriminately into [] crowd[s] or group[s] of persons."  Cal. Penal Code § 13652(b)(4).  For example, LAPD discharged "skip-fire" rounds into a group of protestors and journalists, hitting CalMatters reporter Sergio Olmos.  Rose Decl. ¶ 32, Ex. 40; Gomez Decl. ¶ 47, Ex. TT.  An LAPD officer shot a rubber bullet with Lauren Tomasi of 9News Australia—reporting live on air—directly in his sightline.  Rose Decl. ¶ 26, Ex. 30; Gomez Decl. ¶ 9, Ex. J.  In another instance, LAPD officers fired rubber bullets into the crowd, hitting photographer Marshall Woodruff, slicing open his right eye and leaving him with potentially permanent vision loss.  Rose Decl. ¶ 53, Ex. 70.

Insofar as the impact on journalists was purportedly "incidental," Defendants provide no evidence that they attempted to minimize the impact on these occasions.  *Id.* § 13652(b)(6).  On at least one instance, LAPD officers deployed LLMs and tear gas without warning, even when such

1    warnings would have been feasible and objectively reasonable.  *Id.* § 13652(b)(2).   *See* Chinea Decl.

2    ¶¶ 25–28, Ex. 78.

3          Plaintiffs have thus shown a strong likelihood of success on the merits of their claims arising

4    out of California Penal Code sections 409.7 and 13652.[13]

5                        **2.    Federal claims[14]**

6          In the alternative, Plaintiffs advance two federal constitutional claims: that Defendants

7    retaliate against journalists and that Defendants impinge upon their right of access.  Motion at 11–

8    14.  The Court finds that these two federal constitutional claims also support the requested relief.

9                        **a.    First Amendment right of access**

10         In asking "whether plaintiffs have a constitutionally protected right to access the public

11   forum where the protests [were] staged," the Ninth Circuit applies the two-step *Press-Enterprise II*

12   test.  *Index Newspapers*, 977 F.3d at 829 (citing *Press-Ent. Co. v. Super. Ct. of Cal.*, 478 U.S. 1

13   (1986)).  First, courts ask "whether the place and process has historically been open to the press and

14   general public" and "whether public access plays a significant positive role in the functioning of the

15   particular process in question."  *Id.* (quoting *Press-Ent.*, 478 U.S. at 8).  If a qualified right of access

16   exists, the government can overcome that right if it demonstrates "an overriding interest based on

17   findings that closure is essential to preserve higher values and is narrowly tailored to serve that

18   interest."  *Id.* (quoting *Press-Ent.*, 478 U.S. at 9).

19         As an initial matter, each of the alleged incidents took place on the City's public streets and

20   sidewalks, "the archetyp[ical] . . . traditional public forum."  *Snyder v. Phelps*, 562 U.S. 443, 456

21   (2011).  *See supra* Part II.A.  As the Supreme Court has recognized, the public has a strong interest

22   in ensuring access for the press, who serve as "surrogates for the public."  *Richmond Newspapers,*

23

24   ─────────────────────

25   [13] Because Plaintiffs' First Amendment and California Penal Code sections 409.7 and 13652 claims
     justify awarding the complete relief they seek, the Court need not address Plaintiff's claims under

26   the Bane Act.

27   [14] The Court notes that its analysis under the California Constitution is identical to its analysis of
     Plaintiffs' federal constitutional claims.  The California Constitution's protections for speech in a

28   public forum are at least as extensive as those of the First Amendment.  *Cuviello*, 944 F.3d at 827.

*Inc. v. Virginia*, 448 U.S. 555, 572–73 (1980).  This role is particularly critical where, as here, journalists sought to cover sudden and secretive immigration raids, which the public has limited opportunity to observe firsthand and must "rel[y] necessarily upon the press to bring to [it] in convenient form the facts of those operations."  *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 490–91 (1975).  Such situations are also especially vulnerable to repression of the press.  "When wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate."  *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012).  If the "free press is the guardian of the public interest," then the independent judiciary is the guardian of the free press."  *Id.*

Defendants do not dispute that on numerous instances, LAPD officers dispersed media alongside protestors.  *See supra* Part IV.D.1.b.  Accordingly, the burden shifts to Defendants to establish that the dispersal of journalists was narrowly tailored to preserve public safety.

