1  Carol A Sobel SBN 84483
   Weston Rowland SBN 327599
2  Law Office of Carol A. Sobel
   2632 Wilshire Boulevard, #552
3  Santa Monica, CA 90403
   t. (310) 393-3055
4  e. carolsobellaw@gmail.com
   e. rowland.weston@gmail.com
5
   David Loy SBN 229235
6  Aaron R. Field SBN 310648
   First Amendment Coalition
7  534 4th St., Suite B
   San Rafael, CA 94901
8  t.(415) 460-5060
   e. dloy@firstamendmentcoalition.org
9  e. afield@firstamendmentcoalition.org
10
   Peter Bibring SBN 223981
11 Law Office of Peter Bibring
   2210 W Sunset Blvd # 203,
12 Los Angeles, CA 90026
   t. (213) 471-2022
13 e. peter@bibringlaw.com

Paul Hoffman, SBN 71244
Michael Seplow, SBN 150183
John Washington, SBN 315991
Schonbrun, Seplow, Harris, Hoffman
& Zeldes LLP
9415 Culver Blvd, #115
Culver City, California 90230
t.(310) 396-0731
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. jwashington@sshhlaw.com

Susan E Seager SBN 204824
Law Office of Susan Seager
128 N. Fair Oaks Avenue
Pasadena, CA 91103
t. (310) 890-8991
e. susanseager1999@gmail.com

14
15

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

16
17  LOS ANGELES PRESS CLUB,
    STATUS COUP,

18              PLAINTIFFS,

19          v.

20
21  CITY OF LOS ANGELES, a municipal
    entity,  JIM MCDONNELL, LAPD
22  CHIEF, sued in his official capacity;

23              DEFENDANTS.
24
25
26
27
28

Case No. 25-cv-05423 HDV-E

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

42 U.S.C. § 1983: U.S.
CONSTITUTION - FIRST, FOURTH,
AND FOURTEENTH AMENDMENTS;
CALIFORNIA CONSTITUTION,
ARTICLE I, §§ 2, 3, 7, 13;
CALIFORNIA CIVIL CODE § 52.1;
CALIFORNIA PENAL CODE § 409.7;
CALIFORNIA PENAL CODE § 13652

**INTRODUCTION**

1. Being a journalist in Los Angeles is now a dangerous profession. This case responds to the continuing abuse, including the use of excessive force, by Los Angeles Police Department ("LAPD") officers during recent protests in downtown Los Angeles against federal immigration policies and aggressive raids by Immigration and Customs Enforcement ("ICE"). Dozens of journalists from around the world were present during these protests to record and report on the events as they unfolded. These journalists were not engaged in protest or unlawful activity and were exercising their First Amendment rights and safeguarding the First Amendment rights of all members of the community. They were fulfilling an important function in a democracy as set out in the First Amendment.

2. The LAPD has a long history, as set forth below, of denying access to and using excessive force against journalists at protests. In 2021, in response to the 2020 protests following the death of George Floyd in Minneapolis, and given the history of the LAPD and other law enforcement organizations around the state assaulting press and precluding access for them on the streets, the California Legislature acted to protect journalists covering protests by codifying guarantees for the press, as discussed below.

3. Beginning in June 2025, LAPD actions during the ICE raid protests in downtown Los Angeles reveal a brazen refusal to abide by the Constitution and state law and repeat the same conduct by the Defendant City repeatedly held to be unconstitutional by the federal courts for the past 25 years. This action seeks judicial assistance once again to force the LAPD to respect the constitutional and statutory rights of journalists engaged in reporting on these protests and inevitable protests to come.

**JURISDICTION AND VENUE**

4. This is an action for injunctive relief for violations of Plaintiffs' federal and state constitutional and statutory rights and those of their members.

Jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1343 as Plaintiffs assert a claim under 42 U.S.C. § 1983.  Jurisdiction also exists pursuant to 28 U.S.C. §§ 2201(a) and 2202, the Declaratory Judgment Act. The Court has supplemental jurisdiction to consider Plaintiffs' state law claims under 28 U.S.C. § 1367 as these state law claims arise from the same common nucleus of operative facts as Plaintiffs' federal claims.

5.     Venue is proper in the Western Division of the Central District of California pursuant to 28 U.S.C. § 1391(b) because the events and conduct giving rise to Plaintiffs' claims all occurred in the City of Los Angeles.

## PARTIES

### A. Plaintiffs

6.     Plaintiff LOS ANGELES PRESS CLUB ("LAPC") is a 501(c)(3) nonprofit organization with no parent corporation and no stock. The organization has more than 1,000 member journalists and news organizations in Southern California and has operated since 1913 to support, promote and defend quality journalism.  The LAPC has been very active in monitoring and responding to attacks on journalists during the June 2025 protests in downtown Los Angeles and elsewhere in Los Angeles.  To respond to these unlawful attacks, LAPC has been required to divert resources, money and staff time that it would otherwise have been able to devote to its pre-existing mission of improving the quality of journalism. LAPC members have also suffered excessive force and harassment by LAPD officers in the recent ICE protests and, as these protests continue, to be threatened with such injuries and violations of the law challenged by this action.

7.     Plaintiff STATUS COUP is an independent investigative reporting network and media outlet that focuses on in-field and investigative reporting. Status Coup's Los Angeles based reporters are members of the Los Angeles Press Club. Status Coup regularly sends journalists into the field to investigate and report on protests in the City of Los Angeles. Status Coup has journalists on the ground

during the June 2025 protests. Status Coup reporters were subjected to force, including being struck by various Kinetic Impact Projectiles ("KIPs") as they attempted to film the LAPD officers' response to the protests.  In addition, Status Coup reporters were barred by the LAPD from areas of the protests where, by law, they should have been permitted access.

**B. Defendants**

8.    Defendant CITY OF LOS ANGELES is a municipal corporation duly organized and existing under the Constitution and laws of the State of California. The Los Angeles Police Department is an agency of Defendant City and all actions of the LAPD are the legal responsibility of the City. At all relevant times, Defendant City was responsible for assuring that the actions, omissions, policies, practices, and customs of the LAPD and its employees and agents complied with the laws of the United States and the State of California.

9.    Defendant JIM McDONNELL was, at all times relevant to this action, the LAPD police chief and a policymaker for the department. He is sued in his official capacity. Chief McDONNELL directed the actions challenged herein of the LAPD response to the ICE protests.  On information and belief, he ratified the unlawful conduct in public statements he made over the past several months at press conferences, in testimony before the Los Angeles City Council, and in communications with the Los Angeles Police Commission.

10.    Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto, Defendants, and each of them, were the agents, servants, and employees of the other Defendants and were acting at all times within the scope of their agency and employment and with the knowledge and consent of their principal and employer. At all times, Defendants acted under the color of state law.

11.    Plaintiffs are informed, believe, and thereupon allege that Defendant City's policies and failure of policies, including the repeated failure to train its officers and/or to discipline officers for the unlawful use of force and denial of

access in constitutional responses to the rights of the press at demonstrations, caused the unlawful action taken against Plaintiffs.

## STATEMENT OF FACTS

### I.    HISTORICAL BACKGROUND

12.    Despite decades of massive protests in the City, and despite express warnings of the failures of law enforcement policies over this same time period, the LAPD met the ICE protests in the summer of 2025 with the same unlawful practices it had used for years.  After protests in response to the killing of George Floyd in May 2020, one internal and two external reports were critical of the LAPD's response to the Floyd protests and all recommended retraining of officers and command staff in the LAPD on crowd control practices.

13.    Significantly, in the range of crowd control issues addressed, LAPD was specifically criticized for its treatment of reporters covering the protests. Repeatedly, police subjected reporters to physical force and arrest and prevented access to observe police activity in public places.  In response to widespread abuses by law enforcement agencies in general and the LAPD in particular, legislators amended the California Penal Code to protect press from police assault and interference with news-gathering operations.  However, despite posting multiple memos to all personnel regarding the new laws, as proven by recent events, the LAPD did not follow its own policies or the new law.

14.    The LAPD has a long and entrenched history of using force to obstruct freedom of the press.  In *Crespo v City of Los Angeles*, 2:00-cv-08869 GHK (RC) C.D. Cal. 2000) the Los Angeles Police Department was sued for clubbing reporters and shooting them with less lethal weapons during the 2000 Democratic National Convention ("DNC"). The LAPD entered into a settlement with the ACLU, requiring the police recognize the rights of journalists to cover protests even if an unlawful assembly is declared and an order to disperse is given.  Exhibit 81. As part of the settlement, the City also agreed to assign a liaison to work with

members of the press and to designate areas for journalists to observe from. In a 2001 Los Angeles Times article, retired Asst. Chief Horace Frank, then a lieutenant in the LAPD, asserted that the settlement did not impose any obligation on the LAPD that it was not already doing.  See *Jill Leovy, 7 Reporters Settle Suit Over LAPD*, L.A. Times (Nov. 30, 2001), https://www.latimes.com/archives/la-xpm-2001-nov-30-me-9832-story.html.    If true, there was no burden on the LAPD from complying with the *Crespo* settlement.

15.    Although the LAPD claimed two decades ago that it was already doing what the settlement in *Crespo* required, just a few years later the department violated reporters' First Amendment rights to cover public protests in its unprovoked assault on a May Day immigrants' rights rally in MacArthur Park. The LAPD's attack on protestors and press on May 1, 2007 violated settlement agreements reached to redress the police assault on protestors and press at the Democratic National Convention in 2000 at the Staples Center. In a damning report, the LAPD conceded that it had failed to incorporate the lessons learned after the 2000 DNC debacle.[1]   The May Day assaults resulted in a consent decree.  *Multi-Ethnic Immigrant Workers Network*, 246 F.R.D. 621 (C.D. Cal. 2007).

16.    Among the journalists who sued was a camera operator for Fox 11 News who required repeated surgeries for a shoulder injury she suffered when officers struck her and knocked her down. *See* Dennis Romero, *Journalist Gets $1.7 Million In Suit Against LAPD Over 'May Day Melee' Response*, LA Weekly (July 9, 2010), https://www.laweekly.com/journalist-gets-1-7-million-in-suit-against-lapd-over-may-day-melee-response/.

_____

[1] Ex. 22 Vol. 4, Dep. Chief Michael Hillman & Gerald Chaleff, *LAPD Report to the Board of Police Commissioners: An Examination of May Day 2007* (Oct. 5, 2007), available at http://www.lacp.org/2007-Articles-Main/100907-MayFirst-FinalReport.pdf

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

17.     In the 2020 George Floyd protests, the U.S. Press Freedom Tracker identified 23 incidents in the Los Angeles area in which members of the press reported being arrested, subjected to force, and otherwise prevented from exercising their First Amendment rights.[2]

18.     More recently, the LAPD repeated the same unlawful practices during a police action to evict an encampment of unhoused persons at Echo Park Lake in March 2021.[3]  According to the U.S. Press Freedom Tracker, 59 journalists were arrested or detained nationwide in 2021 with more than a quarter of that number involving the LAPD at the Echo Park Lake incident.[4]

19.     Although the LAPD reported that it encourages its personnel not to interfere with the press "whenever possible," it attempted to justify the arrest of press at the Echo Park event as permissible under California Penal Code Sections 407 and 409, as explained in the LAPD's Media Relations Handbook. That erroneous view of the law by the LAPD has now explicitly been rejected by the California Legislature's amendments to the Penal Code to add Section 409.7 to ensure that members of the media are exempt from dispersal orders and are not subject to arrest for failure to disperse.

20.     As set forth below, and despite the legislative mandate enforcing press access, the LAPD response during the June 2025 protests continues this long and disgraceful history of unconstitutional actions against journalists.  Defendants have deliberately disregarded court orders placing limitations on "crowd control"

---

[2] *See* U.S. Freedom Tracker, *Incident Database, https://pressfreedomtracker.us/all-incidents/?date_lower=2020-05-26&date_upper=2020-06-06&city=Los+Angeles&state=California*

[3] Ex 26 Vol. 7 Echo Park Rehabilitation After Action Report *available at https://www.lapdpolicecom.lacity.org/080321/BPC_21-145.pdf*

[4] Kristin McCudden, *Another Record Year for Press Freedom Violations in the US,* U.S. Press Freedom Tracker (Jan. 12, 2022) https://pressfreedomtracker.us/blog/another-record-year-for-press-freedom-violations-in-the-us/

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

policies and explicit statutory protections for members of the press at protests.  The press are simply trying to do their job for the community, acting as the eyes and ears of the public.

## II.    THE PROTESTS BEGINNING IN JUNE 2025

11.    Starting on or about June 6, 2025, federal agents raided several locations in the Garment District in Downtown Los Angeles ("DTLA").   In response, large scale demonstrations took place in the area, protesting the enforcement of federal immigration policies.  At about the same time, in the nearby city of Paramount when federal ICE agents conducted an operation near a local Home Depot, prompting spontaneous protests there. Over the course of several months, the LAPD has responded to multiple protests throughout the City involving ICE raids and the "No Kings" movement.

12.    Demonstrations are a frequent occurrence in Los Angeles. As is often the case, journalists covered the demonstrations.  Many journalists identify themselves visually and/or verbally as members of the media so that they will not be subjected to excessive force or other constitutional violations. In addition, many have professional photographic and video camera equipment that makes them readily recognizable as members of the press. But such identification did not save them from assaults by LAPD over the past months.