Defendants do not meet this burden.  Defendants justify dispersing Carroll and his crew, for example, by pointing out that they were in the vicinity of a group being arrested for violating California Penal Code section 409 (unlawful assembly following an order to disperse).  Rose Decl. ¶ 39, Ex. 50; Whiteman Decl. ¶ 15d, Ex. N.  But Defendants make no showing that Carroll and his crew's presence hindered their ability to arrest the remaining protestors, that they feared protestors may pose as press to avoid arrest, or any other specific justification requiring the dispersal of press as well as protestors.  In other instances, like the dispersal of multiple media members from the corner of Fourth and Olive, Defendants proffer no explanation at all.[15]  Plaintiffs' expert Roger Clark convincingly opines that the LAPD is capable of permitting journalists in closed areas without sacrificing public safety or its own safety.  Clark Decl. ¶ 11.

Plaintiffs have (at a minimum) raised serious questions as to their right of access claim.

---

[15] Defendants correctly point out that, in other instances, they did permit journalists behind skirmish lines.  *See* Gomez Decl. ¶¶ 30–31, Ex. CC at 15:31:17–15:32:00, 15:39:10–15:39:20, 15:46:50–15:47:20; Ex. DD at 14:25:30–14:27:05, 14:46:15–14:48:15, 14:54:45–14:58:55 ("They're press. They're good.").).  The Court agrees that their behavior in those instances comports with California Penal Code section 409.7 and the First Amendment.  But these instances also prove that permitting journalists' access behind closed lines does not (even in tense situations) tactically or logistically hinder law enforcement operations.

1

        **b.**    **First Amendment retaliation**

2
        The First Amendment also prohibits government officials from subjecting individuals to

3
retaliation for engaging in protected activities. *Hartman v. Moore*, 547 U.S. 250, 256 (2006).  To

4
establish a retaliation claim, a plaintiff must show that: (1) they were engaged in a constitutionally

5
protected activity; (2) [Defendants'] actions would "chill a person of ordinary firmness from

6
continuing to engage in the protected activity"; and (3) "the protected activity was a substantial or

7
motivating factor in [Defendants'] conduct." *Index Newspapers*, 977 F.3d. at 827.

8
        Defendants do not—and cannot—meaningfully dispute that journalists were engaged in

9
constitutionally protected activities. *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012) ("[T]he

10
Supreme Court has long recognized a qualified right of access for the press and public to observe

11
government activities."); *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir.

12
2018) ("The First Amendment protects the right to photograph and record matters of public

13
interest.").  Neither can Defendants contest that "being shot with less-lethal munitions," being

14
exposed to tear gas, or "being shoved by a law enforcement officer" would deter individuals of

15
ordinary firmness from continuing to engage in the protected activity. *Lacey v. Maricopa County*,

16
693 F.3d 896, 917 (9th Cir. 2012); *Index Newspapers,* 977 F.3d. at 827 n.4

17
        Rather, Defendants contend that the LAPD's uses of force do not evince retaliatory animus.

18
Opposition at 14–22 (contending that in each instance, any harm to journalists was incidental to

19
officers' efforts to target protestors engaging in acts of violence).  But Defendants cannot explain

20
multiple instances where LAPD officers apparently targeted journalists who distinguished

21
themselves as journalists. *See supra* Part IV.D.1.a.; *Index Newspapers*, 977 F.3d at 829 (finding that

22
injuries to journalists and legal observers "standing nowhere near protesters" constitute

23
"exceptionally strong evidentiary support" for retaliation).