13.    There are many examples of journalists being subjected to excessive force and other constitutional violations by LAPD during the  2025 ICE protests. The LAPC has documented dozens of instances of excessive force and other incidents of police misconduct toward journalists during the recent protests throughout Los Angeles.  Many of these individuals are members of the LAPC or work for media groups that are members of the LAPC.

14.    The following examples of LAPD misconduct exemplify the pattern of unconstitutional conduct challenged in this action.

1    15.    **Lauren Tomasi** - Ms. Tomasi is the U.S. correspondent for 9 News

2    Queensland in Australia.  On June 9, 2025, as she was completing a live on-air

3    segment while holding a large microphone and working with a camera crew, she

4    was shot in the back of her leg with a less lethal round by a riot-gear-clad LAPD

5    officer.  She was standing in a largely empty intersection, not engaged in any

6    unlawful conduct or near anyone who was.  The video of the shooting shows the

7    LAPD officer looking directly at her and apparently aiming specifically at her

8    without the slightest justification. There are no protestors visible in her immediate

9    vicinity.  She held a microphone and was accompanied by a camera crew.  None

10   of that mattered to the LAPD officers.    Ex. 30 Vol. 8 available at

11   https://drive.google.com/file/d/1G46Vbm6FNzCE59O1dp8nLbXxOd4cWnhq/vie

12   w?usp=drive_link.  The Australian Prime Minister called the shooting "horrific,"

 

9

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

indicating that LAPD misconduct also has international ramifications in this context.

16.     **Livia Albeck-Ripka** – On June 8, 2025, Ms. Albeck-Ripka was shot in the torso with a KIP by an LAPD officer while reporting for the New York Times. *See* Ex. 35 Vol 8 https://www.nytimes.com/video/us/politics/100000010217680/a-look-at-the-crackdown-on-the-la-protests.html.



17.     **Jeremy Lindenfeld** - On June 9, 2025, Mr. Lindenfeld, , a reporter for *Capital & Main* who was wearing a National Press Photographers Association press pass and a "PRESS" sign on his helmet, was shot in the abdomen by an

 

10
FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    LAPD office with a less lethal munition. There was no justification for this

2    action.   See Ex. 46 Vol. 8

3    https://bsky.app/profile/jeremotographs.bsky.social/post/3lr7uewktsk2x.

4           18.    **Sergio Olmos** - On June 8, 2025, Sergio Olmos, a journalist with Cal

5    Matters who has covered dozens of protests in his career, was hit in the chest with

6    a less lethal munition by an LAPD officer. He stated that he has never seen law

7    enforcement as trigger happy with protesters as was the case in these protests. See

8    https://www.washingtonpost.com/style/media/2025/06/09/journalists-injured-la-

9    protests.



FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

19.    **Ford Fischer** - On June 9, 2025, Ford Fischer, a documentary filmmaker, was struck in the stomach with a less lethal round by an LAPD officer. See https://x.com/FordFischer/status/1932305243657945404.



21.    On June 8, while journalist Jeremy Cuenca was on assignment for the Collegian, the student newspaper for Los Angeles Community College, LAPD shot into a crowd, hitting Cuenca twice with rubber bullets, once in his hand nearly severing his finger, which took hours of surgery to reattach.

20.    **Gabriel Ovalle** - On June 10, 2025, Gabriel Ovalle, a Channel 5 editor and camera operator, was struck in the abdomen with a KIP by an LAPD officer. *See* Ex. 78 Vol. 8 https://x.com/Channel5iveNews/status/1932497835288560088.

 

21.    **Tina Berg,** a journalist on assignment for **Status Coup** was forcibly removed from multiple locations by LAPD. In one instance, she was arbitrarily removed from filming a protest near the downtown Civic Center. Ms. Berg was

told that she was being removed from the area for her safety even though her location was well over 100ft from the officers and the protest. When Ms. Berg told the officer that he was violating 409.7, the officer told her on camera that "he gets that" and continued to escort her out of the Civic Center. *See* Ex. 53 Vol. 8 *available at* https://www.youtube.com/live/NPG9zIxMUKc?si=_JTYvoF1-3m4WBnH&t=6985



22.     On June 8, journalist Sean Beckner-Carmitchel was huddling with other journalists, all carrying large cameras and professional equipment, in an entrance to a closed underground parking garage at the Clara Shortridge Foltz courthouse to stay out of the way of LAPD. LAPD fired tear gas directly at them and entered the parking garage ramp and ordered the journalists to leave.

23.     Shortly afterwards, LAPD officers repeatedly shoved a photographer carrying two large, professional-grade cameras and holding up what appeared to be identification on a lanyard, before a mounted LAPD officer rammed the photographer with a horse. The incident was captured on video by officers' body-worn cameras and by journalist Sean Beckner-Carmitchel. The photographer posed no threat and was complying with LAPD orders to move away from the area when the mounted officer rammed her.

24.     The same day, LAPD cleared the area near Alameda and Aliso, including specifically ordering press to disperse by shouting "Media, go!"

25.     Also on June 8, LAPD officers ordered a group of approximately 20 to 30 journalists away from protesters and a police line and held them in a "press area" about 150 feet from protestors under threat of arrest, making reporting on the line impossible.  In this incident, as in others described in this complaint, the journalists were not interfering with police activity, and could have been allowed much closer to the line without interfering with police operations.

26.     On June 8, photojournalist Montez Harris was kettled with a group of protesters. He carried two large professional cameras, a press ID, and business cards identifying him as press. LAPD officers would not allow Harris to leave even though he repeatedly informed them he was a member of the press. Harris eventually scaled a small wall, despite an officer threatening to shoot him.

27.     On June 10, LAPD officers at the corner of 4th and Olive Streets chased and shoved multiple people wearing helmets plainly marked with "PRESS," with IDs on lanyards, and carrying large cameras. The officers shouted, "Leave the area!" repeatedly, although video shows no protesters in the immediate area, and the only people being shoved by LAPD officers all appear to be journalists.

28.     On June 11, LAPD officers kettled a group of journalists in front of Los Angeles City Hall. The journalists repeatedly pointed out many were credentialed media and asked if they were allowed to leave.  LAPD officers told them, "No."

29.     Montez Harris is a freelance photographer. On June 11, 2025 as Mr. Harris was at Grand Park in front of Los Angeles City Hall filming with a large camera, long lens, and camera bag when. Mr. Harris told LAPD officer on horseback that he was filming.  The officer told Mr. Harris that he did not have a "pass," then deliberately charged his horse into Mr. Harris several times screaming at Mr. Harris to "leave the area" as Mr. Harris was already leaving.  Another LAPD

officer shot Mr. Harris in the back of the leg with less-lethal round as he was complying with officers' orders by walking away. *See* Ex. 59 *available at*



https://drive.google.com/file/d/1aLHYqF3LlG1RpO_Jq23Vod7J3SIrN3YW/view?usp=drive_link

30.    On June 9, 2025, CNN reporter Jason Caroll and his crew were detained and ordered to leave the protest area and remain behind the police line on threat of arrest if they returned. Caroll and the CNN crew were led out of the area after being forced to put their hands behind their back and walk backwards. *See* Ex. 52 Vol. 8 *available at* https://www.cnn.com/2025/06/10/us/video/jason-carroll-escorted-la-protest-digvid.



31.    On June 9, CNN Anchor Erin Burnett was reporting from protests and was shoved by an advancing line of LAPD officers while filming in front of the camera on live television. As she noted in the broadcast, "They knew we're media. They're just as happy to push me as to push anybody else."

32.    On June 9, officers shot LLMs at award-winning freelance photojournalist Michael Nigro while he stood practically alone on a pedestrian overpass above the protests. Initially, the LLM struck the bridge near his head. At the time, Nigro carried two large DSLR cameras and wore a helmet with "PRESS" written in large white capital letters against a black background on both sides of his head, a vest with "PRESS" in large white capital letters against a black background both on his chest and back, and a press ID with the word "PRESS" in large letters on a lanyard around his neck. Two hours later, Nigro was documenting the protests at street level when a line of LAPD officers suddenly and without warning or justification yelled "move" and began shoving and shooting LLMs indiscriminately at the crowd. Nonetheless, an LAPD officer shot and struck Nigro in the head with an LLM.

33.    On June 11, LAPD shot Sangjin Kim, a staff photographer for Korea Daily, in the back with an LLM resulting in a bloody welt. Kim carried professional camera equipment and wore a visible press ID.

34.    On June 14, photojournalist Héctor Adolfo Quintanar Perez was covering the protests in downtown Los Angeles on assignment from Zuma Press, an independent press agency. He carried two professional cameras, a large camera bag, and a large press badge issued by Zuma and worn visibly on a lanyard around his neck. At about 5 p.m., when he was close to 300 Los Angeles Street, without any apparent provocation, LAPD officers began using force on protestors and firing LLMs. Perez was taking pictures when he saw an officer aiming an LLM in his direction from "very close," so that the officer must have known he was press given his press ID and cameras. The officer fired an LLM that hit both his knees, opening

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

a wound in his left knee that left Perez walking with a cane and possibly in need of surgery.

35.    On the same day, ABC News chief national correspondent Matt Gutman was reporting live, many feet from the protestors, when an officer shoved him from behind and shouted at him to move while Gutman was standing in a crosswalk, asking where he should go.  Not long after, officers yelled at and shoved Gutman for supposedly brushing past an officer's back, again many feet from protestors.

36.    On June 14, photographer Marshal Woodruff was documenting protests near City Hall, when an LAPD officer began firing LLMs in the crowd. One LLM hit Woodruff in the face, fracturing his cheek and slicing open his right eye, requiring five hours of surgery, with no certainty of how much vision he will regain. Woodruff told local news, "They came in with horses and people almost got trampled. They were firing like 40 bullets in the span of like five seconds. … [I]t sounded more like fireworks being rapidly shot off."

37.    On June 14, an LAPD mounted officer charged 82-year-old photographer David Healy, knocking Healy to the ground and breaking one of his ribs. Healy carried a large professional Canon camera with large lens, was shooting on film, and had business cards with him identifying him as a photographer.

38.    On June 14, photographer Tod Seelie was shoved by LAPD, shot in the leg with a LLM, and tear gassed multiple times. He was wearing a helmet with a press badge and had a media credential.

39.    On June 14, LAPD released tear gas and LLMs on a crowd that included Constanza Eliana Chinea, a California Local News Fellow and founder of the independent media platform Malcriá Media, without warning or a dispersal order and without evidence of violent acts.

40.    On June 14, LAPD officers shot an Agence France-Presse photographer in the face and leg. The photographer told France24, "I was covering

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

the protest … 90 feet away from the police when I received the impact of a rubber bullet in my face and another one in my right arm… I [had] two cameras, a helmet with AFP stickers on it and … a big patch on my chest that said 'Press.'"

41.    On June 14, Kayjel J. Mairena, a student journalist with the Santa Monica College Corsair, was tear gassed twice in downtown Los Angeles while standing with other press off to the side.

42.    Also on June 14, an LAPD officer aimed and fired without any evident justification at the videographer for an AP video livestream, who ducked behind an obstacle at the last minute as a foam baton round landed near him.

43.    In numerous other instances in June protests, LAPD officers ordered the press to move or physically shoved them to force them to move.. An LAPD officer told Los Angeles Times reporter James Queally to move, then when Queally reminded the officer he had a legal right to be there the officer shoved him. On June 10, an LAPD officer at a police line told CNN crew live on air that some could pass while others in the same crew could not, although the CNN reporter with press identification informed officers that the individuals were part of her crew.

44.    On July 4, the day after this Court issued a TRO, LAPD officers kettled Sean Beckner-Carmitchel, Lexis-Olivier Ray, and other members of the press in the MOCA Geffen parking lot, despite them repeatedly identifying themselves as journalists. The LAPD eventually escorted the press away after calling a commanding officer to request a media escort.

## III.    AUGUST 8, 2025 PROTEST

45.    On July 10, 2025, the Court issued a Temporary Restraining Order ("TRO") prohibiting LAPD from barring journalists from entering closed areas at protests; from "[i]ntentionally assaulting, interfering with, or obstructing any journalist" who is reporting at a protest; and from "[c]iting, detaining, or arresting a journalist who is in a closed area for failure to disperse."

18

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

46.    On August 8, 2025, protestors rallied at the Home Depot in Westlake,
just outside of Downtown Los Angeles, and, over the course of approximately two



hours, peacefully marched from the Home Depot to the federal Metropolitan
Detention Center ("MDC"), where federal officers were holding people seized in
immigration enforcement actions, until about 100 people were assembled on
Alameda Street outside the garage entrance to the MDC. The group remained
peaceful. A short time after the protestors arrived, just before 9 p.m., LAPD officers
drove up in police vehicles.   Shortly after that, more LAPD officers ran down
Alameda and formed a skirmish line across the street. Then, with no warning and
no dispersal order, and without making any provision for press who were obviously
in the group, the officers started shouting "move back" as they quickly advanced,
shoving the assembled group and striking them with batons. The line of LAPD
officers advanced on journalists openly displaying press identification and shoved
them to the ground and hit them with batons — even as journalists yelled that they
were press or held their press identification up for officers to see.

47.    As the police assaulted the protestors to force them to move back more,
there was no area where press could be to observe and document the protest and
the police response without being assaulted by the LAPD. When members of the

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   press asserted their right to remain, to have a PIO or command officer called and
2   the Court's Order affirming their rights, officers ignored them or told them to wait.