24
        And even accepting that LAPD officers were at times unable to distinguish journalists from

25
protestors, officers (at the very least) appeared to use near-lethal force against nonresistant and non-

26
assaultive subjects recording their actions.  Clark Decl. ¶ 12 (noting that use of crowd control

27
devices are only necessary in face of resistant or assaultive subjects); *id.* ¶ 19, Ex. D (Directive No.

28
17.1) ("Less-lethal force options shall not be used on a suspect or subject who is passively resisting

or merely failing to comply with commands.").  For example, officers pushed and ran a horse into a woman carrying multiple professional cameras who was evidently attempting to walk away from officers.  Beckner-Carmitchel Decl. ¶ 6, Ex. 37.  Harris was attempting to comply with orders to leave when officers ran into him with his horse and shot him in the back of the leg with a projectile.  Harris Decl. ¶ 6; Gomez Decl. ¶¶ 34–35, Exs. GG, HH, II at 18:52:15–18:52:37.  An LAPD mounted officer charged Healy, a 82-year-old carrying two large professional cameras, with his horse, knocking Healy to the ground and breaking one of his ribs.  *Id.* ¶ 55, Ex. 72; Gomez Decl. ¶¶ 28–29, Ex. AA at 16:02:05–16:05:35, Ex. BB at 16:05:00–16:05:30.  This alone suffices to raise an inference of retaliation.  *See Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066, 1088 (N.D. Cal. 2020) (" . . . [A]ggressive conduct . . . such as shooting a reporter with a rubber bullet even though it does not appear she was engaged in illegal activity or posed a threat of any kind, raises a serious question as to [retaliation].").

At a minimum, Plaintiffs have raised serious questions as to their First Amendment retaliation claims.

### c.  *Monell* **liability**

To prevail on their municipal liability claims, Plaintiffs must establish not only constitutional injuries, but must also prove that (1) the city employee committed the alleged constitutional violation pursuant to a formal policy or longstanding practice that constitutes the standard operating procedure of the governmental entity; (2) the individual who committed the constitutional violation was an official with final policy-making authority; or (3) an official with final policy-making authority ratified a subordinate's unconstitutional action and the basis for it.  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), *holding modified by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992), *cert. denied*, 510 U.S. 932 (1993)).  After showing the existence of one of these conditions, a plaintiff must also prove that the condition was the cause-in-fact and the proximate cause of the constitutional deprivation.  *Id.* (citing *Arnold v. Int'l Bus. Mach. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981)).

1    The parties do not contest that LAPD's formal, written policies comport with the First

2    Amendment.  Whiteman Decl. ¶ 11, Ex. I.  But Defendants may not "avoid liability by pointing to a

3    pristine set of policies."  *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1076 n.10 (9th Cir. 2016)

4    (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  A policy or custom "may be

5    inferred from widespread practices or evidence of repeated constitutional violations for which the

6    errant municipal officers were not discharged or reprimanded."  *Menotti v. City of Seattle*, 409 F.3d

7    1113, 1147 (9th Cir. 2005) (citation omitted).

8    Here, Plaintiffs have established that the LAPD has a consistent custom or practice of

9    dispersing the press and subjecting them to unlawful uses of force.  *See supra* Part I; *Multi-Ethnic*

10    *Immigr. Workers*, 246 F.R.D. at 627 (recounting the history of "unlawful dispersal orders and

11    excessive force orders against demonstrators," leading to "settlements that set forth standards for the

12    LAPD in regards to unlawful assemblies, dispersal orders, and treatment of the media").  Indeed, the

13    passage of sections 409.7 and 13652 were motivated (in part) by the LAPD's long history of

14    constitutional violations against media.  *See* Sen. Pub. Safety Comm. Analysis, Sen. Bill 98, 2021–

15    2022 Reg. Sess. at 5–6 (noting uses of force against media in Los Angeles); Assem. Pub. Safety

16    Comm. Analysis, Sen. Bill 48, 2021–2022 Reg. Sess. at 11 (same).  The similarity of Plaintiffs'

17    allegations with the LAPD's historical violations also suggests that Defendants' practices were the

18    moving force behind Plaintiffs' allegations.  Given this record—and the sheer number of instances

19    proffered by Plaintiffs—the Court is satisfied that Plaintiffs have met their burden of showing a

20    likelihood of prevailing on their *Monell* claims.