3       48.    Sean Beckner-Carmitchel was carrying several professional cameras
4   and wearing his press identification card from the Los Angeles Press Club, which
5   is a laminated photograph of him and the words "PRESS" in 72-point font, on a
6   lanyard attached to his clothes. At one point, while the officers were not moving
7   the skirmish line forward, Beckner-Carmitchel asked to speak with a supervisor or
8   PIO but was told to move back. When he repeated his request, an LAPD officer
9   shoved him and hit him in the ribs with a baton, causing bruising and pain.
10  Beckner-Carmitchel asked multiple times that LAPD officers call a PIO officer, as
11  provided for in the Court's Order.  The response was blank stares except for one
12  officer who responded: "That's not important right now."

13      49.    Only after LAPD officers forcibly pushed the protestors to the end of
14  the block of Alameda did they give a dispersal order. The LAPD officers moved
15  against the group, forcing them toward a line of officers from DHS who prevented
16  them from moving back farther. While most of those assembled left, approximately
17  20 protestors remained along with members of the press.  LAPD forced this group
18  into a small side street, ordered everyone remaining to get up against a nearby wall,
19  and told them they were under arrest. LAPD officers placed the journalists, along
20  with the 20 or so protestors, in zip-ties and held them against the wall for more than
21  an hour.  Although Beckner-Carmitchel repeatedly identified himself as press,
22  stated that LAPD officers were violating California Penal Code Sec. 409.7 and this
23  Court's TRO, and asked for a Public Information Officer ("PIO"), the officers
24  ignored him and one responded that "it didn't matter right then," and they zip-tied
25  him. Beckner-Carmitchel asked for a supervisor or PIO about 10 more times, all to
26  no avail.  LAPD eventually released him with a Field Information ("FI") card filled
27  out by an officer, noting he was "Detained during an illegal assembly. Failed to
28  disperse after multiple dispersal orders."

50.    Several reporters suffered injuries during the incident. LAPD officers struck photojournalist Nicholas Stern in the face just moments after he held up his press identification (which was on a lanyard around his neck) to identify himself to officers as press. Officers continued to advance on Stern, assaulting him and causing a cut and bleeding on Stern's chin, as shown below:



51.    Status Coup journalist Tina Berg was at the federal MDC when LAPD officers arrived shortly before 9 p.m. Berg observed them form a skirmish line across Alameda, blocking the sidewalks on both sides of the street. Berg did not hear a dispersal order before the LAPD skirmish line began advancing on the assembly. Almost immediately, Berg observed officers jabbing and striking protestors with batons.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

52.    Berg asked officers to deescalate, specifically speaking to Officer Aulick. At all times during this interaction, Berg's press credential was around her neck in a lanyard and clearly visible. Officer Aulick advanced in Ms. Berg's direction and jabbed her with his baton. She was then pushed again and cried out in pain. Officer Aulick responded by yelling "get back" and hit her hard again with his baton. Shortly thereafter Berg realized that the interaction had ripped open the distal phalanx of her fifth digit, as shown below.



53.    Both Adam Rose (the press rights chair of Plaintiff Los Angeles Press Club) and Sean Beckner-Carmitchel attempted to get Defendants to comply with the Court's TRO. Mr. Rose, who saw the assembly on live stream, called LAPD's Public Information Office (PIO) on the LAPD's 24/7 hotline and informed Officer Madison, the on-duty PIO officer, what was occurring at MDC. Rose asked that someone from the PIO call Chief McDonnell and that someone from PIO to come to the scene immediately. Officer Madison told Rose he would "monitor" the situation. Rose attempted, again, to convey the urgency of the situation. Rose then texted Deputy Mayor for Communications Zach Seidl, providing a link to several journalist's social media posts with firsthand accounts of the events at the MDC, with no response.

54.    At approximately 10:00 p.m., Rose again called the PIO number and spoke with Officer Madison. Rose told him he was required by the Order to call in a Captain and notify him of the press complaint. In response, Officer Madison said it was up to the Incident Commander in the field and there was nothing for him to do.

55.    A few minutes later, when Rose learned that several journalists had been detained/arrested and were being held zip-tied, he emailed information on the incident to LAPD Chief McDonnell, Captain Alex Chogyoji from PIO, Public Information Director Jennifer Forkish, two general office emails for PIO, Los Angeles Police Commission President Erroll Southers, and Mayor Karen Bass's office, and City Attorney Hydee Feldstein Soto, among other City officials and employees. His email included the names of the detained reporters and demanded their immediate release. He also provided information on three reporters who were injured  and left to get medical care for their wounds.

56.    Over the course of the next hour, Rose repeatedly attempted to contact LAPD and City officials for the release of the journalists.  Ultimately, all but two - -  Nate Gowdy and Carrie Shreck – were released in the field. Gowdy and Shreck were taken to the LAPD Metropolitan Detention Center on Los Angeles Street and were released from there.

57.    In each of the incidents described in this First Amended Complaint, the journalists in question were simply reporting on the protests as they had a right and duty to do.  None of them were engaged in conduct that would have justified the use of any force against them, much less the force that was used. The widespread use of force against journalists by LAPD officers indicates an intent to prevent public scrutiny of police conduct toward demonstrators, a refusal to abide by constitutional and statutory safeguards for journalists in these circumstances, and an institutional failure by the LAPD.

58.    In each of the incidents described in this First Amended Complaint, the journalists in question were simply reporting on the protests as they had a right and duty to do.  None of them were interfering in police operations. LAPD lacked any justification for its repeated exclusion of identifiable journalists from public places, detention and kettling of journalists, and refusal to let journalists through police lines or closed areas around command posts or other rolling closures, in violation of the Constitution and California law. The facts of the assaults on so many reporters supports the conclusion expressed by the National Press Club that reporters had been singled out by the LAPD and other law enforcement agencies. "Journalists in Los Angeles were not caught in the crossfire — they were targeted."[5]

## IV.    DEFENDANTS' ACTIONS VIOLATE THE CALIFORNIA PENAL CODE PROVISIONS ENACTED TO PROTECT REPORTERS

59.    Over the last several years, in the wake of the George Floyd protests, the California Legislature has enacted several strict reform measures to limit the use of so-called "less-lethal munitions" as an instrument of crowd control and to protect the rights of all media to document the response of police to protests and other activity in public places. Defendants' actions violate each of these statutes.

### A.    California Penal Code Section 13652

60.    California Penal Code Section 13652 was enacted in 2021 and became effective January 1, 2022.  Penal Code Section 13652 provides in relevant part:

---

[5] The National Press Club, *National Press Club Condemns Police Targeting of Journalists Covering Los Angeles Protests,* Press Release, June 10, 2025, available at    https://www.press.org/newsroom/national-press-club-condemns-police-targeting-journalists-covering-los-angeles-protests?fbclid=IwY2xjawK8GBlleHRuA2FlbQIxMQBicmlkETFJMktNT2tOdTRVTHI2MlozAR6dIvOPJWdwpQdaezHU5Lvu2hoVWgb5JZbVOB6fn6NtgyZGQuCzqj_uEimNqg_aem_3ErzNfFjD-9g8KOl92hyNg

Except as otherwise provided in subdivision (b), kinetic energy projectiles and chemical agents shall not be used by any law enforcement agency to disperse any assembly, protest, or demonstration.

(b)  Kinetic energy projectiles[6] and chemical agents[7] shall only be deployed by a peace officer that has received training on their proper use by the Commission on Peace Officer Standards and Training for crowd control if the use is objectively reasonable to defend against a threat to life or serious bodily injury to any individual, including any peace officer, or to bring an objectively dangerous and unlawful situation safely and effectively under control, and only in accordance with all of the following requirements:

(1)  Deescalation techniques or other alternatives to force have been attempted, when objectively reasonable, and have failed.

(2) Repeated, audible announcements are made announcing the intent to use kinetic energy projectiles and chemical agents and the type to be used, when objectively reasonable to do so. The announcements shall be made from various locations, if necessary, and delivered in multiple languages, if appropriate.

(3) Persons are given an objectively reasonable opportunity to disperse and leave the scene.

(4)  An objectively reasonable effort has been made to identify persons engaged in violent acts and those who are not, and kinetic energy projectiles or chemical agents are targeted toward

_____

[6] The law defines "Kinetic energy projectiles" as "any type of device designed as less lethal, to be launched from any device as a projectile that may cause bodily injury through the transfer of kinetic energy and blunt force trauma. For purposes of this section, the term includes, but is not limited to, items commonly referred to as rubber bullets, plastic bullets, beanbag rounds, and foam tipped plastic rounds."  Cal. Penal Code § 13652(d)(1).

[7] The law defines "Chemical agents" as "any chemical that can rapidly produce sensory irritation or disabling physical effects in humans, which disappear within a short time following termination of exposure. For purposes of this section, the term includes, but is not limited to, chloroacetophenone tear gas, commonly known as CN tear gas; 2-chlorobenzalmalononitrile gas, commonly known as CS gas; and items commonly referred to as pepper balls, pepper spray, or oleoresin capsicum."  Cal. Penal Code § 13652(d)(2).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

those individuals engaged in violent acts. Projectiles shall not be aimed indiscriminately into a crowd or group of persons.

(5) Kinetic energy projectiles and chemical agents are used only with the frequency, intensity, and in a manner that is proportional to the threat and objectively reasonable.

(6) Officers shall minimize the possible incidental impact of their use of kinetic energy projectiles and chemical agents on bystanders, medical personnel, journalists, or other unintended targets.

(7) An objectively reasonable effort has been made to extract individuals in distress.

(8) Medical assistance is promptly provided, if properly trained personnel are present, or procured, for injured persons, when it is reasonable and safe to do so.

(9) Kinetic energy projectiles shall not be aimed at the head, neck, or any other vital organs.

(10) Kinetic energy projectiles or chemical agents shall not be used by any law enforcement agency solely due to any of the following:

    (A) A violation of an imposed curfew.

    (B) A verbal threat.

    (C) Noncompliance with a law enforcement directive.

(11) If the chemical agent to be deployed is tear gas, only a commanding officer at the scene of the assembly, protest, or demonstration may authorize the use of tear gas.

61. The Preliminary Injunction issued by the federal court in *Black Lives Matter v. City of Los Angeles*, 2:20-cv-05027-CBM-AS (C.D. Cal. 2021 May 5, 2021) [Doc. 102] is consistent with the enactment of California Penal Code Section 13652 regarding the use of KIPs. In the Floyd protests in 2020, there was very little incidence of chemical irritant projectiles used by the LAPD. The subsequently enacted state statute provides even greater protections for everyone at a protest. In this instance, the Plaintiffs did not even receive the threshold protections set by the *Black Lives Matter* injunction.

**B.   Senate Bill 98**

62.    In 2021, California Governor Newsom also signed into law SB 98, ensuring protections for the press to observe and record law enforcement activities at public protests. The Legislature recognized that, "[w]hile [existing] California law protects members of the press from being stopped when entering closed areas during emergencies and natural disasters to gather information, these protections don't extend to protest events such as demonstrations, marches, protests, or rallies where individuals largely engage their First Amendment right to speech." Assem. Pub. Safety Committee Analysis, California Senate Bill No. 98, California 2021-2022 Regular Session (July 13, 2021), Ex. 113 available at https://trackbill.com/s3/bills/CA/2021/SB/98/analyses/assembly-public-safety.pdf.

63.    The bill's author stated that it was enacted following widespread assaults and arrests of reporters covering the protests in response to the killing of George Floyd in 2020. "In California and across the country police have arrested, detained, and have physically assaulted journalists with rubber bullets, pepper spray, tear gas, batons, and fists. In many cases there are strong indications that the officers injuring journalists knew their targets were members of the press. Members of the press risk their personal safety and wellbeing each time they attend protest events to get the public the information they need, but rubber bullets, teargas, and even arrest cannot be the norm for an essential pillar of our democracy." *Id.* The intent of the Legislature in this instance is undebatable.

64.    SB 98 added Section 409.7 to the Penal Code, which reads as follows, in relevant part:

> 409.7. (a) If peace officers … close the immediate area surrounding any emergency field command post or any other command post, or establish a police line, or rolling closure at a demonstration, march, protest, or rally where individuals are engaged in activity that is protected pursuant to the First Amendment to the United States Constitution or Article I of the California Constitution, the following requirements shall apply:

(1) A duly authorized representative of any news service, online news service, newspaper, or radio or television station or network may enter the closed areas described in this section.

(2) A peace officer or other law enforcement officer shall not intentionally assault, interfere with, or obstruct the duly authorized representative of any news service, online news service, newspaper, or radio or television station or network who is gathering, receiving, or processing information for communication to the public.

(3) A duly authorized representative of any news service, online news service, newspaper, or radio or television station or network that is in a closed area described in this section shall not be cited for the failure to disperse, a violation of a curfew, or a violation of paragraph (1) of subdivision (a) of Section 148, for gathering, receiving, or processing information. If the duly authorized representative is detained by a peace officer or other law enforcement officer, that representative shall be permitted to contact a supervisory officer immediately for the purpose of challenging the detention, unless circumstances make it impossible to do so.

65.    In early December 2021, the Los Angeles Police Commission approved a Notice from Chief Moore to all Los Angeles Police Department personnel concerning the right of members of the press, defined broadly (with or without official police-issued credentials), to access incident areas, especially at protests, without fear of arrest or assault by the police.   Specifically, the Notice stated that it was issued to implement the legislative mandate of SB 98.  The Notice is Exhibit 80 Vol. 8 and was obtained from Defendant City's website at: http://www.lapdpolicecom.lacity.org/121421/BPC_21-233.pdf .