21    **E.    Irreparable Harm**

22    As both the Ninth Circuit and the Supreme Court have repeatedly affirmed, "[t]he loss of

23    First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

24    injury."  *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (quoting *Elrod v. Burns*,

25    427 U.S. 347, 373 (1976)).  "[A] party seeking preliminary injunctive relief in a First Amendment

26    context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the

27    existence of a colorable First Amendment claim."  *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02

28    (9th Cir. 2005) (quotation marks omitted).

1    Plaintiffs have established to the Court's satisfaction that they are likely to face continued

2    deprivation of their First Amendment rights.  Even insofar as their injuries are rooted in statutory

3    claims, Plaintiffs risk—and in some cases, already suffered—serious injury or permanent disability

4    at the hands of the LAPD.  Haar Decl. ¶¶ 17–28; Perez Decl. ¶ 11 (averring that he still lives with

5    chronic pain and walks with a cane); Rose Decl. ¶ 53 (averring that it is uncertain if Woodruff will

6    regain his vision); *id.* ¶ 55, Ex. 72 (averring that 82-year-old David Healy suffered a broken rib).

7    These risks in turn chill Plaintiffs' exercise of protected activities, piling on further First Amendment

8    deprivations.

9    Accordingly, Plaintiffs have shown that they are "likely to suffer irreparable harm in the

10   absence of preliminary relief."  *See Winter*, 555 U.S. at 20.

11   **F.    Balance of Equities and Public Interest**

12   Finally, the Court finds that the balance of hardships "tips sharply" in favor of Plaintiffs.  *All.*

13   *for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011).  Here, Plaintiffs raise

14   "serious First Amendment questions" and face the prospect of serious injury, disability, or death if

15   they persist in protected newsgathering activities.  *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041,

16   1059 (9th Cir. 2007) (citation omitted); Haar Decl. ¶¶ 17–28.  In contrast, because the injunction

17   mirrors the Defendants' own policies, compliance poses no significant hardship.

18   "It is always in the public interest to prevent the violation of a party's constitutional rights."

19   *Index Newspapers*, 977 F.3d at 838 (citation omitted).  Insofar as Defendants' actions hinder

20   journalists' ability to act as "surrogates for the public," the public is also served by injunctive relief.

21   *Richmond Newspapers*, 448 U.S. at 572–73.  Defendants assert an important public interest in the

22   safety of officers and the public, but they have not made a showing that permitting journalists in

23   closed areas or limiting the use of crowd control weapons (as already required by California law)

24   poses any risk to officers or the public.  *See Clark Decl.* ¶ 11.  The Court's injunction does not shield

25   anyone—even those who purport to be members of media—who engages in violent or unlawful

26   behavior.  Indeed, the state legislature, after carefully weighing the interests of police, journalists,

27   and the public, found that the additional protections of sections 409.7 and 13652 were necessary to

28   adequately protect journalists and the public that relies on them.  This Court agrees.

1

2

3

**G.    Scope of Relief**

Defendants contend that Plaintiffs impermissibly seek injunctive relief on behalf of nonparties.  Opposition at 24.  The Court disagrees.

The Ninth Circuit has long held that injunctive relief "must be tailored to remedy the specific harm alleged." *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) (quoting *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)).  An injunction against state actors must not "require more of state officials than is necessary to assure their compliance with the constitution." *Gluth v. Kangas*, 951 F.2d 1504, 1509 (9th Cir. 1991) (internal quotation marks omitted).  Reacting to a surge in nationwide injunctions, the Supreme Court clarified that district courts lack authority to issue orders "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2550, 2562–63 (2025).  But *CASA* does not disturb the general principle that injunctions may "incidentally" benefit nonparties. *Id.*; *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987)) ("[A]n injunction is not necessarily made overbroad by extending benefit or protection to persons other than [the] prevailing parties in the lawsuit . . . if such breadth is necessary to give prevailing parties the relief to which they are entitled.").