66.    More than a year earlier, on October 30, 2020, after multiple complaints concerning the LAPD treatment of members of the press during the George Floyd protests, the LAPD issued a notice to all department personnel from the Chief's office (DOC Communications Division), affirming the right of the press to access and document police activity at protests.  The Notice provided that, while

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

individuals who identify as press may be asked for their credentials, the lack of press credentials does not bar a person from acting as a member of the media. The October 30, 2020, memorandum also directed that, when an unlawful assembly order is given and a dispersal order made, the Incident Commander and Public Information Officer shall establish an area for the media to remain and observe.

67.    Based on what had occurred in response to the George Floyd protests, there can be no doubt that the express intent of the Legislature was to ensure that the media could remain and, in fact, be inside the police line. There is no limiting language in the statute that would justify excluding the press by threat or force.  A copy of the October 30, 2020, document was lodged as Exhibit 79 Vol. 8.  On information and belief, Plaintiff alleges that the LAPD and its officials and officers do not comply with these policies or the statutes. Moreover, merely sending out a notice years earlier is not adequate training, if the officers even read the Notice when it issued four years ago.

## V.    LIABILITY OF DEFENDANTS CITY OF LOS ANGELES AND CHIEF McDONNELL IN HIS OFFICIAL CAPACITY

68.    Defendants City of Los Angeles and Chief McDonnell in his official capacity (collectively, "City") failed to have adequate policies to inform LAPD officers on the lawful presence of members of the press at protests and, to the extent it had any such policies, failed to train officers on those policies and/or to enforce the policies. In May 2021, Chief Michel Moore issued a department-wide notice of the preliminary injunction entered in *Black Lives Matter v. City of Los Angeles*.  Ex. 110.  Defendants issued a department-wide notice in December 2021 of the passage of California Penal Code Sections 409.7 and 16352. Exhibit 80 Vol. 8. In September 2023, Defendants issued UOF Directive No. 3, detailing when and how the 40mm launcher could be deployed, including a prohibition on targeting a subject's head, face, eyes, neck, groin or kidney unless lethal force is authorized in the circumstance.  Ex. 111. In February, 2025, Defendants issued an updated UOF

Directive 3.1, reiterating restrictions on the use of the 40mm launcher and other intermediate force options to strike vital organs on the targeted subject's body. Ex. 112. Most, if not all, of these notices were disseminated by posting on an internal communication site, which proved inadequate to reinforce the necessary changes. As a consequence of the City's failure, officers assaulted members of the press, including Plaintiffs, with multiple KIPs and other forms of intermediate force in violation of the law and causing physical harm and fear to journalists who were just doing their jobs.

69. As the facts alleged above demonstrate, despite the LAPD's written policies, there is a widespread and persistent de facto policy, custom and practice in LAPD of ignoring using force against journalists without lawful justification, both intentionally and indiscriminately, using force to retaliate against journalists for reporting on police activity, and excluding journalists from public streets, sidewalks and parks where they are gathering information, in violation of the U.S. and California constitutions and California law, and in often violation of LAPD's own written policies.

70. The City had either actual or constructive knowledge of the different policies, practices, and customs alleged in the paragraphs above and the foreseeable consequences of the failure to implement and train on these state statutes and constitutional rights afforded to members of the press at protests.

71. The City was aware of assaults on press rights at the DNC in 2000, which led to the *Crespo* settlement. Exhibit 81. The LAPD's operating principle was then and continues to be that the press "interfere" despite multiple adverse court decisions and the enactment of specific provisions in the California Penal Code to guarantee press access free of force by law enforcement agencies. In his 2001 deposition in litigation arising out of LAPD's use of force at the 2000 DNC, former Chief Bernard Parks testified:

> I think the press has an obligation not to interfere with an unlawful assembly and dispersal, and the police in declaring that are declaring it

for all people that are at that assembly location, including the press, and historically by our policy and the direction from our city attorney, the press has no right to be at what is viewed to be a crime scene, which is an unlawful assembly. It's distinguished from being a disaster area. A crime scene is not a disaster area.

72.    The repeated failure of policy to provide press access at protests in the May Day 2007 and the 2020 George Floyd events, as well as the 2021 Echo Park encampment clearance was documented in after-action reports issued by the Los Angeles Police Department and by independent investigations commissioned by the Los Angeles City Council.

73.    Chief McDonnell was personally aware of the historic failure of policy by the LAPD on the issue of press access.  Chief McDonnell was a member of the Command Staff of the LAPD from the late 1990s and he was the First Asst. Chief of the LAPD under former Chief Bratton.  During the time that he was a member of the LAPD Command Staff, the LAPD assaulted press at the DNC 2000 and again at the 2007 May Day protests.  Even when his employment with the LAPD was interrupted, Chief McDonnell was the head of two large California law enforcement agencies – the Long Beach Police Department and the Los Angeles County Sheriff – and would have had knowledge of, and been responsible for compliance with, the state statutes ensuring press access and prohibiting the use of force against the press at public protests.

74.    The City also acted or failed to act with deliberate indifference to Plaintiffs' constitutional and statutory rights.

75.    Two of the journalists injured by Defendants on August 8, 2025, were also deliberately injured in 2020 at the George Floyd protests.  Tina Berg of Status Coup was prevented from access to a protest in the area of Fairfax and Stanley Avenues on May 30, 2020. When she arrived in the location, one officer told her to leave but then allowed her to stay after she showed her press credentials; however, she was then told by another officer to "get the fuck across the street."

She heard no dispersal order before observing LAPD officers shoot KIPs at the protesters, striking one person in the head and two in the face, fracturing bones. An LAPD officer hit Ms. Berg with a baton. As she got into her car and started to drive away, LAPD officers fired "less-lethal" munitions at her vehicle, shattering the rear window.  At the same protest, an LAPD officer shot photojournalist Nicholas Stern in the hand with a less-lethal munition, while he was plainly identifiable as press and was taking photographs, and not engaged in any unlawful activity or posing a threat to anyone.

76.    In June 2022, Ms. Berg was also denied access to a protest in Downtown Los Angeles that took place following the decision by the Supreme Court in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022). LAPD officers blocked and shoved her, causing her to fall and suffer several bruises to her face and extremities.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (First and Fourteenth Amendments to the U.S. Constitution,
### 42 U.S.C. § 1983)

77.    Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs in this First Amended Complaint.

78.    The First Amendment, applicable to Defendants through the Fourteenth Amendment, guarantees the right of the press to access areas in traditional public fora necessary to engage in coverage of public officials free from interference or retaliation by tactics such as seizure, arrest, detention, or use of force, especially when they are covering law enforcement conduct in traditional public fora.

79.    As alleged above, Defendants violated Plaintiffs' rights under the First Amendment by denying them access to public streets, sidewalks or parks historically open to the press and public for the purpose of gathering information

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

and taking photographs and video to report news and information to the public, and
retaliating against them for engaging in activity protected by the First Amendment.

80.    Defendants' conduct has caused and is causing Plaintiffs irreparable
injury.

## SECOND CLAIM FOR RELIEF
### (Fourth and Fourteenth Amendments to the U.S. Constitution,
### 42 U.S.C. § 1983)

81.    Plaintiffs reallege and incorporate herein by reference the preceding
and any subsequent paragraphs in this First Amended Complaint.

82.    Under the Fourth Amendment, applicable to Defendants through the
Fourteenth Amendment, Plaintiffs have rights to be free from unlawful seizures of
their persons and unreasonable use of force.

83.    As alleged above, Defendants violated Plaintiffs' rights by using
unreasonable force against Plaintiffs.

84.    No Plaintiff, or member of any Plaintiff, or any reporter or journalist
described herein, posed any threat or danger to law enforcement or others.

85.    Despite already being subject to a preliminary injunction restricting
the use of LLMs against protestors, Defendants discharged hundreds of rounds of
40mm LLMs, in particular, where there was no immediate threat of imminent harm.
The Ninth Circuit previously held that there was "clearly established"
precedent that shooting a protestor with a 40mm "less-lethal" munition in
circumstances similar to those presented here constituted an unreasonable use of
force.

86.    Defendants' use of force constituted deliberate indifference to a
foreseeable risk of harm to Plaintiffs and to a risk of violations of Plaintiffs' rights,
in violation of the Fourteenth Amendment.

87.    Defendants' conduct has caused and is causing Plaintiffs irreparable
injury.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### THIRD CLAIM FOR RELIEF
### (Cal. Const. Art. I, § 2)

88.    Plaintiffs reallege and incorporate herein by reference the preceding
and any subsequent paragraphs in this First Amended Complaint.

89.    Article I, section 2 of the California constitution prohibits the
government from abridging liberty of speech or press.  The rights of freedom
speech and press under the California constitution are generally not only as broad
and great as the First Amendment's, but are even broader and greater.

90.    As alleged above, Defendants violated Plaintiffs' freedom of speech
and freedom of the press by denying Plaintiffs access to public streets, sidewalks
and parks historically open to the press and public for the purpose of gathering
information and taking photographs and video in order to report news and
information to the public, and retaliating against them for engaging in
constitutionally protected activity.

91.    Defendants' conduct has caused and is causing Plaintiffs irreparable
injury.

### FOURTH CLAIM FOR RELIEF
### (Cal. Const. Art. I, §§ 7, 13)

92.    Plaintiffs reallege and incorporate herein by reference the preceding
and any subsequent paragraphs in this First Amended Complaint.

93.    Plaintiffs have rights under Article I, section 13 of the California
constitution to be free from unlawful seizures of their persons and unreasonable
use of force.

94.    As alleged above, Defendants violated Plaintiffs' rights by using
unreasonable force against Plaintiffs.

95.    No Plaintiff, or member of any Plaintiff, or any reporter or journalist
described herein, posed any threat or danger to law enforcement or others that
would justify the use of force.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

96.     Defendants' conduct has caused and is causing Plaintiffs irreparable injury.

## FIFTH CLAIM FOR RELIEF
### (Cal. Penal Code § 409.7)

97.     Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs in this First Amended Complaint.

98.     In response to the significant and unlawful restrictions against the exercise of this most fundamental right by the Defendants in recent years, the California Legislature passed, and Governor Newsom signed, Senate Bill 98 in 2021 (codified at Penal Code section 409.7), establishing requirements to allow press access to areas of police actions as described more fully above.

99.     Significantly, this statute expressly prohibits law enforcement from assaulting members of the press to prevent, interfere or obstruct them from "gathering information for communication to the public."

100.    As alleged above, when Defendants established police lines and rolling closures at demonstrations, marches, protests or rallies, where people engaged in protected speech and expression. Defendants repeatedly excluded journalists from closed areas without justification, including by ordering journalists out of closed areas and using force on journalists so that they could not access closed areas.

101.    As alleged above Defendants repeatedly intentionally assaulted, interfered with, or obstructed journalists who were gathering, receiving, or processing information for communication to the public.

102.    As alleged above Defendants cited, or threatened to cite, journalists for failing to disperse from closed areas, and detained journalists without allowing them to contact a supervisory officer immediately for the purpose of challenging the detention, even when circumstances allowed it.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

103.   Plaintiffs were not engaged in any unlawful activity in the course of their press activities.

104.   Through their conduct, Defendants violated California Penal Code section 409.7, violating their duties under state law and depriving Plaintiffs and their members of their rights under the U.S. and California constitutions and state law.

105.   Defendants' conduct has caused and is causing Plaintiffs irreparable injury.

## SIXTH CLAIM FOR RELIEF
### (Cal. Penal Code § 13652)

106.   In 2021, the Legislature also passed, and Governor Newsom signed, Assembly Bill 48, codified at Penal Code section 13652, establishing requirements for and restrictions on police use of less-lethal weapons at any assembly, protest, or demonstration.  The statute prohibits police use of such weapons unless police have attempted de-escalation techniques and alternatives to force, when reasonable, and such approaches have failed; unless police have made repeated, audible announcements are made announcing the intent to use such force and have given people a reasonable opportunity to disperse and leave the scene; unless police have made a reasonable effort to identify persons engaged in violent acts and target only them with such weapons.

107.   Penal Code section 13652 requires that police at assemblies and protests "shall minimize the possible incidental impact of their use of kinetic energy projectiles and chemical agents on bystanders, medical personnel, journalists, or other unintended targets."

108.   Section 13652 also prohibits police from aiming projectiles indiscriminately into a crowd or group of persons; requires that police use kinetic energy projectiles and chemical agents only with the frequency, intensity, and in a manner that is proportional to the threat and objectively reasonable; prohibits police

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

from aiming kinetic energy projectiles at the head, neck, or any other vital organs; and prohibits police use of kinetic energy projectiles or chemical agents solely due to a violation of an imposed curfew, a verbal threat, or noncompliance with a law enforcement directive.

109.   Through their conduct, Defendants violated California Penal Code section 13652, violating their duties under state law and depriving Plaintiffs and their members of their rights under the U.S. and California constitutions and state law.

110.   Defendants' conduct has caused and is causing Plaintiffs irreparable injury.

### SEVENTH CLAIM FOR RELIEF
### (Violation of the Bane Act, Cal. Civil Code § 52.1)

111.   Plaintiffs reallege and incorporate by reference the preceding paragraphs as though fully set forth herein.  The federal and state constitutions, as well as statute, guarantee freedom of the press, as well freedom from unnecessary and excessive force by law enforcement officers. Defendants, by engaging in the wrongful acts and failures to act alleged above, denied Plaintiffs and their members and other journalists present at the protests of their constitutional and statutory rights by threats, intimidation, or coercion, to deter, prevent and in retaliation for the exercise of their First Amendment and statutory rights, in violation of Cal. Civ. Code § 52.1.