Here, an injunction restricted to members of the LA Press Club and Status Coup would be wholly ineffective in affording Plaintiffs complete relief.  Indeed, the nature of Defendants' constitutional violations ***requires*** some incidental benefits to third parties.  Plaintiffs allege—and have shown, for preliminary purposes—that Defendants indiscriminately deployed force against Plaintiffs' members. *See* Part II.A.2.  Defendants—confronting the exigencies of large-scale protests—are unlikely to be able to determine whether an individual is a member of the LA Press Club or Status Coup before using force. *See Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1502 (9th Cir. 1996).  Even if they could, Plaintiffs could not be assured of any meaningful protection if Defendants were nonetheless permitted to (for example) deploy a volley of rubber bullets at those immediately adjacent to Plaintiffs' members.  For these reasons, the Court finds that

28

1  an injunction applying to all journalists within the LAPD's purview is necessary to afford Plaintiffs

2  complete relief.

V.    **CONCLUSION**[16]

Accordingly, the Court ORDERS Defendants and their officers, agents, servants, employees, attorneys and any person in active concert or participation with any of the foregoing persons (collectively, the "LAPD") as follows:

1.    The LAPD is hereby ENJOINED from:

    a.    Arresting, detaining, or citing any journalist covering a protest in Los Angeles for not dispersing following the issuance of an order to disperse; and

    b.    Interfering with the rights of journalists to cover a protest in Los Angeles; retaliating against journalists for engaging in such coverage by using force against them; or arresting, detaining, or citing journalists who are covering such protests.

    c.    This order does not authorize journalists to impede, block, or otherwise physically interfere with lawful activities of LAPD officers.

    d.    This order does not prevent LAPD officers from detaining, arresting, or citing any person, journalist or otherwise, who engages in such physical interference or commits an unlawful act, other than an alleged failure of a journalist to comply with a dispersal order.

2.    If LAPD establishes a police line or rolling closure at a demonstration, march, protest, or rally where individuals are engaged in activity that is protected pursuant to the First Amendment to the United States Constitution or Article I of the California Constitution, LAPD is ENJOINED from:

---

[16] Federal Rule of Civil Procedure 65(c) requires that, prior to granting injunctive relief, the Court require a movant to pay security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)) (quotation modified).  Accordingly, the Court waives the bond requirement here, as it is unlikely that Defendants will incur any significant cost and requiring a bond "would have a negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public." *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996) (citation omitted).

a. Prohibiting a journalist from entering or remaining in the closed areas, unless
access will interfere with emergency operations, in which case access may be
denied for only so long and only to such an extent as is necessary to prevent
actual interference.

b. Intentionally assaulting, interfering with, or obstructing any journalist who is
gathering, receiving, or processing information for communication to the public
(including by restricting journalists to areas from which they do not have
sufficient opportunity to observe and report on protests, including the interaction
between police and protestors).

c. Citing, detaining, or arresting a journalist who is in a closed area for failure to
disperse, curfew violation, or obstruction of a law enforcement officer for
gathering, receiving, or processing information.  If LAPD detains or arrests a
person who claims to be a journalist, that person shall be permitted to promptly
contact a supervisory officer of the rank of captain or above for purposes of
challenging that detention, unless circumstances make it impossible to do so.