112.   California Civil Code, Section 52.1, the Tom Bane Civil Rights Act, provides that : "if a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States or of the rights secured by the Constitution or laws of this state," a person whose such rights have been interfered with or attempted to be interfered with may prosecute

an action "for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured, including appropriate equitable and declaratory relief to eliminate a pattern or practice of conduct." Cal. Civ. Code § 52.1.  At this time, Plaintiffs seek only injunctive relief in this action.

113.    As alleged herein, LAPD unlawfully used force and the threat of force against Plaintiffs, their members and other journalists to intimidate them and interfere with their constitutional right to document public events as the press, in violation of California Penal Code §§ 409.7 and 13652 to access closed areas and to be free from intentional assault, interference or obstruction by law enforcement while reporting.

114.    In acting as alleged herein, LAPD officers used threats, intimidation, and coercion to interfere with rights secured under the Constitution of the United States, the constitution of the State of California, and the statutory laws of the State providing protection to Plaintiffs and other members of the press and public at protests.  The use of any force, let alone unreasonable force, by Defendants was a substantial factor in causing the violation of rights and attendant harm endured by Plaintiffs and their members and other journalists present at the protests.

115.    As a direct and proximate result of the aforementioned acts or omissions of Defendants, Plaintiffs have suffered and continue to suffer irreparable injury.  Plaintiffs are entitled to injunctive relief to require Defendants to end its unlawful policies, practices and customs and of Defendants that caused the violation of Plaintiffs' rights of freedom of the press under the federal and state constitutions and statutory law.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## **REQUEST FOR RELIEF**

Wherefore, Plaintiffs seek judgment as follows:

1. A preliminary and permanent injunction or writ of mandate restraining Defendants from engaging in the unlawful and unconstitutional actions detailed above and retaining Court jurisdiction to enforce the terms of the injunction;

2. A declaratory judgment that Defendants' alleged conduct violated Plaintiff's rights under the federal and state constitutions and statutory laws described herein;

3. An award of attorneys' fees pursuant to 42 U.S.C. § 1988 and Cal. Civil Code §§ 52(b) & 52.1(h) and Cal. Code of Civ. Proc. § 1021.5 or any other applicable law;

4. Costs of suit;

5. Such other and further relief as the Court may deem just and proper.


Dated: October 6, 2025          Law Office of Carol A. Sobel


                                  /s/   Carol A. Sobel
                                By: CAROL A. SOBEL

                                Law Office of Peter Bibring

                                  /s/  Peter Bibring
                                By: PETER BIBRING

                                Attorneys for Plaintiffs

# EXHIBIT 110

**OFFICE OF THE CHIEF OF POLICE**

<u>N O T I C E</u>                                                                                         April 21, 2021
1.11

**TO:**              All Department Personnel

**FROM:**         Chief of Police

**SUBJECT:**    USE OF LESS-LETHAL LAUNCHERS DURING DEMONSTRATIONS

The purpose of this Notice is to inform personnel about the impact of a temporary restraining
order related to the use of 37mm and 40mm less-lethal launchers, which was partially granted on
April 19, 2021. The order identifies a number of restrictions, some of which are consistent with
existing Department protocols while others are more restrictive.

The following requirements are **<u>effective immediately</u>** in public demonstrations or crowd
control situations:

- An immediate moratorium on the use of the 37mm less-lethal launcher;
- Any officer using a 40mm less-lethal launcher in a public demonstration must have
  successfully completed Department training;
- Officers may use a 40mm less-lethal launcher only on persons who pose a threat
  of **serious bodily harm** to others, including law enforcement;
- Unless an officer or another individual is being attacked by a person who poses a threat
  of serious bodily harm, a 40mm can only be used during a public demonstration
  after **<u>ALL</u>** of the following have occurred:
    - an unlawful assembly has been declared;
    - an order to disperse has been given; a reasonable opportunity to comply with the
      order to disperse has elapsed; <u>and</u>
    - a person poses a threat of serious bodily harm to others, including law
      enforcement.
- The 40mm less-lethal launcher must not be used to target the head, neck, face, eyes, or
  spine of a person; and,
- The optimal range for the 40mm less-lethal launcher is between 5 and 110
  feet. Additionally, the **minimum deployment range is 5 feet**.

Additionally, officers are reminded that the recommended deployment range for the Bean Bag
Shotgun is 5 to 30 feet. As with the 40mm, it must not be used to target the head, neck, face,
eyes, or spine of a person.

Officers should, to the extent possible, on BWV, **<u>articulate the circumstances</u>** of the use of the
40mm and Bean Bag less-lethal munitions in accordance with Department guidelines, including
identifying the target, the reasons for the deployment of the less lethal munitions and the range.

**Exhibit 110-1**

All Department Personnel
Page 2
1.11

Watch Commanders shall ensure this Notice is read at all roll calls for seven consecutive days.

If you have any questions, please contact the Office of the Chief of Staff at (213) 486-8740.

MICHEL R. MOORE
Chief of Police

DISTRIBUTION "D"

Exhibit 110-2

# EXHIBIT 111

LOS ANGELES POLICE DEPARTMENT

# USE OF FORCE
# DIRECTIVE

| UOF Directive No. 3 | September 2023 |
| --- | --- |

### 40mm LESS-LETHAL LAUNCHER

**PURPOSE**

The purpose of this Directive is to familiarize officers with the use, nomenclature, and operational procedures of the 40mm Less-Lethal Launcher (40mm LLL).  The **40mm LLL** is a tactical single-shot launcher configured with a green stock, pistol grip, a rifled barrel, picatinny rail mounting system, and Department- approved optics.  The color green is used to signify that the 40mm LLL is to be used only with Department-specified less-lethal munitions.    The   only   current   Department-approved munition is the 40mm eXact iMpact round.



**PROTOCOL**

The Department's guiding principle when using force shall be reverence for human life.  Officers shall attempt to control an incident by using time, distance and cover, communication, and available resources in an effort to de-escalate the situation whenever it is safe, feasible, and reasonable to do so.  When warranted, Department personnel may use objectively reasonable force to carry out their duties.  Officers may only use a level of force that they reasonably believe is proportional to the seriousness of the suspected offense or the reasonably perceived level of actual or threatened resistance.

Use of an intermediate force option, including the 40mm LLL, is an appropriate force option when an officer reasonably believes either of the following:

- There is an immediate threat to the safety of the officers or others; or,
- If the threat is not immediately addressed, there is an articulable risk the incident could escalate to the use of deadly force.

Intermediate force options should not be used on a suspect or subject who is believed to be unarmed, and, is passively resisting or merely failing to comply with commands.  Verbal threats of violence alone do not justify the use of an intermediate force option.

Ex. 111-001

**Exhibit 5-1**

Use of Force Directive No. 3
40mm Less-Lethal Launcher
Page 2

The Department uses the objectively reasonable standard and the totality of the circumstances when evaluating the reasonableness of the force used, which includes the number of times a particular force option was utilized.  If the force option being utilized appears to be ineffective, Department personnel should consider transitioning to another, potentially more effective force option or tactic.

Officers who encounter an armed self-mutilating or suicidal individual shall not use a 40mm LLL against that person, unless the officer reasonably believes either there is an immediate threat to the safety of the officers or others; or, if the threat is not immediately addressed, there is an articulable risk the incident could escalate to the use of deadly force.  If officers choose to use a 40mm in these situations, they should utilize distance and cover, when feasible, to avoid placing themselves in a vulnerable position.  Officers are reminded that it is not a criminal act to express suicidal ideations or commit/attempt to commit suicide or self-mutilation in the State of California.

The 40mm LLL shall not be used to target the head (e.g., face/eyes), neck, groin, spine, or kidneys unless lethal force is authorized.  The 40mm LLL may be used in crowd control situations against a single suspect or subject as a target-specific intermediate force option.

Prior to deployment, officers shall inspect the ammunition and the holder to ensure only 40mm eXact iMpact ammunition is utilized.  The **40mm eXact iMpact round** is a point-of-aim, point-of-impact, direct fire round consisting of a plastic body and a sponge nose that is spin stabilized via the incorporated rifling collar and the 40mm launcher's rifled barrel.  It can be identified by its silver metal case and blue sponge nose.  These rounds are designed to be non-penetrating, and upon striking  a target, distribute energy over a broad surface area.  The sponge round utilizes smokeless powder as the propellant and has velocities that are extremely consistent.

**PROCEDURES**

The approved deployment range for the 40mm LLL is five (5) to 75 feet.  Officers should always consider weapon retention principles when deploying the 40mm LLL to prevent a suspect or subject from gaining control of the launcher.  When officers identify the need for a 40mm LLL, they should broadcast, "Code Sam-40."  **Code Sam-40** is the radio code used to broadcast a request for a 40mm LLL.

If tactically and environmentally feasible, the designated 40mm LLL officer should deploy the launcher from a position of cover with a designated cover officer.  The 40mm LLL officer alerts other officers when the designated officer is ready to fire by shouting or broadcasting, "40, 40!"  This alerts the officers at the scene that the firing of the 40mm LLL is about to occur.

Ex. 111-002

**Exhibit 5-2**

Use of Force Directive No. 3
40mm Less-Lethal Launcher
Page 3

When firing the 40mm LLL, officers should assess the effectiveness of each round fired. The effectiveness of the 40mm eXact iMpact round is based on the energy at impact. Therefore, the round may have little or no effect on a suspect or subject who:

- Has a large body mass;
- Is wearing heavy clothing/body armor;
- Is under the influence of drugs; or,
- Is in an altered state and cannot feel the impact of the sponge round.

If shots to the navel area or beltline do not appear to be effective, then a leg, arm, or hand may be a viable alternative target. The primary **target area** is the navel area or beltline, but officers may target the suspect's arms, hands, or legs when practicable. If the hand is the selected target, consider its location and what it is holding. Officers shall not target the head, neck, spine, groin, or kidneys – unless lethal force is authorized.

**If control is not achieved and/or it appears that the 40mm eXact iMpact round is not effective, even after changing target areas, the officers must assess the viability of an alternate force option.** Additionally, officers should continue to assess the suspect's actions and the effectiveness of each force option used.

Generally, officers should not deploy the 40mm LLL at a fleeing suspect. Officers should pursue and attempt to contain the suspect, while continually assessing the situation and considering the most appropriate tactical plan. Additionally, officers should avoid deploying the 40mm LLL on individuals who:

> **Tactical Considerations**
>
> - Size of suspect versus size of officer
> - Clothing
> - Altered mental state (may not be effective)
> - Any known history of mental illness
> - Age and/or physical condition of the suspect
> - Suspect's access to weapons
> - Suspect's ability to retreat or escape
> - Bystander involvement
> - Availability of back-up officers (Can suspect be distracted until other units arrive?)
> - Background/Foreground (What is behind/in front of the suspect?)
> - Officers should maintain distance from the suspect

- Are on an elevated or unstable surface which could cause a fall that could result in a significant impact injury;
- Are operating or riding any mode of transportation where the risk of injury would be substantially increased by use of the 40mm; or,
- Are known to be pregnant, under 12 years of age, elderly, or visibly frail.

The 40mm LLL is not a substitute for deadly force. When conducting a building search for a suspect who may be armed, standard firearms must be deployed. Having a 40mm LLL along with other force options during the search will provide officers with different options should the situation change.

Ex. 111-003

**Exhibit 5-3**

Use of Force Directive No. 3
40mm Less-Lethal Launcher
Page 4

**Face Shield Considerations**

It is recommended that operators are aware of their stock position prior to any deployment or crowd control operation and familiarize themselves with operating the launcher system while using a face shield.  The face shield should not be in the down position when the launcher stock is in the completely collapsed or mid-length position.  The shield in the down position could affect proper manipulation or sight alignment and cause the system to move off target and ultimately compromise the operator's accuracy.

**Use of Force Warning**

An officer shall, when feasible, give a verbal warning prior to using the 40mm LLL to control an individual.  A warning is not required when an officer is attacked and must respond to the suspect's actions.  Additionally, if a tactical plan requires the element of surprise to stabilize the situation, a warning is not required.  An example would be a hostage situation.  However, officers are reminded that the surprise/tactical element must still be necessary at the actual time the 40mm LLL is fired.

The verbal warning should include a command and a warning of the potential consequences of the use of force.  The command should be similar to "drop the weapon" or "stop what you are doing" followed by a warning similar to "or we may use the 40mm, and that may cause you injury."

The use or non-use of the warning shall be documented.  The Non-Categorical Use of Force Report, Form 01.67.05, Use of Force Summary heading shall include:

- The name of the officer giving the warning; and,
- An explanation and appropriate justification for not using the warning.

Statements that the "element of surprise was needed" or "for officer safety reasons" will not justify non-use of the warning.  The explanation for non-use must:

- Clearly articulate why the element of surprise was needed;
- Explain in detail any officer safety considerations; and,
- List all pertinent reasons that justify why the warning was not provided.

The use of the warning, or the reasons for non-use, will be factors considered in the determination whether the use of force was objectively reasonable.