3. LAPD is further ENJOINED from using less-lethal munitions ("LLMs") and other crowd
control weapons (including kinetic impact projectiles ("KIP"s), chemical irritants, batons,
and flash-bangs) against journalists who are not posing a threat of imminent harm to an
officer or another person.  LAPD is ENJOINED from using LLMs and crowd control
weapons except when objectively reasonable to defend against an imminent threat to life
or serious bodily injury to any individual, including any peace officer, or to bring an
objectively dangerous and unlawful situation safely and effectively under control.

a. Prior to the discharge of any LLMs, Defendants shall make repeated, audible
announcements, announcing the intent to use kinetic energy projectiles and
chemical agents. The announcements shall be documented, made from various
locations, if necessary, and delivered in multiple languages, if appropriate, to
ensure their communication.

b. Journalists shall be allowed to remain and/or allowed to move to an area outside
the direct target area for the discharge of LLMs.

c.  Kinetic energy projectiles shall not be aimed at the head, neck, back, or any other vital organs (including face, eyes, kidneys, chest, groin, or spine).

d.  Kinetic energy projectiles or chemical agents shall not be used by any law enforcement agency solely due to any of the following:

i.  A violation of an imposed curfew.

ii.  A verbal threat.

iii.  Noncompliance with a law enforcement directive.

4.  LAPD does not violate this Order if a journalist is incidentally exposed to crowd control devices after remaining in the area where such devices were deployed and LAPD has otherwise complied with the terms of this injunction, including legally sufficient advance notice that the LLMs will be deployed.

5.  "Journalist" includes any duly authorized representative of any news service, online news service, newspaper, or radio or television station or network.  To facilitate the Defendants' identification of Journalists protected under this Order, the following shall be considered indicia of being a Journalist: visual identification as a member of the press, such as by carrying a professional or authorized press pass, carrying professional gear such as professional photographic equipment, or wearing a professional or authorized press badge or other official press credentials, or distinctive clothing, that identifies the wearer as a member of the press. It also shall be an indicium of being a Journalist under this Order that the person is standing off to the side of a protest, not engaging in protest activities, and not intermixed with persons engaged in protest activities, although these are not requirements.  These indicia are not exclusive, and a person need not exhibit every indicium to be considered a Journalist under this Order.  Defendants shall not be liable for unintentional violations of this Order in the case of an individual who does not carry or wear a press pass, badge, or other official press credential, professional gear, or distinctive clothing that identifies the person as a member of the press.

6.  Nothing in this Order precludes LAPD from detaining or arresting a journalist who engages in any unlawful activity other than remaining in a closed area or failing to disperse as discussed above. Nothing in this order precludes LAPD from issuing

1    otherwise lawful crowd-dispersal orders except that members of the press are not subject

2    to such orders.

3    7.  To promote compliance with this Preliminary Injunction, LAPD is ordered to notify all

4        sworn officers of the Court's issuance of the preliminary injunction within 72 hours and

5        within this period provide a summary of the Court's findings and the specific provisions

6        set out in the first six provisions of this Preliminary Injunction.  LAPD is further ordered

7        to incorporate such notice in all appropriate Department Manual sections and Crowd

8        Control training materials.  Nothing in this provision prevents LAPD from providing its

9        officers with further information or training to ensure compliance with this Order and its

10       legal obligations to protect journalists at protests from unlawful detention, arrest, and use

11       of force.  LAPD shall provide Plaintiffs with a copy of any training or notification related

12       to this provision given to all officers or to officers assigned to protests.

13   8.  The Department shall re-issue their policies on policing protests, along with this

14       preliminary injunction, at least annually to all officers and shall require officers'

15       acknowledgment that they reviewed them.  The Department shall not deploy to a protest

16       any officer that has not acknowledged review within the previous year.

17   9.  At any protest to which LAPD deploys, the Department shall appoint at least one member

18       of the Department at the rank of lieutenant or above, whose primary assignment shall be

19       to ensure compliance with the terms of this Order and the Department's legal obligations

20       as to journalists. The Department shall provide Plaintiffs with the name, email, and a cell

21       phone number for the assigned liaison officer to allow reporting and resolution of any

22       possible violations of this Order.

23

24   Dated: September 10, 2025

25                                              Hernán D. Vera
                                               United States District Judge

26

27

28

33