Ex. 111-004

**Exhibit 5-4**

Use of Force Directive No. 3
40mm Less-Lethal Launcher
Page 5

## Tactical Discharges

A tactical discharge is defined as any projectile from a less-lethal control device launched with the intent to gain a tactical advantage by creating a distraction, removing obstacles, or altering the environment, and not directed at an individual (e.g., use of a baton or beanbag shotgun to break a window, or deployment of a chemical agent during a barricaded suspect incident).

Tactical discharges are allowed, but are not recommended, as they may cause secondary, unintended impacts.  Before a tactical discharge is used to break a window, officers should consider that another officer or individual may be behind the window and subject to impact by the 40mm round.  In the event the 40mm LLL is used for a tactical discharge, it should be communicated to all officers at scene prior to its use, for their situational awareness.

Tactical discharges **may** be an effective option in **limited** circumstances.  Officers must assess the situation after each tactical discharge, and if the launcher is not producing the desired effect, discontinue its use.  Officers must be prepared to give the rationale behind their decision to fire the 40mm LLL as a tactical discharge.  Tactical discharges shall be reported on an Employee's Report, Form 15.07.00, and submitted to the employee's commanding officer for review and appropriate action.

## Requirement to Intercede When Excessive Force is Observed

An officer shall intercede when present and observing another officer using force that is clearly beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances, taking into account the possibility that other officers may have additional information regarding the threat posed by a subject.

> **Note**: For the purposes of this section, "intercede" includes, but is not limited to, physically stopping the excessive force (when safe and reasonable to do so) and recording the excessive force, if equipped with a body worn video (BWV) camera.  Officers shall attempt to document on BWV the efforts to intervene, efforts to de-escalate the excessive use of force, and confronting the offending officer about the excessive force during the use of force.  If the offending officer continues to use excessive force, the witnessing officer shall immediately report the excessive force to a superior officer.

## Requirement to Report Potential Excessive Force

An officer who is present and observes another officer using force that the present and observing officer believes to be beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances based upon the totality of information actually known to the officer, shall immediately report such force to a superior officer.

Ex. 111-005

**Exhibit 5-5**

Use of Force Directive No. 3
40mm Less-Lethal Launcher
Page 6

**Medical Treatment**

Any person struck with a 40mm eXact iMpact round shall be transported to a Department-approved facility for medical treatment prior to booking.  The person should be carefully monitored for signs of distress.  If a medical emergency situation exists, officers shall render medical aid as required and request a rescue ambulance to respond to their location.

**Reporting**

All discharges of a projectile weapon (e.g., 40mm LLL), excluding tactical discharges, are reportable uses of force and shall be reported in accordance with Department policy whether or not the projectiles/munitions or device make contact with the suspect or subject, including their clothing.

<u>**Points to Remember**</u>

- 5 feet is the minimum deployment range
- Deployment range is from 5 to 75 feet
- Assessment between rounds is critical
- **Do not target the head, neck, spine, groin, or kidneys, unless lethal force is authorized**
- Have a backup plan in the event the 40mm round is ineffective
- 40mm LLL should not be deployed unless lethal force is available for cover
- All discharges of the 40mm LLL, excluding tactical discharges, are a reportable UOF

Ex. 111-006

**Exhibit 5-6**

Use of Force Directive No. 3
40mm Less-Lethal Launcher
Page 7

**Important Reminder**

**Deviation from these basic concepts sometimes occurs due to the fluid and rapidly evolving
nature of law enforcement encounters and the environment in which they occur. Deviations
may range from minor, typically procedural or technical, to substantial deviations from
Department tactical training. Any deviations are to be explained by the involved officer(s), and
justification for substantial deviation from Department tactical training shall be articulated and
must meet the objectively reasonable standard of the Department's Use of Force Policy.**

**AMENDMENTS**

This Use of Force Directive cancels and supersedes Use of Force-Tactics Directive
No. 17.1, 40mm Less-Lethal Launcher, October 2021.

MICHEL R. MOORE
Chief of Police

DISTRIBUTION "A"

Attachment

**Exhibit 5-7**

## HANDLING AND STORAGE OF THE 40mm LESS-LETHAL LAUNCHER

All Department personnel are reminded of the proper care, handling, and storage of the 40mm Less-Lethal Launcher.  In order to maintain the 40mm Less-Lethal Launcher's proper function and accuracy, officers shall treat the equipment with care and refrain from dropping the 40mm Less-Lethal Launcher on the ground.

**Pre-Inspection**

As part of officers' start of watch inspection and prior to going into the field, officers shall ensure that the following 40mm Less-Lethal Launcher procedures are conducted:

- Physically inspect all components of the 40mm Less-Lethal Launcher to ensure they are in good working order;
- Ensure the sight optic is functional and secured to the launcher;
- Ensure the elevation and windage adjustments of the sight optic are aligned with the markings and have not been manipulated or moved; and,
- Ensure the sling is attached securely.

**Securing During Transportation**

Department personnel shall secure the unloaded 40mm Less-Lethal Launcher in their vehicle's 40mm Less-Lethal Launcher mount.  If the Department vehicle is not equipped with a 40mm Less-Lethal Launcher mount, Department personnel shall keep the 40mm Less-Lethal Launcher in the Department-issued case and place it in a secured position inside the trunk of the vehicle.  Care should be taken to ensure the weapon system does not shift during transportation.

**Damage**

Any movement or damage to the sight optic may cause it to no longer be zeroed.  If movement or damage to the sight optic does occur or any components of the 40mm Less-Lethal Launcher malfunction, officers shall immediately return it to their Area/division kit room and notify the Area/division Training Coordinator of the damage. The damaged 40mm Less-Lethal Launcher shall be removed from the inventory immediately and deemed non-operable and non-deployable.  The concerned Area/division Training Coordinator shall, without delay, notify the Department Armorer of the damage.  The Area/division shall also be responsible for transporting the damaged 40mm Less-Lethal Launcher to the Department Armorer for immediate repair.

Lastly, if the 40mm Less-Lethal Launcher is **deployed and fired,** the concerned Area/division Training Coordinator shall, as soon as possible, cause it to be transported to the Department Armorer where it shall be cleaned and inspected prior to redeployment.

Should you have any questions, please contact Firearms Training Section, Training Division, at (818) 832-3740 or (323) 612-4404.

# EXHIBIT 112

LOS ANGELES POLICE DEPARTMENT

# USE OF FORCE DIRECTIVE

| UOF Directive No. 3.1 | February 2025 |
|---|---|

## 40MM LESS-LETHAL LAUNCHER

### PURPOSE

The purpose of this Directive is to familiarize officers with the use, nomenclature, and operational procedures of the 40mm Less-Lethal Launcher (40mm LLL).  The **40mm LLL** is a tactical single-shot launcher configured with a green stock, pistol grip, a rifled barrel, picatinny rail mounting system, and Department- approved optics.  The color green is used to signify that the 40mm LLL is to be used only with Department-specified less-lethal munitions.    The only current Department-approved munition is the 40mm eXact iMpact round.



### PROTOCOL

The Department's guiding principle when using force shall be reverence for human life.  Officers shall attempt to control an incident by using time, distance and cover, communication, and available resources in an effort to de-escalate the situation whenever it is safe, feasible, and reasonable to do so.  When warranted, Department personnel may use objectively reasonable force to carry out their duties.  Officers may only use a level of force that they reasonably believe is proportional to the seriousness of the suspected offense or the reasonably perceived level of actual or threatened resistance.

Use of an intermediate force option, including the 40mm LLL, is an appropriate force option when an officer reasonably believes either of the following:

- There is an immediate threat to the safety of the officers or others; or,
- If the threat is not immediately addressed, there is an articulable risk the incident could escalate to the use of deadly force.

Intermediate force options should not be used on a suspect or subject who is believed to be unarmed, and, is passively resisting or merely failing to comply with commands.  Verbal threats of violence alone do not justify the use of an intermediate force option.

**Exhibit 7-1**

Use of Force Directive No. 3.1
40mm Less-Lethal Launcher
Page 2

The Department uses the objectively reasonable standard and the totality of the circumstances when evaluating the reasonableness of the force used, which includes the number of times a particular force option was utilized.  If the force option being utilized appears to be ineffective, Department personnel should consider transitioning to another, potentially more effective force option or tactic.

Officers who encounter an armed self-mutilating or suicidal individual shall not use a 40mm LLL against that person, unless the officer reasonably believes either there is an immediate threat to the safety of the officers or others; or, if the threat is not immediately addressed, there is an articulable risk the incident could escalate to the use of deadly force.  If officers choose to use a 40mm in these situations, they should utilize distance and cover, when feasible, to avoid placing themselves in a vulnerable position.  Officers are reminded that it is not a criminal act to express suicidal ideations or commit/attempt to commit suicide or self-mutilation in the State of California.

The 40mm LLL shall not be used to target the head (e.g., face/eyes), neck, groin, spine, or kidneys unless lethal force is authorized.

**Crowd Control**

The 40mm LLL is considered a kinetic energy projectile per the State of California.  During crowd control situations, the 40mm LLL has different usage requirements.  Refer to Department policy and procedures regarding Crowd Control with Kinetic Energy Projectiles and Chemical Agents.

**Pre-Deployment**



Prior to deployment, officers shall inspect the ammunition and the holder to ensure only 40mm eXact iMpact ammunition is utilized.  The **40mm eXact iMpact round** is a point-of-aim, point-of-impact, direct fire round consisting of a plastic body and a sponge nose that is spin stabilized via the incorporated rifling collar and the 40mm launcher's rifled barrel.  It can be identified by its silver metal case and blue sponge nose.  These rounds are designed to be non-penetrating, and upon striking a target, distribute energy over a broad surface area.  The sponge round utilizes smokeless powder as the propellant and has velocities that are extremely consistent.

**PROCEDURES**

The approved deployment range for the 40mm LLL is five (5) to 75 feet.  Officers should always consider weapon retention principles when deploying the 40mm LLL to prevent a suspect or subject from gaining control of the launcher.  When officers identify the need for a 40mm LLL, they should broadcast, "Code Sam-40."  **Code Sam-40** is the radio code used to broadcast a request for a 40mm LLL.

Use of Force Directive No. 3.1
40mm Less-Lethal Launcher
Page 3

If tactically and environmentally feasible, the designated 40mm LLL officer should deploy the launcher from a position of cover with a designated cover officer.  The 40mm LLL officer alerts other officers when the designated officer is ready to fire by shouting or broadcasting, "40, 40!"  This alerts the officers at the scene that the firing of the 40mm LLL is about to occur.

When firing the 40mm LLL, officers should assess the effectiveness of each round fired.  The effectiveness of the 40mm eXact iMpact round is based on the energy at impact.  Therefore, the round may have little or no effect on a suspect or subject who:

- Has a large body mass;
- Is wearing heavy clothing/body armor;
- Is under the influence of drugs; or,
- Is in an altered state and cannot feel the impact of the sponge round.

If shots to the navel area or beltline do not appear to be effective, then a leg, arm, or hand may be a viable alternative target.  The primary **target area** is the navel area or beltline, but officers may target the suspect's arms, hands, or legs when practicable.  If the hand is the selected target, consider its location and what it is holding.  Officers shall not target the head, neck, spine, groin, or kidneys – unless lethal force is authorized.

**If control is not achieved and/or it appears that the 40mm eXact iMpact round is not effective, even after changing target areas, the officers must assess the viability of an alternate force option.**  Additionally, officers should continue to assess the suspect's actions and the effectiveness of each force option used.

Generally, officers should not deploy the 40mm LLL at a fleeing suspect.  Officers should pursue and attempt to contain the suspect, while continually assessing the situation and considering the most appropriate tactical plan.  Additionally, officers should avoid deploying the 40mm LLL on individuals who:

> **Tactical Considerations**
>
> - Size of suspect versus size of officer
> - Clothing
> - Altered mental state (may not be effective)
> - Any known history of mental illness
> - Age and/or physical condition of the suspect
> - Suspect's access to weapons
> - Suspect's ability to retreat or escape
> - Bystander involvement
> - Availability of back-up officers (Can suspect be distracted until other units arrive?)
> - Background/Foreground (What is behind/in front of the suspect?)
> - Officers should maintain distance from the suspect

- Are on an elevated or unstable surface which could cause a fall that could result in a significant impact injury;
- Are operating or riding any mode of transportation where the risk of injury would be substantially increased by use of the 40mm; or,
- Are known to be pregnant, under 12 years of age, elderly, or visibly frail.

**Exhibit 7-3**

Use of Force Directive No. 3.1
40mm Less-Lethal Launcher
Page 4

The 40mm LLL is not a substitute for deadly force.  When conducting a building search
for a suspect who may be armed, standard firearms must be deployed.  Having a 40mm
LLL along with other force options during the search will provide officers with different
options should the situation change.

**Face Shield Considerations**

It is recommended that operators are aware of their stock position prior to any deployment
or crowd control operation and familiarize themselves with operating the launcher system
while using a face shield.  The face shield should not be in the down position when the
launcher stock is in the completely collapsed or mid-length position.  The shield in the
down position could affect proper manipulation or sight alignment and cause the system
to move off target and ultimately compromise the operator's accuracy.

**Use of Force Warning**

An officer shall, when feasible, give a verbal warning prior to using the 40mm LLL to
control an individual.  A warning is not required when an officer is attacked and must
respond to the suspect's actions.  Additionally, if a tactical plan requires the element of
surprise to stabilize the situation, a warning is not required.  An example would be a
hostage situation.  However, officers are reminded that the surprise/tactical element must
still be necessary at the actual time the 40mm LLL is fired.

The verbal warning should include a command and a warning of the potential
consequences of the use of force.  The command should be similar to "drop the weapon"
or "stop what you are doing" followed by a warning similar to "or we may use the 40mm,
and that may cause you injury."

The use or non-use of the warning shall be documented.  The Non-Categorical Use of
Force Report, Form 01.67.05, Use of Force Summary heading shall include:

- The name of the officer giving the warning; and,
- An explanation and appropriate justification for not using the warning.

Statements that the "element of surprise was needed" or "for officer safety reasons" will
not justify non-use of the warning.  The explanation for non-use must:

- Clearly articulate why the element of surprise was needed;
- Explain in detail any officer safety considerations; and,
- List all pertinent reasons that justify why the warning was not provided.

The use of the warning, or the reasons for non-use, will be factors considered in the
determination whether the use of force was objectively reasonable.

**Exhibit 7-4**

Use of Force Directive No. 3.1
40mm Less-Lethal Launcher
Page 5

## Tactical Discharges

A tactical discharge is defined as any projectile from a less-lethal control device launched with the intent to gain a tactical advantage by creating a distraction, removing obstacles, or altering the environment, and not directed at an individual (e.g., use of a baton or beanbag shotgun to break a window, or deployment of a chemical agent during a barricaded suspect incident).

Tactical discharges are allowed, but are not recommended, as they may cause secondary, unintended impacts.  Before a tactical discharge is used to break a window, officers should consider that another officer or individual may be behind the window and subject to impact by the 40mm round.  In the event the 40mm LLL is used for a tactical discharge, it should be communicated to all officers at scene prior to its use, for their situational awareness.

Tactical discharges **may** be an effective option in **limited** circumstances.  Officers must assess the situation after each tactical discharge, and if the launcher is not producing the desired effect, discontinue its use.  Officers must be prepared to give the rationale behind their decision to fire the 40mm LLL as a tactical discharge.  Tactical discharges shall be reported on an Employee's Report, Form 15.07.00, and submitted to the employee's commanding officer for review and appropriate action.

## Requirement to Intercede When Excessive Force is Observed

An officer shall intercede when present and observing another officer using force that is clearly beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances, taking into account the possibility that other officers may have additional information regarding the threat posed by a subject.

> **Note**: For the purposes of this section, "intercede" includes, but is not limited to, physically stopping the excessive force (when safe and reasonable to do so) and recording the excessive force, if equipped with a body worn video (BWV) camera.  Officers shall attempt to document on BWV the efforts to intervene, efforts to de-escalate the excessive use of force, and confronting the offending officer about the excessive force during the use of force.  If the offending officer continues to use excessive force, the witnessing officer shall immediately report the excessive force to a superior officer.

## Requirement to Report Potential Excessive Force

An officer who is present and observes another officer using force that the present and observing officer believes to be beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances based upon the totality of information actually known to the officer, shall immediately report such force to a superior officer.

Ex. 112 005

**Exhibit 7-5**

Use of Force Directive No. 3.1
40mm Less-Lethal Launcher
Page 6

**Medical Treatment**

Any person struck with a 40mm eXact iMpact round shall be transported to a Department-approved facility for medical treatment prior to booking.  The person should be carefully monitored for signs of distress.  If a medical emergency situation exists, officers shall render medical aid as required and request a rescue ambulance to respond to their location.

**Reporting**

All discharges of a projectile weapon (e.g., 40mm LLL), excluding tactical discharges, are reportable uses of force and shall be reported in accordance with Department policy whether or not the projectiles/munitions or device make contact with the suspect or subject, including their clothing.

**Points to Remember**

- 5 feet is the minimum deployment range
- Deployment range is from 5 to 75 feet
- Assessment between rounds is critical
- **Do not target the head, neck, spine, groin, or kidneys, unless lethal force is authorized**
- Have a backup plan in the event the 40mm round is ineffective
- 40mm LLL should not be deployed unless lethal force is available for cover
- All discharges of the 40mm LLL, excluding tactical discharges, are a reportable UOF

Ex. 112 006

**Exhibit 7-6**

Use of Force Directive No. 3.1
40mm Less-Lethal Launcher
Page 7

---

**Important Reminder**

Deviation from these basic concepts sometimes occurs due to the fluid and rapidly evolving nature of law enforcement encounters and the environment in which they occur.  Deviations may range from minor, typically procedural or technical, to substantial deviations from Department tactical training.  Any deviations are to be explained by the involved officer(s), and justification for substantial deviation from Department tactical training shall be articulated and must meet the objectively reasonable standard of the Department's Use of Force Policy.

---

**AMENDMENTS**

This Use of Force Directive replaces Use of Force Directive No. 3, 40mm Less-Lethal Launcher, September 2023.

JIM McDONNELL
Chief of Police

DISTRIBUTION "A"

Attachment

Ex. 112 007

**Exhibit 7-7**

HANDLING AND STORAGE OF THE 40mm LESS-LETHAL LAUNCHER

All Department personnel are reminded of the proper care, handling, and storage of the 40mm Less-Lethal Launcher.  In order to maintain the 40mm Less-Lethal Launcher's proper function and accuracy, officers shall treat the equipment with care and refrain from dropping the 40mm Less-Lethal Launcher on the ground.

**Pre-Inspection**

As part of officers' start of watch inspection and prior to going into the field, officers shall ensure that the following 40mm Less-Lethal Launcher procedures are conducted:

- Physically inspect all components of the 40mm Less-Lethal Launcher to ensure they are in good working order;
- Ensure the sight optic is functional and secured to the launcher;
- Ensure the elevation and windage adjustments of the sight optic are aligned with the markings and have not been manipulated or moved; and,
- Ensure the sling is attached securely.

**Securing During Transportation**

Department personnel shall secure the unloaded 40mm Less-Lethal Launcher in their vehicle's 40mm Less-Lethal Launcher mount.  If the Department vehicle is not equipped with a 40mm Less-Lethal Launcher mount, Department personnel shall keep the 40mm Less-Lethal Launcher in the Department-issued case and place it in a secured position inside the trunk of the vehicle.  Care should be taken to ensure the weapon system does not shift during transportation.

**Damage**

Any movement or damage to the sight optic may cause it to no longer be zeroed.  If movement or damage to the sight optic does occur or any components of the 40mm Less-Lethal Launcher malfunction, officers shall immediately return it to their Area/division kit room and notify the Area/division Training Coordinator of the damage. The damaged 40mm Less-Lethal Launcher shall be removed from the inventory immediately and deemed non-operable and non-deployable.  The concerned Area/division Training Coordinator shall, without delay, notify the Department Armorer of the damage.  The Area/division shall also be responsible for transporting the damaged 40mm Less-Lethal Launcher to the Department Armorer for immediate repair.

Lastly, if the 40mm Less-Lethal Launcher is **deployed and fired,** the concerned Area/division Training Coordinator shall, as soon as possible, cause it to be transported to the Department Armorer where it shall be cleaned and inspected prior to redeployment.

Should you have any questions, please contact Firearms Training Section, Training Division, at (818) 832-3740 or (323) 612-4404.

Exhibit 113

Date of Hearing:  July 13, 2021
Counsel:            Matthew Fleming

ASSEMBLY COMMITTEE ON PUBLIC SAFETY
Reginald Byron Jones-Sawyer, Sr., Chair

SB 98 (McGuire) – As Amended June 17, 2021

**SUMMARY:** Allows duly authorized members of the press to enter areas that have been closed
by law enforcement due to a demonstration, march, protest, or rally and prohibits officers from
citing members of the press for failure to disperse, a violation of a curfew, or a violation of
resisting, delaying, or obstructing, as specified.  Specifically, **this bill:**

1) Allows a duly authorized representative of any news service, online news service,
   newspaper, or radio or television station or network to enter areas that are closed as
   command post, police line, or rolling closure at a demonstration, march, protest, or rally
   where individuals are engaged in activity that is protected pursuant to the First Amendment
   to the United States Constitution or Article I of the California Constitution.

2) States that a peace officer or other law enforcement officer shall not intentionally assault,
   interfere with, or obstruct the duly authorized representative of any news service, online
   news service, newspaper, or radio or television station or network who is gathering,
   receiving, or processing information for communication to the public.

3) Prohibits an officer from citing a duly-authorized representative of any news service, online
   news service, newspaper, or radio or television station or network that is authorized or
   permitted to be in a closed area for the failure to disperse, a curfew violation, or a violation of
   resisting, delaying, or obstructing, as specified.

4) Provides that if the duly authorized representative is detained by a peace officer or other law
   enforcement officer, that representative shall be permitted to contact a supervisory officer
   immediately for the purpose of challenging the detention, unless circumstances make it
   impossible to do so.

5) Specifies that these provisions do not prevent a law enforcement officer from enforcing other
   applicable laws if the person is engaged in activity that is unlawful.

**EXISTING LAW**:

1) Provides that every person who participates in any rout or unlawful assembly is guilty of a
   misdemeanor.  (Pen. Code, § 408.)

2) Makes it a misdemeanor for any person to remain present at the place of any riot, rout, or
   unlawful assembly, after being lawfully warned to disperse.  (Pen. Code, § 409.)

3) Authorizes specified law enforcement officers to close the area where a menace to the public
   health or safety is created by a calamity including a flood, storm, fire, earthquake, explosion,

accident, or other disaster.  (Pen. Code, § 409.5, subd. (a).)

4) Authorizes specified law enforcement officers to close the immediate area surrounding any emergency field command post or any other command post activated for the purpose of abating any calamity or any riot or other civil disturbance to any and all unauthorized persons whether or not the field command post or other command post is located near to the actual calamity or riot or other civil disturbance.  (Pen. Code, § 409.5, subd. (b).)

5) Makes it a misdemeanor for any person to willfully and knowingly enter an area closed as the result of such a disaster and willfully remain within the area after receiving notice to evacuate.  (Pen. Code, § 409.5, subd. (c).)

6) Allows a duly authorized representative of any news service, newspaper, or radio or television station or network to enter areas closed as the result of a disaster.  (Pen. Code, § 409.5, subd. (d).)

7) Authorizes specified law enforcement officers to close the area where a menace to the public health or safety is created by an avalanche.  (Pen. Code, § 409.6, subd. (a).)

8) Authorizes specified law enforcement officers to close the immediate area surrounding any emergency field command post or any other command post activated for the purpose of abating hazardous conditions created by an avalanche.  (Pen. Code, § 409.6, subd. (b).)

9) Makes it a misdemeanor for any person to willfully and knowingly enter an area closed due to an avalanche and willfully remain within the area after receiving notice to evacuate; and further authorizes the use of reasonable force to remove any unauthorized person from such an area.  (Pen. Code, § 409.5, subd. (c).)

10) Allows a duly authorized representative of any news service, newspaper, or radio or television station or network to enter areas closed as the result of an avalanche.  (Pen. Code, § 409.5, subd. (d).)

11) Makes it a misdemeanor for a person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician, as defined, in the discharge or attempt to discharge any duty of their office or employment.  (Pen. Code, § 148, subd. (a).)

12) Provides that the fact that a person takes a photograph or makes an audio or video recording of a public officer or peace officer, while the officer is in a public place or the person is in a place he or she has the right to be, does not constitute, in and of itself, a violation of resisting, delaying, or obstructing, nor does it constitute reasonable suspicion to detain the person or probable cause to arrest the person.  (Pen. Code, § 148, subd. (g).)

13) Requires the Commission on Peace Officer Standards and Training (POST) to implement a course or courses of instruction for the training of law enforcement officers in the handling of acts of civil disobedience and adopt guidelines that may be followed by police agencies in responding to acts of civil disobedience.  (Pen. Code, § 13514.5, subd. (a).)

14) Requires the POST training course to include adequate consideration of all of the following subjects:

a) Reasonable use of force;

b) Dispute resolution;

c) Nature and extent of civil disobedience, whether it be passive or active resistance;

d) Media relations;

e) Public and officer safety;

f) Documentation, report writing, and evidence collection; and,

g) Crowd control. (Pen. Code, § 13514.5, subd. (b).)

15) Provides that any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape or to overcome resistance. (Pen. Code, § 835a.)

16) Specifies that a peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance. (Pen. Code, § 835a.)

**FISCAL EFFECT**: Unknown.

**COMMENTS**:

1) **Author's Statement**: According to the author, "When natural disasters such as earthquakes or wildfires occur, state law authorizes peace officers to close certain areas to the public during emergencies, but authorized members of the press are granted unique exemptions from these restrictions, as press provide information to the public on what is going on. Members of the press often need to put themselves in harm's way in order to evaluate the scene of an emergency and report.

"Currently, members of the press are not allowed to interfere with, hinder, or obstruct emergency operations. Restrictions on media access may be imposed for only so long and only to such extent as is necessary to prevent actual interference. While California law protects members of the press from being stopped when entering closed areas during emergencies and natural disasters to gather information, these protections don't extend to protest events such as demonstrations, marches, protests, or rallies where individuals largely engage their First Amendment right to speech.

"In California and across the country police have arrested, detained, and have physically assaulted journalists with rubber bullets, pepper spray, tear gas, batons, and fists. In many cases there are strong indications that the officers injuring journalists knew their targets were members of the press. Members of the press risk their personal safety and wellbeing each time they attend protest events to get the public the information they need, but rubber bullets,

teargas, and even arrest cannot be the norm for an essential pillar of our democracy. We must take steps to ensure that the right of the press and the First Amendment are protected here in the Golden State.

"SB 98 will ensure that journalists' ability to perform their critical role of documenting history and informing the public is protected as they attend demonstrations, marches, protests, and rallies. SB 98 will prohibit law enforcement officers from obstructing, detaining, assaulting or otherwise preventing the press from fulfilling their constitutional mandate in relaying information regarding these events."

2) **Law Enforcement and Crowd Control**:  The basic course of training for law enforcement officers includes training in handling disputes and crowd control (POST website, https://post.ca.gov/regular-basic-course-training-specifications, [as of June 28, 2021].)  The training topic is broken down into crowd management, crowd control, and riot control.  In addition, under Penal Code Section 13514.5, POST is required to provide a supplemental course of training for officers in civil disobedience situations.  This training includes instruction on the use of force as well as media relations in organized protest situations.

The POST training on crowd control situations, and other available law enforcement training materials on the same subject, were recently analyzed by an advisory group to the Governor. (Glaser, Review of Research on Policing Demonstrations, July 28, 2020, pp. 3 – 8, available at: https://www.gov.ca.gov/wp-content/uploads/2020/10/Policing-and-Protests-Recommendations.pdf, [as of July 1, 2021].)  The advisory group concluded that the materials acknowledge many of the challenges of policing protests, introduce the idea that crowds are heterogeneous and not inherently prone to violence, and provide clear operational guidance.  (*Id.* at 8.)  The advisory group criticized the training materials for failing to reflect systematic research on crowd behavior in general and policing protests in particular.  (*Ibid.*)

The rules for when and what type of force law enforcement can use in crowd control situations is defined by case law and local policy.  In general, when courts are evaluating whether or not a specific use of force was lawful or not, they will attempt to balance the "nature and quality of the intrusion on the individual" against the "countervailing governmental interests at stake" and make a determination about whether the use of force was reasonable under the circumstances.  (*Graham v. Connor* (1989) 490 U.S. 386, 396.)  The decision about whether or not the use of force is "reasonable," and therefore lawful, must take into account "the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving."  (*Id.* at 396-97.)

For example, in *Deorle v. Rutherford* (9th Cir. 2000) 272 F.3d 1272, 1286, the court found that an officer shooting a beanbag round into the face of a mentally disturbed person without warning was unreasonable.  The officer arrived on the scene and was able to observe the individual form a distance prior to firing the less-lethal beanbag round, which weighed against the notion that the officer had to make a split second decision to use less-lethal force. (*Ibid.*)  By contrast, in *Forrester v. City of San Diego* (9th Cir. 1994) 25 F.3d 804, the court held the use of "pain compliance" techniques to be reasonable to disperse a group of protestors.  Prior to applying the pain compliance techniques, the officers warned the demonstrators that they would be subject to pain compliance measures if they did not move,

that such measures would hurt, and that they could reduce the pain by standing up, eliminating the tension on their wrists and arms. (*Id*. at 806.)

3) **Police Confrontations with the Media**: The genesis of this bill is the use of force when it is applied to journalists who are attempting to provide news coverage of protests, marches, demonstrations, etc. Numerous Black Lives Matter Protests have occurred following the killing of George Floyd, and other African Americans by police officers. The United States Press Freedom tracker indicates that from May 2020 to May 2021, there were over 600 aggressive acts by officers against journalists. (U.S. Press Freedom Tracker website, available at: https://pressfreedomtracker.us/, [as of June 28, 2021].) The website contains links to various incidents in the state of California, including one protest in Los Angeles where police allegedly used force against at least four journalists in separate instances. (*Multiple journalists covering protests in Los Angeles assaulted*, U.S. Press Freedom Tracker, available at: https://pressfreedomtracker.us/all-incidents/multiple-journalists-covering-protests-los-angeles-assaulted/, [as of June 28, 2021].)

This bill would add several protections for journalists into state law. First, it would clarify that "duly authorized members of the press" have access to areas that have been closed by the police due to a protest, march or other type of demonstration. It further instructs that journalists are not to be assaulted, interfered with, or obstructed during their coverage of such demonstrations. In addition, this bill would provide journalists with immunity from specified violations such as remaining after an order to disperse, curfew violations, and resisting arrest offenses.

4) **SB 629 of the 2019 – 2020 Legislative Session and the Governor's Veto Message**: SB 629 (McGuire) of the 2019 – 2020 Legislative Session was substantially similar to this bill. It had a somewhat broader definition of who constituted media for purposes of the bill, in that it defined a "duly authorized representative of a news service" to include anyone who appears to be gathering news and who produces a press credential as well as anyone carrying professional broadcasting or recording equipment. This gave rise to criticism that the bill was drafted too broadly, in that a person with an iPhone and an internet blog could possibly qualify as a duly authorized representative. This bill has removed that language and made some other minor changes.

In his veto message, Governor Newsom stated the following in regards to SB 629:

> "This bill would allow authorized representatives of any news service, online news service, newspaper, or radio or television station or network to enter areas that have been closed by law enforcement due to a demonstration, march, protest or rally, including the immediate area surrounding any emergency field command post or any other command post. This bill would, additionally, prohibit a peace officer from intentionally assaulting, interfering with or obstructing these duly authorized representatives who are gathering, receiving or processing information for communication to the public.

> "Media access to public gatherings - especially protests - is essential for a functioning democracy, and law enforcement should not be able to interfere with those efforts. But I am concerned that this legislation too broadly defines a 'duly

authorized representative of a news service, online news service, newspaper, or
radio or television station or network.' As written, this bill would allow any
person who appears to be engaged in gathering, receiving or processing
information, who produces a business card, press badge, other similar credential,
or who is carrying professional broadcasting or recording equipment, to have
access to a restricted law enforcement area. This could include those individuals
who may pose a security risk - such as white nationalists, extreme anarchists or
other fringe groups with an online presence.

"Law enforcement agencies should be required to ensure journalists and legal
observers have the ability to exercise their right to record and observe police
activities during protests and demonstrations. But doing so shouldn't inadvertently
provide unfettered access to a law enforcement command center. In fact, the
police reform advisors that I appointed in the wake of the nationwide protests this
summer to advise me on what more California can do to protect and facilitate the
right to engage in peaceful protests and demonstrations made concrete
recommendations on protecting journalists and legal observers exercising their
right to record and observe police activities during protests and demonstrations. I
plan to implement these recommendations at the state level and am encouraging
every California law enforcement agency to do the same. I also plan to work with
the Legislature on providing access to journalists in a way that addresses the
security concerns and accomplishes the intent of this bill."

This bill is the second iteration of SB 629. This time around, the language expanding who
would qualify as "a duly authorized representative of any news service, online news service,
newspaper, or radio or television station or network" has been removed. This bill, unlike SB
629, is analogous to existing law in terms of who would qualify as media for purposes of its
access and protection provisions. (*See e.g.* Pen. Code, § 409.5, subd. (d).) In that sense, this
bill appears to respond to the Governor's veto message by using a definition that is narrower
than the one advanced in SB 629.

This bill does not appear to address the other concerns stated by the Governor in his veto
message. Specifically, there have been no changes to address the worry about the extent of
access to sensitive law enforcement areas, and there does not appear to be any significant
overlap between this bill and the Governor's Policing and Protests Recommendations. (*See*
Glaser, *supra*.) In regards to access, the author submits that case law adequately addresses
ant potential problems that may arise. (*See e.g. Leiserson v. City of San Diego* (1986) 184
Cal.App.3d 41, 51 (holding that existing law with language that is substantially similar to this
bill means that "press representatives must be given unrestricted access to disaster sites
*unless* police personnel at the scene reasonably determine that such unrestricted access will
interfere with emergency operations." (*emphasis* added).) The author's staff has also stated
that they are continuing to work with the Governor's office to address any lingering concerns
about the bill.

5) **Argument in Support**: According to the *California News Publisher's Association,
California Black Media, ImpreMedia, Ethnic Media Services, the California Broadcasters
Association, ACLU California Action, and the First Amendment Coalition*: "In order to
protect members of the media who are often responsible for the first draft of history, SB 98
would: ensure an authorized member of the media may enter areas closed off by first

responders during a demonstration, march, protest or rally; prohibit an officer from assaulting a journalist or obstructing their ability to gather or process news; and create an accelerated process for a journalist to challenge being detained by an officer.

"Recent actions taken against journalists by law enforcement officers demonstrate that additional statutory protections are necessary to allow reporters and photographers to gather and process information and report on the significant events that are transforming and reshaping our world.

"In California and across the country police have arrested, detained, and have physically assaulted journalists with rubber bullets, pepper spray, tear gas, batons, and fists. In many cases there are strong indications that the officers injuring journalists knew their targets were members of the press.

…

"The right of the press to document police activity is foundational to our democracy and has long been recognized and protected by the courts. News reporting on police conduct serves the crucial First Amendment interest in promoting the "free discussion of governmental affairs." Mills v. Alabama, 384 U.S. 214, 218 (1966). Further, the ability journalists to cover people exercising their First Amendment to petition the government and assemble is crucial to continuing a dialog on the difficult issues our society faces.

"In a turbulent and troubled time and with an abundance of misinformation flooding information channels, journalists need to be able to gather and report facts without having to fear that they will be shot at or arrested by law enforcement officers simply because they are trying to provide context and help us all understand the significance of these events.

"Police attacks on journalists are what we expect from third world countries. SB 98 would make clear that it is the policy of this state that assaults and obstructions designed to prevent the constitutionally protected free flow of information to Californians will not be tolerated."

6) **Argument in Opposition**: According to the *California Statewide Law Enforcement Association*: "While we certainly understand the need to protect the media during protests, SB 98 has unintended consequences that could put officers and the public in danger. By granting the media access to emergency command posts, they will have access to field tactics our command post officers are communicating to the officers on the ground. Should that information be leaked to the public, it could prevent our officers from diverting crowds to safe locations or even worse, provide suspects with pertinent information to aid in the commission of a crime. We appreciate the recent amendments that require permission from the commanding officer; however, we remain opposed until it is further clarified that a peace officer is allowed to remove the reporter for willful interference with a response."

7) **Related Legislation**: AB 48 (Gonzalez) would prohibit the use of kinetic energy projectiles or chemical agents, as defined, by any law enforcement agency to disperse any assembly, protest, or demonstration, except in compliance with specified standards. AB 48 is pending in the Senate Public Safety Committee.

Ex. 113007

8) **Prior Legislation**:

    a) AB 629 (McGuire),  of the 2019 – 2020 Legislative  Session, was similar  to this bill.  SB
       629 was vetoed by Governor Newsom.

    b) AB 392 (Weber),  Chapter 170, Statutes  of 2019, revised  the standards  for use of deadly
       force by peace officers.

    c) AB 230 (Caballero),  Chapter 285, Statutes  of 2019, required  law enforcement  agencies to
       maintain  a policy that provides  guidelines  on the use of force, utilizing  de-escalation
       techniques  and other alternatives  to use of force, specific  guidelines  for the application  of
       deadly  force, and factors for evaluating  and reviewing  all use of force incidents.

    d) SB 411 (Lara), Chapter 177, Statutes  of 2015, provided  that taking a photograph  or
       recording  a law enforcement  officer  while  the officer  is performing  any official  duty in a
       public  place or in a place where  the person has a right  to be does not constitute  the
       offense  resisting,  obstructing,  or interfering.

    e) SB 1844 (Thompson),  Chapter 207, Statutes  of 1998, required  the Commission on Peace
       Officer  Standards and Training  (POST) to implement  a course for training peace officers
       to deal with civil  disobedience,  including  reasonable  use of force, active and passive
       resistance,  media relations,  officer  safety, evidence  collection  and crowd control.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

ACLU of California
Asian American  Journalists  Association,  Los Angeles
Asian American  Journalists  Association,  Sf Bay Area
California  Black Media
California  Broadcasters  Association
California  Federation of Teachers Afl-cio
California  News Publishers  Association
California  Public  Defenders  Association
California  Public  Defenders  Association  (CPDA)
Californians  Aware: the Center for Public  Forum Rights
Ccnma: Latino Journalists  of California
Communications  Workers of America,  District  9
Ethnic  Media Services
First Amendment  Coalition
IBEW Local 45
Journalism  and Women Symposium,  Southern  California  (jaws Socal)
LA Opinion
Los Angeles  County
Los Angeles  Press Club
Media Alliance

Media Guild of The West, Newsguild-cwa Local 39213
National Association of Black Journalists of Los Angeles
National Association of Hispanic Journalists
National Press Photographers Association
National Writers Union
Oakland Privacy
Online News Association Local Los Angeles
Orange County Press Club
Pacific Media Workers Guild (the Newsguild-communications Workers of America Local 39521)
Radio Television Digital News Association
Society of Professional Journalists, Greater Los Angeles Chapter
Society of Professional Journalists, Northern California Chapter
We Make Kcrw
Writers Guild of America West
Writers Guild of America, East

**Oppose**

California Association of Highway Patrolmen
California Civil Liberties Advocacy
California Narcotic Officers' Association
California Police Chiefs Association
California State Sheriffs' Association
California Statewide Law Enforcement Association
Los Angeles County Sheriff's Department
Los Angeles County Sheriff's Dept.
Peace Officers Research Association of California (PORAC)
Riverside Sheriffs' Association
California Peace Officers Association

**Analysis Prepared by**: Matthew Fleming / PUB. S. / (916) 319-3744

Ex. 113009